*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OASIS PETROLEUM INC., *et al.*,[1] | ) | Case No. 20-[_____] (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

## DISCLOSURE STATEMENT FOR THE JOINT
## PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
## OASIS PETROLEUM INC. AND ITS DEBTOR AFFILIATES

**JACKSON WALKER L.L.P.**
Bruce J. Ruzinsky (TX Bar No. 17469425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Vienna F. Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221

Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com
Email: jwertz@jw.com
Email: vanaya@jw.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:        (713) 836-3600
Facsimile:        (713) 836-3601
Email:        brian.schartz@kirkland.com
-and-

Chad J. Husnick, P.C. (*pro hac vice* admission pending)
David L. Eaton (*pro hac vice* admission pending)
John Luze (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        chad.husnick@kirkland.com
                 david.eaton@kirkland.com
                 john.luze@kirkland.com
-and-

AnnElyse Scarlett Gains (*pro hac vice* admission pending)
1301 N. Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone:        (202) 389-5000
Facsimile:        (202) 389-5200
Email:        annelyse.gains@kirkland.com

Dated: September 29, 2020

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

---

[1]   Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/oasis.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  1001 Fannin Street, Suite 1500, Houston, Texas 77002.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.   THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

SOLICITATION OF VOTES ON THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF OASIS PETROLEUM INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | RBL CLAIMS |
| CLASS 4 | NOTES CLAIMS AND MIRADA CLAIMS |
| CLASS 8 | INTERESTS IN OASIS |

IF YOU ARE IN CLASS 3, CLASS 4 OR CLASS 8, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.

<u>DELIVERY OF BALLOTS</u>

CLASS 3, CLASS 4 OR CLASS 8 BALLOTS MAY BE RETURNED IN THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE WITH THE BALLOT OR TO AN ADDRESS BELOW, AND MUST BE RECEIVED BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON MONDAY, NOVEMBER 2, 2020.

<u>BY REGULAR MAIL AT:</u>

Oasis Ballot Processing
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245

<u>BY HAND DELIVERY OR OVERNIGHT MAIL AT:</u>

Oasis Ballot Processing
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245

<u>VIA E-BALLOT PORTAL</u>.  SUBMIT YOUR BALLOT FORM VIA THE SOLICITATION AGENT'S ONLINE PORTAL, BY VISITING HTTPS://WWW.KCCLLC.NET/OASIS (THE "E BALLOT PORTAL").  CLICK ON THE "SUBMIT E-BALLOT" SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR BALLOT.

PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT.

CLASS 3, CLASS 4 AND CLASS 8 BALLOTS, INCLUDING MASTER BALLOTS AND PRE-VALIDATED BENEFICIAL OWNER BALLOTS, MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON MONDAY, NOVEMBER 2, 2020, VIA THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE, OR AS OTHERWISE DIRECTED ON THE BALLOT:

*If you are a noteholder or interest holder and received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a master ballot before the Voting Deadline.*

BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED

---

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR
VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT AT:

BY E-MAIL TO:
OASISINFO@KCCLLC.COM

WITH A REFERENCE TO "OASIS PETROLEUM INC." IN THE SUBJECT LINE

BY TELEPHONE:
(866) 480-0830 (TOLL FREE) OR (781) 575-2040  (INTERNATIONAL)
AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM

---

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the Joint Chapter 11 Plan of Reorganization of Oasis Petroleum Inc. and Its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims for purposes of soliciting votes to accept or reject the Plan.

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors and certain Consenting Stakeholders that have executed the Restructuring Support Agreement, including holders of approximately 97% in principal of the RBL Claims and approximately 52% in principal of the Notes Claims.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims in Class 3, Class 4 and Class 8 to read this Disclosure Statement (including the Risk Factors described in Article VII hereof) and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR'S BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>NOVEMBER 2, 2020 AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.

---

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) and/or Regulation D of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain institutional holders of RBL Claims and Notes Claims of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code and the exemptions listed above to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of New Common Stock and New Warrants under the Plan, and the shares of New Common Stock issuable upon exercise of the New Warrants. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

v

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with the Debtors' advisors, has prepared the financial projections attached hereto as **Exhibit D** and described in this Disclosure Statement (the "**Financial Projections**"). The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to holders of Claims against, or Interests in, the Debtors or any other party in interest. Please refer to Article VIII of this Disclosure Statement, entitled "Risk Factors" for a discussion of certain risk factors that holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If

vi

any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

[*Remainder of page intentionally left blank.*]

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................................1

II. PRELIMINARY STATEMENT ............................................................................................1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN ..............................................................................................................................3

 A. What is chapter 11? ...................................................................................................3
 B. Why are the Debtors sending me this Disclosure Statement? .................................3
 C. Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement? ...............................................................................................4
 D. Am I entitled to vote on the Plan? ............................................................................4
 E. What will I receive from the Debtors if the Plan is consummated? ..........................4
 F. What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim? .........................................................................6
 G. Are any regulatory approvals required to consummate the Plan? ...........................7
 H. What happens to my recovery if the Plan is not confirmed or does not go effective? ...7
 I. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ................................................................................................8
 J. What are the sources of Cash and other consideration required to fund the Plan? ...8
 K. Are there risks to owning the New Common Stock or New Warrants upon emergence from chapter 11? .....................................................................................8
 L. Is there potential litigation related to the Plan? ......................................................8
 M. What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? ............................................................................................8
 N. Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan? ...............................9
 O. How will the preservation of the Causes of Action impact my recovery under the Plan? ...9
 P. Will there be releases and exculpation granted to parties in interest as part of the Plan? ...10
 Q. What is the deadline to vote on the Plan? ...............................................................14
 R. How do I vote for or against the Plan? ...................................................................14
 S. Why is the Bankruptcy Court holding a Confirmation Hearing? ...........................14
 T. What is the purpose of the Confirmation Hearing? ................................................14
 U. What is the effect of the Plan on the Debtors' ongoing businesses? .......................15
 V. Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ................................................................15
 W. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ............................................................................................15
 X. Do the Debtors recommend voting in favor of the Plan? .......................................16
 Y. Who Supports the Plan? ..........................................................................................16

IV. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ................16

 A. Restructuring Support Agreement ...........................................................................16
 B. The Plan ...................................................................................................................16

V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...........20

 A. Oasis' Corporate History .........................................................................................20
 B. The Debtor's Prepetition Capital Structure ............................................................21

| | | |
|---|---|---|
| VI. | **EVENTS LEADING TO THE CHAPTER 11 FILINGS**............................................**24** |
| | A. | Recent Market Volatility and March 2020 Oil Market Crash. ........................................24 |
| | B. | The Debtors' Response to Market Events and the Restructuring Support Agreement. ..................25 |
| | C. | The Mirada Settlement. .................................................................................................26 |

| | | |
|---|---|---|
| VII. | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES**........................................................................................................................**27** |
| | A. | First Day Relief....................................................................................................27 |
| | B. | Proposed Case Timeline .......................................................................................27 |

| | | |
|---|---|---|
| VIII. | **RISK FACTORS** ...............................................................................................**28** |
| | A. | Bankruptcy Law Considerations ..........................................................................28 |
| | B. | Risks Related to Recoveries under the Plan ........................................................34 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses....................37 |

| | | |
|---|---|---|
| IX. | **SOLICITATION, VOTING, AND NEW COMMON STOCK ELECTION PROCEDURES** ...........**44** |
| | A. | Holders of Claims Entitled to Vote on the Plan ...................................................44 |
| | B. | Voting Record Date .............................................................................................44 |
| | C. | Voting on the Plan................................................................................................44 |
| | D. | Ballots Not Counted.............................................................................................46 |

| | | |
|---|---|---|
| X. | **CONFIRMATION OF THE PLAN**................................................................................**47** |
| | A. | Requirements for Confirmation of the Plan ........................................................47 |
| | B. | Best Interests of Creditors/Liquidation Analysis ...............................................47 |
| | C. | Feasibility............................................................................................................47 |
| | D. | Acceptance by Impaired Classes..........................................................................48 |
| | E. | Confirmation Without Acceptance by All Impaired Classes ..............................48 |
| | F. | Valuation of the Debtors ......................................................................................49 |

| | | |
|---|---|---|
| XI. | **CERTAIN SECURITIES LAW MATTERS** ...................................................................**50** |
| | A. | Issuance of Securities under the Plan...................................................................50 |
| | B. | Subsequent Transfers ...........................................................................................50 |
| | C. | New Common Stock & Management Incentive Plan............................................52 |

| | | |
|---|---|---|
| XII. | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.............................**52** |
| | A. | Introduction..........................................................................................................52 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors..........................................................................................53 |
| | C. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests Entitled to Vote.....................................................................56 |
| | D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims or Interests Entitled to Vote. ....................................................62 |
| | E. | FATCA. ................................................................................................................65 |
| | F. | Information Reporting and Backup Withholding..................................................66 |

| | | |
|---|---|---|
| XIII. | **RECOMMENDATION** ..........................................................................................**67** |

**EXHIBITS**[3]

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Liquidation Analysis

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

---

[3]   Each Exhibit is incorporated herein by reference.

## I.   INTRODUCTION

Oasis Petroleum Inc. ("**Oasis**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**," and together with Oasis's direct and indirect non-Debtor subsidiaries and affiliates, the "**Company**"), submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the  Plan.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.

**THE DEBTORS AND CERTAIN CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 97% IN PRINCIPAL OF THE RBL CLAIMS AND APPROXIMATELY 52% IN PRINCIPAL OF THE NOTES CLAIMS, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.   PRELIMINARY STATEMENT

The Debtors are a Houston, Texas based company that operates in the upstream and midstream oil and gas sectors.  Oasis, together with its subsidiaries Oasis Petroleum North America LLC ("**OPNA**") and Oasis Petroleum Permian LLC ("**OP Permian**"), operate an independent exploration and production ("**E&P**") company focused on the acquisition and development of onshore, unconventional crude oil and natural gas resources in the United States.  Specifically, OPNA and OP Permian conduct the Company's E&P activities and own its crude oil and natural gas properties located in the North Dakota and Montana regions of the Williston Basin (as defined herein) and the Texas region of the Delaware Basin (as defined herein), respectively. Further, the Debtors operate a midstream business segment through Debtor Oasis Midstream Services LLC ("**OMS**") and non-debtor affiliate Oasis Midstream Partners LP ("**OMP**") (NASDAQ: OMP), which is a publicly traded master limited partnership that, together with its non-debtor subsidiaries, is engaged in gathering and gas processing.  As of the date of this Disclosure Statement, the Company employs approximately 445 people and produces approximately 80,066 barrels of oil equivalent per day in the Williston and Delaware Basins.

As of the date of this Disclosure Statement, among other obligations, the Debtors have approximately $2.3 billion in aggregate outstanding secured and unsecured debt obligations, including:  (a) approximately $361 million in outstanding borrowings under a reserve-based lending facility; (b) approximately $77 million in secured letters of credit issued but undrawn under the RBL Facility; (c) approximately $44 million in 6.50% senior unsecured notes due 2021; (d) approximately $834 million in 6.875% senior unsecured notes due 2022; (e) approximately $308 million in 6.875% senior unsecured notes due 2023; (f) approximately $245 million in 2.625% convertible notes due 2023; and (g) approximately $395 million in 6.250% senior unsecured notes due 2026.

As a crude oil and natural gas producer, the Company's revenue, profitability and future growth are substantially dependent upon the prevailing and future prices for crude oil and natural gas, which are

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

dependent upon numerous factors beyond its control such as economic, political and regulatory developments and competition from other energy sources.  Prices for crude oil, natural gas and natural gas liquids ("**NGLs**") experienced extreme volatility and an overall decline in year-to-date 2020, further exacerbating an already depressed commodity price environment.  These conditions negatively affected the Company's financial position, results of operations, cash flows, the quantities of crude oil and natural gas reserves capable of being economically produced and the Company's access to capital.

Despite the Debtors' efforts to mitigate the financial strain brought on by current adverse market conditions, the Debtors' liquidity position remained strained and was projected to be insufficient over the long-term to fund the capital-intensive nature of the their business and to service its highly leveraged capital structure.  Further, notwithstanding significant efforts, as further detailed herein, the Debtors have been unable to refinance their debt or attract sufficient new capital.  As a result, in late March 2020, the Company engaged financial and legal advisors to explore strategic alternatives to enhance the Debtors' liquidity, evaluate strategic merger and acquisition opportunities, and address their capital structure.

Over the next several months, the Debtors engaged discussions with its key secured and unsecured stakeholder groups regarding a long-term balance sheet solution, including the RBL Lenders and an ad hoc group of holders of the Notes (the "Ad Hoc Group").  These discussions were ultimately successful.  The Debtors, with broad support across their capital structure, ultimately determined that pursuing an in-court deleveraging transaction represents the value-maximizing path forward.  After extensive, arm's-length negotiations, the Consenting Stakeholders and the Debtors arrived at the transactions embodied in the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B**, the key terms of which include:

- certain of the Consenting RBL Lenders will provide a superpriority debtor-in-possession revolving debtor-in-possession financing facility in an aggregate amount of $450 million (the "**DIP Facility**"), including $150 million of new money loans and $300 million of "rolled up" prepetition RBL Claims;

- certain of the Consenting RBL Lenders will also provide a senior secured reserved-based lending exit facility in an aggregate amount up to $1.5 billion (the "**Exit Facility**") and an initial borrowing base totaling up to $575 million, the proceeds of which will be used to refinance amounts outstanding under the DIP Facility and any remaining prepetition RBL Claims outstanding on the Effective Date, and otherwise fund the Debtors' emergence from chapter 11;

- holders of Notes Claims will receive 100% of the new common equity in Reorganized Oasis, subject to dilution on account of the Management Incentive Plan and New Warrants (as defined below);

- certain long-running litigation claims asserted by Mirada will be settled on terms set forth in the Plan and a separate settlement agreement to be included in the Plan Supplement;

- payment in full in cash of all administrative and priority claims;

- payment in full or reinstatement of General Unsecured Claims; and

- holders of existing equity interests will receive certain 4-year warrants (the "**New Warrants**") convertible into up to 7.5% of the new common equity in Reorganized Oasis.

The Restructuring Support Agreement is a significant achievement for the Debtors. A right-sized capital structure will ultimately allow the Debtors to maximize value for the benefit of all stakeholders. In addition, the compromises and settlements embodied in the Restructuring Support Agreement, and to be implemented pursuant to the Plan, preserve value by enabling the Debtors to avoid protracted, value-destructive litigation over potential recoveries and other causes of action that could delay the Debtors' emergence from chapter 11. As of the date of this Disclosure Statement, holders of approximately 97% in principal of the RBL Claims and approximately 52% in principal of the Notes Claims have signed onto the Restructuring Support Agreement and support the transactions contemplated by the Restructuring Support Agreement and the Plan. The core terms of the Restructuring Support Agreement will be implemented through a chapter 11 plan of reorganization—namely, the Plan (described more fully in Article B of this Disclosure Statement, entitled "The Plan," which begins on page 16).

With a prepackaged Plan and key creditor support in place pursuant to the Restructuring Support Agreement, the Debtors expect to emerge positioned to capitalize on their asset base as the Company looks to reorient its go-forward growth and operating plans to be competitive. Given the Debtors' core strengths—including their experienced management team and employees and the strategic location of their projects—the Debtors are confident that they can implement the Restructuring Support Agreement's balance sheet restructuring to ensure the Debtors' long-term viability. For these reasons and the reasons described further in this Disclosure Statement, the Debtors strongly urge you to vote to accept the Plan.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.**      **Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases.  The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement together with Confirmation of the Plan at the same hearing, which may be scheduled as shortly as two weeks after commencing the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

**D.**      **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein).  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "**Class**."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | RBL Claims | Impaired | Entitled to Vote |
| Class 4 | Notes Claims and Mirada Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Intercompany Interests Other Than in Oasis | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 8 | Interests in Oasis | Impaired | Entitled to Vote |

**E.**      **What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE**

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**[2]

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor and in its sole discretion: (a) payment in full in Cash of its Allowed Other Secured Claim; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | $0 | 100% |
| 2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $0 | 100% |
| 3 | RBL Claims | Each holder of an Allowed RBL Claim (i) electing to participate in the Exit Facility by entry into the Exit Facility Commitment Letter will receive, (x) on a dollar-for-dollar basis in exchange for the portion of its RBL Claim representing the principal of the loans owed to such lender under the RBL Credit Agreement, an equal amount of the principal of the revolving loans under the Exit Facility as of the Effective Date, upon the terms and conditions set forth in the Exit Facility Term Sheet and (y) with respect to any other portion of such holder's RBL Claim (to the extent not already paid prior to the Effective Date, including as adequate protection pursuant to the DIP Orders), cash in an amount equal to such portion of such holder's RBL Claim, and (ii) not electing to participate in the Exit Facility by electing not to sign the Exit Facility Commitment Letter (x) shall be deemed to have funded a Second Out Term Loan on a dollar-for-dollar basis in exchange for the portion of its RBL Claim representing the principal of the loans owed to such lender, any unreimbursed claims for professional fees and expenses under the RBL Credit Agreement, and any of such holder's Specified Default Interest and (y) with respect to any other portion of such holder's RBL Claim (to the extent not already paid prior to the Effective Date, including as adequate protection pursuant to the DIP Orders), cash in an amount equal to such portion of such holder's RBL Claim. The Liens securing the loans under the RBL Credit Agreement shall be retained and deemed assigned to the administrative agent under the Exit Facility to secure the Exit Facility upon the Effective Date. Notwithstanding the foregoing, on the Effective Date, any Specified Default Interest shall be discharged, | $361 | 100% |

---

[2]   The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

5

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| | | released, and deemed waived by all holders of RBL Claims that execute the Restructuring Support Agreement. | | |
| 4 | Notes Claims and Mirada Claims | Each holder of an Allowed Notes Claim or an Allowed Mirada Claim shall receive its Pro Rata share (calculated based on the aggregate amount of all Allowed Notes Claims and Allowed Mirada Claims) of 100% of the New Common Stock, subject to dilution on account of the Management Incentive Plan and the New Warrants; provided, that notwithstanding that the Mirada Claims are classified as Class 4 Claims, such claims, in lieu of any treatment as Class 4 Claims, shall be treated in accordance with the Mirada Settlement Agreement. | $1,877[3] | 62%[4] |
| 5 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor: (a) payment in full in Cash; or (b) Reinstatement. | $5 - $10 | 100% |
| 6 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either: (a) Reinstated; or (b) canceled, released, and extinguished and without any distribution at the Debtors' election and in their sole discretion. | N/A | 0% / 100% |
| 7 | Intercompany Interests other than in Oasis | Each holder of an Interest other than in Debtors shall have such interests, at the option of the applicable Debtor, either: (a) Reinstated; or (b) canceled, released, and extinguished and without any distribution at the Debtors' election and in their sole discretion. | N/A | 0% / 100% |
| 8 | Interests in Oasis | Each holder of an Interest in Oasis shall receive its Pro Rata share of the New Warrants. | N/A | 0% |

## F.   What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

### 1.   Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123

---

[3]   Estimate includes Notes Claims only.

[4]   Projected recovery is subject to dilution on account of the Management Incentive Plan and New Warrants.

of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 2.      DIP Claims

DIP Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein.  Except to the extent that a holder of a DIP Claim agrees to a less favorable treatment, each DIP Claim, as well as any other fees, interest, or other obligations owing to third parties under the DIP Credit Agreement, shall be (a) in the case of DIP Claims other than the principal amount of the loans under the DIP Credit Agreement, paid in full, in Cash, by the Debtors on the Effective Date in accordance with the terms of the DIP Credit Agreement, and (b) in the case of DIP Claims that represent the principal amount of the loans under the DIP Credit Agreement, shall be converted to an identical principal amount of Exit Facility Revolving Loans, and contemporaneously with the foregoing payment and conversion, the DIP Facility shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders, pursuant to the terms of the DIP Credit Agreement.

### 3.      Priority Tax Claims.

Priority Tax Claims will be satisfied as set forth in Article II.D of the Plan, as summarized herein. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### G.      Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### H.      What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of

7

the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 47, and the Liquidation Analysis attached hereto as **Exhibit C**.

**I.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "**Effective Date**"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 47, for a discussion of the conditions precedent to consummation of the Plan.

**J.     What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) Cash on hand, including Cash from operations and the DIP Facility, as applicable; (2) the New Common Stock in Reorganized Oasis; (3) the proceeds from the Exit Facility; and (4) the New Warrants.

**K.     Are there risks to owning the New Common Stock or New Warrants upon emergence from chapter 11?**

Yes.  *See* Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 28.

**L.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  *See* Article VIII.C.10 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 42.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 48.

**M.     What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On the Effective Date, the Reorganized Debtors will implement the Management Incentive Plan (as described more fully in Article IV.7 on page 20 of this Disclosure Statement).  The New Common Stock being provided in connection with the Management Incentive Plan will dilute all of the New Common Stock equally.

8

As is typical for many of the Debtors' peer companies, to be a competitive employer and to maximize the value of the Debtors' estates, the Debtors have requested access to a pool of New Common Stock that the New Board can use to attract, incentivize, and retain talented key employees (including officers) after the Effective Date.  After the Effective Date, the New Board will implement the allocation, timing, and structure of the issuance of the New Common Stock pursuant to the Management Incentive Plan Term Sheet.

N.    **Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?**

The mid-point of the Debtors' estimate of aggregate Allowed General Unsecured Claims is approximately $5 million - $10 million.[5]  Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor: (a) payment in full in Cash; or (b) Reinstatement.  Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material. Moreover, the Debtors in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages Claims not accounted for in this estimate.  Further, the Debtors may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to holders of Claims in Class 5, and such changes could be material.

O.    **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII**

---

[5]    The projected aggregate amount of General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on, among other things, potential Executory Contract and Unexpired Lease rejections pursuant to section 365 of the Bankruptcy Code.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims.

**of the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

P.      **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Stakeholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (X) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN, (Y) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION**

10

**DEADLINE, OR (Z) TIMELY VOTE TO REJECT THE PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

    1.  **Release of Liens.**

**Except with respect to the Liens securing the RBL Credit Facility, which Liens shall be retained by the Exit Facility Agent to secure the Exit Facility, or as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.**

    2.  **Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against or Interest in a Debtor or other Entity, or that any holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts,**

11

any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan or the Restructuring Transactions or (b) any individual from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Releasing Parties, including, without limitation, the Releasing Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for a hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

3.      Releases by the Releasing Parties.

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or entity under the Plan, any

12

post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan or the Restructuring Transactions or (b) any individual from any claim or Cause of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual, (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for a hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

4.       Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Facility, the Exit Facility, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Exit Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above do not exculpate any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan.

5.       Injunction.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching,

13

**collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**Q.      What is the deadline to vote on the Plan?**

The Voting Deadline is Monday, November 2, 2020, at 4:00 p.m. (prevailing Central Time).

**R.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot, the master ballot containing your vote and returned by your nominee, or the "pre-validated" ballot provided by your nominee for direct return by you must be properly completed, executed, and delivered as directed, so that the ballot, master ballot or pre-validated ballot containing your vote is **actually received** by the Debtors' solicitation agent, Kurtzman Carson Consultants LLC (the "**Solicitation Agent**") **on or before the Voting Deadline,** *i.e.* **Monday, November 2, 2020, at 4:00 p.m., prevailing Central Time**. *See* Article IX of this Disclosure Statement, entitled, "Solicitation, Voting, and New Common Stock Election Procedures" which begins on page 44 for more information.

**S.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court shortly after the commencement of the Chapter 11 Cases. All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**T.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain

14

limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**U.        What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**V.        Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the then-sitting members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the New Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents. The initial New Board shall consist of those individuals that are selected in accordance with Article IV.L of the Plan.

Assuming that the Effective Date occurs, holders of Allowed Claims or Allowed Interests (as applicable) that receive distributions representing a substantial percentage of outstanding shares of the New Common Stock (including shares issued upon exercise of the New Warrants), may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**W.        Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

*By regular mail at:*

Oasis Ballot Processing
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245

*By hand delivery or overnight mail at:*

Oasis Ballot Processing
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245

*By electronic mail at:*
OasisInfo@kcccllc.com

*By telephone  at:*
(866) 480-0830  (toll free) or (781) 575-2040 (international) and request to speak with a member of the Solicitation Team

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at www.kccllc.net/Oasis (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

### X.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### Y.    Who Supports the Plan?

The Plan is supported by the Debtors and certain Consenting Stakeholders that have executed the Restructuring Support Agreement, which includes holders of approximately and 97% in principal of the RBL Claims and approximately 52% in principal of the Notes Claims.

## IV.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.    Restructuring Support Agreement

On September 29, 2020, the Debtors and the Consenting Stakeholders entered into the Restructuring Support Agreement.  Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the pre-arranged restructuring contemplated thereby, including the Plan.  The restructuring transactions contemplated by the Plan will significantly reduce the Debtors' funded-debt obligations and annual interest payments and result in a stronger balance sheet for the Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process.  The Restructuring Support Agreement will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence.  The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Debtors to conduct competitive operations going forward.

### B.    The Plan

The Plan contemplates the following key terms, among others described herein and therein:

#### 1.    General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification,

distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the RBL Claims and Notes Claims and (2) any claim to avoid, subordinate, or disallow any RBL Claims and Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### 2.      Restructuring Transactions

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions. The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

### 3.      Reorganized Debtors

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New

17

Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

### 4.     Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) Cash on hand, including Cash from operations and the DIP Facility, as applicable; (2) the New Common Stock; (3) the proceeds from the Exit Facility; and (4) the New Warrants.

### (a)     Exit Facilities

On and as of the Effective Date, (i) the Reorganized Debtors shall enter into the Exit Facility by executing and delivering the Exit Facility Documents, (ii) all RBL Lenders shall be deemed to be parties to, and bound by, the Exit Facility Credit Agreement, without the need for execution thereof by any such applicable RBL Lender, (iii) Reorganized Oasis shall be deemed to have borrowed the available Exit Facility Revolving Loans on the terms and conditions set forth in the Exit Facility Documents, which loans will be guaranteed by each of the other Reorganized Debtors in accordance with the Exit Facility Documents, (iv) Reorganized Oasis shall be deemed to have borrowed 100% of the Second Out Term Loans which loans will be guaranteed by each of the other Reorganized Debtors in accordance with the Exit Facility Documents, and (v) the Exit Facility Revolving Lenders shall provide commitments in accordance with the Exit Facility Commitment Letter.

To the extent applicable, Confirmation of the Plan shall be deemed (i) approval of the Exit Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (ii) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (A) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facility, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (B) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facility.

As of the Effective Date, the Liens securing the RBL Credit Facility shall be retained, deemed assigned to the Exit Facility Agent to secure the Exit Facility, and shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. To the extent provided in the Exit Facility Documents, the Exit Facility Agent or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other security interests retained and/or granted to secure the obligations arising under the Exit Facility Documents have been retained and/or granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that

18

would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### (b)      Issuance of New Common Stock

The issuance of the New Common Stock, including equity awards reserved for the Management Incentive Plan, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests.  The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The Debtors and the Reorganized Debtors shall use commercially reasonable efforts to cause the New Common Stock to become publicly traded and listed on a national securities exchange on or as soon as reasonably practicable after the Effective Date.

### (c)      Issuance of New Warrants

On the Effective Date, Reorganized Oasis will issue the New Warrants to provide for distributions to holders of Interests in Oasis as contemplated by this Plan.  All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Any New Common Stock issued upon the exercise of the New Warrants shall be subject to dilution on account of the Management Incentive Plan.

### 5.      Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Confirmation Order, the Plan, the Exit Facility Documents or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 6.      Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and all of the directors for the initial term of the New Board shall be appointed.  The New

19

Board will initially consist of seven (7) directors, including: (i) the Chief Executive Officer of Reorganized Oasis and (ii) six (6) additional directors selected by the Required Consenting Noteholders. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents. To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code. Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

### 7.    Management Incentive Plan

On the Effective Date, the Reorganized Debtors shall implement the Management Incentive Plan. The Management Incentive Plan shall provide for 5% of the New Common Stock reserved for the Management Incentive Plan to be allocated within thirty (30) days following the Effective Date in the form of restricted stock units (or equivalents) and on terms (including performance metrics and vesting criteria) otherwise to be agreed between management of Reorganized Oasis and the compensation committee of the New Board; *provided* that such period shall be extended automatically by an additional fifteen (15) days if good faith discussions between management of Reorganized Oasis and the New Board regarding the terms of the Management Incentive Plan remain ongoing at the conclusion of the initial thirty (30) day period. The remaining up to 5% of the New Common Stock reserved for the Management Incentive Plan will be available to be allocated after the Effective Date, in the form and on terms as determined by the New Board in consultation with management for the Reorganized Debtors. In connection with the structure, allocation and documentation of the Management Incentive Plan Pool, the compensation committee of the New Board and the participants in the Management Incentive Plan may discuss modifications as may be appropriate to certain employment agreements or letters, indemnification agreements, severance agreements or other agreements entered into with current and former employees and assumed pursuant to the Plan.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Oasis' Corporate History

Oasis Petroleum Inc. is a publicly traded Delaware corporation (NASDAQ: OAS). Oasis was founded in 2007 by Thomas Nusz and Taylor Reid, with the backing of EnCap Investments, and initially invested in developing oil and gas resources in the Williston Basin. In June 2010, Oasis completed its initial public offering on the New York Stock Exchange (the "**NYSE**").

In 2013, Oasis formed a wholly-owned midstream segment to provide marketing and transportation services to its E&P segments. In September 2017, OMP completed its initial public offering on the NYSE as well, with the Debtors retaining a majority interest. The Debtors' non-debtor, majority-owned affiliate, OMP, and Debtor-affiliate, OMS, operate this midstream business (the **"Midstream Business"**). OMP is a growth-oriented, fee-based master limited partnership that develops and operates a diversified portfolio of midstream assets.

In 2018, Oasis entered into a second basin, with the acquisition of approximately 22,000 net acres in the Delaware Basin. These assets are located in the western region of Texas. Since that time, the Debtors have strategically added to their Delaware Basin holdings such that as of the Petition Date the Debtors hold approximately 25,000 net acres in the region.

Today, Oasis and its Debtor-affiliates operate an independent E&P company with a focus on the acquisition and development of onshore, unconventional crude oil and natural gas resources in the United States. The Debtors' primary production and development activities remain located in the Williston Basin in North Dakota and Montana, with additional oil and gas properties located in the Delaware Basin in Texas.

20

The Debtors' E&P assets are predominately mature properties with stable, high-quality, oil-weighted production.

As of the Petition Date, the Debtors control one of the largest concentrated leasehold positions in the Bakken and Three Forks formations in the Williston Basin of northeastern Montana and northwestern North Dakota (the "**Williston Basin**"), with approximately 408,000 net acres.  The Williston Basin represents the Debtors' cornerstone asset, generating 91% of Oasis's total production.

Additionally, as of the Petition Date, the Debtors also control approximately 25,000 net acres in the Delaware Basin in West Texas (the "**Delaware Basin**").  This acreage covers some of the deepest, most oil-rich and over-pressurized reserves in the Delaware Basin.

As of December 31, 2019, the Debtors' estimated proved reserved, across both the Williston and Delaware basins, totaled approximately 286.4 million stock tank BOE.  In 2019, the Debtors' average daily production was 80,066 BOE per day.

Oasis's common stock trades on the The NASDAQ Stock Market LLC securities exchange ("**NASDAQ**") under the symbol "OAS."  A simplified version of the Debtors' current corporate structure is as follows:



\* Ownership 100% unless otherwise noted

### B.      The Debtor's Prepetition Capital Structure

As of the date of this Disclosure Statement, the Debtors have approximately $2.265 billion in aggregate outstanding principal amount of funded and unfunded debt obligations.

| *Funded and Unfunded Debt* | *Principal Amount (in USD millions)* |
|---|---|
| Oasis Credit Facility | $361 |
| Letters of Credit (under RBL Facility) | $77 |
| Senior Unsecured Notes | |
| 6.50% senior unsecured notes due November 1, 2021 | $44 |
| 6.875% senior unsecured notes due March 15, 2022 | $835 |
| 6.875% senior unsecured notes due January 16, 2023 | $308 |
| 6.25% senior unsecured notes due May 1, 2026 | $395 |
| 2.65% senior unsecured convertible notes due September 15, 2023 | $245 |
| *Total Funded and Unfunded Obligations* | $2,265 |

### 1.       Oasis Credit Facility

On October 16, 2018, Oasis, as a guarantor, entered into a Third Amended and Restated Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "**Oasis Credit Facility**") with OPNA, a wholly owned subsidiary of Oasis, as borrower, a syndicate of lenders and LC, Wells Fargo Bank, N.A., as administrative agent (the "**Administrative Agent**").  The Oasis Credit Facility is guaranteed by Oasis and certain of its subsidiaries (collectively, the "**First Lien Guarantors**")[6] and is secured on a first-priority basis by substantially all of the assets and stock of OPNA and the other First Lien Guarantors (other than stock of Oasis Petroleum Inc.), including mortgage liens on oil and gas properties having at least 90% (as of April 24, 2020) of reserve value as determined by reserve reports. The Oasis Credit Facility is restricted to a borrowing base, which is reserve-based and subject to semi-annual redeterminations on April 1 and October 1 of each year.

The maturity date of the Oasis Credit Facility is October 16, 2023 (the "**Scheduled Maturity Date**"), subject to a springing maturity on the earliest of (i) December 15, 2021 if the 2022 Senior Notes (as defined below) are not repurchased, redeemed or refinanced to have a maturity date at least ninety days after the Scheduled Maturity Date; (ii) October 17, 2022 if the 2023 Senior Notes (as defined below) are not repurchased, redeemed or refinanced to have a maturity date at least ninety days after the Scheduled Maturity Date and (iii) June 16, 2023 if the 2023 Convertible Notes (as defined below) are not repurchased, converted, redeemed or refinanced to have a maturity date at least ninety days after the Scheduled Maturity Date.  The Oasis Credit Facility accrues interest at a rate per annum equal to:  (a) the alternative base rate plus an applicable margin of 0.750% - 1.750% based on the total commitments utilization percentage; or (b) adjusted LIBOR plus an applicable margin of 2.250% - 3.250% based on the total commitments utilization percentage.

### 2.       Senior Unsecured Notes

As of the Petition Date, the Company had $1.83 billion principal amount of senior unsecured notes outstanding with maturities ranging from November 2021 to May 2026 and coupons ranging from 6.25% to 6.875%.  Prior to certain dates, the Company has the option to redeem some or all of the Senior Notes

---

[6]     As of the Petition Date, the First Lien Guarantors include Oasis Petroleum Inc., Oasis Petroleum LLC, Oasis Petroleum Marketing LLC, Oasis Well Services LLC, Oasis Midstream Services LLC, OMS Holdings LLC, Oasis Petroleum Permian LLC, and OMP GP LLC.

(as defined below) for cash at certain redemption prices equal to a certain percentage of their principal amount plus an applicable make-whole premium and accrued and unpaid interest to the redemption date.

*6.50% Senior Unsecured Notes due November 1, 2021.* On November 10, 2011, Oasis issued $400 million in aggregate principal of 6.50% senior unsecured notes due 2021 (the "**2021 Senior Notes**"), pursuant to an indenture by and among Oasis and the other guarantors party thereto, and U.S. Bank National Association as trustee (as amended, restated, supplemented or otherwise modified from time to time, the "**November 2011 Senior Notes Indenture**").  The obligations under the 2021 Senior Notes are guaranteed by Oasis Petroleum LLC, OPNA, Oasis Petroleum Marketing, LLC, Oasis Well Services LLC, Oasis Midstream Services LLC, OMS Holdings LLC, Oasis Petroleum Permian LLC and OMP GP LLC (collectively, the "**Senior Notes Guarantors**"), but are unsecured.  Interest on the 2021 Senior Notes is payable semi-annually in arrears on each of May 1 and November 1.  The 2021 Senior Notes are scheduled to mature on November 1, 2021.  As of the Petition Date, there is approximately $44 million in principal amount outstanding under the 2021 Senior Notes.

*6.875% Senior Unsecured Notes due March 15, 2022.* On September 25, 2013, Oasis issued $1 billion in aggregate principal of 6.875% senior unsecured notes due 2022 (the "**2022 Senior Notes**"), pursuant to an indenture by and among Oasis and the guarantors party thereto, and U.S. Bank National Association as trustee (as amended, restated, supplemented or otherwise modified from time to time, the "**February 2011 Senior Notes Indenture**").  The obligations under the 2022 Senior Notes are guaranteed by the Senior Notes Guarantors, but are unsecured.  Interest on the 2022 Senior Notes is payable semi-annually in arrears on each of March 15 and September 15.  The 2022 Senior Notes are scheduled to mature on March 15, 2022.  As of the Petition Date, there is approximately $835 million in principal amount outstanding under the 2022 Senior Notes.

*6.875% Senior Unsecured Notes due January 15, 2023.* On July 2, 2012, Oasis issued $400 million in aggregate principal of 6.875% senior unsecured notes due 2023 (the "**2023 Senior Notes**"), pursuant to the November 2011 Senior Notes Indenture.  The obligations under the 2023 Senior Notes are guaranteed by the Senior Notes Guarantors, but are unsecured.  Interest on the 2023 Senior Notes is payable semi-annually in arrears on each of January 15 and July 15. The 2023 Senior Notes are scheduled to mature on January 15, 2023.  As of the Petition Date, there is approximately $308 million in principal amount outstanding under the 2023 Senior Notes.

*6.25% Senior Unsecured Notes due May 1, 2026.* On May 14, 2018, Oasis issued $400 million in aggregate principal of 6.25% senior unsecured notes due 2026 (the "**2026 Senior Notes**"), pursuant to an indenture by and among Oasis and the other guarantors party thereto, and U.S. Bank National Association as trustee (as amended, restated, supplemented or otherwise modified from time to time, the "**2018 Senior Notes Indenture**", and together with the February 2011 Senior Notes Indenture and the November 2011 Senior Notes Indenture, the "**Senior Notes Indentures**").  The obligations under the 2026 Senior Notes are guaranteed by the Senior Notes Guarantors, but are unsecured.  Interest on the 2026 Senior Notes is payable semi-annually in arrears on each of May 1 and November 1. The 2026 Senior Notes are scheduled to mature on May 1, 2026.  As of the Petition Date, there is approximately $395 million in principal amount outstanding under the 2026 Senior Notes.

*2.625% Unsecured Convertible Notes due March 15, 2023.* On September 19, 20126, Oasis issued $275 in aggregate principal of 2.65% senior unsecured convertible notes due 2023 (the "**2023 Senior Convertible Notes**" and together with the 2021 Senior Notes, the 2022 Senior Notes, the 2023 Senior Notes and the 2026 Senior Notes, the "**Senior Notes**"), pursuant to the November 2011 Senior Notes Indenture. The obligations under the Senior Notes are guaranteed by the Senior Notes Guarantors, but are unsecured. The Debtors have the option to settle conversions with cash, shares of common stock or a combination of cash and common stock at their election.  Prior to March 15, 2023, the 2023 Senior Convertible Notes will

23

be convertible only under certain limited conditions. On or after March 15, 2023, the Senior Convertible Notes will be convertible at any time until the second scheduled trading day immediately preceding the September 15, 2023 maturity date. The Senior Convertible Notes will be convertible at an initial conversion rate of 76.3650 shares of OAS common stock per $1,000 principal amount of the notes, which is equivalent to an initial conversion price of approximately $13.10. Interest on the 2023 Senior Convertible Notes is payable semi-annually in arrears on each of March 15 and September 15. The 2023 Senior Convertible Notes are scheduled to mature on March 15, 2023. As of the Petition Date, there is approximately $245 million in principal amount outstanding under the 2023 Senior Convertible Notes.

### 3. Equity

Oasis's certificate of incorporation authorizes one class of common stock (Class A common stock) and one class of preferred stock. As of July 31, 2020, Oasis has 320,975,203 shares of Class A common stock outstanding. The Debtors have not declared nor paid any cash dividends to Class A common stock holders since its inception. In addition, the Oasis Credit Facility and the Senior Notes indentures subjected the Debtors' ability to pay cash dividends on the Class A common stock to compliance with financial tests and/or basket amounts as set forth under these agreements. As described above, Oasis's common stock initially traded on the NYSE and as of the Petition Date, traded under the symbol "OAS" on the NASDAQ. As of the date of this Disclosure Statement, Oasis has no shares of preferred stock outstanding.

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.   Recent Market Volatility and March 2020 Oil Market Crash.

The difficulties initially faced in 2020 by the Debtors are consistent with those faced industry-wide. Volatile market conditions have challenged oil and gas companies and others for years. From January 1, 2014 until April 20, 2020, WTI crude oil prices ranged from a high of $107.26 per barrel to a low of -$37.63 per barrel; during that same period Henry Hub natural gas prices ranged from a high of $6.15 per mmbtu to a low of $1.55 per mmbtu. As of the Petition Date, and due in part to the combined impact of the COVID-19 pandemic and the oil price war between the Kingdom of Saudi Arabia and Russia, WTI was priced at $40.37 per barrel and natural gas was priced at $2.76 per mmbtu.

In early 2020, the initial spread of COVID-19 caused decreased factory output and transportation demand, resulting in a decline in energy prices. To address this, OPEC, led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia. However, those initial efforts faltered, and the parties failed to reach an agreement as to production levels. Instead, both the Kingdom of Saudi Arabia and Russia announced that they would increase, rather than decrease, production, resulting in surplus supply amidst already decreasing demand for energy. Meanwhile, the COVID-19 pandemic continued and continues to spread, causing governments across the world to institute strict public health and safety measures, including stay-at-home orders that have further decreased energy demand. On April 12, 2020, in an effort to relieve some of the negative impacts on the industry, 23 countries agreed to commit to withholding 9.7 million barrels of oil per day from the global markets. However, that agreement was not enough to counteract the combined effects of the initial price war and the decreased demand due to COVID-19.

The corresponding effects on energy markets have been severe. In March 2020, oil prices plummeted to near $20 per barrel, which was the lowest in nearly twenty years until April 20, 2020, when the WTI crude oil price for May contracts settled at a negative price for the first time in history.

24



*WTI Crude May 2020 Contracts*

The effect of recent events on companies in the oil and gas industry (not just E&P companies) has been undeniable.  However, independent oil and gas companies such as Oasis have been especially hard-hit, as their revenues are primarily generated from the sale of oil, natural gas, and NGLs.  Making matters worse, the drastic decrease in demand and corresponding over-supply of oil, natural gas and NGLs has led to an unprecedented storage shortage.  Oil and gas companies are left with no option but to consider well shut-ins and other production measures to address the impending storage issue.

The current volatility in commodity markets has made it especially difficult for some companies to execute on out-of-court restructuring alternatives.  In the first eight months of 2020, 36 E&P companies have filed for chapter 11.

### B.      The Debtors' Response to Market Events and the Restructuring Support Agreement.

The recent market downturn forced the Debtors to reevaluate their current and future liquidity needs and sustainability of their capital structure.  At the same time the broader market was experiencing significant unrest, the Debtors' RBL Facility was due for a semi-annual borrowing base redetermination. As discussed above, the Debtors' borrowing base under the RBL Facility was ultimately redetermined down from $1.3 billion to $600 million.  Given the borrowing base redetermination and market volatility, the Debtors' had uncertainty regarding their ability to maintain compliance with their financial covenants, manage liquidity through subsequent borrowing base redeterminations and address their capital structure to enable them to meet their long term operating goals. Additionally, the Debtors' RBL Facility credit agreement included a springing maturity which would have accelerated the RBL Facility maturity to December 2021 and resulted in this maturity being three months prior to the Debtors' $835 million Unsecured Note maturity in March 2022.  Accordingly, the Debtors determined to take decisive action to address their capital structure, the ultimate product of which was the Restructuring Support Agreement.

In late March and April, 2020, the Debtors engaged Perella Weinberg Partners and Tudor, Pickering, Holt & Co. to act as investment banker, Kirkland & Ellis LLP to act as legal advisor, and AlixPartners to act as restructuring advisor.  Over the next several months, the Debtors and their board of directors (the "**Board**") analyzed a range of strategic alternatives, initially focusing on transactions that would allow the Debtors to address their capital structure, maturity profile and liquidity needs.  The Debtors, with the assistance of their board, ran a process seeking third party financing proposals that would allow the Debtors to address their capital structure, ultimately receiving five financing proposals.

In parallel with exploring third-party financing alternatives, the Debtors engaged with their RBL Lenders and the Ad Hoc Group regarding potential in and out-of-court restructuring alternatives.  The Debtors and the Board pursued and analyzed financial alternatives and stakeholder discussions over the

25

following months.  During this time period, the Board held approximately thirty (30) meetings to consider alternatives and receive updates and review materials prepared by the Debtors' management team and advisors. In June 2020, the members of the Ad Hoc Group executed non-disclosure agreements to engage in confidential discussions around both in and out-of-court alternatives.  Through discussions with the RBL Lenders and the Ad Hoc Group, the Debtors and the Board ultimately determined that an in-court recapitalization process represented the value-maximizing path forward.

Through these negotiations, the Debtors, the RBL Lenders, and the members of the Ad Hoc Group ultimately arrived at the terms of a prepackaged restructuring, the terms of which are embodied in the Restructuring Support Agreement.  On September 15, 2020, the Debtors elected to enter the grace period with respect to an approximately $32 million interest payment due on account of the Unsecured Notes to allow for time to finalize negotiations with respect to the Support Agreement and preserve liquidity necessary to fund the Debtors' exit from these chapter 11 cases.  On September 29, 2020, the Board authorized entry into the Restructuring Support Agreement and the Debtors executed the Restructuring Support Agreement and commenced solicitation of the Plan shortly thereafter.

The Restructuring Support Agreement provides for the reorganization of the Debtors as a going concern with a deleveraged capital structure and sufficient liquidity to fund the Debtors' post-emergence business plan.  In addition to the RBL Lenders' commitments funding the DIP Facility and the Exit Facility, under the Restructuring Support Agreement, the Ad Hoc Group has agreed to support a full equitization of the Unsecured Notes, thereby deleveraging the Debtors' capital structure by more than $1.8 billion.  The Restructuring Support Agreement further contemplates that all general unsecured claims (including employee and vendor obligations) will be unimpaired and that holders of existing common equity in Oasis will receive the New Warrants.

The Restructuring Support Agreement represents the successful culmination of months of restructuring efforts and a significant compromise and continued commitment to the Debtors' future by the RBL Lenders and the Ad Hoc Group.  The Restructuring Support Agreement also gives the Debtors the best opportunity to recover from historically challenging operating conditions and kick-start their go-forward operations.  The Debtors believe that confirmation of the Plan, consistent with the term set forth in the Restructuring Support Agreement and described in this declaration, will ultimately maximize value for all stakeholders in these chapter 11 cases.

### C.     The Mirada Settlement.

In addition to the transactions contemplated by the Restructuring Support Agreement, contemporaneous with the Restructuring Support Agreement the Debtors executed a settlement agreement related to certain long-running litigation with Mirada, which is one of the Debtors non-operating counterparties under a prepetition joint operating agreement.  Details of the litigation and proposed settlement are provided below.  The Debtors intend to seek approval of the settlement pursuant to the Plan and file the settlement agreement with the Court as part of the plan supplement by the applicable deadline.

On March 23, 2017, Mirada Energy, LLC, Mirada Wild Basin Holding Company, LLC and Mirada Energy Fund I, LLC (collectively, "Mirada") filed a lawsuit against Oasis and certain of its subsidiaries, seeking monetary damages in excess of $100 million, declaratory relief, attorneys' fees, and costs Specifically, Mirada asserts that the Debtor defendants breached certain joint operating agreements by: (a) failing to allow Mirada to participate in the Debtors' midstream operations in the Wild Basin; (b) refusing to provide Mirada with information that Mirada contends is required under certain agreements and failing to provide information in a timely fashion; (c) failing to consult with Mirada and failing to obtain Mirada's consent prior to drilling more than one well at a time in the Wild Basin; and (d) overstating the estimated costs of proposed well operations in the Wild Basin. In the lawsuit, Mirada seeks a range of declaratory

26

relief, including that the Company be removed as operator in the Wild Basin at Mirada's election and that Mirada be allowed to elect a new operator and that Mirada has a right to participate in the Wild Basin midstream operations, consisting of produced water disposal, crude oil gathering and natural gas gathering and processing.

Subsequently, Mirada filed amended petitions that added new claims, theories, and defendants. For example, Mirada added a claim that the Debtor defendants breached certain agreements by charging Mirada for midstream services provided by its affiliates. Additionally, Mirada added certain non-Debtor defendants, each of which is a subsidiary of OMP, including Bighorn DevCo LLC, Bobcat DevCo LLC, and Beartooth DevCo LLC, asserting that these entities were created in bad faith in an effort to avoid contractual obligations owed to Mirada.

The Debtor and non-Debtor defendants have asserted counterclaims for a judgment declaring that (a) they have no obligation to purchase, manage, gather, transport, compress, process, market, sell or otherwise handle Mirada's proportionate share of oil and gas and (b) a provision in one agreement does not incorporate by reference any provisions in another participation agreement and joint operating agreement. The defendants also seek its attorney's fees, costs and expenses.

The Debtors believe that Mirada's claims are without merit, but in an effort to resolve the potential liability in connection therewith and increase the certainty and consensus in these chapter 11 cases, the Debtors pursued good faith settlement discussions with Mirada. The Debtors were ultimately able to reach a settlement agreement, the key terms of which include the Debtors' agreement to pay certain Mirada related parties $42.75 million (with $20 million due on the effective date of the Plan, and the balance due on or before 180 days thereafter) and broad, mutual releases. The Mirada settlement resolves a complex contested issue in these chapter 11 cases and facilitates a more efficient emergence from these chapter 11 cases. The Debtors will provide additional support for the Mirada settlement in connection with confirmation of the Plan.

## VII.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.  First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors intend to file several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at www.kccllc.net/Oasis.

### B.  Proposed Case Timeline

As part of the Debtors' Restructuring Support Agreement, the Debtors agreed to the following case milestones to ensure that the Debtors' chapter 11 cases proceed in a structured and expeditious manner towards confirmation:

- The Company Parties shall have disseminated the Solicitation Materials and thereby commenced solicitation of votes to accept or reject the Plan by no later than September 30, 2020;

- The Petition Date shall occur by September 30, 2020;

27

- Not later than three (3) Business Days after the Petition Date, the Debtors shall have obtained entry by the Court of the Interim DIP Order;

- Not later than thirty (30) calendar days after the Petition Date, the Debtors shall have filed with the Court (i) the Plan, and (ii) the Disclosure Statement;

- Not later than thirty (30) calendar days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court a motion to establish a bar date for filing proofs of claim; provided that the foregoing Milestone shall not apply in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of the Plan prior to the Petition Date;

- Not later than thirty (30) calendar days after the Petition Date, the Debtors shall have obtained entry by the Court of the Final DIP Order; provided that the foregoing Milestone shall automatically be extended to forty-five (45) calendar days after the Petition Date in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of the Plan prior to the Petition Date; provided further, that in no event shall the foregoing Milestone be later than immediately preceding the hearing on confirmation of the Plan;

- Not later than sixty-five (65) calendar days after the Petition Date, the Debtors shall have obtained entry by the Court of the Disclosure Statement Order;

- Not later than one hundred ten (110) calendar days after the Petition Date, the Debtors shall have obtained entry by the Court of the Confirmation Order; and

- Not later than December 20, 2020, the Plan Effective Date shall have occurred.

Consistent with this timeline, the Debtors intend to seek a confirmation hearing before the Bankruptcy Court within approximately forty-five (45) days of the Petition Date and emerge from chapter 11 shortly thereafter.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.[7]

### A.   Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily

---

[7]   For more information regarding risk factors, please reference Oasis' Form 10-K for the year ended December 31, 2019 and Form 10-Q for the quarter ended June 30, 2020, each filed with the Securities and Exchange Commission.

affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1. There Is a Risk of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains provisions that give the Consenting Stakeholders the ability to terminate the Restructuring Support Agreement upon the occurrence of certain events or if certain conditions are not satisfied, including the failure to achieve certain milestones. To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 4. The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate.

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation

29

of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 5. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 6. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance acceptable to the Required Consenting Stakeholders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 7. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class

(as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 8.    Continued Risk Upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, changes in interest rates, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 37. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 9.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting

31

from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 10. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### 13. The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding

**Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Plan by the Bankruptcy Court could last approximately forty-five (45) days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities;

- key customers may choose to switch to a competitor; and

- suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

### 14.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not take place.

### 15.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

33

B.       **Risks Related to Recoveries under the Plan**

1.       **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.       **A Liquid Trading Market for the Shares of New Common Stock or New Warrants May Not Develop**

Although the Debtors and the Reorganized Debtors may apply to relist the New Common Stock on a national securities exchange, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Common Stock will develop. The liquidity of any market for shares of New Common Stock or the New Warrants will depend upon, among other things, the number of holders of shares of New Common Stock, Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Common Stock or New Warrants will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Stock or New Warrants may be substantially limited.

3.       **The Trading Price for the Shares of New Common Stock or the New Warrants May Be Depressed Following the Effective Date**

Assuming that the Effective Date occurs, shares of New Common Stock and New Warrants will be issued to holders of certain Classes of Claims or Interests. Following the Effective Date of the Plan, shares of New Common Stock and New Warrants may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements. In addition, holders of Claims or Interests that receive shares of New Common Stock or New Warrants may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock or New Warrants available for trading could cause the trading price for the shares of New Common Stock or the New Warrants to be depressed, particularly in the absence of an established trading market for the New Common Stock or the New Warrants.

4.       **If the New Warrants Are Exercised, the Underlying Shares of New Common Stock Will Be Eligible for Future Resale in the Public Market, Which Could Lead to "Market Overhang," Resulting in Dilution and Potentially Depressing the Trading Price of the New Common Stock**

If the New Warrants are exercised, a substantial number of additional shares of New Common Stock could be eligible for resale in the public market, which could depress the trading price of the New

Common Stock. The Reorganized Debtors also may grant options and equity awards pursuant to the Management Incentive Plan and may grant additional options, warrants, or other convertible securities in the future. The exercise or conversion of the New Warrants or other options or convertible securities will dilute the percentage ownership of other holders of the New Common Stock. If holders of the New Common Stock sell substantial amounts of New Common Stock, shares issued upon the exercise of the New Warrants, or other outstanding options or convertible securities in the public market, it could create a circumstance commonly referred to as an "overhang" and, in anticipation of which, the trading price of the New Common Stock could fall. An overhang may adversely affect the Reorganized Debtors' ability to obtain financing on reasonable and acceptable terms whether or not sales have occurred or are occurring.

### 5. Certain Holders of New Common Stock or New Warrants May Be Restricted in Their Ability to Transfer or Sell Their Securities

To the extent that shares of the New Common Stock or New Warrants issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, such rights or shares of such New Common Stock or New Warrants will not be freely tradeable if, at the time of transfer, the holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by holders of Claims who receive New Common Stock or New Warrants pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock and the New Warrants will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Common Stock or New Warrants to freely resell the New Common Stock (including, as applicable, shares issuable upon exercise of the New Warrants) or the New Warrants. *See* Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 50.

### 6. Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information

regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.

Holders of New Common Stock or New Warrants who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XI to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 50.

7.      **Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date**

Assuming that the Effective Date occurs, holders of Claims who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock (including, as applicable, shares issued upon exercise of the New Warrants) may be in a position to influence matters requiring approval by the holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The holders may have interests that differ from those of the other holders of shares of New Common Stock and may vote in a manner adverse to the interests of other holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock or the New Warrants. In addition, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock or the New Warrants. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

8.      **Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" which begins on page 52, to determine how certain tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and certain Holders of Claims or Interests, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

9.      **The Debtors May Not Be Able to Accurately Report Their Financial Results**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control

36

deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 10.    Potential Dilution by Other Issuances of Securities

The ownership percentage represented by New Common Stock will be subject to dilution from any other shares that may be issued post-emergence, including by the New Common Stock issued from the Management Incentive Plan Pool and the conversion or exercise of any other options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock. The amount of dilutive effect of any of the foregoing could be material.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.    The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facilities upon emergence. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.

37

Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the chapter 11 proceedings last longer than anticipated, the Debtors will require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

**5.      The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue**

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and gas properties,  borrowings under its reserved-based lending facility, issuances of debt securities, including the Notes, and issuances of equity securities.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have limited access to additional financing.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; (e) the availability of incremental draws under the DIP Facility; and (f) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  In addition, the Debtors' ability to consummate the Plan is dependent on their ability to satisfy the conditions precedent to the Exit Facility lenders' funding under the Exit Facility. The Debtors can provide no assurance that such conditions will be satisfied.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

**6.      Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil, natural gas, and NGL prices. Oil, natural gas, and NGLs are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand. Oil, natural gas, and NGL prices historically have been volatile and are likely to continue to be volatile in the future. The prices for oil, natural gas, and NGLs are subject to a variety of factors beyond the Debtors' control, such as:

- the current uncertainty in the global economy;

- changes in global supply and demand for oil, natural gas, and NGLs;

39

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil, natural gas, and NGLs;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil, natural gas, and NGLs inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Oil, natural gas, and NGL prices affect the amount of cash flow available to the Debtors to meet their financial commitments and fund capital expenditures. Oil and natural gas prices also affect the Debtors' ability to borrow money and raise additional capital. For example, the amount the Debtors will be able to borrow under the Exit Facility will be subject to periodic redeterminations based, in part, on then-current oil, natural gas, and NGL prices and on changing expectations of future prices. Lower oil, natural gas, and NGL prices may not only decrease the Debtors' revenues on a per-unit basis, but also may reduce the amount of oil, natural gas, and NGLs that the Debtors can produce economically in the future. Higher operating costs associated with any of the Debtors' oil or natural gas fields will make their profitability more sensitive to oil, natural gas, or NGL price declines. A sustained decline in oil, natural gas, or NGL prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures. In addition, a sustained decline in oil, natural gas, or NGL prices might result in substantial downward estimates of the Debtors' proved reserves. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

7.      **Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition and Results of Operations**

The Debtors' future success will depend on, among other things, the success of their exploitation, exploration, development, and production activities. The Debtors' oil and natural gas exploration and production activities are subject to numerous risks beyond their control, including the risk that drilling will not result in commercially viable oil or natural gas production. The Debtors' decisions to purchase, explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analysis, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. The Debtors' costs of drilling, completing, and operating wells are often uncertain before drilling commences. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical. Further, the Debtors' future business,

40

financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures, and discharges of toxic gases;

- adverse weather conditions;

- reductions in oil, natural gas, and NGL prices;

- natural gas and oil property title problems; and

- market limitations for oil, natural gas, and NGLs.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

### 8.    The Debtors' Operations Depend, in Part, on the Pricing and Availability of Midstream Services

"Midstream" services include oil and natural gas gathering—*i.e.*, intricate pipelines that transport and combine extracted hydrocarbons from the various upstream wellheads to larger transportation pipelines—and transportation services. The Debtors frequently enter into long-term agreements with midstream providers for these services. Such midstream services agreements frequently include protections in favor of the midstream service provider—including acreage dedication and minimum volume throughput provisions—that have the effect of locking the Debtors into certain long-term pricing for midstream services and, in the case of minimum throughput obligations, potentially paying for services the Debtors

41

cannot use. Failure to maintain favorable economic terms with their midstream counterparties could have a material, adverse effect on the Debtors' businesses. Moreover, any attempt to reject certain of the Debtors' midstream services agreements in the Chapter 11 Cases could lead to costly, protracted litigation with the midstream services provider.

### 9. Commodity Prices and Hedging May Present Additional Risks

The Debtors may not be able to enter into new commodity derivatives covering additional estimated future production on favorable terms or at all. If the Debtors cannot or choose not to enter into commodity derivatives in the future, the Debtors could be more affected by changes in commodity prices than their competitors that engage in hedging arrangements. The Debtors' inability to hedge the risk of low commodity prices in the future, on favorable terms or at all, could have a material adverse impact on their businesses, financial condition, and results of operations.

If the Debtors are able to enter into any commodity derivatives, such derivatives may limit the benefit the Debtors would receive from increases in commodity prices. These arrangements would also expose the Debtors to the risk of financial losses in some circumstances, including the following: (a) the Debtors' production could be materially less than expected; or (b) the counterparties to the contracts could fail to perform their contractual obligations.

If the Debtors' actual production and sales for any period are less than the production covered by any commodity derivatives (including reduced production due to operational delays) or if the Debtors are unable to perform their exploration and development activities as planned, the Debtors might be required to satisfy a portion of their obligations under those commodity derivatives without the benefit of the cash flow from the sale of that production, which may materially impact the Debtors' liquidity. Additionally, if market prices for production exceed collar ceilings or swap prices, the Debtors would be required to make monthly cash payments, which could materially adversely affect their liquidity.

### 10. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 11. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

42

**12.      Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**13.      The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' oil and natural gas operations are subject to various federal, state and local governmental regulations, including environmental laws and regulations that impose penalties and other sanctions for noncompliance and that require measures to remediate or mitigate pollution and environmental impacts from current and former operations. Significant expenditures may be required to comply with these laws and regulations. The Debtors could be liable for costs of investigation, removal and remediation, damages to and loss of use of natural resources, loss of profits or impairment of earning capacity, property damages, costs of increased public services, as well as administrative, civil and criminal fines and penalties, and injunctive relief. Certain environmental statutes impose strict, joint and several liability for costs required to investigate, clean up and restore sites where hazardous substances or other waste products have been disposed of or otherwise released (i.e., liability may be imposed regardless of whether the current owner or operator was responsible for the release or contamination or whether the operations were in compliance with all applicable laws at the time the release or contamination occurred). In general,  oil and natural gas operations (including hydraulic fracturing operations) recently have been the subject of increased legislative and regulatory attention with respect to public health and environmental matters (including climate change), which could result in increased costs for environmental compliance, such as emissions control, permitting, or waste handling, storage, transport, remediation or disposal for the oil and natural gas industry and could have a significant impact on the Debtors' operating costs.

**14.      The Debtors' Operations are Subject to Hazards Inherent in the Energy Services Industry.**

Risks inherent in the oil and natural gas industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment.  These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses, regulatory enforcement actions, and remedial obligations that could have an adverse effect on the Debtors' business and results of operations.  The existence, frequency, and severity of such incidents will affect operating costs, insurability and relationships with customers, employees, and regulators.  In particular, the Debtors' customers may elect not to purchase the Debtors' services if they view the Debtors' safety record as unacceptable, which could cause the Debtors' to lose customers and substantial revenue.

**IX.     SOLICITATION, VOTING, AND NEW COMMON STOCK ELECTION PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

**A.      Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Class 3, Class 4 and Class 8 (collectively, the "**Voting Classes**").  The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims or Interests in Classes 1, 2, 5, 6, and 7.

**B.      Voting Record Date**

**The Voting Record Date is September 15, 2020** (the "**Voting Record Date**").  The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

**C.      Voting on the Plan**

**The Voting Deadline is Monday, November 2, 2020 at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted.

**1.      Holders of Claims in Classes 3, 4 (other than Notes Claims) and 8**

If you are a holder of a claim in Class 3, Class 4 (other than Notes Claims, the procedures for which are described below) or Class 8, you must submit your ballot form through the E-Ballot Portal or complete, sign, and date your ballot and return it (with an original signature) *promptly* in the enclosed reply envelope or to one of the following addresses:

| **If sent by first-class mail** | **If sent by hand delivery or overnight mail:** |
| --- | --- |
| **Oasis Ballot Processing**<br>**c/o Kurtzman Carson Consultants LLC**<br>**222 N. Pacific Coast Highway, Suite 300**<br>**El Segundo, California 90245** | **Oasis Ballot Processing**<br>**c/o Kurtzman Carson Consultants LLC**<br>**222 N. Pacific Coast Highway, Suite 300**<br>**El Segundo, California 90245** |

### 2. Holders of Claims in Class 4 that are Notes Claims and Class 8 Interests held through a Nominee

Holders of Notes Claims or Interests held in "street name" through a nominee may vote on the Plan by one of the following two methods (as selected by such holder's nominee):

- Complete and sign the enclosed beneficial holder ballot. Return the beneficial holder ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process your instructions and return a completed master ballot to the Solicitation Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Solicitation Agent for instructions; or

- Complete and sign the pre-validated beneficial holder ballot (as described below) provided to you by your nominee. Return the pre-validated beneficial holder ballot to the Solicitation Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any beneficial holder ballot returned to a nominee will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Solicitation Agent that beneficial holder ballot (properly validated) or a master ballot casting the vote of such holder.

If any holder holds Notes Claims or Interests through more than one nominee, such holder may receive multiple mailings containing beneficial holder ballots. The holder should execute a separate beneficial holder ballot for each block of Notes Claims or Interests that it holds through any particular nominee and return each beneficial holder ballot to the respective nominee in the return envelope provided therewith. Holders who execute multiple beneficial holder ballots with respect to Notes Claims or Interests held through more than one nominee must indicate on each beneficial holder ballot the names of all such other nominees and the additional amounts of such Notes Claims so held and voted.

A nominee that, on the Voting Record Date, is the record holder of the Notes Claims or Interests for one or more holders can obtain the votes of the holders of such Notes Claims or Interests, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

### (a) Pre-Validated Ballots

The nominee may "pre-validate" a beneficial holder ballot by: (i) signing the beneficial holder ballot and indicating on the beneficial holder ballot the name of the nominee and DTC Participant Number; (ii) indicating on the beneficial holder ballot the amount and the account number of the Senior Notes Claims or Interests held by the nominee for the holder; and (iii) forwarding such beneficial holder ballot—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Solicitation Agent, and other materials requested to be forwarded—to the holder for voting. The

45

holder must then complete the remaining portions of the beneficial holder ballot and return the beneficial holder ballot directly to the Solicitation Agent in the pre-addressed, postage-paid return envelope so that it is <u>actually received</u> by the Solicitation Agent on or before the Voting Deadline.  A list of the holders to whom "pre-validated" beneficial holder ballots were delivered should be maintained by nominees for inspection for at least one year from the Voting Deadline.

<b>(b)        Master Ballots</b>

If the nominee elects not to pre-validate beneficial holder ballots, the nominee may obtain the votes of holders by forwarding to the holders the unsigned beneficial holder ballots—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded.  Each such holder must then indicate its vote on the beneficial holder ballot, complete the information requested on the beneficial holder ballot, review the certifications contained on the beneficial holder ballot, execute the beneficial holder ballot, and return the beneficial holder ballot to the nominee.  After collecting the beneficial holder ballots, the nominee should, in turn, complete a master ballot compiling the votes and other information from the beneficial holder ballots, execute the master ballot, and deliver the master ballot to the Solicitation Agent so that it is <u>actually received</u> by the Solicitation Agent on or before the Voting Deadline.  All beneficial holder ballots returned by holders should either be forwarded to the Solicitation Agent (along with the master ballot) or retained by nominees for inspection for at least one year from the Voting Deadline.  EACH NOMINEE SHOULD ADVISE ITS ELIGIBLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE SOLICITATION AGENT SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE.

> **If you have any questions about the solicitation or voting process, please contact the solicitation agent at (866) 480-0830 (toll free) or (781) 575-2040 (international) or via electronic mail to <u>OasisInfo@kccllc.com</u>.**

**D.        Ballots Not Counted**

<u>**No ballot will be counted toward Confirmation if, among other things**</u>:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the DIP Agent, the RBL Agent, the Indenture Trustee, the Exit Facility Agent, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE IX OF THE DISCLOSURE STATEMENT WILL <u>NOT</u> BE COUNTED.**

## X.   CONFIRMATION OF THE PLAN

### A.   Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.   Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of AlixPartners, Perella Weinberg Partners, and Tudor Pickering Holt & Co. have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as **Exhibit D**.  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," which begins on page 28, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[8]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### E. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and

---

[8]  A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.      Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of Perella Weinberg Partners, and Tudor Pickering Holt & Co. produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

49

## XI.   CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Common Stock and the options or other equity awards (and any New Common Stock underlying such awards) to be issued pursuant to the Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "**Blue Sky Law**").  The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Stock and New Warrants by Reorganized Oasis pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.  The New Common Stock underlying the Management Incentive Plan will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

### A.   Issuance of Securities under the Plan

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution by Reorganized Oasis of the New Common Stock, the New Warrants, and the shares of New Common Stock issuable upon exercise of the New Warrants (collectively, the "**1145 Securities**").

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the issuance of the 1145 Securities, and all shares of New Common Stock and the New Warrants that constitute 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.  Recipients of the New Common Stock and New Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

### B.   Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock or New Warrants who are deemed to be "underwriters" may be entitled to resell their New Common Stock or New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock or New Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and the New Warrants and, in turn, whether any Person may freely resell New Common Stock or New Warrants.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

### C.      New Common Stock & Management Incentive Plan.

The Confirmation Order shall authorize the board of the Reorganized Oasis to adopt and enter into the Management Incentive Plan, which shall reserve exclusively for management employees up to 10% of the New Common stock on a fully diluted, fully distributed basis (the "**Management Incentive Plan Pool**") which will be reserved and issued as set forth in the Plan.  Grants of such New Common Stock from the Management Incentive Plan Pool will dilute all of the New Common Stock outstanding at the time of such issuance.  The New Common Stock is also subject to dilution in connection with the conversion of any other options, warrants, convertible securities or other securities that may be issued post-emergence. The New Common Stock from the Management Incentive Plan Pool will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

## XII.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  Introduction.

The following discussion summarizes certain United States ("**U.S.**") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and holders of Claims or Interests entitled to vote on the Plan (i.e., holders of Allowed RBL Claims, Allowed Notes Claims, Allowed Mirada Claims, and Allowed Interests in Oasis).  It does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the U.S. Department of Treasury regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the U.S. Internal Revenue Service (the "**IRS**"), all as in effect on the date hereof (collectively, "**Applicable Tax Law**").  Changes in Applicable Tax Law or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS or any other taxing authority would not assert, or that a court would not sustain, a position different from any position discussed herein.

This discussion does not address non-U.S., U.S. state or local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtors and the Reorganized Debtors). In addition, this discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules, such as: (1) persons who are related to the Debtors or Reorganized Debtors within the meaning of section 267 of the Tax Code; (2) persons liable for alternative minimum tax, the so-called "Medicare tax," or the base erosion and anti-abuse tax; (3) persons subject to special tax accounting rules as a result of preparing an "applicable financial statement" (as defined in section 451 of the Tax Code); (4) persons whose functional currency is not the U.S. dollar; (5) U.S. expatriates; (6) broker-dealers; (7) banks; (8) mutual funds; (9) insurance companies; (10) financial institutions; (11) small business investment companies; (12) regulated investment companies; (13) tax-exempt organizations; (14) controlled foreign corporations; (15) passive foreign investment companies; (16) partnerships (or other entities or arrangements treated as partnerships or other pass-through entities for U.S. federal income tax purposes); (17) subchapter S corporations; (18) persons who hold Claims or Interests, or who will hold New Common Stock, New Warrants, or Exit Facility Loans, as part of a straddle, hedge, conversion transaction, or other integrated investment; (19) persons using a mark-to-market method of accounting; and (20) persons who are themselves in bankruptcy.  Furthermore, this discussion assumes (1) that a holder of Claims or Interests holds only Claims or Interests in a single Class and (2) that a holder of a Claim or Interest holds its Claim or Interest, and will hold any New Common Stock, New Warrant, or Exit Facility Loan, as a "capital asset"

52

within the meaning of section 1221 of the Tax Code (generally, property held for investment). This discussion also assumes that the various debt and other arrangements to which any of the Debtors or Reorganized Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and that the RBL Claims, Notes Claims, Mirada Claims, and Exit Facility Loans constitute or will constitute interests in the Debtors or Reorganized Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This discussion does not discuss differences in tax consequences to a holder of a Claim or Interest that acts as a backstop party or otherwise acts or receives consideration in a capacity other than as a holder of a Claim or Interest, and the tax consequences for such a holder may differ materially from those described herein.

For purposes of this discussion, a "**U.S. Holder**" is a holder of a Claim, an Interest, New Common Stock, a New Warrant, or an Exit Facility Loan that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary supervision over the trust's administration and one or more United States persons (as defined in section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "**non-U.S. Holder**" is a holder of a Claim, an Interest, New Common Stock, a New Warrant, or an Exit Facility Loan that is neither a U.S. Holder nor a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, an Interest, New Common Stock, a New Warrant, or an Exit Facility Loan, the tax treatment of a partner (or other beneficial owner) or such partnership (or other entity or arrangement) generally will depend upon the status of the partner and the activities of the partnership and the partner. Partnerships and partners of such partnerships that are holders of Claims, Interests, New Common Stock, New Warrants, or Exit Facility Loans are urged to consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM, AN INTEREST, NEW COMMON STOCK, A NEW WARRANT, OR AN EXIT FACILITY LOAN. EACH HOLDER OF A CLAIM, AN INTEREST, NEW COMMON STOCK, A NEW WARRANT, OR AN EXIT FACILITY LOAN IS URGED TO CONSULT ITS TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, AND LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

    **B.**    **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors.**

    **1.**    **Effects of Restructuring on Tax Attributes of Debtors.**

As of December 31, 2019, the Debtors estimate they had U.S. federal net operating losses ("**NOLs**") in the amount of approximately $1,170,026,125, general business credits in the amount of approximately $461,147, and tax basis in their assets in the amount of approximately $ 3,725,869,854. The Debtors further estimate that they may generate additional tax attributes in the 2020 and 2021 taxable years.

### 2.      COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of any Cash, (ii) the issue price of any new indebtedness of the taxpayer (e.g., Exit Facility Loans), and (iii) the fair market value of any other consideration (e.g., New Common Stock), in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that case or (b) to the extent that the taxpayer is insolvent immediately before the discharge.  Instead, as a consequence of such exclusion, the taxpayer must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business tax credits; (c) capital loss carryovers; (d) tax basis in assets (including, in the case of a partner in a partnership, such partner's outside basis in its partnership interest) but not below the amount of liabilities to which the debtor remains subject; (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, a taxpayer can elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the debtor's net income or loss for the taxable year of the discharge of indebtedness has been determined.  Any COD Income over the amount of available tax attributes generally will not give rise to U.S. federal income tax and generally will have no other U.S. federal income tax impact.

No determination has yet been made as to whether the Reorganized Debtors would elect to first reduce tax basis in their property or to first reduce NOLs.  At this time, regardless of whether the Reorganized Debtors make this election, no assurance can be given that the Reorganized Debtors would have NOLs or other tax attributes remaining after reduction for COD income.

The amount of COD Income that may result in a reduction of the Debtors' tax attributes will depend on the fair market value (or in the case of new indebtedness, the issue price of such indebtedness as determined for U.S. federal income tax purposes) of the consideration received by holders of Claims.  The fair market value or issue price, as applicable, of such consideration cannot be known with certainty until after the Effective Date.

### 3.      Limitation on Utilization of NOLs and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors anticipate that their ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change" within the meaning of section 382 or 383 of the Tax Code (an "**Ownership Change**") the amount of its NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes allocable to periods prior to the Ownership Change (collectively, the "**Pre-Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation has a "net unrealized built-in loss" at the time of an Ownership Change (taking into account most assets and items of "built-in" income and deductions), then, in general, built-in losses (including depletion, amortization, or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-

54

Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the Ownership Change.

The rules of sections 382 and 383 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the Plan will result in an Ownership Change of Oasis on the Effective Date and that the Reorganized Debtors' use of any available Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

### (a)        General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an Ownership Change would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the Ownership Change (with certain adjustments) and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rate in effect for any month in the three-calendar-month period ending with the calendar month in which the Ownership Change occurs).  The annual limitation may be increased to the extent that the Reorganized Debtors (i) recognize certain built-in gains in their assets during the five-year period following the Ownership Change or (ii) are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[9]  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an Ownership Change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after an Ownership Change, the annual limitation resulting from such Ownership Change is zero.

### (b)        Special Bankruptcy Exceptions.

An exception to the foregoing annual limitation rules generally applies when former equity holders and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Interests or Claims, at least 50% of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis. Instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors were to undergo another Ownership Change within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

---

[9]    The IRS proposed Treasury Regulations in September 2019 that would make substantial changes to these rules. However, the IRS has also issued proposed Treasury Regulations that would cause any company that has an Ownership Change pursuant to a plan of reorganization in a bankruptcy case filed before the proposed Treasury Regulations are finalized to be "grandfathered." Accordingly, the September 2019 proposed Treasury Regulations are not expected to impact the Debtors with respect to an Ownership Change that occurs pursuant to the Plan.

Under the exception in section 382(l)(6) of the Tax Code (the "**382(l)(6) Exception**"), the annual limitation is calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the Ownership Change and (ii) the value of the debtor corporation's assets (determined without regard to liabilities) immediately before the Ownership Change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an Ownership Change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo an Ownership Change within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation from any such subsequent Ownership Change would be determined under the regular rules for Ownership Changes.

The availability to the Reorganized Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan.  As discussed above, however, no assurance can be given that the Reorganized Debtors would have NOLs allocable to periods prior to the Effective Date remaining after reduction for COD Income.  Even if the 382(l)(5) Exception could apply, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another Ownership Change may occur within two years after emergence.  Given the uncertainty regarding whether the 382(l)(5) Exception may apply or be elected out of, the Debtors anticipate that their use of the Pre-Change Losses (if any) after the Effective Date likely will be subject to limitation based on the rules discussed above.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an Ownership Change were to occur after the Effective Date.

C.      **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests Entitled to Vote.**

1.      **Consequences to Holders of Allowed RBL Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Allowed RBL Claims, each holder thereof will receive Exit Facility Loans and may also receive Cash.

Although the matter is not free from doubt, we believe and intend to take the position that the RBL Claims should not be treated as "securities" for U.S. federal income tax purposes, and the remainder of this discussion assumes that the RBL Claims are not treated as "securities" for U.S. federal income tax purposes. The exchange of Allowed RBL Claims for Exit Facility Loans (or for Exit Facility Loans and Cash) is expected to be treated as a taxable exchange under section 1001 of the Tax Code. In that case, a U.S. Holder of an Allowed RBL Claim would generally recognize gain or loss in an amount equal to (a) the sum of the issue price of the Exit Facility Loans and the amount of any Cash received for such RBL Claim (other than any Exit Facility Loans and Cash treated as received in satisfaction of accrued but untaxed interest on the Allowed RBL Claims as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such RBL Claim. A U.S. Holder's initial aggregate tax basis in an Exit Facility Loan would generally equal the fair market value of such Exit Facility Loan. A U.S. Holder's holding period for an Exit Facility Loan would begin the day following the exchange. Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed RBL Claim is greater than one year at the time of the exchange. The deductibility of capital losses is subject to limitations.

56

**2.**     **Consequences to Holders of Allowed Notes Claims or Allowed Mirada Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Allowed Notes Claims and Allowed Mirada Claims, each holder thereof will receive New Common Stock; provided that the treatment of the Mirada Claims may instead be governed by the Mirada Settlement Agreement, in which case the tax consequences for a holder of a Mirada Claim may differ materially from those described herein.

The extent to which a U.S. Holder of an Allowed Notes Claim or an Allowed Mirada Claim will recognize gain or loss pursuant to the Plan will depend upon whether the receipt of New Common Stock in respect of its Claim qualifies as a "recapitalization" (within the meaning of section 368(a)(1)(E) of the Tax Code). In general, receipt of New Common Stock in respect of a Notes Claim will qualify as a recapitalization if the underlying Notes are treated as "securities" for U.S. federal income tax purposes. Whether an instrument constitutes a security is determined based on all the facts and circumstances, but most authorities have held that the length of the original term of a debt instrument is an important factor in determining whether a debt instrument is a security for U.S. federal income tax purposes. These authorities indicate that a term of less than five years is evidence that an instrument generally is not a security, whereas a term of ten years or more is evidence that an instrument generally is a security. The 2021 Notes had a term to maturity of approximately 10 years when issued; the 2022 Notes had a term to maturity of approximately 8.5 years when issued; the 2023 Notes had a term to maturity of approximately 10.5 years when issued; the 2023 Convertible Notes had a term to maturity of approximately 7 years when issued; and the 2026 Notes had a term to maturity of approximately 8 years when issued. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Although the matter is not free from doubt, we believe and intend to take the position that (a) all of the Notes should be treated as securities and (b) the receipt of New Common Stock by a U.S. Holder in respect of its Notes Claim should be treated as a transaction that qualifies as a recapitalization for U.S. federal income tax purposes.

Assuming the receipt of New Common Stock in respect of an Allowed Notes Claim is treated as a transaction that qualifies as a recapitalization for U.S. federal income tax purposes, a U.S. Holder of an Allowed Notes Claim will generally not recognize gain or loss on the exchange except to the extent that New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the underlying Notes (see the "Accrued Interest" discussion below). In addition, any market discount on the underlying Notes would carry over to the New Common Stock (see "Market Discount" discussion below). The aggregate tax basis of a U.S. Holder of an Allowed Notes Claim in New Common Stock received in respect of its Notes Claims (other than in satisfaction of accrued but untaxed interest on the underlying Notes (see "Accrued Interest" discussion below)) should be equal to the tax basis of the underlying Notes, and such U.S. Holder's holding period in the New Common Stock received should include the holding period for the underlying Notes.

The debtors believe and intend to take the position that the Mirada Claims should not be treated as "securities" for U.S. federal income tax purposes, and the remainder of this discussion assumes that the Mirada Claims are not treated as "securities" for U.S. federal income tax purposes. A U.S. Holder of an Allowed Mirada Claim, or an Allowed Notes Claim that is not a "security", will be treated as receiving its distributions under the Plan in a taxable exchange pursuant to section 1001 of the Tax Code. Such U.S. Holder should recognize gain or loss equal to the difference between (a) the fair market value of the New Common Stock received by such U.S. Holder (other than any New Common Stock treated as received in

satisfaction of accrued interest on its Claim as discussed below under "Accrued Interest") and (b) such U.S. Holder's adjusted tax basis in its Claim.  Such gain or loss should be capital in nature (except to the extent described below under "Market Discount") and should be long-term capital gain or loss if the debts constituting the surrendered Claim were held for more than one year.  U.S. Holders of Allowed Notes Claims or Allowed Mirada Claims that receive New Common Stock in a taxable exchange should obtain a tax basis in such New Common Stock equal to the fair market value thereof as of the date such New Common Stock is distributed to the U.S. Holder.  The holding period for such New Common Stock should begin on the day following the Effective Date.

### 3.      Consequences to Holders of Allowed Interests in Oasis and any Section.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Allowed Interests in Oasis, each holder thereof will receive New Warrants.

The exchange of Allowed Interests in Oasis for New Warrants is expected to be treated as a taxable exchange under section 1001 of the Tax Code. In that case, a U.S. Holder of such an Interest will generally recognize gain or loss in an amount equal to (a) the fair market value of New Warrants received in respect of such Interest less (b) such U.S. Holder's adjusted tax basis in such Interest. A U.S. Holder's initial aggregate tax basis in a New Warrant would generally equal its fair market value. A U.S. Holder's holding period for a New Warrant would begin the day following the exchange. Any such gain or loss recognized by a U.S. Holder will be capital gain or loss. Capital gain will generally taxable at preferential rates to non-corporate U.S. Holders whose holding period in such Interests is greater than one year at the time of such exchange. The deductibility of capital losses is subject to limitations.

### 4.      Accrued Interest.

A portion of the consideration (e.g., New Common Stock or Cash) received by a U.S. Holder of a Claim may be attributable to accrued but untaxed interest on such Claim.  Such amount should be taxable to such U.S. Holder as ordinary interest income if such accrued interest had not been previously included in such U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on its Claim was previously included in such U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but Applicable Tax Law is unclear on this point. The tax basis of any property determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such property should begin on the day following the Effective Date.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on the Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

58

### 5.     Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.   In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if a U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the stated redemption price on the debt instrument at maturity or (b) in the case of a debt instrument issued with original issue discount, its "revised issue price," in each case, by at least a *de minimis* amount (equal to 0.25% of the stated redemption price of the debt instrument at maturity, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by such U.S. Holder (unless such U.S. Holder elected to include market discount in income as it accrued).  In addition, in the event of recapitalization treatment (as described above), the Tax Code indicates that, under Treasury Regulations to be issued, any accrued market discount in respect of the Allowed Notes Claims should not be currently includable in income. However, such accrued market discount should carry over to any non-recognition property received in exchange therefor (i.e., New Common Stock in respect of Allowed Notes Claims). Any gain recognized by a U.S. Holder upon a subsequent disposition of such property would be treated as ordinary income to the extent of any accrued market discount carried over not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.  U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 6.     Limitation on Use of Capital Losses.

U.S. Holders who recognize capital losses as a result of the distributions under the Plan or as a result of disposing of consideration received under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset capital gains (without regard to holding periods) and ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are also allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 7.     Consequences of Owning and Disposing of New Common Stock and New Warrants.

#### (a)     Exercise or Lapse of a New Warrant

Except as discussed below with respect to the cashless exercise of a New Warrant, a U.S. Holder generally will not recognize taxable gain or loss upon receipt of New Common Stock that such U.S. Holder acquired by exercising a New Warrant for cash. A U.S. Holder's tax basis in New Common Stock received upon exercise of its New Warrant generally will be an amount equal to the sum of the U.S. Holder's initial tax basis in the New Warrant and the exercise price of such New Warrant. A U.S. Holder's holding period for New Common Stock received upon exercise of its New Warrant will begin on the date following the

date of exercise (or the date of exercise) of the New Warrant and will not include the period during which the U.S. Holder held the New Warrant. If a New Warrant is allowed to lapse unexercised, a U.S. Holder of such New Warrant generally will recognize a capital loss equal to such U.S. Holder's tax basis in the New Warrant.

The tax consequences of a cashless exercise of a New Warrant are not clear under Applicable Tax Law. A cashless exercise may be tax-free, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. Holder's basis in the New Common Stock received would equal the U.S. Holder's basis in the New Warrant. If the cashless exercise was treated as not being a gain realization event (and not a recapitalization), a U.S. Holder's holding period in the New Common Stock would be treated as commencing on the date following the date of exercise (or the date of exercise) of the New Warrant. If the cashless exercise was treated as a recapitalization, the holding period of the New Common Stock would include the holding period of the New Warrant.

It is also possible that a cashless exercise could be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. Holder could be deemed to have surrendered New Warrants equal to the number of shares of New Common Stock having a value equal to the exercise price for the total number of New Warrants to be exercised. The U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the fair market value of the New Common Stock represented by the New Warrants deemed surrendered and the U.S. Holder's adjusted tax basis in the New Warrants deemed surrendered. In this case, a U.S. Holder's tax basis in the New Common Stock received would equal the sum of the fair market value of the New Common Stock represented by the New Warrants deemed surrendered and the U.S. Holder's adjusted tax basis in the New Warrants exercised. A U.S. Holder's holding period for the New Common Stock would commence on the date following the date of exercise (or the date of exercise) of the New Warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders are urged to consult their tax advisors regarding the tax consequences of a cashless exercise.

### (b)      Possible Constructive Distributions

The terms of each New Warrant provide for an adjustment to the number of shares of New Common Stock for which the New Warrant may be exercised or to the exercise price of the New Warrant in certain events. An adjustment which has the effect of preventing dilution generally is not taxable. U.S. Holders of New Warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases such U.S. Holders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of New Common Stock that would be obtained upon exercise) as a result of a distribution of cash to the holders of shares of our New Common Stock which is taxable to the U.S. Holders of such shares. Such constructive distribution would be subject to tax as described under that section in the same manner as if the U.S. Holders of the New Warrants received a cash distribution from us equal to the fair market value of such increased interest. Generally, a U.S. Holder's adjusted tax basis in its New Warrant would be increased to the extent any such constructive distribution is treated as a dividend.

### (c)      Distributions on New Common Stock.

Any distributions made on account of the New Common Stock will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of

Reorganized Oasis as determined under U.S. federal income tax principles. Such income will be includable in the gross income of a U.S. Holders as ordinary income on the day actually or constructively received by such U.S. Holder. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(d)** **Sale, Redemption, or Repurchase of New Common Stock or a New Warrant.**

Unless a non-recognition provision applies and except as discussed in "Market Discount" above, a U.S. Holder of New Common Stock or a New Warrant generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of its New Common Stock or New Warrant. Such capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period in its New Common Stock or New Warrant is more than one year. Long-term capital gain of an individual taxpayer generally is taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as discussed in "Limitations on Use of Capital Losses" above. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on a taxable disposition of New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Common Stock. In addition, in the event the Allowed Notes Claims are subject to recapitalization treatment, any gain recognized by a U.S. Holder of an Allowed Notes Claim upon a subsequent disposition of New Common Stock (or any stock or property received for it in a later tax-free exchange) received will be treated as ordinary income for U.S. federal income tax purposes to the extent of any accrued market discount carried over to the New Common Stock not previously included in income (see "Market Discount" above).

**8.** **Consequences of Owning and Disposing of Exit Facility Loans.**

**(a)** **Interest on Exit Facility Loans**

This discussion assumes that the Exit Facility Loans will be issued with no more than a de minimis amount of original issue discount (if any) for U.S. federal income tax purposes. Stated interest on Exit Facility Loans generally will be taxable to a U.S. Holder of an Exit Facility Loan as ordinary income at the time it is paid or accrued in accordance with the U.S. Holder's usual method of accounting for tax purposes.

**(b)** **Sale, Redemption, or Repurchase of Exit Facility Loans**

Unless a non-recognition provision applies, a U.S. Holder of an Exit Facility Loan generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of its Exit Facility

Loan.  Such capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period in its Exit Facility Loan is more than one year.  Long-term capital gain of an individual taxpayer generally is taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as discussed in "Limitations on Use of Capital Losses" above.

> **D.**    **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims or Interests Entitled to Vote.**

> **1.**    **Gain Recognition.**

Any gain realized by a non-U.S. Holder on the sale, exchange, or other taxable disposition of its Claim or Interest generally will not be subject to U.S. federal income tax unless:

- the non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the disposition occurs, and certain other conditions are met;

- the gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States, and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by the non-U.S. Holder in the United States; or

- if the non-U.S. Holder disposes of Interests in Oasis, Oasis is a "United States real property holding corporation" within the meaning of the Tax Code and applicable Treasury Regulations ("**USRPHC**") at any time within the shorter of (i) the five-year period preceding the disposition or (ii) the non-U.S. Holder's holding period for the Interest.

If the exception in the first bullet point above applies, a non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or applicable lower treaty rate or exemption) on the amount by which the non-U.S. Holder's capital gains allocable to U.S. sources exceed the non-U.S. Holder's capital losses allocable to U.S. sources during the taxable year of the disposition.  However, only capital losses for which the non-U.S. Holder has timely filed U.S. federal income tax returns may be applied in the foregoing manner, notwithstanding that the non-U.S. Holder is not considered a resident of the United States.

If the exception in the second bullet point above applies, a non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the disposition at regular graduated U.S. federal income tax rates applicable to the non-U.S. Holder as if it were a "United States person" (as defined in the Tax Code).  To claim an exemption from withholding tax, a non-U.S. Holder must provide a properly executed IRS Form W-8ECI (or successor form).  In addition, if such non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable treaty rate or exemption) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

If the exception in the third bullet above applies, a non-U.S. Holder of an Interest in Oasis generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Interest in Oasis under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder ("**FIRPTA**").  Taxable gain from a non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the non-U.S. Holder's adjusted tax basis in such interest) would constitute effectively connected income.  A non-U.S. Holder would also be subject to withholding tax equal to 15% of the amount realized on the disposition and generally required to file a U.S. federal income tax return.  The amount of any such withholding may be allowed as a credit against the

non-U.S. Holder's U.S. federal income tax liability and may entitle the non-U.S. Holder to a refund if the non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) the non-U.S. Holder's holding period for its interests in the corporation.  The Debtors believe that Oasis is a USRPHC.

In general, FIRPTA will not apply upon a non-U.S. Holder's disposition of its Interests in Oasis if (x) the Interests are treated as "regularly traded" on an established securities market and continue to be regularly traded on an established securities market and (y) the non-U.S. Holder did not directly or indirectly own more than 5% of the value of the Interests during a specified testing period. Currently, the Debtors believe that Interests in Oasis are treated as "regularly traded" on an established securities market.

### 2. Interest.

Payments made to a non-U.S. Holder pursuant to the Plan that are attributable to accrued but untaxed interest or any interest payments in respect of an Exit Facility Loan generally will not be subject to U.S. federal income or withholding tax, provided that (a) the non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of Oasis, (b) the non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to Oasis (each, within the meaning of the Tax Code), and (c) the withholding agent has received, or receives prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person (the "**Portfolio Interest Exception**").  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The Portfolio Interest Exception is not available with respect to accrued but untaxed interest that is effectively connected with a non-U.S. Holder's conduct of a trade or business within the United States.  If the Portfolio Interest Exception is not available, a non-U.S. Holder may still mitigate the withholding tax obligation by providing a properly executed IRS Form W-8ECI (or successor form) to the withholding agent.  However, this would not mitigate the non-U.S. Holder's U.S. federal income tax obligation; a non-U.S. Holder would still be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise).  In addition, if a non-U.S. Holder is treated as a corporation for U.S. federal income tax purposes, its earnings and profits that are attributable to such interest may be subject to branch profits tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A non-U.S. Holder that does not qualify for the Portfolio Interest Exception with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.

### 3. Distributions on New Common Stock.

Distributions made (or deemed made) on the New Common Stock and distributions deemed made on the New Warrants (see "Possible Constructive Distributions") will generally constitute dividends for U.S. federal income tax purposes to the extent paid out of Reorganized Oasis's accumulated earnings and profits, as determined under U.S. federal income tax principles.  Distributions in excess of Reorganized

Oasis's current and accumulated earnings and profits will generally constitute a return of capital, which generally would be subject to withholding under FIRPTA at a rate of 15%, and will first be applied against and reduce a non-U.S. Holder's adjusted tax basis in its New Common Stock or New Warrants, but not below zero. Distributions not treated as dividends and in excess of a holder's adjusted basis will generally be treated as capital gain subject to the rules discussed in "Gain on Disposition of New Common Stock or New Warrants."

Dividends paid to a non-U.S. Holder of New Common Stock or New Warrants will generally be subject to withholding of U.S. federal income tax at a 30% rate (or applicable lower treaty rate or exemption). However, dividends that are effectively connected with the conduct of a trade or business by the non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the non-U.S. Holder) are not subject to withholding, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. Holder were a "United States person" (as defined in section 7701(a)(30) of the Tax Code). Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. Holder of New Common Stock or New Warrants who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends, will be required (a) to complete the applicable IRS Form W-8BEN or Form W-8BEN-E and certify under penalty of perjury that such non-U.S. Holder is not a "United States person" (as defined in section 7701(a)(30) the Tax Code) and is eligible for treaty benefits or (b) if the New Common Stock or New Warrants are held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable Treasury Regulations. Special certification and other requirements apply to certain non-U.S. Holders that are pass-through entities rather than corporations or individuals. A non-U.S. Holder of New Common Stock or New Warrants eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

### 4. Gain on Disposition of New Common Stock, New Warrants, or Exit Facility Loans.

Any gain realized by a non-U.S. Holder on the sale, exchange, or other taxable disposition of its New Common Stock, New Warrants, or Exit Facility Loans generally will not be subject to U.S. federal income tax unless:

- the non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year in which the disposition occurs, and certain other conditions are met;

- the gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States, and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by the non-U.S. Holder in the United States; or

- if the non-U.S. Holder disposes of New Common Stock or New Warrants, Reorganized Oasis is a USRPHC at any time within the shorter of (i) the five-year period preceding the disposition or (ii) the non-U.S. Holder's holding period for the New Common Stock or New Warrants.

If the exception in the first bullet point above applies, a non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or applicable lower treaty rate or exemption) on the amount by which the non-U.S. Holder's capital gains allocable to U.S. sources exceed the non-U.S. Holder's capital losses allocable to U.S. sources during the taxable year of the disposition. However, only capital losses for which the non-U.S. Holder has timely filed U.S. federal income tax returns may be applied in the foregoing manner, notwithstanding that the non-U.S. Holder is not considered a resident of the United States.

If the exception in the second bullet point above applies, a non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the disposition at regular graduated U.S. federal income tax rates applicable to the non-U.S. Holder as if it were a "United States person" (as defined in section 7701(a)(30) of the Tax Code). To claim an exemption from withholding tax, a non-U.S. Holder must provide a properly executed IRS Form W-8ECI (or successor form). In addition, if such non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable treaty rate or exemption) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

If the exception in the third bullet above applies, a non-U.S. Holder of New Common Stock or New Warrants generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock or New Warrants under FIRPTA. Taxable gain from a non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the non-U.S. Holder's adjusted tax basis in such interest) would constitute effectively connected income. A non-U.S. Holder would also be subject to withholding tax equal to 15% of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the non-U.S. Holder's U.S. federal income tax liability and may entitle the non-U.S. Holder to a refund if the non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of (a) the 5-year period ending on the effective time of the applicable disposition or (b) the non-U.S. Holder's holding period for its interests in the corporation. The Debtors believe that Reorganized Oasis will be a USRPHC.

In general, FIRPTA will not apply (a) upon a disposition of a New Warrant if either (i) (1) the New Common Stock is regularly traded on an established securities market, (2) the New Warrants are not regularly traded, and (3) the fair market value of the New Warrants owned, actually or constructively, by the non-U.S. Holder on the date the New Warrants were acquired is equal to or less than the fair market value of 5% of the value of New Common Stock or (ii) (1) the New Warrants are regularly traded, and (2) the non-U.S. Holder owns, actually or constructively, 5% or less of the outstanding New Warrants or (b) upon a disposition of New Common Stock if at all times during the shorter of the five-year period preceding the disposition date or the non-U.S. Holder's holding period in the New Common Stock, (i) the non-U.S. Holder did not directly or indirectly own more than 5% of the value of the New Common Stock during a specified testing period and (ii) the New Common Stock is regularly traded on an established securities market.

E.      **FATCA.**

Under sections 1471 through 1474 of the Tax Code ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and

investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual, or periodical income (including dividends, if any, on shares of New Common Stock).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Previously, withholding with respect to gross proceeds from the disposition of certain property like the New Common Stock was scheduled to begin on January 1, 2019, however, such withholding has been eliminated under proposed Treasury Regulations, which can be relied on until final Treasury Regulations become effective.

Each non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

### F. Information Reporting and Backup Withholding.

The Debtors or any other applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest, dividends, and other amounts payable under the Plan or in connection with payments made on account of consideration received pursuant to the Plan.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim or Interest under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. Additionally, under the backup withholding rules, a holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan or in connection with payments made on account of consideration received pursuant to the Plan unless (1) in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and (2) in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24%.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims, Interests, New Common Stock, New Warrants, or Exit Facility Loans are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO IT OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. STATE OR LOCAL OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAW.**

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 29, 2020                          Oasis Petroleum Inc.
                                                    on behalf of itself and all other Debtors


                                                    */s/ Michael H. Lou*
                                                    _____
                                                    Name:  Michael H. Lou
                                                    Title:  Chief Financial Officer and Executive Vice President

67

**Exhibit A**

**Plan of Reorganization**

*Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| OASIS PETROLEUM INC., *et al.*,[1] | ) ) ) | Case No. 20-[_____] (___) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
OF OASIS PETROLEUM INC. AND ITS DEBTOR AFFILIATES**

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

**JACKSON WALKER L.L.P.**
Bruce J. Ruzinsky (TX Bar No. 17469425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Vienna F. Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com
Email: jwertz@jw.com
Email: vanaya@jw.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:        (713) 836-3600
Facsimile:        (713) 836-3601
Email:        brian.schartz@kirkland.com
-and-
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
David L. Eaton (*pro hac vice* admission pending)
John Luze (*pro hac vice* admission pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        chad.husnick@kirkland.com
                david.eaton@kirkland.com
                john.luze@kirkland.com
-and-
AnnElyse Scarlett Gains (*pro hac vice* admission pending)
1301 N. Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone:        (202) 389-5000
Facsimile:        (202) 389-5200
Email:        annelyse.gains@kirkland.com

Dated: September 29, 2020

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

---

[1]  Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/oasis.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  1001 Fannin Street, Suite 1500, Houston, Texas 77002.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
        GOVERNING LAW ........................................................................................................1
     A.      Defined Terms. ............................................................................................................1
     B.      Rules of Interpretation. ..............................................................................................10
     C.      Computation of Time. .................................................................................................10
     D.      Governing Law. ..........................................................................................................10
     E.      Reference to Monetary Figures. ..................................................................................11
     F.      Reference to the Debtors or the Reorganized Debtors. ..............................................11
     G.      Controlling Document. ................................................................................................11
     H.      Consultation, Information, Notice, and Consent Rights. ............................................11

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  AND PRIORITY CLAIMS ....................................11
     A.      Administrative Claims. ...............................................................................................11
     B.      DIP Claims. .................................................................................................................12
     C.      Professional Claims. ...................................................................................................12
     D.      Priority Tax Claims. ....................................................................................................13

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .....................................13
     A.      Classification of Claims and Interests. .......................................................................13
     B.      Treatment of Claims and Interests. ............................................................................14
     C.      Special Provision Governing Unimpaired Claims. .....................................................16
     D.      Elimination of Vacant Classes. ...................................................................................16
     E.      Voting Classes, Presumed Acceptance by Non-Voting Classes. ................................16
     F.      Intercompany Interests. ...............................................................................................16
     G.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................16
     H.      Controversy Concerning Impairment. .........................................................................16
     I.      Subordinated Claims. ..................................................................................................16

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...........................................................17
     A.      General Settlement of Claims and Interests. ...............................................................17
     B.      Restructuring Transactions. .........................................................................................17
     C.      Reorganized Debtors. ..................................................................................................17
     D.      Sources of Consideration for Plan Distributions. .......................................................18
     E.      Corporate Existence. ...................................................................................................19
     F.      Vesting of Assets in the Reorganized Debtors. ..........................................................19
     G.      Cancellation of Existing Securities and Agreements. .................................................19
     H.      Corporate Action. ........................................................................................................20
     I.      New Organizational Documents. ................................................................................20
     J.      Indemnification Obligations. .......................................................................................20
     K.      Directors and Officers of the Reorganized Debtors. ..................................................21
     L.      Effectuating Documents; Further Transactions. ..........................................................21
     M.      Section 1146 Exemption. ............................................................................................21
     N.      Director and Officer Liability Insurance. ....................................................................21
     O.      Management Incentive Plan. ........................................................................................22
     P.      Employee and Retiree Benefits. ..................................................................................22
     Q.      Preservation of Causes of Action. ..............................................................................22

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................23
     A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ...............23
     B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................24
     C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ..............24
     D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........25

i

E. Insurance Policies. ..................................................................................................................25
F. Reservation of Rights. ...........................................................................................................25
G. Nonoccurrence of Effective Date. .........................................................................................25
H. Employee Compensation and Benefits. .................................................................................25
I. Contracts and Leases Entered Into After the Petition Date. ..................................................26

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................26
A. Distributions on Account of Claims Allowed as of the Effective Date. .................................26
B. Disbursing Agent. .................................................................................................................27
C. Rights and Powers of Disbursing Agent. ..............................................................................27
D. Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...........................27
E. Manner of Payment. ..............................................................................................................28
F. Section 1145 Exemption. ......................................................................................................28
G. Compliance with Tax Requirements. .....................................................................................28
H. Allocations. ...........................................................................................................................29
I. No Postpetition Interest on Claims. .......................................................................................29
J. Foreign Currency Exchange Rate. .........................................................................................29
K. Setoffs and Recoupment. ......................................................................................................29
L. Claims Paid or Payable by Third Parties. ..............................................................................29

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
DISPUTED CLAIMS ........................................................................................................30
A. Disputed Claims Process. ......................................................................................................30
B. Allowance of Claims. ............................................................................................................30
C. Claims Administration Responsibilities. ................................................................................30
D. Adjustment to Claims or Interests without Objection. ...........................................................31
E. Disallowance of Claims or Interests. .....................................................................................31
F. No Distributions Pending Allowance. ....................................................................................31
G. Distributions After Allowance. ..............................................................................................31
H. No Interest. ............................................................................................................................31

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................31
A. Discharge of Claims and Termination of Interests. ................................................................31
**B. Release of Liens.** .................................................................................................................32
**C. Releases by the Debtors.** ....................................................................................................32
**D. Releases by the Releasing Parties.** .....................................................................................33
**E. Exculpation.** .......................................................................................................................33
**F. Injunction.** ..........................................................................................................................33
G. Protections Against Discriminatory Treatment. .....................................................................34
H. Document Retention. .............................................................................................................34
I. Reimbursement or Contribution. ...........................................................................................34

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ..................................34
A. Conditions Precedent to the Effective Date. ..........................................................................34
B. Waiver of Conditions. ...........................................................................................................35
C. Effect of Failure of Conditions. ............................................................................................36
D. Substantial Consummation ....................................................................................................36

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...............................36
A. Modification and Amendments. .............................................................................................36
B. Effect of Confirmation on Modifications. ..............................................................................36
C. Revocation or Withdrawal of Plan. ........................................................................................36

ARTICLE XI. RETENTION OF JURISDICTION ................................................................................36

ARTICLE XII. MISCELLANEOUS PROVISIONS ..............................................................................38

A.   Immediate Binding Effect. ................................................................................................38
B.   Additional Documents. ....................................................................................................38
C.   Payment of Statutory Fees. ..............................................................................................39
D.   Statutory Committee and Cessation of Fee and Expense Payment. .................................39
E.   Reservation of Rights. ......................................................................................................39
F.   Successors and Assigns.....................................................................................................39
G.   Notices. .............................................................................................................................39
H.   Term of Injunctions or Stays.............................................................................................40
I.   Entire Agreement. .............................................................................................................40
J.   Plan Supplement. ..............................................................................................................40
K.   Nonseverability of Plan Provisions. .................................................................................40
L.   Votes Solicited in Good Faith. ..........................................................................................40
M.   Closing of Chapter 11 Cases. ...........................................................................................41
N.   Waiver or Estoppel............................................................................................................41
O.   Creditor Default. ...............................................................................................................41

**INTRODUCTION**

Oasis Petroleum Inc. and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), propose this joint prepackaged chapter 11 plan of reorganization (the "Plan") for the resolution of the outstanding claims against, and equity interests in, the Debtors.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of this Plan, the Restructuring Transactions, and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.      Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

"*2021 Notes Indenture*" means that certain indenture agreement (as may be amended, restated, supplemented, or otherwise modified from time to time) dated November 10, 2011, between Oasis Petroleum Inc., as issuer, the entities specified therein, as guarantors, and U.S. Bank National Association, as trustee, that governs the 2021 Notes.

"*2021 Notes*" means the senior unsecured notes with a maturity date of November 1, 2021 issued by Oasis Petroleum Inc. pursuant to the 2021 Notes Indenture

"*2022 Notes Indenture*" means that certain indenture agreement (as may be amended, restated, supplemented, or otherwise modified from time to time) dated September 24, 2013, between Oasis Petroleum Inc., as issuer, the entities specified therein, as guarantors, and U.S. Bank National Association, as trustee, that governs the 2022 Notes.

"*2022 Notes*" means the senior unsecured notes with a maturity date of March 15, 2022 issued by Oasis Petroleum Inc. pursuant to the 2022 Notes Indenture.

"*2023 Convertible Notes Indenture*" means that certain indenture agreement (as may be amended, restated, supplemented, or otherwise modified from time to time) dated November 10, 2011, between Oasis Petroleum Inc., as issuer, the entities specified therein, as guarantors, and U.S. Bank National Association, as trustee, that governs the 2023 Convertible Notes.

"*2023 Convertible Notes*" means the senior unsecured convertible notes with a maturity date of September 15, 2023 issued by Oasis Petroleum Inc. pursuant to the 2023 Convertible Notes Indenture.

"*2023 Notes Indenture*" means that certain indenture agreement (as may be amended, restated, supplemented, or otherwise modified from time to time) dated July 2, 2012, between Oasis Petroleum Inc., as issuer, the entities specified therein, as guarantors, and U.S. Bank National Association, as trustee, that governs the 2023 Notes.

"*2023 Notes*" means the senior unsecured notes with a maturity date of January 15, 2023 issued by Oasis Petroleum Inc. pursuant to the 2023 Notes Indenture.

"*2026 Notes Indenture*" means that certain indenture agreement (as may be amended, restated, supplemented, or otherwise modified from time to time) dated September 19, 2016, between Oasis Petroleum Inc., as issuer, the entities specified therein, as guarantors, and U.S. Bank National Association, as trustee, that governs the 2026 Notes.

"*2026 Notes*" means the senior unsecured notes with a maturity date of May 1, 2026 issued by Oasis Petroleum Inc. pursuant to the 2026 Notes Indenture.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Claims for compensation for services rendered or reimbursement of expenses incurred under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"*Allowed*" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a final order as applicable.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which the New York Stock Exchange or the NASDAQ is closed for trading.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Claims and Balloting Agent*" means Kurtzman Carson Consultants LLC, the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

"*Claims Register*" means the official register of Claims maintained by the Claims and Balloting Agent.

"*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Company Party*" has the meaning set forth in the Restructuring Support Agreement.

"*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, compensation, and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and the employees, former employees and retirees of their subsidiaries, including all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements, and plans, incentive plans, deferred compensation plans and life, accidental death, and dismemberment insurance plans.

"*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the jointly administered docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting RBL Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Consenting Stakeholder Fees and Expenses*" has the meaning set forth in the Restructuring Support Agreement.

"*Constitutional Documents*" means certificates of formation, limited liability company agreements, partnership agreements, certificates of incorporation, bylaws, stockholders' agreement or any similar entity organizational or constitutive document, as applicable.

"*Consummation*" means the occurrence of the Effective Date.

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

3

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

"*Debtor Release*" means the release set forth in Article VIII.C of the Plan.

"*Definitive Documents*" means the documents listed in Section 3.01 of the Restructuring Support Agreement.

"*DIP Agent*" means Wells Fargo Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Facility.

"*DIP Claims*" means all Claims derived from, based upon, or secured pursuant to the DIP Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder, in each case, with respect to the DIP Facility.

"*DIP Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement (as may be amended, supplemented, or otherwise modified from time to time) governing the DIP Facility, between Oasis Petroleum North America, LLC, as borrower, the Debtor guarantors that are party thereto, the lenders party thereto, and the DIP Agent.

"*DIP Facility*" means that certain debtor-in-possession financing facility on terms and conditions consistent in all respects with the Restructuring Support Agreement, the DIP Credit Agreement, and the DIP Orders.

"*DIP Facility Documents*" means, collectively, the DIP Credit Agreement, the "Loan Documents" as defined in the DIP Credit Agreement, and any other documentation necessary or appropriate to effectuate the incurrence of the DIP Facility.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Facility.

"*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

"*DIP Term Sheet*" has the meaning set forth in the Restructuring Support Agreement.

"*Disbursing Agent*" means the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

"*Disputed*" means, as to a Claim or an Interest, any Claim or Interest:  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

"*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan.

"*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

"*Distribution Record Date*" means, other than with respect to publicly held Securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the first day of the Confirmation Hearing.  For the avoidance of doubt, no distribution record date shall apply to holders of public securities.

"*Effective Date*" means the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, as amended from time to time.

"*Exculpated Partie*s" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders; (d) the indenture trustees under the Debtors' prepetition secured notes indentures; (e) the RBL Agent; (f) the DIP Agent; (g) the DIP Lenders; and (h) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exit Facility*" means, collectively, the Exit Revolving Facility and the Second Out Term Loans.

"*Exit Facility Agent*" means Wells Fargo Bank, N.A., in its capacity as administrative agent under the Exit Facility Credit Agreement.

"*Exit Facility Commitment Letter*" has the meaning set forth in the Restructuring Support Agreement.

"*Exit Facility Credit Agreement*" means the credit agreement governing the Exit Facility, which shall be consistent with the terms set forth in the Exit Facility Commitment Letter and the Exit Facility Term Sheet and included in the Plan Supplement.

"*Exit Facility Documents*" means, collectively, the Exit Facility Credit Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, including the Exit Facility Commitment Letter, the Exit Facility Fee Letter, and any and all agreements, documents, and instruments delivered or to be entered into with respect to the Second Out Term Loans.

"*Exit Facility Fee Letter*" has the meaning set forth in the Restructuring Support Agreement.

"*Exit Facility Loans*" means, collectively, the Exit Facility Revolving Loans and the Second Out Term Loans.

"*Exit Facility Revolving Lenders*" means the RBL Lenders electing to participate in the Exit Revolving Facility by executing the Restructuring Support Agreement and the Exit Facility Commitment Letter (or, in each case, a joinder thereto, as applicable) and any applicable assignees and participants thereof.

"*Exit Facility Revolving Loans*" means first out revolving loans in an initial aggregate principal amount not to exceed the "Borrowing Base" (as defined in the Exit Facility Term Sheet) as in effect on the Effective Date in accordance with the Exit Facility Credit Agreement and the Plan.

"*Exit Facility Term Sheet*" has the meaning set forth in the Restructuring Support Agreement.

"*Exit Revolving Facility*" means the new money senior secured reserve-based facility subject to a borrowing base, on the terms set forth in the Exit Facility Credit Agreement.

"*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final DIP Order*" means the final order authorizing the use of cash collateral and debtor-in-possession financing on terms consistent with the DIP Term Sheet and the Restructuring Support Agreement.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*General Unsecured Claim*" means any Claim other than an Administrative Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a RBL Claim, a DIP Claim, a Notes Claim, or a Mirada Claim.

"*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

"*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and any claim against or interest in the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing. For the avoidance of doubt, Interests shall include all outstanding equity awards (whether vested or unvested) granted pursuant to an equity incentive plan, which shall vest in accordance with the terms of the applicable award documentation, except that all unvested restricted stock awards shall become fully vested.

"*Interim DIP Order*" means the interim order authorizing the use of cash collateral and debtor-in-possession financing on terms consistent with the DIP Term Sheet and the Restructuring Support Agreement.

"*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Management Incentive Plan*" means the management incentive plan that the Reorganized Debtors will implement on or after the Effective Date that shall provide for up to 10% of the New Common Stock, on a fully diluted, fully distributed basis which will be reserved and issued as set forth in this Plan.

"*Mirada*" means, collectively, the Mirada Parties and the Mirada Individuals, in each case as defined in the Mirada Settlement Agreement.

"*Mirada Claims*" means any and all Claims and/or Interests held, asserted or assertable by Mirada including, without limitation, all claims asserted in that certain case captioned *Mirada Energy, et al.* v. *Oasis Petroleum Inc.*, et al., No. 2017-19911 (Tex. Dist. Ct.).

"*Mirada Settlement Agreement*" means that certain Settlement and Mutual Release Agreement, dated as of September 28, 2020, by and between certain of the Debtors and their Affiliates and Mirada, which shall be included in the Plan Supplement.

"*New Board*" means the board of directors of Reorganized Oasis.  The identities of directors on the New Board shall be set forth in the Plan Supplement.

"*New Common Stock*" means the common equity in Reorganized Oasis.

"*New Organizational Documents*" means the Constitutional Documents for Reorganized Oasis, and each of the other Reorganized Debtors, including articles of incorporation, bylaws, stockholders' agreement, and the identity of proposed members of Reorganized Oasis's board of directors, board of managers, or similar governing body, which shall be consistent with the Restructuring Support Agreement, this Plan, and section 1123(a)(6) of the Bankruptcy Code (as applicable, and shall otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Stakeholders..

"*New Warrants Agreement*" means those certain agreements providing for, among other things, the issuance and terms of the New Warrants, which shall be included in the Plan Supplement.  The New Warrants Agreement shall not provide for Black-Scholes protection but shall provide that the New Warrants remain outstanding following any stock-for-stock merger transaction following the Effective Date.

"*New Warrants*" means the 4-year warrants to purchase up to 7.5% of the New Common Stock at a strike price equal to the aggregate amount of Notes Claims (including any interest thereon that would have accrued as of the Effective Date).

"*Notes Claims*" means, collectively, all claims derived from or based upon the Notes or the Notes Indentures, including in each case claims for all principal amounts outstanding, interest, expenses, costs, and other charges arising thereunder or related thereto.

"*Notes Indentures*" means, collectively, the 2021 Notes Indenture, the 2022 Notes Indenture, the 2023 Notes Indenture, the 2023 Convertible Notes Indenture, and the 2026 Notes Indenture.

"*Notes Trustee*" means U.S. Bank National Association, in its capacity as trustee under the Notes Indentures.

"*Notes*" means, collectively, the 2021 Notes, the 2022 Notes, the 2023 Notes, the 2023 Convertible Notes and the 2026 Notes.

7

"*Oasis*" means Oasis Petroleum Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

"*OMP Waiver Agreement*" means that certain  Limited Waiver and Forbearance Extension to Credit Agreement, dated as of September 29, 2020, among OMP Operating LLC, as borrower, Oasis Midstream Partners LP, as parent, the guarantors party thereto, Wells Fargo Bank, N.A., as administrative agent and issuing bank, and the lenders party thereto.

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim, including any Secured Tax Claim, other than an RBL Claim or a DIP Claim.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the first date any of the Company Parties commences a Chapter 11 Case.

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under this Plan.

"*Plan Objection Deadline*" means the date the Bankruptcy Court establishes as the deadline to File an objection to Confirmation of the Plan.

"*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed prior to the Confirmation Hearing, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) to the extent known, the identities of the members of the New Board; (c) the Rejected Executory Contracts and Unexpired Leases Schedule; (d) the Schedule of Retained Causes of Action; (e) the Exit Facility Documents; (f) the documentation related to the New Warrants, including the New Warrant Agreement; (g) the form of registration rights agreement; and (h) the Mirada Settlement Agreement.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date in accordance with this Plan and the Restructuring Support Agreement (and subject to the applicable consent rights thereunder).

"*Priority Tax Claim*" means any Claim of a Governmental Unit (as defined in section 101(27) the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

"*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

 "*Professional Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.C of the Plan.

"*Professional Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"*Professional Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Amount.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*RBL Agent*" means Wells Fargo Bank, N.A. in its capacity as administrative agent for the RBL Credit Facility.

"*RBL Claims*" means all Claims derived from, based upon, or secured pursuant to the RBL Credit Agreement, including Claims for all principal amounts outstanding, interest (accruing at the applicable default rate under the RBL Credit Agreement), fees, expenses, costs, and other charges arising thereunder or related thereto.

"*RBL Credit Agreement*" means that certain Third Amended and Restated Credit Agreement, dated as of October 16, 2018, by and among Oasis Petroleum Inc., as parent, Oasis Petroleum North America LLC, as borrower, Wells Fargo Bank, N.A., as Administrative Agent and the other parties party thereto, as amended by that certain First Amendment to Third Amended and Restated Credit Agreement dated as of April 15, 2019, that certain Second Amendment to Third Amended and Restated Credit Agreement dated as of July 2, 2019, that certain Third Amendment to Third Amended and Restated Credit Agreement dated as of November 4, 2019 and that certain Limited Waiver and Fourth Amendment to Third Amended and Restated Credit Agreement dated as of April 24, 2020.

"*RBL Credit Facility*" means the reserve-based loan facility under the RBL Credit Agreement.

"*RBL Credit Facility Documents*" means the RBL Credit Agreement and any other documentation governing or related to the RBL Credit Facility.

"*RBL Lenders*" means the lenders under the RBL Credit Facility.

"*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

"*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Required Consenting Stakeholders.

"*Released Claims*" means any Claims or Interests that have been released, discharged, or are subject to exculpation pursuant to this Plan.

"*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the Consenting Stakeholders; (b) the indenture trustees under the Debtors' prepetition secured notes indentures; (c) the RBL Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) each current and former Affiliate of each Entity in clause (a) through (e); and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

"*Releasing Parties*" means, collectively, (a) the Consenting Stakeholders; (b) the indenture trustees under the Debtors' prepetition secured notes indentures; (c) the RBL Agent; (d) the DIP Agent; (e) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (f) all holders of Claims or Interests that abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on

9

the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (g) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (h) each current and former Affiliate of each Entity in clause (a) through (g); and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (h), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

"*Reorganized Debtors*" means collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new entity established in connection with the implementation of the Restructuring Transactions.

"*Reorganized Oasis*" means Oasis, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

"*Required Consenting Noteholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting RBL Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required Consenting Stakeholders*" has the meaning set forth in the Restructuring Support Agreement.

"*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of September 29, 2020, by and among the Debtors and the Consenting Stakeholders, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

"*Restructuring Term Sheet*" means the Restructuring Term Sheet attached as Exhibit B to the Restructuring Support Agreement.

"*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in the Plan and Restructuring Support Agreement, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of the Plan.

"*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

"*Second Out Term Lenders*" means the RBL Lenders electing not to participate in the Exit Revolving Facility and any applicable assignees and participants thereof.

"*Second Out Term Loans*" means a first lien senior secured second-out non-amortizing fully-drawn term loan in the principal amount of an individual Second Out Term Lender's RBL Claim, which term loan shall (a) mature seven (7) years after the Effective Date, (b) accrue interest at the LIBO rate plus 3.00% pursuant to a three-month interest period, (C) be repaid in an amount sufficient to repay all then-remaining indebtedness in respect of such Second Out Term Loans seven (7) years after the Effective Date, and otherwise be on terms and conditions consistent with the Restructuring Support Agreement and acceptable to the Required Consenting RBL Lenders.

10

"*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

"*Specified Default Interest*" has the meaning set forth in that certain Limited Waiver and Fourth Amendment to Third Amended and Restated Credit Agreement, dated as of April 24, 2020, among the Borrower, the guarantors party thereto, Wells Fargo Bank, NA, as administrative agent, and the Pre-Petition Lenders party thereto.

"*Third-Party Release*" means the releases set forth in Article VIII.D of the Plan.

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Claim*" means any Claim that is not a Secured Claim.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15)  references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be

conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other Definitive Documents (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *DIP Claims.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Credit Agreement on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, costs, expenses, noncontingent indemnification obligations, and any and all other amounts payable under the DIP Credit Agreement.

Except to the extent that a holder of a DIP Claim agrees to a less favorable treatment, each DIP Claim, as well as any other fees, interest, or other obligations owing to third parties under the DIP Credit Agreement, shall be (a) in the case of DIP Claims other than the principal amount of the loans under the DIP Credit Agreement, paid in full, in Cash, by the Debtors on the Effective Date in accordance with the terms of the DIP Credit Agreement, and (b) in the case of DIP Claims that represent the principal amount of the loans under the DIP Credit Agreement, shall be converted to an identical principal amount of Exit Facility Revolving Loans, and contemporaneously with the foregoing payment and conversion, the DIP Facility shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders, pursuant to the terms of the DIP Credit Agreement.

C.      *Professional Claims.*

1.      <u>Final Fee Applications and Payment of Professional Claims</u>.

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, which the Reorganized

Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Amount on the Effective Date.

        2.    <u>Professional Escrow Account</u>.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Escrow Account with Cash equal to the Professional Amount, which shall be funded by the Reorganized Debtors. The Professional Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

        3.    <u>Professional Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

        4.    <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*D.*      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

*A.*      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | RBL Claims | Impaired | Entitled to Vote |
| Class 4 | Notes  Claims and Mirada Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 7 | Existing Interests Other Than in Oasis | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| Class 8 | Interests in Oasis | Impaired | Entitled to Vote |

**B.**      *Treatment of Claims and Interests.*

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor and in its sole discretion:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)      the collateral securing its Allowed Other Secured Claim;

(iii)      Reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Priority Claims

     (a)    *Classification*:  Class 2 consists of all Other Priority Claims.

     (b)    *Treatment*:  Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

     (c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.   Class 3 – RBL Claims

     (a)    *Allowance*:  On the Effective Date, all RBL Claims shall be deemed Allowed in full, including accrued and unpaid interest (at the applicable default rate), fees, costs, and expenses, plus any and all other amounts owed under the RBL Credit Facility Documents.

     (b)    *Classification*:  Class 3 consists of all RBL Claims.

     (c)    *Treatment*:  On the Effective Date, each holder of an Allowed RBL Claim (i) electing to participate in the Exit Facility by entry into the Exit Facility Commitment Letter will receive, (x) on a dollar-for-dollar basis in exchange for the portion of its RBL Claim representing the principal of the loans owed to such lender under the RBL Credit Agreement, an equal amount of the principal of the revolving loans under the Exit Facility as of the Effective Date, upon the terms and conditions set forth in the Exit Facility Term Sheet and (y) with respect to any other portion of such holder's RBL Claim (to the extent not already paid prior to the Effective Date, including as adequate protection pursuant to the DIP Orders), cash in an amount equal to such portion of such holder's RBL Claim, and (ii) not electing to participate in the Exit Facility by electing not to sign the Exit Facility Commitment Letter (x) shall be deemed to have funded a Second Out Term Loan on a dollar-for-dollar basis in exchange for the portion of its RBL Claim representing the principal of the loans owed to such lender, any unreimbursed claims for professional fees and expenses under the RBL Credit Agreement, and any of such holder's Specified Default Interest and (y) with respect to any other portion of such holder's RBL Claim (to the extent not already paid prior to the Plan Effective Date, including as adequate protection pursuant to the DIP Orders), cash in an amount equal to such portion of such holder's RBL Claim. The Liens securing the loans under the RBL Credit Agreement shall be retained and deemed assigned to the administrative agent under the Exit Facility to secure the Exit Facility upon the Plan Effective Date.

     (d)    *Waiver of Specified Default Interest:*  Notwithstanding the foregoing, on the Effective Date, any Specified Default Interest shall be discharged, released, and deemed waived by all holders of RBL Claims that execute the Restructuring Support Agreement.

     (e)    *Voting:* Class 3 is Impaired under the Plan.  Holders of RBL Claims are entitled to vote to accept or reject the Plan.

4.   Class 4 – Notes Claims and Mirada Claims

     (a)    *Classification*:  Class 4 consists of all Notes Claims and Mirada Claims.

     (b)    *Allowance:*  On the Effective Date, the Notes Claims shall be Allowed in full, including accrued and unpaid interest, fees, costs, and expenses plus any and all other amounts owed under the indentures governing the Notes Claims.

16

(c) *Treatment*: On the Effective Date, each holder of an Allowed Notes Claim or an Allowed Mirada Claim shall receive its Pro Rata share (calculated based on the aggregate amount of all Allowed Notes Claims and Allowed Mirada Claims) of 100% of the New Common Stock, subject to dilution on account of the Management Incentive Plan and the New Warrants; *provided*, that notwithstanding that the Mirada Claims are classified as Class 4 Claims, such claims, in lieu of any treatment as Class 4 Claims, shall be treated in accordance with the Mirada Settlement Agreement..

(d) *Voting*: Class 4 is Impaired under the Plan. Holders of Notes Claims and holders of Mirada Claims are entitled to vote to accept or reject the Plan.

5. Class 5 – General Unsecured Claims

(a) *Classification*: Class 5 consists of all General Unsecured Claims.

(b) *Treatment*: Each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor: (a) payment in full in Cash; or (b) Reinstatement.

(c) *Voting*: Class 5 is Unimpaired under the Plan. Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan

6. Class 6 – Intercompany Claims

(a) *Classification*: Class 6 consists of all Intercompany Claims.

(b) *Treatment*: Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either:

(i) Reinstated; or

(ii) canceled, released, and extinguished and without any distribution at the Debtors' election and in their sole discretion.

(c) *Voting*: Class 6 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 6 is not entitled to vote to accept or reject the Plan.

7. Class 7 – Intercompany Interests Other Than in Oasis

(a) *Classification*: Class 7 consists of all Interests in the Debtors other than in Oasis.

(b) *Treatment:* Each holder of an Interest other than in Oasis shall have such interests, at the option of the applicable Debtor, either:

(i) Reinstated; or

(iii) canceled, released, and extinguished and without any distribution at the Debtors' election and in their sole discretion.

(c) *Voting*: Class 7 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Class 7 is not entitled to vote to accept or reject the Plan.

17

8.   Class 8 – Interests in Oasis

   (a)   *Classification*:  Class 8 consists of all Interests in Oasis.

   (b)   *Treatment*:  Each holder of an Interest in Oasis shall receive its Pro Rata share of the New Warrants.

   (c)   *Voting*:  Class 8 is Impaired under the Plan.  Holders of Interests in Debtors are entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims.*

   Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.   *Elimination of Vacant Classes.*

   Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.   *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

   If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.   *Intercompany Interests.*

   To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

G.   *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

   Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired.

H.   *Controversy Concerning Impairment.*

   If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.   *Subordinated Claims.*

   The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the

18

Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the RBL Claims and Notes Claims and (2) any claim to avoid, subordinate, or disallow any RBL Claims and Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors.  The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents and the Exit Facility Documents, as the boards of directors of the applicable Reorganized Debtors deem appropriate.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations and the DIP Facility, as applicable; (2) the New Common Stock; (3) the proceeds from the Exit Facility; and (4) the New Warrants.

1.      Exit Facility.

On and as of the Effective Date, (a) the Reorganized Debtors shall enter into the Exit Facility by executing and delivering the Exit Facility Documents, (b) all RBL Lenders shall be deemed to be parties to, and bound by, the Exit Facility Credit Agreement, without the need for execution thereof by any such applicable RBL Lender, (c) Reorganized Oasis shall be deemed to have borrowed the available Exit Facility Revolving Loans on the terms and conditions set forth in the Exit Facility Documents, which loans will be guaranteed by each of the other Reorganized Debtors in accordance with the Exit Facility Documents, (d) Reorganized Oasis shall be deemed to have borrowed 100% of the Second Out Term Loans which loans will be guaranteed by each of the other Reorganized Debtors in accordance with the Exit Facility Documents, and (e) the Exit Facility Revolving Lenders shall provide commitments in accordance with the Exit Facility Commitment Letter.

To the extent applicable, Confirmation of the Plan shall be deemed (a) approval of the Exit Facility (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facility, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facility.

As of the Effective Date, the Liens securing the RBL Credit Facility shall be retained, deemed assigned to the Exit Facility Agent to secure the Exit Facility, and shall constitute valid, binding, enforceable, and automatically perfected Liens in the collateral specified in the Exit Facility Documents. To the extent provided in the Exit Facility Documents, the Exit Facility Agent or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The guarantees, mortgages, pledges, Liens, and other security interests retained and/or granted to secure the obligations arising under the Exit Facility Documents have been retained and/or granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents. The Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

20

2.   Issuance of New Common Stock.

The issuance of the New Common Stock, including equity awards reserved for the Management Incentive Plan, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units or equity interests (as the case may be based on how the New Common Stock is denominated and the identity of the Reorganized Debtor issuing such shares, units, or equity interests) of New Common Stock required to be issued under the Plan and pursuant to their New Organizational Documents.

All of the shares, units, or equity interests (as the case may be based on how the New Common Stock is denominated) of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Debtors and the Reorganized Debtors shall use commercially reasonable efforts to cause the New Common Stock to become publicly traded and listed on a national securities exchange on or as soon as reasonably practicable after the Effective Date.

3.   Issuance of New Warrants.

On the Effective Date, Reorganized Oasis will issue the New Warrants only to the extent required to provide for distributions to holders of Interests in Oasis as contemplated by this Plan. All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Any New Common Stock issued upon the exercise of the New Warrants shall be subject to dilution on account of the Management Incentive Plan.

E.   *Approval of the Mirada Settlement Agreement.*

On the Effective Date, the Mirada Settlement Agreement shall be approved in its entirety. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all Claims, Interests, and controversies subject to the Mirada Settlement Agreement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Mirada Settlement Agreement, the compromise and settlement set forth in the Mirada Settlement Agreement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the settlement and compromise set forth in the Mirada Settlement Agreement is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. As set forth in the Mirada Settlement Agreement, on the Effective Date, the Debtors shall (i) pay the sum of $20,000,000.00 for the benefit of certain Mirada related parties and (ii) on or before the 180th day after the date the payment in preceding clause (i) is due, pay the sum of $22,750,000.00 for the benefit of certain Mirada related parties, in each case on the terms set forth in the Mirada Settlement Agreement.

F.   *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Restructuring Support Agreement, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free

21

of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan, the Exit Facility Documents, or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except with respect to Liens securing the RBL Claims and the Exit Facility and except to the extent otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, the DIP Credit Agreement, the RBL Credit Agreement, and the Notes Indentures shall continue in effect solely to the extent necessary to:  (1) permit holders of Claims under the DIP Credit Agreement, the RBL Credit Agreement, and the Notes Indentures to receive their respective distributions pursuant to this Plan; (2) permit the Reorganized Debtors and the Disbursing Agent, as applicable, to make distribution on account of the Allowed Claims under the DIP Credit Agreement, the RBL Credit Agreement, and the Notes Indentures, as applicable; and (3) permit each of the DIP Agent, the RBL Agent and the Notes Trustee to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of this Plan.  Except as provided in this Plan (including Article VI hereof), on the Effective Date, the DIP Agent, the RBL Agent, and the Notes Trustee, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Credit Agreement, the RBL Credit Agreement, and the Notes Indenture, as applicable.  The commitments and obligations (if any) of the holders of the Notes and the lenders under the DIP Credit Agreement and the RBL Credit Agreement to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the DIP Credit Agreement, the RBL Credit Agreement, and the Notes Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.  Notwithstanding anything to the contrary herein or in the Restructuring Support Agreement, in no event will the loans under the RBL Credit Agreement be cancelled or satisfied or repaid in full as a result of the implementation of the Plan, and instead, the loans under the RBL Credit Agreement will be restructured as loans under the Exit Facility Credit Agreement as set forth herein and therein, and the Liens securing the RBL Credit Facility shall be retained by the Exit Facility Agent to secure the Exit Facility.

I.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefit Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Common Stock, including upon the exercise of the New Warrants, as applicable; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facility Documents, as applicable; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or

22

after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facility Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

K.      *Indemnification Obligations.*

All indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) as of the Petition Date for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall, to the fullest extent permitted by applicable law, be reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

L.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and all of the directors for the initial term of the New Board shall be appointed. The New Board will initially consist of seven (7) directors, including: (i) the Chief Executive Officer of Reorganized Oasis, and (ii) six (6) additional directors selected by the Required Consenting Noteholders. In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents. To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code. Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to

23

effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

N.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.      *Management Incentive Plan.*

On the Effective Date, the Reorganized Debtors shall implement the Management Incentive Plan. The Management Incentive Plan shall provide for 5% of the New Common Stock reserved for the Management Incentive Plan to be allocated within thirty (30) days following the Effective Date in the form of restricted stock units (or equivalents) and on terms (including performance metrics and vesting criteria) otherwise to be agreed between management of Reorganized Oasis and the compensation committee of the New Board; *provided* that such period shall be extended automatically by an additional fifteen (15) days if good faith discussions between management of Reorganized Oasis and the New Board regarding the terms of the Management Incentive Plan remain ongoing at the conclusion of the initial thirty (30) day period. The remaining up to 5% of the New Common Stock reserved for the

24

Management Incentive Plan will be available to be allocated after the Effective Date, in the form and on terms as determined by the New Board in consultation with management for the Reorganized Debtors. In connection with the structure, allocation and documentation of the Management Incentive Plan Pool, the compensation committee of the New Board and the participants in the Management Incentive Plan may discuss modifications as may be appropriate to certain employment agreements or letters, indemnification agreements, severance agreements or other agreements entered into with current and former employees and assumed pursuant to the Plan.

Q.      *Employee and Retiree Benefits.*

On and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall adopt, assume, continue, and/or honor in the ordinary course of business all obligations related to all Employee Compensation and Benefits Programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date.  Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall

25

retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Article V.H.1 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims

arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.5 of this Plan.

### C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

No later than seven (7) calendar days before the Confirmation Hearing, the Debtors shall provide notices of proposed Cure amounts to the counterparties to the assumed Executory Contracts or Unexpired Leases, which shall include a description of the procedures for objecting to the proposed Cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Unless otherwise agreed in writing by the parties in the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served, and actually received by the counsel to the Debtor no later than the date and time specified in the notice.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to such assumption or Cure amount.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before fourteen (14) days after the Debtors provide such counterparty with a notice of the proposed Cure amount with respect to the applicable Executory Contract or Unexpired Lease.  Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure amount.  The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may agree.  If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a

counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Employee Compensation and Benefits.*

1.    Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

a.      all employee equity or equity-based incentive plans; and

b.      Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

For the avoidance of doubt on the Effective Date, the Debtors shall (a) assume all employment agreements or letters, indemnification agreements, severance agreements, or other agreements entered into with current and former officers and other employees or (b) to the extent agreed, enter into new agreements with such officers and other employees on terms and conditions acceptable to the Debtor and such employee.

Notwithstanding anything herein to the contrary, the Debtors' Chief Operating Officer shall be deemed to have, as of the Effective Date, irrevocably waived any right to terminate his employment for "Good Reason" (as defined in that certain Fifth Amended and Restated Employment Agreement as of March 20, 2018 by and between Oasis Petroleum Inc. and Taylor Reid) solely to the extent such right arises as a result of him not being appointed to the New Board.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity,

28

self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.       *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.5 of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Thereafter, a Distribution Date shall occur no less frequently than once in every ninety (90) day period, as necessary, in the Reorganized Debtors' sole discretion.

B.       *Disbursing Agent.*

All distributions under the Plan shall be made by the Reorganized Debtors. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.       *Rights and Powers of Disbursing Agent.*

1.   <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

29

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.    Minimum Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

4.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

5.    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest other than the holders of RBL Claims shall be deemed to have surrendered such certificate or instrument to the Distribution Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or

30

agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan or to RBL Claims.

*E.      Manner of Payment.*

1.     All distributions of the New Common Stock to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.     All distributions of Cash to the holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.     At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.      Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock and New Warrants, as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, such New Common Stock and New Warrants will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

*G.      Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

*H.      Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest; *provided* that the foregoing shall not apply to holders of Allowed RBL Claims.

*I.      No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim; *provided* that the foregoing shall not apply with respect to postpetition interest (accruing at the applicable default rate under the RBL Credit Agreement) accruing with respect to the RBL Claims, which RBL Claims shall accrue postpetition interest

31

(accruing at the applicable default rate under the RBL Credit Agreement) to be paid by the Debtors in accordance with the treatment specified for Class 3 in the Plan.

*J.      Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

*K.      Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder; *provided further* that nothing herein shall limit any rights of setoff or recoupment under the Exit Facility Documents.  In no event shall any holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

*L.      Claims Paid or Payable by Third Parties.*

1.   Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.   Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary court of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.R of the Plan.

33

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

F.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

G.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

H.      *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.  Notwithstanding the foregoing, the RBL Claims shall accrue postpetition interest (accruing at the applicable default rate under the RBL Credit Agreement) to be paid by the Debtors in accordance with the treatment specified for Class 3 in the Plan.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether

34

known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan.

**B.      Release of Liens.**

**Except with respect to the Liens securing the RBL Credit Facility, which Liens shall be retained by the Exit Facility Agent to secure the Exit Facility, or as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any holder of such Secured Claim (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such holder, has filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such holder's behalf.**

**C.      Releases by the Debtors.**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against or Interest in a Debtor or other Entity, or that any holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors, the Debtors' in- or out-of-court**

35

restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan or the Restructuring Transactions or (b) any individual from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Releasing Parties, including, without limitation, the Releasing Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for a hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### D.      Releases by the Releasing Parties.

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan or the Restructuring Transactions or (b) any individual from any claim or Cause of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct.

36

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual, (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for a hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

E.      *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Facility, the Exit Facility, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Exit Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above do not exculpate any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan.

F.      *Injunction.*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Effective Date obligations of any party or entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility),

37

**or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan.**

*G.        Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H.        Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*I.        Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

*A.        Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

a.    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Required Consenting Stakeholders, which shall:

   i.    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   ii.    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

   iii.    authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions; (b) distribute the New Common Stock and New Warrants pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash, the New Warrants and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facility Credit Agreement and Management

38

Incentive Plan, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

    iv.    authorize the implementation of the Plan in accordance with its terms;

    v.    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

    vi.    be a Final Order;

b.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

c.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;

d.    the Restructuring Support Agreement shall remain in full force and effect;

e.    the Final DIP Order shall remain in full force and effect;

f.    the Mirada Settlement Agreement shall be effective in accordance with its terms and remain in full force and effect;

g.    the OMP Waiver Agreement shall be effective in accordance with its terms and remain in full force and effect;

h.    the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing in accordance with the terms of the Exit Facility and the closing of the Exit Facility shall have occurred;

i.    all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such fees and expenses;

j.    all Consenting Stakeholder Fees and Expenses shall have been paid in full in accordance with the Restructuring Support Agreement; and

k.    the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan.

B.    *Waiver of Conditions.*

Any one or more of the conditions to Consummation set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required Consenting Stakeholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

39

*C.       Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or Restructuring Support Agreement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

*D.       Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

*A.       Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*B.       Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.       Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

b.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c.   resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

d.   ensure that distributions to holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

e.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

f.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g.   enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

h.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

k.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

m.   enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.   determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

o.   enter an order concluding or closing the Chapter 11 Cases;

p.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

q.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.   determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

s.   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

t.   hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

u.   hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

v.   enforce all orders previously entered by the Bankruptcy Court; and

w.   hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents and the Exit Facility and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.   *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.   *Additional Documents.*

On or before the Effective Date, and consistent with the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan

and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## C. *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

## D. *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Confirmation Date.

## E. *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

## F. *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## G. *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Oasis Petroleum Inc. | Kirkland & Ellis LLP<br>609 Main Street<br>Houston, Texas 77002<br>Attention: Brian Schartz (brian.schartz@kirkland.com)<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention: Chad J. Husnick, P.C.<br>           (chad.husnick@kirkland.com)<br>           David. L. Eaton (david.eaton@kirkland.com) |

43

| | John Luze (john.luze@kirkland.com)<br>and<br><br>Kirkland & Ellis LLP<br>1301 N. Pennsylvania Ave., N.W.<br>Washington, D.C. 20004<br>Attention: AnnElyse Scarlett Gains<br>   (annelyse.gains@kirkland.com)<br>and<br><br>Jackson Walker L.L.P.<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention: Bruce J. Ruzinsky (bruzinsky@jw.com)<br>   Matthew D. Cavenaugh<br>   (mcavenaugh@jw.com)<br>   Jennifer F. Wertz (jwertz@jw.com)<br>   Vienna F. Anaya (vanaya@jw.com) |
|---|---|
| **United States Trustee** | **Counsel to the Consenting RBL Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Vinson & Elkins LLP<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3900<br>Dallas, Texas 75201<br>Attention:  Bill Wallander (bwallander@velaw.com)<br>   Bradley Foxman (bfoxman@velaw.com)<br>   Matthew Struble (mstruble@velaw.com) |
| **Counsel to the Consenting Noteholders** | |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attention: Andrew N. Rosenberg (arosenberg@paulweiss.com)<br>   Alice Belisle Eaton (aeaton@paulweiss.com)<br>   Alexander Woolverton (awoolverton@paulweiss.com) | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

44

*I.*     *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*J.*     *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.kccllc.net/oasis or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

*K.*     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however*, any such alteration or interpretation shall be acceptable to the Debtors and the Required Consenting Stakeholders.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

*L.*     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

*M.*     *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*N.*     *Waiver or Estoppel.*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if

such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: September 29, 2020

OASIS PETROLEUM INC.

on behalf of itself and all other Debtors

*/s/ Michael H. Lou*
Name:  Michael H. Lou
Title:  Chief Financial Officer and Executive Vice President

**Exhibit B**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 12.02, this "**Agreement**") is made and entered into as of September 29, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Oasis Petroleum Inc., a corporation incorporated under the Laws of Delaware ("**Oasis**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Notes Claims, and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Noteholders**"); and

    iii.    the undersigned holders of the RBL Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (in each case solely in their capacity as such, collectively, the "**Consenting RBL Lenders**" and, together with the Consenting Noteholders, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, including for the avoidance of

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

doubt entry into the DIP Facility (as defined below) and entry into the Exit Facility (as defined below), collectively, the "**Restructuring Transactions**");

WHEREAS, the Company Parties and certain of the Consenting RBL Lenders (in such capacity, the "**DIP Lenders**") have agreed to enter into a senior secured superpriority revolving debtor-in-possession financing facility (the "**DIP Facility**") substantially on the terms set forth in the term sheet attached hereto as **Exhibit C** (the "**DIP Term Sheet**");

WHEREAS, the Company Parties and certain of the Consenting RBL Lenders have agreed to enter into a new money senior secured reserve-based facility (the "**Exit Facility**") substantially on the terms set forth in the term sheet attached hereto as **Exhibit D** hereto (the "**Exit Facility Term Sheet**");

WHEREAS, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**Administrative Claim**" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Claims for compensation for services rendered or reimbursement of expenses incurred under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the RBL and/or the Notes, including any successors thereto.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 12.02 (including the Restructuring Term Sheet).

2

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder that becomes a party hereto after the Agreement Effective Date, as of the date and time such Consenting Stakeholder executes and delivers a Joinder in accordance with the terms hereof) to the Termination Date applicable to that Party.

"**Allowed**" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a final order, as applicable.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas presiding over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cause of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

3

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims**" means any Claim against a Company Party, including the DIP Claims, the RBL Claims and the Notes Claims.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party, including the DIP Claims, the RBL Claims and the Notes Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan, which shall be consistent with this Agreement.

"**Consenting Noteholders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting RBL Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholder Fees and Expenses**" means all accrued but unpaid reasonable and documented fees and expenses (whether incurred prior to or after the commencement of the Chapter 11 Cases) related to the formulation, development, negotiation, documentation, and implementation of this Agreement, the Plan, the Restructuring Transactions contemplated thereby and hereby, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, in each case, of:  (i)(a) Vinson & Elkins LLP, as counsel to Wells Fargo Bank, N.A., in its capacity as administrative agent under the RBL Credit Agreement, (b) any local counsel to Wells Fargo Bank, N.A., in its capacity as administrative agent under the RBL Credit Agreement, and (c) FTI Consulting, Inc., as financial advisor to Vinson & Elkins LLP in connection with its representation of Wells Fargo Bank, N.A., in its capacity as administrative agent under the RBL Credit Agreement, and (ii)(a) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Consenting Noteholders, (b) Porter Hedges LLP, as local counsel to the Consenting Noteholders, and (c) Evercore Group L.L.C., as financial advisor to the Consenting Noteholders, in the case of clause (ii), in accordance with the engagement letters and/or fee letters, if applicable, among such consultant or professional and any of the Company Parties and, in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals or the Company Parties.

"**Constitutional Documents**" means certificates of formation, limited liability company agreements, partnership agreements, certificates of incorporation, bylaws or any similar entity organizational or constitutive document, as applicable.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

4

"**DIP Agent**" means Wells Fargo Bank, N.A., in its capacity as administrative agent and collateral agent under the DIP Facility.

"**DIP Commitment Letter**" means that certain Commitment Letter dated as of the date hereof executed by Oasis Petroleum North America, L.L.C., a Delaware limited liability company, the DIP Agent and the DIP Lenders party thereto, as the same may be amended from time to time in accordance with the terms thereof.

"**DIP Claims**" means all Claims derived from, based upon, or secured pursuant to the DIP Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder, in each case, with respect to the DIP Facility.

"**DIP Facility**" has the meaning set forth in the recitals to this Agreement.

"**DIP Facility Credit Agreement**" means that certain debtor-in-possession credit agreement governing the DIP Facility by and among Oasis Petroleum North America LLC, a Delaware limited liability company as "Borrower", the other Debtors, the DIP Lenders party thereto from time to time, and the DIP Agent, which shall be consistent with the terms set forth in the DIP Term Sheet.

"**DIP Facility Documents**" means the DIP Facility Credit Agreement, the "Loan Documents" as defined in the DIP Facility Credit Agreement, and any other documentation necessary or appropriate to effectuate the incurrence of the DIP Facility.

"**DIP Facility Fee Letters**" has the meaning set forth in Section 2(e).

"**DIP Lenders**" has the meaning set forth in the recitals to this Agreement.

"**DIP Orders**" means, as applicable, the Interim DIP Order or the Final DIP Order.

"**DIP Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Estate**" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facility**" has the meaning set forth in the recitals to this Agreement.

"**Exit Facility Commitment Letter**" means that certain Commitment Letter dated as of the date hereof executed by Oasis Petroleum North America, L.L.C., a Delaware limited liability company, and the Initial Exit Facility Lenders, as the same may be amended (including as

supplemented by a joinder of additional commitment parties) from time to time in accordance with the terms thereof, which memorializes a several and not joint commitment by each Initial Exit Facility Lender to provide a portion of the Exit Facility in the amount set forth opposite each Initial Exit Facility Lender's name in the Exit Facility Commitment Letter (or joinder thereto, as applicable), as the same may be reduced from time to time in accordance with the Exit Facility Commitment Letter or the Exit Facility Term Sheet.

"**Exit Facility Credit Agreement**" means the credit agreement governing the Exit Facility, which shall be consistent with the terms set forth in the Exit Facility Commitment Letter and the Exit Facility Term Sheet and included in the Plan Supplement.

"**Exit Facility Documents**" means the Exit Facility Credit Agreement and any other documentation necessary or appropriate to effectuate the incurrence of the Exit Facility, including the Exit Facility Commitment Letter and the Exit Facility Fee Letter.

"**Exit Facility Fee Letter**" has the meaning set forth in Section 2(d).

"**Exit Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Final DIP Order**" means the final order of the Bankruptcy Court approving the Debtors' entry into the DIP Facility and use of cash collateral.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties file contemporaneously with the commencement of the Chapter 11 Cases.

"**General Unsecured Claim**" means any Claim other than an Administrative Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a RBL Claim, a DIP Claim, a Notes Claim, or a Mirada Claim.

"**Initial Exit Facility Lenders**" has the meaning given to such term in the Exit Facility Term Sheet.

"**Intercompany Claim**" means any Claim held by a Debtor against another Debtor.

6

"**Intercompany Interest**" means an Interest in a Debtor held by another Debtor.

"**Interim DIP Order**" means the interim order of the Bankruptcy Court approving the Debtors' entry into the DIP Facility and use of cash collateral.

"**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit F**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" means the milestones set forth in Section 4.

"**Mirada**" means, collectively, the Mirada Parties and the Mirada Individuals, in each case as defined in the Mirada Settlement Agreement.

"**Mirada Claims**" means any and all Claims and/or Interests asserted by Mirada including, without limitation, all claims asserted in that certain case captioned *Mirada Energy, et al.* v. *Oasis Petroleum Inc.*, et al., No. 2017-19911 (Tex. Dist. Ct.).

"**Mirada Settlement Agreement**" means that certain Settlement and Mutual Release Agreement, dated as of September 28, 2020, by and between certain of the Debtors and their Affiliates and Mirada, which shall be included in the Plan Supplement.

"**New Organizational Documents**" means the Constitutional Documents for Reorganized Oasis, and each of the other Company Parties, including articles of incorporation, bylaws, stockholders' agreement, and the identity of proposed members of Reorganized Oasis's board of directors, board of managers, or similar governing body.

"**New Warrants**" has the meaning given to such term in the Restructuring Term Sheet.

"**Noteholders**" means the holders of Notes, from time to time.

"**Notes**" means (i) the senior unsecured notes, due November 1, 2021, issued by Oasis Petroleum Inc; (ii) the senior unsecured notes, due March 15, 2022, issued by Oasis Petroleum Inc; (iii) the senior unsecured convertible notes, due September 15, 2023, issued by Oasis Petroleum Inc; (iv) the senior unsecured notes, due January 15, 2023, issued by Oasis Petroleum Inc; and (v) the senior unsecured notes, due May 1, 2026, issued by Oasis Petroleum Inc.

7

"**Notes Claim**" means all Claims derived from or based upon the Notes, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"**Oasis**" has the meaning set forth in the preamble to this Agreement.

"**OMP Waiver Agreement**" means that certain  Limited Waiver and Forbearance Extension to Credit Agreement, dated as of the date hereof, among OMP Operating LLC, as borrower, Oasis Midstream Partners LP, as parent, the guarantors party thereto, Wells Fargo Bank, N.A., as administrative agent and issuing bank, and the lenders party thereto.

"**Other Priority Claim**" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"**Other Secured Claim**" means any Secured Claim, including any Secured Tax Claim, other than a RBL Claim or a DIP Claim.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meets the requirements of Section 7.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 7.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, which shall be consistent with this Agreement.

"**Plan Effective Date**" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court which shall include, without limitation (i) schedules of assumed or rejected contracts, (ii) the New Organizational Documents; (iii) the documentation related to the New Warrants; (iv) required disclosures regarding directors and officers of Reorganized Oasis (consistent with the terms of the Restructuring Term Sheet; (v) the form of registration rights agreement, which shall be in form and substance reasonably acceptable to the Required Consenting Noteholders; (vi) the Exit Facility Credit Agreement; and (vii) the Mirada Settlement Agreement.

"**Priority Tax Claim**" means any Claim of a Governmental Unit (as defined in section 101(27) the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Proof of Claim**" means a proof of claim filed against any of the Debtors in the Chapter 11 Cases by the applicable claims bar date.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**RBL Agent**" means Wells Fargo Bank, N.A., in its capacity as administrative agent under the RBL Credit Agreement.

"**RBL Claims**" means all Claims derived from, based upon, or secured pursuant to the RBL Credit Agreement, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

"**RBL Credit Agreement**" means that certain Third Amended and Restated Credit Agreement, dated as of October 16, 2018, by and among Oasis Petroleum Inc., as parent, Oasis Petroleum North America LLC, as borrower, Wells Fargo Bank, N.A., as Administrative Agent and the other parties party thereto, as amended by that certain First Amendment to Third Amended and Restated Credit Agreement dated as of April 15, 2019, that certain Second Amendment to Third Amended and Restated Credit Agreement dated as of July 2, 2019, that certain Third Amendment to Third Amended and Restated Credit Agreement dated as of November 4, 2019 and that certain Limited Waiver and Fourth Amendment to Third Amended and Restated Credit Agreement dated as of April 24, 2020.

"**RBL Facility Documents**" means the RBL Credit Agreement and any other documentation governing or related to the revolving credit facility governed by the RBL Credit Agreement.

"**RBL Lenders**" means the lenders under the RBL Credit Agreement, from time to time.

"**Reorganized Debtors**" means a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.

"**Reorganized Oasis**" means Oasis, or any successor or assign, by merger, consolidation, or otherwise, on or after the Plan Effective Date.

"**Required Consenting Noteholders**" means, as of the relevant date, Consenting Noteholders holding over 50% of the aggregate outstanding principal amount of the Notes Claims that are held by Consenting Noteholders.

"**Required Consenting RBL Lenders**" means, as of the relevant date, Consenting RBL Lenders holding at least 50.01% of the aggregate outstanding principal amount of the RBL Claims that is held by Consenting RBL Lenders.

9

"**Required Consenting Stakeholders**" means the Required Consenting RBL Lenders and the Required Consenting Noteholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Secured Tax Claim**" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan, including the Disclosure Statement and related ballots.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 10.01, 10.02, 10.03, or 10.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the indentures governing the Notes.

1.02. Interpretation. For purposes of this Agreement:

(a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended,

10

restated, supplemented, or otherwise modified from time to time in accordance herewith; provided that any capitalized terms herein which are defined with reference to another agreement are, unless otherwise provided herein, defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not;

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 12.10 other than counsel to the Company Parties; and

(k)     Rule 9006(a) of the Federal Rules of Bankruptcy Procedure applies in computing any period of time prescribed or allowed herein only to the extent such period of time governs a Milestone pertaining to the entry of an order by the Bankruptcy Court in the Chapter 11 Cases.

**Section 2.    *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Central Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement:

(i)     holders of at least one-half (1/2) of the aggregate outstanding principal amount of the Notes Claims; and

(ii)     holders of at least two-thirds (2/3) of the aggregate outstanding principal amount of the RBL Claims;

(c)     the Company Parties shall have executed and delivered the Exit Facility Commitment Letter and a Fee Letter (the "**Exit Facility Fee Letter**") with the Initial Exit Facility Lenders;

11

(d)     the Company Parties and the DIP Lenders shall have executed and delivered the DIP Commitment Letter and the fee letters relating thereto (the "**DIP Facility Fee Letters**") and the Company Parties shall have paid any fees thereunder or relating thereto;

(e)     The Company Parties and the Consenting RBL Lenders shall have executed and delivered the OMP Waiver Agreement;

(f)     the Company Parties shall have paid, or caused to be paid, all Consenting Stakeholder Fees and Expenses invoiced at least one (1) Business Day prior to the Agreement Effective Date; and

(g)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 12.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

2.02.    With respect to any Consenting Stakeholder that becomes a party to this Agreement pursuant to Section 7 hereof or by execution of a Joinder, this Agreement shall become effective as to such Consenting Stakeholder at the time it executes and delivers a Transfer Agreement or Joinder, as applicable, in accordance with the terms hereof.

**Section 3.**    *Definitive Documents*.

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following:

(a)     the Plan;

(b)     the Confirmation Order and pleadings in support of its entry;

(c)     the Disclosure Statement and its exhibits, including the Solicitation Procedures, and the motion seeking approval of the same;

(d)     the Disclosure Statement Order and its exhibits, including the other Solicitation Materials;

(e)     the First Day Pleadings and all orders sought pursuant thereto;

(f)     the Plan Supplement;

(g)     the DIP Facility Documents and the motion seeking approval of the DIP Facility;

(h)     the DIP Orders;

(i)     the Exit Facility Documents;

(j)     the documentation related to the New Warrants;

(k)     the New Organizational Documents; and

(l)      the Mirada Settlement Agreement.

3.02.   The Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion and, except as expressly contemplated in this Agreement (including as set forth in the exhibits and annexes hereto), shall be consistent with this Agreement.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall be consistent with the terms of this Agreement in all respects, as they may be modified, amended, or supplemented in accordance with Section 11.  The Definitive Documents (and any amendments or modifications thereto) not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; *provided*, that the Definitive Documents (and any amendments or modifications thereto) in Sections 3.01(a), (b), (g), (h), and (i) shall be in form and substance acceptable to the Company Parties, the RBL Agent, and the Required Consenting Stakeholders.

**Section 4.**      *Milestones*.

4.01.   The following Milestones shall apply to this Agreement:

(a)      The Company Parties shall have disseminated the Solicitation Materials and thereby commenced solicitation of votes to accept or reject the Plan by no later than September 30, 2020;

(b)      The Petition Date shall occur by September 30, 2020;

(c)      Not later than three (3) Business Days after the Petition Date, the Debtors shall have obtained entry by the Court of the Interim DIP Order;

(d)      Not later than thirty (30) calendar days after the Petition Date, the Debtors shall have filed with the Court (i) the Plan, and (ii) the Disclosure Statement;

(e)      Not later than thirty (30) calendar days after the Petition Date, the Debtors shall have filed with the Bankruptcy Court a motion to establish a bar date for filing proofs of claim; *provided* that the foregoing Milestone shall not apply in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of the Plan prior to the Petition Date;

(f)      Not later than thirty (30) calendar days after the Petition Date, the Debtors shall have obtained entry by the Court of the Final DIP Order; *provided* that the foregoing Milestone shall automatically be extended to forty-five (45) calendar days after the Petition Date in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of the Plan prior to the Petition Date; *provided further*, that in no event shall the foregoing Milestone be later than immediately preceding the hearing on confirmation of the Plan;

(g)      Not later than sixty-five (65) calendar days after the Petition Date, the Debtors shall have obtained entry by the Court of the Disclosure Statement Order;

13

(h)     Not later than one hundred ten (110) calendar days after the Petition Date, the Debtors shall have obtained entry by the Court of the Confirmation Order; and

(i)     Not later than December 20, 2020, the Plan Effective Date shall have occurred.

4.02.   The Milestones may be extended or waived with the prior written consent (which may be an email between counsel to the Company Parties and the Required Consenting Stakeholders) of the Required Consenting Stakeholders.

**Section 5.    *Commitments of the Consenting Stakeholders*.**

5.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, each Consenting Stakeholder agrees, severally, and not jointly, in respect of all of its Company Claims/Interests, to:

(a)     support the Restructuring Transactions and vote and exercise any powers or rights available to it with respect to any Company Claims in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)     use commercially reasonable efforts to cooperate with and, subject to applicable Laws, assist the Company Parties in obtaining additional support for the Agreement and the Restructuring Transactions from (1) in the case of the Consenting RBL Lenders, the other RBL Lenders, and (2) in the case of the Consenting Noteholders, the other Noteholders;

(c)     solely with respect to the Consenting RBL Lenders, to the extent any Consenting RBL Lender is not a party to the DIP Commitment Letter, such Consenting RBL Lender agrees to execute the DIP Commitment Letter unless otherwise agreed by the RBL Agent;

(d)     solely with respect to the Consenting RBL Lenders who are not Initial Exit Facility Lenders, execute the Exit Facility Commitment Letter;

(e)     use commercially reasonable efforts to give any notice, order, instruction, or direction to the applicable Agents/Trustees reasonably necessary to give effect to the Restructuring Transactions; *provided* that in no event shall the Consenting Stakeholder be required to bear responsibility for any out-of-pocket costs related to any such notice, order, instruction, or discretion; and

(f)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

5.02.   <u>Plan Voting</u>.   In addition to the obligations set forth in Section 5.01, during the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

14

(a)      vote each of its Company Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(b)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(c)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a) and (b) above.

5.03.   Negative Commitments.  During the Agreement Effective Period, each Consenting Stakeholder agrees, severally, and not jointly, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(d)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(e)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests against the  Company Parties, other than to enforce this Agreement, the DIP Orders, the DIP Facility Documents, the Plan, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement;

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(g)      solely as to the Consenting Noteholders, object to or commence any legal proceeding challenging (i) the adequate protection granted or proposed to be granted to the holders of the RBL Claims under the DIP Orders or (ii) the DIP Facility Documents or the entry of the DIP Orders; or

(h)      object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

15

5.04.   <u>Hedging Program</u>. The Debtors shall provide information to the advisors to the Consenting Stakeholders regarding any Swap Agreements to be entered into under the DIP Credit Agreement, including draft documentation, as soon as reasonably practicable in advance of entry into any Swap Agreements.  The Debtors shall consult with the advisors to the Consenting Stakeholders in advance of entry into any Swap Agreement, and shall reasonably incorporate any comments and direction from the advisors to the Consenting Stakeholders prior to entry into any Swap Agreement.

5.05.   <u>Additional Provisions Regarding the Consenting Stakeholders' Commitments</u>.

(a)   The Parties understand that the Consenting RBL Lenders are engaged in a wide range of financial services and businesses.  In furtherance of the foregoing, the Parties acknowledge and agree that, a Consenting RBL Lender may indicate on its signature page hereto that it is executing this Agreement on behalf of a specific trading desk(s) and/or business group(s) of such Consenting RBL Lender, and if so indicated, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Consenting RBL Lender until such trading desk or business group is or becomes a party to this Agreement.

(b)   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(i)   be construed to prohibit any Consenting Stakeholder from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring Transactions;

(ii)   affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(iii)   impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(iv)   prevent any Consenting Stakeholder from enforcing this Agreement, the DIP Orders, the DIP Facility Documents, the Plan, the Confirmation Order, or any other Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents;

(v)   (i) prevent any Consenting Stakeholder from taking any action which is required by applicable Law, (ii) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege, or (iii) require any Consenting Stakeholder to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations; *provided*, that if any Consenting Stakeholder proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable Law, such Consenting Stakeholder shall, to the

extent practicable, provide advance reasonable notice to the Company Parties, and Counsel to the Company Parties;

(vi)    prevent any Consenting Stakeholder by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(vii)    prevent any Consenting Stakeholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company Claims/Interests in accordance with the terms of the DIP Orders, the DIP Facility Documents, or the RBL Facility Documents (including, without limitation, the filing of a proof of claim against any Company Party); or

(viii)    obligate any Consenting Stakeholder to deliver a vote to support the Plan or prohibit any Consenting Stakeholder from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date occurring as a result of the occurrence of the Plan Effective Date), and upon the Termination Date as to a Consenting Stakeholder (other than a Termination Date occurring as a result of the occurrence of the Plan Effective Date), such Consenting Stakeholder's vote shall automatically be deemed void *ab initio* and such Consenting Stakeholder shall have a reasonable opportunity to cast a vote.

5.06.    Limitation on Consenting Stakeholders' Commitments.  Notwithstanding any other provision of this Agreement to the contrary, including this Section 5, nothing in this Agreement shall require any Consenting Stakeholder to incur, assume, become liable for any expenses, liabilities, or other obligations, or to commence litigation or agree to any commitments, undertakings, concessions, indemnities, or other arrangements to such Consenting Stakeholder that could result in expenses, liabilities, or other obligations to such Consenting Stakeholder other than as specifically and expressly required in this Agreement, the DIP Commitment Letter, or the Exit Facility Commitment Letter.

**Section 6.    *Commitments of the Company Parties*.**

6.01.    Affirmative Commitments.  Except as set forth in Section 6.03, during the Agreement Effective Period, each of the Company Parties agrees to:

(a)    support and take all steps reasonably necessary to consummate the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

17

(e)    (1) provide counsel for the Consenting RBL Lenders and the Consenting Noteholders a reasonable opportunity (which, to the extent practicable, shall be no less than two (2) Business Days) to review draft copies of all pleadings, motions, and proposed orders (including, without limitation, the First Day Pleadings and all "second day" motions) and, (2) to the extent reasonably practicable, provide a reasonable opportunity to counsel for the Consenting RBL Lenders and the Consenting Noteholders, to review draft copies of all other documents that the Company Parties intend to file with Bankruptcy Court and the Definitive Documents, as applicable;

(f)    oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders and, to the extent the Company Parties receive any Joinders or Transfers Agreements, to notify counsel to the Consenting Stakeholders of such Joinders and Transfer Agreements;

(h)    consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the completion and execution of the Definitive Documents and the implementation of the Restructuring Transactions;

(i)    upon reasonable request of any Consenting Stakeholder, inform the advisors to such Consenting Stakeholder as to:  (1) the material business and financial (including liquidity) performance of the Company Parties; (2) the status and progress of the Restructuring Transactions, including the negotiations of the Definitive Documents; and (3) the status of obtaining any necessary or desirable authorizations (including consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body, or any stock exchange;

(j)    inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of: (1) any event or circumstance that has occurred that would permit any Party to terminate this Agreement with respect to such Party; (2) any matter or circumstance which they know to be a material impediment to the implementation or consummation of the Restructuring Transactions; (3) any notice of any commencement of any material involuntary insolvency proceeding, legal suit for payment of debt, or enforcement of a security interest by any person in respect of any Company Party; (4) any breach of this Agreement (including a breach by any Company Party); and (5) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(k)    use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(l)      operate their businesses in the ordinary course, taking into account the Restructuring Transactions and the Chapter 11 Cases;

(m)      comply with the terms, conditions, and obligations of the DIP Facility Documents and the DIP Orders, once approved or entered, as applicable, by the Bankruptcy Court;

(n)      timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Stakeholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

(o)      timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Stakeholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan reorganization, as applicable;

(p)      not engage in any material merger, consolidation, disposition, acquisition investment, dividend, sale-leaseback, or similar transaction outside the ordinary course without the consent of the Consenting Stakeholders, except as provided in the Definitive Documents; and

(q)      subject to the terms of the DIP Orders or any other applicable order of the Bankruptcy Court, timely pay the Consenting Stakeholder Fees and Expenses arising prior to and after the Agreement Effective Date, consistent with all governing engagement agreements.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 6.03, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      modify the Plan, in whole or in part, in a manner that is inconsistent with this Agreement without the consent of the Required Consenting Stakeholders; or

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan.

6.03.   <u>Additional Provisions Regarding Company Parties' Commitments</u>.

(a)      Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, to take any action or to refrain from taking any action with

respect to the Restructuring Transactions to the extent such Company Party, board of directors, board of managers, or similar governing body of a Company Party believes in good faith, after consulting with counsel, that the taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 6.03(a) shall not be deemed to constitute a breach of this Agreement; *provided* that any Company Party that exercises its fiduciary duties to take any action or to refrain from taking any action as contemplated by the foregoing shall provide prompt written notice of such action or inaction to counsel to the Consenting Stakeholders within two (2) Business Days following any such action or inaction; *provided further* nothing in this Section 6.03(a) shall impede any Party's right to terminate this Agreement pursuant to Section 10, including, for the avoidance of doubt, the Consenting Stakeholders' rights to terminate in accordance with Section 10.01.

(b)      Notwithstanding anything to the contrary in this Agreement (but subject to Section 6.03(a)), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider or respond to Alternative Restructuring Proposals; provided, that if any Company Party receives a written proposal or expression of interests regarding any Alternative Restructuring Proposal, then within two (2) Business Days of receipt thereof, the Company Party shall notify (with email being sufficient) counsel to the Consenting Stakeholders and DIP Agent of any such proposal or expression of interest, with such notice to include a copy of such proposal if it is in writing, or otherwise a summary of the material terms thereof; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; provided, that the Company Parties shall provide copies of any such Alternative Restructuring Proposal to the financial advisors and counsel of the Consenting Stakeholders no later than two (2) Business Days following receipt thereof by the Company Parties or their advisors and (f) enter into or continue discussions or negotiations with holders of Company Claims/Interests (including any Consenting Stakeholder) regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that if any Company Party receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (i) provide such information to the advisors to the Consenting Stakeholders and DIP Agent regarding such discussions as is reasonably necessary to keep the Consenting Stakeholders and DIP Agent reasonably informed as to the status and substance of such discussions, and (ii) use commercially reasonable efforts to respond promptly to information requests and questions from counsel to the Consenting Stakeholders and DIP Agent relating to such proposal.

(c)      Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

20

**Section 7.**     *Transfer of Company Claims/Interests and Joinders*.

7.01.   <u>Transfer Restrictions</u>.  During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests other than any RBL Claims or any DIP Claims, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)     either (i) the transferee executes and delivers to the Company Parties, and in the case of a transferee of a Consenting Noteholder, counsel to the Consenting Noteholders in accordance with Section 12.10 by the date of the Transfer or, in the case of a transferee of a Consenting RBL Lender, counsel to the Consenting RBL Lenders in accordance with Section 12.10 by the date of the Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

7.02.   <u>Effect of Transfer</u>.  Upon compliance with the requirements of Section 7.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 7.01 shall be void *ab initio*.

7.03.   <u>Consenting Stakeholder Exception</u>.  This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; <u>provided</u>, <u>however</u>, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of becoming aware of its failure to provide such notice; *provided*, that any failure by such Consenting Stakeholder to provide notice of such acquisition shall not be deemed a material breach of such Consenting Stakeholder's obligations hereunder to the extent such Consenting Stakeholder provides notice of such acquisition as soon as is reasonably practicable.  Any RBL Lender that is not a Consenting RBL Lender can join this Agreement at any time prior to the Voting Deadline (as defined in the Plan) by executing a Joinder in the form attached to this Agreement (and by executing a joinder to the Exit Facility Commitment Letter in accordance with the terms thereof) and delivering an executed copy of each to counsel to the Company Parties and counsel to the Consenting RBL Lenders in accordance with Section 12.10.

21

7.04.   <u>No Obligation</u>.  This Section 7 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

7.05.   <u>Qualified Marketmaker Exceptions</u>.  Notwithstanding Section 7.01, a Qualified Marketmaker that acquires any Company Claims/Interests from a Consenting Stakeholder with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently Transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within fifteen (15) Business Days of its acquisition; (b) the transferee otherwise is a Permitted Transferee under Section 7.01 and is or becomes a Consenting Stakeholder at the time of such transfer; and (c) the Transfer otherwise is a Permitted Transfer under Section 7.01.  Notwithstanding Section 7.01 and Section 7.03, to the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.  To the extent that a Qualified Marketmaker that is not otherwise a Party to this Agreement acquires Company Claims/Interests of a Consenting Creditor and such Qualified Marketmaker is eligible and entitled to vote such Company Claims/Interests acquired pursuant to this Section 7.05, and such Qualified Marketmaker is not otherwise precluded from voting such Company Claims/Interests in favor of the Plan, and receives a separate ballot for such Company Claims/Interests, such Qualified Marketmaker shall vote such Company Claims/Interests to accept the Plan on a timely basis as contemplated hereunder.

7.06.   <u>General Exception</u>.  Notwithstanding anything to the contrary in this Section 7, the restrictions on Transfer set forth in this Section 7 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

7.07.   The Company Parties understand that the Consenting Stakeholders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Stakeholders that principally manage and/or supervise the Consenting Stakeholder's investment in the Company Parties included on the signature page hereto, and shall not apply to any other trading desk or business group of the Consenting Stakeholder so long as they are not acting at the direction or for the benefit of such trading desk(s) and/or business group(s) of the Consenting Stakeholder whose investment in the Company Parties is included on the signature page hereto or in connection with such investment of the Consenting Stakeholder in the Company Parties.

22

7.08.   Joinder.  Any person or entity executing and delivering a Joinder:

(a)     becomes, and shall be treated for all purposes under this Agreement as, a Party to this Agreement with respect to all Company Claims/Interests that such person or entity holds and subsequently acquires;

(b)     agrees to be bound by all of the terms of this Agreement (as such terms may be amended from time to time in accordance with the terms hereof);

(c)     solely with respect to any RBL Lender, agrees to become a party to the Exit Facility Commitment Letter; and

(d)     is deemed, without further action, to make to the other Parties hereto the representations and warranties that the Parties to this Agreement make in Sections 8 and 9 of this Agreement, in each case as of the date of the Joinder.

**Section 8.     *Representations and Warranties of Consenting Stakeholders*.**  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)     it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 7); *provided* that notwithstanding anything to the contrary herein, this representation shall only apply to each Consenting RBL Lender as of the date such Consenting Lender executes this Agreement;

(b)     it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests subject to applicable Law and, with respect to the RBL Claims, the RBL Credit Agreement;

(c)     such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)     solely with respect to holders of Company Claims/Interests other than holders of RBL Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 9.**     *Mutual Representations, Warranties, and Covenants*.     Each of the Parties represents, warrants, and covenants to each other Party that, as of the date such Party executes and delivers this Agreement, on the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except (i) as expressly provided in this Agreement, the Plan, and the Bankruptcy Code or (ii) as may be necessary and/or required by the United States Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws, no material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body is required in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into, and performance by it of, this Agreement and the Restructuring Transactions contemplated by this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement regarding the Company Parties that have not been disclosed to all Parties to this Agreement.

**Section 10.**     *Termination Events*.

10.01.  Consenting Stakeholder Termination Events.  This Agreement may be terminated (a) with respect to the Consenting RBL Lenders, by the Required Consenting RBL Lenders, and (b) with respect to the Consenting Noteholders, by the Required Consenting Noteholders, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 12.10 hereof upon the occurrence of the following events:

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured for four (4) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 12.10 hereof detailing any such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment, or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains

24

in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 12.10 hereof detailing any such issuance; provided, however, a Consenting Stakeholder cannot use this provision to terminate the Agreement if it sought or requested such ruling or order in contravention of any obligation set out in this Agreement

(c) the Bankruptcy Court enters an order denying confirmation of the Plan;

(d) the Bankruptcy Court enters an order, or any Company Party files a motion or application seeking an order (without the prior written consent of the Required Consenting Stakeholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(e) the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement, the Definitive Documents or the Restructuring Transactions, and such inconsistent relief is not dismissed, vacated or modified to be consistent with this Agreement and the Restructuring Transactions within five (5) Business Days following written notice thereof to the Company Parties by the Required Consenting Stakeholders;

(f) the Company Parties lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(g) any Company Party, without the consent of the Required Consenting Stakeholders in accordance with this Agreement, (i) files, or otherwise makes public, any of the Definitive Documents (including any modification or amendments thereto) that is inconsistent with this Agreement, (ii) amends or modifies, or files a pleading seeking authority to amend or modify, any Definitive Document in a manner that is inconsistent with this Agreement, (iii) files, or publicly announces that it will file, with the Bankruptcy Court any plan of reorganization other than the Plan, (iv) suspends or revokes the Restructuring Transactions, (v) files or announces that it will file any motion or application seeking authority to sell any material assets, or (vi) publicly announces its intention to take any action listed in clause (i), (ii), (iii), (iv), or (v) of this Section 10.01(g);

(h) any Company Party (i) withdraws from the Plan, (ii) executes a definitive written agreement with respect to an Alternative Restructuring Proposal, or (iii) publicly announces its intention to take any action listed in clause (i) or (ii) of this Section 10.01(h);

(i) any Company Party (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any RBL Claims, liens, or interests held by any Consenting RBL Lender arising under or relating to the RBL Facility Documents or (ii) supports any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

25

(j)      (i) the occurrence of any termination event or event of default under the DIP Orders or DIP Facility Documents, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof and acceleration of the obligations under the DIP Facility Credit Agreement, (ii) the termination or modification without the consent of the DIP Agent of the Company Parties' authority to obtain the DIP Facility or use cash collateral pursuant to the DIP Orders that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof, or (iii) if the DIP Orders entered by the Court are not in form and substance acceptable to the DIP Agent;

(k)      (i) a determination is made with respect to any Company Party and notice of such determination is delivered to the Consenting Stakeholders in accordance with sections 6.036.03(a) and 12.10 hereof, that (1) its continued support of the Restructuring Transactions would be inconsistent with its fiduciary obligations under applicable Law or (2) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, or (ii) any Company Party or the board of directors, board of managers, or similar governing body of a Company Party takes or refrains from taking any action on the basis of a determination made pursuant to Section 6.03(a) of this Agreement and such action or inaction would have otherwise constituted a breach of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement;

(l)      any Company Party files, or publicly announces that it will file, with the Bankruptcy Court a motion, application, or adversary proceeding (or any Company Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (i) challenging the validity, enforceability, or priority of, or seeking the avoidance, disallowance, subordination, or recharacterization, as applicable, of the liens of the RBL Agent or the DIP Agent, the DIP Claims or the RBL Claims, or (ii) asserting any other cause of action against the Consenting Stakeholders;

(m)      the Bankruptcy Court enters an order providing relief against any of the Consenting Stakeholders with respect to any of the causes of action or proceedings specified in Section 10.01(k) and such order remains in effect for five (5) Business Days after entry of such order;

(n)      any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing;

(o)      any Milestone is not met, and the failure to meet such Milestone has not been waived or such Milestone has not been extended pursuant to Section 4.01(c);

26

(p)      the Company Parties terminate their obligations under and in accordance with this Agreement; or

(q)      the Bankruptcy Court enters an order granting relief from the automatic stay imposed by Bankruptcy Code section 362 authorizing any party to proceed with regard to any material asset of the Company Parties and such relief has a material adverse effect on the Restructuring Transactions.

10.02. Company Party Termination Events. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 12.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by Consenting RBL Lenders holding an amount of RBL Claims that (i) either would (A) result in non-breaching Consenting RBL Lenders failing to hold at least two-thirds (2/3) of the aggregate outstanding principal amount of RBL Claims or (B) reasonably be expected to prevent the consummation of the Restructuring Transactions, and (ii) remains uncured (to the extent curable) for five (5) Business Days after the Consenting Stakeholders seeking termination pursuant to this provision transmit a written notice in accordance with Section 12.10 detailing any such breach;

(b)      the breach in any material respect by Consenting Noteholders holding an amount of Notes Claims that (i) either would (A) result in non-breaching Consenting Noteholders failing to hold at least one-half (1/2) of the aggregate outstanding principal amount of Notes Claims or (B) reasonably be expected to prevent the consummation of the Restructuring Transactions, and (ii) remains uncured (to the extent curable) for five (5) Business Days after the Consenting Stakeholders seeking termination pursuant to this provision transmit a written notice in accordance with Section 12.10 detailing any such breach;

(c)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 12.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)      the Bankruptcy Court enters an order denying confirmation of the Plan.

10.03. Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

27

10.04.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

10.05.  Effect of Termination.

(a)     Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 10.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement or, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.

(b)     Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.

(c)     Notwithstanding any provision to the contrary in this Section 10, no Party may exercise any of a termination right set forth in this Section 10 if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of the applicable Consenting Stakeholder Termination Event or Company Termination Event giving rise to such termination right; provided, however, nothing in this Section 10.05(c) shall restrict any Company Party's right to terminate this Agreement in accordance with Section 10.02(a).

(d)     For the avoidance of doubt, upon the termination of this Agreement by any Company Party pursuant to Section 10.02(c), the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with this Section 10.05.

**Section 11.**     *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 11.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: each Company Party, the Required Consenting RBL Lenders, and the Required Consenting Noteholders; provided, however, that if the proposed modification, amendment, waiver, or supplement (x) has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder or (y) changes the economic treatment provided to any Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 11 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(e)     Where a written consent, acceptance, approval, or waiver is expressly required or contemplated by this Agreement, including a written approval by the Company Parties, the Required Consenting RBL Lenders, or the Required Consenting Noteholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

(f)     Any consent or waiver contemplated in this Section 11 may be provided by electronic mail from counsel to the relevant parties.

(g)     Notwithstanding Section 11(a) of this Agreement, any modification, amendment, or change to the definition of "Required Consenting RBL Lenders" shall require the consent of the Company Parties and the Consenting RBL Lenders.

**Section 12.**     *Miscellaneous*.

12.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance

29

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

12.02. <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

12.03. <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

12.04. <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.  The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

12.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

12.06. <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.07. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

12.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

12.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

12.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Oasis Petroleum Inc.
1001 Fannin Street, Suite 1500
Attention: Nickolas J. Lorentzatos, General Counsel
E-mail address: nlorentzatos@oasispetroleum.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:     Brian Schartz, P.C.
               AnnElyse Scarlett Gains
E-mail address:     brian.schartz@kirkland.com
                    annelyse.gains@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:     Chad Husnick
               John Luze
E-mail address:     chad.husnick@kirkland.com
                    john.luze@kirkland.com

(b)     if to a Consenting RBL Lender, to:

31

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Attention:      Bill Wallander
                Brad Foxman
                Matthew Struble
Email address:      bwallander@velaw.com
                    bfoxman@velaw.com
                    mstruble@velaw.com

(c)      if to a Consenting Noteholder, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:      Andrew N. Rosenberg
                Alice Belisle Eaton
                Alexander Woolverton
E-mail address:      arosenberg@paulweiss.com
                     aeaton@paulweiss.com
                     awoolverton@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received.

12.11.  Independent Due Diligence and Decision Making.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

12.12.  Enforceability of Agreement.  The Parties hereby acknowledge and agree: (i) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code, (ii) each Party waives any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required, (iii) that they shall not take a position to the contrary of this Section 12.12 in the Bankruptcy Court or any other court of competent jurisdiction, (iv) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 12.12 is illegal, invalid, or unenforceable, in whole or in part, and (v) the Parties will seek relief from the automatic stay in the DIP Orders for authority for the Parties to exercise any rights under this Agreement.

12.13.  Waiver.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any

32

proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

12.14. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

12.15. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

12.16. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

12.17. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

12.18. <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

12.19. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 11, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

12.20. <u>Fees and Expenses</u>.  Regardless of whether the Restructuring Transactions are or have been consummated, and subject to the terms of the DIP Orders, the Company Parties shall promptly pay and reimburse in cash all Consenting Stakeholder Fees and Expenses in full in cash on a regular and continuing basis in accordance with all governing engagement agreements, subject to the expiration of any applicable provision of the DIP Orders.  On the Plan Effective Date, all accrued and unpaid Consenting Stakeholder Fees and Expenses incurred up to (and including) the Plan Effective Date (including an estimate for post-closing matters) shall be paid in full in cash.  Nothing herein shall relieve or supersede the Company Parties from any such payment

33

or reimbursement obligations under the RBL Facility Documents, the DIP Facility Documents, or the DIP Orders.

12.21.  Survival.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 7 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 10.05, Section 12, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

12.22.  Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing in this Agreement shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

12.23.  Good Faith Cooperation; Further Assurances. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent reasonably practicable) in respect of all matters concerning the implementation and consummation of the Restructuring. Further, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.

12.24.  No Waiver; Reservation of Rights.  Nothing herein shall constitute a waiver of any of the Parties' rights, except as expressly set forth herein. All of the Parties' respective rights to challenge the action of any other Party pursuant to this Agreement, including pursuant to Articles III, V, VI, IX, X and XI, are expressly preserved.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

[*Signature pages follow.*]

34

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**OASIS PETROLEUM INC.**
**OASIS MIDSTREAM SERVICES LLC**
**OASIS PETROLEUM LLC**
**OASIS PETROLEUM MARKETING LLC**
**OASIS PETROLEUM NORTH AMERICA LLC**
**OASIS PETROLEUM PERMIAN LLC**
**OASIS WELL SERVICES LLC**
**OMS HOLDINGS LLC**


By: _____

Name: Michael H. Lou

Title: Chief Financial Officer and Executive Vice President



**OMP GP LLC**

By: _____

Name: Michael H. Lou

Title: President

[*Signature pages of Consenting Stakeholders on file with the Company Parties.*]

## EXHIBIT A

## Company Parties

Oasis Midstream Services LLC
Oasis Petroleum Inc.
Oasis Petroleum LLC
Oasis Petroleum Marketing LLC
Oasis Petroleum North America LLC
Oasis Petroleum Permian LLC
Oasis Well Services LLC
OMP GP LLC
OMS Holdings LLC

## EXHIBIT B

**Restructuring Term Sheet**

*Execution Version*

**THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS CHAPTER 11 RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING TERM SHEET

### INTRODUCTION

This Restructuring Term Sheet (this "**Restructuring Term Sheet**") describes the financial restructuring of Oasis Petroleum Inc. (and, together with its debtor subsidiaries, the "**Debtors**").  This Restructuring Term Sheet is being agreed to in connection with the Debtors' and the Consenting Stakeholders' entry into that certain Restructuring Support Agreement, dated as of September 29, 2020 (as may be further amended, supplemented or modified pursuant to the terms thereof, the "**Restructuring Support Agreement**"),[1] to which this Restructuring Term Sheet is attached as Exhibit A.  Pursuant to the Restructuring Support Agreement, the Debtors and the Consenting Stakeholders have agreed to support the transactions contemplated therein and herein.

This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will to be contained in the Definitive Documents, which remain subject to negotiation and completion in accordance with the Restructuring Support Agreement and applicable bankruptcy law.  The Definitive Documents will not contain any material terms or conditions that are inconsistent in any material respect with this Restructuring Term Sheet or the Restructuring Support Agreement.  This Restructuring Term Sheet incorporates the rules of construction as set forth in section 102 of the Bankruptcy Code.

---

[1]     Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings given to such terms in the Restructuring Support Agreement.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Chapter 11 Plan** | On the Plan Effective Date, or, other than with respect to the holders of RBL Claims, as soon as is reasonably practicable thereafter, each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the holder of such Allowed Claim or Interest, as applicable. |
| | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor.  For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter other than with respect to the RBL Lenders, DIP Lenders, and Exit Facility Lenders. |
| **DIP Facility** | The Consenting RBL Lenders (in such capacity, collectively, the "**DIP Lenders**") will provide a senior secured superpriority revolving debtor-in-possession financing facility in an aggregate principal amount of $450 million, consisting of a $150 million new money revolving facility, with a $100 million letter of credit facility sublimit, and $300 million of rolled up RBL Claims and otherwise substantially on the terms set forth in the term sheet attached as Exhibit C (the "**DIP Term Sheet**") to the Restructuring Support Agreement.  During the Chapter 11 Cases, the Consenting RBL Lenders shall forbear from any attempt to collect any Specified Default Interest and any such amounts shall not be rolled up into the DIP Facility; *provided*, for the avoidance of doubt, that as set forth in the DIP Term Sheet, the RBL Lenders shall be entitled to adequate protection payments consisting of current cash payments on a monthly basis in an amount equal to the amount of postpetition fees and interest on the RBL Claims at the default rate set forth in the RBL Credit Agreement.  On the Plan Effective Date, the Consenting RBL Lenders shall waive any right to payment of Specified Default Interest (as defined below). |
| **Exit Facility** | The Consenting RBL Lenders will provide a new money senior secured reserve-based facility (the "**Exit Facility**") substantially on the terms set forth in the term sheet attached as Exhibit D (the "**Exit Facility Term Sheet**") to the Restructuring Support Agreement. |
| | The proceeds of the Exit Facility may be used as necessary to fund cash distributions on the Plan Effective Date to holders of Allowed Claims required by this Restructuring Term Sheet and the Plan and for other uses as set forth in the Exit Facility Term Sheet and the Plan. |
| **New Common Stock** | On the Plan Effective Date, Reorganized Oasis will issue a single class of common Interests (the "**New Common Stock**").  The New Common Stock will be distributed to holders of Allowed General Unsecured Claims in accordance with this Restructuring Term Sheet.  The Debtors and the Reorganized Debtors shall use commercially reasonable efforts to cause the |

2

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| | New Common Stock to become publicly traded and listed on a national securities exchange on or as soon as reasonably practicable after the Plan Effective Date. |
| **New Warrants** | On the Plan Effective Date, Reorganized Oasis will issue 4-year warrants convertible into 7.5% of the New Common Stock at a strike price equal to the aggregate amount of Notes Claims (including any interest thereon that would have accrued as of the Plan Effective Date) (the "**New Warrants**"). The documentation for the New Warrants will be included in the Plan Supplement and will not include Black-Sholes protection but will provide that the New Warrants remain outstanding following any stock-for-stock merger transaction following the Plan Effective Date.  Any New Common Stock issued pursuant to the New Warrants shall be subject to dilution on account of the Management Inventive Plan. |
| **Mirada Settlement** | On the Plan Effective Date, the Mirada Settlement Agreement and all terms contained therein will be deemed approved by the Bankruptcy Court and the Mirada Settlement Agreement shall be in full force and effect on the Plan Effective Date.  The Plan shall provide that, as set forth in the Mirada Settlement Agreement, on the Plan Effective Date, the Debtors shall (i) pay the sum of $20,000,000.00 for the benefit of certain Mirada related parties and (ii) on or before the 180th day after the date the payment in preceding clause (i) is due, pay the sum of $22,750,000.00 for the benefit of certain Mirada related parties, in each case on the terms set forth in the Mirada Settlement Agreement |
| **Hedging Program** | On or before the Plan Effective Date, the Debtors will enter into new hedging arrangements sufficient to cover the Closing Date Minimum Hedge Volumes (as defined in the Exit Facility Term Sheet). |
| **Cash on Hand** | Cash distributions in accordance with this Restructuring Term Sheet shall be made from cash on hand as of the Plan Effective Date, including proceeds from the Exit Facility and the DIP Facility. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in Section 3 of the Restructuring Support Agreement.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| **Tax Matters** | The Parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring Transactions in a tax efficient and cost-effective manner for the Debtors. |

3

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Unclassified Non-Voting Claims** | | | |
| N/A | **DIP Claims** | On the Plan Effective Date, each holder of an Allowed DIP Claim shall be: (a) in the case of DIP Claims other than the principal amount of the loans under the DIP Credit Agreement, paid in full, in cash in accordance with the terms of the DIP Credit Agreement, and (b) in the case of DIP Claims that represent the principal amount of the loans under the DIP Credit Agreement, converted to an identical principal amount of Exit Facility Revolving Loans. | N/A |
| N/A | **Administrative Claims** | On the Plan Effective Date, each holder of an Allowed Administrative Claim shall receive payment in full in cash. | N/A |
| N/A | **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| **Class 1** | **Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option and in their sole discretion: (a) payment in full in cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 2** | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| **Class 3** | **RBL Claims** | On the Plan Effective Date, all RBL Claims shall be deemed Allowed in full, including accrued and unpaid interest (at the applicable default rate), fees, costs, and expenses, plus any and all other amounts owed under the RBL Facility Documents.<br><br>On the Plan Effective Date, each holder of an Allowed RBL Claim (i) electing to participate in the Exit Facility by entry into the Exit Facility Commitment Letter will receive, (x) on a dollar-for-dollar basis in exchange for the portion of its RBL Claim representing the principal of the loans owed to such lender under the RBL Credit Agreement, an equal amount of the principal of the | Impaired / Entitled to Vote |

4

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| | | revolving loans under the Exit Facility as of the Plan Effective Date, upon the terms and conditions set forth in the Exit Facility Term Sheet and (y) with respect to any other portion of such holder's RBL Claim (to the extent not already paid prior to the Plan Effective Date, including as adequate protection pursuant to the Final DIP Order), cash in an amount equal to such portion of such holder's RBL Claim, and (ii) not electing to participate in the Exit Facility by electing not to sign the Exit Facility Commitment Letter (x) shall be deemed to have funded a second out term loan on a dollar-for-dollar basis in exchange for the portion of its RBL Claim representing the principal of the loans owed to such lender, any unreimbursed claims for professional fees and expenses under the RBL Credit Agreement, and any of such holder's Specified Default Interest and (y) with respect to any other portion of such holder's RBL Claim (to the extent not already paid prior to the Plan Effective Date, including as adequate protection pursuant to the Final DIP Order), cash in an amount equal to such portion of such holder's RBL Claim.  The Liens securing the loans under the RBL Credit Agreement shall be retained and deemed assigned to the administrative agent under the Exit Facility to secure the Exit Facility upon the Plan Effective Date.  Notwithstanding the foregoing, on the Plan Effective Date, any Specified Default Interest[2] shall be discharged, released, and deemed waived by all holders of RBL Claims that execute the Restructuring Support Agreement. | |
| **Class 4** | **Notes Claims and Mirada Claims** | On the Plan Effective Date, the Notes Claims shall be Allowed in full, including accrued and unpaid interest, fees, costs, and expenses plus any and all other amounts owed under the indentures governing the Notes Claims.<br><br>On the Plan Effective Date, each holder of an Allowed Notes Claim  or an Allowed Mirada Claim shall receive its *pro rata* share (calculated based on the aggregate amount of all Allowed Notes Claims and Allowed Mirada Claims) of 100% of the New Common Stock, subject to dilution on account of the Management Incentive Plan and the New Warrants; provided, that notwithstanding | Impaired / Entitled to Vote |

---

[2]   "*Specified Default Interest*" has the meaning set forth in that certain Limited Waiver and Fourth Amendment to Third Amended and Restated Credit Agreement, dated as of April 24, 2020, among the Borrower, the guarantors party thereto, Wells Fargo Bank, NA, as administrative agent, and the Pre-Petition Lenders party thereto.

| | | TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| | | that the Mirada Claims are classified as Class 4 Claims, such claims, in lieu of any treatment as Class 4 Claims, shall be treated in accordance with the Mirada Settlement Agreement. | |
| **Class 5** | **General Unsecured Claims** | On the Plan Effective Date, each holder of an Allowed General Unsecured Claim shall receive, at the option of the applicable Debtor: (a) payment in full in Cash; or (b) Reinstatement | Unimpaired / Deemed to Accept |
| **Class 6** | **Intercompany Claims** | On the Plan Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim Reinstated or cancelled, released, and extinguish and without any distribution at the Debtors' election and in their sole discretion. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 7** | **Intercompany Interests Other Than in Oasis** | On the Plan Effective Date, each holder of an Interest other than in Oasis shall have such Interest Reinstated or cancelled, released, and extinguish and without any distribution at the Debtors' election and in their sole discretion. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 8** | **Interests in Oasis** | On the Plan Effective Date, each holder of an Interest in Oasis shall retain its pro rata share of the New Warrants. | Impaired / Entitled to Vote |

| | GENERAL PROVISIONS REGARDING THE PLAN |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein.  On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except with respect to the liens securing the RBL Claims and the Exit Facility and except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged.  Notwithstanding anything to the contrary herein, in the Restructuring Support Agreement, or in the Plan, for the avoidance of doubt, the liens securing the RBL Claims shall not be released, and such liens shall be retained by the Exit Facility Agent to secure the Exit Facility upon the Plan Effective Date. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters but, for the avoidance of doubt, shall not retain jurisdiction over the Exit Facility. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims that the Debtors resolve or compromise after the Plan Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Plan Effective Date. |

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against or Interest in a Debtor or other Entity, or that any holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan or the Restructuring Transactions or (b) any individual from any Claim or Cause of Action related to an act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct. |
| **Releases by Holders of Claims and Interests** | As of the Plan Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, |

8

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| | the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan or the Restructuring Transactions or (b) any individual from any claim or Cause of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud or willful misconduct. |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Facility, the Exit Facility, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Exit Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct or actual fraud. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above do not exculpate any post-Plan Effective Date obligations of any party or entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any |

9

| **GENERAL PROVISIONS REGARDING THE PLAN** | |
|---|---|
| | document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan |
| **Injunction** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Plan Effective Date obligations of any party or entity under the Plan, any post-Plan Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facility), or any document, instrument, or agreement (including those set forth in the Plan Supplement and the Exit Facility) executed to implement the Plan. |
| **Releasing Parties, Released Parties, and Exculpated Parties** | As used in this Restructuring Term Sheet, the term "**Released Parties**" means, collectively, and in each case in its capacity as such:  (a) the Consenting Stakeholders; (b) the indenture trustees under the Debtors' prepetition secured notes indentures; (c) the RBL Agent; (d) the DIP Lenders; (e) the DIP Agent; (f) each current and former Affiliate of each Entity in clause (a) through (e); and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (f), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, |

10

| **GENERAL PROVISIONS REGARDING THE PLAN** ||
| --- | --- |
| | principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals. |
| | As used in this Restructuring Term Sheet, the term "**Releasing Parties**" means, collectively, (a) the Consenting Stakeholders; (b) the indenture trustees under the Debtors' prepetition secured notes indentures; (c) the RBL Agent; (d) the DIP Agent; (e) all holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (f) all holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (g) all holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan; (h) each current and former Affiliate of each Entity in clause (a) through (g); and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (h), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively. |
| | As used in this Restructuring Term Sheet, the term "**Exculpated Parties**" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) the Consenting Stakeholders; (d) the indenture trustees under the Debtors' prepetition secured notes indentures; (e) the RBL Agent; (f) the DIP Agent; (g) the DIP Lenders; and (h) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. |

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** ||
| --- | --- |
| **Governance** | The new board of directors of Reorganized Oasis (the "**New Board**") shall consist of seven (7) members and shall include the Chief Executive Officer of Reorganized Oasis and six (6) additional members appointed by the Required Consenting Noteholders.  The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the |

11

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | time of filing.  Corporate governance for Reorganized Oasis, including charters, bylaws, operating agreements, or other organization documents, as applicable (the "**New Organizational Documents**"), shall be consistent with this Restructuring Term Sheet and section 1123(a)(6) of the Bankruptcy Code.  The Required Consenting Noteholders will discuss and consider appointing the COO to the New Board.<br><br>The COO shall waive any right to terminate his employment for "Good Reason" (as defined in his employment agreement) solely to the extent such right arises as a result of not being appointed to the New Board. |
| **Management Incentive Plan** | On the Plan Effective Date, the Reorganized Debtors will reserve exclusively for management employees a pool of New Common Stock (the "**Management Incentive Plan Pool**") representing (on a fully diluted and fully distributed basis) up to 10% of the total equity value of the Reorganized Debtors (the "**Management Incentive Plan**"). The Management Incentive Plan shall provide for 5% of the Management Incentive Plan Pool to be allocated within thirty (30) days following the Plan Effective Date in the form of restricted stock units (or equivalents) and on terms (including performance metrics and vesting criteria) otherwise to be agreed between management of Reorganized Oasis and the compensation committee of the New Board; provided that such period shall be extended automatically by an additional fifteen (15) days if good faith discussions between management of Reorganized Oasis and the New Board regarding the terms of the Management Incentive Plan remain ongoing at the conclusion of the initial thirty (30) day period.  The remaining up to 5% of the Management Incentive Plan Pool will be available to be allocated after the Plan Effective Date, in the form and on terms as determined by the New Board in consultation with management for the Reorganized Debtors.  In connection with structure, allocation and documentation of the Management Incentive Plan Pool, the compensation committee of the New Board and the participants in the Management Incentive Plan may discuss modifications as may be appropriate to certain employment agreements or letters, indemnification agreements, severance agreements, or other agreements entered into with current and former employees and assumed pursuant to the Plan. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |

12

| **OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Stakeholders consent to the continuation of the Debtors' wages, compensation, and benefits programs according to existing terms and practices, including executive compensation programs and any motions in the Bankruptcy Court for approval thereof.  On the Plan Effective Date, the Debtors shall (a) assume all employment agreements or letters, indemnification agreements, severance agreements, or other agreements entered into with current and former employees; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee. |
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date. |
| **Retained Causes of Action** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the Plan. |
| **Conditions Precedent to Restructuring** | The following shall be conditions to the Plan Effective Date (the "**Conditions Precedent**"): <br><br> (a)   the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Required Consenting Stakeholders, which shall: <br><br> (i)   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; <br><br> (ii)   decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent; <br><br> (iii)   authorize the Debtors, as applicable/necessary, to: (a) implement the Restructuring Transactions, including the Rights Offering; (b) distribute the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other |

13

## OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING

exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facility and the Management Incentive Plan;

(iv)   authorize the implementation of the Plan in accordance with its terms; and

(v)   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(vi)   be a Final Order;

(b)   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

(c)   the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan;

(d)   the Restructuring Support Agreement shall remain in full force and effect;

(e)   the Final DIP Order shall remain in full force and effect;

(f)   the Mirada Settlement Agreement shall be effective in accordance with its terms and remain in full force and effect;

(g)   the OMP Waiver Agreement shall be effective in accordance with its terms and remain in full force and effect

(h)   the Exit Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the Exit Facility shall have been satisfied or duly waived in writing in accordance with the terms of the Exit Facility and the closing of the Exit Facility shall have occurred;

(i)   all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been placed in a professional fee escrow

14

15

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | account pending the Bankruptcy Court's approval of such fees and expenses;<br><br>(j)    all Consenting Stakeholder Fees and Expenses shall have been paid in full in accordance with the Restructuring Support Agreement; and<br><br>(k)    the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement, this Restructuring Term Sheet, and the Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior consent of the Required Consenting Stakeholders, may waive any one or more of the Conditions Precedent to the Plan Effective Date. |

## EXHIBIT C

**DIP Term Sheet**



*Execution Version*

**CONFIDENTIAL**
**Oasis Petroleum North America LLC**
**Senior Secured Superpriority Debtor-in-Possession Revolving Credit Agreement**
**Indicative Summary of Terms and Conditions**

| | |
|---|---|
| Borrower: | Oasis Petroleum North America LLC, a Delaware limited liability company (the "**Borrower**"). |
| Guarantors: | Oasis Petroleum Inc. ("**Parent**"), Oasis Midstream Services LLC, Oasis Petroleum LLC ("**OP LLC**"), Oasis Petroleum Marketing LLC, Oasis Petroleum Permian LLC, Oasis Well Services LLC, OMP GP LLC and OMS Holdings LLC, each organized under the laws of the State of Delaware (collectively, the "**Guarantors**"). |
| Debtors: | The Borrower and the Guarantors are collectively referred to herein as the "**Debtors**". |
| DevCos: | Beartooth DevCo LLC and Bobcat DevCo LLC (the "**DevCos**"). |
| Post-Petition Lenders: | Wells Fargo Bank, N.A. and the other Pre-Petition Lenders (as defined below) under the Pre-Petition Credit Agreement (as defined below) participating in the DIP Facility (as defined below) in the percentages as set forth in the DIP Facility (collectively, the "**Post-Petition Lenders**"). |
| Post-Petition Agent: | Wells Fargo Bank, N.A. (in such capacity, the "**Post-Petition Agent**"). |
| Venue: | Debtors will file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**", and the date the Debtors' bankruptcy cases are commenced, the "**Petition Date**"). |
| Documentation Principles: | The definitive documentation for the DIP Facility, including all other related agreements and documents creating, evidencing or securing indebtedness or obligations of any of the Debtors to the Post-Petition Agent or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the Post-Petition Agent, for itself and for and on behalf of the Post-Petition Lenders, on account of the DIP Facility shall contain the terms set forth |

herein and shall otherwise be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date (as defined below). The documentation will be based on the applicable "Loan Documents" under and as defined in that certain Third Amended and Restated Credit Agreement dated October 16, 2018, among the Parent; OP LLC; the Borrower; each of the lenders from time to time party thereto (the "**Pre-Petition Lenders**");  and Wells Fargo Bank, N.A., as administrative agent on behalf of itself and the other Pre-Petition Lenders (the "**Pre-Petition Agent**") (as in effect immediately prior to the commencement of bankruptcy case of the Borrower, the "**Pre-Petition Credit Agreement**"), with changes consistent with this DIP Facility Term Sheet and otherwise to reflect customary lender form updates (the "**Documentation Principles**").  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Pre-Petition Credit Agreement.

| | |
|---|---|
| DIP Facility: | A priming secured and superpriority debtor-in-possession revolving credit facility of $450 million (the "**DIP Commitments**") consisting of (a) an $150 million new money revolving facility (the "**New Money Facility**"), which shall include an amount of $100 million in the form of a letter of credit facility and (b) up to $300 million of Pre-Petition Secured Indebtedness (as defined below) that will be deemed to be refinanced as post-petition secured indebtedness (the "**Refinancing**") held by the Post-Petition Lenders, as more fully described and documented in the Financing Orders (as defined below) (the New Money Facility and the Refinancing, collectively, the "**DIP Facility**"), and the credit agreement entered into among the Post-Petition Agent, the Post-Petition Lenders and the Debtors, which in each case must be in form and substance acceptable to the Post-Petition Agent and the Post-Petition Lenders (the "**Post-Petition Credit Agreement**").  Until the entry of the Final Order (as defined below), (a) a maximum amount of new money funding of $120 million (the "**Cap**") of cash which may be drawn by the Borrower, of which up to $80 million of the Cap may be drawn as letters of credit, will be available to the Debtors on an interim basis under the DIP Facility (and which shall include all letters of credit subject to the Pre-Petition LC Refinancing (as defined below)) and (b) up to $240 million of the Pre-Petition Secured Indebtedness will be Refinanced by |

the DIP Facility (the limitations described in the foregoing clauses (a) and (b), the "**Interim Limits**").  The actual amounts available to be borrowed under the DIP Facility will be subject to the Initial Budget or the DIP Budget, as applicable, (each term as defined below), subject to the Permitted Variances (as defined below).

Availability:    So long as the Total Outstandings (as defined below) do not exceed the lesser of (a) the DIP Loan Limit (as defined below) and (b) the amount then authorized by any Financing Order (including, without limitation, prior to the entry of the Final Order, the Interim Limits): (i) loans under the DIP Facility will be available to be made at any time prior to the Maturity Date (as defined below), (ii) letters of credit under the DIP Facility will be issued and renewed as described in the section entitled "Letters of Credit" below and (iii) amounts repaid under the DIP Facility may be reborrowed.

"**Total Outstandings**" means, at any time, the aggregate principal amount of the loans under the DIP Facility then outstanding plus the aggregate stated amount of all issued but undrawn Letters of Credit and, without duplication, all unreimbursed disbursements on any Letter of Credit as of such date.

"**DIP Loan Limit**" means the DIP Commitments less the amount of any Carve Out Reserves (as defined in Annex II hereto).

Letters of Credit:    A portion of the DIP Facility not in excess of $100 million shall be available for the issuance of letters of credit ("**Letters of Credit**") by Wells Fargo Bank, N.A. (the "**Post-Petition Issuing Bank**"). Upon entry of the Interim Order (as defined below), all letters of credit issued under the Pre-Petition Credit Agreement (the "**Refinanced L/Cs**") shall be Refinanced and deemed reissued under the Post-Petition Credit Agreement (the "**Pre-Petition L/C Refinancing**").

Permitted Use of Proceeds:    All proceeds under the DIP Facility shall be used strictly in accordance with the Initial Budget or the DIP Budget, as applicable, subject to the Permitted Variance, as provided below.  Unless otherwise agreed, no borrowing shall be made more frequently than once per week.

Term:    All commitments of the Post-Petition Lenders under the DIP Facility shall terminate at the earliest of the following events: (a) the date which is 6 months after the Petition Date (or, with

the consent of the Majority Post-Petition Lenders, the date that is 9 months after the Petition Date; subject to not less than five (5) business days' prior written notice by the Borrower of the extension request, the absence of any default or event of default under the Post-Petition Credit Agreement (an "**Event of Default**"), truth and accuracy in all material respects of representations and warranties (unless such representations and warranties are already qualified by materiality, material adverse effect or a similar qualification in which case such representations and warranties shall be true and correct in all respects), the effectiveness of the restructuring support agreement and payment of the Extension Fee (as defined below), it being understood that such extension shall be binding on all of the Post-Petition Lenders to the extent such extension is approved by the Majority Post-Petition Lenders and the other conditions for such condition are satisfied (such extension, the "**Extension**")); (b) the entry of an order pursuant to section 363 of the Bankruptcy Code approving the sale of substantially all of the Debtors' assets; (c) the effective date of any plan of reorganization; (d) the entry of an order for the conversion of the Debtors' bankruptcy cases to cases under Chapter 7 of the Bankruptcy Code; (e) the entry of an order for the dismissal of the Debtors' bankruptcy cases; or (f) at the election of the Post-Petition Agent or the Majority Post-Petition Lenders, the date on which any Event of Default is continuing (the earliest of the events described above, the "**Maturity Date**").

| | |
|---|---|
| New Money Loan Interest Rate: | Choice of 1 month Adjusted LIBO Rate (1.0% floor) + 5.50% per annum or Alternate Base Rate (2.0% floor) + 4.50% per annum, payable monthly in cash, provided that no Interest Period may extend beyond the Maturity Date. |
| Refinancing and Rate Applied to Drawn and Unreimbursed Refinanced L/Cs: | Choice of 1 month Adjusted LIBO Rate (1.0% floor) + 4.25% per annum or Alternate Base Rate (2.0% floor) + 3.25% per annum. |
| Default Rate: | Alternate Base Rate (2.0% floor) + 4.75% per annum + an additional 2.00% per annum default rate, effective (a) automatically upon any payment Event of Default and (b) upon written notice to the Borrower of the election of the Majority Post-Petition Lenders for any other Event of Default that has occurred and is continuing, in each case, with accrual of the default rate occurring from and including the first date |

on which the applicable Event of Default occurred and ending on the date on which such Event of Default has been cured or waived.

| | |
|---|---|
| Facility Fee: | 2.00% of the New Money Commitments payable to the Post-Petition Lenders on the Closing Date (as defined below) ratably in accordance with their New Money Commitments as of such date. "**New Money Commitments**" shall be defined as (a) $150,000,000 minus (b) the face amount of the Refinanced L/Cs. |
| Unused Commitment Fee: | 0.5% per annum on daily average unused amount of the New Money Commitments payable monthly in arrears and on the Maturity Date. |
| Letter of Credit Fees: | A per annum participation fee payable ratably to each Post-Petition Lender equal in the aggregate to (x) 5.50% with respect to Letters of Credit other than Refinanced L/Cs and (y) 4.25% with respect to Refinanced L/Cs. Borrower shall also pay to the issuing lender additional fronting and standard fees on the terms set forth in the Pre-Petition Credit Agreement. |
| Extension Fee: | 50 bps on the amount of the New Money Commitments payable on the date of such Extension (the "**Extension Fee**"). |
| Arrangement Fee and Agency Fee: | As separately agreed between the Post-Petition Agent and the Borrower. |
| Pre-Petition Secured Indebtedness: | All indebtedness and other obligations under the Pre-Petition Credit Agreement and related loan and security documents (the "**Pre-Petition Secured Indebtedness**"). |
| Adequate Protection Payments and Liens: | As adequate protection of the interests of the Pre-Petition Lenders for the DIP Facility advances, use of cash collateral and other collateral to the extent of any diminution in value of such interests, the Pre-Petition Lenders will receive, subject to the Carve Out (as defined below) (a) replacement liens on all real and personal property, tangible or intangible, wherever located, including all bank accounts, deposits and cash and, subject to and effective upon entry of the Final Order (as defined below), all proceeds of any avoidance actions under chapter 5 of the Bankruptcy Code, whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates, and all proceeds, products, rents, revenues and profits of same, and in each case junior |

to the liens securing the DIP Facility, (b) adequate protection payments consisting of current cash payments on a monthly basis in an amount equal to the amount of post-petition interest and fees on the obligations, at the Pre-Petition Credit Agreement default rate, in respect of the Pre-Petition Secured Indebtedness, (c) adequate protection payments consisting of cash reimbursement of the reasonable and documented (in summary format) fees, costs and expenses (including reasonable professional fees) of the Pre-Petition Agent and (d) super-priority administrative expense claims under Section 507(b) of the Bankruptcy Code and junior to the DIP Facility.

Asset Sales:

The (i) net cash proceeds from certain sales of any of the Debtors' assets outside the ordinary course of business and (ii) the proceeds of any extraordinary receipts, in excess of $5,000,000, individually or in the aggregate, on a combined basis for the foregoing clauses (i) and (ii) during the term of the DIP Facility shall be paid first to the Post-Petition Agent for application to the DIP Facility, and upon the DIP Facility being indefeasibly satisfied in full, then to the Pre-Petition Agent for application to the Pre-Petition Secured Indebtedness.

Collateral:

All indebtedness and obligations of the Debtors under the DIP Facility will be secured by security interests and liens granted pursuant to Section 364(c)(2) and (d)(1) of the Bankruptcy Code (the "**Priority Lien**"), with priority over all valid and perfected existing and future security interests, liens, claims and encumbrances, in and on all real and personal property of the Debtors, tangible or intangible, wherever located, including all bank accounts, deposits and cash and, subject to and effective upon entry of the Final Order, all proceeds of any avoidance actions under chapter 5 of the Bankruptcy Code (up to the amount of the commitments then in effect under the DIP Facility), whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates, and all proceeds, products, rents, revenues and profits of same (the "**Collateral**"), subject only to the Carve Out (as defined below), and certain liens to the extent they are valid, perfected, unavoidable and of senior priority to the liens and security interests of the Pre-Petition Lenders.  In addition, to the extent of the outstanding obligations of the Debtors under the DIP Facility, the Post-Petition Lenders shall be granted superpriority claims over all other claims against the Debtors, subject only to the Carve

Out.  All of the liens described above shall be effective and perfected as of the Petition Date upon entry of, and pursuant to, the Interim Order.  Administrative Agent shall have the discretion to require additional lien perfection filings and account control agreements after the Closing Date.

Hedge Contracts:

Any hedge contract under the Post-Petition Credit Agreement to which any Post-Petition Lender is a counterparty shall be secured by liens securing the DIP Facility on a pari passu basis.

Guaranties:

All Debtors (other than the Borrower) shall guarantee the DIP Facility and secure it with their property that is Collateral.

No Surcharge & Marshalling Waiver:

The DIP Facility shall provide that subject only to and effective upon entry of the Final Order with respect to the Pre-Petition Lenders' pre-petition collateral and adequate protection collateral, and effective upon entry of the Interim Order with respect to the Post-Petition Lenders' post-petition collateral, (i) no costs or expenses of administration shall be imposed against such collateral, as applicable, under Section 506(c) of the Bankruptcy Code or otherwise, and (ii) such collateral shall not be subject to the doctrine of marshalling or Section 552 of the Bankruptcy Code "equities of the case" arguments.

Carve Out:

The Financing Orders shall include a carve out (the "**Carve Out**") substantially identical to Annex II attached hereto.

Budget:

On or before the Petition Date, the Debtors shall have furnished to the Post-Petition Agent a thirteen (13) week rolling operating budget and cash flow forecast, in form and substance acceptable to the Post-Petition Agent (the "**Initial Budget**"), together with such related information and/or materials as the Post-Petition Agent and the Majority Post-Petition Lenders may deem reasonably necessary or desirable in connection therewith.

No later than 12:00 p.m. Central time on Thursday starting with the fourth Thursday of the first full four calendar weeks following the Petition Date, and every four weeks thereafter (or on a more frequent basis if agreeable to the Borrower and the Post-Petition Agent), the Debtors shall propose an updated rolling budget (the "**Proposed DIP Budget**") to the Post-Petition Agent.  The Post-Petition Agent may approve such Proposed DIP Budget, which will then become the

budget then in effect in the Post-Petition Agent's discretion if approved by the Post-Petition Agent in writing (which approval may be provided by electronic mail communicated by Post-Petition Agent's counsel to Debtors' counsel) (the "**DIP Budget**"); provided, that if the Proposed DIP Budget is not approved by the Post-Petition Agent, the DIP Budget that was last approved by the Post-Petition Agent shall continue to be in effect.

No later than 12:00 p.m. Central time on Thursday starting with the Thursday after the first full two calendar weeks following the Petition Date, and every four weeks thereafter, the Debtors shall deliver to the Post-Petition Agent a 13 week cash flow forecast. For the avoidance of doubt, the 13 week cash flow forecast will not be deemed a Proposed DIP Budget and will not require approval from the Post-Petition Agent.

No later than 12:00 p.m. Central time on Thursday of each week starting with the Thursday after the first full four calendar weeks following the Petition Date, and on a weekly basis thereafter (each a "**Report Date**"), the Debtors shall deliver to the Post-Petition Agent a weekly variance report (the "**Variance Report**"). The Variance Report shall measure performance for all actual post-petition disbursements made (a) with respect to the first Report Date, during the period from and including the Petition Date through and including the Friday ending immediately prior to the first Report Date and (b) with respect to each Report Date thereafter, the prior four weeks ending on the Friday immediately preceding such Report Date (the periods described in the foregoing clause (a) or (b), as applicable, the "**Test Period**") on a rolling basis against the amount budgeted therefor in the DIP Budget, shall include calculations showing any discrepancies between anticipated and actual receipts and, beginning on the First Testing Date (as defined below), shall include calculations that demonstrate that the Debtors are in compliance with the Permitted Variance (as defined below).

On each Report Date, beginning on the Thursday following the first four full calendar weeks following the Petition Date (the "**First Testing Date**"), the Debtors shall demonstrate in each such Variance Report (A) that the actual disbursements made (the "**Tested Disbursements**") in the prior Test Period, excluding (i) any fluctuations in royalty payments, payments to working interest holders, or similar payments or ad valorem or other taxes due on account of production of oil

and gas interests that are attributable to changes in commodity prices, (ii) adequate protection payments to the Pre-Petition Agent and the Pre-Petition Lenders, (iii) reimbursements to Oasis Midstream Partners LP and its subsidiaries for capital expenditures, (iv) professional fees, (v) settlement payments to hedge counterparties and (vi) payments in respect of the DIP Facility (items (i) through (vi), collectively "**Excluded Items**"), do not exceed the sum of the aggregate amount budgeted therefor in the DIP Budget for the applicable Test Period by more than fifteen percent (15%) of the budgeted amount for such Test Period (the "**Permitted Variance**") on a cumulative basis for all disbursements made during such Test Period and (B) that the Debtors' Liquidity (to be defined as unrestricted cash and cash equivalents of the Debtors' plus unused commitments under the DIP Facility) is, (i) at any time the Interim Order is in effect, an amount not less than $15 million and (ii) at any time the Final Order is in effect, no less than $20 million. For the avoidance of doubt, Liquidity shall be tested daily, but reported weekly in the Variance Report. Certification of compliance shall be provided on such Report Date, concurrently with delivery of each Variance Report.

Each Variance Report shall include actual disbursements and actual receipts for such Test Period, broken out as line items (but, for the avoidance of doubt, such items shall not be tested, other than the Tested Disbursements tested on an aggregate basis as described above).

General Conditions Precedent:  Usual and customary for a facility of this type and otherwise generally consistent with the Documentation Principles, including:

1. The effectiveness of the Post-Petition Credit Agreement and availability of the DIP Facility will occur on the date (the "**Closing Date**") that the following conditions are satisfied or waived:

   (a) The entry of an order by the Bankruptcy Court approving a cash management system for the Debtors and other "first day" orders satisfactory to the Post-Petition Agent;

   (b) Execution and delivery of satisfactory definitive documentation for the DIP Facility;

(c) Receipt of satisfactory Initial Budget approved by the Post-Petition Agent;

(d) Receipt of a model of projected monthly cash flow, cash balance and balance of debt for borrowed money of the Debtors similar in level of detail to previously delivered models, for the monthly periods commencing on the first day of the month immediately following the month of effectiveness of the DIP Facility through December 31, 2020, in form and substance acceptable to the Post-Petition Agent;

(e) Bankruptcy Court's entry within three (3) business days of the Petition Date of an interim order approving the DIP Facility and use of cash collateral in a form and substance acceptable to the Post-Petition Agent (the "**Interim Order**");

(f) Reimbursement of all reasonable and documented (in summary form) fees and expenses of the Pre-Petition Agent and Pre-Petition Lenders and Post-Petition Agent and Post-Petition Lenders to the extent invoiced at least one (1) business day prior thereto;

(g) Payment in full of unpaid reasonable and documented (in summary form) fees and expenses of Vinson & Elkins LLP and FTI Consulting to the extent invoiced at least one (1) business day prior thereto;

(h) Use commercially reasonable efforts to, with respect to all hedge contracts entered into prior to the Closing Date, either (i) liquidate such hedges or (ii) reset such hedges to current market terms in existence at the time of such reset in exchange for a lump-sum cash payment substantially similar to the payment that such Debtor would be entitled to receive in respect of a contemporaneous liquidation of such hedge (collectively, the "**Specified Liquidations**"), in each case, on terms mutually acceptable to the Borrower and the applicable hedge counterparty, and all proceeds of such Specified Liquidations shall have been applied to the prepayment of the loans under the Pre-Petition Credit Agreement;

(i) All representations and warranties of the Debtors in the Post-Petition Credit Agreement shall be true and

correct in all material respects (unless such representations and warranties are already qualified by materiality, material adverse effect or a similar qualification in which case such representations and warranties shall be true and correct in all respects), and there shall be no default or Event of Default in existence at the time of, or immediately after giving effect to the making of, such initial funding;

(j) The Post-Petition Agent shall have received such documents and other instruments as are customary for transactions of this type or as it may request;

(k) The delivery of other customary closing deliverables (including, without limitation, delivery of secretary and officer certificates and notice of borrowing); and

(l) The sum of the outstanding principal amount of loans under the Pre-Petition Credit Agreement and the LC Exposure under the Pre-Petition Credit Agreement shall be no more than $500 million.

2. As to all subsequent advances under the DIP Facility:

(a) All representations and warranties of the Debtors in the Post-Petition Credit Agreement shall be true and correct in all material respects (unless such representations and warranties are already qualified by materiality, material adverse effect or a similar qualification in which case such representations and warranties shall be true and correct in all respects); there shall be no default or Event of Default in existence at the time of, or after giving effect to the making of, such funding; the delivery of a borrowing request; no violation of any applicable governmental requirement shall occur as a result of such advance; and there shall be no event, development or circumstance that has resulted in or could be expected to result in a material adverse effect.

(b) With respect to amounts in excess of the Interim Limits or the Cap, the Bankruptcy Court's entry within thirty (30) days of the Petition Date of a final order approving the DIP Facility and use of cash collateral, in form and substance acceptable to the Post-Petition Agent (the "**Final Order**", and the

Interim Order and Final Order collectively are referred to herein as the "**Financing Orders**"), which Final Order shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified; <u>provided</u> that the time period for entry of the Final Order shall automatically be extended to within forty (40) days of the Petition Date in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of a chapter 11 plan of reorganization prior to the Petition Date; and

(c) The making of the requested credit extension would not cause the Total Outstandings to exceed the lesser of (a) the DIP Loan Limit and (b) the amount then authorized by any Financing Order (including, without limitation, prior to the entry of the Final Order, the Interim Limits).

| | |
|---|---|
| Representations & Warranties: | Customary representations and warranties for transactions of this type and otherwise generally consistent with the Documentation Principles. |
| Affirmative Covenants: | Affirmative covenants customary for transactions of this type and otherwise generally consistent with the Documentation Principles, including, without limitation, the following (subject to exceptions and qualifications to be agreed): |

(a) Maintain its corporate existence and do all things necessary to keep rights to the conduct of its business;

(b) Notice of material events;

(c) Perform every act and discharge all of the obligations to be performed and discharged under the Post-Petition Credit Agreement;

(d) Maintain books and records;

(e) Comply with laws, environmental matters, ERISA, Commodity Exchange Act Keepwell Provisions;

(f) Comply with covenants with respect to the DevCo undertakings, marketing activities, further assurances, reserve reports, title information, additional collateral, additional guarantors, taxes and claims;

(g) Operate and maintain its properties and collateral (including the DevCo properties);

(h) Permit inspections;

(i) Maintain current financial records in accordance with GAAP;

(j) Comply with customary reporting requirements, including audited annual financial reports and quarterly consolidated financial reports; delivery of the items described under the heading "Budget" above; 30 days after the end of each month, delivery of a report of actual production volume for such month; on the last day of each month, delivery of a forecast of production volume for the next month;

(k) Maintain ownership of DevCo equity interests and ownership of certain general partnership interests;

(l) Support entry of a Final Order providing for a waiver of any claims to surcharge the Post-Petition Agent's and Pre-Petition Agent's collateral under section 506(c) of the Bankruptcy Code;

(m) Maintain insurance in amounts and on terms appropriate to the Debtors' business and with financially sound and reputable insurers;

(n) Support entry of a Final Order providing for an acknowledgment of the right of the Post-Petition Agent and Pre-Petition Agent, as applicable, to credit bid at any sale of the Debtors' assets that are subject to the liens of the Post-Petition Lenders or the Pre-Petition Lenders (whether 363 sale or otherwise); and

(o) Comply at all times with the Budget, subject to the Permitted Variance, as described above.

Negative Covenants:    Negative covenants customary for transactions of this type and otherwise generally consistent with the Documentation Principles, including, without limitation, covenants with respect to the following (subject to exceptions and qualifications to be agreed):

(a) Create or permit to exist any lien or encumbrance on any asset, except as permitted by the Post-Petition Credit

Page **13** of **31**

Agreement or the Financing Orders;

(b) Incur or permit to exist any financing under section 364 of the Bankruptcy Code or any other indebtedness, except as permitted by the Post-Petition Credit Agreement;

(c) Create or permit to exist any superpriority administrative expense claim except as specifically permitted by the Post-Petition Agent or the Financing Orders, other than with respect to the DIP Facility or as contemplated by the restructuring support agreement;

(d) Make investments, loans and advances, except as permitted by the Post-Petition Credit Agreement;

(e) Permit the Liquidity as of the end of any business day to be less than (1) $15 million at any time following entry of the Interim Order but before entry of the Final Order; and (2) $20 million at any time following entry of the Final Order;

(f) Declare or pay dividends or make any distributions to equityholders or pay amounts with respect to subordinated indebtedness or any other prepetition indebtedness, except to the Pre-Petition Lenders and as specifically permitted by the Post-Petition Credit Agreement;

(g) Merge or consolidate with any other entity, make any fundamental changes in its corporate structure or otherwise change the nature of its business;

(h) Transfer or otherwise dispose of any assets other than hydrocarbons in the ordinary course of business and other exceptions to be agreed;

(i) Use cash collateral or the proceeds of the DIP Facility except in accordance with the Initial Budget or DIP Budget, as applicable, and subject to the Permitted Variance; or

(j) Fail to operate strictly in compliance with the Initial Budget or DIP Budget, as applicable, subject to the Permitted Variance, as described above.

| | |
|---|---|
| Case Milestones: | The Financing Orders and the Post-Petition Credit Agreement shall provide that the Debtors will implement their Chapter 11 Case in accordance with the Milestones as reflected in <u>Annex I</u> attached hereto. |
| | The Debtors may extend a Case Milestone only with the express written consent of the Post-Petition Agent (which consent may be provided by electronic mail communicated by Post-Petition Agent's counsel to Debtors' counsel) acting at the direction of the Majority Post-Petition Lenders. |
| Events of Default: | Events of default customary for transactions of this type, consistent with the Documentation Principles, including, without limitation (subject to exceptions and qualifications to be agreed): |

    (a)  The failure of Debtors to obtain the Final Order from the Bankruptcy Court not later than 30 days after the Petition Date; <u>provided</u> that the foregoing time period shall automatically be extended to forty (40) days after the Petition Date in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of a chapter 11 plan of reorganization prior to the Petition Date <u>provided further, however</u>, that in no event shall the foregoing Case Milestone be later than immediately preceding the hearing on confirmation of the Plan;

    (b)  Nonpayment of principal, fees, interest or mandatory prepayments when due (with a 3 business day grace period for non-principal payments);

    (c)  The failure or breach of any warranty or representation of the Debtors;

    (d)  Violation of covenants (subject, in the case of certain affirmative covenants, to a 30-day grace period);

    (e)  Change of control;

    (f)  Entry of an order for the dismissal or conversion to Chapter 7 of the Debtors' bankruptcy cases; the appointment of a bankruptcy trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) of the Bankruptcy Code) except with the express written consent of the Post-Petition Agent; the

granting of any other superpriority administrative expense claim, except with the express written consent of the Post-Petition Agent; any Debtor shall attempt to vacate or modify the Interim Order, the Final Order or the cash collateral order over the objection of the Post-Petition Agent; or any Debtor shall institute any proceeding or investigation or support same by any other person who seeks to challenge the status and/or validity of the liens of the Pre-Petition Agent or the Post-Petition Agent (as security for the Pre-Petition Lenders and the Post-Petition Lenders, respectively);

(g) The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay to the holder or holders of any security interest or lien (other than in favor of Post-Petition Agent, Post-Petition Lenders, Pre-Petition Agent or Pre-Petition Lenders) to permit the pursuit of any judicial or non-judicial transfer or other remedy against any assets of any of the Debtors, in each case involving assets with an aggregate value in excess of $1 million;

(h) The Debtors shall fail to meet any established Case Milestones (after giving effect to any extension thereof as described under the section entitled "Case Milestones" above);

(i) Failure by any Debtor to comply in any respect with the Financing Orders;

(j) The filing or support by the Debtors of any plan of reorganization that (i) does not provide for termination of the unused commitments under the DIP Facility and indefeasible payment in full in cash of all of the Debtors' obligations under the DIP Facility and (ii) is not otherwise acceptable to the Post-Petition Agent in its sole discretion;

(k) Bankruptcy Court approves or the Debtors request approval of any sale or other disposition of all or a portion of the Collateral securing the DIP Facility loans pursuant to section 363 of the Bankruptcy Code other than as permitted by the Financing Orders or a plan of reorganization approved by the Post-Petition Agent and the Majority Post-Petition Lenders, or the Post-Petition Credit Agreement;

(l)  The termination of the restructuring support agreement or any agreement attached as an exhibit thereto, either in whole or in part, or any modification, amendment or supplement of the restructuring support agreement, including the exhibits thereto without the prior written consent of the Majority Post-Petition Lenders; and

(m) Any Debtor files, or supports a motion that has been filed, to reject the restructuring support agreement.

Upon the occurrence and continuation of any Event of Default, the Post-Petition Agent may, and at the direction of the Majority Post-Petition Lenders shall, subject in all respects to the Financing Orders, exercise rights and remedies in accordance with the Post-Petition Credit Agreement and security documents and applicable law.

|  |  |
|---|---|
| Releases/ Covenant Not to Sue: | Subject to the challenge rights of third parties set forth in the Interim Order and Final Order, the Debtors shall provide each of the Pre-Petition Agent, the Pre-Petition Lenders, the Issuing Bank and the Secured Swap Parties, the Post-Petition Agent, the Post-Petition Issuing Bank, the Post-Petition Lenders and other customary parties a comprehensive release and covenant not to sue as to any and all claims and causes of action against any of them as of the date of such release, and the date of each advance made under the DIP Facility. |
| Expense Reimbursement/ Indemnification: | All reasonable and documented out-of-pocket expenses (in summary form) of the Post-Petition Agent associated with the preparation, execution, delivery and administration of the DIP Facility and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel), (b) all costs, expenses, Taxes, assessments and other charges incurred by the Post-Petition Agent or any Post-Petition Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by the Post-Petition Credit Agreement and any related documents, (c)  all reasonable and documented out-of-pocket expenses (in summary form) incurred in connection with the issuance of any letter of credit, and (d) all out-of-pocket expenses incurred by the Post-Petition Agent or any Post-Petition Lender, including the reasonable and documented (in summary form) fees, charges and disbursements of any counsel for any Post- |

Petition Lender, in connection with the enforcement or protection of its rights in connection the Post-Petition Credit Agreement and any related documents.

The Post-Petition Agent and the Post-Petition Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the transactions and the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent such losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the indemnified person).

| | |
|---|---|
| Assignments: | The Post-Petition Credit Agreement will contain assignment provisions customarily found in the loan agreements for similar debtor in possession financings and subject to the Documentation Principles; provided, that for the avoidance of doubt any assignment under the Post-Petition Credit Agreement shall (1) be subject to the Borrower's consent (unless an Event of Default has occurred and is continuing or such assignment is made to a Post-Petition Lender or its affiliate); and (2) not be permitted to any Industry Competitor (as defined in the Pre-Petition Credit Agreement).  All assignees of DIP Facility loans and letters of credit shall become bound to the terms of the restructuring support agreement (unless the restructuring support agreement is no longer in effect at such time). |
| Amendments: | Any provision of the Post-Petition Credit Agreement or the Financing Orders may be amended with the consent of the Borrower together with the vote of Post-Petition Lenders holding more than 50% of the overall commitments under the Post-Petition Credit Agreement or, in the case of a termination of such commitment, of the revolving loans outstanding thereunder (the "**Majority Post-Petition Lenders**"), except with respect to certain matters specified in the Post-Petition Credit Agreement requiring the vote of all Post-Petition Lenders or each affected Post-Petition Lender. |
| Governing Law: | New York law shall govern the Post-Petition Credit Agreement (provided that perfection of security interests in the Debtors' real property or midstream assets will be governed by the law of the state in which such assets are |

located to the extent determined by the Post-Petition Agent to be necessary).  Debtors and the Post-Petition Lenders shall agree that all disputes between the Debtors on the one hand and the Post-Petition Lenders on the other hand shall be heard by the Bankruptcy Court so long as the bankruptcy case is pending.

DIP to Exit Conversion:

On the date upon which the conditions precedent to the effectiveness of an "exit credit facility" (the "**Exit Facility**") shall have been satisfied or waived as contemplated by the terms specified in the Exit Facility Term Sheet attached as Exhibit A (the "**Exit Facility Term Sheet**") to that certain Exit Commitment Letter (the "**Exit Facility Commitment Letter**") by and among the Borrower, Wells Fargo Securities, LLC, as Lead Arranger (as defined therein), and the Initial Lenders (as defined therein) (the following clauses (i) through (iv), collectively, the "**DIP Debt Conversion**"): (i) the aggregate principal amount of all DIP Facility loans that are outstanding as of such date and any Pre-Petition Secured Indebtedness that was not converted into the DIP Facility shall, in each case, be automatically converted on a dollar-for-dollar basis for "Loans" under and as defined in the Exit Facility, (ii) all outstanding Letters of Credit shall be deemed to be issued as "Letters of Credit" under and as defined in the Exit Facility, (iii) all outstanding hedges with a Post-Petition Lender or its affiliate shall be deemed to be secured by the liens securing the Exit Facility, and the Debtors shall receive credit therefor for purposes of satisfying the minimum hedging requirements set forth in the Exit Facility Term Sheet, and (iv) all outstanding treasury management arrangements with a Post-Petition Lender or its affiliate shall be deemed to be secured by the liens securing the Exit Facility. Upon payment in full (as defined in the Post-Petition Credit Agreement), the DIP Facility will terminate and be superseded and replaced in its entirety by the Exit Facility.

<u>Annex I</u>

<u>Case Milestones</u>

"<u>Case Milestones</u>" means the following milestones relating to the Chapter 11 Case:

(a)      The Petition Date shall occur no later than September 29, 2020;

(b)      No later than 3 business days after the Petition Date (or such later date as the Post-Petition Agent may agree in writing), the Bankruptcy Court shall have entered the Interim Order, in a form and substance satisfactory to the Post-Petition Agent;

(c)      No later than 30 days after the Petition Date (or such later date as the Post-Petition Agent may agree in writing), the Debtors shall have filed with the Bankruptcy Court the Plan and Disclosure Statement (each as defined in the restructuring support agreement), in each case, in a form and substance satisfactory to the Post-Petition Agent;

(d)      No later than 30 days after the Petition Date (or such later date as the Post-Petition Agent may agree in writing), the Debtors shall have filed with the Bankruptcy Court a motion to establish a bar date for filing proofs of claim; <u>provided</u> that the foregoing Case Milestone shall not apply in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of a chapter 11 plan of reorganization prior to the Petition Date;

(e)      No later than 30 days after the Petition Date (or such later date as the Post-Petition Agent may agree in writing), the Bankruptcy Court shall have entered the Final Order; <u>provided</u> that the foregoing Case Milestone shall automatically be extended to forty-five (45) days after the Petition Date in the event the Debtors commence the Chapter 11 Cases on a "prepackaged" basis by commencing solicitation of a chapter 11 plan of reorganization prior to the Petition Date; <u>provided further</u>, <u>however</u>, that in no event shall the foregoing Case Milestone be later than immediately preceding the hearing on confirmation of the Plan;

(f)      No later than 65 days after the Petition Date (or such later date as the Post-Petition Agent may agree in writing), the Bankruptcy Court shall have entered an order (the "<u>Disclosure Statement Order</u>") (i) approving the adequacy of the Disclosure Statement, and (ii) approving the related solicitation procedures, in each case, in form and substance satisfactory to the Post-Petition Agent;

(g)      No later than 110 days after the Petition Date (or such later date as the Post-Petition Agent may agree in writing), the Bankruptcy Court shall have entered the Confirmation Order (as defined in the restructuring support agreement) in a form and substance satisfactory to the Post-Petition Agent; and

(h)      No later than December 20, 2020 (or such later date as the Post-Petition Agent may agree in writing), the plan of reorganization shall have become effective.

**ANNEX II**

## Carve Out

1.    Carve Out.

(a)    Carve Out.  Notwithstanding anything to the contrary in this Interim DIP Order, any DIP Documents, or any other order of the Court, all of the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, and the Adequate Protection Claim shall be subject only to the payment of the Carve Out as and only to the extent set forth in this Interim DIP Order.  As used in this Interim DIP Order, the "*Carve Out*" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, other than any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any committee[1] (the "*Allowed Professional Fees"*) incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*") and any official Committee appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code (the "*Committee Professionals*" and, together with the Debtor Professionals, the "*Professional Persons*") at any time before or on the first business day following delivery by

---

[1]    Any fee due and payable to a Professional Person that is employed as an investment banker or financial advisor arising from the consummation of any transaction shall be payable only to the extent allowed by the Court and as and to the extent set forth in such Professional Person's engagement letter, and solely from the proceeds received by the Debtors resulting from the consummation of such transaction, free and clear of the liens of the DIP Agent and the DIP Lenders.

the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,750,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "***Post-Carve Out Trigger Notice Cap***").  For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to any Committee and counsel to the Ad Hoc Group of Consenting Noteholders, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Closing Date (as defined in the DIP Credit Agreement), each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "***Estimated Fees and Expenses***") incurred during the preceding week by such Professional Person (through Saturday of such week, the "***Calculation Date***"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "***Weekly Statement***"); *provided*, *that* within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver to the Debtors one additional statement (the "***Final Statement***")

setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been or should have been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the DIP Agent).  If any Professional Person fails to deliver a Weekly Statement or the Final Statement within three calendar days after such Weekly Statement or Final Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees of such Professional Person for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement or Final Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget for such period for such Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph [●](c) below.  Solely as it relates to the DIP Agent and the DIP Lenders, any deemed draw and borrowing pursuant to paragraph [●](c)(i)(x) for amounts under paragraph [●](a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y)

the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "DIP Professional Fee Carve Out Cap").  For the avoidance of doubt, the DIP Agent shall be entitled to maintain at all times a reserve (the "Carve-Out Reserve") against availability under the DIP Facility in an amount (the "Carve-Out Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph [●](a)(i) and [●](a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "Budgeted Cushion Amount").  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Closing Date, the Debtors shall deliver to the DIP Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the DIP Agent shall be entitled to rely upon such reports in accordance with section [●] of the DIP Credit Agreement.  Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the DIP Agent shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

(c)     Carve Out Reserves.

(i)     On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors and their lead restructuring counsel with copies to counsel to any Committee and counsel to the Ad Hoc Group of Consenting Noteholders (the "***Termination Declaration***

*Date*"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Borrower for the Loans (as defined in the DIP Facility) under the DIP Facility, in an amount equal to the sum of (1) the amounts set forth in paragraphs [●](a)(i) and [●](a)(ii) above, and (2) the lesser of (a) the then unpaid amounts of the Allowed Professional Fees and (b) the DIP Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs [●](a)(i)–(iii) above.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "*Pre-Carve Out Trigger Notice Reserve*") prior to any and all other claims.

(ii)      On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for Loans under the DIP Facility, in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute Loans) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "*Post-Carve Out Trigger Notice Reserve*" and, together with the Pre-Carve Out Trigger Notice Reserve, the "*Carve Out Reserves*") prior to any and all other claims.

(iii)      On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default or Event of Default (as such terms are defined

in the DIP Credit Agreement), the failure of the Debtors to satisfy any or all of the conditions precedent for Loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender with an outstanding DIP Commitment (on a pro rata basis based on the then outstanding DIP Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility; *provided* that in no event shall the DIP Agent or the DIP Lenders be required to extend Loans pursuant to a deemed draw and borrowing pursuant to paragraphs [●](c)(i)(x) and [●](c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)      All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "***Pre-Carve Out Amounts***"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "***Post-Carve Out Amounts***"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties unless the Prepetition Claim has been indefeasibly paid in full, in cash.

(v)     Notwithstanding anything to the contrary in the DIP Documents, or this Interim DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 1, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 1, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim DIP Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Interim DIP Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim DIP Order, the DIP Documents, or the Prepetition Claim Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Prepetition Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Claim.

(d)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, the Prepetition Agent, the DIP Secured Parties, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim DIP Order or otherwise shall be construed to obligate the DIP Agent, the Prepetition Agent, the DIP Secured Parties, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim DIP Order, the DIP Documents, the Bankruptcy Code, and applicable law.

2.     In no event shall the Carve Out, or the funding of any DIP Loans or use of DIP Collateral to satisfy the Carve Out, result in any reduction in the amount of any DIP Obligations, the security therefor, or the obligations of the Debtors to pay the same in accordance with the DIP Documents.

3.     Other than the Carve Out, neither the DIP Agent nor the Prepetition Secured Parties consent to any carve out from the Collateral for the payment of any fees or expenses of any

Professional Persons. The amounts payable on account of Allowed Professional Fees are subject to final approval and allowance by the Court, and to the extent the amounts funded in the Carve Out Reserves exceed the amount so allowed, any excess shall be used to pay the DIP Agent for the benefit of the DIP Secured Parties, unless the DIP Obligations have been indefeasibly paid in full in cash and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties, unless the Prepetition Claim has been indefeasibly paid in full in cash in accordance with paragraph [●](c) above. The Agent, for itself and for and on behalf of the Prepetition Secured Parties, expressly retains the right to object to any fees or expenses of any Professional Persons as to reasonableness or on any other grounds.

(b)      Notwithstanding anything to the contrary in this Interim DIP Order, neither the Carve Out, Cash Collateral, or any proceeds of any DIP Loans, letters of credit issued under the DIP Facility, or the Collateral shall be used to pay any Allowed Professional Fees (including, without limitation, expenses) in connection with any of the following (each a "***Prohibited Purpose***"):  (a) objecting to, seeking subordination of, seeking to avoid, or contesting in any manner the validity, amount, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Motion or any of the relief requested therein, this Interim DIP Order, the DIP Facility, any DIP Obligations, the DIP Superpriority Claim, the Prepetition Claim, the Adequate Protection Claims, or any other claim of the Agent, the DIP Secured Parties, or the Prepetition Secured Parties or the perfected status or priority of any of the DIP Liens, the Prepetition Liens, the Adequate Protection Liens, or any other liens of the Agent, any DIP Secured Party, or any Prepetition Secured Party, or any other rights or interests of the Agent, the DIP Secured Parties, or the Prepetition Secured Parties; (b) asserting, investigating, prosecuting, or joining in any claim, demand, or cause of action against the Agent, any DIP

Secured Party, or any Prepetition Secured Party, including, without limitation, for lender liability, breach of contract, or tort, or pursuant to Section 105, 506, 510, 544, 547, 548, 549, 550, 552 or 553 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; (c) seeking to modify, or modifying, any of the rights granted under this Interim DIP Order to the Agent, any DIP Secured Party, or any Prepetition Secured Parties or under the DIP Documents or the Prepetition Claim Documents, as applicable; (d) other than as set forth in paragraph [●][2] below after the occurrence and during the continuance of an Event of Default, objecting to, contesting, delaying, preventing, hindering, or interfering in any way with (i) the Agent's or any Prepetition Secured Party's enforcement of realization upon any of the applicable Collateral, or (ii) the exercise of any rights and remedies by the Agent or the Prepetition Secured Parties with respect to any Collateral, (e) asserting or declaring any of the DIP Documents the Prepetition Claim Documents, or this Interim DIP Order to be invalid, not binding, or unenforceable in any respect, (f) using funds advanced under the DIP Facility or Cash Collateral except as specifically permitted in this Interim DIP Order and the Budget (after giving effect to the Permitted Variance), (g) selling any Collateral outside the ordinary course of business except as specifically authorized by this Interim DIP Order or by order of the Court, (h) incurring any indebtedness except as permitted by this Interim DIP Order and the DIP Documents, or (i) committing any other act or taking any other actions that are adverse to the Agent or any Prepetition Secured Party.  Notwithstanding the foregoing, funds advanced under the DIP Facility or Cash Collateral deposited into the Carve Out Reserves for any Committee Professionals may be used to pay the fees earned and expenses incurred of counsel to any appointed creditors' Committee in an amount not to exceed $25,000 to review the Prepetition

---

[2]        To reference remedies paragraph in DIP order.

Claim, the Prepetition Claim Documents, and the Prepetition Liens, and to assert any challenges to one or more of the Debtors' stipulations or the releases set forth herein.

**EXHIBIT D**

**Exit Facility Term Sheet**

*Execution Version*



**CONFIDENTIAL**
**Oasis Petroleum North America LLC**
**Exit Senior Secured Revolving Credit Facility**
**Indicative Summary of Terms and Conditions**

## I.   <u>Parties</u>

Borrower:

Oasis Petroleum North America LLC, a Delaware limited liability company (the "<u>Borrower</u>").

Guarantors:

Oasis Petroleum Inc., a Delaware corporation (the "<u>Parent</u>"), Oasis Petroleum LLC, a Delaware limited liability company ("<u>OP LLC</u>"), Oasis Petroleum Marketing LLC, a Delaware limited liability company, Oasis Well Services LLC, a Delaware limited liability company, Oasis Midstream Services LLC, a Delaware limited liability company, OMS Holdings LLC, a Delaware limited liability company, Oasis Petroleum Permian LLC, a Delaware limited liability company, OMP GP LLC, a Delaware limited liability company (the "<u>General Partner</u>"), and all Material Subsidiaries that are required to guarantee the Facility (defined below) in accordance with its terms during the tenor of the Facility (collectively, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>Credit Parties</u>"); <u>provided</u> that (a) foreign Subsidiaries, (b) domestic Subsidiaries, substantially all the assets of which consist of equity interests, or debt and equity interests, in controlled foreign corporations ("<u>FSHCO</u>") and (c) domestic Subsidiaries that are direct or indirect Subsidiaries of foreign Subsidiaries, shall not be required to become Guarantors.

"<u>Material Subsidiary</u>" means, as of any date, (a) any restricted domestic Subsidiary that owns any oil and gas property evaluated in the most recently delivered reserve report and (b) any restricted domestic Subsidiary of Parent, OP LLC or the Borrower that, together with its subsidiaries, owns property having a fair market value of $5,000,000 or more; <u>provided</u> that if the aggregate fair market value of all property of all restricted domestic Subsidiaries that are not Guarantors exceeds $10,000,000, then Parent, OP LLC and the Borrower shall promptly designate restricted domestic Subsidiaries that are not then Guarantors as Material Subsidiaries (and cause such

US 7272673v22

|  | designated Material Subsidiaries to comply with the Facility) to the extent necessary so that the aggregate fair market value of all property owned by restricted domestic Subsidiaries that are not then Guarantors is less than $10,000,000. For purposes herein, "Subsidiary" shall exclude Oasis Petroleum International LLC and its subsidiaries, Oasis Midstream Partners, LP ("OMP") and its subsidiaries and the DevCos (defined below). |
|---|---|
| DevCos: | Beartooth DevCo LLC, a Delaware limited liability company, and Bobcat DevCo LLC, a Delaware limited liability company (each a "DevCo" and together, the "DevCos"). |
| Administrative Agent: | Wells Fargo Bank, N.A. ("Wells Fargo" and in such capacity, the "Administrative Agent"). |
| Sole Lead Arranger and Sole Lead Bookrunner: | Wells Fargo Securities, LLC shall act as sole lead arranger and sole lead bookrunner (in such capacity, the "Lead Arranger"). |
| Revolving Lenders: | Wells Fargo and a syndicate of financial institutions and other entities arranged by the Lead Arranger and approved by the Borrower (each a "Revolving Lender" and, collectively, the "Revolving Lenders"). On the Closing Date (defined below), the Revolving Lenders shall constitute all of the Pre-Petition Lenders (defined below) participating in the DIP Facility (defined below). For the avoidance of doubt, in no event shall any Term Lender (defined below) be considered a Revolving Lender. |
| Required Revolving Lenders: | Revolving Lenders (excluding any defaulting Revolving Lenders) holding not less than 66.67% of the outstanding aggregate amount of the revolving loans under the Facility (the "Loans") and participations in Letters of Credit (defined below) (or, if no Loans or Letters of Credit are outstanding, Revolving Lenders (excluding any defaulting Revolving Lenders) holding not less than such percentage of the unused Commitments (defined below) under the Facility) (the "Required Revolving Lenders"). For the avoidance of doubt, in no event shall any Term Lender be considered in the determination of Required Revolving Lenders. |

2

| Majority Revolving Lenders: | Revolving Lenders (excluding any defaulting Revolving Lenders) holding more than 50% of the outstanding aggregate amount of the Loans and participations in Letters of Credit (or, if no Loans or Letters of Credit are outstanding, Revolving Lenders (excluding any defaulting Revolving Lenders) holding more than such percentage of the unused Commitments under the Facility).  For the avoidance of doubt, in no event shall any Term Lender be considered in the determination of Majority Revolving Lenders. |
|---|---|
| Swingline Lender: | Wells Fargo (in such capacity, the "Swingline Lender"). |

## II.    Facility

| Type and Amount of Facility: | The reserve-based revolving credit facility (the "Facility") shall be in an amount of up to $1.5 billion (the "Aggregate Maximum Credit Amount" and the portion of the Aggregate Maximum Credit Amount allocated to a particular Revolving Lender shall be referred to herein as such Revolving Lender's "Maximum Credit Amount"). |
|---|---|
| Maturity Date: | The date that is 3.5 years after the Closing Date (the "Maturity Date"). |
| Availability: | Subject to the Borrowing Base and the Aggregate Elected Commitment Amount (each term defined below) then in effect and to the Availability Block and the Initial Hedge Reduction Amount, in each case, described in the row captioned "Initial Hedging", the Facility shall be available on a revolving basis during the period commencing on the Closing Date subject to satisfaction of the applicable conditions precedent described below, and ending on the earlier of the Maturity Date and the termination of the Commitments (the "Termination Date"), in accordance with the terms of the Facility Documentation (defined below). |

Availability under the Facility shall be limited to the total Commitments of the Revolving Lenders, and shall also be subject to the Availability Block described below and the Initial Hedge Reduction Amount described below.   "Commitment" means,

3

|  | with respect to each Revolving Lender, the commitment of such Revolving Lender to make Loans, to acquire participations in Swingline Loans (defined below) and to acquire participations in Letters of Credit under the Facility, expressed as an amount which shall at any time be the least of (a) such Revolving Lender's Maximum Credit Amount, (b) such Revolving Lender's applicable percentage of the then effective Borrowing Base and (c) such Revolving Lender's Elected Commitment (defined below). |
|---|---|
| Letters of Credit: | A portion of the Facility equal to $100 million shall be available for the issuance of letters of credit (the "Letters of Credit") by Wells Fargo (in such capacity, the "Issuing Bank").  No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (b) five business days prior to the Maturity Date. On the Closing Date, all letters of credit issued (or deemed reissued) under the DIP Credit Agreement shall be refinanced and deemed reissued under the Credit Agreement (defined below).<br><br>Drawings under any Letter of Credit shall be reimbursed by the Borrower on the same business day if the Borrower receives notice of the applicable Letter of Credit disbursement by 10:00 a.m. New York City time on such day; provided, that if such disbursement is not less than $1,000,000, the Borrower shall be deemed to have requested an ABR Loan (defined below) in the amount of such disbursement.  To the extent that the Borrower does not so reimburse the Issuing Bank, the Administrative Agent shall notify each Revolving Lender of (a) the applicable disbursement, (b) the payment then due from the Borrower and (c) such Revolving Lender's applicable percentage thereof.  Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its applicable percentage of the payment then due from the Borrower. |
| Swingline Loans: | A portion of the Facility shall be available for the extension by the Swingline Lender of swingline loans (the "Swingline Loans") not resulting in (a) swingline borrowings in excess of $50,000,000 at any time outstanding or (b) the sum of the outstanding principal |

amount of the Loans, the outstanding principal amount of the Swingline Loans and the LC Exposure (defined below) (the "Revolving Credit Exposure") exceeding the aggregate Commitments.  Settlement of such Swingline Loans will occur no later than seven (7) business days following the making of a Swingline Loan.  Upon the making by the Swingline Lender of any Swingline Loan, the Administrative Agent shall notify each Revolving Lender of its applicable percentage thereof and each Revolving Lender shall pay to the Administrative Agent its applicable percentage of such Swingline Loan. The Borrower may borrow, prepay and reborrow amounts under the subfacility for Swingline Loans provided for in the Credit Agreement; however, in no event may the Borrower continue or convert a Swingline Loan.

Purpose:

The proceeds of the Loans shall be used by the Borrower (a) for payments of certain fees, costs and expenses in connection with the Transactions (as defined in the Exit Commitment Letter to which this Exit Facility Term Sheet is attached), (b) to consummate the Refinancing (as defined in the Exit Commitment Letter to which this Exit Facility Term Sheet is attached) and (c) for general corporate purposes (including funding working capital for exploration and production operations) and to repay Swingline Loans; provided that the Borrower will not use any proceeds for any purpose which would violate the provisions of Regulations T, U or X.

Security:

The Facility and each commodity swap, interest rate swap or similar agreement between the Borrower and a Revolving Lender or an affiliate of a Revolving Lender (whether such swap was entered into prior to the time, or during the time, that such person or its affiliate is a Revolving Lender (including any swap agreement entered into with such person in existence prior to the Closing Date), even if such person subsequently ceases to be a Revolving Lender (or an affiliate thereof)) shall be ratably secured by:

- First priority (subject to certain permitted liens to be defined in the Facility Documentation in a manner consistent with the Documentation Principles (defined below)), perfected liens and security interests on substantially all assets of the

5

Credit Parties, including a first priority (subject to certain permitted liens), perfected lien on all equipment of the Credit Parties and on all oil and gas properties of the Borrower and its subsidiaries that are Guarantors comprising not less than 90% of the proved oil and gas properties evaluated in the reserve report most recently delivered to the Administrative Agent, in each case, subject to exceptions to be agreed.

- Pledge of (a) 100% of the stock of restricted domestic Subsidiaries and (b) 65% of the stock of restricted foreign Subsidiaries and FSHCOs with, in each case for entities described in this clause (b), total assets greater than $1,000,000.

- Unconditional joint and several guarantee from each Guarantor.

- Pledge of equity in the Credit Parties' percentage ownership in the DevCos and OMP.

Borrowing Base:    The Borrowing Base (the "Borrowing Base") will be proposed by the Administrative Agent and subject to Revolving Lender approval as described below; provided that each of any proposal made by the Administrative Agent and each Revolving Lender's determination as to whether to approve or disapprove such proposal will be in the sole discretion of the Administrative Agent and such Revolving Lender, as applicable, based upon its review of the most recently delivered reserve report (including any supplemental information provided thereto) and such other information (including, without limitation, the status of title information with respect to the oil and gas properties of the Credit Parties and the existence of any other debt, the Credit Parties' other assets, liabilities, fixed charges, cash flow, business, properties, prospects, management and ownership, hedged and unhedged exposure to price, price and production scenarios, interest rate and operating cost changes) as it deems appropriate in its sole discretion and consistent with its normal oil and gas lending criteria as it exists at the particular time. The Borrowing Base will be re-determined on a semi-annual basis, with the parties having the Interim Redetermination Rights as described below. The

6

Borrowing Base will also be subject to interim adjustments in connection with (a) sales of assets, hedge unwinds and title defects such that if the aggregate value of such sales or hedge unwinds exceeds 5.0% of the then existing Borrowing Base, the Borrowing Base will be automatically reduced by an amount equal to such excess and (b) the incurrence of Unsecured Debt, such that upon the incurrence thereof, the Borrowing Base will be automatically reduced by an amount equal to the product of 0.25 multiplied by an amount equal to the difference between (x) the stated principal amount of such Unsecured Debt minus (y) the stated principal amount of previously outstanding Unsecured Debt to the extent such previously outstanding principal amount was redeemed or refinanced with the proceeds of such Unsecured Debt.   Scheduled Borrowing Base redeterminations will be on a semi-annual basis each April 1st and October 1st, based upon a reserve report prepared as of the immediately preceding January 1 and July 1, respectively, and delivered to the Administrative Agent and the Revolving Lenders on or before March 1st and September 1st of each year, respectively; provided that the first scheduled Borrowing Base redetermination will occur on or about April 1, 2021. The January 1 reserve report will be comprised of (a) a report prepared by one or more Approved Petroleum Engineers (as defined in the Existing Credit Agreement) with regards to not less than 90% of the proved oil and gas properties of the Borrower and its subsidiaries that are Guarantors and (b) a report on the remainder of such oil and gas properties prepared internally by the Borrower, and the July 1 reserve report will be prepared internally by the Borrower in a form reasonably acceptable to the Administrative Agent.

Upon receipt of a proposed Borrowing Base notice, each Revolving Lender shall have fifteen (15) days to agree with the proposed Borrowing Base or disagree with the proposed Borrowing Base by proposing an alternate Borrowing Base.  If, in the case of any proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, at the end of such fifteen (15) days, any Revolving Lender has not communicated its approval or disapproval in writing to the Administrative Agent, such silence shall

7

be deemed to be an approval of the proposed Borrowing Base. If, in the case of any proposed Borrowing Base that would increase the Borrowing Base then in effect, at the end of such fifteen (15) days, any Revolving Lender has not communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be a disapproval of the proposed Borrowing Base. If, at or prior to the end of such 15-day period, all of the Revolving Lenders, in the case of a proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Revolving Lenders (defined below), in the case of a proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved or, in the case of a decrease or reaffirmation, deemed to have approved, as aforesaid, then the proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in the Facility. If, however, at the end of such 15-day period, all of the Revolving Lenders or the Required Revolving Lenders, as applicable, have not approved or, in the case of a decrease or reaffirmation, deemed to have approved, as aforesaid, then the Administrative Agent shall poll the Revolving Lenders to ascertain the highest Borrowing Base then acceptable to (a) in the case of a decrease or reaffirmation, a number of Revolving Lenders sufficient to constitute the Required Revolving Lenders and (b) in the case of an increase, all of the Revolving Lenders, and such amount shall become the new Borrowing Base, effective on the date specified in the Facility.

The Borrower or the Administrative Agent, at the request of the Required Revolving Lenders, each may request one additional unscheduled Borrowing Base redetermination during any 12-month period (except for the period commencing on the Closing Date and ending on April 1, 2021) (the "Interim Redetermination Rights").

To the extent the Closing Date occurs on or before the ninetieth (90th) day after the execution of the Exit Commitment Letter to which this Exit Facility Term Sheet is attached, the initial Borrowing Base shall be an amount equal to (a) $575,000,000 minus (b) the principal amount of the Non-Participating Lender

8

Term Loan (as defined below). Otherwise, the initial Borrowing Base shall be equal to an amount determined by the Administrative Agent and the Revolving Lenders within the period that is thirty (30) days prior to the Closing Date, based on the reserve report prepared as of July 1, 2020 and provided to the Administrative Agent by the Borrower on September 1, 2020, along with such other information as the Administrative Agent may require, and otherwise shall be in accordance with the redetermination criteria described above.

Additionally, the initial Borrowing Base shall be subject to reduction by the Initial Hedge Reduction Amount as described below in the row captioned "Initial Hedging".

Elected Commitments:

In addition to being subject to the Borrowing Base, availability under the Facility will be limited to the aggregate amount of "Elected Commitments" of the Revolving Lenders as set forth in the Facility (such aggregate amount, the "Aggregate Elected Commitment Amount"). The Aggregate Elected Commitment Amount as of the Closing Date shall be equal to the amount of the initial Borrowing Base.

Once between each scheduled redetermination of the Borrowing Base, the Borrower may request that the Aggregate Elected Commitment Amount be increased by either an existing Revolving Lender increasing its Elected Commitment or by having a person acceptable to the Administrative Agent who is not currently a Revolving Lender become a Revolving Lender with an Elected Commitment under the Facility. The Elected Commitments may be increased in amounts no less than $50 million (unless the Administrative Agent consents to such lesser amount); provided that in no event will such increase be permitted if the Aggregate Elected Commitment Amount will exceed the Borrowing Base then in effect.

Upon any redetermination or other adjustment in the Borrowing Base that would result in the Borrowing Base becoming less than the Aggregate Elected Commitment Amount, the Aggregate Elected Commitment Amount shall be automatically reduced (ratably among the Revolving Lenders in accordance

9

with each Revolving Lender's percentage of the Aggregate Maximum Credit Amount) so that it equals such redetermined Borrowing Base.

Non-Participating Lender Term Loan Facility:

To the extent that any holder of RBL Claims (as defined in the Restructuring Support Agreement) does not elect to participate in the Facility, such holder (each such holder, a "Term Lender" and, collectively, the "Term Lenders"; the Term Lenders collectively with the Revolving Lenders, the "Lenders") shall, in accordance with the terms of the Restructuring Support Agreement, receive a non-amortizing "second-out" term loan which shall (a) accrue interest at the LIBO Rate plus 3.00% pursuant to a three-month Interest Period (as described in Annex I), (b) have a maturity date no earlier than seven (7) years after the Closing Date, (c) not subject the Credit Parties or its Subsidiaries to any representations, warranties or covenants that are more burdensome or restrictive to such entities than those applicable to the Facility, (d) be guaranteed and secured on a pari passu basis with the Facility pursuant to the same Facility Documentation, (e) include limited reporting obligations owed to the Term Lenders to be agreed and (f) otherwise be on terms and conditions acceptable to the Required Revolving Lenders and the Borrower (such term loan, the "Non-Participating Lender Term Loan"). The Non-Participating Lender Term Loan shall be documented as a separate tranche of term loan debt under the Facility Documentation, and the Term Lenders shall not be entitled to vote on any matter under the Facility Documentation (including but not limited to approval of the Borrowing Base and amendments or waivers of covenants) other than with respect to amendments or modifications directly and adversely affecting the economic terms of the Non-Participating Lender Term Loan, such as any amendment or modification that would decrease the interest rate applicable thereto (it being understood that only the consent of the Majority Revolving Lenders shall be necessary to waive any obligation of the Borrower to pay default interest) or extend the maturity thereof.

### III.   Certain Payment Provisions

10

| | |
|---|---|
| Fees and Interest Rates: | As set forth on Annexes I and II. |
| Principal Payments: | On the Termination Date. |
| Voluntary Prepayments: | Voluntary prepayments of Loans are permitted (subject to payment of applicable breakage costs, if any) in minimum amounts and with prior notices to be set forth in the Credit Agreement but in any case consistent with the Documentation Principles. |
| Mandatory Prepayments: | If, as a result of a scheduled or interim redetermination of the Borrowing Base or an adjustment to the Borrowing Base in respect of title defects, the sum of outstanding Loans and Letters of Credit exceeds the Borrowing Base (a "Borrowing Base Deficiency"), then the Borrower shall, within ten (10) business days (or such longer period as may be acceptable to the Administrative Agent) following receipt of written notice of the redetermination or such adjustment, as applicable, deliver written notice (the "Election Notice") to the Administrative Agent stating the action which the Borrower proposes to take to eliminate such Borrowing Base Deficiency, and the Borrower shall thereafter, at its option: |

(a) prepay the borrowings and/or deposit cash collateral in an aggregate principal amount equal to such Borrowing Base Deficiency within thirty (30) days after the Borrower's delivery of the Election Notice;

(b) repay such Borrowing Base Deficiency in six (6) equal and consecutive monthly installments, the first installment being due and payable thirty (30) days after the Borrower's receipt of notice of the redetermined or adjusted Borrowing Base, and each subsequent installment being due and payable on the same day in each of the five (5) subsequent calendar months;

(c) provide additional proved oil and gas properties not evaluated in the most recently delivered reserve report acceptable to the Administrative Agent in its sole discretion (together with title information with respect thereto acceptable to the Administrative Agent in its sole discretion) sufficient to increase the Borrowing Base by an amount at least equal to such

Borrowing Base Deficiency within thirty (30) days after its delivery of the Election Notice; or

(d) effect any combination of the foregoing clauses (a), (b) and (c) in amounts necessary to eliminate such Borrowing Base Deficiency; provided that (x) if the Borrower fails to provide a timely Election Notice, it shall be deemed to have selected the option described in clause (b) above and (y) all payments required to be made pursuant to this clause (d) must be made on or prior to the Termination Date.  If a Borrowing Base Deficiency remains after prepaying all of the borrowings as a result of an LC Exposure, the Borrower shall deposit with the Administrative Agent on behalf of the Revolving Lenders an amount equal to such Borrowing Base Deficiency to be held as cash collateral as provided in the Facility Documentation.

If a Borrowing Base Deficiency occurs as the result of an asset disposition, unwind or termination of hedge arrangements, or in connection with the incurrence of Unsecured Debt, then the Borrower shall (A) prepay the borrowings in an aggregate principal amount equal to such Borrowing Base Deficiency (i) within one (1) business day after the receipt of proceeds from such disposition, unwind or termination or (ii) on the date of such incurrence of debt, and (B) if a Borrowing Base Deficiency remains after prepaying all of the borrowings as a result of LC Exposure, deposit with the Administrative Agent on behalf of the Revolving Lenders an amount equal to such Borrowing Base Deficiency to be held as cash collateral as provided in the Facility Documentation.  The Borrower shall be obligated to make such deposit of cash collateral on or prior to the first business day succeeding the date it or any Credit Party receives cash proceeds as a result of the applicable asset disposition, unwind or termination of hedge arrangements or debt incurrence; provided that in all cases, the Borrowing Base Deficiency must be eliminated on or prior to the Termination Date.

If a Borrowing Base Deficiency occurs as a result of the application of the Initial Hedge Reduction Amount as described below, then, within one (1) business day of such Borrowing Base reduction, the Borrower shall (A) prepay the borrowings in an aggregate principal amount equal to such Borrowing Base Deficiency, and

12

(B) if a Borrowing Base Deficiency remains after prepaying all of the borrowings as a result of LC Exposure, deposit with the Administrative Agent on behalf of the Revolving Lenders an amount equal to such Borrowing Base Deficiency to be held as cash collateral as provided in the Facility Documentation.

Excess Cash Balances.  If on the last business day of any week while there are any Loans outstanding, the Borrower or any other Credit Party have any cash or cash equivalents in excess of $50,000,000 in the aggregate (other than (a) cash collateral with respect to Letters of Credit, (b) any cash set aside and to be used to pay royalty or other production revenue obligations of the Credit Parties for amounts which have accrued to unaffiliated third parties, (c) any cash set aside to and to be used to pay in the ordinary course of business amounts (other than royalty or other production revenue obligations) of the Credit Parties then due and owing to unaffiliated third parties and for which the Credit Parties have issued checks or have initiated wires or ACH transfers (or will issue checks or initiate wires or ACH transfers within five business days) in order to make such payments, (d) any cash set aside and used solely for payroll or employee benefits or for the payment of taxes of the Credit Parties and (e) any cash of the Credit Parties constituting purchase price deposits set aside and held in escrow by an unaffiliated third party pursuant to a binding and enforceable purchase and sale agreement with an unaffiliated third party containing customary provisions regarding the payment and refunding of such deposits (the "Excess Cash"), then the Borrower shall prepay the Loans in an amount equal to the lesser of (x) the amount of Excess Cash and (y) the amount of Loans then outstanding, on the next business day); provided that to the extent that any Excess Cash results from the receipt of the proceeds of any sale or disposition of property less than five (5) business days prior to such date, then the Borrower shall not be required to prepay such Excess Cash until the fifth business day following the receipt of such proceeds. Each prepayment of Loans shall be applied as directed by the Borrower, provided that if the Borrower does not provide instructions for the application of such prepayment, such prepayment shall be applied, first, ratably to any ABR Loan then outstanding, and,

13

second, to any LIBO Rate Loan (defined below) then outstanding, and if more than one LIBO Rate Loan is then outstanding, to each such LIBO Rate Loan in order of priority beginning with the LIBO Rate Loan with the least number of days remaining in the Interest Period (defined below) applicable thereto and ending with the LIBO Rate Loan with the most number of days remaining in the Interest Period applicable thereto.  Each Excess Cash prepayment of Loans shall be applied ratably to the Loans included in the prepaid borrowings.  Prepayments shall be accompanied by accrued interest to the extent required by the Facility Documentation.

Optional Commitment Reductions:

The Aggregate Maximum Credit Amount and the Aggregate Elected Commitment Amount may be reduced by the Borrower in minimum amounts to be set forth in the Facility Documentation or terminated in whole.

## IV.    Certain Conditions to Borrowing and Issuance of Letters of Credit

Conditions Precedent to Effectiveness and Initial Borrowings:

The availability of the Facility shall be conditioned upon satisfaction of customary conditions precedent to be agreed (the date upon which all such conditions precedent shall be satisfied or waived, the "Closing Date"), including without limitation:

(a)    the negotiation, execution and delivery of satisfactory Facility Documentation, including security documentation, promissory notes and other usual and customary closing documents, certificates, and authorizing resolutions for the Facility;

(b)    the Revolving Lenders and the Administrative Agent shall have received all reasonable and documented out-of-pocket fees and expenses required to be paid on or before the Closing Date (including the reasonable and documented fees and expenses of professionals retained by the Administrative Agent) invoiced at least two business days prior thereto;

(c)    all representations and warranties of the Credit Parties in the Facility Documentation shall be true and correct in all material respects (or, if already qualified by materiality, material adverse effect or a similar qualification, true and correct in all respects), and

14

there shall be no default or event of default in existence at the time of, or after giving effect to the making of, such funding on such date;

(d)   receipt and satisfactory review of (i) Borrower's audited financial statements for the most recent fiscal year ending at least 90 days prior to the Closing Date, (ii) Borrower's unaudited financial statements for the most recent fiscal quarter ending at least 60 days prior to the Closing Date, (iii) pro forma financial statements of the Borrower (after giving effect to closing) and (iv) detailed financial projections (to be mutually agreed upon) of the Borrower;

(e)   to the extent that the Closing Date has not occurred by March 1, 2021, receipt of a reserve report prepared by an Approved Petroleum Engineer as of January 1, 2020;

(f)   satisfactory title information as reasonably required by the Administrative Agent on not less than 90% of the proved oil and gas properties of the Credit Parties evaluated in the most recent reserve report;

(g)   receipt of mortgages and security agreements providing perfected, first priority (subject to certain permitted liens to be defined in the Facility Documentation in a manner consistent with the Documentation Principles) liens and security interests on (i) all personal property assets of the Credit Parties constituting collateral, and (ii) not less than 90% of the proved oil and gas properties of the Credit Parties evaluated in the most recent reserve report;

(h)   all governmental and third party approvals necessary in connection with the financing contemplated hereby shall have been obtained and be in full force and effect;

(i)   the Administrative Agent shall have received lien search results and be satisfied that there are no liens and security interests on the Credit Parties' property other than (i) those being released and (ii) permitted liens;

(j)   the delivery of legal opinions regarding the Facility Documentation, including, as applicable,

15

opinions of local counsel with respect to mortgages governed by North Dakota, Montana and Texas law (which opinions shall include, among other things, the enforceability of the mortgages under applicable local law), in form and substance reasonably satisfactory to the Administrative Agent;

(k)     the Administrative Agent and the Revolving Lenders shall have received, by at least three (3) business days prior to the Closing Date, "know your customer" and similar information required by bank regulatory authorities to the extent requested at least six (6) business days prior to the Closing Date;

(l)     no material adverse change (excluding the pendency of the bankruptcy cases) from the date the Chapter 11 Cases commenced until the Closing Date;

(m)     final redetermination of the Borrowing Base (to the extent required in accordance with the row captioned "Borrowing Base" above);

(n)     entry of a final order of the Bankruptcy Court confirming the Plan (as defined in the Restructuring Support Agreement) that has not been reversed, stayed, modified or amended;

(o)     the Administrative Agent shall have received satisfactory evidence that the Total Leverage Ratio (as defined below), determined on a pro forma basis after giving effect to the occurrence of the Transactions, does not exceed 1.5 to 1.0 as of the last day of the most recently completed fiscal quarter ended at least 60 days (for any fiscal quarter other than the last fiscal quarter of 2020) or 90 days (for the fiscal quarter ended December 31, 2020) prior to the Closing Date (with EBITDAX calculated on a last quarter annualized basis);

(p)     minimum availability under the Facility, determined on a pro forma basis after giving effect to the occurrence of the Transactions of $75 million; provided that to the extent the Borrower has caused the beneficiary of a letter of credit issued (or deemed reissued) under the DIP Credit Agreement that will be reissued under the Facility to, on or prior to the Closing Date, enter into a legally binding agreement

16

(in form and substance reasonably acceptable to the Administrative Agent) among the Borrower, such beneficiary and the Administrative Agent pursuant to which such beneficiary shall agree to return (or to accept an amendment thereto reducing the stated amount thereof) such letter of credit within ten business days of the Closing Date, the stated amount of such letter of credit (or the amount of such agreed reduction thereto) shall increase availability on a dollar for dollar basis solely for the purpose of determining satisfaction of this condition precedent (such adjustment as set forth in this proviso, the "LC Adjustment"); provided further that in the event that any beneficiary of any letter of credit subject to the LC Adjustment fails to comply with the applicable agreement regarding such letter of credit on or before the date that is ten business days after the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion), (x) availability shall be recalculated as of such date without giving effect to the LC Adjustment with respect to the applicable letter of credit and (y) to the extent that availability is less than $75 million after giving effect to such recalculation, an immediate event of default shall occur under the Facility;

(q)      entry into hedges covering the Closing Date Minimum Hedge Volumes (as defined below); and

(r)      after giving effect to any requested credit extension on the Closing Date, the Credit Parties shall have no outstanding debt except for debt permitted under the Credit Agreement.

| Conditions Precedent to Lending: | The making of each extension of credit shall be conditioned upon (a) the accuracy in all material respects (or, if already qualified by materiality, material adverse effect or a similar qualification, the accuracy in all respects) of all representations and warranties (including, without limitation, the material adverse change, solvency and litigation representations) in the Facility Documentation on the date of such credit extension, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such credit extension, such representations and warranties shall continue to be true and correct in |

17

all material respects (or, if already qualified by materiality, material adverse effect or a similar qualification, true and correct in all respects) as of such specified earlier date, (b) there being no Borrowing Base Deficiency, no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit, (c) delivery of a borrowing request, (d) no violation of, or conflict with, any applicable governmental requirement occurring as a result of such credit extension, (e) there being no event, development or circumstance that has resulted in, or could reasonably be expected to have, a material adverse effect at the time of and immediately after giving effect to such credit extension, (f) no change in law having occurred that enjoins, prohibits or restrains, the making or repayment of any Loan or the consummation of the transactions contemplated the Facility Documentation and (g) there being no litigation pending or threatened seeking to, enjoin, prohibit or restrain, the making or repayment of any Loan or the consummation of the transactions contemplated the Facility Documentation.

At the time of and immediately after giving effect to any borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, the Borrower together with the other Credit Parties shall not have any Excess Cash.

## V.   **Certain Documentation Matters**

Documentation Principles:

The definitive documentation for the Facility, including the credit agreement (the "Credit Agreement") and all other related agreements and documents creating, evidencing or securing indebtedness or obligations of any of the Credit Parties to the Administrative Agent or granting or perfecting liens or security interests by any of the Credit Parties in favor of and for the benefit of the Administrative Agent, for itself and for and on behalf of the Revolving Lenders, on account of the Facility shall contain the terms set forth herein and shall otherwise be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date (the "Facility Documentation"). The documentation will be based on the applicable "Loan Documents" under and as defined in that certain Third

|  | Amended and Restated Credit Agreement dated October 16, 2018, among the Parent, OP LLC and the Borrower; the lenders party thereto (the "Pre-Petition Lenders");  and Wells Fargo, as administrative agent (as in effect immediately prior to the commencement of bankruptcy case of the Borrower, the "Existing Credit Agreement"), with changes consistent with this Exit Facility Term Sheet and otherwise to reflect customary lender form updates, including without limitation updated LIBOR replacement provisions (the "Documentation Principles"). |
|---|---|
| Representations and Warranties: | The Facility shall contain representations and warranties customary for financings of this type (including materiality thresholds and other qualifications to be agreed) and shall otherwise be consistent with the Documentation Principles, including, without limitation: existence and organizational status; power and authority; qualification; execution, delivery and enforceability of Facility Documentation; compliance with laws and agreements; with respect to the execution, delivery and performance of the Facility Documentation, no violation of, or conflict with, law, charter documents or material agreements; litigation; margin regulations; licenses and permits; governmental approvals and other consents with respect to the execution, delivery and performance of the Facility; Investment Company Act; PATRIOT ACT; absence of undisclosed liabilities; accuracy of disclosure and financial statements; since the Closing Date, no material adverse effect; no defaults or Borrowing Base Deficiency; insurance; taxes; ERISA; environmental matters; creation and perfection of security interests; no material misstatements; ownership of properties; maintenance of properties; location of business and offices; DevCo properties; subsidiaries and equity interests; state regulation; title to refined products; gas imbalances; prepayments; marketing of production; hedge agreements; use of loans and letters of credit; sanctions laws/OFAC; EEA Financial Institutions; consolidated solvency; beneficial ownership certification |
| Affirmative Covenants: | The Facility shall contain affirmative covenants customary for financings of this type (including materiality thresholds and other qualifications to be |

19

agreed) and shall otherwise be consistent with the Documentation Principles, including, without limitation: delivery of annual and quarterly financial statements (with annual financial statements to be accompanied by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit other than solely with respect to, or resulting solely from (a) an upcoming maturity date under the Facility occurring within one year from the time such opinion is delivered or (b) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period); certificates and other information; delivery of notices of defaults, certain material events and changes in beneficial ownership; maintenance of organizational existence and rights and privileges; conduct of business; performance of obligations under the Facility Documentation; inspections (including books and records); operation and maintenance of properties; maintenance of insurance; payment of taxes; compliance with laws (including environmental laws); delivery of reserve reports as described above; reasonably satisfactory title review on at least ninety percent (90%) of the proved oil and gas properties of the Credit Parties evaluated in the most recent reserve report; additional guarantors and collateral; further assurances on collateral matters consistent with the requirements otherwise set forth herein; ERISA; DevCo properties; marketing activities; Commodity Exchange Act Keepwell Provisions; DevCo parent undertaking; ownership of DevCo equity interests; ownership of General Partner equity interests; unrestricted subsidiaries; use of proceeds; know-your-customer information; sanctions laws/OFAC/anti-money laundering laws; account control agreements; hedge agreements (required minimum rolling hedging of (i) 80% for the next twelve months as of any date of determination and (ii) 70% for months thirteen through twenty-four following any date of determination, in each case (i) tested on a quarterly basis and (ii) based on estimated oil PDP production reflected in the most recently delivered reserve report).

| Initial Hedging: | The Borrower shall enter into hedges covering minimum hedge volumes of (i) 10,303 MBBL for the first year after the Closing Date, (ii) 6,761 MBBL for the second year after the Closing Date and (iii) 4,945 |

20

MBBL for the third year after the Closing Date; provided that, 2/3rds of such hedging shall be entered into on the Closing Date (the "Closing Date Minimum Hedge Volumes"), with the remainder (the "Post-Closing Minimum Hedge Volumes" and, together with the Closing Date Minimum Hedge Volumes, the "Minimum Hedge Volumes") to be entered into by the date that is thirty (30) days after the Closing Date (the "Post-Closing Deadline").

In the event that the Closing Date Minimum Hedge Volumes do not satisfy the target hedge pricing requirements set forth below, then availability under the Facility shall be automatically reduced as of the Closing Date by an amount (the "Availability Block") equal to the product of (1) sixty-five percent (65%) and (2) the positive sum of (a) the difference between the PV-9 value of (i) the Required First Year Target Hedge Pricing (defined below) multiplied by the Closing Date Minimum Hedge Volumes for the first year after the Closing Date and (ii) the actual hedge pricing multiplied by the Closing Date Minimum Hedge Volumes for the first year after the Closing Date, (b) the difference between the PV-9 value of (i) the Required Second Year Target Hedge Pricing (defined below) multiplied by the Closing Date Minimum Hedge Volumes for the second year after the Closing Date and (ii) the actual hedge pricing multiplied by the Closing Date Minimum Hedge Volumes for the second year after the Closing Date and (c) the difference between the PV-9 value of (i) the Required Third Year Target Hedge Pricing (defined below) multiplied by the Closing Date Minimum Hedge Volumes for the third year after the Closing Date and (ii) the actual hedge pricing multiplied by the Closing Date Minimum Hedge Volumes for the third year after the Closing Date. For the avoidance of doubt, the Availability Block will apply until the earliest of (i) satisfaction of the target hedge pricing requirements, (ii) the Post-Closing Deadline or (iii) waiver of the application of the Availability Block by the Required Revolving Lenders.

In the event that the Minimum Hedge Volumes entered into as of the Post-Closing Deadline do not satisfy the target hedge pricing requirements set forth

21

below, then, the Credit Parties shall have ten business days after the Post-Closing Deadline (the "Cure Period") to satisfy the target hedge pricing requirements set forth below; provided that availability under the Facility shall be automatically reduced as of the Post-Closing Deadline by an amount (the "Initial Hedge Reduction Amount") equal to the product of (1) sixty-five percent (65%) and (2) the positive sum of (a) the difference between the PV-9 value of (i) the Required First Year Target Hedge Pricing multiplied by the Minimum Hedge Volumes for the first year after the Closing Date and (ii) the actual hedge pricing multiplied by the Minimum Hedge Volumes for the first year after the Closing Date, (b) the difference between the PV-9 value of (i) the Required Second Year Target Hedge Pricing multiplied by the Minimum Hedge Volumes for the second year after the Closing Date and (ii) the actual hedge pricing multiplied by the Minimum Hedge Volumes for the second year after the Closing Date and (c) the difference between the PV-9 value of (i) the Required Third Year Target Hedge Pricing multiplied by the Minimum Hedge Volumes for the third year after the Closing Date and (ii) the actual hedge pricing multiplied by the Minimum Hedge Volumes for the third year after the Closing Date.

If the Credit Parties fail to satisfy the target hedge pricing requirements set forth below for the Minimum Hedge Volumes during the Cure Period, unless the Required Revolving Lenders otherwise agree during the Cure Period, upon the expiration of the Cure Period, the Borrowing Base shall automatically be reduced by the Initial Hedge Reduction Amount and the Credit Parties shall have one business day to cure any Borrowing Base Deficiency resulting from such Borrowing Base reduction.

The target pricing for the hedges described above shall not be less than (i) $43.04/bbl for the first year after the Closing Date (the "Required First Year Target Hedge Pricing"), (ii) $43.94/bbl for the second year after the Closing Date (the "Required Second Year Target Hedge Pricing") and (iii) $44.79/bbl for the third year after the Closing Date (the "Required Third Year Target Hedge Pricing").

22

For the avoidance of doubt, in no event shall either the Availability Block or the Initial Hedge Reduction Amount be an amount less than $0.

|  |  |
|---|---|
| Financial Covenants: | Financial covenants to consist of (a) a minimum current ratio of not less than 1.0 to 1.0 and (b) a maximum consolidated total leverage ratio (to be tested net of balance sheet cash in an amount not to exceed $50 million) (the "Total Leverage Ratio") not to exceed 3.0 to 1.0. EBITDAX (as defined below) to be initially calculated LQA, building to trailing four (4) quarters. The first covenant test shall be based upon the fiscal quarter ending March 31, 2021. "EBITDAX" shall have substantially the same meaning ascribed to such term in the Existing Credit Agreement, with the addition of customary addbacks, subject, in each case, to caps to be agreed, with respect to any costs, fees or expenses in connection with the implementation of fresh start accounting, the Chapter 11 Cases, the Plan (as defined in the Restructuring Support Agreement) and the transaction contemplated thereby (including costs, fees and expenses in connection with litigation and settlement thereof confirmed under the Plan). |
| Negative Covenants: | The Facility shall contain negative covenants customary for financings of this type (including materiality thresholds and other qualifications to be agreed) and shall otherwise be consistent with the Documentation Principles, including, without limitation: |

(a)     incurrence of debt, with exceptions for, among other things, (i) the Facility, (ii) capital lease arrangements up to a cap to be agreed, (iii) intercompany debt, (iv) any debt incurred on the Closing Date in accordance with an Acceptable Plan (as defined in the DIP Credit Agreement) and (v) unsecured debt in an aggregate principal amount not to exceed $400 million ("Unsecured Debt"), but subject to a pro forma Total Leverage Ratio of less than 2.5 to 1.0, reduction of the Borrowing Base to the extent set forth above, pro forma financial covenant compliance, and usual and customary high yield basket provisions consistent with the Documentation Principles;

(b)     liens, which shall permit, among other things,

23

liens (i) created under the Facility Documentation (including those liens securing the Facility, any hedge agreements and any treasury arrangements) and (ii) in respect of purchase money or capital lease arrangements up to a cap to be agreed;

(c)     fundamental changes;

(d)     asset sales and early monetization or early termination of any hedge or swap positions;

(e)     investments and, solely with respect to the period commencing on the Closing Date through and including the last day of calendar year ending December 31, 2021, Capital Expenditures (as defined below), which shall permit (i) investments or Capital Expenditures in an amount not to exceed $25 million; provided that, such investments or Capital Expenditures shall only be permitted to the extent that (w) no event of default exists at the time of such investment, (x) the pro forma Total Leverage Ratio is less than 2.0 to 1.0, (y) immediately after giving effect to such investment the availability under the Facility is not less than 25% of the Borrowing Base, and (z) positive Free Cash Flow (as defined below) of the Borrower and its Subsidiaries, on a consolidated basis, exists at the time of such investment, (ii) the ability to make Capital Expenditures in an amount not to exceed $275 million during the 2021 calendar year; provided that, for the avoidance of doubt, this clause (e)(ii) is in addition to the investments and Capital Expenditures permitted in clause (e)(i) above and (iii) other investments under specified baskets to be set forth in the Facility Documentation;

 (f)     dividends or distributions on, or redemptions of, Borrower capital stock ("Restricted Payments"); provided that, commencing on the date of the delivery of the compliance certificate for the fourth fiscal quarter ending after the Closing Date, the Borrower shall be permitted to make Restricted Payments subject to (i) no event of default, (ii) a pro forma Total Leverage Ratio test of less than 2.0 to 1.0, (iii) pro forma availability under the Facility of not less than 25% of the Borrowing Base, and (iv) generation by the Borrower and its Subsidiaries on a consolidated basis, of positive Free Cash Flow at the time of such

24

Restricted Payment, provided that clause (iv) shall only be applicable to the extent the pro forma Total Leverage Ratio exceeds 1.5 to 1.0 at the time of the applicable Restricted Payment;

(h) payments of principal on junior debt; provided that the Facility Documentation shall permit the refinancing of such junior debt subject to customary limitations;

(i)     environmental matters;

(j)     subsidiaries; designation and conversion of restricted and unrestricted subsidiaries;

(k)     ERISA compliance;

(l)     limitations on negative pledges and limitations on the prohibition of subsidiary distributions;

(m)     sale or discount of receivables;

(n)     mergers, etc.;

(o)     gas imbalance; take-or-pay or other prepayments;

(p)     covenants of Parent, OP LLC and the General Partner;

(q)     non-qualified ECP Guarantors;

(r)     changes to organizational documents of General Partner and DevCos;

(s)     transactions with affiliates;

(t)     change in nature of business;

(u)     international operations; and

(v)     use of proceeds.

For purposes of the positive free cash flow governor for Restricted Payments and investments described above, "Free Cash Flow" shall be defined as EBITDAX less (i) Interest Expense (defined in a manner consistent with the Documentation Principles), less (ii) Capital Expenditures (as defined below), less (iii) taxes paid in cash, less (iv) investments made in

cash; less (v) mandatory cash payments in respect of debt.

"Capital Expenditures" shall mean accrued capital expenditures (as determined in accordance with GAAP) for any period, including (a) exploration and production expenses and other capital expenditures and (b) midstream capital expenditures associated with the Credit Parties' retained ownership in the DevCos (specifically excluding (i) the portion of capital expenditures funded by OMP or attributable to OMP in accordance with ownership in each DevCo and (ii) capitalized interest).

|  |  |
|---|---|
| Events of Default: | The Facility shall contain events of default customary for financings of this type (including materiality thresholds and other qualifications to be agreed) and shall otherwise be consistent with the Documentation Principles, including, without limitation: |

Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a three business day grace period; material inaccuracy of representations and warranties; violation of covenants (subject, in the case of certain affirmative covenants, to a 30-day grace period); failure to enter into the Post-Closing Date Minimum Hedge Volumes by the Post-Closing Deadline; cross-default to material indebtedness; bankruptcy and insolvency events; ERISA events; material judgment in excess of $25 million that is unstayed or undischarged for a period of thirty (30) consecutive days; the loan documents ceasing to be valid or enforceable; Change of Control (as defined below).

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof), of equity interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding equity interests of the Parent, (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Parent by persons who were not (i) members of the board of directors of Parent as of the Closing Date, (ii)

26

nominated (or whose nomination was approved) by the board of directors of the Parent or (iii) appointed (or whose appointment was approved) by directors so nominated (or whose nomination was so approved), (c) the Parent fails to own directly or indirectly all of the equity interests of the Borrower, (d) the General Partner shall cease to be the sole general partner of Oasis Midstream Partners LP (the "Midstream MLP"), with substantially the same powers to manage the Midstream MLP as are granted to the General Partner under the Midstream MLP partnership agreement, (e) the failure of the Parent, OP LLC and the Borrower to own directly or indirectly (i) all of the equity interests of the General Partner other than the Class B Units (as defined in the General Partner limited liability company agreement) and (ii) equity interests representing at least 85% of total number of Units (as defined in the General Partner limited liability company agreement) issued by the General Partner, (f) the failure of the Parent to have direct or indirect sole control of the General Partner or (g) the occurrence of a "change of control" (or any other similar event) under any material indebtedness.

| | |
|---|---|
| Voting: | Amendments and waivers with respect to the Facility requires the approval of the Majority Revolving Lenders, except that no such agreement shall (a) increase the Maximum Credit Amount or Elected Commitment of any Revolving Lender without the written consent of such Revolving Lender, (b) increase the Borrowing Base without the written consent of all Revolving Lenders, decrease or maintain the Borrowing Base without the consent (or deemed consent) of the Required Revolving Lenders, or modify the Borrowing Base provisions in any manner that results in an increase in the Borrowing Base without the consent of each Revolving Lender, (c) reduce the principal amount of any Loan or Letter of Credit disbursement without the written consent of each Revolving Lender affected thereby, (d) reduce the rate of interest (it being understood that only the consent of the Majority Revolving Lenders shall be necessary to waive any obligation of the Borrower to pay default interest), or reduce, or waive or excuse the payment of, any fee or other amount payable under the Facility owed to any Revolving Lender without the written consent of such Revolving Lender, (e) |

27

postpone the scheduled date of payment or prepayment of the principal amount of any Loan or Letter of Credit disbursement, or any interest thereon, or the scheduled date of any fees or other amounts payable under the Facility, or reduce the amount of, waive or excuse any such payment (it being understood that only the consent of the Majority Revolving Lenders shall be necessary to waive any obligation of the Borrower to pay default interest), or postpone or extend the Termination Date without the written consent of each Revolving Lender affected thereby, (f) change the pro rata sharing of payments provisions without the written consent of each Revolving Lender, (g) release any Guarantor (except as otherwise provided in the Facility Documentation), release all or substantially all of the collateral (except as otherwise provided in the Facility Documentation) or waive or amend other customary provisions consistent with the Documentation Principles without the written consent of each Revolving Lender, or (h) amend, modify or otherwise affect the rights or duties of the Administrative Agent, any other agent, the Issuing Bank or the Swingline Lender under the Facility without the prior written consent of the Administrative Agent, other such agent, the Issuing Bank or the Swingline Lender, as the case may be.

For the avoidance of doubt, Term Lenders shall only be able to vote with respect to amendments or modifications to the Facility Documentation that directly and adversely affect the economic terms of the Non-Participating Lender Term Loan, such as any amendments or modifications that would decrease the interest rate applicable thereto (it being understood that only the consent of the Majority Revolving Lenders shall be necessary to waive any obligation of the Borrower to pay default interest) or extend the maturity thereof.

| | |
|---|---|
| Assignments and Participations: | (a)  Consents: (i) Each Lender will be permitted to make assignments, without the consent of the Borrower, if such assignment is to a Lender, an affiliate of a Lender, an Approved Fund or any other assignee during the continuance of an event of default; provided that no such assignment may be made by a Revolving Lender to a Term Lender, an affiliate of a Term Lender or an Approved Fund affiliated with a |

28

Term Lender without the consent of the Borrower (other than during the continuance of an event of default), (ii) each Lender will be permitted to make assignments, without the consent of the Administrative Agent, if such assignment is to a Lender or an affiliate of a Lender immediately prior to giving effect to such assignment; provided that no such assignment may be made by a Revolving Lender to a Term Lender or an affiliate of a Term Lender without the consent of the Administrative Agent and (iii) except in the case of an assignment to a Lender or an affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment cannot be less than $5 million without the consent of each of the Borrower (unless an event of default has occurred and is continuing) and the Administrative Agent.

"Approved Fund" means any person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(b)    Participations:  Lenders will be permitted to sell participations with voting rights limited to significant matters such as changes in amount, rate, maturity date and releases of all or substantially all of the collateral securing the Facility or all or substantially all of the value of the guaranties of the Borrower's obligations made by the Guarantors. Participations will be permitted without the consent of the Borrower, the Administrative Agent, the Swingline Lender or the Issuing Bank.

(c)    No Assignment or Participation to Certain Persons:  No assignment or participation may be made to natural persons, the Borrower, any other Loan Party, or any of their respective affiliates or subsidiaries or to any defaulting Revolving Lender. No assignment or participation may be sold to any "Industry Competitor" of any Loan Party.  "Industry Competitor" means any person (other than Borrower,

29

any Guarantor or any of their affiliates or subsidiaries) that is (or one or more of whose affiliates are) actively engaged as one of its principal businesses in lease acquisitions, exploration and production operations or development of oil and gas properties (including the drilling and completion of producing wells).

Yield Protection:

The Facility Documentation shall contain customary provisions consistent with the Documentation Principles (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy or other requirements of law, and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBO Rate Loan on a day other than the last day of an Interest Period with respect thereto.

Expenses and Indemnification:

The Borrower shall pay (a) all reasonable out-of-pocket expenses of the Administrative Agent associated with the syndication of the Facility and the preparation, execution, delivery and administration of the Facility and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel), (b) all costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent in connection with any filing, registration, recording or perfection of any security interest contemplated by the loan documents, (c) all reasonable out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance of any Letter of Credit, and (d) all out-of-pocket expenses incurred by any agent, the Swingline Lender, the Issuing Bank or any Revolving Lender, including the reasonable fees, charges and disbursements of any counsel for any Agent, the Swingline Lender, the Issuing Bank or any Revolving Lender, in connection with the enforcement or protection of its rights in connection the loan documents.

The Administrative Agent, the Swingline Lender and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the transactions and the

30

financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent such losses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the indemnified person and provided that the Borrower shall not indemnify any indemnitee for (a) any financial liability of the Lender to the Parent, OP LLC, the Borrower or any Subsidiary pursuant to and in accordance with the terms of a swap agreement and (b) claims among Lenders or between Lenders and their related parties to the extent unrelated to a breach of an obligation of the Parent, OP LLC, the Borrower or any Subsidiary and (c) losses, claims, damages, liabilities or related expenses that are determined by a court of competent jurisdiction by final and nonappealable judgment to be a direct result of a material breach of the Facility by such indemnitee).

| | |
|---|---|
| Defaulting Lenders: | The Facility Documentation shall include customary market provisions relating to defaulting lenders consistent with the Documentation Principles. |
| Eligible Contract Participants and Excluded Swap Obligations: | The Facility Documentation shall include customary market provisions relating to guarantees of swap obligations by Credit Parties that are not "eligible contract participants" under the Commodity Exchange Act. |
| Governing Law and Forum: | State of New York |
| DIP to Exit Conversion: | On the Closing Date, (the following clauses (i) through (iv), collectively, the "DIP Debt Conversion"): (i) the aggregate principal amount of all "Loans" under and as defined in the DIP Credit Agreement that are outstanding as of such date and any Pre-Petition Secured Indebtedness of any Revolving Lender that was not converted into the DIP Facility (as defined in that certain DIP Term Sheet attached to that certain Senior Secured Superpriority Debtor-in-Possession Revolving Credit Facility Commitment Letter, dated on or about the date hereof, among the Borrower, the financial institutions party thereto and Wells Fargo Bank, N.A. (the "DIP Term Sheet")) shall, in each case, be automatically converted on a dollar-for-dollar basis for Loans under the Facility, (ii) all outstanding "Letters of Credit" (as |

defined in the DIP Term Sheet) shall be deemed to be issued as Letters of Credit under the Facility, (iii) all outstanding hedges with a Revolving Lender or an affiliate of a Revolving Lender under the DIP Facility shall be deemed to be included in the Facility, and the Credit Parties shall receive credit therefor for purposes of satisfying the minimum hedging requirements set forth herein, and (iv) all outstanding treasury management arrangements with a Revolving Lender or an affiliate of a Revolving Lender under the DIP Facility shall be deemed to be included in the Facility. Upon Payment in Full (as defined in the DIP Credit Agreement, including all or in part as a result of the DIP Debt Conversion), the DIP Facility will terminate and be superseded and replaced in its entirety by the Facility.

| | |
|---|---|
| Counsel to the Administrative Agent: | Vinson & Elkins L.L.P. |

**Annex I**

**Interest and Certain Fees**

Interest Rate Options:    The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to:

- the ABR plus the Applicable Margin (such margin set forth on Annex II hereto)  ("ABR Loans"); or

- the LIBO Rate (as adjusted for statutory reserve requirements (the "Adjusted LIBO Rate")) plus the Applicable Margin ("LIBO Rate Loans").

As used herein:

"ABR" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate (defined in a manner consistent with the Documentation Principles) in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.00%, (c) subject to the availability of LIBO, the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a business day, the immediately preceding business day) plus 1.00% and (d) 2.00%.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding business day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a business day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; provided that in no event shall the Federal Funds Effective Rate be less than 0%.

"LIBO Rate" means, subject to the implementation of a replacement rate, with respect to any LIBO Rate borrowing for any Interest Period, the greater of (a) 1.00% and (b) the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to

Annex I

those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two business days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such LIBO Rate borrowing for such Interest Period shall be the rate (rounded upwards, if necessary, to the next 1/100 of 1%) at which dollar deposits of an amount comparable to such LIBO Rate borrowing and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two (2) business days prior to the commencement of such Interest Period.  Notwithstanding the foregoing, unless otherwise specified in any amendment to the Credit Agreement, in the event that a replacement rate with respect to LIBO Rate is implemented then all references herein to LIBO Rate shall be deemed references to such replacement rate.

Interest Periods for LIBO Rate Loans shall be one, two, three or six months (or, with the consent of each Revolving Lender, nine or twelve months).  Interest on ABR Loans shall be payable on the last day of each quarter, upon any prepayment (whether due to acceleration or otherwise) and at final maturity.  Interest on LIBO Rate Loans shall be payable in arrears on the last day of each Interest Period, in the case of an Interest Period longer than three months, quarterly, upon any prepayment (whether due to acceleration or otherwise) and at final maturity.  Interest on all LIBO Rate Loans shall be calculated for actual days elapsed on the basis of a 360 day year unless such computation would exceed the highest lawful rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days, as applicable).  Interest on all ABR Loans and all fees shall be calculated for actual days elapsed on the basis of a 365, or when appropriate 366, day year.

Annex I

| | |
|---|---|
| Interest Period: | With respect to any LIBO Rate borrowing, the period commencing on the date of such borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Revolving Lender, nine or twelve months) thereafter, as the Borrower may elect; provided, that (a) if any Interest Period would end on a day other than a business day, such Interest Period shall be extended to the next succeeding business day unless such next succeeding business day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding business day and (b) any Interest Period pertaining to a LIBO Rate borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last business day of the last calendar month of such Interest Period. For purposes hereof, the date of a borrowing initially shall be the date on which such borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such borrowing. |
| Upfront Fees: | The Borrower agrees to pay to the Administrative Agent, for the account of each Revolving Lender, an upfront fee payable in two (2) installments as follows:<br><br>(a) an installment of the upfront fee on the Closing Date of seventy basis points (0.70%) on each Revolving Lender's applicable percentage of an amount (the "<u>Closing Date Availability Amount</u>") equal to the Aggregate Elected Commitment Amount minus, if applicable, the amount of the Availability Block in place due to the failure of the Credit Parties to satisfy the target hedge pricing requirements specified in the "Initial Hedging" section above for the Closing Date Minimum Hedge Volumes on the Closing Date; and<br><br>(b) an installment of the upfront fee on the next Business Day after the Cure Period of seventy basis points (0.70%) on each Revolving Lender's applicable percentage of an amount equal to the positive difference, if any, between, the Aggregate Elected Commitment Amount then in effect minus the Closing Date Availability Amount. |

Annex I

| | |
|---|---|
| Commitment Fees: | The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Revolving Lender during the period from and including the Closing Date to but excluding the Termination Date. Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date.  Solely for purposes of calculating the commitment fee, Swingline Loans will not be deemed to be a utilization of the Commitments.  To the extent that the Borrowing Base is reduced by the Initial Hedge Reduction Amount, the Borrower shall be reimbursed for any commitment fees previously paid (or entitled to deduct from the amount of commitment fees to be paid on the next payment date, as applicable) with respect to the portion of the Commitment thereby reduced. |
| Letter of Credit Fees: | The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to LIBO Rate Loans on the average daily amount of such Revolving Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed Letter of Credit disbursements) and shall be payable quarterly in arrears.  During the continuation of an event of default, upon written notice to the Borrower of the election of the Majority Revolving Lenders, such Letter of Credit Fees shall increase by 2% per annum over the then applicable rate. "LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all Letter of Credit disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC Exposure of any Revolving Lender at any time shall be its applicable percentage of the total LC Exposure at such time. |
| | A fronting fee equal to 1/4 of 1% per annum on the face amount of each Letter of Credit, shall be payable quarterly in arrears to the Issuing Bank for its own account.  In addition, customary administrative, |

Annex I

|  |  |
|---|---|
|  | issuance, amendment, payment and negotiation charges shall be payable to the Issuing Bank for its own account consistent with the Documentation Principles. |
| Default/Deficiency Rate: | (i) Automatically upon the occurrence of any payment or insolvency related event of default and (ii) with respect to any other event of default that has occurred and is continuing, upon written notice to the Borrower of the election of the Majority Revolving Lenders, all outstanding principal, fees and other obligations under the Facility Documentation shall bear interest at 2% above the rate otherwise applicable to ABR Loans; provided that in either case under clause (i) or clause (ii), such default interest shall accrue from the date of the occurrence of the applicable event of default and end on the date on which such event of default has been cured or waived.  During a Borrowing Base Deficiency, an amount of the Revolving Credit Exposure equal to the amount of the deficiency shall, upon written notice to the Borrower of the election of the Majority Revolving Lenders, bear interest at 2% above the rate otherwise applicable to such portion of the Revolving Credit Exposure, which shall accrue from the date of occurrence of such Borrowing Base Deficiency until the date that such Borrowing Base Deficiency is cured or waived. |

Annex I

## Annex II.

**Applicable Margin and Commitment Fee:**

The Applicable Margin and Commitment Fee for purposes of determining the applicable interest rate will be determined based upon the percentage of the total Commitments then being utilized as follows:

| Total Commitments Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Total Commitments Utilization Percentage | < 25% | ≥ 25% < 50% | ≥ 50% < 75% | ≥ 75% < 90% | ≥ 90% |
| ABR Loans or Swingline Loans | 2.000% | 2.250% | 2.500% | 2.750% | 3.000% |
| LIBO Rate Loans | 3.000% | 3.250% | 3.500% | 3.750% | 4.000% |
| Commitment Fee Rate | 0.500% | 0.500% | 0.500% | 0.500% | 0.500% |

Annex II

**EXHIBIT E**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Oasis Petroleum Inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a ["Consenting RBL Lender" // "Consenting Noteholder"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Notes | |
| RBL | |
| Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT F

**Form of Joinder**

# JOINDER

With respect to the Restructuring Support Agreement, dated as of September 29, 2020, as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof (the "**Agreement**"), the undersigned (the "**Joinder Party**")—

(1) becomes and shall be treated for all purposes under the Agreement as a Consenting Stakeholder, Consenting RBL Lender, and/or Consenting Noteholder, as appropriate, with respect to (i) all Company Claims/Interests that the Joinder Party holds and (ii) the Company Claims/Interests acquired through a Transfer (if applicable) to the same extent the transferor was bound by the Agreement;

(2) agrees to be subject to and bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as **Annex 1** (as such terms may be amended from time to time in accordance with the terms thereof) and by the vote of the transferor with respect to any Company Claims/Interests acquired through a Transfer, if the transferor of the Company Claims/Interests voted on the Plan before the effectiveness of the Transfer of the Company Claims/Interests to be transferred in connection with the execution of this Joinder; and

(3) is deemed, without further action, to make to the other Parties as of the date hereof the representations and warranties that the Parties make in Sections 8 and 9 of the Agreement.

The Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

Capitalized terms used in this Joinder but not otherwise defined shall have the respective meanings set forth in the Agreement.  The Agreement shall control over any provision in this Joinder that is inconsistent with the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| RBL Claims | |
| Notes Claims | |

**<u>Exhibit C</u>**

**Liquidation Analysis**

See attached.

## LIQUIDATION ANALYSIS[13]

### Introduction

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared the hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. As illustrated by this Liquidation Analysis, holders of Claims or Interests in Impaired Classes and holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such holder would receive in a chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

### Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result,

---

[13] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Oasis Petroleum Inc. and its Debtor Affiliates* (as altered, amended, modified, or supplemented from time to time, the "Plan").

the actual amount of claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Liquidation Analysis was prepared for the sole purpose of generating a reasonable and good faith estimate of the recoveries that would result if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code and is not intended and should not be used for any other purpose. The Liquidation Analysis does not include estimates for: (i) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets, (ii) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions, (iii) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code, or (iv) environmental or other governmental claims arising from the shut-down or sale of the Debtors' assets. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and trustee fees (together, the "Wind-Down Expenses"). To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Basis of Presentation**

The Liquidation Analysis has been prepared assuming that the Debtors converted their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about November 20, 2020 (the "Liquidation Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of June 30, 2020 and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date. The Debtors' management team believes that the June 30, 2020 book value of assets and certain liabilities are a proxy for such book values as of the Liquidation Date. It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates, during which time all of the assets of the Debtors would be sold, in piecemeal or in whole, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of liquidation, wind down expenses, trustee fees and other chapter 7 administrative claims attributable to the Wind-Down Expenses; (ii) *second,* to pay the secured portions of all Allowed Secured Claims from the respective collateral; and (iii) *third*, to pay amounts on the Allowed Other Priority Claims. Any remaining net cash would be distributed to creditors holding Unsecured Claims, including Deficiency Claims that arise to the extent of the unsecured portion of the Allowed Secured Claims. An inability by the Debtors or the Trustee to maintain the Debtors' operations during the marketing period, a seizure of collateral by secured creditors, and/or significant employee attrition would likely yield significantly lower recoveries than those estimated in this Liquidation Analysis.

The Liquidation Analysis has been prepared assuming that the Debtors' current chapter 11 cases convert to chapter 7 on the Liquidation Date. This Liquidation Analysis assumes operations of the Debtors and Non-Debtors (collectively, the "Liquidating Entities") will cease and the related individual assets will be sold in a sale under a three-month liquidation process (the "Liquidation Timeline") under the direction of the Trustee, utilizing the Debtors' employees, resources and third-party advisors, to allow for the orderly wind down of the Debtors' estates. There can be no assurance that the liquidation would be completed in this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest. The Liquidation Analysis is also based on the assumptions that: (i) the Debtors have continued access to cash collateral during the course of the Liquidation Timeline to fund Wind Down Expenses and (ii) operations, accounting, treasury, IT, and other management services needed to wind down the estates continue. The Liquidation Analysis was prepared on a by-entity basis for all Liquidating Entities and is displayed below on a consolidated basis for convenience. Asset recoveries accrue first to satisfy creditor claims at the legal entity level. To the extent any remaining value exists, it flows to each individual entity's parent organization or appropriate shareholder. In addition, the Liquidation Analysis includes an analysis of the recovery of pre-petition Intercompany Claims.

**DETAILED LIQUIDATION ANALYSIS**

The liquidation analysis for the Liquidation Entities was analyzed on a by-entity basis. The following table provides a summary of Liquidation Analysis of the Debtors, which should be reviewed in conjunction with the associated notes.

| | | Book | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|---|
| **Liquidation Analysis Summary - Consolidated Debtors** | | | | | | |
| *In $Thousands* | Note: | Value | Low | High | Low | High |
| Cash and Cash Equivalents | [A] | $    81,035 | 100% | 100% | $    81,035 | $    81,035 |
| Accounts Receivable | [B] | 193,374 | 75% | 85% | 145,030 | 164,368 |
| Prepaid Expenses | [C] | 13,204 | 3% | 5% | 335 | 671 |
| Inventory | [D] | 29,892 | 62% | 75% | 18,605 | 22,509 |
| Oil and Gas Properties - Net | [E] | 1,166,678 | 45% | 49% | 519,870 | 569,939 |
| PPE, Other Properties | [F] | 51,692 | 29% | 43% | 14,853 | 22,375 |
| Other Assets | [G] | 46,876 | 1% | 2% | 657 | 984 |
| Equity Ownership | [H] | 516,999 | 25% | 44% | 129,519 | 229,780 |
| **Total Assets** | | **$ 2,099,751** | **43%** | **52%** | **$    909,905** | **$ 1,091,661** |
| | | | | | | |
| **Wind-Down Expenses** | [I] | | | | 283,529 | 291,000 |
| Wind-Down Expenses Recovery $ | | | | | 283,529 | 291,000 |
| *Wind-Down Expenses Recovery %* | | | | | *100%* | *100%* |
| | | | | | | |
| **DIP Loan and Rollup Facility Claims** | [J] | | | | $    377,620 | $    377,620 |
| DIP Loan and Rollup Facility Recovery $ | | | | | 377,620 | 377,620 |
| DIP Loan and Rollup Facility Deficiency Recovery $ | | | | | - | - |
| *DIP Loan and Rollup Facility Recovery %* | | | | | *100%* | *100%* |
| | | | | | | |
| **Prepetition RBL Claims** | [K] | | | | $    60,640 | $    60,640 |
| Prepetition RBL Recovery $ | | | | | 60,640 | 60,640 |
| Prepetition RBL Deficiency Recovery $ | | | | | - | - |
| *Prepetition RBL Recovery %* | | | | | *100%* | *100%* |
| | | | | | | |
| **Senior Unsecured Notes Claims** | [L] | | | | $ 1,877,171 | $ 1,877,171 |
| Senior Unsecured Notes Recovery $ | | | | | 168,553 | 329,307 |
| *General Unsecured Recovery %* | | | | | *9%* | *18%* |
| | | | | | | |
| **General Unsecured Claims** | [M] | | | | $    738,235 | $    738,235 |
| General Unsecured Recovery $ | | | | | 19,563 | 33,094 |
| *General Unsecured Recovery %* | | | | | *3%* | *4%* |
| | | | | | | |
| **Total Creditor Recovery** | | | | | **$    909,905** | **$ 1,091,661** |

## Notes to the Liquidation Analysis

[A] <u>Cash</u>: The cash balance represents the estimated balance as of the Liquidation Date. A 100% recovery on cash and equivalents has been estimated for the low and high cases.

[B] <u>Accounts Receivable</u>: A 75% to 85% recovery has been estimated for the Debtors' receivables based on the likelihood of recoverability.

[C] <u>Prepaid Expenses</u>: Prepaid expenses and other assets consist of prepaid and accounting assets that will likely be largely unrecoverable in the event of a chapter 7 liquidation.  These assets have been evaluated on an individual basis for recoverability.  On a blended basis, a 3% to 5% recovery has been estimated on the Debtors' prepaid expenses.

[D] <u>Inventory</u>:  A 62% to 75% recovery has been estimated for the Debtors' inventory based on the likelihood of recoverability.

[E] <u>Oil and Gas Properties - Net</u>:  Oil and gas property recoveries have been estimated based on the present value of future cash flows related to oil and gas assets.  The estimated recovery of $520 million to $570 million implies a recovery 45% to 49% of net book value.

[F] <u>PPE, Other Properties</u>:  PPE, other properties consist primarily of non-oil and gas properties, computers, fixtures, and equipment.  These assets were evaluated by category and a blended 29% to 43% recovery has been estimated for the Debtors' other assets based on the likelihood of recoverability.

[G] <u>Other Assets</u>: Other assets includes primarily deferred costs and right of use assets that are unlikely to be recoverable in a chapter 7 liquidation. On a blended basis, a 1% to 2% recovery has been estimated on the Debtors' other assets.

[H] <u>Equity Ownership</u>: Equity ownership consists of the Debtors' equity ownership in Non-Debtor entities, including Oasis Midstream Petroleum. A range of proceeds was estimated for the holdings in OMP and the Non-Debtor entities of $130 million to $230 million.

[I] <u>Wind-Down Expenses</u>:  Wind-Down Expenses represent balance sheet priority liabilities and the expenses associated with administering the chapter 7 liquidation.  A combined 4% trustee and related legal/professional expense has been applied to the total non-cash recovery value.  Additionally, wind down expenses and certain priority liabilities (e.g., taxes payable) have been included in the estimated Wind-Down Expenses.  A full recovery is estimated for Wind-Down Expenses.

[J] <u>DIP Loan and Rollup Facility Claims</u>:  Based on the available proceeds after satisfying the Total Priority & Wind-Down Expenses, a full recovery has been estimated for the DIP Loan and Rollup Facility Claims.

[K] <u>Prepetition RBL Claims</u>:  A full recovery on the Prepetition RBL Claims has been estimated.

[L] <u>Senior Unsecured Notes Claims</u>:  The Senior Unsecured Notes Claims represent unsecured claims.  A recovery of 9% to 18% has been estimated for the General Unsecured Claims.

[M] <u>General Unsecured Claims</u>:  General Unsecured Claims represent an estimate of prepetition unsecured claims.  A recovery of 3% to 4% has been estimated for the General Unsecured Claims.

**Exhibit D**

**Financial Projections**

See attached.

## FINANCIAL PROJECTIONS

The Debtors believe that the Plan[14] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or the Financial Projections to holders of Claims or Interests or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the Financial Projections for the years 2020 through 2024. The Financial Projections were prepared by Management and are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

The Debtors have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE UNDERLYING ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE DEBTORS' AND REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that such plans, intentions and expectations will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward

---

[14] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which these Financial Projections are attached.

looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to: (a) fluctuations in crude oil and natural gas prices and the Debtors' and Reorganized Debtors' ability to hedge against movements in prices; (b) the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows; (c) the timing and amount of future production of crude oil and natural gas; (d) changes in the availability and cost of capital; (e) environmental, drilling and other operating risks, including liability claims as a result of crude oil and natural gas operations; (f) proved and unproved drilling locations and future drilling plans; and (g) the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation. Additional information regarding these uncertainties are described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtors' future performance.

## I. METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including well-level analyses. Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Financial Projections. In preparation of the Financial Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth herein.

## II. ASSUMPTIONS

### A.  Overview

The Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore oil and natural gas assets in the United States. The Debtors are also majority owners of Oasis Midstream Partners, which provides a collection of services including gas gathering and processing, saltwater gathering and disposal services, fresh water services, and crude oil gathering and transport services, among others.

### B.  Presentation

The Projections are presented on a deconsolidated basis in an effort to reflect the component parts of the Reorganized Debtors' cash flows from upstream and midstream businesses.  The Projections begin with the specific components needed to build to Upstream EBITDAX.  Therefore, revenues only include crude oil and natural gas revenue and exclude midstream revenues.  Additionally, certain operating expenses are shown prior to certain reductions that are applied when the Reorganized Debtors consolidate midstream entities' interest for financial reporting purposes (see "Operating Expenses" section for more detail).

The cash flows from OMS that are attributable to the Reorganized Debtors are included below Upstream EBITDAX in the Financial Projections in the line item called "Midstream EBITDA attributable to Oasis," which includes the EBITDA from the Reorganized Debtors' retained interest in Beartooth and Bobcat DevCos and distributions from the Reorganized Debtors' ownership of both the LP units and GP units in Oasis Midstream Partners. The Projections may not be comparable to historical financials found in the Debtor's public disclosures. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to Accounting Standards Certification ("ASC") 852-10, as issued by the Financial Accounting Standards Board.

### C.  Plan Consummation

The Financial Projections include projected financial statements for 2020–2024 and an Assumed Effective Date of December 1, 2020.

### D.  Crude Oil and Natural Gas Revenue

Revenue is generated from the exploration for and development, production, and sale of crude oil, natural gas, and natural gas liquids ("NGLs").

### E.  Commodity Pricing

Commodity pricing is based on September 17, 2020 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil, natural gas, and NGLs. Management estimates realized pricing based on forecasted crude oil differentials and natural gas and NGL differentials versus Henry Hub Gas.

| Benchmark Pricing | Dec 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| WTI Oil ($/Bbl) | $41.53 | $43.22 | $44.68 | $45.72 | $46.71 |
| Henry Hub Gas ($/MMBtu) | $3.10 | $2.93 | $2.64 | $2.51 | $2.48 |

| Realized Pricing | Dec 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| Oil ($/Bbl) | $37.34 | $40.17 | $43.94 | $45.06 | $45.90 |
| Gas ($/Mcf) | $3.18 | $3.38 | $3.22 | $3.16 | $3.19 |

### F.  Operating Expenses

Operating expenses consist of lease operating expenses ("LOE"), gathering, marketing and transportation ("GM&T"), and production and ad valorem taxes ("Prod. Taxes").  LOE and GM&T exclude the Oasis Midstream Services ("OMS") deduction that is applied for consolidated financial statement purposes ("OMS deduct").



### G.  Cash General and Administrative Expenses

Cash general and administrative  expenses ("Cash G&A") primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory and public company requirements. The Reorganized Debtors' projected Cash G&A expenses are based on the Reorganized Debtors' anticipated development and operational plans.



### H.  Cash Interest Expense

Post-emergence Cash Interest Expense is forecasted based on the Reorganized Debtors' anticipated pro forma capital structure.

### I.  Cash Income Taxes

Cash Income Taxes are projected based on the application of IRC Section 382(l)(6), utilizing the Debtors' income statement forecast, estimated net operating loss ("NOL") carryforward, tax credit, and Section 163(j) disallowed interest carryforward balances on the Emergence Date, tax depreciation, depletion, and amortization forecasts, taking into account the impacts of cancellation of debt income ("CODI"). If the Debtors qualify for the exception under IRC Section 382(l)(5) and do not elect out of such exception, Cash Income Taxes may be materially reduced for the forecast period.

## III. Financial Projections

**Income Statement**

| ($ in Millions) | Pro Forma 12/1 | Dec 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Crude Oil Revenue | | $50 | $599 | $645 | $689 | $698 |
| Natural Gas Revenue | | 13 | 153 | 133 | 131 | 130 |
| Hedging Revenue | | (0) | (0) | – | – | – |
| **Total E&P Revenue** | | **$63** | **$752** | **$779** | **$819** | **$828** |
| Production Taxes | | (5) | (54) | (57) | (60) | (60) |
| LOE (pre OMS deduct) | | (19) | (236) | (238) | (233) | (231) |
| GM&T (pre OMS deduct) | | (10) | (125) | (136) | (121) | (111) |
| Cash General and Adminsitrative Expense | | (4) | (49) | (49) | (49) | (49) |
| **Upstream  EBITDAX** | | **$24** | **$289** | **$298** | **$357** | **$377** |
| Midstream EBITDA attributable to Oasis | | 8 | 143 | 126 | 99 | 86 |
| **OAS EBITDA** | | **$33** | **$432** | **$425** | **$455** | **$463** |

**Summary Cash Flow Build**

| ($ in Millions) | Pro Forma 12/1 | Dec 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **OAS EBITDAX** | | **$33** | **$432** | **$425** | **$455** | **$463** |
| Cash Interest Expense | | (1) | (10) | (6) | (3) | (3) |
| Upstream Total CapEx | | (7) | (223) | (273) | (230) | (253) |
| OAS Portion of Midstream Capital | | (0) | (10) | (10) | (6) | (30) |
| Working Capital Changes | | (4) | 12 | 6 | (18) | (14) |
| Cash Income Taxes | | – | (17) | (7) | (26) | (23) |
| **OAS Free Cash Flow** | | **$20** | **$184** | **$135** | **$172** | **$139** |
| | | | | | | |
| Total Debt | | | | | | |
| Beginning Debt | | 340 | 320 | 136 | 1 | – |
| Debt (Paydown) / Drawn | | (20) | (184) | (135) | (1) | – |
| **Ending Debt[(1)]** | **$340** | **$320** | **$136** | **$1** | **-** | **-** |
| | | | | | | |
| Cash Balance | | | | | | |
| Beginning Cash Balance | | 5 | 5 | 5 | 5 | 176 |
| Cash (Decrease) / Increase | | – | – | – | 171 | 139 |
| **Ending Cash Balance** | **$5** | **$5** | **$5** | **$5** | **$176** | **$315** |

*(1) Total Debt is the expected amount drawn under the Oasis Revolving Credit Facility and excludes LCs and surety bonds*

**Exhibit E**

**Valuation Analysis**

See attached.

## Valuation Analysis Exhibit
September 29, 2020

Solely for the purposes of the Prepackaged Plan and this Disclosure Statement, Perella Weinberg Partners LP and Tudor Pickering Holt & Co Advisors LP ("**TPH**"), as investment bankers to the Debtors, have estimated a range of total enterprise value (the "**Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Prepackaged Plan.

For purposes of the Prepackaged Plan, the estimated range of the Enterprise Value of the Reorganized Debtors was determined to be approximately $1.3 billion to $1.7 billion, with a mathematical midpoint of $1.5 billion, as of an assumed Effective Date of December 1, 2020. The estimated range of the Enterprise Value represents a valuation of the Reorganized Debtors based on the application of standard valuation techniques, including (a) risked net asset value ("**Risked NAV**") analysis, (b) discounted cash flow ("**DCF**") analysis, (c) public comparable company ("**Comparable Company**") analysis, and (d) precedent transactions ("**Precedent Transaction**") analysis. For purposes of this valuation, TPH has assumed that no material changes that would affect estimated value occur between the date of this Disclosure Statement and the assumed Effective Date. TPH's estimated range of the Enterprise Value and the implied Equity Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Prepackaged Plan or of the terms and provisions of the Prepackaged Plan. This valuation analysis is based on information as of September 26, 2020  and is based on reserve information, development schedules and financial information provided to TPH by the Debtors' management, as well as the Financial Projections discussed in this Disclosure Statement (with the Reorganized Debtors' Business Plan Financial Projections based on NYMEX forward pricing as of September 17, 2020). This valuation analysis is based on a number of assumptions, including but not limited to a successful reorganization of the Debtors' business in a timely manner, the achievement of the Financial Projections, access to adequate exit financing, continuity of a qualified management team, and capital market conditions consistent with those that exist as of September 24, 2020.

The following is a brief summary of certain financial analyses performed by TPH to arrive at its estimated range of the Enterprise Value. TPH did not consider any one analysis or factor to the exclusion of any other analyses or
factors in determining the estimated range of the Enterprise Value and the implied Equity Value. TPH believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors
could create a misleading or incomplete view of the processes underlying the preparation of this Valuation Analysis. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

### A.  Risked NAV Analysis

The value of the Reorganized Debtors' proved oil and gas reserves and unproved reserves and unproved acreage were estimated using both pre-tax and post-tax Risked NAV analyses. The Risked NAV analysis calculates the value of the business by calculating the sum of the present value of future cash flows generated by the Reorganized Debtors' reserves. For the pre-tax risked NAV, various risk-adjusted discount rates are applied to future cash flows from the Reorganized Debtors' reserve report, determined by reserve category. For the post-tax risked NAV, various risk adjustment factors are applied to the present value (using the company's estimated weighted average cost of capital) of future cash flows from the Reorganized Debtors' reserve report, determined by reserve category. The risk adjustment factors and

1

**Valuation Analysis Exhibit**
September 29, 2020

risk-adjusted discount rates utilized are based on oil and gas exploration and production ("**E&P**") industry standard guidance from The Society of Petroleum Evaluation Engineers, 39th Annual Survey of Parameters Used in Property Evaluation dated June 2020. The Enterprise Value of the Reorganized Debtors is then calculated by adjusting the aggregate risk-adjusted cash flows for (i) the present value of future corporate costs and other expenditures, including general and administrative costs, (ii) the present value of future cash flows associated with the Reorganized Debtors' retained interest in BobCat DevCo LLC and Beartooth DevCo LLC, (iii) the market value of the Reorganized Debtors' interest in Oasis Midstream Partners LP, (iv) the estimated value of the Reorganized Debtors interest in OMP GP LLC and, (v) in the case of the post-tax risked NAV, the present value of future taxes.

### B.  DCF Analysis

The DCF analysis estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF discounts the expected cash flows by the company's estimated weighted average cost of capital. This approach has two components: (i) the present value of the projected unlevered after-tax cash flows for a determined period of time and (ii) the present value of the terminal value of the cash flows. The terminal value represents the portion of the Enterprise Value that lies beyond the time horizon of the available projections. TPH utilized the Reorganized Debtors' Financial Projections (excluding distributions associated with the Reorganized Debtors' interest in Oasis Midstream Partners LP and OMP GP LLC) for the DCF analysis. In performing the DCF analysis, TPH made assumptions for the (i) weighted average cost of capital and (ii) the terminal EBITDAX multiple. The Enterprise Value of the Reorganized Debtors is calculated by adding (i) DCF analysis value, (ii) the market value of the Reorganized Debtors interest in Oasis Midstream Partners LP and (iii) the estimated value of the Reorganized Debtors interest in OMP GP LLC.

### C.  Comparable Company Analysis

The Comparable Company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar geographic location, scale, reserve composition, operating and financial characteristics and/or other characteristics deemed relevant. Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the outstanding net debt for such company. From such enterprise values, various measures of operating and financial metrics such as production, proved reserves and EBITDAX can be calculated.  TPH observed enterprise value as a multiple of each selected company's publicly-available consensus projected 2021 and 2022 EBITDAX. The Enterprise Value of the Reorganized Debtors is calculating by applying a range of enterprise value / EBITDAX multiples to the Reorganized Debtors' Financial Projections (excluding EBITDA associated with the Reorganized Debtors' interest in Oasis Midstream Partners LP and OMP GP LLC) and then adding (i) the market value of the Reorganized Debtors' interest in Oasis Midstream Partners LP and (ii) the estimated value of the Reorganized Debtors' interest in OMP GP LLC.  Although the selected companies were compared to the Reorganized Debtors for purposes of this analysis, no entity used in this analysis is identical to the Reorganized Debtors. The selection of public entities for this purpose was based upon characteristics that were deemed relevant based on TPH's professional judgment.

### D.  Precedent Transactions Analysis

**Valuation Analysis Exhibit**
September 29, 2020

The Precedent Transactions analysis estimates the value of a company by examining public and private mergers and acquisitions transactions on an enterprise and asset-level basis. The selection of precedent transactions for this purpose was based on the geographic location, scale and/or other characteristics deemed relevant to the Reorganized Debtors, and included both enterprise and asset-level transactions. From the transaction values associated with the precedent transactions, various measures of operating and financial metrics such as production, proved reserves and EBITDAX can be calculated. TPH observed the transaction value as a multiple of each selected transaction's publicly-available projected forward year 1 and forward year 2 EBITDAX (for such transactions where EBITDAX estimates are available).  The Enterprise Value of the Reorganized Debtors is calculating by applying a range of transaction value / EBITDAX multiples to the Reorganized Debtors' Financial Projections (excluding EBITDA associated with the Reorganized Debtors' interest in Oasis Midstream Partners LP and OMP GP LLC) and then adding (i) the market value of the Reorganized Debtors' interest in Oasis Midstream Partners LP, and (ii) the estimated value of the Reorganized Debtors' interest in OMP GP LLC.  Although the selected transactions were compared to the Reorganized Debtors for purposes of this analysis, no transaction used in this analysis is identical to the Reorganized Debtors. The selection of transactions for this purpose was based upon characteristics that were deemed relevant based on TPH's professional judgment.

The summary set forth above does not purport to be a complete description of the analysis performed by TPH. The preparation of an Enterprise Value estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects for such a business. As a result, the estimate of Enterprise Value and Equity Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set herein.

THE ASSUMED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 1, 2020 REFLECTS WORK PERFORMED BY TPH ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO TPH AS OF SEPTEMBER 26, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT TPH'S CONCLUSIONS, TPH DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the Enterprise Value of the Reorganized Debtors of between $1.3 billion and $1.7 billion and estimated net debt of $335 million as of the Effective Date, the imputed range of Equity Value for the Reorganized Debtors is between approximately $965 million and $1,365 million, with a mathematical midpoint of $1,165 million.

TPH DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH TPH'S ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF ESTIMATES OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY

3

**Valuation Analysis Exhibit**
September 29, 2020

TPH REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PREPACKAGED PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PREPACKAGED PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, TPH, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

TPH assumed that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value. In estimating the Enterprise Value, TPH: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team; (d) reviewed certain publicly available operational and financial data for, and considered the market value and transaction value of, public companies and precedent transactions that TPH deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. TPH assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information. The estimated ranges of Enterprise Value and Equity Value do not constitute a recommendation to any holder

4

**Valuation Analysis Exhibit**
September 29, 2020

of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Prepackaged Plan. TPH has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance or at any time.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY TPH REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH TPH'S VALUATION ANALYSIS. TPH IS ACTING AS INVESTMENT BANKER TO THE COMPANY, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL OR OTHER SPECIALIST ADVICE.