**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| OASIS PETROLEUM INC., *et al.*,[1] | ) ) ) | Case No. 20-34771 (MI) |
| Debtors. | ) ) ) | (Jointly Administered) |

**SUPPLEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF
REORGANIZATION OF OASIS PETROLEUM INC. AND ITS DEBTOR AFFILIATES**

> **PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this plan supplement (this "Plan Supplement"), in support of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Oasis Petroleum Inc. and Its Debtor Affiliates* (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan"),[2] which was filed with the United States Bankruptcy Court for the Southern District of Texas (the "Court") on September 30, 2020 [Docket No. 24].

> **PLEASE TAKE FURTHER NOTICE THAT** the Plan Supplement includes current drafts of the following documents (certain of which continue to be negotiated between the Debtors and the applicable Consenting Stakeholders, and will be Filed in substantially final form prior to the Effective Date), as may be modified, amended, or supplemented from time to time:

| | |
|---|---|
| **Exhibit A** | New Organizational Documents |
| **Exhibit B** | 1129(a)(5) Disclosures Regarding Directors and Officers |
| **Exhibit C** | Rejected Executory Contracts and Unexpired Leases Schedule |
| **Exhibit D** | Schedule of Retained Causes of Action |
| **Exhibit E** | Exit Facility Credit Agreement |
| **Exhibit F** | New Warrant Agreement |
| **Exhibit G** | Registration Rights Agreement |
| **Exhibit H** | Mirada Settlement Agreement |

---

[1] Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/oasis. The location of the Debtors' service address for purposes of these chapter 11 cases is: 1001 Fannin Street, Suite 1500, Houston, Texas 77002.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

KE 71794109

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan and/or the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan; *provided* that, if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Court.

**PLEASE TAKE FURTHER NOTICE THAT** the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan.  If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Court pursuant to the order confirming the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors will seek approval of the Disclosure Statement and confirmation of the Plan at a hearing scheduled for **November 10, 2020, at 3:30 p.m., prevailing Central Time** before the Honorable Marvin Isgur at the United States Bankruptcy Court, Courtroom 404, 515 Rusk Street, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the adequacy of the Disclosure Statement or the confirmation of the Plan was on **November 2, 2020, at 4:00 p.m., prevailing Central Time** (the "Objection Deadline").  Any objection to the Disclosure Statement or the Plan **must**: (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state the name and address of the objecting party and the amount and nature of the claim or interest beneficially owned by such entity; (d) state the legal or factual basis for such objections and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed with the Court with proof of service thereof so as to be ***actually received*** on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents **free of charge**, contact the Debtors' Claims and Noticing Agent, Kurtzman Carson Consultants LLC by:  (a) visiting the Debtors' restructuring website https:// www.kccllc.net/oasis; (b) calling (866) 480-0830 (toll-free in the United States and Canada) or (781) 575-2040 (outside the United States); or (c) by submitting an electronic inquiry at http://www.kccllc.net/oasis/inquiry.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee by visiting the Court's website on PACER at https://ecf.txsb.uscourts.gov.

Houston, Texas
November 3, 2020

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

Bruce J. Ruzinsky (TX Bar No. 17469425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Vienna F. Anaya (TX Bar No. 24091225)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com
Email: jwertz@jw.com
Email: vanaya@jw.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Facsimile:      (713) 836-3601
Email:          brian.schartz@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
David L. Eaton (admitted *pro hac vice*)
John Luze (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          chad.husnick@kirkland.com
                david.eaton@kirkland.com
                john.luze@kirkland.com

-and-

AnnElyse Scarlett Gains (admitted *pro hac vice*)
1301 N. Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone:   (202) 389-5000
Facsimile:   (202) 389-5200
Email:          annelyse.gains@kirkland.com

*Proposed Co-Counsel for the Debtors
and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on November 3, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Exhibit A**

### **New Organizational Documents**

This **Exhibit A** includes the following organizational documents for the Reorganized Debtors:

- **Exhibit A(i)**: Amended and Restated Certificate of Incorporation of Oasis Petroleum Inc.

- **Exhibit A(ii)**: Amended and Restated Bylaws for Oasis Petroleum Inc.

The organizational documents contained in this **Exhibit A** remain subject to continuing negotiations. The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement (including this **Exhibit A**), and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**<u>Exhibit A(i)</u>**

**Amended and Restated Certificate of Incorporation of Oasis Petroleum Inc.**

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**OASIS PETROLEUM INC.**

Oasis Petroleum Inc., a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), certifies as follows:

1.　　The present name of the corporation is Oasis Petroleum Inc. (the "Corporation"). The Corporation was incorporated by the filing of its original Certificate of Incorporation with the Office of the Secretary of State of the State of Delaware on February 25, 2010 (the "Original Certificate of Incorporation").

2.　　This Amended and Restated Certificate of Incorporation (this "Certificate of Incorporation"), which restates and integrates and also further amends the provisions of the Corporation's Original Certificate of Incorporation, as heretofore amended, was duly adopted in accordance with the provisions of Sections 242, 245 and 303 of the DGCL.

3.　　The Corporation's Original Certificate of Incorporation, as heretofore amended, is hereby amended, integrated and restated to read in its entirety as follows:

FIRST: The name of the corporation is Oasis Petroleum Inc. (the "Corporation").

SECOND: The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 in New Castle County, Delaware. The name of its registered agent at such address is The Corporation Trust Company.

THIRD: The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

FOURTH:

(a)　　Authorized Stock. The total number of shares of stock which the Corporation shall have authority to issue is [●] shares of capital stock, classified as (i) [●] shares of preferred stock, par value $0.01 per share ("Preferred Stock"), and (ii) [●] shares of common stock, par value $0.01 per share ("Common Stock"). The authorized number of shares of any class or series of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of the stock of the Corporation entitled to vote, and no separate vote of such class or series of stock the authorized number of which is to be increased or decreased shall be necessary to effect such change.

(b)　　Preferred Stock. The Board (as defined below) is hereby authorized, by resolution or resolutions thereof, to provide, out of the unissued shares of Preferred Stock, for one or more series of Preferred Stock and, with respect to each such series, to fix the number of shares constituting such series and the designations, powers, preferences, rights, qualifications, limitations and restrictions in respect of the shares of such series. The powers, designations, preferences and relative, participating, optional or

other rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, may differ from those of any and all other series at any time outstanding. Except as may otherwise be provided in this Certificate of Incorporation (including any certificate filed with the Office of the Secretary of State of the State of Delaware establishing the terms of a series of Preferred Stock in accordance with this <u>subsection (b)</u> (such certificate, a "Preferred Stock Designation")) or by applicable law, no holder of any series of Preferred Stock, as such, shall be entitled to any voting powers in respect thereof.

(c)　　Common Stock. The designations and the powers, preferences, rights, qualifications, limitations and restrictions of the Common Stock are as follows:

(i)　　*Voting*. Except as may otherwise be provided in this Certificate of Incorporation or by applicable law, each holder of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held of record by such holder on all matters on which stockholders generally are entitled to vote. Notwithstanding the foregoing, except as otherwise required by applicable law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Preferred Stock Designation) or the DGCL.

(ii)　　*Dividends*. Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock, dividends may be declared and paid on the Common Stock out of funds legally available therefor at such times and in such amounts as the Board in its discretion shall determine.

(iii)　　*Dissolution, Liquidation or Winding Up*. Upon the dissolution, liquidation or winding up of the Corporation, subject to the rights, if any, of the holders of any outstanding series of Preferred Stock, the holders of the Common Stock shall be entitled to receive the assets of the Corporation available for distribution to its stockholders ratably in proportion to the number of shares of Common Stock held by them.

(d)　　Non-voting Equity Securities. The Corporation shall not issue any non-voting equity securities to the extent prohibited by Section 1123(a)(6) of Title 11 of the United States Code (the "Bankruptcy Code") as in effect on the date of filing of this Certificate of Incorporation with the Office of the Secretary of State of the State of Delaware; provided, however, that the foregoing restriction (i) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, (ii) shall not have any further force or effect beyond that required under Section 1123(a)(6), and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

FIFTH: The business and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors (the "Board"). Except as otherwise provided for or fixed pursuant to the terms of any Preferred Stock Designation relating to the rights of the holders of any series of Preferred Stock to elect additional directors, the total number of directors constituting the entire Board shall be as specified in, or determined in the manner provided in, the bylaws of the Corporation (the "Bylaws"). Unless and except to the extent that the Bylaws so provide, the election of directors need not be by written ballot. In furtherance of, and not in limitation of, the powers conferred by the laws of the State of Delaware, the

Board is expressly authorized to adopt, amend or repeal the Bylaws, subject to the power of the stockholders of the Corporation to adopt, amend and repeal any Bylaw whether adopted by them or otherwise.

SIXTH: To the fullest extent permitted under the DGCL, as amended from time to time, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  Any amendment, repeal or modification of this Sixth Article shall be prospective only and shall not affect any limitation on liability of a director for acts or omissions occurring prior to the date of such amendment, repeal or modification.

SEVENTH: To the fullest extent permitted by Section 122(17) of the DGCL, the Corporation, on behalf of itself and its direct and indirect subsidiaries (collectively, "Subsidiaries"), hereby renounces any interest or expectancy of the Corporation or any such Subsidiary in, or in being offered an opportunity to participate in, any Excluded Opportunity.

As used herein, "Excluded Opportunity" means any business opportunity, transaction or other matter (a "Corporate Opportunity"), whether or not the Corporation or any Subsidiary might reasonably be deemed to have pursued or had the ability or desire to pursue such Corporate Opportunity if granted the opportunity to do so, that is presented to, acquired, created or developed by or which otherwise comes into the possession of (i) any director of the Corporation who is not an officer or employee of the Corporation or any Subsidiary or (ii) any stockholder of the Corporation, affiliate of such stockholder (other than the Corporation or any of its Subsidiaries) or any partner, member, manager, director, officer, employee or agent of any such stockholder or affiliate, in each case of this clause (ii) who is not an officer or employee of the Corporation or any Subsidiary (any of the foregoing clauses (i) and (ii), a "Specified Party"); provided, however, that the definition of "Excluded Opportunity" does not include, and the Corporation and its Subsidiaries do not hereby renounce any interest or expectancy in, or in being offered an opportunity to participate in, any Corporate Opportunity with respect to a Specified Party who either (1) is a director of the Corporation and who is first offered the applicable Corporate Opportunity solely in his or her capacity as a director, officer or employee of the Corporation or any Subsidiary or (2) first identified the applicable Corporate Opportunity solely through the disclosure of the Corporation's or any Subsidiary's confidential information in circumstances in which the Corporation had a reasonable expectation that such information would be held in confidence.

Neither the amendment nor repeal of this Seventh Article, nor the adoption of any provision of this Certificate of Incorporation or the Bylaws, nor, to the fullest extent permitted by Delaware law, any modification of law, shall adversely affect any right or protection of any Specified Party granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or modification.  This Seventh Article shall not limit any protections or defenses available to, or indemnification rights of, any director or officer of the Corporation under this Certificate of Incorporation, the Bylaws or applicable law.

EIGHTH: Except as otherwise provided for or fixed pursuant to the Fourth Article hereof or any Preferred Stock Designation relating to the rights of holders of any series of Preferred Stock, any action required or permitted to be taken by the stockholders of the Corporation must be taken at a duly held annual or special meeting of stockholders and may not be taken by any consent in writing of such stockholders.

3

NINTH: The Corporation shall have the right, subject to any express provisions or restrictions contained in this Certificate of Incorporation or bylaws of the Corporation, from time to time, to amend this Certificate of Incorporation or any provision hereof in any manner now or hereafter provided by law, and all rights and powers of any kind conferred upon a director or stockholder of the Corporation by this Certificate of Incorporation or any amendment hereof are subject to such right of the Corporation.

TENTH:

(a)      Unless the Corporation consents in writing to the selection of an alternative forum, and subject to applicable jurisdictional requirements, the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, employee, agent or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws, (d) any action to interpret, apply, enforce or determine the validity of this Certificate of Incorporation or the Bylaws, (e) any action asserting a claim governed by the internal affairs doctrine, or (f) any action asserting an "internal corporate claim" as that term is defined in Section 115 of the DGCL, shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction over such action or proceeding, then another court of the State of Delaware or, if no court of the State of Delaware has jurisdiction, then the United States District Court for the District of Delaware).

(b)      Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended.

**[Remainder of Page Intentionally Left Blank]**

4

IN WITNESS WHEREOF, Oasis Petroleum Inc. has caused this Amended and Restated Certificate of Incorporation to be executed by its duly authorized officer this __ day of _____, 2020.

OASIS PETROLEUM INC.

By: _____

    Name:

    Title:

[Amended and Restated Certificate of Incorporation of Oasis Petroleum Inc.]

## Exhibit A(ii)

**Amended and Restated Bylaws for Oasis Petroleum Inc.**

**AMENDED AND RESTATED BYLAWS**

**OF**

**OASIS PETROLEUM INC.**

Incorporated under the Laws of the State of Delaware

# ARTICLE I

# DEFINITIONS

As used in these Bylaws, unless the context otherwise requires, the term:

SECTION 1.1.     "Assistant Secretary" means an Assistant Secretary of the Corporation.

SECTION 1.2.     "Assistant Treasurer" means an Assistant Treasurer of the Corporation.

SECTION 1.3.     "Board of Directors" means the Board of Directors of the Corporation.

SECTION 1.4.     "Business Day" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York, NY are authorized or obligated by law or executive order to close.

SECTION 1.5.     "Bylaws" means these Amended and Restated Bylaws of the Corporation, as amended from time to time.

SECTION 1.6.     "Certificate of Incorporation" means the Certificate of Incorporation of the Corporation, as amended from time to time (including by any Preferred Stock Designation (as defined in the Certificate of Incorporation of the Corporation filed with the Office of the Secretary of State of the State of Delaware on [●], 20[●])).

SECTION 1.7.     "Chairperson" means the Chairperson of the Board of Directors.

SECTION 1.8.     "Chief Executive Officer" means the Chief Executive Officer of the Corporation.

SECTION 1.9.     "Close of Business" shall mean 5:00 p.m. local time at the Office of the Corporation, and if an applicable deadline falls on the Close of Business on a day that is not a Business Day, then the applicable deadline shall be deemed to be the Close of Business on the immediately preceding Business Day.

SECTION 1.10.     "Common Stock" has the meaning ascribed to such term by the Certificate of Incorporation.

SECTION 1.11.     "Corporation" means Oasis Petroleum Inc., a Delaware corporation.

SECTION 1.12.     "DGCL" means the General Corporation Law of the State of Delaware, as amended from time to time.

SECTION 1.13.     "Directors" means the directors of the Corporation.

SECTION 1.14.   "Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, in each case as amended from time to time.

SECTION 1.15.   "law" means any U.S. or non-U.S., federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a governmental authority (including any department, court, agency or official, or non-governmental self-regulatory organization, agency or authority and any political subdivision or instrumentality thereof).

SECTION 1.16.   "Listing Date" means the first such date on or after the Effective Date (as defined in the Plan) that the Corporation has a class of equity securities registered under the Exchange Act and listed or admitted to trading on a national securities exchange (as defined under the Exchange Act).

SECTION 1.17.   "Office of the Corporation" means the principal executive offices of the Corporation, the Corporation's registered office in the State of Delaware or any other offices of the Corporation designated by the Board of Directors as an Office of the Corporation for purposes of these Bylaws.

SECTION 1.18.   "person" shall be interpreted broadly to include natural persons and entities.

SECTION 1.19.   "Plan" means the [Joint Prepackaged Chapter 11 Plan of Reorganization of the Corporation and its Debtor Affiliates] filed in the cases commenced in the United States Bankruptcy Court for the Southern District of Texas jointly administered under the caption *In re Oasis Petroleum, Inc. et al.*, Case No. 20-[●].

SECTION 1.20.   "Preferred Stock" has the meaning ascribed to such term by the Certificate of Incorporation.

SECTION 1.21.   "President" means the President of the Corporation.

SECTION 1.22.   "Public Disclosure" of any date or other information means disclosure thereof by a press release reported by the Dow Jones News Services, Associated Press or comparable U.S. national news service or in a document publicly filed by the Corporation with the SEC pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

SECTION 1.23.   "SEC" means the U.S. Securities and Exchange Commission.

SECTION 1.24.   "Secretary" means the Secretary of the Corporation.

SECTION 1.25.   "Stockholder Associated Person" means, with respect to any Stockholder, (i) any other beneficial owner of stock of the Corporation that are owned by such Stockholder and (ii) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Stockholder or such beneficial owner.

3

SECTION 1.26.   "Stockholders" means the stockholders of the Corporation.

SECTION 1.27.   "Treasurer" means the Treasurer of the Corporation.

SECTION 1.28.   "Vice President" means a Vice President of the Corporation.

## ARTICLE II

## OFFICES AND RECORDS

SECTION 2.1.    Registered Office. The registered office of the Corporation in the State of Delaware shall be located at 1209 Orange Street, City of Wilmington, County of New Castle, and the name of the Corporation's registered agent at such address is The Corporation Trust Company. The registered office and registered agent of the Corporation may be changed from time to time by the Board of Directors in the manner provided by law.

SECTION 2.2.    Other Offices. The Corporation may have such other offices, either within or without the State of Delaware, as the Board of Directors may designate or as the business of the Corporation may from time to time require.

SECTION 2.3.    Books and Records. The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors.

## ARTICLE III

## STOCKHOLDERS

SECTION 3.1.    Place of Meeting. Meetings of Stockholders shall be held at such place, if any, either within or without the State of Delaware, or by means of remote communication, as may be designated by the Board of Directors from time to time.

SECTION 3.2.    Annual Meeting. A meeting of Stockholders for the election of Directors and such other business as may be properly brought before the meeting in accordance with these Bylaws shall be held annually at such date and time as may be designated by the Board of Directors from time to time. Any previously scheduled Annual Meeting may be postponed by resolution of the Board of Directors upon public notice given prior to the date previously scheduled for such Annual Meeting.

SECTION 3.3.    Special Meeting.

(A)    Special meetings of Stockholders may be called at any time by, and only by, (i) the Board of Directors or (ii) solely to the extent required by Section 3.3(B), the Secretary. Business transacted at any special meeting of Stockholders shall be limited to the purposes stated in the Corporation's notice of the meeting.

(B)    Subject to Section 3.3(F)-(H), a special meeting of Stockholders shall be called by the Secretary upon proper written request or requests (each, a "Meeting Request")

given by or on behalf of one or more Stockholders (each, a "Requesting Stockholder") of record of at least 25% of the voting power of all outstanding shares of Common Stock of the Corporation (the "Required Percent").  The record date for determining the Stockholders entitled to request a special meeting shall be the date on which the first Meeting Request for such special meeting was received by the Secretary in the manner required by the preceding sentence.

(C)    To be in proper form, a Meeting Request shall be dated and signed by the Requesting Stockholder or Requesting Stockholders submitting such Meeting Request, shall be delivered to and received by the Secretary at the Office of the Corporation by hand or by certified or registered mail, return receipt requested, and shall set forth:

(1)    a statement of the specific purpose of the meeting and the matters proposed to be acted on at the meeting, the reasons for conducting such business at the meeting, any material interest in such business of each such Requesting Stockholder and the text, if any, of the proposal or business (including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend these Bylaws, the language of the proposed amendment);

(2)    the name and address of each such Requesting Stockholder as it appears on the Corporation's stock ledger;

(3)    the number of shares of the Corporation's Common Stock owned of record and beneficially by each such Requesting Stockholder;

(4)    as to each such Requesting Stockholder, the Stockholder Information (as defined in Section 3.13, except that references therein to the "Proponent" and "Stockholder Business" shall instead refer, respectively, to each "Requesting Stockholder" and "the matters proposed to be acted on at the special meeting" for purposes of this paragraph);

(5)    any material interest of each Requesting Stockholder in the matters proposed to be acted on at the special meeting;

(6)    [if delivered after the Listing Date,][1] a representation as to whether each Requesting Stockholder intends (A) to deliver a proxy statement and form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the matters proposed to be acted on at the special meeting or (B) otherwise to solicit proxies from Stockholders in support of the matters proposed to be acted on at the special meeting;

(7)    [if delivered after the Listing Date,][2] all other information that would be required to be filed with the SEC if the Requesting Stockholders were participants in a solicitation subject to Section 14 of the Exchange Act; and

---

[1] Note to Draft: Bracketed clause to be deleted if and when definitively determined that listing will occur on the Effective Date of the Plan.

[2] Note to Draft: Bracketed clause to be deleted if and when definitively determined that listing will occur on the Effective Date of the Plan.

(8)     a representation that each Requesting Stockholder shall provide any other information reasonably requested by the Corporation.

The requirement set forth in clause (4) of the immediately preceding sentence shall not apply to (a) any Stockholder, or beneficial owner, as applicable, who has provided a written request solely in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act by way of a solicitation statement filed on Exchange Act Schedule 14A or (b) any Stockholder that is a broker, bank or custodian (or similar entity) and is acting solely as nominee on behalf of a beneficial owner.

(D)     The Requesting Stockholders shall also provide any other information reasonably requested from time to time by the Corporation within ten Business Days after each such request.

(E)     The Requesting Stockholders shall affirm as true and correct the information provided to the Corporation in the Meeting Request or at the Corporation's request pursuant to Section 3.3(D) (and shall update or supplement such information as needed so that such information shall be true and correct) as of (i) the record date for the meeting, and (ii) the date that is ten Business Days before the date of the meeting and, if applicable, before reconvening any adjournment or postponement thereof.  Such affirmation, update and/or supplement must be delivered personally or mailed to, and received at the Office of the Corporation, addressed to the Secretary, by no later than (x) five Business Days after the applicable date specified in clause (i) of the foregoing sentence (in the case of the affirmation, update and/or supplement required to be made as of those dates), and (y) not later than seven Business Days before the date for the meeting (in the case of the affirmation, update and/or supplement required to be made as of ten Business Days before the meeting or reconvening any adjournment or postponement thereof).

(F)     A Requesting Stockholder may revoke its Meeting Request at any time by written revocation delivered to the Secretary, and if, following such revocation, there are unrevoked Meeting Requests from less than the Required Percent, the Board of Directors, in its discretion, may cancel the special meeting of the Stockholders.

(G)     A special meeting requested by Stockholders shall be held at such date, time and place, if any, either within or without the state of Delaware or by means of remote communication, as may be fixed by the Board of Directors; provided, however, that the date of any such special meeting shall be not fewer than 30 nor more than 120 days after the receipt by the Secretary in the manner required by Section 3.3(C) of Meeting Requests from the Required Percent.

(H)     Notwithstanding anything to the contrary in this Section 3.3:

(i)     The determination of the validity of a written request to call a Special Meeting shall be made by the Board of Directors, which determination shall be conclusive and binding on the Corporation and the Stockholders. Notwithstanding anything to the contrary herein, the Corporation shall not accept, and shall consider ineffective, a written request to call a Special Meeting requested by Stockholders if

6

(a) the Meeting Requests from the Required Percent do not comply with these Bylaws or the Certificate of Incorporation; (b) the action relates to an item of business that is not a proper subject for stockholder action under applicable law; (c) the Meeting Requests from the Required Percent are received by the Secretary during the period commencing 90 days prior to the first anniversary of the date of the immediately preceding annual meeting of Stockholders and ending on the date of the final adjournment of the next annual meeting of Stockholders (provided that, for purposes of the Corporation's first annual meeting of Stockholders after the Listing Date, the date of the immediately preceding annual meeting of Stockholders shall be deemed to be the Listing Date); (d) an identical or substantially similar item of business, as determined in good faith by the Board of Directors, was presented at a meeting of Stockholders held not more than 60 days before the Meeting Requests from the Required Percent are received by the Secretary or (e) the Meeting Request was made in a manner that involved a violation of Regulation 14A under the Exchange Act or other applicable law; and

(ii)     Nothing herein shall prohibit the Board of Directors from including in the Corporation's notice of any special meeting of Stockholders called by the Secretary additional matters to be submitted to the Stockholders at such meeting not included in the Meeting Request in respect of such meeting.

SECTION 3.4.     Record Date.

(A)     For the purpose of determining the Stockholders entitled to notice of any meeting of Stockholders or any adjournment thereof, unless otherwise required by the Certificate of Incorporation or applicable law, the Board of Directors may fix a record date (the "Notice Record Date"), which record date shall not precede the date on which the  resolution fixing the record date was adopted by the Board of Directors and shall not be more than 60 or less than 10 days before the date of such meeting.  The Notice Record Date shall also be the record date for determining the Stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such Notice Record Date, that a later date on or before the date of the meeting shall be the date for making such determination (the "Voting Record Date").  For the purposes of determining the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, exercise any rights in respect of any change, conversion or exchange of stock or take any other lawful action, unless otherwise required by the Certificate of Incorporation or applicable law, the Board of Directors may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board of Directors and shall not be more than 60 days prior to such action.

(B)     If no such record date is fixed by the Board of Directors:

(1)     The record date for determining Stockholders entitled to notice of and to vote at a meeting of Stockholders shall be at the Close of Business on the day next preceding the day on which notice is given, or, if notice is waived, at the Close of Business on the day next preceding the day on which the meeting is held; and

(2)     The record date for the purposes of determining the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights,

7

exercise any rights in respect of any change, conversion or exchange of stock or take any other lawful action shall be at the Close of Business on the day on which the Board of Directors adopts the resolution relating thereto.

(C)     When a determination of Stockholders of record entitled to notice of or to vote at any meeting of Stockholders has been made as provided in this Section 3.4, such determination shall apply to any adjournment thereof, unless the Board of Directors fixes a new Voting Record Date for the adjourned meeting, in which case the Board of Directors shall also fix such Voting Record Date or a date earlier than such date as the new Notice Record Date for the adjourned meeting.

SECTION 3.5.     Notice of Meeting. Whenever under the provisions of applicable law, the Certificate of Incorporation or these Bylaws Stockholders are required or permitted to take any action at a meeting, a notice of the meeting in the form of a writing or electronic transmission shall be given stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the Notice Record Date and the Voting Record Date, if such date is different from the Notice Record Date, and, in the case of a special meeting, the purposes for which the meeting is called.  Unless otherwise provided by these Bylaws or applicable law, notice of any meeting shall be given, not less than 10 days nor more than 60 days before the date of the meeting, to each Stockholder entitled to vote at such meeting as of the Notice Record Date.  If mailed, such notice shall be deemed to be given when deposited in the U.S. mail, with postage prepaid, directed to the Stockholder at his or her address as it appears on the records of the Corporation.  If given by electronic mail, such notice shall be deemed to be given when directed to such Stockholder's electronic mail address unless the Stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited pursuant to the terms of the DGCL.  A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.  An affidavit of the Secretary, an Assistant Secretary or the transfer agent of the Corporation that the notice required by this Section 3.5 has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

SECTION 3.6.     Waivers of Notice.  Whenever the giving of any notice to Stockholders is required by applicable law, the Certificate of Incorporation or these Bylaws, a written waiver, signed by the Stockholder entitled to notice, or a waiver by electronic transmission by such Stockholder, whether before or after the event as to which such notice is required, shall be deemed equivalent to notice.  Attendance by a Stockholder at a meeting shall constitute a waiver of notice of such meeting except when the Stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.  Neither the business to be transacted at, nor the purposes of, any regular or special meeting of the Stockholders need be specified in any waiver of notice.

SECTION 3.7.     List of Stockholders.  The Secretary shall prepare and make, at least 10 days before every meeting of Stockholders, a complete, alphabetical list of the Stockholders entitled to vote at the meeting, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder.  Such list may be examined by

8

any Stockholder, at the Stockholder's expense, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting, during ordinary business hours at the principal place of business of the Corporation or on a reasonably accessible electronic network or other electronic means as permitted by applicable law.  If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any Stockholder who is present.  If the meeting is held solely by means of remote communication, the list shall also be open for inspection as provided by applicable law.  Except as provided by applicable law, the stock ledger shall be the only evidence as to who are the Stockholders entitled to examine the list of Stockholders or to vote in person or by proxy at any meeting of Stockholders.

SECTION 3.8.   <u>Quorum and Adjournment</u>.

(A)   Except as otherwise provided by law or by the Certificate of Incorporation, the holders of a majority of the voting power of the outstanding shares of the Corporation entitled to vote at the meeting, present in person or represented by proxy, shall constitute a quorum at a meeting of Stockholders, except that when specified business is to be voted on by one or more classes or series of stock voting as a separate class, the holders of a majority of the voting power of the shares of such classes or series shall constitute a quorum of such separate class for the transaction of such business.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; <u>provided</u>, <u>however</u>, that the foregoing shall not limit the right of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

(B)   In the absence of a quorum, the person presiding over the meeting in accordance with <u>Section 3.15</u> or, in the absence of such person, the holders of a majority of the voting power of the shares of stock present in person or represented by proxy at any meeting of Stockholders, including an adjourned meeting, may adjourn such meeting to another time or place.  If a meeting is adjourned (whether before or after establishing a quorum) to another time or place, notice need not be given of the adjourned meeting if the time and place, if any, thereof, and the means of remote communication, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  Any business that might have been transacted at the meeting as originally called may be transacted at the adjourned meeting.  If, however, the adjournment is for more than 30 days, or if after the adjournment a new Notice Record Date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given in accordance with <u>Section 3.5</u> to each Stockholder of record entitled to vote at the meeting.  If after the adjournment a new Voting Record Date is fixed for the adjourned meeting, the Board shall fix a new Notice Record Date in accordance with <u>Section 3.4(C)</u> and shall give notice of such adjourned meeting in accordance with <u>Section 3.5</u> to each Stockholder entitled to vote at such meeting as of the Notice Record Date.  The Stockholders present at a duly called meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Stockholders to leave less than a quorum.

9

SECTION 3.9.    Proxies. At all meetings of Stockholders, each Stockholder entitled to vote may authorize another person or persons to act for such Stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A Stockholder may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or by delivering a new duly authorized proxy bearing a later date.

SECTION 3.10.    Required Vote. At any meeting of Stockholders, all matters other than the election of directors, except as otherwise provided by the Certificate of Incorporation, these Bylaws or any applicable law, shall be decided by the affirmative vote of a majority of the voting power of shares of stock present in person or represented by proxy and entitled to vote thereon.  Each Director shall be elected [(x) prior to the Listing Date, by plurality vote or (y) after the Listing Date,][3] by the vote of the majority of the votes cast with respect to the Director at any meeting for the election of Directors at which a quorum is present; provided that if as of a date that is 14 days in advance of the date the Corporation files its definitive proxy statement (regardless of whether or not thereafter revised or supplemented) with the SEC the number of nominees exceeds the number of Directors to be elected, the Directors shall be elected by the vote of a plurality of the shares represented in person or by proxy at any such meeting and entitled to vote on the election of Directors.  For purposes of this Section 3.10, a majority of the votes cast means that (a) the number of votes cast "for" a Director must exceed the number of votes cast "against" that Director and (b) abstentions and broker non-votes are not counted as votes cast.  Any Director who is not so elected shall offer to tender his or her resignation to the Board of Directors in accordance with Section 4.5.  The Corporate Governance and Nominating Committee of the Board of Directors (or other named committee delegated comparable authority) will make a recommendation to the Board of Directors on whether to accept or reject the resignation, or whether other action should be taken.  The Board of Directors will act on the Committee's recommendation and publicly disclose its decision in respect of the resignation within 90 days after the date of the certification of the election results.

SECTION 3.11.    Inspectors of Elections. [Prior to the Listing Date the Board of Directors may, and after the Listing Date][4] the Board of Directors shall, in advance of any meeting of Stockholders, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting and make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting, the person presiding at the meeting in accordance with Section 3.12 may appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting and the validity of

---

[3] Note to Draft: Bracketed clause to be deleted if and when definitively determined that listing will occur on the Effective Date of the Plan.

[4] Note to Draft: Bracketed clause to be deleted if and when definitively determined that listing will occur on the Effective Date of the Plan.

proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.  Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the Stockholders will vote at a meeting shall be determined by the person presiding at the meeting in accordance with Section 3.12. and shall be announced at the meeting.  No ballot, proxy, vote or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a Stockholder shall determine otherwise.  In determining the validity and counting of proxies and ballots cast at any meeting of Stockholders, the inspectors may consider such information as is permitted by applicable law.  No person who is a candidate for office at an election may serve as an inspector at such election..

SECTION 3.12.  Conduct of Meetings.  The Board of Directors may adopt such rules and procedures for the conduct of Stockholder meetings as it deems appropriate.  At each meeting of Stockholders, the Chairperson or, in the absence of the Chairperson, the Chief Executive Officer or, if the Chief Executive Officer is absent, any officer of the Corporation designated by the Board of Directors (or in the absence of any such designation, the President or most senior Vice President present), shall preside over the meeting.  Except to the extent inconsistent with the rules and procedures as adopted by the Board of Directors, the person presiding over the meeting of Stockholders shall have the right and authority to convene, adjourn (whether or not a quorum is present), recess and reconvene the meeting from time to time, to prescribe such additional rules and procedures and to do all such acts as, in the judgment of such person, are appropriate for the proper conduct of the meeting.  Such rules and procedures, whether adopted by the Board of Directors or prescribed by the person presiding over the meeting, may include (a) the establishment of an agenda or order of business for the meeting, (b) rules and procedures for maintaining order at the meeting and the safety of those present, (c) limitations on attendance at or participation in the meeting to Stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the person presiding over the meeting shall determine, (d) restrictions on entry to the meeting after the time fixed for the commencement thereof, (e) limitations on the time allotted to questions or comments by participants, and (f) restrictions on the use of cell phones, audio or video recording devices and similar devices at the meeting.  Subject to any prior, contrary determination by the Board of Directors, the person presiding over any meeting of Stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, may determine and declare to the meeting that a matter or business was not properly brought before the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered.  Unless and to the extent determined by the Board of Directors or the person presiding over the meeting, meetings of Stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The Secretary or, in his or her absence, one of the Assistant Secretaries, shall act as secretary of the meeting.  If none of the officers above designated to act as the person presiding over the meeting or as secretary of the meeting shall be present, a person presiding over the meeting or a secretary of the meeting, as the case may be, shall be designated by the Board of Directors and, if the Board of Directors has not so

11

acted, in the case of the designation of a person to act as secretary of the meeting, designated by the person presiding over the meeting.

SECTION 3.13.   Notice of Stockholder Business and Nominations.

(A)      Annual Meetings of Stockholders.

(1)      Nominations of persons for election to the Board of Directors and the proposal of other business to be considered by the Stockholders at an annual meeting of Stockholders may be made (a) pursuant to the Corporation's notice of meeting (or any supplement thereto), (b) by or at the direction of the Board of Directors (or any committee thereof) or (c) by any Stockholder who (i) was a Stockholder of record at the time of giving of notice provided for in this Bylaw, on the record date for the determination of the Stockholders entitled to vote at the meeting, and at the time of the annual meeting, (ii) is entitled to vote at the meeting and (iii) complies with the notice procedures set forth in this Bylaw as to such business or nomination.  Except for the nomination of Proxy Access Nominees in accordance with Section 3.14 or the submission of proposals pursuant to Rule 14a-8 under the Exchange Act, clause (c) of this Section 3.13(A)(1) shall be the exclusive means for a Stockholder to nominate candidates for election as Directors ("Stockholder Nominees") or to bring other business ("Stockholder Business") before an annual meeting of the Stockholders.

(2)      At any annual meeting of Stockholders, all nominations of Stockholder Nominees and proposals of Stockholder Business must be made by timely notice thereof in writing given by or on behalf of a Stockholder of record (the "Stockholder Notice") and must otherwise be a proper matter for stockholder action under applicable law.

(3)      To be timely in the case of an annual meeting of Stockholders, a Stockholder Notice shall be delivered to the Secretary and received at the Office of the Corporation not earlier than the Close of Business on the 120th day and not later than the Close of Business on the 90th day prior to the first anniversary of the preceding year's annual meeting; provided, however, that if the date of the annual meeting is more than 30 days before or more than 60 days after such anniversary date, or if no annual meeting was held during the prior year, then to be timely the Stockholder Notice must be so received at the Office of the Corporation (x) not earlier than the Close of Business on the 120th day prior to the date of such annual meeting and (y) not later than the Close of Business on the later of the 90th day prior to such annual meeting and the 10th day following the day on which the date of such annual meeting was first announced by Public Disclosure; provided, further, that for purposes of the Corporation's first annual meeting of Stockholders after the Listing Date, the date of the prior year's annual meeting of Stockholders shall be [April 28, 2020].  In no event shall any adjournment or postponement of an annual meeting or the Public Disclosure thereof commence a new time period (or extent any time period) for the giving of a Stockholder Notice.

(4)      Notwithstanding anything in Section 3.13(A)(3) to the contrary, in the event that the number of directors to be elected to the Board of Directors is increased and there is no Public Disclosure by the Corporation naming all of the nominees for the additional directorships or specifying the size of the increased Board of Directors at least 100 days prior to the first anniversary of the preceding year's annual meeting (or, in the case of the Corporation's

12

first annual meeting after the Listing Date, 100 days prior to the first anniversary of the Listing Date), a Stockholder Notice of Stockholder Nominees shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be delivered to the Secretary and received at the Office of the Corporation not later than the Close of Business on the 10th day following the day on which such Public Disclosure is first made by the Corporation.

(5)     To be in proper form in the case of an annual meeting of Stockholders, a Stockholder Notice must set forth:

(a)     the name and record address of each Stockholder (the "Proponent") nominating the Stockholder Nominee or proposing the Stockholder Business, as applicable, as they appear on the Corporation's books;

(b)     the name and address of any Stockholder Associated Person;

(c)     in the case of a nomination, the name and address of the Stockholder Nominee(s);

(d)     as to each Proponent and Stockholder Associated Person, (i) the class or series and number of shares of the Corporation which are, directly or indirectly, owned beneficially and of record by the Proponent or Stockholder Associated Person (provided, however, that for purposes of this Section 3.13(A)(5), a person shall be deemed to beneficially own any shares of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future), (ii) the date such shares were acquired, (iii) in the case of a proposal of Stockholder Business, a description of any agreement, arrangement or understanding, direct or indirect, with respect to such Stockholder Business between or among the Proponent, any Stockholder Associated Person or any others (including their names) acting in concert with any of the foregoing, (iv) a description of any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of the Corporation or with a value derived, in whole or in part, from the value of any class or series of shares of the Corporation, whether or not such instrument or right shall be subject to settlement in the underlying class or series of capital stock of the Corporation (a "Derivative") directly or indirectly owned beneficially by each Proponent and any Stockholder Associated Person and any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the value of shares of the Corporation, (v) a description of any Short Interest held by each Proponent and any Stockholder Associated Person, presently or within the last 12 months in any security of the Corporation (for purposes of these Bylaws, a person shall be deemed to have a "Short Interest" in a security if such person, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has the opportunity to profit or share in any profit derived from any decrease in the value of the subject security) and (vi) a description in reasonable detail of any proxy (including revocable proxies), contract, arrangement, understanding or other relationship pursuant to which the Proponent or any Stockholder Associated Person has a right to vote or has granted a right to vote any shares of any security of the Corporation.  The information specified in Section 3.13(A)(5)(a)-(d) is referred to herein as "Stockholder Information";

13

(e)    a representation that each Proponent is a holder of record of stock of the Corporation entitled to vote at the meeting, will continue to hold stock of the Corporation entitled to vote at such meeting through the date of such meeting and intends to appear in person or by proxy at the meeting to nominate such Stockholder Nominee and/or propose such Stockholder Business, as applicable;

(f)    in the case of a nomination of a Stockholder Nominee, (i) the principal occupation or employment of each Stockholder Nominee (present and for the past five years), (ii) all information regarding each Stockholder Nominee and Stockholder Associated Person that would be required to be disclosed in a solicitation of proxies for election of Directors in a contested election subject to Section 14 of the Exchange Act, (iii) the written consent of each Stockholder Nominee to being named in a proxy statement as a nominee and to serve if elected and (iv) a completed signed questionnaire, representation and agreement required by Section 4.3;

(g)    in the case of a nomination of a Stockholder Nominee, a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings (whether written or oral) during the past three years, and any other material relationships, between or among a Proponent, Stockholder Associated Person and their respective affiliates and associates, or others acting in concert therewith, on the one hand, and each Stockholder Nominee and his or her affiliates and associates, or others acting in concert therewith, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Rule 404 of Regulation S-K promulgated under the Securities Act of 1933, as amended (the "Securities Act") (or any successor provision) if the Proponent, Stockholder Associated Person or their respective affiliates or associates, or any person acting in concert therewith, were the "registrant" for purposes of such rule and the Stockholder Nominee were a director or executive officer of such registrant;

(h)    in the case of a proposal of Stockholder Business, (i) a brief description of the Stockholder Business desired to be brought before the annual meeting, (ii) the text, if any, of the proposal (including the text of any resolutions proposed for consideration and, if such business includes a proposal to amend the Bylaws, the language of the proposed amendment), and (iii) the reasons for conducting such Stockholder Business at the meeting and any material interest of each Proponent and any Stockholder Associated Person in such Stockholder Business;

(i)    a representation as to whether the Proponent intends (i) to deliver a proxy statement and form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to elect such Stockholder Nominee(s) and/or approve or adopt such Stockholder Business, as applicable or (ii) otherwise to solicit proxies from Stockholders in support of such Stockholder Nominee(s) and/or Stockholder Business, as applicable;

(j)    all other information that would be required to be filed with the SEC if the Proponents or Stockholder Associated Persons were participants in a solicitation subject to Section 14 of the Exchange Act; and

14

(k)     a representation that the Proponents shall provide any other information reasonably requested by the Corporation.

(B)     <u>Special Meetings of Stockholders</u>.

(1)     If the Corporation's notice of a special meeting includes the election of Directors, nominations of persons for election to the Board of Directors at such meeting may be made (a) by or at the direction of the Board of Directors or (b) by any Stockholder who (i) was a Stockholder of record at the time of giving of notice provided for in this Bylaw and at the time of the special meeting, (ii) is entitled to vote at the meeting and (iii) complies with the notice procedures set forth in this Bylaw as to such nomination. Subject to <u>Section 3.13(C)</u>, clause (b) of the preceding sentence shall be the exclusive means for a Stockholder to nominate Stockholder Nominees before a special meeting of the Stockholders. For avoidance of doubt, in connection with any special meeting, Stockholders cannot propose Stockholder Business that is not included in the Corporation's notice of the meeting and Stockholders may nominate Stockholder Nominees for election at such meeting only if the Corporation's notice of the meeting specifies the election of Directors as among the purposes of such meeting.

(2)     Subject to <u>Section 3.13(C)</u>, at any special meeting of Stockholders at which Directors are to be elected, all nominations of Stockholder Nominees must be made by timely delivery of a Stockholder Notice.

(3)     To be timely in the case of a special meeting of Stockholders, a Stockholder Notice shall be delivered to the Secretary and received at the Office of the Corporation (x) not earlier than the Close of Business on the 120th day prior to such special meeting and (y) not later than the Close of Business on the later of the 90th day prior to such special meeting and the 10th day following the day on which the date of such special meeting was first announced by Public Disclosure.  In no event shall any adjournment or postponement of a special meeting or the Public Disclosure thereof commence a new time period (or extent any time period) for the giving of a Stockholder Notice.

(4)     Notwithstanding anything in <u>Section 3.13(B)(3)</u> to the contrary, in the event that the number of directors to be elected to the Board of Directors at such special meeting is increased and there is no Public Disclosure by the Corporation naming all of the nominees for the additional directorships or specifying the size of the increased Board of Directors at least 100 days prior to such special meeting, a Stockholder Notice of Stockholder Nominees shall also be considered timely, but only with respect to nominees for the additional directorships, if it shall be delivered to the Secretary and received at the Office of the Corporation not later than the Close of Business on the 10th day following the day on which such Public Disclosure is first made by the Corporation.

(5)     To be in proper form in the case of a special meeting of Stockholders, a Stockholder Notice must set forth all of the information required by <u>Section 3.13(A)(5)</u> in the case of a Stockholder Nominee nominated for election at an annual meeting.

15

(C)    <u>General</u>.

(1)    In addition to the information required by <u>Section 3.13(A)-(B)</u>, the Proponents shall also provide any other information reasonably requested from time to time by the Corporation within 10 Business Days after each such request.  In addition, the Proponents shall affirm as true and correct the information provided to the Corporation in the Stockholder Notice or at the Corporation's request pursuant to the preceding sentence (and shall update or supplement such information as needed so that such information shall be true and correct) as of (a) the record date for the meeting, (b) in the case of an annual meeting of Stockholders, the date that is 10 calendar days before the first anniversary date of the Corporation's proxy statement released to Stockholders in connection with the previous year's annual meeting (this clause (b) being inapplicable in the case of the first annual meeting after the Listing Date) and (c) the date that is 10 Business Days before the meeting and, if applicable, before reconvening any adjournment or postponement thereof.  Such affirmation, update and/or supplement must be delivered to the Secretary and received at the Office of the Corporation by no later than (x) five Business Days after the applicable date specified in clause (a) or (b) of the foregoing sentence (in the case of the affirmation, update and/or supplement required to be made as of those dates), and (y) not later than seven Business Days before the date for the meeting (in the case of the affirmation, update and/or supplement required to be made as of 10 Business Days before the meeting or reconvening any adjournment or postponement thereof).

(2)    Except to the extent otherwise determined by the Board of Directors, the person presiding over the meeting shall, if the facts warrant, determine and declare to the meeting that the nomination of any Stockholder Nominee and/or the proposal of any Stockholder Business, as applicable, was not properly brought before the meeting in accordance with the procedures set forth in this <u>Section 3.13</u>.  Any such nomination or business not properly brought before the meeting shall be disregarded and such Stockholder Nominee shall not be qualified for election as a Director (in the case of a nomination) and/or not be transacted (in the case of other business).

(3)    Except to the extent otherwise determined by the Board of Directors, if the Proponent (or a qualified representative of the Proponent) does not appear at the meeting of Stockholders to nominate the Stockholder Nominee and/or present the Stockholder Business, as applicable, such nomination shall be disregarded and such Stockholder Nominee shall not be qualified for election as a Director and/or such business shall not be transacted, respectively, in either case notwithstanding that proxies in respect of such vote may have been received by the Corporation.  For purposes of this <u>Section 3.13</u>, to be considered a qualified representative of the Proponent, a person must be a duly authorized officer, manager or partner of such Stockholder or must be authorized by a writing executed by such Stockholder or an electronic transmission delivered by such Stockholder to act for such Stockholder as proxy at the meeting of Stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of Stockholders.

(4)    Nothing in this <u>Section 3.13</u> shall be deemed to affect any rights of shareholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 of the Exchange Act.  Further, nothing in this <u>Section 3.13</u> shall be deemed to affect

any rights of the holders of any series of preferred stock of the Corporation pursuant to any applicable provision of the Certificate of Incorporation.

SECTION 3.14.   Proxy Access for Director Nominations.

(A)   Information to be Included in the Corporation's Proxy Materials.  Subject to the terms and conditions set forth in these Bylaws, for annual meetings of Stockholders [that occur after the Listing Date,] the Corporation shall include in its proxy statement and in its form of proxy for such meeting, in addition to any persons nominated for election by or at the direction of the Board of Directors (or any committee thereof), the name and the Required Information (as defined below) of any person nominated for election to the Board of Directors who satisfied the eligibility requirements of this Section 3.14 (each a "Proxy Access Nominee") and who is identified in a proper written notice (a "Proxy Access Notice") that complies with and is timely delivered pursuant to this Section 3.14 by an Eligible Stockholder (as defined in subsection (E) below).  For the avoidance of doubt, and any other provision of these Bylaws notwithstanding, the Corporation may in its sole discretion solicit against, and include in the proxy statement and other proxy materials its own statement(s) or other information relating to, any Eligible Stockholder and/or Proxy Access Nominee, including any information provided to the Corporation with respect to the foregoing.

(B)   Certain Definitions.  For the purposes of this Section 3.14:

(1)   "affiliate" and "associate" shall have the meanings ascribed thereto in Rule 405 under the Securities Act; provided, however, that the term "partner" as used in the definition of "associate" shall not include any limited partner that is not involved in the management of the relevant partnership; and

(2)   a person shall be deemed to "own" only those outstanding shares of Voting Stock as to which such person itself possesses both (a) the full voting and investment rights pertaining to the shares and (b) the full economic interest in (including the opportunity for profit and risk of loss on) such shares. The number of shares calculated in accordance with the foregoing clauses (a) and (b) shall be deemed not to include (and to the extent any of the following arrangements have been entered into by affiliates of such person, shall be reduced by) any shares (x) sold by such person or any of its affiliates in any transaction that has not been settled or closed, including any short sale, (y) borrowed by such person or any of its affiliates for any purposes or purchased by such person or any of its affiliates pursuant  to an agreement to resell, or (z) subject to any option, warrant, forward contract, swap, contract of sale, other derivative or similar agreement entered into by such person or any of its affiliates, whether any such instrument or agreement is to be settled with shares, cash or other consideration, in any such case which instrument or agreement has, or is intended to have, or if exercised by either party thereto would have, the purpose or effect of (i) reducing in any manner, to any extent or at any time in the future, such person's or any of its affiliates' full right to vote or direct the voting of any such shares, and/or (ii) hedging, offsetting or altering to any degree gain or loss arising from the full economic ownership of such shares by such person or any of its affiliates. For purposes of this Section 3.14 a person shall "own" shares held in the name of a nominee (including a Custodian Holder) or other intermediary so long as the person retains the right to instruct how the shares are voted with respect to the election of directors and the right to direct the disposition

17

thereof and possesses the full economic interest in the shares. For purposes of this <u>Section 3.14</u>, a person's ownership of shares shall be deemed to continue during any period in which the person has loaned such shares so long as such person retains the power to recall such shares on no greater than 5 Business Days' notice or has delegated any voting power over such shares by means of a proxy, power of attorney or other instrument or arrangement so long as such delegation is revocable at any time by the person. The terms "<u>owned</u>," "<u>owning</u>" and other variations of the word "<u>own</u>" shall have correlative meanings.

(3)     the "<u>Required Information</u>" that the Corporation will include in its proxy statement is (1) the information concerning the Proxy Access Nominee and the Eligible Stockholder that the Corporation determines is required to be disclosed in the Corporation's proxy statement by the regulations promulgated under the Exchange Act; and (2) if the Eligible Stockholder so elects, a Statement (as defined in <u>subsection (I)</u> below); and

(4)     "<u>Voting Stock</u>" shall mean outstanding shares of capital stock of the Corporation entitled to vote generally for the election of directors.

(C)     <u>Notice Period</u>.  To be timely, a stockholder's Proxy Access Notice must be received by the Secretary at the Office of the Corporation no later than 120 days prior to the anniversary of the mailing of the Corporation's definitive proxy statement for the immediately preceding year's annual meeting of Stockholders; <u>provided</u>, <u>however</u>, in the case of the first annual meeting after the Listing Date, the mailing date of the Corporation's definitive proxy statement for the immediately preceding year's annual meeting shall be deemed to be 30 days prior to the Listing Date. Neither an adjournment nor a postponement of an annual meeting (or a Public Disclosure thereof) shall begin a new time period for delivering a Proxy Access Notice.

(D)     <u>Permitted Number of Proxy Access Nominees</u>.  The maximum number of Proxy Access Nominees nominated by all Eligible Stockholders appearing in the Corporation's proxy materials pursuant to this <u>Section 3.14</u> with respect to an annual meeting of Stockholders shall not exceed the greater of (x) two (2) and (y) the largest whole number that does not exceed twenty percent (20%) of the number of Directors in office as of the last day on which a Proxy Access Notice may be delivered in accordance with the procedures set forth in this <u>Section 3.14</u> (such greater number, the "<u>Permitted Number</u>"); <u>provided</u>, <u>however</u>, that if one or more vacancies on the Board of Directors for any reason occur after the deadline for delivery of the Proxy Access Notice and before the date of the applicable annual meeting of Stockholders and the Board of Directors resolves to reduce the size of the Board of Directors in connection therewith such that the number of Directors subject to election by the holders of Voting Stock is reduced, the Permitted Number shall be calculated based on the number of Directors in office as so reduced.  The Permitted Number shall also be reduced by:

(1)     the number of Stockholder Nominees as to whom the Corporation shall have timely received one or more Stockholder Notices in proper form pursuant to <u>Section 3.13(A)</u>, <u>provided</u> that the Permitted Number after such reduction shall not be less than one (1);

(2)     the number of Director candidates who will be included in the Corporation's proxy materials with respect to such annual meeting as nominees unopposed (by the Corporation) or recommended by the Board of Directors (or any committee thereof) pursuant

18

to an agreement, arrangement or other understanding with any holder or group of holders of Voting Stock (other than any such agreement, arrangement or understanding entered into in connection with an acquisition of Voting Stock by such holder or group of holders from the Corporation), other than any such director candidate (a) whose term of office will expire at such annual meeting and who is not seeking (or agreeing) to be nominated at such meeting for another term of office or (b) who at the time of such annual meeting will have served as a director continuously, as a nominee of the Board of Directors (or any committee thereof), for at least two (2) consecutive annual terms immediately preceding the applicable annual meeting; provided that the Permitted Number after such reduction shall not be less than one (1);

(3)     the number of Directors in office who were previously elected to the Board of Directors as Proxy Access Nominees pursuant to this Section 3.14 at any annual meeting of Stockholders in the preceding two years and whose re-election at the upcoming annual meeting is being recommended by the Board of Directors (or any committee thereof); and

(4)     the number of Director candidates whose names were submitted for inclusion in the Corporation's proxy materials pursuant to this Section 3.14 for the upcoming annual meeting of stockholders, but who were thereafter nominated for election at such meeting by the Board of Directors (or any committee thereof).

An Eligible Stockholder submitting more than one Proxy Access Nominee for inclusion in the Corporation's proxy statement pursuant to this Section 3.14 shall rank such Proxy Access Nominees based on the order that the Eligible Stockholder desires such Proxy Access Nominees to be selected for inclusion in the Corporation's proxy statement and include such specified rank in its Proxy Access Notice. If the number of Proxy Access Nominees pursuant to this Section 3.14 for an annual meeting of stockholders exceeds the Permitted Number, then the highest ranking qualifying Proxy Access Nominee from each Eligible Stockholder will be selected by the Corporation for inclusion in the proxy statement until the Permitted Number is reached, going in order of the amount (largest to smallest) of the ownership of Voting Stock disclosed in each Eligible Stockholder's Proxy Access Notice. If the Permitted Number is not reached after the highest ranking Proxy Access Nominee from each Eligible Stockholder has been selected, this selection process will continue as many times as necessary, following the same order each time, until the Permitted Number is reached.  After the Permitted Number is so reached, if any Proxy Access Nominee previously included in the Permitted Number ceases to be a Proxy Access Nominee for any reason (other than the Corporation's failure to include such Proxy Access Nominee in the Corporation's proxy materials in violation of this Section 3.14) or otherwise withdraws his or her nomination or becomes unwilling or unable to continue to stand for election as a Director, the Corporation nevertheless shall not be required to include in its proxy materials pursuant to this Section 3.14 any substitute nominee or nominees with respect to the annual meeting of Stockholders.

(E)     Definition of Eligible Stockholder. An "Eligible Stockholder" is one or more persons who:

(1)     own and have owned (as defined above) continuously for the shorter of (i) the period from the Listing Date to the date that the Proxy Access Notice is received at the Office of the Corporation and (ii) at least three (3) years prior to the date that the

19

Proxy Access Notice is received at the Office of the Corporation (such shorter period, the "Minimum Holding Period") at least three percent (3%) of the aggregate voting power of the Voting Stock as of the most recent date prior to the submission of the Proxy Access Notice for which such amount is given in any filing by the Corporation with the SEC (the "Proxy Access Request Required Shares");

(2)     continue to own the Proxy Access Request Required Shares at all times between the date such Proxy Access Notice is received at the Office of the Corporation and the date of the applicable annual meeting; and

(3)     satisfies all other requirements of, and complies with all applicable procedures set forth in, this Section 3.14;

[provided that the aggregate number of record stockholders and beneficial owners whose stock ownership is counted for the purpose of satisfying the foregoing ownership requirement shall not exceed twenty (20).  Two or more funds that are part of the same family of funds by virtue of being under common management and investment control, under common management and sponsored primarily by the same employer or a "group of investment companies" (as such term is defined in Section 12(d)(1)(G)(ii) of the Investment Company Act of 1940, as amended) (a "Qualifying Fund") shall be treated as one record stockholder or beneficial owner for the purpose of determining the aggregate number of record stockholders and beneficial owners in this subsection (E), provided that each fund included within a Qualifying Fund otherwise meets the requirements set forth in this Section 3.14.] No shares may be attributed to more than one group constituting an Eligible Stockholder under this Section 3.14, and no record stockholder (other than a Custodian Holder (as defined below)) or beneficial owner may be a member of more than one group constituting an Eligible Stockholder, with respect to any annual meeting of Stockholders. If any person (other than a Custodian Holder) purports to be a member of more than one group constituting an Eligible Stockholder, such person shall only be deemed to be a member of the group that has the largest ownership position (as reflected in the applicable Proxy Access Notice).  "Custodian Holder," with respect to any Eligible Stockholder, means any broker, bank or custodian (or similar nominee) who (i) is acting solely as a nominee on behalf of a beneficial owner and (ii) does not own (as defined in this Section 3.14) any of the shares comprising the Proxy Access Request Required Shares of the Eligible Stockholder.  Whenever the Eligible Stockholder consists of a group of persons (including a group of funds that are part of the same Qualifying Fund), each provision in this Section 3.14 that requires the Eligible Stockholder to provide any written statements, representations, undertakings, agreements or other instruments or to meet any other conditions (including to have owned the Proxy Access Request Required Shares continuously for the Minimum Holding Period and through the date of the annual meeting of Stockholders) shall be deemed to require each such person (including each individual fund) that is a member of such group (other than a Custodian Holder) to provide such statements, representations, undertakings, agreements or other instruments and to meet such other conditions (except that the members of such group may aggregate the shares that each member has owned continuously for the Minimum Holding Period in order to meet the 3% ownership requirement of the "Proxy Access Request Required Shares" definition).

20

(F)     Form of Notice.  To be in proper written form, the Proxy Access Notice must include or be accompanied by the following:

(1)     a written statement by the Eligible Stockholder certifying as to the number of shares it owns and has owned continuously for the Minimum Holding Period, and the Eligible Stockholder's agreement to provide (a) within five Business Days following the later of the record date for the annual meeting of stockholders or the date on which notice of the record date is first publicly disclosed, a written statement by the Eligible Stockholder certifying as to the number of shares it owns and has owned continuously through the record date and (b) prompt notice if the Eligible Stockholder ceases to own a number of shares at least equal to the Required Shares prior to the date of the annual meeting;

(2)     if the Eligible Stockholder is not a record stockholder of the Proxy Access Request Required Shares, proof that the Eligible Stockholder owns, and has owned continuously for the Minimum Holding Period, the Proxy Access Request Required Shares, in a form that would be deemed by the Corporation to be acceptable pursuant to Rule 14a-8(b)(2) under the Exchange Act (or any successor rule) for purposes of a shareholder proposal under such rule;

(3)     a copy of the Schedule 14N that has been or is concurrently being filed with the SEC as required by Rule 14a-18 under the Exchange Act;

(4)     as to the Eligible Stockholder and each Proxy Access Nominee, the information required by Section 3.13(A)(5)(d)(iv)-(v) (except that the references to the "Proponent" and to "any Stockholder Associated Person" in such clauses shall instead refer, respectively, to the "Eligible Stockholder" and "each Proxy Access Nominee" for purposes of this paragraph);

(5)     as to each Proxy Access Nominee:

(a)     the items specified in Section 3.13(A)(5)(f) (including the questionnaire, representation and agreement required by Section 4.3) (except that the references to "Stockholder Nominee" in such sections shall instead refer to "Proxy Access Nominee," and the reference to the "Stockholder Associated Person" may be disregarded, for purposes of this paragraph) and an executed agreement, in a form deemed satisfactory by the Board of Directors or its designee (which form shall be provided by the Corporation reasonably promptly upon written request therefor), pursuant to which such Proxy Access Nominee agrees not to be named in any other person's proxy statement or form of proxy;

(b)     a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among the Eligible Stockholder and its affiliates and associates, or others acting in concert therewith, on the one hand, and such Proxy Access Nominee and his or her affiliates and associates, or others acting in concert therewith, on the other hand, including all information that would be required to be disclosed pursuant to Rule 404 of Regulation S-K promulgated under the Securities Act (or any successor provision) if the Eligible Stockholder, or any affiliate or associate thereof or person acting in concert

21

therewith, were the "registrant" for purposes of such rule and the Proxy Access Nominee were a director or executive of such registrant; and

(c)     any other information relating to the Proxy Access Nominee that would be required to be disclosed in a proxy statement or other filings required to be made in connection with the solicitation of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder;

(6)     an executed agreement, in a form deemed satisfactory by the Board of Directors or its designee (which form shall be provided by the Corporation reasonably promptly upon written request therefor), pursuant to which the Eligible Stockholder:

(a)     represents that it intends to continue to hold the Proxy Access Request Required Shares through the date of, and to vote the Proxy Access Request Required Shares at, the annual meeting of Stockholders;

(b)     represents that it acquired the Proxy Access Request Required Shares in the ordinary course of business and not with the intent to change or influence control of the Corporation, and that neither the Eligible Stockholder nor any Proxy Access Nominee presently has such intent;

(c)     represents and agrees that it has not nominated and will not nominate for election to the Board of Directors at the annual meeting of Stockholders any person other than the Proxy Access Nominee(s) it is nominating pursuant to this Section 3.14;

(d)     represents and agrees that it is not currently engaged as of the date of the agreement, and will not engage, in, and is not currently as of the date of the agreement, and will not be, a "participant" in another person's, "solicitation" within the meaning of Rule 14a-1(l) under the Exchange Act in support of the election of any individual as a director at the annual meeting other than its Proxy Access Nominee(s) or a nominee of the Board of Directors;

(e)     represents and agrees that it has not distributed and will not distribute to any Stockholder or beneficial owner of Voting Stock any form of proxy for the annual meeting other than the form distributed by the Corporation;

(f)     represents and agrees that it is currently in compliance as of the date of the agreement, and will comply, with all laws and regulations (including, without limitation, Rule 14a-9(a) under the Exchange Act) applicable to solicitations and the use, if any, of soliciting material in connection with the annual meeting;

(g)     agrees to assume all liability stemming from any legal or regulatory violation arising out of the Eligible Stockholder's communications with the Stockholders and beneficial owners of Voting Stock or out of the information that the Eligible Stockholder provided to the Corporation, in each case, in connection with the nomination or election of Proxy Access Nominee(s) at the annual meeting;

22

(h)        agrees to indemnify and hold harmless the Corporation and each of its directors, officers and employees individually against any liability, loss, damages, expenses or other costs (including attorneys' fees) incurred in connection with any threatened or pending action, suit or proceeding, whether legal, administrative or investigative, against the Corporation or any of its directors, officers or employees arising out of any legal or regulatory violation referenced in clause (g) above or any failure or alleged failure of the Eligible Stockholder or its Proxy Access Nominee(s) to comply with, or any breach or alleged breach by the Eligible Stockholder or its Proxy Access Nominee(s) of, the requirements of this Section 3.14; and

(i)        agrees to file with the SEC any written solicitation of the Stockholders or beneficial owners of Voting Stock relating to the annual meeting at which its Proxy Access Nominee(s) will be nominated, regardless of whether any such filing is required under Regulation 14A of the Exchange Act or whether any exemption from filing is available for such solicitation or other communication under Regulation 14A of the Exchange Act;

(7)        in the case of a nomination by a group of persons together constituting an Eligible Stockholder, the designation by all group members (other than a Custodian Holder) of one member of the group that is authorized to receive communications, notices and inquiries from the Corporation and to act on behalf of the Eligible Stockholder group with respect to all matters relating to the nomination under this Section 3.14 (including withdrawal of the nomination); and

(8)        in the case of a nomination by a group of persons together constituting an Eligible Stockholder in which two or more funds that are part of the same Qualifying Fund are counted as one record stockholder or beneficial owner for purposes of qualifying as an Eligible Stockholder, documentation reasonably satisfactory to the Corporation that demonstrates that the funds are part of the same Qualifying Fund.

(G)        Additional Required Information.  In addition to the information required pursuant to Section 3.14(F) or any other provision of these Bylaws, (i) the Corporation from time to time may require any proposed Proxy Access Nominee to furnish any other information (a) that may reasonably be required by the Corporation to determine whether the Proxy Access Nominee would be independent under the Independence Standards (as defined in Section 4.3(B)), (b) that could be material to a reasonable Stockholder's understanding of the independence, or lack thereof, of such Proxy Access Nominee, (c) that may reasonably be required by the Corporation to determine the eligibility of such Proxy Access Nominee to serve as a Director or (d) as may otherwise be reasonably requested, and (ii) the Corporation from time to time may require the Eligible Stockholder to furnish any other information that may reasonably be required by the Corporation to verify the Eligible Stockholder's continuous ownership of the Proxy Access Request Required Shares for the Minimum Holding Period or other compliance with this Section 3.14.

(H)        Duty to Update, Supplement and Correct.  Any information required by this Section 3.14 to be provided to the Corporation must be updated and supplemented by the Eligible Stockholder or Proxy Access Nominee, as applicable, by delivery to the Secretary (i) no later than 10 days after the record date for determining the Stockholders entitled to vote at the

23

annual meeting of Stockholders, of such information as of such record date and (ii) no later than five days before the annual meeting of Stockholders, of such information as of the date that is 10 days before the annual meeting of Stockholders.  Further, in the event that any information or communications provided (pursuant to this Section 3.14 or otherwise) by the Eligible Stockholder or the Proxy Access Nominee to the Corporation or its Stockholders or beneficial owners of Voting Stock ceases to be true and correct in any material respect or omits a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, each Eligible Stockholder or Proxy Access Nominee, as the case may be, shall promptly notify the Secretary of any such inaccuracy or omission in such previously provided information and of the information that is required to make such information or communication true and correct.  For the avoidance of doubt, the requirement to update, supplement and correct such information shall not permit any Eligible Stockholder or other person to change or add any proposed Proxy Access Nominee or be deemed to cure any defects or limit the remedies (including without limitation under these Bylaws) available to the Corporation relating to any defect (including any inaccuracy or omission).

(I)     Supporting Statement.  The Eligible Stockholder may provide to the Secretary, at the time the Proxy Access Notice is originally provided, a single written statement for inclusion in the Corporation's proxy statement for the annual meeting, not to exceed five hundred (500) words in support of the candidacy of each such Eligible Stockholder's Proxy Access Nominee(s) (the "Statement"). Notwithstanding anything to the contrary contained in this Section 3.14, the Corporation may omit from its proxy materials any information or Statement (or portion thereof) that it, in good faith, believes is materially false or misleading, omits to state any material fact, directly or indirectly without factual foundation impugns the character, integrity or personal reputation of or makes charges concerning improper, illegal or immoral conduct or associations with respect to any person or would violate any applicable law or regulation.

(J)     Exclusion From Proxy Materials.  Notwithstanding anything to the contrary contained in this Section 3.14, the Corporation shall not be required pursuant to this Section 3.14 to include a Proxy Access Nominee in its proxy materials for any annual meeting of Stockholders, or, if the proxy statement already has been filed, to allow the nomination of a Proxy Access Nominee, notwithstanding that proxies in respect of such vote may have been received by the Corporation, if the Board of Directors determines that:

(1)     such Proxy Access Nominee would not satisfy the Independence Standards;

(2)     the election of such Proxy Access Nominee as a Director would cause the Corporation to be in violation of its Certificate of Incorporation, these Bylaws, the rules or listing standards of the principal national securities exchanges upon which the stock of the Corporation is listed or traded, or any applicable law, rule or regulation;

(3)     such Proxy Access Nominee is, or has been within the past three (3) years, an officer or director of a competitor, as defined in Section 8 of the Clayton Antitrust Act of 1914, as amended;

24

(4)      such Proxy Access Nominee is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or has been convicted in such a criminal proceeding within the past ten (10) years;

(5)      such Proxy Access Nominee is subject to any order of the type specified in Rule 506(d) of Regulation D promulgated under the Securities Act;

(6)      such Proxy Access Nominee otherwise becomes ineligible for inclusion in the Corporation's proxy materials pursuant to this Section 3.14 or otherwise becomes ineligible, not qualified or unavailable for election at the annual meeting of Stockholders;

(7)      such Proxy Access Nominee or the applicable Eligible Stockholder (or any member of any group of persons that together is such Eligible Stockholder) provided information to the Corporation in connection with such nomination that was untrue in any material respect or omitted to state a material fact necessary in order to make any statement made, in light of the circumstances under which it was made, not misleading;

(8)      such Proxy Access Nominee or the applicable Eligible Stockholder (or any member of any group of persons that together is such Eligible Stockholder) otherwise breaches or fails to comply with its representations, undertakings or obligations pursuant to these Bylaws, including, without limitation, this Section 3.14; or

(9)      the Eligible Stockholder ceases to be an Eligible Stockholder for any reason, including, but not limited to, not owning the Proxy Access Request Required Shares through the date of the applicable annual meeting.

For the purpose of this subsection (J), the occurrence of clauses (1) through (4) and, to the extent related to a breach or failure by the Proxy Access Nominee, clauses (7) and (8) will result in the exclusion from the proxy materials pursuant to this Section 3.14 of the specific Proxy Access Nominee to whom the ineligibility applies and any related Statement or, if the proxy statement for the applicable annual meeting of Stockholders already has been filed, will result in such Proxy Access Nominee not being eligible or qualified for election at such annual meeting of Stockholders, and, in either case, no other nominee may be substituted by the Eligible Stockholder that nominated such Proxy Access Nominee.  The occurrence of clause (9) and, to the extent related to a breach or failure by an Eligible Stockholder (or any member of any group of persons that together is such Eligible Stockholder), clauses (7) and (8) will result in the shares owned by such Eligible Stockholder (or such member of any group of persons that together is such Eligible Stockholder) being excluded from the Proxy Access Request Required Shares and, if as a result the persons who together nominated the Proxy Access Nominee shall no longer constitute an Eligible Stockholder, will result in the exclusion from the proxy materials pursuant to this Section 3.14 of all of such persons' Proxy Access Nominees and any related Statements or, if the proxy statement for the applicable annual meeting of stockholders already has been filed, will result in such Proxy Access Nominees not being eligible or qualified for election at such annual meeting of Stockholders.

25

(K)      Attendance of Eligible Stockholder at Annual Meeting.  Notwithstanding the foregoing provisions of this Section 3.13(C)(5), unless otherwise required by law or otherwise determined by the Board of Directors or person presiding over the meeting, if none of (i) the Eligible Stockholder or (ii) a Qualified Representative (as defined below) of the Eligible Stockholder appears at the annual meeting of Stockholders to present such Eligible Stockholder's Proxy Access Nominee(s), such nomination or nominations shall be disregarded and conclusively deemed withdrawn, notwithstanding that proxies in respect of the election of the Proxy Access Nominee(s) may have been received by the Corporation.  A "Qualified Representative" of an Eligible Stockholder means a person that is a duly authorized officer, manager or partner of such Eligible Stockholder or is authorized by a writing (i) executed by such Eligible Stockholder, (ii) delivered (or a reliable reproduction or electronic transmission of the writing is delivered) by such Eligible Stockholder to the Corporation prior to the taking of the action taken by such person on behalf of such Eligible Stockholder and (iii) stating that such person is authorized to act for such Eligible Stockholder with respect to the action to be taken.

(L)      Exclusive Method.  This Section 3.14 shall be the exclusive method for stockholders to include nominees for director election in the Corporation's proxy materials.

## ARTICLE IV

## ARTICLE III BOARD OF DIRECTORS

SECTION 4.1.     General Powers. The business and affairs of the Corporation shall be managed under the direction of the Board of Directors. The Board of Directors may adopt such rules and procedures, not inconsistent with the Certificate of Incorporation, these Bylaws or applicable law, as it may deem proper for the conduct of its meetings and the management of the Corporation.

SECTION 4.2.     Number, Tenure. Subject to the rights of the holders of any series of Preferred Stock to elect directors under specified circumstances, the initial number of Directors as of the adoption of these Bylaws shall be seven (7) and thereafter shall be fixed from time to time exclusively pursuant to a resolution adopted by the Board of Directors.  Each Director shall hold office until a successor is duly elected and qualified or until the Director's earlier death, resignation, disqualification or removal.

SECTION 4.3.     Director Qualification. To be qualified to be a nominee for election or reelection as a Director after the Listing Date, the nominee must deliver (in accordance with the time periods prescribed for delivery of a Stockholder Notice or Proxy Access Notice under Section 3.13 or Section 3.14, respectively, (in the case of a Stockholder Nominee or Proxy Access Nominee) or upon request of the Secretary from time to time (in the case of a person nominated by or at the direction of the Board of Directors or any committee thereof)) to the Secretary at the Office of the Corporation:

(A)      a completed and signed written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the

26

Secretary upon written request of any Stockholder of record identified by name within five Business Days of such request);

(B)     information as necessary to permit the Board of Directors to determine if each such nominee (i) is independent, and satisfies the audit, compensation or other board committee independence requirements, under applicable rules and listing standards of the principal national securities exchanges upon which the stock of the Corporation is listed or traded, any applicable rules of the SEC or any other regulatory body with jurisdiction over the Corporation, or any publicly disclosed standards used by the Board of Directors in determining and disclosing the independence of the Directors, (ii) is not or has not been, within the past three years, an officer or director of a competitor, as defined in Section 8 of the Clayton Antitrust Act of 1914, as amended from time to time, or (iii) is not a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or has been convicted in a criminal proceeding within the past 10 years ((i) through (iii) collectively, the "Independence Standards");

(C)     a written representation and agreement (in the form provided by the Secretary upon written request of any Stockholder of record identified by name within five Business Days of such request) that such person (i) is not and will not become a party to (a) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a Director, will act or vote on any issue or question (a "Voting Commitment") that has not been disclosed to the Corporation or (b) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a Director, with such person's fiduciary duties under applicable law, (ii) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a Director that has not been disclosed to the Corporation, (iii) will comply, if elected as a Director, with all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation that are applicable to Directors and (iv) currently intends to serve as a Director for the full term for which he or she is standing for election; and

(D)     such person's written consent to being named as a nominee for election as a Director and to serving as a Director if elected.

SECTION 4.4.     Newly Created Directorships and Vacancies. Subject to the rights of the holders of any series of Preferred Stock to elect Directors under specific circumstances, any newly created directorships resulting from an increase in the authorized number of Directors and any vacancies occurring in the Board of Directors may be filled solely by the affirmative vote of a majority of the remaining Directors then in office, although less than a quorum, or a sole remaining Director.  A Director so elected shall be elected to hold office until the earlier of the expiration of the term of office of the Director whom he or she has replaced, a successor is elected and qualified or the Director's earlier death, resignation, disqualification or removal.  No decrease in the authorized number of Directors shall shorten the term of any incumbent Director.

27

SECTION 4.5.    Resignation.  Any Director may resign at any time by notice given in writing or by electronic transmission to the Board of Directors, the Chairperson, the Chief Executive Officer or the Secretary.  Such resignation shall take effect at the time of receipt of such notice or at such later time, or such later time determined upon the happening of an event, as is therein specified.

SECTION 4.6.    Regular Meetings. A regular meeting of the Board of Directors shall be held without other notice than this Bylaw immediately after, and at the same place as, the annual meeting of Stockholders.  The Board of Directors may, by resolution, provide the time and place for the holding of additional regular meetings without other notice than such resolution.

SECTION 4.7.    Special Meetings.  Special meetings of the Board of Directors may be held at such times and at such places, if any, as may be determined by the Chairperson or the Chief Executive Officer on at least 24 hours' notice to each Director given by one of the means specified in Section 4.10 other than by mail or on at least three days' notice if given by mail. Special meetings shall be called by the Chairperson, Chief Executive Officer, President or Secretary in like manner and on like notice on the written request of any two or more Directors.

SECTION 4.8.    Conference Telephone Meetings. Members of the Board of Directors, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other at the same time, and such participation in a meeting shall constitute presence in person at such meeting.

SECTION 4.9.    Adjourned Meetings.  A majority of the Directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place.  At least 24 hours' notice of any adjourned meeting of the Board of Directors shall be given to each Director whether or not present at the time of the adjournment; provided, however, that notice of the adjourned meeting need not be given if (a) the adjournment is for 24 hours or less and (b) the time, place, if any, and means of remote communication, if any, are announced at the meeting at which the adjournment is taken.  Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

SECTION 4.10.   Notice Procedure. Subject to Section 4.9 and Section 4.11, whenever notice is required to be given to any Director by applicable law, the Certificate of Incorporation or these Bylaws, such notice shall be deemed given effectively if given in person or by telephone, mail addressed to such Director at such Director's address as it appears on the records of the Corporation, telecopy or by electronic mail or other means of electronic transmission.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting.

SECTION 4.11.   Waiver of Notice.  Whenever the giving of any notice to Directors is required by applicable law, the Certificate of Incorporation or these Bylaws, a written waiver signed by the Director, or a waiver by electronic transmission by such Director, whether before or after such notice is required, shall be deemed equivalent to notice.  Attendance

28

by a Director at a meeting shall constitute a waiver of notice of such meeting except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special Board or committee meeting need be specified in any waiver of notice.

SECTION 4.12.   Quorum; Action by Majority Vote. The presence of a majority of the Directors then in office shall be necessary to constitute a quorum for the transaction of business at any meeting of the Board of Directors; provided, however, that in no case shall a quorum consist of less than one-third of the total number of Directors that the Corporation would have if there were no vacancies on the Board of Directors. The act of a majority of the Directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. The Directors present at a meeting at which a quorum has been established may continue to transact business until adjournment, notwithstanding the withdrawal of enough Directors to leave less than a quorum.

SECTION 4.13.   Action by Consent of Board of Directors. Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or committee.

## ARTICLE V

## COMMITTEES OF THE BOARD

The Board of Directors may designate one or more committees in accordance with Section 141(c) of the DGCL.  Unless the Board of Directors provides otherwise, at all meetings of such committee, a majority of the then authorized number of members of the committee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee.  Each committee shall keep regular minutes of its meetings.  Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter and repeal rules and procedures for the conduct of its business.  In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article IV.

## ARTICLE VI

## OFFICERS

SECTION 6.1.     Positions. The offices of the Corporation shall include a Chairperson, Chief Executive Officer, a President, a Treasurer, a Secretary and such other officers as the Board of Directors from time to time may deem proper, who shall exercise such powers and perform such duties as shall be determined by the Board of Directors from time to time.  Any number of offices may be held by the same person.

29

SECTION 6.2.     Term of Office. Each officer of the Corporation shall hold office from the time of his or her election by the Board of Directors and until such officer's successor is elected and qualified or until such officer's earlier death, resignation or removal. Any officer may resign at any time upon written notice to the Corporation.  Such resignation shall take effect at the time of receipt of such notice or at such later time, or at such later time determined upon the happening of an event, as is therein specified.  Any officer may be removed at any time with or without cause by the Board of Directors.  Any resignation or removal of an officer shall be without prejudice to the contract rights, if any, of such officer, the Corporation or any other person.  Any vacancy occurring in any office of the Corporation may be filled by the Board of Directors.  The election or appointment of an officer shall not of itself create contract rights.

SECTION 6.3.     Chairperson. The Chairperson shall preside at all meetings of the Stockholders and of the Board of Directors and perform such other duties as shall be determined from time to time by the Board of Directors.  Only Directors shall be eligible to be the Chairperson.

SECTION 6.4.     Chief Executive Officer. The Chief Executive Officer shall act in a general executive capacity and shall have general supervision over the business of the Corporation and other duties incident to the office of Chief Executive Officer, and any other duties as may from time to time be assigned to the Chief Executive Officer by the Board of Directors.  The Chief Executive Officer shall, in the absence of or because of the inability to act of the Chairperson, perform all duties of the Chairperson and preside at all meetings of Stockholders and of the Board of Directors.

SECTION 6.5.     President. The President shall have such powers and shall perform such duties as may from time to time be assigned to the President by the Board of Directors.

SECTION 6.6.     Vice Presidents. Each Vice President shall have such powers and shall perform such duties as may from time to time be assigned to such Vice President by the Board of Directors.

SECTION 6.7.     Treasurer. The Treasurer (who also may be given the title of Chief Financial Officer, without prejudice to the power of the Board of Directors to designate any other office as that of Chief Financial Officer) shall exercise general supervision over the receipt, custody and disbursement of corporate funds. The Treasurer shall cause the funds of the Corporation to be deposited in such banks as may be authorized by the Board of Directors, or in such banks as may be designated as depositaries in the manner provided by resolution of the Board of Directors, and, in general, perform all duties incident to the office of Treasurer of a corporation and such other duties as may from time to time be assigned to the Treasurer by the Board of Directors or the Chief Executive Officer.

SECTION 6.8.     Secretary. The Secretary shall attend, and keep or cause to be kept in one or more books provided for that purpose the minutes of, all meetings of the Board of Directors, the committees of the Board of Directors and the Stockholders.  The Secretary shall see that all notices are duly given in accordance with the provisions of these Bylaws and as

30

required by law.  The Secretary shall be custodian of the records and the seal of the Corporation (if any), and the Secretary or an Assistant Secretary shall have authority to affix the same on any instrument that may require it, and when so affixed, the seal may be attested by the signature of the Secretary or by the signature of such Assistant Secretary.  The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the same by such officer's signature.  The Secretary or an Assistant Secretary may also attest all instruments signed by any other officer of the Corporation.  The Secretary shall see that the books, reports, statements, certificates and other documents and records required by law to be kept and filed are properly kept and filed, and in general perform all duties incident to the office of Secretary of a corporation and such other duties as may from time to time be assigned to the Secretary by the Board of Directors or the Chief Executive Officer.

SECTION 6.9.    Assistant Treasurers and Assistant Secretaries.  Assistant Treasurers and Assistant Secretaries shall perform such duties as shall be assigned to them by the Treasurer or by the Secretary, respectively, or by the Board of Directors or the Chief Executive Officer.

SECTION 6.10.   Contracts and Other Instruments.  Except as otherwise required by law, the Certificate of Incorporation or these Bylaws, any contracts or other instruments may be executed and delivered in the name and on the behalf of the Corporation by such officer or officers of the Corporation as the Board of Directors may from time to time direct.  Such authority may be general or confined to specific instances as the Board of Directors may determine. The Chief Executive Officer, the President or any Vice President may execute bonds, contracts, deeds, leases and other instruments to be made or executed for or on behalf of the Corporation.  Subject to any restrictions imposed by the Board of Directors, the Chief Executive Officer, the President or any Vice President of the Corporation may delegate contractual powers to subordinate officers and employees of the Corporation.

SECTION 6.11.   Actions with Respect to Securities of Other Entities.  All stock and other securities of other entities owned or held by the Corporation for itself, or for other parties in any capacity, shall be voted (including by written consent), and all proxies with respect thereto shall be executed, by the person or persons authorized to do so by resolution of the Board of Directors or, in the absence of such authorization, by the Chairperson, the Chief Executive Officer, the Treasurer or the Secretary.

## ARTICLE VII

## INDEMNIFICATION

SECTION 7.1.    Right to Indemnification.  The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (a "Covered Person") who was or is a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, agent or fiduciary of

31

another entity, joint venture, trust or other enterprise, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement (except for judgments, fines and amounts paid in settlement in any action or suit by or in the right of the Corporation to procure a judgment in its favor) actually and reasonably incurred by such Covered Person, and such indemnification shall continue as to a person who has ceased to be a Covered Person and shall inure to the benefit of his or her heirs, executors and administrators. Notwithstanding the preceding sentence, except as otherwise provided in Section 7.3, the Corporation shall be required to indemnify a Covered Person in connection with a Proceeding (or part thereof) commenced by such Covered Person only if the commencement of such Proceeding (or part thereof) by the Covered Person was authorized by the Board of Directors.

SECTION 7.2.    Prepayment of Expenses.  To the extent not prohibited by applicable law, the Corporation shall pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any Proceeding in advance of its final disposition; provided, however, that, to the extent required by applicable law, such payment of expenses in advance of the final disposition of the Proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article VII or otherwise.

SECTION 7.3.    Claims.  If a claim for indemnification or advancement of expenses under this Article VII is not paid in full within 30 days after a written claim therefor by the Covered Person has been received by the Corporation, the Covered Person may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such action the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

SECTION 7.4.    Nonexclusivity of Rights.  The rights conferred on any Covered Person by this Article VII shall be contract rights and shall not be exclusive of any other rights that such Covered Person may have or hereafter acquire under any statute, provision of these Bylaws, the Certificate of Incorporation, agreement, vote of stockholders or disinterested directors or otherwise.

SECTION 7.5.    Other Sources.  The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of another entity or enterprise shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such other entity or enterprise.

SECTION 7.6.    Amendment or Repeal.  Any amendment or repeal of the foregoing provisions of this Article VII shall not adversely affect any right or protection hereunder of any Covered Person in respect of any act or omission occurring prior to the time of such amendment or repeal.

SECTION 7.7.    Other Indemnification and Prepayment of Expenses.  This Article VII shall not limit the right of the Corporation, to the extent and in the manner permitted

32

by applicable law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

SECTION 7.8.    Severability.  If any provision or provisions of this Article VII shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (1) the validity, legality and enforceability of the remaining provisions of this Article VII (including, without limitation, each portion of any paragraph of this Article VII containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (2) to the fullest extent possible, the provisions of this Article VII (including, without limitation, each such portion of any paragraph of this Article VII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

SECTION 8.1.    Certificates Representing Shares.  The shares of stock of the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. If shares are represented by certificates (if any) such certificates shall be in the form approved by the Board of Directors.  Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of, the Corporation by any two authorized officers of the Corporation.  Any or all such signatures may be facsimiles. Although any officer, transfer agent or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent or registrar were still such at the date of its issue.

SECTION 8.2.    Transfer and Registry Agents.  The Corporation may from time to time maintain one or more transfer offices or agents and registry offices or agents at such place or places as may be determined from time to time by the Board of Directors.

SECTION 8.3.    Lost, Stolen or Destroyed Certificates.  The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate or his legal representative to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

SECTION 8.4.    Form of Records.  Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device, method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases); provided that the records so kept can be converted into clearly legible paper form within a reasonable time, and, with respect to the stock ledger,

33

that the records so kept (i) can be used to prepare the list of stockholders specified in Sections 219 and 220 of the DGCL, (ii) record the information specified in Sections 156, 159, 217(a) and 218 of the DGCL and (iii) record transfers of stock as governed by Article 8 of the Uniform Commercial Code as enacted in the State of Delaware, 6 *Del C.*§§ 8-101 *et seq*. The Corporation shall convert any records so kept into clearly legible paper form upon the request of any person entitled to inspect such records pursuant to any provision of the DGCL.

SECTION 8.5.    Fiscal Year. The fiscal year of the Corporation shall be determined by the Board of Directors.

SECTION 8.6.    Seal. The Corporation may have a corporate seal, which shall be in such form as may be approved from time to time by the Board of Directors.  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

SECTION 8.7.    Time Periods. In applying any provision of these Bylaws which require that an act be done or not done a specified number of days prior to an event or that an act be done during a period of a specified number of days prior to an event, calendar days shall be used unless otherwise specified, the day of the doing of the act shall be excluded, and the day of the event shall be included.

SECTION 8.8.    Amendments. These Bylaws may be altered, amended or repealed and new Bylaws may be adopted by the Board of Directors.  These Bylaws may also be altered, amended or repealed by the Stockholders, whether such Bylaws were originally adopted by them or otherwise.

SECTION 8.9.    Section Headings. Section headings in these Bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

SECTION 8.10.    Inconsistent Provisions. In the event that any provision of these Bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL or any other applicable law, such provision of these Bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

34

## **Exhibit B**

### **1129(a)(5) Disclosures Regarding Directors and Officers**

**1.      Disclosure Regarding Directors**

As of the Effective Date, the term of the current members of the board of directors of Oasis Petroleum Inc. shall automatically expire and the members of the New Board shall be appointed in accordance with the New Organizational Documents.  As set forth in the Article IV.L of the Plan, the initial New Board shall consist of seven directors, consisting of:  (i) the Chief Executive Officer of Reorganized Oasis and (ii) six (6) directors to be selected by the Required Consenting Noteholders.

In accordance with Article IV.L of the Plan and section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose at or before the Confirmation Hearing the identities and affiliations of the remaining proposed members of the New Board.  To the extent any director is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director will also be disclosed.  Each director of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.  After the Effective Date, the appointment of officers and executives of the Reorganized Debtors shall be governed by the New Organizational Documents to be adopted on or after the Effective Date.

**2.      Disclosure Regarding Officers**

The Debtors' existing officers will continue with the Debtors through and after the Effective Date in their current roles and receive compensation consistent with current practices, subject to any modifications in connection with the structure, allocation, and documentation of the Management Incentive Plan in accordance with Article IV.P of the Plan.  After the Effective Date, the appointment and/or replacement of officers and executives of the Reorganized Debtors shall be governed by the New Organizational Documents to be adopted on or after the Effective Date.

**Exhibit C**

**Rejected Executory Contracts and Unexpired Leases Schedule**[1]

None.

---

[1] The list contained in this **Exhibit C** remains subject to continuing negotiations. The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement (including this **Exhibit C)**, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**Exhibit D**

**Schedule of Retained Causes of Action**

This **Exhibit D** includes the Schedule of Retained Causes of Action, including, among other Causes of Action:

- **Exhibit D(i)**:  Causes of Action Related to Insurance Policies

- **Exhibit D(ii)**: Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation

The provisions contained in this **Exhibit D** remain subject to continuing negotiations.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement (including this **Exhibit D**), and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**Schedule of Retained Causes of Action**

Article IV.R of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.   In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.   The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article IV of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all and shall retain the following Causes of Action:[4]

### 1.      Causes of Action Related to Insurance Policies and Sureties

Unless otherwise released by the Plan, the Debtors, and the Reorganized Debtors expressly reserve and shall retain all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, and sureties and related agreements  to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against sureties, insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  Without limiting the generality of the foregoing, the Debtors' expressly reserve all Causes of Action against the Entities identified in **Exhibit D(i)** attached hereto.

### 2.      Causes of Action Related to Tax Obligations and Tax Refunds

Unless otherwise released by the Plan, the Debtors, and the Reorganized Debtors, as applicable, expressly reserve and shall retain all Causes of Action based in whole or in part upon any and all tax obligations and tax refunds to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically identified herein.

---

[4]    The categories of Causes of Action listed herein are indicative, but are in no way exclusive of the Causes of Action retained in connection with the Plan.

**3.      Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Exhibit D(ii)** attached hereto.

For the avoidance of doubt, all Mirada Claims shall be settled, released, and otherwise dealt with pursuant to the Plan and the Mirada Settlement Agreement.

**4.      Claims Related to Deposits/ Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.[5]

**5.      Claims Related to Contracts and Leases**

Unless otherwise released by the Plan, the Debtors and Reorganized Debtors, as applicable, expressly reserve Causes of Action based in whole or in part upon any and all contracts and leases, including without limitation all oil and gas leases, joint operating agreements, and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto), including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors.  The claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties:  (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition

---

[5]   For the avoidance of doubt, the Debtors reserve all rights with respect to any deposit provided in accordance with the *Order (I) Approving the Debtors Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors Proposed Procedures for Resolving Additional Assurance Requests, (IV) Authorizing Certain Fee Payments for Services Performed, and (V) Granting Related Relief* [Docket No. 56] or otherwise provided as "adequate assurance of payment" (as that term is used by Section 366 of the Bankruptcy Code) and the *Final Order Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, (IV) Perform Intercompany Transactions, and (V) Granting Related Relief* [Docket No. 178].

performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics', artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

## 6. Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

## 7. Claims Related to Liens

Unless otherwise released by the Plan or the DIP Order, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein.

**Exhibit D(i)**

**Claims Related to Insurance Policies and Sureties**

**Insurance Policies**

| Type of Policy Coverage | Insurance Carrier | Policy Number | Policy Term |
|---|---|---|---|
| Commercial General Liability | Markel International | JCGL102585 | 9/1/20 - 9/1/21 |
| Automobile Liability | Travelers Insurance Co. | 8100R61696120 | 9/1/20 - 9/1/21 |
| Umbrella Liability | Markel International | JUMB102222 | 9/1/20 - 9/1/21 |
| Excess Liability | Markel / Lloyd's of London | AU2000096 | 9/1/20 - 9/1/21 |
| Energy Package (includes Control of Well/Extra Expense; Care, Custody, Control; Property) | Lloyd's of London and certain other insurance companies | EG0185720 | 10/1/20 - 10/1/21 |
| Directors & Officers Liability Program | HCC<br>XL<br>Markel American Ins. Co.<br>QBE<br>Nationwide<br>Old Republic<br>Arch Insurance Co.<br>Sompo International<br>RLI Insurance Co.<br>Allianz<br>AWAC<br>AIG | 34MGU19A47654<br>ELU15618519<br>MKLM6EL0004807<br>100002585<br>XMF1902334<br>ORPRO43199<br>DOX100011700<br>DOX10011344502<br>EPG0021631<br>USF00102919<br>03056771<br>018396419 | 9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21<br>9/20/19 - 3/20/21 |
| Directors & Officers Liability - Extended Reporting Period | HCC<br>XL<br>Markel American Ins. Co.<br>QBE<br>Nationwide<br>Old Republic<br>Arch Insurance Co.<br>Sompo International<br>RLI Insurance Co.<br>Allianz<br>AWAC<br>AIG | 34MGU19A47654<br>ELU15618519<br>MKLM6EL0004807<br>100002585<br>XMF1902334<br>ORPRO43199<br>DOX100011700<br>DOX10011344502<br>EPG0021631<br>USF00102919<br>3056771<br>18396419 | 9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26<br>9/20/20 - 9/20/26 |
| Site Pollution Legal Liability | Ironshore Specialty Insurance Co. Inc. | 001762007 | 9/1/20 - 9/1/21 |
| Excess Pollution Legal Liability | Ironshore Specialty Insurance Co. Inc. | 002501805 | 9/1/20 - 9/1/21 |
| Unmanned Aircraft Liability | Global Aerospace | 9003569 | 6/15/20 - 6/15/21 |
| Commercial Liability, Other | Berkley Insurance Co. | BCCR-45002859-22 | 6/22/20 - 6/22/21 |
| Fiduciary Liability | Beazley Insurance Co. | V1BCDD200501 | 6/22/20 - 6/22/21 |
| Employment Practices Liability | Beazley Insurance Co. | V1BCDD200501 | 6/22/20 - 6/22/21 |
| Worker's Comp Liability – TX | Travelers Casualty and Surety Co. | UB8J898484 | 1/1/20 - 1/1/21 |
| Worker's Comp Liability – ND | North Dakota Workforce | 1291133 | 1/1/20 - 12/31/20 |

**Surety Policies**

| Bond No. | Surety / Issuing Carrier | Principal | Beneficiary | Type of Bond | Effective Date | Expiration Date | Amount ($) |
|---|---|---|---|---|---|---|---|
| RBF0001150 | RLI Insurance Company | Oasis Petroleum Marketing LLC | Canadian Revenue Agency | Customs Tax | 12/23/2013 | 12/23/2020 | 5,000 |
| RBF0001151 | RLI Insurance Company | Oasis Petroleum Marketing LLC | Canadian Border Services Agency | Customs Tax | 7/31/2014 | 7/31/2021 | 435,009 |
| RLB0010418 | RLI Insurance Company | Oasis Petroleum North America LLC | North Dakota Industrial Commission | General Performance Obligations | 5/29/2007 | 5/29/2021 | 100,000 |
| RLB0010419 | Argonaut Insurance Company | Oasis Petroleum North America LLC | US Bureau of Land Management | General Performance Obligations | 6/19/2007 | 6/19/2021 | 150,000 |
| RLB0010420 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | General Performance Obligations | 5/29/2007 | 5/29/2021 | 50,000 |
| RLB0010448 | Argonaut Insurance Company | Oasis Petroleum North America LLC | US Bureau of Indian Affairs | General Performance Obligations | 6/8/2007 | 6/8/2021 | 75,000 |
| RLB0010475 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 6/20/2007 | 6/20/2021 | 10,000 |
| RLB0010476 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 6/20/2013 | 6/20/2021 | 10,000 |

| Bond No. | Surety / Issuing Carrier | Principal | Beneficiary | Type of Bond | Effective Date | Expiration Date | Amount ($) |
|---|---|---|---|---|---|---|---|
| RLB0010477 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 6/20/2013 | 6/20/2021 | 10,000 |
| RLB0011465 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 4/22/2008 | 4/22/2021 | 10,000 |
| RLB0013498 | RLI Insurance Company | Oasis Petroleum North America LLC | US Bureau of Land Management | General Performance Obligations | 10/25/2013 | 10/25/2021 | 25,000 |
| RLB0013630 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 1/6/2011 | 1/6/2021 | 10,000 |
| RLB0013631 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 1/6/2011 | 1/6/2021 | 10,000 |
| RLB0013666 | RLI Insurance Company | Oasis Petroleum North America LLC | US Bureau of Indian Affairs | General Performance Obligations | 1/21/2011 | 1/21/2021 | 75,000 |
| RLB0013764 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 3/30/2011 | 3/30/2021 | 10,000 |
| RLB0014547 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 6/29/2012 | 6/29/2021 | 10,000 |
| RLB0015166 | RLI Insurance Company | Oasis Petroleum North America LLC | North Dakota Industrial Commission | General Performance Obligations | 5/31/2013 | 5/31/2021 | 100,000 |

| Bond No. | Surety / Issuing Carrier | Principal | Beneficiary | Type of Bond | Effective Date | Expiration Date | Amount ($) |
|---|---|---|---|---|---|---|---|
| RLB0015862 | RLI Insurance Company | Oasis Petroleum North America LLC | Montana Board of Oil and Gas Conservation | Plugging and Abandonment Commitments | 11/24/2014 | 11/24/2020 | 10,000 |
| RLB0015967 | RLI Insurance Company | Oasis Petroleum North America LLC | North Dakota Industrial Commission | General Performance Obligations | 2/27/2015 | 2/27/2021 | 100,000 |
| SUR0032469 | Argonaut Insurance Company | Oasis Petroleum Marketing LLC | Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC | Commercial Transportation Services | 5/20/2015 | 5/20/2021 | 36,000,000 |
| SUR0032470 | Argonaut Insurance Company | Oasis Midstream Services LLC | Board of Commissioners, McKenzie County ND | Facilities Reclamation | 6/1/2015 | 6/1/2021 | 822,000 |
| SUR0035077 | Argonaut Insurance Company | Oasis Midstream Services LLC | Board of Commissioners, McKenzie County ND | Facilities Reclamation | 3/15/2016 | 3/15/2021 | 511,913 |
| SUR0035078 | Argonaut Insurance Company | Oasis Midstream Services LLC | Board of Commissioners, McKenzie County ND | Facilities Reclamation | 3/15/2016 | 3/15/2021 | 581,507 |
| SUR0038621 | RLI Insurance Company | Oasis Petroleum North America LLC | Mountrail County, North Dakota | Road Right-of- Way | 10/5/2016 | 10/5/2021 | 125,450 |
| SUR0042221 | Argonaut Insurance Company | Oasis Midstream Services LLC | McKenzie Co CUP - Margret C. Sell Trust, et al. | Facilities Reclamation | 5/4/2017 | 5/4/2021 | 27,795 |
| SUR0042222 | Argonaut Insurance Company | Oasis Midstream Services LLC | McKenzie Co CUP - Tim Dwyer Farm Trust, et al. | Facilities Reclamation | 5/4/2017 | 5/4/2021 | 46,602 |

| Bond No. | Surety / Issuing Carrier | Principal | Beneficiary | Type of Bond | Effective Date | Expiration Date | Amount ($) |
|---|---|---|---|---|---|---|---|
| SUR0042234 | Argonaut Insurance Company | Oasis Midstream Services LLC | Board of Commissioners, McKenzie County ND | Facilities Reclamation | 6/1/2017 | 6/1/2021 | 190,000 |
| SUR0042286 | Argonaut Insurance Company | Oasis Midstream Services LLC | North Dakota Industrial Commission | Midstream Right-of-Way | 9/8/2017 | 9/8/2021 | 100,000 |
| SUR0045865 | Argonaut Insurance Company | Oasis Petroleum Permian LLC | Railroad Commission of Texas | General Performance Obligations | 1/5/2018 | 6/1/2021 | 50,000 |
| SUR0045910 | RLI Insurance Company | Oasis Petroleum North America LLC | North Dakota Industrial Commission | General Performance Obligations | 4/25/2018 | 4/25/2021 | 100,000 |
| SUR0052031 | Argonaut Insurance Company | Oasis Petroleum Marketing LLC | Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC | Commercial Transportation Services | 2/1/2019 | 2/1/2021 | 6,000,000 |
| SUR0052037 | Argonaut Insurance Company | Oasis Petroleum Permian LLC | Railroad Commission of Texas | General Performance Obligations | 3/7/2019 | 6/1/2021 | 605,369 |
| SUR0061634 | Argonaut Insurance Company | Oasis Petroleum North America LLC | North Dakota Industrial Commission | Other - Single well bond (DALE 5601 14-26B) | 6/22/2020 | 6/22/2021 | 160,000 |
| SUR0061635 | Argonaut Insurance Company | Oasis Petroleum North America LLC | North Dakota Industrial Commission | Geophysical Exploration Bond | 7/16/2020 | 7/16/2021 | 25,000 |

**Exhibit D(ii)**

**Claims, Defenses, Cross-Claims, and
Counter-Claims Related to Litigation and Possible Litigation**

| Case Name | Case Number | Jurisdiction |
|---|---|---|
| Aaron Bell v. Oasis Petroleum LLC | 2020-26328 | Harris County, Texas. |
| Alliance for Open Markets (BP Canada Energy Marketing Corp., Oasis Petroleum Marketing LLC, and Tenaska Marketing Ventures) Complainant v. Northern Border Pipeline Company, Respondent | RP20-745-000 | The United States of America before the Federal Energy Regulatory Commission. |
| American State Bank & Trust Company of Williston v. Enviro Shield Products, Inc., Logan Oil Tools, Inc.; Oasis Petroleum North America LLC; and any person in possession; and all persons unknown claiming any interest in or lien or encumbrance upon the real estate described in the Complaint | | In the Northwest Judicial District Court of North Dakota, Williams County. |
| Burbidge Minerals, FLLC, Plaintiff v. The Ellbogen Company II, LLC, Oasis Petroleum North America LLC, et al | 31-2019-CV-00119 | In the North Central Judicial District Court of Mountrail County, North Dakota. |
| Crowder, et al. v. Kostad, et al. (including Oasis Petroleum North America LLC) | 31-2018-CV00225 | In the Northern Central Judicial District Court of North Dakota, County of Mountrail. |
| First International Bank & Trust, as Trustee of the Clarence and E. Mae Helling Family Trust, Plaintiff v. Oasis Petroleum North America LLC, Defendant | 18-cv-00067 | In the United States District Court for the District of North Dakota, Western Division. |
| GEM Razorback, LLC, Plaintiff v. Oasis Petroleum North America LLC, Defendant | 27-2019-cv-00425 | In the Northwest Judicial District Court of McKenzie County, North Dakota. |
| Gerrity Bakken, LLC v. Oasis Petroleum North America LLC (et al); | 27-2015-cv-00267 | In the Northwest Judicial District Court of McKenzie County, North Dakota. |
| Hipolito Rodriguez v. Oasis Petroleum North America LLC, John Doe, and John Doe Inc. | 1:20-cv-00111-DMT-CRH | In the United States District Court for the District of North Dakota Western Division. |
| In re: Evelyn Marlene Kastner, Debtor v. ConocoPhillips Company et al | 20-01015-TBM | In the United States Bankruptcy Court for the District of Colorado. |
| Kyle Harris, Plaintiff v. MLB Consulting, LLC, et al. | Civil No. 53-2015-CV-00360 | In the Northwest Judicial District Court of North Dakota, County of Williams. |
| North Dakota Petroleum Council, Inc., Continental Resources, Inc., Marathon Oil Company, Whiting Oil and Gas Corporation, Enerplus Resources (USA) Corporation, WPX Energy, Inc., Statoil Oil & Gas, LP, Burlington Resources Oil & Gas Company LP, Hess Corporation, QEP Resources, Oasis Petroleum North America LLC, Halcon Resources Corporation, and XTO Energy, Inc., Appellants v. Bureau of Land Management, Respondent | | In the United States Department of Interior, Office of Hearings and Appeals, Interior Board of Land Appeals. |
| Oasis Petroleum Marketing LLC and OMP Operating LLC v. Northern Border Pipeline Company | RP20-859-000 | In the United States of America before the Federal Energy Regulatory Commission; Docket No. RP20-859-000. |

| Case Name | Case Number | Jurisdiction |
|---|---|---|
| Vitesse Oil, LLC; Vitesse Energy, LLC; and Iron Oil Operating LLC v. State of North Dakota; North Dakota Board of University and School of Lands; and Oasis Petroleum North America LLC | 27-2019-CV-00266 | In the Northwest Judicial District Court, State of North Dakota, County of McKenzie. |
| William Armstrong and Jody Armstrong v. Nabors Drilling Technologies USA, Inc.; Oasis Petroleum North America LLC and John Does 1-10; Roe Corporations 1-10 | 53-2017-cv-01477 | In the Northeast Judicial Court of McHenry County, North Dakota. |
| Wright, Antoine, individually and for others similarly situated v. Oasis Petroleum LLC; Case No. 4:20-cv-02674 | 4:20-cv-02674 | In the United States District Court for the Southern District of Texas, Houston Division. |
| Cox, Larry, individually and for others similarly situated v. Oasis Petroleum LLC; Case No. 4:20-cv-02903 | 4:20-cv-02903 | In the United States District Court for the Southern District of Texas, Houston Division. |
| Virginia Ceynar, David Ceynar, Hystad Ceynar Minerals, LLC and The Birdhead Company LLC, on behalf of themselves and a class of similarly situated persons, Plaintiffs v. Oasis Petroleum North America LLC, Defendant | 1:20-cv-00139-CRH | In the United States District Court for the District of North Dakota Western Division. |

**Exhibit E**

**Exit Facility Credit Agreement**[1]

---

[1] The agreement contained in this **Exhibit E** remain subject to continuing negotiations.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement (including this **Exhibit E**), and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

*Draft 11/3/2020*

# CREDIT AGREEMENT[1]

**DATED AS OF
NOVEMBER [\_\_], 2020**

**AMONG**

**OASIS PETROLEUM INC.,
AS PARENT,**

**OASIS PETROLEUM NORTH AMERICA LLC,
AS BORROWER,**

**THE OTHER CREDIT PARTIES PARTY HERETO,**

**WELLS FARGO BANK, N.A.,
AS ADMINISTRATIVE AGENT, ISSUING BANK AND SWINGLINE LENDER**

**AND**

**THE LENDERS PARTY HERETO**

**SOLE LEAD ARRANGER AND SOLE BOOKRUNNER**

**WELLS FARGO SECURITIES, LLC**

---

[1] <u>NTD</u>: Subject to review and comment by the Lenders.

US 7429795v.11

**TABLE OF CONTENTS**

Page

ARTICLE I
DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above ...................................................................................2
Section 1.02    Certain Defined Terms ..................................................................................2
Section 1.03    Types of Loans and Borrowings ..................................................................41
Section 1.04    Terms Generally; Rules of Construction .....................................................41
Section 1.05    Accounting Terms and Determinations; GAAP ...........................................42
Section 1.06    Rates ............................................................................................................42
Section 1.07    Divisions .....................................................................................................42

ARTICLE II
THE CREDITS

Section 2.01    Commitments ...............................................................................................42
Section 2.02    Loans and Borrowings .................................................................................43
Section 2.03    Requests for Borrowings .............................................................................44
Section 2.04    Interest Elections .........................................................................................45
Section 2.05    Funding of Borrowings; Funding by Lenders ..............................................46
Section 2.06    Termination and Reduction of Aggregate Maximum Credit
                Amounts; Optional Increase and Reduction of Aggregate
                Elected Commitment Amounts .....................................................................47
Section 2.07    Borrowing Base ...........................................................................................50
Section 2.08    Letters of Credit ..........................................................................................55
Section 2.09    Swingline Loans ..........................................................................................62

ARTICLE III
PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans ....................................................................................63
Section 3.02    Interest ........................................................................................................63
Section 3.03    Inability to Determine Rates; Effect of Benchmark Transition
                Event. ...........................................................................................................64
Section 3.04    Prepayments ................................................................................................66
Section 3.05    Fees .............................................................................................................69

ARTICLE IV
PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs .....................71
Section 4.02    Presumption of Payment by the Borrower ...................................................72
Section 4.03    Certain Deductions by the Administrative Agent ........................................72
Section 4.04    Disposition of Proceeds ...............................................................................73

ARTICLE V
INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01    Increased Costs ...........................................................................................73
Section 5.02    Break Funding Payments .............................................................................74

US 7429795v.11

Section 5.03 Taxes ..................................................................................................75
Section 5.04 Mitigation Obligations; Replacement of Lenders ...........................78

### ARTICLE VI
### CONDITIONS PRECEDENT

Section 6.01 Effective Date ..................................................................................79
Section 6.02 Each Credit Event ...........................................................................83

### ARTICLE VII
### REPRESENTATIONS AND WARRANTIES

Section 7.01 Organization; Powers.......................................................................84
Section 7.02 Authority; Enforceability.................................................................85
Section 7.03 Approvals; No Conflicts...................................................................85
Section 7.04 Financial Condition; No Material Adverse Change.........................85
Section 7.05 Litigation..........................................................................................86
Section 7.06 Environmental Matters.....................................................................86
Section 7.07 Compliance with the Laws and Agreements; No Defaults or
             Borrowing Base Deficiency...............................................................88
Section 7.08 Investment Company Act .................................................................88
Section 7.09 Taxes................................................................................................88
Section 7.10 ERISA...............................................................................................88
Section 7.11 Disclosure; No Material Misstatements...........................................89
Section 7.12 Insurance..........................................................................................89
Section 7.13 Restriction on Liens .........................................................................90
Section 7.14 Subsidiaries......................................................................................90
Section 7.15 Location of Business and Offices ....................................................90
Section 7.16 Properties; Titles, Etc......................................................................90
Section 7.17 Maintenance of Properties ...............................................................91
Section 7.18 Gas Imbalances, Prepayments .........................................................92
Section 7.19 Marketing of Production ..................................................................92
Section 7.20 Swap Agreements and Qualified ECP Guarantor............................92
Section 7.21 Use of Loans and Letters of Credit .................................................93
Section 7.22 Solvency...........................................................................................93
Section 7.23 Anti-Corruption Laws......................................................................93
Section 7.24 Sanctions..........................................................................................93
Section 7.25 OP International. ..............................................................................93
Section 7.26 EEA Financial Institutions..............................................................93
Section 7.27 DevCo Properties.............................................................................94
Section 7.28 FERC................................................................................................95
Section 7.29 State Regulation...............................................................................96
Section 7.30 Title to Refined Products .................................................................96
Section 7.31 Beneficial Ownership Certification .................................................96

### ARTICLE VIII
### AFFIRMATIVE COVENANTS

Section 8.01 Financial Statements; Other Information.........................................96
Section 8.02 Notices of Material Events.............................................................101

ii

Section 8.03   Existence; Conduct of Business ................................................................101
Section 8.04   Payment of Obligations ...............................................................................101
Section 8.05   Performance of Obligations under Loan Documents ....................................101
Section 8.06   Operation and Maintenance of Properties ....................................................102
Section 8.07   Insurance .....................................................................................................103
Section 8.08   Books and Records; Inspection Rights .........................................................103
Section 8.09   Compliance with Laws .................................................................................103
Section 8.10   Environmental Matters .................................................................................103
Section 8.11   Reserve Reports ...........................................................................................105
Section 8.12   Title Information ..........................................................................................106
Section 8.13   Additional Collateral; Additional Guarantors ..............................................107
Section 8.14   ERISA Compliance ......................................................................................108
Section 8.15   DevCo Properties .........................................................................................108
Section 8.16   Marketing Activities .....................................................................................109
Section 8.17   Commodity Exchange Act Keepwell Provisions ..........................................110
Section 8.18   DevCo Parent Undertaking ...........................................................................110
Section 8.19   Ownership of DevCo Equity Interests ..........................................................110
Section 8.20   Ownership of General Partner Equity Interests .............................................110
Section 8.21   Unrestricted Subsidiaries .............................................................................110
Section 8.22   Affirmative Hedging Covenant .....................................................................111
Section 8.23   Post-Closing Covenants ...............................................................................111

## ARTICLE IX
## NEGATIVE COVENANTS

Section 9.01   Financial Covenants .....................................................................................112
Section 9.02   Debt .............................................................................................................112
Section 9.03   Liens ............................................................................................................114
Section 9.04   Dividends, Distributions and Redemptions; Repayment of
               Senior Notes and Amendment to Terms of Senior Notes ...............................115
Section 9.05   Investments, Loans and Advances ................................................................117
Section 9.06   Nature of Business; International Operations ................................................119
Section 9.07   Proceeds of Notes ........................................................................................120
Section 9.08   Designation and Conversion of Restricted and Unrestricted
               Subsidiaries. ................................................................................................120
Section 9.09   ERISA Compliance ......................................................................................120
Section 9.10   Sale or Discount of Receivables ...................................................................121
Section 9.11   Mergers, Etc ................................................................................................121
Section 9.12   Sale of Properties and Liquidation of Swap Agreements ..............................122
Section 9.13   Environmental Matters .................................................................................124
Section 9.14   Transactions with Affiliates ..........................................................................124
Section 9.15   Subsidiaries .................................................................................................125
Section 9.16   Negative Pledge Agreements; Dividend Restrictions ....................................125
Section 9.17   Gas Imbalances, Take-or-Pay or Other Prepayments ....................................126
Section 9.18   Swap Agreements .........................................................................................126
Section 9.19   Covenants of Parent, OP LLC and the General Partner ..................................127
Section 9.20   Non-Qualified ECP Guarantors ...................................................................127

US 7429795v.11

Section 9.21    Changes to Organizational Documents of General Partner and DevCos.............................................................................127
Section 9.22    Capital Expenditures...........................................................127

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.01    Events of Default .................................................................128
Section 10.02    Remedies...............................................................................130

ARTICLE XI
THE AGENTS

Section 11.01    Appointment; Powers............................................................132
Section 11.02    Duties and Obligations of Administrative Agent...................132
Section 11.03    Action by Administrative Agent............................................133
Section 11.04    Reliance by Administrative Agent.........................................133
Section 11.05    Subagents ..............................................................................134
Section 11.06    Resignation of Administrative Agent ...................................134
Section 11.07    Agents as Lenders.................................................................134
Section 11.08    No Reliance............................................................................134
Section 11.09    Administrative Agent May File Proofs of Claim....................135
Section 11.10    Authority of Administrative Agent to Release Collateral and Liens.....................................................................................136
Section 11.11    The Arranger ........................................................................136
Section 11.12    Intercreditor Agreement........................................................136

ARTICLE XII
MISCELLANEOUS

Section 12.01    Notices ..................................................................................136
Section 12.02    Waivers; Amendments...........................................................137
Section 12.03    Expenses, Indemnity; Damage Waiver.................................139
Section 12.04    Successors and Assigns.........................................................142
Section 12.05    Survival; Revival; Reinstatement .........................................145
Section 12.06    Counterparts; Integration; Effectiveness..............................146
Section 12.07    Severability ...........................................................................146
Section 12.08    Right of Setoff.......................................................................147
Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS ...................................................147
Section 12.10    Headings ...............................................................................148
Section 12.11    Confidentiality ......................................................................148
Section 12.12    Interest Rate Limitation .......................................................149
Section 12.13    EXCULPATION PROVISIONS ............................................150
Section 12.14    Collateral Matters; Swap Agreements ..................................151
Section 12.15    No Third Party Beneficiaries ................................................151
Section 12.16    USA Patriot Act Notice ........................................................151
Section 12.17    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.........................................................151
Section 12.18    No Advisory or Fiduciary Responsibility..............................152

iv

v

Section 12.19      Acknowledgement Regarding Any Supported QFCs....................................152

**ANNEXES, EXHIBITS AND SCHEDULES**

Annex I                  List of Maximum Credit Amounts and Elected Commitments

Exhibit A                Form of Note
Exhibit B                Form of Borrowing Request
Exhibit C                Form of Interest Election Request
Exhibit D                Form of Compliance Certificate
Exhibit E-1              Security Instruments
Exhibit E-2              Form of Guaranty and Security Agreement
Exhibit F                Form of Assignment and Assumption
Exhibit G                Form of Elected Commitment Increase Certificate
Exhibit H                Form of Additional Lender Certificate
Exhibit I-1              Form of U.S. Tax Compliance Certificate (Foreign Lenders; Not Partnerships)
Exhibit I-2              Form of U.S. Tax Compliance Certificate (Foreign Participants; Not Partnerships)
Exhibit I-3              Form of U.S. Tax Compliance Certificate (Foreign Participants; Partnerships)
Exhibit I-4              Form of U.S. Tax Compliance Certificate (Foreign Lenders; Partnerships)

Schedule 2.08            Existing Letters of Credit
Schedule 7.05            Litigation
Schedule 7.06            Environmental Matters
Schedule 7.14            Subsidiaries
Schedule 7.16            Title Defects
Schedule 7.18            Gas Imbalances
Schedule 7.19            Marketing Contracts
Schedule 7.20            Swap Agreements
Schedule 9.05            Investments

US 7429795v.11

**THIS CREDIT AGREEMENT** dated as of November [__], 2020, is among: Oasis Petroleum Inc., a Delaware corporation (the "Parent"); Oasis Petroleum LLC, a Delaware limited liability company ("OP LLC"), Oasis Petroleum North America LLC, a Delaware limited liability company (the "Borrower"); each of the Lenders from time to time party hereto; and Wells Fargo Bank, N.A. (in its individual capacity, "Wells Fargo") as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

## R E C I T A L S

A.      On September 30, 2020 (the "Petition Date"), the Parent, OP LLC, the Borrower and its Subsidiaries (as defined below) each commenced a voluntary case (each a "Chapter 11 Case", and collectively, the "Chapter 11 Cases") under Chapter 11 of Title 11 of the Bankruptcy Code (as defined below), which Chapter 11 Cases were jointly administered in the Bankruptcy Court (as defined below).

B.      Prior to the Petition Date, financing was provided to the Borrower pursuant to that certain Third Amended and Restated Credit Agreement dated as of October 16, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Pre-Petition Credit Agreement"), among the Borrower, the Parent, OP LLC, the lenders from time to time party thereto (the "Pre-Petition Lenders"), Wells Fargo, in its capacities as "Administrative Agent" for the Pre-Petition Lenders (in such capacity, the "Pre-Petition Agent") and "Issuing Bank" (in such capacity, the "Pre-Petition Issuing Bank"), and Wells Fargo and JPMorgan Chase Bank, N.A., in their respective capacities as "Swingline Lender" (in such capacity, the "Pre-Petition Swingline Lenders"), pursuant to which the Pre-Petition Lenders extended "Loans" (as defined in the Pre-Petition Credit Agreement), the Pre-Petition Issuing Bank issued "Letters of Credit" (as defined in the Pre-Petition Credit Agreement) and the Pre-Petition Swingline Lenders extended "Swingline Loans" (as defined in the Pre-Petition Credit Agreement).

C.      Prior to the Effective Date (as defined below), financing was provided to the Borrower pursuant to that certain Senior Secured Superpriority Debtor-in-Possession Revolving Credit Agreement dated as of October 2, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Effective Date, the "DIP Credit Agreement"), by and among the Parent, OP LLC, the Borrower, the other guarantors party thereto, the lenders party thereto (the "DIP Lenders", and together with the Pre-Petition Lenders, the "Existing Lenders"), Wells Fargo, in its capacity as "Issuing Bank", and as "Administrative Agent" for the DIP Lenders, pursuant to which the DIP Lenders extended "Loans" (as defined in the DIP Credit Agreement), issued "Letters of Credit" (as defined in the DIP Credit Agreement) and made certain other extensions of credit to the Borrower.

D.      In connection with the Chapter 11 Cases, the Parent, the Borrower and its Subsidiaries have filed the Joint Prepackaged Chapter 11 Plan of Reorganization of Oasis Petroleum Inc. and its Debtor Affiliates (together with all annexes, exhibits, schedules and supplements thereto, in each case, as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepackaged Plan"), which was filed with the Bankruptcy Court on September 30, 2020 and which was confirmed pursuant to an order entered by the Bankruptcy Court on [___], 2020 (the "Confirmation Order"), which Confirmation Order, inter alia, authorized and approved the restructuring and refinancing of the Pre-Petition Credit

1

US 7429795v.11

Agreement and the DIP Credit Agreement and the Borrower's entry into and performance under this Agreement.

E.      The Lenders, the Swingline Lender and the Issuing Bank are willing to make available: (i) to the Borrower, such revolving credit and swingline facilities and (ii) to the Borrower and the other Credit Parties (as defined below), such letter of credit facilities, in each case, upon the terms and subject to the conditions set forth herein.

F.      In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01   Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02   Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquisition Properties" has the meaning assigned to such term in Section 2.07(e)(ii).

"Additional Lender" has the meaning assigned to such term in Section 2.06(c)(i).

"Additional Lender Certificate" has the meaning assigned to such term in Section 2.06(c)(ii)(G).

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the LIBO Rate for such Interest Period multiplied by the Statutory Reserve Rate.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affected Loans" has the meaning assigned such term in Section 3.03(b).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

US 7429795v.11

"Agents" means, collectively, the Administrative Agent and any other agent for the Lenders from time to time appointed under this Agreement.

"Aggregate Elected Commitment Amounts" at any time shall equal the sum of the Elected Commitments, as the same may be increased, reduced or terminated pursuant to Section 2.06(c). As of the Effective Date, the Aggregate Elected Commitment Amounts shall be equal to $[575,000,000].

"Aggregate Maximum Credit Amounts" at any time shall equal the sum of the Maximum Credit Amounts.  The Aggregate Maximum Credit Amounts as of the Effective Date is $1,500,000,000.

"Agreement" means this Credit Agreement, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"Alternate Base Rate" means, for any day, a rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.00% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; provided that, for purposes of this definition, the Adjusted LIBO Rate for any day shall be the rate determined by the Administrative Agent by reference to the rate set by ICE Benchmark Administration (or any successor or substitute administrator) applicable to dollar deposits in the London interbank market with a one month Interest Period (as set forth by any service selected by the Administrative Agent that has been nominated by ICE Benchmark Administration, or any successor or substitute administrator, as an authorized information vendor for the purpose of displaying such rates, or any successor to or substitute for any such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, on such day (or the immediately preceding Business Day if such day is not a day on which banks are open for dealings in dollar deposits in the London interbank market); provided, further, that if the Alternate Base Rate as determined hereunder shall be less than 2.00% per annum, such rate shall be deemed to be 2.00% per annum for purposes of this Agreement.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  If the Alternate Base Rate is being used as an alternate rate of interest pursuant to Section 3.03 hereof, then the Alternate Base Rate shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above.

"Annualized EBITDAX" means, for the purposes of calculating the Leverage Ratio as set forth in 9.01(b) for the fiscal quarters ending March 31, 2021, June 30, 2021 and September 30, 2021, (a) EBITDAX for the period commencing on January 1, 2021 and ending on the last day of such applicable fiscal quarter multiplied by (b) the factor for such period set forth in the table below:

3

| Rolling Period Ending | Factor |
|---|---|
| March 31, 2021 | 4 |
| June 30, 2021 | 2 |
| September 30, 2021 | 4/3 |

"Anti-Corruption Laws" means all state or federal laws, rules, and regulations applicable to the Parent, OP LLC, Borrower or any of their respective Subsidiaries from time to time concerning or relating to bribery or corruption, including the FCPA.

"Anti-Money Laundering Laws" means any and all laws, statues, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing or money laundering (including, without limitation, the USA Patriot Act, the Money Laundering Control Act of 1986, the Bank Secrecy Act, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), and the rules and regulations promulgated thereunder) of the jurisdictions in which the Borrower or any of its Subsidiaries operates or in which the proceeds of the Loans or Letters of Credit will be used in connection with the operations of the Parent, OP LLC, the Borrower or any of their respective Subsidiaries.

"Applicable Margin" means, for any day, with respect to any ABR Loan or Eurodollar Loan or any Swingline Loan, or with respect to the Commitment Fee Rate, as the case may be, the rate per annum set forth in the Total Commitments Utilization Grid below based upon the Total Commitments Utilization Percentage then in effect:

| Total Commitments Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Total Commitments Utilization Percentage | < 25% | ≥ 25% < 50% | ≥ 50% < 75% | ≥ 75% < 90% | ≥ 90% |
| ABR Loans or Swingline Loans | 2.000% | 2.250% | 2.500% | 2.750% | 3.000% |
| Eurodollar Loans | 3.000% | 3.250% | 3.500% | 3.750% | 4.000% |
| Commitment Fee Rate | 0.500% | 0.500% | 0.500% | 0.500% | 0.500% |

Each change in the Applicable Margin shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change, *provided*, *however*, that if at any time the Borrower fails to deliver a Reserve Report pursuant to Section 8.12(a), then from the time of such failure until the time that the Borrower delivers such Reserve Report to the Administrative Agent, the "Applicable Margin" means the rate

per annum set forth on the grid when the Total Commitments Utilization Percentage is at its highest level).

"Applicable Percentage" means, with respect to any Lender, the percentage of the Aggregate Maximum Credit Amounts represented by such Lender's Maximum Credit Amount as such percentage is set forth on Annex I; *provided* that in the case of Section 2.08(k) when a Defaulting Lender shall exist, "Applicable Percentage" as used in such Section 2.08(k) shall mean the percentage of the Aggregate Maximum Credit Amounts (disregarding any Defaulting Lender's Maximum Credit Amounts) represented by such Lender's Maximum Credit Amount.

"Approved Counterparty" shall mean any Person who, with respect to a Swap Agreement, is  (a) a Secured Swap Party, or (b) any other Person whose issuer rating or long term senior unsecured debt ratings at the time of entry into such Swap Agreement is A-/A3 by S&P or Moody's (or their equivalent) or higher (or whose obligations under the applicable Swap Agreement are guaranteed by an Affiliate of such Person meeting such rating standards).

"Approved Electronic Platform" means IntraLinks$^{TM}$, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by the Administrative Agent to be its electronic transmission system.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company Petroleum Consultants, L.P., (c) DeGolyer and MacNaughton and (d) any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Arranger" means Wells Fargo Securities, LLC, in its capacities as the sole lead arranger and sole bookrunner hereunder.

"ASC" means the Financial Accounting Standards Board Accounting Standards Codification, as in effect from time to time.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Available Commitment" means, at any time, (a) the aggregate amount of the Commitments of all Lenders at such time minus (b) the aggregate amount of the Revolving Credit Exposures of all Lenders at such time.

"Availability Block" means an amount, as calculated by the Borrower and confirmed by the Administrative Agent in its sole discretion, equal to:

5

(x) during the Initial Availability Block Period, the product of (1) sixty-five percent (65%) and (2) the positive sum of (a) the difference between the present value discounted at nine percent (9%) per annum of (i) the Required First Year Target Hedge Pricing multiplied by the Effective Date Minimum Hedge Volumes for the calendar year ending December 31, 2021 (the "Initial Measurement Period") and (ii) the Effective Date Minimum Hedge Volumes for the Initial Measurement Period multiplied by the actual average price per bbl applicable thereto, (b) the difference between the present value discounted at nine percent (9%) per annum of (i) the Required Second Year Target Hedge Pricing multiplied by the Effective Date Minimum Hedge Volumes for the calendar year ending December 31, 2022 (the "Second Measurement Period") and (ii) the Effective Date Minimum Hedge Volumes for the Second Measurement Period multiplied by the actual average price per bbl applicable thereto and (c) the difference between the present value discounted at nine percent (9%) per annum of (i) the Required Third Year Target Hedge Pricing multiplied by the Effective Date Minimum Hedge Volumes for the calendar year ending December 31, 2023 (the "Third Measurement Period") and (ii) the Effective Date Minimum Hedge Volumes for the Third Measurement Period multiplied by the actual average price per bbl applicable thereto; and

(y) during the Final Availability Block Period or upon the expiration of the Hedge Cure Period, as applicable, the product of (1) sixty-five percent (65%) and (2) the positive sum of (a) the difference between the present value discounted at nine percent (9%) per annum of (i) the Required First Year Target Hedge Pricing multiplied by the Minimum Hedge Volumes for the Initial Measurement Period and (ii) the Minimum Hedge Volumes for the Initial Measurement Period multiplied by the actual average price per bbl applicable thereto as of such date, (b) the difference between the present value discounted at nine percent (9%) per annum of (i) the Required Second Year Target Hedge Pricing multiplied by the Minimum Hedge Volumes for the Second Measurement Period and (ii) the Minimum Hedge Volumes for the Second Measurement Period multiplied by the actual average price per bbl applicable thereto as of such date and (c) the difference between the present value discounted at nine percent (9%) per annum of (i) the Required Third Year Target Hedge Pricing multiplied by the Minimum Hedge Volumes for the Third Measurement Period and (ii) the Minimum Hedge Volumes for the Third Measurement Period multiplied by the actual average price per bbl applicable thereto as of such date;

provided that, in each case, the Availability Block shall not be an amount less than $0.

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom,  Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution

6

US 7429795v.11

of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank Products" means any of the following bank services: (a) commercial credit cards, including merchant card services and purchase or debit cards, including non-card e-payables services, (b) stored value cards, and (c) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Borrower or any Guarantor.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, any appellate court having jurisdiction over the Chapter 11 Cases from time to time, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"bbl" means one barrel of oil.

"Beartooth" means Beartooth DevCo LLC, a Delaware limited liability company.

"Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR) that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then prevailing market convention for determining a rate of interest as a replacement to LIBO Rate for U.S. dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"Benchmark Replacement Adjustment" means, with respect to any replacement of LIBO Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBO Rate with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of

7

determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the LIBO Rate:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of the LIBO Rate permanently or indefinitely ceases to provide the LIBO Rate; or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the LIBO Rate:

(a)     a public statement or publication of information by or on behalf of the administrator of the LIBO Rate announcing that such administrator has ceased or will cease to provide the LIBO Rate, permanently or indefinitely; provided, that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate;

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the LIBO Rate, a resolution authority with jurisdiction over the administrator for the LIBO Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBO Rate, which states that the administrator of the LIBO Rate has ceased or will cease to provide the LIBO Rate permanently or indefinitely; provided, that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate; or

(c)     a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate announcing that the LIBO Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such

8

notice by the Required Lenders) and the Lenders.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (a) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with Section 3.03 and (b) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to Section 3.03.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Bobcat" means Bobcat DevCo LLC, a Delaware limited liability company.

"Borrowing" means (a) Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect or (b) a Swingline Loan.

"Borrowing Base" means at any time an amount equal to the amount determined in accordance with Section 2.07, as the same may be adjusted from time to time pursuant to Section 8.13(c), Section 8.24(a), Section 9.12(d), Section 9.12(e) or Section 9.12(f).

"Borrowing Base Deficiency" occurs if at any time the total Revolving Credit Exposures exceeds the Borrowing Base then in effect.

"Borrowing Base Value" means, with respect to any Oil and Gas Property of a Credit Party or any Swap Agreement in respect of commodities, the value the Administrative Agent attributed to such asset in connection with the most recent determination of the Borrowing Base as confirmed by Required Lenders.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment,

9

prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Call Spread Counterparties" means one or more financial institutions selected by the Parent to sell the options contemplated by the Permitted Bond Hedge Transaction(s) and purchase the warrants contemplated by the Permitted Warrant Transaction(s).

"Capital Expenditures" means accrued capital expenditures (as determined in accordance with GAAP) of the Parent and its Consolidated Restricted Subsidiaries for any period, including (a) exploration and production expenses and other capital expenditures and (b) midstream capital expenditures associated with the Credit Parties' retained ownership in the DevCos but specifically excluding (i) the portion of capital expenditures funded by OMP or attributable to OMP in accordance with its ownership interest in each DevCo and (ii) capitalized interest.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Restricted Subsidiaries having a fair market value in excess of $2,500,000.

"CFC" means any subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof)[, other than by the Designated Equity Holders,][2] of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Parent, (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Parent by Persons who were not (i) members of the board of directors of Parent as of the Effective Date, (ii) nominated (or whose nomination was approved) by the board of directors of the Parent or (iii) appointed (or whose appointment was approved) by directors so nominated (or whose nomination was so approved), (c) the Parent fails to own directly or indirectly all of the Equity Interests of the Borrower, (d) the General Partner shall cease to be the sole general partner of the Midstream MLP, with substantially the same powers to manage the Midstream MLP as are granted to the General Partner under the Midstream MLP Partnership Agreement on the Effective Date, (e) the failure of the Parent, OP LLC and the Borrower to own directly or indirectly (i) all of the Equity Interests of the General Partner other than the Class B Units and (ii) Equity Interests representing at least 85% of total number of Units (as defined in the General Partner LLC Agreement) issued by the General Partner, (f) the failure of the Parent to have direct or indirect sole Control of the General Partner or (g) the occurrence of a "change of control" (or any other

---

[2] NTD: To confirm whether any significant holders will exist at closing.

US 7429795v.11

similar event) under any Material Indebtedness to which any Credit Party or any Restricted Subsidiary is an obligor.

"Change in Law" means  the adoption of any law, rule or regulation after the date of this Agreement,  any change in any law, rule or regulation or in the interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or  compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b)), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; *provided*, *however*, for the purposes of this Agreement, each of the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, guidelines or directives in connection therewith or promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision or the United States or foreign regulatory authorities, in each case, pursuant to Basel III, shall be deemed to be a change in law regardless of when such law, rule or regulation goes into effect or is adopted.

"Class B Unit" has the meaning set forth in the General Partner LLC Agreement, as in effect on the Effective Date.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all Property which is subject to a Lien under one or more Security Instruments.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit and Swingline Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be  modified from time to time pursuant to Section 2.06 and modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b).  The amount representing each Lender's Commitment shall at any time be the least of  such Lender's Maximum Credit Amount,  such Lender's Applicable Percentage of the then-effective Borrowing Base and such Lender's Elected Commitment.

"Commitment Fee Rate" has the meaning set forth in the definition of "Applicable Margin".

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"Consolidated Net Income" means with respect to the Parent, the Consolidated Restricted Subsidiaries and the DevCos, for any period, the aggregate of the net income (or loss) of the Parent, the Consolidated Restricted Subsidiaries and the DevCos, without duplication, after allowances for taxes for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein) the following: (a) the net income of the Midstream MLP, its subsidiaries or any other Person in which the Parent, any Consolidated Restricted Subsidiaries or a DevCo has an interest (which interest, in the case of a Person other than the Midstream MLP and its subsidiaries, does not cause the net income of such other Person to be consolidated with the net income of the Parent, the Consolidated

11

Restricted Subsidiaries and the DevCos in accordance with GAAP), except to the extent of the amount of dividends or distributions actually paid in cash during such period by the Midstream MLP, its subsidiaries or such other Person to the Parent or any Consolidated Restricted Subsidiary; (b) the net income (but not loss) during such period of any Consolidated Restricted Subsidiaries or any DevCo to the extent that the declaration or payment of dividends or similar distributions or transfers or loans by that Consolidated Restricted Subsidiaries or DevCo is not at the time permitted by operation of the terms of its charter or any agreement, instrument or Governmental Requirement applicable to such Consolidated Restricted Subsidiary or is otherwise restricted or prohibited, in each case determined in accordance with GAAP; (c) the net income (or loss) of any Person acquired in a pooling-of-interests transaction for any period prior to the date of such transaction; (d) any extraordinary non-cash gains or losses during such period and (e) any gains or losses attributable to writeups or writedowns of assets, including ceiling test writedowns; *provided* that if the Parent or any Consolidated Restricted Subsidiary shall acquire or dispose of any Property resulting in the payment of consideration or receipt of gross proceeds, as applicable, in excess of $20,000,000 during such period, then Consolidated Net Income shall be calculated after giving *pro forma* effect to such acquisition or disposition, as if such acquisition or disposition had occurred on the first (1st) day of such period; *provided further* that the aggregate net income (or loss) attributable to each DevCo included in the determination of Consolidated Net Income for any period shall be limited to the lesser of (x) such DevCo's net income (or loss) for the applicable period multiplied by DevCo Ownership Percentage in such DevCo and (y) the actual amount of cash distributions made by such DevCo in the applicable period to the Parent and the Consolidated Restricted Subsidiaries.  For the avoidance of doubt, the aggregate net income (or loss) attributable to the Midstream MLP and its subsidiaries (other than any DevCo) shall be included in the determination of Consolidated Net Income for any period in an amount equal to the amount of cash distributions received by the Parent and the Consolidated Restricted Subsidiaries from the Midstream MLP or its subsidiaries (other than any DevCo) during such period.

"Consolidated Restricted Subsidiaries" means any Restricted Subsidiaries that are Consolidated Subsidiaries.

"Consolidated Subsidiaries" means each Subsidiary of the Parent (whether now existing or hereafter created or acquired), the financial statements of which shall be (or should have been) consolidated with the financial statements of the Parent in accordance with GAAP.  For the avoidance of doubt, in no event shall OP International or any of its subsidiaries, the Midstream MLP or any of its subsidiaries or any DevCo be a Consolidated Subsidiary for purposes of the Loan Documents.

"Consolidated Unrestricted Subsidiaries" means any Unrestricted Subsidiaries that are Consolidated Subsidiaries.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Covered Entity" means any of the following:

12

(i)      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)      a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R.§ 47.3(b); or

(iii)      a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R.§ 382.2(b).

"Covered Party" has the meaning assigned to it in Section 12.19.

"Convertible Notes" means any unsecured senior or unsecured senior subordinated Debt securities (whether registered or privately placed) convertible into Equity Interests of the Parent (other than Disqualified Capital Stock) incurred pursuant to a Convertible Notes Indenture.

"Convertible Notes Indenture" means any indenture among the Parent, as issuer, the subsidiary guarantors party thereto and the trustee named therein, pursuant to which the Convertibles Notes are issued, as the same may be amended or supplemented in accordance with Section 9.04(b).

"Credit Parties" means, collectively, the Borrower and each Guarantor, and "Credit Party" means any one of the foregoing.  For the avoidance of doubt, no DevCo shall be a Credit Party for purposes of the Loan Documents.

"Current Production" means the lesser of (a) the prior month's production of each of crude oil and natural gas, calculated separately, of the Borrower and its Restricted Subsidiaries and (b) the forecasted production, as reasonably determined by the Borrower, of each of crude oil and natural gas, calculated separately, of the Borrower and its Restricted Subsidiaries for each month for the period ending no sooner than the latest month for which volumes are hedged under Swap Agreements.

"Debt" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services, other than any such obligations that (i) are not greater than sixty (60) days past the date of invoice or delinquent or (ii) are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Debt is assumed by such Person; (g) all Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or

13

covenants of others to purchase the Debt or Property of others; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Person (other than firm transportation or storage, or drilling contracts); (k) any Debt of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment.  The Debt of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP.

"Debt Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit (including, for the avoidance of doubt, the Letters of Credit deemed issued in replacement of the Existing Letters of Credit) hereunder, and the grant of Liens by the Borrower on Mortgaged Properties and other Properties pursuant to the Security Instruments and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Indebtedness and the other obligations under the Guaranty and Security Agreement by such Guarantor and such Guarantor's grant of the security interests and provision of collateral under the Security Instruments, and the grant of Liens by such Guarantor on Mortgaged Properties and other Properties pursuant to the Security Instruments.

"Deemed Fundings" has the meaning assigned to such term in Section 6.01.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that  has failed, within three (3) Business Days of the date required to be funded or paid, to  fund any portion of its Loans,  fund any portion of its participations in Letters of Credit or Swingline Loans or  pay over to any Credit Party any other amount required to be paid by it hereunder;  has notified the Borrower or any other Credit Party in writing, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit;  has failed, within three (3) Business Days after request by the Administrative Agent, a Swingline Lender or a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations to fund prospective Loans and participations in then outstanding Letters of Credit and Swingline Loans under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent; or  has (or whose bank holding company has) been placed into receivership, conservatorship or bankruptcy or has become subject to a Bail-In Action; *provided* that (x) a Lender shall not become a Defaulting Lender solely as a result of the acquisition or maintenance of an ownership interest in such Lender or Person controlling such Lender or the exercise of control over a Lender or Person controlling such Lender

14

by a Governmental Authority or an instrumentality thereof and (y) the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or Person under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall not be deemed an event described in clause (d) hereof, so long as, in the case of each of clauses (x) and (y), such ownership interest or such appointment, as applicable, does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such governmental authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

["Designated Equity Holders" means (a) [_____] and (b) any of its Affiliates and funds or partnerships managed or advised by it or any of its Affiliates, but not including their respective portfolio companies.]

"DevCo" means Beartooth and Bobcat; provided that any such Person shall only constitute a DevCo so long as (a) the Parent and OP LLC directly or indirectly owns Equity Interests in such Person (other than any Equity Interests indirectly held by the Parent and OP LLC through the Midstream MLP and its subsidiaries) and (b) less than 100% of the Equity Interests in such Person are owned directly or indirectly by the Parent and OP LLC (excluding any Equity Interests held directly or indirectly by the Midstream MLP and its subsidiaries from the calculation of those owned by Parent or OP LLC).

"DevCo Ownership Percentage" at any time of determination, with respect to any DevCo, means the aggregate percentage of Equity Interests in such DevCo owned at such time by the Credit Parties (excluding, for the avoidance of doubt, any Equity Interests held indirectly by the Credit Parties through the Midstream MLP or its subsidiaries).

"DevCo Parent Undertaking" means either of the DevCo Parent Undertaking Agreements in respect of a DevCo, dated as of the date hereof, between OMS and the Administrative Agent, as the same may be amended, modified, supplemented or restated from time to time.

"DIP Loans" means the "Loans" under and as defined in the DIP Credit Agreement made by the DIP Lenders to the Borrower pursuant to the DIP Credit Agreement that are outstanding immediately prior to the Effective Date.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which Payment in Full has occurred.

"dollars" or "$" refers to lawful money of the United States of America.

15

"Domestic Subsidiary" means any Restricted Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"Drop Down Disposition" means any disposition by (a) OMS of any Equity Interests in any DevCo owned by OMS to OMP or its subsidiaries or (b) the Credit Parties of any Midstream Properties to OMP and its subsidiaries or to any DevCo.

"Early Opt-in Election" means the occurrence of:

(a)    (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined that dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 3.03(c) are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBO Rate, and

(b)    (i) the election by the Administrative Agent or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Borrower and the Lenders or by the Required Lenders of written notice of such election to the Administrative Agent.

"EBITDAX" means, for any period, the sum of Consolidated Net Income for such period plus the following expenses or charges to the extent deducted from Consolidated Net Income in such period: (i) interest, (ii) income taxes, (iii) depreciation, depletion, amortization or exploration expenses and other similar noncash charges, (iv) any fees, expenses and other transaction costs (whether or not such transactions were consummated) which are incurred through December 31, 2020 in connection with the implementation of fresh start accounting, the Transactions, the transactions contemplated thereby and any other reorganization items and restructuring costs; *provided* that, to the extent such fiscal quarters are included in such period of calculation, the aggregate amount added back to EBITDAX pursuant to this clause (iv) shall not exceed (a) $9,000,000 for the fiscal quarter ending June 30, 2020, (b) $50,000,000 for the fiscal quarter ending September 30, 2020 and (c) $31,000,000 for the fiscal quarter ending December 31, 2020 in the aggregate and (v) any fees, expenses and other transaction costs incurred in connection with any Investments, acquisitions, incurrences of Debt or sales or dispositions (in each case, whether or not consummated) permitted under this Agreement, minus all noncash income added to Consolidated Net Income. Notwithstanding any other provisions of this Agreement to the contrary contained herein, for purposes of the Leverage Ratio tested pursuant to Section 6.01(r) on the Effective Date, EBITDAX shall be calculated as EBITDAX (as calculated above) for the fiscal quarter ending [September 30, 2020] multiplied by a factor of four (4).

"EEA Financial Institution" means  any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority,  any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or  any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

16

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Effective Date Availability Amount" has the meaning assigned to such term in Section 3.05(e).

"Effective Date Minimum Hedge Volumes" means two-thirds of the Minimum Hedge Volumes.

"Elected Commitment" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Elected Commitment", as the same may be increased, reduced or terminated from time to time in connection with an optional increase, reduction or termination of the Aggregate Elected Commitment Amounts pursuant to Section 2.06(c).

"Elected Commitment Increase Certificate" has the meaning assigned to such term in Section 2.06(c)(ii)(F).

"Engineering Reports" has the meaning assigned such term in Section 2.07(c)(i).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to occupational health and worker safety (to the extent relating to exposure to Hazardous Materials), the protection of the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Materials, in effect in any and all jurisdictions in which the Parent, the Borrower or any Subsidiary is conducting or at any time has conducted business, or where any Property of the Borrower or any Subsidiary is located, including without limitation, the Oil Pollution Act of 1990 ("OPA"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended (to the extent relating to exposure to Hazardous Materials), the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other analogous state or local environmental conservation or protection Governmental Requirements.

"Environmental Permit" means any permit, registration, license, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership

17

US 7429795v.11

interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b) or (c) of section 414 of the Code, or solely with respect to Section 412 of the Code or Section 302 of ERISA, subsections (m) or (o) of section 414 of the Code.

"ERISA Event" means: (a) any "reportable event," as defined in section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure of a Plan to meet the minimum funding standards under section 412 of the Code or section 302 of ERISA (determined without regard to any waiver of the funding provisions therein or in section 430 of the Code or section 303 of ERISA); (c) the filing pursuant to section 412 of the Code or section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the failure of a Plan to satisfy the requirements of section 401(a)(29) of the Code, section 436 of the Code or section 206(g) of ERISA; (e) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan (including any liability in connection with the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under section 4041 of ERISA); (f) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan or the occurrence of any other event or condition which might constitute grounds under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (g) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability under section 4062(e) of ERISA or with respect to the withdrawal or partial withdrawal from any Plan (including as a "substantial employer," as defined in section 4001(a)(2) of ERISA) or Multiemployer Plan (including the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any Withdrawal Liability); (h) the occurrence of an act or omission which could give rise to the imposition on the Borrower, a Subsidiary or any ERISA Affiliate of fines, penalties, taxes or related charges or liabilities under Chapter 43 of the Code or under section 409, section 502, or section 4071 of ERISA in respect of any employee benefit plan (within the meaning of section 3(3) of ERISA); or (i) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate of any notice concerning the imposition of a Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, in endangered or critical status, within the meaning of section 305 of ERISA, or insolvent, within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

18

US 7429795v.11

"Event of Default" has the meaning assigned such term in Section 10.01.

"Excepted Liens" means: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens arising by operation of law in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent for more than 30 days or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties (or in the case of the DevCos, of the Midstream Properties) each of which is in respect of obligations that are not delinquent for more than 30 days or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business (or in the case of the DevCos, usual and customary in the midstream business) and are for claims which are not delinquent for more than 30 days or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, *provided* that any such Lien referred to in this clause does not materially impair the use of any material Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Restricted Subsidiary or any DevCo or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies or customary deposit account terms and burdening only deposit accounts or other funds maintained with a creditor depository institution, *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Parent or any of its Restricted Subsidiaries or any DevCo to provide collateral to the depository institution; (f) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Parent or any Restricted Subsidiary or any DevCo for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, that do not secure any monetary obligations and which in the aggregate do not materially impair the use of any material Property for the purposes of which such Property is held by the Parent or any Restricted Subsidiary or materially impair the value of any material Property subject thereto; (g) leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Parent or any Restricted Subsidiary, taken as a whole; (h) Liens arising from precautionary UCC financing statement or similar filings; (i) Liens on cash or securities pledged to secure (or to secure

19

the bonds, letters of credit or similar instruments securing) performance of tenders, surety, stay, customs and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, plugging and abandonment or decommissioning obligations, regulatory obligations and other obligations of a like nature, including those incurred to secure health, safety and environmental obligations, incurred in the ordinary course of business and (j) judgment and attachment Liens not giving rise to an Event of Default; *provided* that any appropriate legal proceedings which may have been duly initiated for the review of any such judgment that, individually or in the aggregate, exceeds the materiality threshold applicable thereto set forth in Section 10.01(k), shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; *provided, further* that (i) Liens described in clauses (a) through (d) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens and (ii) the term "Excepted Liens" shall not include any Lien securing Debt for borrowed money other than the Indebtedness and, with respect to the DevCos, the OMP Credit Facility.

"Excess Cash" has the meaning assigned to it in Section 3.04(e).

"Excluded Lender" means, any Person that is an Industry Competitor, a Credit Party, any Credit Party's Affiliate or Subsidiary, a Defaulting Lender or a natural person (including a holding company, investment vehicle or trust for, owned and operated for the primary benefit of, a natural person).

"Existing Letter of Credit" means the letters of credit described on Schedule 2.08 hereto and issued and outstanding under the DIP Credit Agreement immediately prior to the Effective Date.

"Excluded Subsidiary" means (a) any Foreign Subsidiary, (b) any CFC, (c) any FSHCO and (d) any Subsidiary that is a direct or indirect subsidiary of any CFC or FSHCO.

"Excluded Swap Obligation" means, with respect to any Credit Party individually determined on a Credit Party by Credit Party basis, any Indebtedness in respect of any Swap Agreement if, and solely to the extent that, all or a portion of the guarantee of such Person of, or the grant by such Person of a security interest to secure, such Indebtedness in respect of any Swap Agreement (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Person's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guarantee or grant of a security interest becomes effective with respect to such related Indebtedness in respect of any Swap Agreement.  If any Indebtedness in respect of any Swap Agreement arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Indebtedness in respect of any Swap Agreement that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation

20

of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income (however denominated), franchise Taxes, and branch profits Taxes (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, any U.S. federal withholding tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement or designates a new lending office, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding tax pursuant to Section 5.03(a) or Section 5.03(c), (c) any withholding tax that is attributable to the Administrative Agent's or any Lender's failure to comply with Section 5.03(f), and (d) any withholding taxes imposed by FATCA.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of the foregoing.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the rate per annum equal to the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; *provided* that in no event shall the Federal Funds Effective Rate be less than 0%.

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"FERC" means the Federal Energy Regulatory Commission or any of its successors.

"Final Availability Block Period" means the period from and including the date of the Post-Closing Deadline until the earliest to occur of (a) the expiration of the Hedge Cure Period and the resulting reduction of the Borrowing Base to the extent required by Section 8.24(a), (b) the Credit Parties' entry into Minimum Hedge Volumes that satisfy the Target Hedge Pricing Requirements or (c) the waiver of the application of the Availability Block and any corresponding reduction of the Borrowing Base pursuant to Section 8.24(a) by the Required Lenders.

"Financial Officer" means, for any Person, any vice president, the chief financial officer, principal accounting officer, treasurer or controller of such Person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

21

US 7429795v.11

"Financial Statements" means the financial statement or statements of the Parent and its Consolidated Subsidiaries referred to in Section 7.04(a).

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"Free Cash Flow" means, without duplication, for the period commencing on the Effective Date and ending on the last day of the most recent Test Period as of the date of any calculation herein, the cumulative sum of EBITDAX for such period *less* for such period, (i) Interest Expense, *less* (ii) Capital Expenditures, *less* (iii) taxes paid in cash by the Parent and its Consolidated Restricted Subsidiaries, *less* (iv) Investments made in cash by the Parent and its Consolidated Restricted Subsidiaries; *less* (v) mandatory cash principal payments by the Parent and its Consolidated Restricted Subsidiaries in respect of Debt (x) of the type described in clause (a), (b), (d), (e), (l) or (m) of the definition thereof or (y) of the type described in clauses (f), (g) or (k) of the definition thereof to the extent in respect of Debt of the type described in clause (x).

"FSHCO" means any domestic subsidiary, substantially all the assets of which consist of equity interests, or debt and equity interests, in CFCs.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.05.

"Gathering System" means the Midstream Properties of the Credit Parties and the DevCos, as applicable, comprised of any pipeline or gathering system owned or leased from time to time by any Credit Party or DevCo that is used in the business of such Credit Party or DevCo.

"General Partner" means OMP GP LLC, a Delaware limited liability company.

"General Partner LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of the General Partner, dated as of May 22, 2017, and as such agreement may be amended, amended and restated, supplemented or otherwise modified in compliance with Section 9.21.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Parent, the Borrower, any Subsidiary, any of their Properties, any Agent, the Issuing Bank or any Lender.

22

US 7429795v.11

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rule of common law, authorization or other directive or requirement, whether now or hereinafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantors" means:

   (a)   the Parent;

   (b)   OP LLC;

   (c)   OMS;

   (d)   Oasis Petroleum Marketing LLC, a Delaware limited liability company;

   (e)   Oasis Well Services LLC, a Delaware limited liability company;

   (f)   OMS Holdings LLC, a Delaware limited liability company;

   (g)   Oasis Petroleum Permian LLC, a Delaware limited liability company;

   (h)   the General Partner; and

   (i)   each other Person that guarantees the Indebtedness pursuant to Section 8.14(b);

*provided that*, for the avoidance of doubt, no DevCo shall be a Guarantor for purposes of the Loan Documents.

"Guaranty and Security Agreement" means the Guaranty and Security Agreement executed by the Credit Parties in substantially the form of Exhibit E-2 pursuant to which the Credit Parties (a) unconditionally guaranty on a joint and several basis, payment of the Indebtedness, and (b) grant Liens and a security interest on the Credit Parties' personal property constituting "collateral" as defined therein in favor of the Administrative Agent for the benefit of the Secured Parties to secure the Indebtedness, as the same may be amended, modified or supplemented from time to time.

"Hazardous Material" means any substance regulated or as to which liability might arise under any applicable Environmental Law due to its hazardous, toxic, dangerous or deleterious properties or characteristics including, without limitation:  (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; and (c) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical wastes. "Hedge Cure Period" has the meaning assigned to such term in Section 8.24(a).

23

US 7429795v.11

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Notes or on other Indebtedness under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests therein or thereto, of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Indebtedness" means, without duplication, any and all amounts and obligations of every nature owing or to be owing by the Parent, any Subsidiary or any Guarantor (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising): (a) to the Administrative Agent, the Issuing Bank or any Lender under any Loan Document; (b) to any Secured Swap Party under any Secured Swap Agreement; (c) to any Bank Products Provider in respect of Bank Products; and (d) all renewals, extensions and/or rearrangements of any of the above; *provided* that solely with respect to any Guarantor that is not an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder, Excluded Swap Obligations of such Guarantor shall in any event be excluded from "Indebtedness" owing by such Guarantor.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower or any Guarantor under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Industry Competitor" means any Person (other than Borrower, any Guarantor or any of their Affiliates or Subsidiaries) that is (or one or more of whose Affiliates are) actively engaged as one of its principal businesses in lease acquisitions, exploration and production operations or development of oil and gas properties (including the drilling and completion of producing wells).

"Initial Availability Block Period" means the period from and including the Effective Date until the earliest to occur of (a) the Credit Parties' entry into Effective Date Minimum Hedge Volumes that satisfy the Target Hedge Pricing Requirements, (b) the Post-Closing Deadline and the commencement of the Final Availability Block Period or (c) the waiver or removal of the application of the Availability Block during such period by the Required Lenders.

"Initial Measurement Period" has the meaning assigned to such term in the definition of Availability Block.

24

US 7429795v.11

"Initial Reserve Report" means the report of the chief engineer of the Borrower with respect to certain Oil and Gas Properties of the Borrower and its Restricted Subsidiaries as of July 1, 2020.[3]

"Intercreditor Agreement" means (a) the Amended and Restated Intercreditor Agreement dated as of November 7, 2017 among the DevCos, OMS, the Administrative Agent, and Wells Fargo (or any successor administrative agent), as administrative agent under the OMP Credit Facility, and (b) if the OMP Credit Facility is refinanced or replaced in accordance with the terms of the Intercreditor Agreement, any successor intercreditor agreement entered into in connection therewith, in each case as the same may be amended, modified, supplemented or restated from time to time.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Expense" means, for any period, the sum (determined without duplication) of the aggregate gross interest expense of the Parent and the Consolidated Restricted Subsidiaries for such period, (1) including (a) interest expense under GAAP, (b) capitalized interest, and (c) the portion of any payments or accruals under Capital Leases allocable to interest expense, plus the portion of any payments or accruals under Synthetic Leases allocable to interest expense whether or not the same constitutes interest expense under GAAP, but (2) excluding the amortization of debt discount and fees and expenses related to the issuance of Debt, Capital Leases, Synthetic Leases, the Senior Notes or the Indebtedness.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first (1st) day of such Interest Period and (c) with respect to a Swingline Loan, the day that such Loan is required to be repaid pursuant to Section 2.09.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, nine or twelve months) thereafter, as the Borrower may elect; *provided*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the

---

[3] NTD: If the Effective Date has not occurred by March 1, 2021, this definition will be revised to be defined as the report of an Approved Petroleum Engineer with respect to certain Oil and Gas Properties of the Borrower and its Restricted Subsidiaries as of January 1, 2021.

25

date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Redetermination" has the meaning assigned such term in Section 2.07(b).

"Interim Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.07(d).

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, the assumption of Debt of, the purchase or other acquisition of any other Debt of or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory, material, equipment or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Debt of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person; provided that in no event shall any Permitted Bond Hedge Transactions or any Permitted Warrant Transaction be considered an "Investment" for the purpose of this Agreement.

"Issuing Bank" means Wells Fargo, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Commitment" at any time means $100,000,000.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption, and any Person that shall have become a party hereto as an Additional Lender pursuant to Section 2.06(c). Unless the context otherwise requires, the term "Lenders" includes the Swingline Lender.

26

US 7429795v.11

"Letter of Credit" means any letter of credit issued (or deemed issued in replacement of the Existing Letters of Credit) pursuant to this Agreement.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"Leverage Ratio" shall have the meaning set forth in Section 9.01(b).

"LIBO Rate" means, subject to the implementation of a Benchmark Replacement in accordance with Section 3.03(c), (a) for any interest rate calculation with respect to a Eurodollar Borrowing, the rate of interest per annum determined on the basis of the rate for deposits in dollars for a period equal to the applicable Interest Period as published by the ICE Benchmark Administration Limited, a United Kingdom company, or a comparable or successor quoting service approved by the Administrative Agent, at approximately 11:00 a.m. (London time) two (2) London Banking Days prior to the first day of the applicable Interest Period. If, for any reason, such rate is not so published then the "LIBO Rate" shall be determined by the Administrative Agent to be the arithmetic average of the rate per annum at which deposits in dollars would be offered by first class banks in the London interbank market to the Administrative Agent at approximately 11:00 a.m. (London time) two (2) London Banking Days prior to the first (1st) day of the applicable Interest Period for a period equal to such Interest Period, and (b) for any interest rate calculation with respect to a ABR Borrowing, the rate of interest per annum determined on the basis of the rate for deposits in dollars for an Interest Period equal to one month (commencing on the date of determination of such interest rate) as published by ICE Benchmark Administration Limited, a United Kingdom company, or a comparable or successor quoting service approved by the Administrative Agent, at approximately 11:00 a.m. (London time) on such date of determination, or, if such date is not a Business Day, then the immediately preceding Business Day. If, for any reason, such rate is not so published then the "LIBO Rate" for such ABR Borrowing shall be determined by the Administrative Agent to be the arithmetic average of the rate per annum at which deposits in dollars would be offered by first class banks in the London interbank market to the Administrative Agent at approximately 11:00 a.m. (London time) on such date of determination for a period equal to one month commencing on such date of determination. Each calculation by the Administrative Agent of the LIBO Rate shall be conclusive and binding for all purposes, absent manifest error. Notwithstanding the foregoing, (x) in no event shall the LIBO Rate (including any Benchmark Replacement with respect thereto) be less than 1.00% and (y) unless otherwise specified in any amendment to this Agreement entered into in accordance with Section 3.03(c), in the event that a Benchmark Replacement with respect to the LIBO Rate is implemented then all references herein to the LIBO Rate shall be deemed references to such Benchmark Replacement.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties. The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions

27

US 7429795v.11

or reservations.  For the purposes of this Agreement, the Parent, OP LLC, the Borrower, the Subsidiaries and the DevCos shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidate" means, with respect to any Swap Agreement, the sale, assignment, novation, unwind or termination of all or any part of such Swap Agreement; *provided* that for purposes of this definition, a Swap Agreement shall not be deemed to have been Liquidated if, (a) such Swap Agreement is novated from the existing counterparty to an Approved Counterparty, with the Borrower or another Credit Party being the "remaining party" for purposes of such novation, or (b) upon its termination, it is replaced, in a substantially contemporaneous transaction, with one or more Swap Agreements with approximately the same mark-to-market value and without cash payments to the Borrower or any other Credit Party in connection therewith. The terms "Liquidated" and "Liquidation" have correlative meanings thereto.

"Loan Documents" means this Agreement, the Intercreditor Agreement, the Notes, the Letter of Credit Agreements, the Letters of Credit, the Security Instruments and each DevCo Parent Undertaking.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement. Unless the context otherwise requires, the term "Loans" includes the Swingline Loans.

"London Banking Day" means any day on which dealings in dollar deposits are conducted by and between banks in the London interbank Eurodollar market.

"Majority Lenders" means, at any time while no Loans or LC Exposure is outstanding, Lenders having more than fifty percent (50%) of the Aggregate Maximum Credit Amounts; and at any time while any Loans or LC Exposure is outstanding, Lenders holding more than fifty percent (50%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)); *provided* that the Maximum Credit Amounts and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of Majority Lenders.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property or condition (financial or otherwise) of the Credit Parties, taken as a whole, (b) the ability of the Credit Parties to perform any of their obligations under any Loan Document, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Administrative Agent, any other Agent, the Issuing Bank or any Lender under any Loan Document.

"Material Indebtedness" means Debt (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos in an aggregate principal amount exceeding $25,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any

28

DevCo in respect of any Swap Agreement at any time shall be the Swap Termination Value owed by the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos, as applicable.

"Material Subsidiary" means, as of any date, any Subsidiary (a) that is both a Restricted Subsidiary and a Domestic Subsidiary and (b) that either (i) owns any Oil and Gas Property evaluated in the most recently delivered Reserve Report or (ii) together with its subsidiaries, owns Property having a fair market value of $5,000,000 or more; *provided* that if the aggregate fair market value of all Property of all Subsidiaries that are both Restricted Subsidiaries and Domestic Subsidiaries that are not Guarantors exceeds $10,000,000, then the Borrower shall promptly designate Subsidiaries that are both Restricted Subsidiaries and Domestic Subsidiaries that are not then Guarantors as Material Subsidiaries (and cause such designated Material Subsidiaries to comply with Section 8.14(b)) to the extent necessary so that the aggregate fair market value of all Property owned by Subsidiaries that are both Restricted Subsidiaries and Domestic Subsidiaries that are not then Guarantors is less than $10,000,000.

"Maturity Date" means [_____], 2024.[4]

"Maximum Credit Amount" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts", as the same may be reduced or terminated from time to time in connection with a reduction or termination of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), modified from time to time pursuant to Section 2.06(c) or modified from time to time pursuant to any assignment permitted by Section 12.04(b).

"Midstream MLP" means Oasis Midstream Partners, LP, a Delaware limited partnership.

"Midstream MLP Partnership Agreement" means that certain Amended and Restated Agreement of Limited Partnership of the Midstream MLP dated as of September 25, 2017, as the same may be amended, restated or otherwise modified from time to time to the extent permitted under this Agreement.

"Midstream Properties" means all tangible property used in (a) gathering, compressing, treating, processing and transporting natural gas, crude, condensate and natural gas liquids; (b) fractionating and transporting natural gas, crude, condensate and natural gas liquids; (c) marketing natural gas, crude, condensate and natural gas liquids; and (d) water distribution, supply, treatment and disposal services thereof, including, Gathering Systems, Processing Plants, storage facilities, surface leases, Rights of Way and servitudes related to each of the foregoing. Unless otherwise specified herein, "Midstream Properties" shall be deemed to refer to such properties owned or leased by the Credit Parties, any Unrestricted Subsidiary or the DevCos, as applicable.  Notwithstanding the foregoing, in no event shall any interest in, or any interest or right derived from, any oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests or production payment interests be deemed to be Midstream Properties for purposes of the Loan Documents.

---

[4] NTD: The date that is 3.5 years after the Effective Date.

US 7429795v.11

"Minimum Hedge Volumes" means hedges covering minimum hedge volumes of (a) 10,303 Mbbl for the Initial Measurement Period, (b) 6,761 Mbbl for the Second Measurement Period and (c) 4,945 Mbbl for the Third Measurement Period.

"Mbbl" means one thousand bbl.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means any Property owned by the Borrower or any Guarantor which is subject to the Liens existing and to exist under the terms of the Security Instruments.

"Multiemployer Plan" means a multiemployer plan as defined in section 3(37) or 4001(a)(3) of ERISA that is subject to Title IV of ERISA, section 412, 431 or 432 of the Code or section 302, 304 or 305 of ERISA and to which the Borrower, a Subsidiary or any ERISA Affiliate is making or accruing an obligation to make contributions.

"New Borrowing Base Notice" has the meaning assigned such term in Section 2.07(d).

"Non-Consenting Lender" means any Lender that does not approve (a) any amendment, waiver or consent of or under any Loan Document that requires the approval of all Lenders or all affected Lenders in accordance with Section 12.02 (other than any Proposed Borrowing Base that would increase the then-current Borrowing Base) and has been approved by the Required Lenders or (b) any Proposed Borrowing Base that would increase the then-current Borrowing Base that has been approved by (i) if there are less than three Lenders at such time, all Lenders (other than any Defaulting Lender), and (ii) if there are three or more Lenders at such time (A) at any time while no Loans or LC Exposure is outstanding, Lenders having at least eighty percent (80%) of the Aggregate Maximum Credit Amounts and (B) at any time while any Loans or LC Exposure is outstanding, Lenders holding at eighty percent (80%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Notes" means the promissory notes of the Borrower described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products,

30

revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"OMP" means OMP Operating LLC, a Delaware limited liability company.

"OMP Credit Facility" means any senior secured credit facility pursuant to that certain Credit Agreement dated September 25, 2017, among OMP, as borrower, the other credit parties thereto, Wells Fargo, as administrative agent and the lenders party thereto, as such agreement may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"OMS" means Oasis Midstream Services LLC, a Delaware limited liability company.

"OP International" means Oasis Petroleum International LLC, a Delaware limited liability company.

"Other Connection Taxes" means, with respect to the Administrative Agent or any Lender, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or Property taxes, charges or similar levies arising from any payment made hereunder, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement and any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 5.04(b)).

"Participant" has the meaning set forth in Section 12.04(c)(i).

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

31

US 7429795v.11

"Payment in Full" means that the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents have been paid in full (other than with respect to contingent obligations for which no claim has been made) and all Letters of Credit have expired or terminated (other than those that have been cash collateralized in an amount in cash equal to 102.5% of the LC Exposure, or with respect to which other arrangements have been made on terms reasonably satisfactory to the Issuing Bank) and all LC Disbursements shall have been reimbursed.

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"Permitted Bond Hedge Transaction(s) means the bond hedge or capped call options purchased by the Parent or any other Credit Party from the Call Spread Counterparties to hedge the Parent's payment and/or delivery obligations due upon conversion of the Convertible Notes.

"Permitted OMP Credit Facility Liens" means Liens on Midstream Properties owned by any DevCo that are in favor of Wells Fargo (or any successor administrative agent), as administrative agent under the OMP Credit Facility to secure the obligations and indebtedness under such OMP Credit Facility and which Liens are subject to the Intercreditor Agreement.

"Permitted Refinancing Debt" means Senior Notes issued or incurred by the Parent or any other Credit Party, and Debt constituting guarantees thereof by other Credit Parties, incurred or issued in exchange for, or the net proceeds of which are used to extend, refinance, repay, renew, replace (whether or not contemporaneously), defease, discharge, refund or otherwise Redeem outstanding Senior Notes, in whole or in part from time to time; provided that the principal amount of such Permitted Refinancing Debt (or if such Permitted Refinancing Debt is issued at a discount, the initial issuance price of such Permitted Refinancing Debt) does not exceed the then outstanding principal amount of the Senior Notes so exchanged for, extended, refinanced, repaid, renewed, replaced, defeased, discharged, refunded or otherwise Redeemed (plus the amount of any premiums and accrued interest paid and fees and expenses incurred in connection therewith).

"Permitted Warrant Transaction(s)" means one or more net share or cash settled warrants sold by the Parent to the Call Spread Counterparties, concurrently with the purchase by the Parent or any other Credit Party of the Permitted Bond Hedge Transactions, to offset the cost to the Parent of the Permitted Bond Hedge Transactions.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 412 or 430 of the Code or section 302 of ERISA (other than a Multiemployer Plan) and which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate and to which the Borrower or a Subsidiary has any liability, including on account of an ERISA Affiliate.

"Post-Closing Deadline" means the date that is thirty (30) days after the Effective Date.

32

US 7429795v.11

"Post-Closing Minimum Hedge Volumes" means one-third of the Minimum Hedge Volumes.

"Pre-Petition Loans" means the "Loans" under and as defined in the Pre-Petition Credit Agreement made by the Pre-Petition Lenders to the Borrower pursuant to the Pre-Petition Credit Agreement that are outstanding immediately prior to the Effective Date.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Wells Fargo, as its prime rate in effect at its principal office in San Francisco; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.  Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Processing Plants" means the Midstream Properties of the Credit Parties or DevCos, as applicable, comprised of any processing plants owned or leased from time to time by any Credit Party or DevCo that are used in the business of such Credit Party or DevCo.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Borrowing Base" has the meaning assigned to such term in Section 2.07(c)(i).

"Proposed Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(c)(ii).

"Proved Reserves" means collectively, "proved oil and gas reserves," "proved developed producing oil and gas reserves," "proved developed non-producing oil and gas reserves" (consisting of proved developed shut-in oil and gas reserves and proved developed behind pipe oil and gas reserves), and "proved undeveloped oil and gas reserves," as such terms are defined by the SPE in its standards and guidelines.

"Purchase Money Debt" means Debt of the Credit Parties incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including equipment or motor vehicles, and any Debt assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Debt; *provided* that (i) in each case the acquired assets are reasonably related to the businesses of the Credit Parties engaged in on the Effective Date and (ii) such Debt is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 12.19.

"Qualified ECP Guarantor" means, in respect of any Swap Agreement, each Credit Party that (a) has total assets exceeding $10,000,000 at the time any guaranty of obligations under such Swap Agreement becomes effective or (b) otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt.  "Redeem" has the correlative meaning thereto.

"Redetermination Date" means, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.07(d).

"Reduction Date" has the meaning assigned such term in Section 2.07(e).

"Refined Products" means gasoline, diesel fuel, jet fuel, asphalt and asphalt products, and other refined products of crude oil.

"Register" has the meaning assigned such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Release" means any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing into the environment.

"Relevant Governmental Body" means the Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Remedial Work" has the meaning assigned such term in Section 8.10(a).

"Required First Year Target Hedge Pricing" has the meaning assigned to such term in the definition of Target Hedge Pricing Requirements.

"Required Lenders" means, at any time while no Loans or LC Exposure is outstanding, Lenders having at least sixty-six and two-thirds percent (66⅔%) of the Aggregate Maximum Credit Amounts; and at any time while any Loans or LC Exposure is outstanding, Lenders holding

34

at least sixty-six and two-thirds percent (66⅔%) of the outstanding aggregate principal amount of the Loans and participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under <u>Section 12.04(c)</u>); *provided* that the Maximum Credit Amounts and the principal amount of the Loans and participation interests in Letters of Credit of the Defaulting Lenders (if any) shall be excluded from the determination of Required Lenders.

"<u>Required Second Year Target Hedge Pricing</u>" has the meaning assigned to such term in the definition of Target Hedge Pricing Requirements.

"<u>Required Third Year Target Hedge Pricing</u>" has the meaning assigned to such term in the definition of Target Hedge Pricing Requirements.

"<u>Reserve Report</u>" means a report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each January 1st or July 1st (or such other date in the event of an Interim Redetermination) the oil and gas reserves located in the United States attributable to the Oil and Gas Properties of the Credit Parties, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the economic assumptions consistent with the Administrative Agent's lending requirements at the time.

"<u>Resolution Authority</u>" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Responsible Officer</u>" means, as to any Person, the Chief Executive Officer, the President, any Financial Officer or any Vice President of such Person.  Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"<u>Restricted Parties</u>" means the Parent and its Restricted Subsidiaries, and "<u>Restricted Party</u>" means any one of the foregoing.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other Property and including any transfer of cash, securities or other Property by division of any Person) with respect to any Equity Interests in the Borrower or any of its Restricted Subsidiaries or any DevCo, or any payment (whether in cash, securities or other Property and including any transfer of cash, securities or other Property by division of any Person), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower or any of its Restricted Subsidiaries or any DevCo or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any of its Restricted Subsidiaries or any DevCo.

"<u>Restricted Subsidiary</u>" means any Subsidiary of the Parent that is not an Unrestricted Subsidiary.

"<u>Revolving Credit Exposure</u>" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans plus such Lender's LC Exposure at such time (including, for the avoidance of doubt, the LC Exposure with respect to any Letters of Credit that are deemed issued in replacement of the Existing Letters of Credit, including any such Existing Letters of Credit that are returned or amended pursuant to <u>Section 6.01(o)</u> and <u>Section 8.24(b)</u>;

35

provided that the Revolving Credit Exposure shall be adjusted as necessary to reflect the return or amendment of such Existing Letters of Credit) plus such Lender's Swingline Exposure at such time.

"S&P" means S&P Global Ratings and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (including, as of the Effective Date, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, any Person operating, organized or resident in a Sanctioned Country or any Person owned or controlled by any such Person or Persons described in the foregoing clause (a) or clause (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Scheduled Redetermination" has the meaning assigned such term in Section 2.07(b).

"Scheduled Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.07(d).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Second Measurement Period" has the meaning assigned to such term in the definition of Availability Block.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, the Bank Products Providers and the Secured Swap Parties, and "Secured Party" means any of them individually.

"Secured Swap Agreements" means any Swap Agreement between the Parent, OP LLC, the Borrower or any other Credit Party and any Person entered into prior to the time, or during the time, that such Person or its Affiliate is a Lender (including any Swap Agreement between such Person in existence prior to the date hereof), even if such Person subsequently ceases to be a Lender (or an Affiliate thereof) for any reason (any such Person, a "Secured Swap Party").

"Secured Swap Indebtedness" means Indebtedness of the type referred to in clause (b) of the definition of Indebtedness.

US 7429795v.11

"Secured Swap Party" has the meaning assigned to such term in the definition of Secured Swap Agreement.

"Security Instruments" means the Guaranty and Security Agreement, the Intercreditor Agreement, mortgages, deeds of trust, and other agreements, instruments or certificates described or referred to in Exhibit E-1, and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Parent, OP LLC, the Borrower, any other Guarantor or any other Person (other than Secured Swap Agreements or participation or similar agreements between any Lender and any other lender or creditor with respect to any Indebtedness pursuant to this Agreement) as security for the payment or performance of the Indebtedness, the Notes, this Agreement, or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Senior Notes" means any unsecured senior or unsecured senior subordinated Debt securities (whether registered or privately placed) issued pursuant to a Senior Notes Indenture including, for the avoidance of doubt, any Convertible Notes.

"Senior Notes Indenture" means any indenture among any Credit Party, as issuer, the subsidiary guarantors party thereto and the trustee named therein, pursuant to which the Senior Notes are issued, as the same may be amended or supplemented in accordance with Section 9.04(b), including, for the avoidance of doubt, any Convertible Note Indenture.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"Solvent" means, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets (after giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement) of such Person and its Restricted Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their Debt, (b) the present fair saleable value of the property of such Person and its Restricted Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their Debt, as such Debt becomes absolute and matured, (c) such Person and its Restricted Subsidiaries, on a consolidated basis, are able to pay their Debt, as such Debt becomes absolute and matured (after taking into account the timing and amounts of cash to be received by such Person and its Restricted Subsidiaries and the amounts to be payable on or in respect of its liabilities, and giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement) and (d) such Person and its Restricted Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital. The amount of any contingent Debt at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"SPE" means the Society of Petroleum Engineers.

37

"Statutory Reserve Rate" means, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, manager or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Parent and/or one or more of its Subsidiaries and (b) any partnership of which the Parent or any of its Subsidiaries is a general partner.  Unless otherwise indicated herein, each reference to the term "Subsidiary" shall mean a Subsidiary of the Parent; *provided*, that none of OP International and its subsidiaries, Midstream MLP and its subsidiaries or any DevCo shall be considered a "Subsidiary" of the Parent, OP LLC or the Borrower for purposes of the Loan Documents.

"Supported QFC" has the meaning assigned to it in Section 12.19.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions (including any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act); *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or its Subsidiaries shall be a Swap Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements,  for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and  for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Swingline Borrowing" means a borrowing of a Swingline Loan pursuant to Section 2.09.

38

"Swingline Exposure" means, at any time, the aggregate principal amount of all Swingline Loans outstanding at such time.  The Swingline Exposure of any Lender at any time shall be its Applicable Percentage of the total Swingline Exposure at such time.

"Swingline Lender" means Wells Fargo, in its capacity as a lender of Swingline Loans hereunder.

"Swingline Loan" has the meaning assigned to such term in Section 2.09.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Target Hedge Pricing Requirements" means, with respect to the Minimum Hedge Volumes, hedges covering volumes with an average price per bbl of not less than (a) $43.04/bbl for the Initial Measurement Period (the "Required First Year Target Hedge Pricing"), (b) $43.94/bbl for the Second Measurement Period (the "Required Second Year Target Hedge Pricing") and (c) $44.79/bbl for the Third Measurement Period (the "Required Third Year Target Hedge Pricing").

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Commitments.

"Term SOFR" means the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Test Period" shall mean, for any date of determination under this Agreement of (x) the Leverage Ratio or Free Cash Flow, the four (4) consecutive fiscal quarters of the Borrower then most recently ended for which financial statements are then required to have been delivered pursuant to Section 8.01(a) or (b) or (y) the Current Ratio, the fiscal quarter of the Borrower then most recently ended for which financial statements are then required to have been delivered pursuant to Section 8.01(a) or (b).

"Third Measurement Period" has the meaning assigned to such term in the definition of Availability Block.

"Total Commitments Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the total Commitments of the Lenders in effect on such day.

US 7429795v.11

"Total Net Debt" means, at any date, (a) all Debt (i) of the type described in clause (a), (b) (to the extent such amounts have been funded and not reimbursed), (c), (d), (e), (l) or (m) of the definition thereof or (ii) of the type described in clauses (f), (g) or (k) to the extent in respect of Debt of the type described in clause (i), in each case of the definition thereof, of the Parent and the Consolidated Restricted Subsidiaries on a consolidated basis, excluding (a) non-cash obligations under ASC 815 minus (b) the aggregate cash and cash equivalents of the Parent and the Consolidated Restricted Subsidiaries up to an amount not to exceed $50,000,000 in the aggregate, in each case, free and clear of all Liens other than Liens permitted under Section 9.03, included in the cash and cash equivalents accounts listed on the consolidated balance sheet of the Parent and the Consolidated Restricted Subsidiaries at such date.

"Transactions" means the Debt Transactions, the Chapter 11 Cases and the transactions described in the Prepackaged Plan occurring on or about the Effective Date.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"Unrestricted Subsidiary" means any Subsidiary of the Parent designated as such on Schedule 7.14 as of the Effective Date or which the Borrower has designated in writing to the Administrative Agent to be an Unrestricted Subsidiary pursuant to Section 9.08.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 12.19.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 5.03(f).

"Wholly-Owned Subsidiary" means any Restricted Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Parent or one or more of the Wholly-Owned Subsidiaries or are owned by the Parent and one or more of the Wholly-Owned Subsidiaries.

US 7429795v.11

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"Withholding Agent" means any Credit Party or the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.03    Types of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth in the Loan Documents), (b)  any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.  Notwithstanding anything herein to the contrary, for the purposes of calculating any of the ratios tested under Section 9.01, and the components of each of such ratios, except to the extent expressly stated otherwise, OP International and its subsidiaries, any DevCo, any Unrestricted Subsidiary and the Midstream MLP and its subsidiaries (including in each case their assets, liabilities, income, losses, cash flows, and the elements thereof) shall be

41

excluded, except for any cash dividends or distributions actually paid by any such Person to the Restricted Parties, which shall be deemed to be income to such Restricted Party when actually received by such Person.

Section 1.05    Accounting Terms and Determinations; GAAP.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the Financial Statements except for changes in which Borrower's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); *provided* that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

Section 1.06    Rates.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "LIBO Rate" or with respect to any rate that is an alternative or replacement for or successor to any such rate (including, without limitation, any Benchmark Replacement) or the effect of any of the foregoing, or of any Benchmark Replacement Conforming Changes.

Section 1.07    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE CREDITS

Section 2.01    Commitments.

(a)    Subject to the terms and conditions set forth herein, each Lender severally, but not jointly, agrees to make Loans (other than Swingline Loans which shall be governed by Section 2.09) in U.S. dollars to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment, (ii) the total Revolving Credit Exposures exceeding the total Commitments, (iii) during the Initial Availability Block Period, the Revolving Credit Exposures exceeding the difference between the total Commitments minus the amount set forth in clause (x) of the definition of Availability Block or (iv) during the Final Availability Block Period, the Revolving Credit Exposures exceeding the difference between the total Commitments minus the amount set forth in clause (y) of the definition of Availability Block.  Within the foregoing

limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

(b)     On the terms and conditions set forth herein, upon the Effective Date (i) the Pre-Petition Loans held by the Pre-Petition Lenders which are also Lenders (or Affiliates of Lenders) hereunder shall be automatically substituted and exchanged for (and repaid by) Loans hereunder on a dollar-for-dollar basis (and such Pre-Petition Loans shall be deemed refinanced on the Effective Date, and shall constitute and be deemed to be Loans hereunder as of such date) and (ii) the DIP Loans held by the DIP Lenders which are also Lenders (or Affiliates of Lenders) hereunder shall be automatically substituted and exchanged for (and repaid by) Loans hereunder on a dollar-for-dollar basis (and such DIP Loans shall be deemed refinanced on the Effective Date, and shall constitute and shall be deemed to be Loans for all purposes hereunder and under the other Loan Documents as of such date) (the loans in clause (i) and clause (ii) collectively, the "Existing Loans").   Without limiting the foregoing, such Existing Loans shall be allocated among the Lenders based on each Lender's Applicable Percentage.  The parties hereto acknowledge and agree that on the Effective Date, any accrued and unpaid interest (other than, for the avoidance of doubt, the Specified Default Interest (as defined in the Prepackaged Plan) and fees due in respect of the DIP Loans, the Pre-Petition Loans and the Existing Letters of Credit) shall be deemed to constitute Indebtedness.

Section 2.02    Loans and Borrowings.

(a)     Borrowings; Several Obligations.  Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Types of Loans.  Subject to Section 3.03, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)     Minimum Amounts; Limitation on Number of Borrowings.  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $1,000,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $250,000 and not less than $1,000,000; *provided* that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.08(e).  Borrowings of more than one Type may be outstanding at the same time, *provided* that there shall not at any time be more than a total of ten (10) Eurodollar Borrowings outstanding. Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

43

(d)     Notes.  If requested by a Lender, the Loans made by each Lender shall be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit A, dated, in the case of  (a) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement, (b) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption or (c) any Lender that becomes a party hereto in connection with an increase in the Aggregate Elected Commitment Amounts pursuant to Section 2.06(c), as of the effective date of such increase, payable to such Lender in a principal amount equal to its Maximum Credit Amount as in effect on such date, and otherwise duly completed.  In the event that any Lender's Maximum Credit Amount increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or otherwise), the Borrower shall deliver or cause to be delivered, to the extent such Lender is then holding a Note, on the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Maximum Credit Amount after giving effect to such increase or decrease, and otherwise duly completed and such Lender shall promptly return to the Borrower the previously issued Note held by such Lender.  The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be recorded by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03   Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone or e-mail (a) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of the proposed Borrowing or (b)  in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of the proposed Borrowing; *provided* that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) or for the Deemed Fundings. Each such telephonic or e-mail Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Parent, OP LLC and the Borrower. Each such telephonic/e-mail and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)      the aggregate amount of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

44

US 7429795v.11

(v)      the amount of the then effective Borrowing Base, the Aggregate Elected Commitment Amounts, the current total Revolving Credit Exposures (without regard to the requested Borrowing), the *pro forma* total Revolving Credit Exposures (giving effect to the requested Borrowing) and, if applicable, the Availability Block then in effect; and

(vi)      the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Each Borrowing Request shall constitute a representation that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed an amount equal to the total Commitments (*i.e.*, the least of (x) the Aggregate Maximum Credit Amounts, (y) the then effective Borrowing Base and (z) the Aggregate Elected Commitment Amounts) minus the amount of the Availability Block then in effect, if any.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04     Interest Elections.

(a)      Conversion and Continuance.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section 2.04(a) shall not apply to Swingline Borrowings, which may not be converted or continued.

(b)      Interest Election Requests.  To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone or e-mail by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic or e-mail Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower.

(c)      Information in Interest Election Requests.  Each telephonic/e-mail and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)      the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof

to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and (iv) shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing:  (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05    Funding of Borrowings; Funding by Lenders.

(a)    Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided that Swingline Loans shall be made as provided in Section 2.09.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

46

(b)      Presumption of Funding by the Lenders.  Except with respect to Swingline Loans made pursuant to Section 2.09, unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i)  in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06    Termination and Reduction of Aggregate Maximum Credit Amounts; Optional Increase and Reduction of Aggregate Elected Commitment Amounts.

(a)      Scheduled Termination of Commitments.  Unless previously terminated, the Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Maximum Credit Amounts, the Borrowing Base or the Aggregate Elected Commitments Amount is terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)      Optional Termination and Reduction of Aggregate Maximum Credit Amounts.

(i)      The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts; provided that (a)  each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000, (b)  the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the total Commitments, and (c) upon any reduction of the Aggregate Maximum Credit Amounts that results in the Aggregate Maximum Credit Amounts being less than the Aggregate Elected Commitment Amounts, the Aggregate Elected Commitment Amounts shall be automatically reduced (ratably among the Lenders) so that they equal the Aggregate Maximum Credit Amounts as so reduced.

(ii)      The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Maximum Credit Amounts under Section 2.06(b)(i) at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; provided that any such notice

47

delivered hereunder may state that it is conditioned upon the occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Maximum Credit Amounts shall be permanent and may not be reinstated.  Each reduction of the Aggregate Maximum Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

(c)     Optional Increase and Reduction of Aggregate Elected Commitment Amounts.

(i)     Subject to the conditions set forth in Section 2.06(c)(ii), the Borrower may increase the Aggregate Elected Commitment Amounts then in effect by increasing the Elected Commitment of a Lender or by causing a Person that is acceptable to the Administrative Agent that at such time is not a Lender to become a Lender (an "Additional Lender").  Notwithstanding anything to the contrary contained in this Agreement, in no case shall an Additional Lender be the Borrower or an Affiliate of a Borrower.

(ii)     Any increase in the Aggregate Elected Commitment Amounts shall be subject to the following additional conditions:

(A)     such increase shall not be less than $50,000,000 unless the Administrative Agent otherwise consents, and no such increase shall be permitted if after giving effect thereto the Aggregate Elected Commitment Amounts exceed the Borrowing Base then in effect;

(B)     following any Scheduled Redetermination Date, the Borrower may not increase the Aggregate Elected Commitment Amounts more than once before the next Scheduled Redetermination Date;

(C)     no Default shall have occurred and be continuing on the effective date of such increase;

(D)     on the effective date of such increase, no Eurodollar Borrowings shall be outstanding or if any Eurodollar Borrowings are outstanding, then the effective date of such increase shall be the last day of the Interest Period in respect of such Eurodollar Borrowings unless the Borrower pays compensation required by Section 5.02;

(E)     no Lender's Elected Commitment may be increased without the consent of such Lender;

(F)     if the Borrower elects to increase the Aggregate Elected Commitment Amounts by increasing the Elected Commitment of a Lender, the Borrower and such Lender shall execute and deliver to the Administrative Agent a certificate substantially in the form of Exhibit G (an "Elected Commitment Increase Certificate"); and

(G)     if the Borrower elects to increase the Aggregate Elected Commitment Amounts by causing an Additional Lender to become a party to this Agreement, then

48

the Borrower and such Additional Lender shall execute and deliver to the Administrative Agent a certificate substantially in the form of Exhibit H (an "Additional Lender Certificate"), together with an Administrative Questionnaire and a processing and recordation fee of $3,500, and the Borrower shall (1) if requested by the Additional Lender, deliver a Note payable to such Additional Lender in a principal amount equal to its Maximum Credit Amount, and otherwise duly completed and (2) pay any applicable fees as may have been agreed to between the Borrower, the Additional Lender and/or the Administrative Agent.

(iii)     Subject to acceptance and recording thereof pursuant to Section 2.06(c)(iv), from and after the effective date specified in the Elected Commitment Increase Certificate or the Additional Lender Certificate (or if any Eurodollar Borrowings are outstanding, then the last day of the Interest Period in respect of such Eurodollar Borrowings, unless the Borrower has paid compensation required by Section 5.02): (a) the amount of the Aggregate Elected Commitment Amounts shall be increased as set forth therein, and (b) in the case of an Additional Lender Certificate, any Additional Lender party thereto shall be a party to this Agreement and have the rights and obligations of a Lender under this Agreement and the other Loan Documents.  In addition, the Lender or the Additional Lender, as applicable, shall purchase a pro rata portion of the outstanding Loans (and participation interests in Letters of Credit) of each of the other Lenders (and such Lenders hereby agree to sell and to take all such further action to effectuate such sale) such that each Lender (including any Additional Lender, if applicable) shall hold its Applicable Percentage of the outstanding Loans (and participation interests) after giving effect to the increase in the Aggregate Elected Commitment Amounts.

(iv)     Upon its receipt of a duly completed Elected Commitment Increase Certificate or an Additional Lender Certificate, executed by the Borrower and the Lender or by the Borrower and the Additional Lender party thereto, as applicable, the processing and recording fee referred to in Section 2.06(c)(ii) and the Administrative Questionnaire referred to in Section 2.06(c)(ii), if applicable, the Administrative Agent shall accept such Elected Commitment Increase Certificate or Additional Lender Certificate and record the information contained therein in the Register required to be maintained by the Administrative Agent pursuant to Section 12.04(b)(iv).  No increase in the Aggregate Elected Commitment Amounts shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 2.06(c)(iv).

(v)     Upon any increase in the Aggregate Elected Commitment Amounts pursuant to this Section 2.06(c), (a) each Lender's Maximum Credit Amount shall be automatically deemed amended to the extent necessary so that each such Lender's Applicable Percentage equals the percentage of the Aggregate Elected Commitment Amounts represented by such Lender's Elected Commitment, in each case after giving effect to such increase, and (b) Annex I to this Agreement shall be deemed amended to reflect the Elected Commitment of each Lender (including any Additional Lender) as thereby increased, any changes in the Lenders' Maximum Credit Amounts pursuant to the foregoing clause (v), and any resulting changes in the Lenders' Applicable Percentages.

(vi)     The Borrower may from time to time reduce the Aggregate Elected Commitment Amounts; *provided* that (a) each reduction of the Aggregate Elected Commitment Amounts shall be in an amount that is an integral multiple of $1,000,000 and not less than

49

$1,000,000 and (b) the Borrower shall not reduce the Aggregate Elected Commitment Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the Aggregate Elected Commitment Amounts.

(vii)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Elected Commitment Amounts under Section 2.06(c)(vi) at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.   Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.   Each notice delivered by the Borrower pursuant to this Section 2.06(c)(vii) shall be irrevocable; *provided* that any such notice of commitment termination delivered hereunder may state that it is conditioned upon the occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.   Any termination or reduction of the Aggregate Elected Commitment Amounts shall be permanent and may not be reinstated, except pursuant to Section 2.06(c)(i).   Each reduction of the Aggregate Elected Commitment Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

(viii)     Upon any redetermination or other adjustment in the Borrowing Base pursuant to this Agreement that would otherwise result in the Borrowing Base becoming less than the Aggregate Elected Commitment Amounts, the Aggregate Elected Commitment Amounts shall be automatically reduced (ratably among the Lenders in accordance with each Lender's Applicable Percentage) so that they equal such redetermined Borrowing Base (and Annex I shall be deemed amended to reflect such amendments to each Lender's Elected Commitment and the Aggregate Elected Commitment Amounts.

(ix)     Contemporaneously with any increase in the Borrowing Base pursuant to this Agreement, if (a) the Borrower elects to increase the Aggregate Elected Commitment Amount and (b)  each Lender has consented to such increase in its Elected Commitment, then the Aggregate Elected Commitment Amount shall be increased (ratably among the Lenders in accordance with each Lender's Applicable Percentage) by the amount requested by the Borrower (subject to the limitations set forth in Section 2.06(c)(ii)(A)) without the requirement that any Lender deliver an Elected Commitment Increase Certificate, and Annex I shall be deemed amended to reflect such amendments to each Lender's Elected Commitment and the Aggregate Elected Commitment Amount. The Administrative Agent shall record the information regarding such increases in the Register required to be maintained by the Administrative Agent pursuant to Section 12.04(b)(iv).

Section 2.07   Borrowing Base.

(a)     Initial Borrowing Base.  For the period from and including the Effective Date to but excluding the first Redetermination Date following the Effective Date, the amount of the Borrowing Base shall be an amount equal to $[575,000,000].  Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments in between Scheduled Redeterminations

from time to time pursuant to Section 2.07(e), Section 8.13(c), Section 8.24(a)(ii), Section 9.12(d), Section 9.12(e) or Section 9.12(f).

(b)      Scheduled and Interim Redeterminations.  The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.07(b) (a "Scheduled Redetermination"), and, subject to Section 2.07(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Agents, the Issuing Bank and the Lenders on April 1st and October 1st of each year (or, in each case, such date promptly thereafter as reasonably practicable), commencing April 1, 2021.  In addition, the Borrower may, by notifying the Administrative Agent thereof, and the Administrative Agent may, at the direction of the Required Lenders, by notifying the Borrower thereof, one time during any 12-month period, each elect to cause the Borrowing Base to be redetermined between Scheduled Redeterminations (an "Interim Redetermination") in accordance with this Section 2.07; provided that, neither the Borrower nor the Administrative Agent acting at the direction of the Required Lenders may elect to cause an Interim Redetermination during the period commencing on the Effective Date and ending on April 1, 2021.

(c)      Scheduled and Interim Redetermination Procedure.

(i)      Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows:  Upon receipt by the Administrative Agent of (x) the Reserve Report and the certificate required to be delivered by the Borrower to the Administrative Agent, in the case of a Scheduled Redetermination, pursuant to Section 8.12(a) and (c), and, in the case of an Interim Redetermination, pursuant to Section 8.12(b) and (c), and (y) such other reports, data and supplemental information, including, without limitation, the information provided pursuant to Section 8.12(c), as may, from time to time, be reasonably requested by the Administrative Agent (the Reserve Report, such certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall, in its sole discretion, propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including, without limitation, the status of title information with respect to the Oil and Gas Properties of the Credit Parties as described in the Engineering Reports and the existence of any other Debt, the Credit Parties' other assets, liabilities, fixed charges, cash flow, business, properties, prospects, management and ownership, hedged and unhedged exposure to price, price and production scenarios, interest rate and operating cost changes) as the Administrative Agent deems appropriate in its sole discretion and consistent with its normal oil and gas lending criteria as it exists at the particular time.  In no event shall any Proposed Borrowing Base exceed the Aggregate Maximum Credit Amounts.

(ii)      The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice"):

(A)      in the case of a Scheduled Redetermination (x) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on or before March 15th and September 15th of such year following the date of delivery or (y) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by

51

the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then promptly after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.07(c)(i); and

(B)     in the case of an Interim Redetermination, promptly, and in any event, within fifteen (15) days after the Administrative Agent has received the required Engineering Reports.

(iii)     Any Proposed Borrowing Base that would increase the Borrowing Base then in effect must be approved by all of the Lenders as provided in this Section 2.07(c)(iii); and any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect must be approved or be deemed to have been approved by the Required Lenders based upon the Engineering Reports and such other information (including, without limitation, the status of title information with respect to the Oil and Gas Properties of the Credit Parties as described in the Engineering Reports and the existence of any other Debt, the Credit Parties' other assets, liabilities, fixed charges, cash flow, business, properties, prospects, management and ownership, hedged and unhedged exposure to price, price and production scenarios, interest rate and operating cost changes) as each Lender deems appropriate in its sole discretion and consistent with its normal oil and gas lending criteria as it exists at the particular time as provided in this Section 2.07(c)(iii). Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have fifteen (15) days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base. If at the end of such fifteen (15) days, any Lender has not, in the case of any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be an approval of the Proposed Borrowing Base. If at the end of such fifteen (15) days, any Lender has not, in the case of any Proposed Borrowing Base that would increase the Borrowing Base then in effect, communicated its approval or disapproval in writing to the Administrative Agent, such silence shall be deemed to be a disapproval of the Proposed Borrowing Base. If, at the end of such fifteen (15) day period, all of the Lenders, in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved or, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, deemed to have approved, as aforesaid, then the Proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in Section 2.07(d). If, however, at the end of such fifteen (15) day period, all of the Lenders, in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have not approved or, in the case of a decrease or reaffirmation, deemed to have approved, as aforesaid, then the Administrative Agent shall poll the Lenders to ascertain the highest Borrowing Base then acceptable to (x) in the case of a decrease or reaffirmation, a number of Lenders sufficient to constitute the Required Lenders and (y) in the case of an increase, all of the Lenders, as applicable, and, such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).

(d)     Effectiveness of a Redetermined Borrowing Base.  After a redetermined Borrowing Base is approved by all of the Lenders or approved or deemed to have been approved

52

by the Required Lenders, as applicable, pursuant to Section 2.07(c)(iii), the Administrative Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Agents, the Issuing Bank and the Lenders.

(i)     in the case of a Scheduled Redetermination, (a) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on the April 1st or October 1st (or, in each case, such date promptly thereafter as reasonably practicable), as applicable, following such notice, or (b) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and (c) in a timely and complete manner, then on the Business Day next succeeding delivery of such New Borrowing Base Notice; and

(ii)     in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such New Borrowing Base Notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base under Section 2.07(e), Section 8.13(c), Section 8.24(a), Section 9.12(d), Section 9.12(e) or Section 9.12(f), whichever occurs first.   Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

(e)     Reduction of Borrowing Base Upon Issuance of Senior Notes.

(i)     (1) If the Parent issues any Senior Notes (including any Permitted Refinancing Debt) in accordance with Section 9.02(i) ("New Debt") during the period between Scheduled Redetermination Dates and not in conjunction with an Interim Redetermination, then on the Reduction Date, the Borrowing Base then in effect shall be reduced by an amount equal to the product of 0.25 multiplied by an amount equal to the difference between (A) the stated principal amount of such New Debt minus (B) the stated principal amount of previously outstanding Senior Notes to the extent such previously outstanding principal amount was Redeemed with the proceeds of such New Debt, and (2) the Borrowing Base as so reduced shall become the new Borrowing Base immediately upon the Reduction Date, effective and applicable to the Borrower, the Agents, the Issuing Bank and the Lenders on such date until the next redetermination or modification thereof hereunder.   As used herein, the term "Reduction Date" means (i) if the Borrower has delivered notice pursuant to Section 8.01(r) that it intends to use a portion of the proceeds of New Debt to Redeem existing Senior Notes, the earlier of (x) the date on which the Redemption of such Senior Notes is consummated and (y) thirty (30) days following such issuance of New Debt (or such later date as the Administrative Agent may agree in its sole discretion but in any event not to exceed ninety (90) days following such issuance of New Debt), and (ii) otherwise, the date of the issuance of such New Debt.   For purposes of this Section 2.07(e), if any such Debt is issued at a discount or otherwise sold for less than "par", the reduction shall be calculated based upon the stated principal amount without reference to such discount.

US 7429795v.11

(ii)     The Borrowing Base reduction provided for in Section 2.07(e)(i) shall not occur on the date such Senior Notes are issued if reasonably prior (and in any event, at least two Business Days prior) to the issuance of such Senior Notes:

(A)     The Borrower delivers written notice to the Administrative Agent and the Lenders that the Credit Parties intend to issue such Senior Notes to finance all or a portion of (x) a recent acquisition of Oil and Gas Properties for which the acquired assets have not yet been included in the most recent redetermination of the Borrowing Base or (y) a contemplated acquisition of Oil and Gas Properties (such properties, the "Acquisition Properties"), which notice shall specify the contemplated principal amount of such Senior Notes and the targeted closing date of the issuance thereof;

(B)     The Borrower delivers to the Administrative Agent and the Lenders a Reserve Report and such other Engineering Reports reasonably requested by the Administrative Agent in form and with an "as of" date reasonably satisfactory to the Administrative Agent which evaluates such Acquisition Properties; and

(C)     The Borrower delivers to the Administrative Agent a certificate in form and substance reasonably acceptable to the Administrative Agent stating that the Borrower has a reasonable, good faith expectation that the value that the Lenders will attribute to such Acquisition Properties in the first redetermination of the Borrowing Base that becomes effective following the consummation of such contemplated (or recently completed) acquisition will be greater than or equal to 25% of the stated principal amount of such Senior Notes;

Provided, that:

(1)     the Borrowing Base shall, subject to clauses (2) and (3) below, be redetermined giving pro forma effect to the acquisition of such Acquisition Properties in accordance with the procedures set forth in Section 2.07(c) for an Interim Redetermination, with such redetermined Borrowing Base to become effective upon the later to occur of (x) the date the Credit Parties acquire substantially all of such Acquisition Properties and (y) (1) the date that is 30 days following the date on which the Lenders receive the applicable Engineering Reports pursuant to clause (B) above or, in either case, such date as soon thereafter as reasonably practicable (provided that such redetermination shall not constitute a Scheduled Redetermination or an Interim Redetermination requested by the Borrower or the Majority Lenders);

(2)     if (i) the Credit Parties do not acquire substantially all of such Acquisition Properties for any reason prior to the date that is 90 days following the Credit Parties' issuance of such Senior Notes or (ii) any Credit Party knows with reasonable certainty that the Credit Parties will not acquire substantially all of such Acquisition Properties, then, subject to clause (3) below, the redetermination referred to in the foregoing clause (1) shall not be effective and the Borrowing Base shall be automatically reduced upon the earlier to occur of the events described in clauses (i) and (ii) in accordance with the procedures set forth in Section 2.07(e)(i) by an amount equal to 25% of the stated principal amount of such Senior Notes;

54

(3)      if upon consummation of such acquisition, the Credit Parties acquire at least 85% but less than 95% of the total value of such Acquisition Properties (as reasonably determined by the Administrative Agent), (iii) the Borrowing Base reduction provided for in the foregoing clause (2) shall not occur, (iv) the redetermination referred to in the foregoing clause (1) shall not be effective and (v) the Borrowing Base shall be redetermined giving effect to the Acquisition Properties actually acquired by the Credit Parties in accordance with the procedures set forth in Section 2.07(c) for an Interim Redetermination, with such redetermined Borrowing Base to become effective 15 days (or such longer period as is reasonably necessary) following the date on which such acquisition is consummated (provided that such redetermination shall not constitute a Scheduled Redetermination or an Interim Redetermination requested by the Borrower or the Required Lenders), *provided further*, that this clause (3) shall only be given effect if the redetermination referred to in clause (1) resulted in a Proposed Borrowing Base greater than or equal to the Borrowing Base in effect immediately prior to such redetermination;

(4)      the Borrower shall promptly (and in any event, within two Business Days) provide the Administrative Agent with written notice upon the Borrower knowing with reasonable certainty that the Credit Parties will not acquire substantially all of the Acquisition Properties;

(5)      for purposes of the foregoing clauses (1) and (2), "substantially all of such Acquisition Properties" shall mean Oil and Gas Properties with a value (as reasonably determined by the Administrative Agent) of not less than 95% of the total value of all of such Acquisition Properties; and

(6)      on the date that any such acquisition occurs, the Borrower shall deliver to the Administrative Agent a certificate certifying (w) that attached to such certificate are true, accurate and complete copies of the transaction documents evidencing and governing the acquisition of such Acquisition Properties, (x) that the Credit Parties have consummated such acquisition in accordance with the terms of such documents, (y) as to which Acquisition Properties have been acquired and which Acquisition Properties were not acquired, and (z) as to the final purchase price for the Acquisition Properties after giving effect to all adjustments thereto made at the closing of such acquisition (and specifying by category and amount each such adjustment).

Section 2.08    Letters of Credit.

(a)      General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of dollar denominated Letters of Credit for its own account or for the account of any of its Restricted Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period; *provided* that the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if a Borrowing Base Deficiency exists at such time or would exist as a result thereof.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

US 7429795v.11

Notwithstanding anything to the contrary in the foregoing, the Existing Letters of Credit shall be deemed to have been issued hereunder as "Letters of Credit" on the Effective Date.

(b)        Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (other than in respect of the deemed issuance and replacement of the Existing Letters of Credit with Letters of Credit hereunder pursuant to Section 2.08(a)), or the amendment, renewal or extension of an outstanding Letter of Credit, the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than five (5) Business Days in advance of the requested date of issuance, amendment, renewal or extension (or such later date as the Issuing Bank may agree to in its sole discretion)) a notice:

(i)        requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)        specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)        specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.08(c));

(iv)        specifying the amount of such Letter of Credit;

(v)        specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)        specifying the amount of the then effective Borrowing Base and whether a Borrowing Base Deficiency exists at such time, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit), the *pro forma* total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the Availability Block then in effect, if any.

Each notice shall constitute a representation by the Borrower that after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (i) the LC Exposure shall not exceed the LC Commitment and (ii) the total Revolving Credit Exposures shall not exceed an amount equal to the total Commitments (*i.e.*, the least of (x) the Aggregate Maximum Credit Amounts, (y) the then effective Borrowing Base and (z) the Aggregate Elected Commitment Amounts) minus the amount of the Availability Block then in effect, if any.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit; *provided* that, in the event of any conflict between such application or any Letter of Credit Agreement and the terms of this Agreement, the terms of this Agreement shall control.

(c)      Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date.

(d)      Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the existence of a Borrowing Base Deficiency or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)      Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 3:00 p.m., New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 3:00 p.m., New York City time, on the Business Day immediately following the date that the Borrower receives such notice; provided that the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, mutatis mutandis, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this Section 2.08(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated

57

above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)     Obligations Absolute.   The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.08(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii)  any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect,  (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv)  any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.08(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; *provided* that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy or e-mail) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; *provided* that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

58

(h)     Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.08(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans.  Interest accrued pursuant to this Section 2.08(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to Section 2.08(e) to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)     Replacement of the Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j)     Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.08(j), or (ii)  the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to, in the case of an Event of Default, 102.5% of the LC Exposure, and in the case of a payment required by Section 3.04(c), 102.5% of the amount of such excess as provided in Section 3.04(c) plus any accrued and unpaid interest thereon; *provided* that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Parent, OP LLC, the Borrower or any Restricted Subsidiary described in Section 10.01(h) or Section 10.01(i).  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this Section 2.08(j) shall be

59

absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantor's obligations under this Agreement and the other Loan Documents.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.   Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

(k)      Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, and any LC Exposure  or any Swingline Exposure exists at the time a Lender becomes a Defaulting Lender, then:

(i)      all or any part of such LC Exposure or Swingline Exposure shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent (x) the sum of all non-Defaulting Lenders' Revolving Credit Exposures does not exceed the total of all non-Defaulting Lenders' Commitments and (y) the conditions set forth in Section 6.02 are satisfied at such time;

(ii)      if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall, without prejudice to any right or remedy available to it hereunder or under applicable law, within one (1) Business Day following notice by the Administrative Agent cash collateralize such Defaulting Lender's LC Exposure and prepay such Defaulting Lender's Swingline Exposure (in each case after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 2.08(j) for so long as such LC Exposure is outstanding;

(iii)      if the Borrower cash collateralizes any portion of such Defaulting Lender's LC Exposure pursuant to this Section 2.08(k), the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.05(b) with respect to such Defaulting

US 7429795v.11

Lender's LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(iv)    if the LC Exposure and the Swingline Exposure of the non-Defaulting Lenders is reallocated pursuant to this Section 2.08(k), then the fees payable to the Lenders pursuant to Section 3.05(a) and Section 3.05(b) shall be adjusted in accordance with such non-Defaulting Lenders' Applicable Percentages; or

(v)    if any Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.08(k), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all commitment fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Commitment that was utilized by such LC Exposure) under Section 3.05(a) and letter of credit fees payable under Section 3.05(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until such LC Exposure is cash collateralized and/or reallocated.

If the Borrower, the Administrative Agent, the Swingline Lender and the Issuing Bank agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swingline Loans to be held pro rata by the Lenders in accordance with the Commitments (without giving effect to Section 2.08(k)(i)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Notwithstanding any provision of this Agreement to the contrary, so long as any Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 2.08(j), and participating interests in any such newly issued or increased Letter of Credit or newly made Swingline Loan shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.08(k)(i) (and any Defaulting Lender shall not participate therein). Subject to Section 12.19, no reallocation hereunder shall constitute a waiver or release of any claim by any party hereunder against a Defaulting Lender arising from such Lender having become a Defaulting Lender.

Section 2.09    Swingline Loans.

(a)    Subject to the terms and conditions set forth herein, the Swingline Lender agrees to make loans to the Borrower (each such loan, a "Swingline Loan") from time to time during the Availability Period in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding $50,000,000, or (ii) the aggregate Revolving Credit Exposures exceeding an amount equal to the aggregate Commitments minus the amount of the Availability Block then in effect, if any; provided that (x) the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Loan and (y) the Swingline Lender shall not be required to make a Swingline Loan that would result in the total outstanding amount of such Lender's Loans to exceed such Lender's Commitment.  The Borrower shall pay to the Administrative Agent, for the account of the Swingline Lender or each Lender, as applicable, pursuant to this Section 2.09, the outstanding aggregate principal and accrued and unpaid interest under each Swingline Loan no later than seven (7) Business Days following such Swingline Borrowing.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow amounts under the subfacility for Swingline Loans provided for in this Section 2.09, provided that, for the avoidance of doubt, in no event may the Borrower continue or convert a Swingline Loan.

(b)    To request a Swingline Loan, the Borrower shall notify each of the Administrative Agent and the Swingline Lender of such request by telephone or e-mail not later than 2:00 p.m., New York City time, on the date of the proposed Swingline Loan (and, in the case of telephonic notice, confirmed by hand delivery or e-mail).  Each such notice shall be irrevocable and shall specify the requested date (which shall be a Business Day) and amount of the requested Swingline Loan.  The Administrative Agent will promptly advise the Swingline Lender of (i) the current aggregate Revolving Credit Exposures and (ii) the undrawn portion of the Commitments (after giving effect to, as applicable, the Availability Block then in effect, if any) available to make Swingline Loans.  To the extent that the Swingline Lender receives the information referred to in the immediately preceding sentence no later than 4:00 p.m., New York City time, then the Swingline Lender shall make such Swingline Loan available to the Borrower by means of a credit to the general deposit account of the Borrower by 5:00 p.m., New York City time, on the requested date of such Swingline Loan.  Each Swingline Borrowing shall be in an amount that is an integral multiple of $250,000 and not less than $1,000,000.

(c)    The Lenders shall participate in Swingline Loans according to their respective Applicable Percentages.  Upon any Swingline Borrowing, the Administrative Agent shall give notice thereof to each Lender, specifying in such notice such Lender's Applicable Percentage of such Swingline Loan or Loans.  Each Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Lender's Applicable Percentage of such Swingline Loan or Loans.  Each Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the aggregate Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  Each Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the

62

same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so received by it from the Lenders and shall distribute the payments received from the Borrower to the Swingline Lender and the other Lenders as their interests appear with respect to such Swingline Loans. The Administrative Agent shall notify the Borrower of any participations in any Swingline Loan acquired pursuant to this paragraph. Any amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower) in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to the Administrative Agent; any such amounts received by the Administrative Agent shall be promptly remitted by the Administrative Agent to the Lenders that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to the Swingline Lender or to the Administrative Agent, as applicable, if and to the extent such payment is required to be refunded to the Borrower for any reason. The purchase of participations in a Swingline Loan pursuant to this paragraph shall not relieve the Borrower of any default in the payment thereof.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01   Repayment of Loans. The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02   Interest.

(a)   ABR Loans. The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)   Eurodollar Loans. The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)   Swingline Loans. Each Swingline Loan shall bear interest on the unpaid principal amount of such Swingline Loan at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(d)   Post-Default Rate and Borrowing Base Deficiency Rate. Notwithstanding the foregoing, (i) if any Event of Default of the type described in Section 10.01(a), Section 10.01(b), Section 10.01(h) or Section 10.01(i) has occurred and is continuing on or after the Effective Date, or (ii) the Majority Lenders (or the Administrative Agent at their direction) provide written notice to the Borrower of their election in connection with the occurrence and continuance on or after the Effective Date of any other Event of Default, then in each case all Loans then outstanding and any other fees or other amounts then due and owing under any Loan Document, shall bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the rate applicable to ABR Loans as provided in Section 3.02(a) but in no event

63

to exceed the Highest Lawful Rate.  In the case of the foregoing clause (i), such increase in the interest rate shall become effective automatically upon the occurrence of any such Event of Default and shall accrue from and including the first date on which such Event of Default occurred.  In the case of the foregoing clause (ii), such increase in the interest rate shall become effective upon delivery of written notice to the Borrower of the election of the Majority Lenders (or the election of the Administrative Agent at the direction of the Majority Lenders) during the continuance of such Event of Default, and thereafter shall accrue from and including the date upon which the notice of such election described therein is provided to the Borrower and ending on the date on which such Event of Default has been cured or waived in accordance with Section 12.02.  During any Borrowing Base Deficiency, a portion of the Revolving Credit Exposure equal to the amount of the Borrowing Base Deficiency shall, upon the written election of the Majority Lenders (or the Administrative Agent at their direction), bear interest, after as well as before judgment, at the rate per annum equal to two percent (2%) plus the rate otherwise applicable to such portion of the Revolving Credit Exposures but in no event to exceed the Highest Lawful Rate; provided that, upon such written election of the Majority Lenders (or the Administrative Agent at their direction), such increase in the interest rate shall accrue from and including the date on which notice of such written election is provided to the Borrower and ending on the date on which such Borrowing Base Deficiency has been repaid or waived in accordance with Section 12.02.

(e)      Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; *provided* that (i) interest accrued pursuant to Section 3.02(d) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion and (iv) accrued interest on any Swingline Loan shall be payable on the earlier of (x) the Termination Date and (y) seven (7) Business Days after such Swingline Loan is made.

(f)      Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first (1st) day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03     Inability to Determine Rates; Effect of Benchmark Transition Event.

(a)      Circumstances Affecting LIBO Rate Availability.  Unless and until a Benchmark Replacement is implemented in accordance with clause (c) below, in connection with any request for a Eurodollar Loan or a conversion to or continuation thereof or otherwise, if for

64

any reason (i) the Administrative Agent shall determine (which determination shall be conclusive and binding absent manifest error) that dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Loan, (ii) the Administrative Agent shall determine (which determination shall be conclusive and binding absent manifest error) that reasonable and adequate means do not exist for ascertaining the Adjusted LIBO Rate or LIBO Rate for such Interest Period with respect to a proposed Eurodollar Loan or (iii) the Required Lenders shall determine (which determination shall be conclusive and binding absent manifest error) that the Adjusted LIBO Rate or LIBO Rate does not adequately and fairly reflect the cost to such Lenders of making or maintaining such Loans during such Interest Period, then the Administrative Agent shall promptly give notice thereof to the Borrower. Thereafter, until the Administrative Agent notifies the Borrower that such circumstances no longer exist, the obligation of the Lenders to make Eurodollar Loans and the right of the Borrower to convert any Loan to or continue any Loan as a Eurodollar Loan shall be suspended, and the Borrower shall either (A) repay in full (or cause to be repaid in full) the then outstanding principal amount of each such Eurodollar Loan together with accrued interest thereon (subject to Section 12.12), on the last day of the then current Interest Period applicable to such Eurodollar Loan; or (B) convert the then outstanding principal amount of each such Eurodollar Loan to an ABR Loan as of the last day of such Interest Period.

(b)    Laws Affecting LIBO Rate Availability. If, after the date hereof, the introduction of, or any change in, any Governmental Requirement or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any of the Lenders (or any of their respective lending offices) with any request or directive (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, shall make it unlawful or impossible for any of the Lenders (or any of their respective lending offices) to honor its obligations hereunder to make or maintain any Eurodollar Loan, such Lender shall promptly give notice thereof to the Administrative Agent and the Administrative Agent shall promptly give notice to the Borrower and the other Lenders. Thereafter, until the Administrative Agent notifies the Borrower that such circumstances no longer exist, (i) the obligations of the Lenders to make Eurodollar Loans, and the right of the Borrower to convert any Loan to a Eurodollar Loan or continue any Loan as a Eurodollar Loan shall be suspended (the "Affected Loans") and thereafter the Borrower may select only ABR Loans and (ii) if any of the Lenders may not lawfully continue to maintain an Affected Loan to the end of the then current Interest Period applicable thereto, the applicable Affected Loan shall immediately be converted to an ABR Loan for the remainder of such Interest Period.

(c)    Effect of Benchmark Transition Event.

(i)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. Any such

65

amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the Adjusted LIBO Rate or LIBO Rate with a Benchmark Replacement pursuant to this Section 3.03(c) will occur prior to the applicable Benchmark Transition Start Date.

(ii)     Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(iii)     Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (A) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (B) the implementation of any Benchmark Replacement, (C) the effectiveness of any Benchmark Replacement Conforming Changes and (D) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this Section 3.03(c), including any determination with respect to a tenor, rate or adjustment or of the occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 3.03(c).

(iv)     Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Eurodollar Borrowing of, conversion to or continuation of Eurodollar Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period, the component of the Alternate Base Rate based upon the Adjusted LIBO Rate will not be used in any determination of the Alternate Base Rate.

Section 3.04     Prepayments.

(a)     Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)     Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone or e-mail (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 noon, New York City time, one (1) Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall

US 7429795v.11

specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; *provided* that any such notice may state that it is conditioned upon the occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02.

(c)	Mandatory Prepayments.

(i)	If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), or any reduction of the Aggregate Elected Commitment Amounts pursuant to Section 2.06(c), the total Revolving Credit Exposures exceeds the total Commitments, then the Borrower shall (a) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (b)  if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).

(ii)	Upon any Scheduled Redetermination of the Borrowing Base or Interim Redetermination of the Borrowing Base, in each case in accordance with Section 2.07(b), or any adjustment to the amount of the Borrowing Base in accordance with Section 8.13(c), if the total Revolving Credit Exposures exceeds the redetermined or adjusted Borrowing Base, then the Borrower shall, within ten (10) Business Days after its receipt of a New Borrowing Base Notice indicating such Borrowing Base Deficiency, inform the Administrative Agent of the Borrower's election to:  (A) within thirty (30) days following such election, prepay the Loans in an aggregate principal amount equal to such excess, (B) prepay the Loans in six equal monthly installments, commencing on the thirtieth (30th) day following receipt of the New Borrowing Base Notice indicating such Borrowing Base Deficiency with each payment being equal to 1/6th of the aggregate principal amount of such excess and due and payable on the same day in each of the five subsequent calendar months, (C) within thirty (30) days following such election, mortgage additional Oil and Gas Properties not evaluated in the most recently delivered Reserve Report acceptable to the Administrative Agent in its sole discretion (together with title information with respect thereto acceptable to the Administrative Agent in its sole discretion) having a Borrowing Base Value sufficient, after giving effect to any other actions taken pursuant to this Section 3.04(c), to eliminate such excess, or (D) undertake a combination of any of clauses (A), (B) and (C); *provided* that if, because of LC Exposure, a Borrowing Base Deficiency remains after prepaying all of the Loans, the Borrower shall cash collateralize such remaining Borrowing Base Deficiency as provided in Section 2.08(j); *provided further*, that all payments required to be made pursuant to this clause (ii) must be made on or prior to the Termination Date.  Notwithstanding the foregoing, if the Borrower does not inform the Administrative Agent of its election within such ten (10) Business Day period, the Borrower shall be deemed to have delivered an election notice proposing the action set forth in clause (B) above as of the last day of such ten (10) Business Day period.

67

(iii)   Upon any adjustments to the Borrowing Base pursuant to Section 9.12(d), Section 9.12(e) or Section 9.12(f), if the total Revolving Credit Exposures exceeds the Borrowing Base as adjusted, then the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j). The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral on the first (1st) Business Day succeeding the date it or any Restricted Subsidiary receives cash proceeds as a result of a disposition in accordance with Section 9.12(d), Section 9.12(e) or Section 9.12(f); *provided* that all payments required to be made pursuant to this Section 3.04(c)(iii) must be made on or prior to the Termination Date.

(iv)   Upon any adjustments to the Borrowing Base pursuant to Section 2.07(e), if the total Revolving Credit Exposures exceeds the Borrowing Base as adjusted, then the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j). The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral, if required, on the first (1st) Business Day succeeding the date it issues such Senior Notes; *provided* that all payments required to be made pursuant to this Section 3.04(c)(iv) must be made on or prior to the Termination Date.

(v)   Upon any reduction of the Borrowing Base pursuant to Section 8.24(a), if the total Revolving Credit Exposures exceeds the Borrowing Base as adjusted, then the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j). The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral, if required, within one (1) Business Day of such Borrowing Base adjustment; *provided* that all payments required to be made pursuant to this Section 3.04(c)(v) must be made on or prior to the Termination Date.

(vi)   Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(vii)   Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings. Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)   No Premium or Penalty. Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

68

(e)   Excess Cash Balances.  If on the last Business Day of any week while there are any Borrowings outstanding, the Borrower or any other Credit Party have any cash or cash equivalents in excess of $50,000,000 in the aggregate (other than (i) cash collateral with respect to Letters of Credit, (ii) any cash set aside and to be used to pay royalty or other production revenue obligations of the Credit Parties for amounts which have accrued to unaffiliated third parties, (iii) any cash set aside to and to be used to pay in the ordinary course of business amounts (other than royalty or other production revenue obligations) of the Credit Parties then due and owing to unaffiliated third parties and for which the Credit Parties have issued checks or have initiated wires or ACH transfers (or will issue checks or initiate wires or ACH transfers within five (5) Business Days) in order to make such payments, (iv) any cash set aside and used solely for payroll or employee benefits or for the payment of taxes of the Credit Parties and (v) any cash of the Credit Parties constituting purchase price deposits set aside and held in escrow by an unaffiliated third party pursuant to a binding and enforceable purchase and sale agreement with an unaffiliated third party containing customary provisions regarding the payment and refunding of such deposits) (the "Excess Cash"), then the Borrower shall prepay the Borrowings on the next Business Day in an amount equal to the lesser of (A) the amount of the Excess Cash and (B) the amount of Borrowings then outstanding; provided that to the extent that any Excess Cash results from the receipt of the proceeds of any sale or disposition of Property less than five (5) Business Days prior to such date, then the Borrower shall not be required to prepay such Excess Cash until the fifth (5th) Business Day following the receipt of such proceeds.  Each prepayment of Borrowings pursuant to this Section 3.04(e) shall be applied as directed by the Borrower, provided that if the Borrower does not provide instructions for the application of such prepayment, such prepayment shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.  Each prepayment of Borrowings pursuant to this Section 3.04(e) shall be applied ratably to the Loans included in the prepaid Borrowings.  Prepayments pursuant to this Section 3.04(e) shall be accompanied by accrued interest to the extent required by Section 3.02.

Section 3.05   Fees.

(a)   Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.  Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Solely for purposes of calculating the commitment fees pursuant to this Section 3.05(a), Swingline Loans will not be deemed to be a utilization of the Commitments.  To the extent that the Borrowing Base is reduced by the amount of the Availability Block pursuant to Section 8.24(a)(ii), the Borrower

69

US 7429795v.11

shall be entitled to deduct from the amount of commitment fees to be paid on the next payment date the amount of any such fees previously paid by the Borrower and/or that would otherwise be due and owing on the next payment date, in each case with respect to the portion of the Commitment thereby reduced.

(b)     Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure (during the continuation of an Event of Default, upon written notice to the Borrower of the election of Majority Lenders, such participation fee shall increase by 2% per annum over the then applicable rate), (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.25% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third (3rd) Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; *provided* that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.  Any other fees payable to the Issuing Bank pursuant to this Section 3.05(b) shall be payable within ten (10) days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of three hundred sixty (360) days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of three hundred sixty-five (365) days (or three hundred sixty-six (366) days in a leap year), and shall be payable for the actual number of days elapsed (including the first (1st) day but excluding the last day).

(c)     Administrative Agent Fees.     The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(d)     Defaulting Lender Fees.  Subject to Section 2.08(k), the Borrower shall not be obligated to pay the Administrative Agent any Defaulting Lender's ratable share of the fees described in Section 3.05(a) and (b) for the period commencing on the day such Defaulting Lender becomes a Defaulting Lender and continuing for so long as such Lender continues to be a Defaulting Lender.

(e)     Upfront Fees.  The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, an upfront fee payable in two (2) installments as follows:

70

(i)        an installment of the upfront fee on the Effective Date of seventy basis points (0.70%) on each Lender's Applicable Percentage of an amount (the "Effective Date Availability Amount") equal to the Aggregate Elected Commitment Amount minus, if applicable, the amount of any Availability Block pursuant to clause (x) of the definition thereof in place during the Initial Availability Block Period; and

(ii)        an installment of the upfront fee on the next Business Day after the expiration of the Final Availability Block Period of seventy basis points (0.70%) on each Lender's Applicable Percentage of an amount equal to the positive difference, if any, between, the Aggregate Elected Commitment Amount then in effect minus the Effective Date Availability Amount.

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)        Payments by the Borrower.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim. Fees, once paid, shall be fully earned and shall not be refundable under any circumstances absent manifest error. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.   The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)        Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)        Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender

71

receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender (other than, in the case of Swingline Loans, the Swingline Lenders), then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02    Presumption of Payment by the Borrower. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    Certain Deductions by the Administrative Agent. If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(b), Section 2.08(d), Section 2.08(e) or Section 4.02, or otherwise hereunder, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.  If at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan or a reimbursement of an LC Disbursement while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its pro rata share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Percentage of all Loans then outstanding.  After

72

acceleration or maturity of the Loans, all principal will be paid ratably as provided in Section 10.02(c).

Section 4.04   Disposition of Proceeds.  The Security Instruments contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Administrative Agent for the benefit of the Secured Parties of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Indebtedness and other obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Instruments, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and the Restricted Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Restricted Subsidiaries.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01   Increased Costs.

(a)   Eurodollar Changes in Law.  If any Change in Law shall:

(i)   impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)   impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing, converting or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)   Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit or Swingline Loans held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital

adequacy and liquidity), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or (b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than one hundred eighty (180) days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; provided, further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b)  the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, (c)  the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.04(b), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii)  the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 and reasonably detailed calculations therefore, upon request of the Borrower, shall be delivered to the Borrower and shall be conclusive absent manifest error.

US 7429795v.11

The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 5.03    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; *provided* that if the applicable Withholding Agent shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased by the Borrower or any Guarantor as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 5.03), the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii)  the applicable Withholding Agent shall make such deductions and (iii) the applicable Withholding Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower.  The Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent, timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid or payable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, or required to be deducted from a payment to the Administrative Agent, such Lender or the Issuing Bank, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent, a Lender (with a copy to the Administrative Agent) or the Issuing Bank specifying the amount of such payment or liability delivered to the Borrower shall be conclusive absent manifest error.

(d)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i)  any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or

75

otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower or a Guarantor to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(f)(ii)(A) and Section 5.03(f)(ii)(B) and Section 5.03(g) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a "United States person" as defined in Section 7701(a)(3) of the Code shall deliver to the Borrower and the Administrative   Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative   Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest

76

under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner; and

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Withholding Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g) FATCA. If a payment made to a Lender under this Agreement would be subject to United States federal withholding tax imposed by FATCA if such Lender fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Withholding Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation

77

reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 5.03(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     For purposes of this Section 5.03, the term "Lender" includes any Issuing Bank.

(i)     Each party's obligation under this Section 5.03 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 5.04     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of Different Lending Office. If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders. If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, if it becomes unlawful for any Lender or its applicable lending office to make Eurodollar Loans, as described in Section 3.03, or while a Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 12.04(b)), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender

78

US 7429795v.11

or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01    Effective Date.  This Agreement, and the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder, including (x) the deemed refinancing of the Existing Loans with Loans hereunder pursuant to Section 2.01(b) and (y) the deemed issuance and replacement of the Existing Letters of Credit with Letters of Credit hereunder pursuant to Section 2.08(a) (collectively, the "Deemed Fundings") shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

(a)    The Administrative Agent, the Arranger and the Lenders shall have received all commitment, facility, upfront, arrangement and agency fees and all other fees and amounts due and payable by the Credit Parties on or prior to the Effective Date, including, to the extent invoiced at least two (2) Business Days prior to the Effective Date, reimbursement or payment of all reasonable and documented out-of-pocket fees and expenses required to be reimbursed or paid by the Credit Parties hereunder (including the reasonable and documented fees and expenses of Vinson & Elkins LLP, counsel to the Administrative Agent, and the financial advisor fees of FTI Consulting, Inc.).

(b)    The Administrative Agent shall have received a certificate of the Secretary or an Assistant Secretary of the Parent, OP LLC, the Borrower and each other Guarantor setting forth (i) resolutions of its board of directors or other appropriate governing body with respect to the authorization of the Parent, OP LLC, the Borrower or such Guarantor to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of the Parent, OP LLC, the Borrower or such Guarantor (y) who are authorized to sign the Loan Documents to which the Parent, OP LLC, the Borrower or such Guarantor is a party and (z) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers, and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of the Parent, OP LLC, the Borrower, each Guarantor and each DevCo, certified as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(c)    The Administrative Agent shall have received (i) certificates of the appropriate State agencies with respect to the existence or good standing, as applicable, of the Parent, OP LLC, the Borrower, each Guarantor and each DevCo in the state in which such Credit Party is organized and (ii) certificates with respect to the qualification of the Borrower to conduct business in Texas, Montana and North Dakota.

US 7429795v.11

(d)　　The Administrative Agent shall have received a certificate with respect to the matters described in Section 6.01(r) and Section 6.02(a) through (c), duly and properly executed by a Responsible Officer of the Borrower and dated as of the date of Effective Date.

(e)　　The Administrative Agent shall have received from each party hereto counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(f)　　To the extent requested by a Lender, the Administrative Agent shall have received duly executed Notes payable to each Lender in a principal amount equal to its Maximum Credit Amount dated as of the date hereof.

(g)　　The Administrative Agent shall have received from each party thereto duly executed counterparts (in such number as may be requested by the Administrative Agent) of each DevCo Parent Undertaking, the Security Instruments, including the Guaranty and Security Agreement, the mortgages and the other Security Instruments described on Exhibit E-1.　In connection with the execution and delivery of the Security Instruments, the Administrative Agent shall:

(i)　　be reasonably satisfied that the Security Instruments create first priority, perfected Liens (subject only to Excepted Liens identified in clauses (a) through (d) and (f) of the definition thereof, but subject to the provisos at the end of such definition) on at least 90% of the Proved Reserves evaluated in the Initial Reserve Report and on all other Property purported to be pledged as collateral pursuant to the Security Instruments;

(ii)　　have received certificates, together with undated, blank stock powers for each such certificate, representing all of the issued and outstanding Equity Interests of each of the Guarantors (other than the Parent) to the extent any such Equity Interest is certificated; and

(iii)　　have received evidence in form and substance satisfactory to it that the Credit Parties have delivered to each Agent under and as defined in the Intercreditor Agreement the deliverables required under Section 5.14(b)(ii) of the Intercreditor Agreement.

(h)　　The Administrative Agent shall have received the executed legal opinions of (i) Kirkland & Ellis LLP, counsel to the Credit Parties, in form and substance reasonably satisfactory to the Administrative Agent, and (ii) local counsel in the States of [Montana],[5] North Dakota and Texas to the Credit Parties in form and substance reasonably satisfactory to the Administrative Agent (which opinions shall include, among other things, the enforceability of the mortgages under applicable local law).　The Borrower, the other Credit Parties and the Administrative Agent hereby instruct such counsel to deliver such legal opinions.

(i)　　The Administrative Agent shall have received a certificate of insurance coverage of the Credit Parties evidencing that the Credit Parties are carrying insurance in accordance with Section 7.12.

---

[5] NTD: To be determined based on Effective Date Mortgages.

US 7429795v.11

(j)        The Administrative Agent shall have received title information as the Administrative Agent may reasonably require satisfactory to the Administrative Agent setting forth the status of title to at least 90% of the Proved Reserves evaluated in the Initial Reserve Report.

(k)        [Reserved.]

(l)        The Administrative Agent shall have received a certificate of a Responsible Officer of the Parent, OP LLC and the Borrower certifying that the Parent, OP LLC and the Borrower has received all consents and approvals required by Section 7.03.

(m)        The Administrative Agent shall have received (i) the financial statements referred to in Section 7.04(a), (ii) a pro forma balance sheet of the Parent prepared as of the end of the fiscal quarter ended [September 30, 2020] after giving effect to the Transactions on the Effective Date, (iii) a model of the projected consolidated cash flow, cash balance and balance of Debt for borrowed money of the Parent on a monthly basis from the first (1st) day of the month immediately following the Effective Date through December 31, 2024, in form and substance satisfactory to the Administrative Agent and (iv) the Initial Reserve Report accompanied by a certificate covering the matters described in Section 8.12(c).

(n)        The Administrative Agent shall have received appropriate UCC search certificates reflecting no prior Liens encumbering the Properties of the Credit Parties for each of the following jurisdictions:  Delaware, North Dakota, Montana and Texas and from the Secretary of State in the state in which such Credit Party is organized; other than Liens being assigned or released on or prior to the Effective Date or Liens permitted by Section 9.03.

(o)        The Administrative Agent shall have received a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying, and attaching detailed calculations with respect thereto (including with respect to any LC Adjustments included in the calculation of the Effective Date Availability Test) that immediately after giving effect to the occurrence of the Transactions, the Borrower will have an Available Commitment as of the Effective Date in an amount that is not less than $75,000,000 (the "Effective Date Availability Test"); *provided* that to the extent the Borrower has caused the beneficiary of an Existing Letter of Credit that will be deemed reissued and replaced hereunder to, on or prior to the Effective Date, enter into a legally binding agreement (in form and substance reasonably acceptable to the Administrative Agent) among the Borrower, such beneficiary and the Administrative Agent pursuant to which such beneficiary shall agree to promptly return (or to accept an amendment thereto reducing the stated amount thereof) such letter of credit, the stated amount of such letter of credit (or the amount of such agreed reduction thereto) shall, solely for the purposes of calculating the amount of the Available Commitment for the Effective Date Availability Test, be deemed to increase the amount of the Available Commitment on a dollar for dollar basis (such adjustment as set forth in this proviso, the "LC Adjustment") but, for the avoidance of doubt, the stated amount of such letter of credit and any disbursements with respect thereto shall be included in the calculation of the Revolving Credit Exposures for all purposes other than the calculation of the Available Commitment for the Effective Date Availability Test.

81

(p)     [The Administrative Agent shall have received such other documents as the Administrative Agent or special counsel to the Administrative Agent may reasonably request.][6]

(q)     The Borrower, to the extent qualifying as a "legal entity customer" under the Beneficial Ownership Regulation, shall deliver to the Administrative Agent a Beneficial Ownership Certification.

(r)     The Administrative Agent shall have received satisfactory evidence that the Leverage Ratio, determined on a pro forma basis after giving effect to the occurrence of the Transactions, does not exceed 1.5 to 1.0 as of the Test Period ended [September 30, 2020].

(s)     [Reserved.]

(t)     [Reserved.]

(u)     The Administrative Agent and the Lenders shall have received, by at least three (3) Business Days (or such later date as agreed to by the Administrative Agent in its sole discretion) prior to the Effective Date, all documentation and other information about the Credit Parties as shall have been requested in writing by the Administrative Agent or the Lenders at least six (6) Business Days prior to the Effective Date required by U.S. regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(v)     [Reserved.]

(w)     The Bankruptcy Court shall have entered the Confirmation Order confirming the Prepackaged Plan and approving the corresponding disclosure statement, in each case, in form and substance acceptable to the Administrative Agent,  and which Confirmation Order shall be in full force and effect and shall not (i) have been stayed, reversed, vacated, amended, supplemented or otherwise modified in a manner that could reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders or (ii) be the subject of any appeal, unless in each case, waived in writing by the Administrative Agent and the Majority Lenders.

(x)     The effective date under the Prepackaged Plan shall have occurred or shall occur concurrently with the effectiveness of this Agreement (and all conditions precedent thereto as set forth therein shall have been satisfied or waived in accordance with the terms thereof).

(y)     [The final determination of the Borrowing Base shall have occurred.][7]

(z)     After giving effect to the Transactions, the Credit Parties shall have no Debt for borrowed money other than the Indebtedness.

(aa)     The Administrative Agent shall have received a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying (i)

---

[6] NTD: To be removed prior to Effective Date.
[7] NTD: To be removed prior to closing.

US 7429795v.11

that the Credit Parties have entered into the Effective Date Minimum Hedge Volumes (and to the extent not listed on Schedule 7.20, setting forth a true and complete list of such Effective Date Minimum Hedge Volumes, the material terms thereof (including the average price per volume of the Effective Date Minimum Hedge Volumes for each of the Initial Measurement Period, the Second Measurement Period and the Third Measurement Period, type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any credit support agreements relating thereto (other than the Loan Documents) and any margin required or supplied under any credit support document, and the counterparty to each such agreement) and (ii) the amount of any Availability Block (pursuant to clause (x) of the definition thereof) during the Initial Availability Block Period.

Without limiting the generality of the provisions of Section 11.04, for purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required under this Section 6.01 to be consented to or approved by or acceptable or reasonably satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the Effective Date specifying its objection thereto.  All documents executed or submitted pursuant to this Section 6.01 by and on behalf of the Borrower or any of its Subsidiaries shall be in form and substance reasonably satisfactory to the Administrative Agent and its counsel.  The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02).  The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

Section 6.02    Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing , and of the Issuing Bank to issue, increase, renew or extend any Letter of Credit (including any Deemed Funding made on the Effective Date except as expressly set forth below), is subject to the satisfaction of the following conditions:

(a)    At the time of and immediately after giving effect to such Borrowing or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, no Default or Borrowing Base Deficiency shall have occurred and be continuing.

(b)    (i) At the time of and immediately after giving effect to such Borrowing or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, in each case occurring on the Effective Date (including any Deemed Funding made on the Effective Date), no event, development or circumstance has occurred since the Petition Date and shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect (excluding the pendency of the Chapter 11 Cases) and (ii) at the time of and immediately after giving effect to any other Borrowing or any other issuance, increase, renewal or extension of any Letter of Credit, as applicable, no event, development or circumstance has occurred since the Effective Date and shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

(c)    The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material

83

US 7429795v.11

respects (or, if already qualified by materiality, Material Adverse Effect or a similar qualification, true and correct in all respects) on and as of the date of such Borrowing or the date of issuance, increase, renewal or extension of such Letter of Credit, as applicable, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, increase, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall continue to be true and correct in all material respects (or, if already qualified by materiality, Material Adverse Effect or a similar qualification, true and correct in all respects) as of such specified earlier date.

(d)      (i) The making of such Loan or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, would not conflict with, or cause any Lender or the Issuing Bank to violate or exceed, any applicable Governmental Requirement, and (ii) no Change in Law shall have occurred, and no litigation shall be pending or threatened, which in either case does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, increase, renewal, extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(e)      Other than with respect to the Deemed Fundings, at the time of and immediately after giving effect to such Borrowing or the issuance, increase, renewal or extension of such Letter of Credit, as applicable, the Borrower, together with the other Credit Parties, shall not have any Excess Cash.

(f)      Other than with respect to the Deemed Fundings, the receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit (or an increase, extension or renewal of a Letter of Credit) in accordance with Section 2.08(b), as applicable.

Each request for a Borrowing and each request for the issuance, increase, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Parent, OP LLC and the Borrower on the date thereof as to the matters specified in Section 6.02(a) through (e) (or Section 6.02(a) through (d) with respect to the Deemed Fundings).

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

Each of the Parent, OP LLC and the Borrower represents and warrants to the Lenders that:

Section 7.01   Organization; Powers.   Each of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and each DevCo is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, have all requisite power and authority, and have all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

84

Section 7.02    Authority; Enforceability.  The Debt Transactions are within the Parent's, OP LLC's, the Borrower's, each Guarantor's corporate, limited liability company or partnership, as applicable, powers and have been duly authorized by all necessary corporate, limited liability company, partnership and, if required, shareholder, member or partner action (including any action required to be taken by any class of directors of the Parent, OP LLC, the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Debt Transactions).  Each Loan Document to which the Parent, OP LLC, the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Parent, OP LLC, the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    Approvals; No Conflicts.  The Debt Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including shareholders or any class of directors, whether interested or disinterested, of the Parent, OP LLC, the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, except such as have been obtained or made and are in full force and effect other than (i) the recording and filing of the Security Instruments as required by this Agreement, (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents and (iii) those consents, approvals or filings that are customarily obtained after the closing of an acquisition of Oil and Gas Properties, (b) will not violate (i) the charter, by-laws or other organizational documents of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo or (ii) any applicable law or regulation or any order of any Governmental Authority, other than any such violation that could not reasonably be expected to have a Material Adverse Effect or an adverse effect on the enforceability of the Loan Documents, (c) will not violate or result in a default under any material indenture, agreement or other instrument binding upon the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo or their respective Properties, or give rise to a right thereunder to require any payment to be made by the Parent, OP LLC, the Borrower, such Restricted Subsidiary or such DevCo, (d) will not result in the creation or imposition of any Lien on any material Property of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo (other than the Liens created by the Loan Documents and the Permitted OMP Credit Facility Liens encumbering the Property of the DevCos to the extent that such Property consists solely of Collateral).

Section 7.04    Financial Condition; No Material Adverse Change.

(a)    The Parent has heretofore furnished to the Lenders (i) its consolidated balance sheet and statements of income, stockholders equity and cash flows as of and for the fiscal year ended December 31, 2019, reported on by PricewaterhouseCoopers LLP, independent public accountants and (ii) its unaudited consolidated balance sheet and statements of income, stockholders equity and cash flows as of and for the fiscal quarter ended [September 30], 2020.

85

US 7429795v.11

Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject, in the case of clause (ii), to the absence of footnotes and normal year-end audit adjustments.

(b)     Since the Effective Date, there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

(c)     None of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo  has on the date hereof any material Debt (including Disqualified Capital Stock) or any material off-balance sheet liabilities or partnerships, unusual forward or long-term commitments or unrealized or anticipated losses from any such unfavorable commitments that are, in the aggregate, material to the balance sheet and statements of income, stockholders equity and cash flows of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos on a consolidated basis and are not reflected on such balance sheets and statements of income, stockholders equity and cash flows (including in the footnotes to such financial statements) or otherwise permitted under Section 9.02.

Section 7.05     Litigation.

(a)     Except as set forth on Schedule 7.05, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority, including the FERC or any equivalent state regulatory agency, pending against or, to the knowledge of the Parent, OP LLC or the Borrower, threatened in writing against the Borrower or any Restricted Subsidiary or any DevCo (i) not fully covered by insurance (except for normal deductibles) that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (ii) that involve any Loan Document or the Debt Transactions.

(b)     Since the Effective Date, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in a Material Adverse Effect.

Section 7.06     Environmental Matters.     Except for such matters as set forth on Schedule 7.06 or that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect on the Parent, OP LLC, the Borrower or the DevCos:

(a)     the Borrower and the Subsidiaries and the DevCos, including with respect to each of their respective Properties and operations thereon are, and within all applicable statute of limitation periods have been, in compliance with all applicable Environmental Laws;

(b)     the Borrower and the Subsidiaries and the DevCos have obtained all Environmental Permits required for their respective operations and each of their Properties, with all such Environmental Permits being currently in full force and effect, and none of Borrower or the Subsidiaries or the DevCos has received any written notice or, to the knowledge of Parent, OP LLC, the Borrower or the DevCos, oral notice that any such existing Environmental Permit will be revoked or that any application for any new Environmental Permit or renewal of any existing Environmental Permit will be protested or denied;

86

US 7429795v.11

(c)      there are no claims, demands, suits, orders, inquiries, or proceedings concerning any violation of, or any liability (including as a potentially responsible party) under, any applicable Environmental Laws that is pending or to the knowledge of the Parent, OP LLC or the Borrower, threatened in writing against the Borrower or the Subsidiaries or the DevCos, including with respect to any of their respective Properties or as a result of any operations at the Properties;

(d)      none of the Properties of any Credit Party or any DevCo contain or have contained any:  (i) underground storage tanks for Hazardous Materials; (ii) asbestos-containing materials; or (iii) landfills or dumps; (iv) hazardous waste management units as defined pursuant to RCRA or any comparable state law; or (v) sites on or proposed for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published; pursuant to any comparable state law, in each case that would reasonably be expected to result in liability under Environmental Law for Parent, OP LLC, the Borrower or the DevCos under Environmental Law;

(e)      there has been no Release or threatened Release, of Hazardous Materials at, on, under or from any of Borrower's or the Subsidiaries' or the DevCos' Properties, there are no investigations, remediations, abatements, removals, or monitorings of Hazardous Materials required under applicable Environmental Laws at such Properties and, to the knowledge of the Parent, OP LLC or the Borrower, none of such Properties are adversely affected by any Release or threatened Release of a Hazardous Material originating or emanating from any other real property, in each case that could reasonably be expected to result in liability for Parent, OP LLC, the Borrower or the DevCos under Environmental Law;

(f)      neither the Borrower nor the Subsidiaries nor the DevCos has received any written notice asserting an alleged liability or obligation under any applicable Environmental Laws with respect to the investigation, remediation, abatement, removal, or monitoring of any Hazardous Materials at, under, or Released or threatened to be Released from any real properties offsite the Borrower's or the Subsidiaries' or the DevCo's Properties;

(g)      there has been no exposure of any Person to any Hazardous Materials as a result of or in connection with the operations and businesses of any of the Borrower's or the Subsidiaries' or the DevCos' Properties that would reasonably be expected to form the basis for a claim against Parent, OP LLC, the Borrower or the DevCos for damages or compensation under Environmental Law; and

(h)      the Borrower and the Subsidiaries and the DevCos have provided to Lenders copies of all environmental site assessment reports, investigations, studies and analyses in the Borrowers, Subsidiaries, or DevCos custody, possession or control bearing on any alleged non-compliance with or liability under Environmental Laws (including with respect to any Environmental Permits required for the operation of the Properties of the Borrower and the Subsidiaries and the DevCos) that are in any of the Borrower's or the Subsidiaries' or the DevCos' possession or control and relating to their respective Properties or operations thereon.

87

Section 7.07   Compliance with the Laws and Agreements; No Defaults or Borrowing Base Deficiency.

(a)      Each of the Parent, OP LLC, the Borrower, each Restricted Subsidiary and each DevCo is in compliance with all Governmental Requirements applicable to it or its Property and all material agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)      No Default or Borrowing Base Deficiency has occurred and is continuing.

Section 7.08   Investment Company Act.  None of the Parent, OP LLC, the Borrower, any Restricted Subsidiary nor any DevCo is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09   Taxes.   Each of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Parent, OP LLC, the Borrower, such Restricted Subsidiary or such DevCo, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The charges, accruals and reserves on the books of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos in respect of Taxes and other governmental charges are, in the reasonable opinion of the Parent, OP LLC and the Borrower, adequate.

Section 7.10   ERISA.

(a)      Except as would not reasonably be expected, individually or in the aggregate, to result in a material liability to the Borrower or any of its Subsidiaries; (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) the Borrower, the Subsidiaries and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan; and (iii) each Plan is, and has been, maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

(b)      None of the Borrower, its Subsidiaries or any ERISA Affiliates are required to contribute to, or have any other direct or contingent liability in respect of, any Multiemployer Plan that, when taken together with all other such contribution obligations and liabilities to any other Multiemployer Plan, would reasonably be expected to result in a material liability to the Borrower or any of its Subsidiaries.  None of the Borrower, its Subsidiaries or any ERISA Affiliate has (i) failed to make any contribution or payment to any Plan or Multiemployer Plan, or made any amendment to any Plan that has resulted or could result in the imposition of a Lien or the posting of a bond or other security under ERISA or the Code, or (ii) incurred any liability under Title IV of ERISA other than a liability to the PBGC for premiums under section 4007 of ERISA

88

that are not past due that, in either case of (i) or (ii), would reasonably be expected to result in a material liability to the Borrower or any of its Subsidiaries.  The present value of all accrued benefits under each Plan that is subject to Title IV of ERISA (based on those assumptions used to fund such Plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by a material amount.

(c)     None of the Borrower or the Subsidiaries, nor any ERISA Affiliate, sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, that provides benefits to former employees of such entities, other than continuation coverage under Section 4980B of the Code, that may not be terminated by the applicable plan sponsor in its sole discretion at any time without any material liability, other than the payment of claims incurred as of the date of such termination pursuant to the terms of such plan and the requirements of applicable law.

(d)     None of the Borrower or its Subsidiaries sponsors, maintains or contributes to any employee pension plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 7.11   <u>Disclosure; No Material Misstatements</u>.  The Parent, OP LLC and the Borrower have disclosed to the Administrative Agent all matters, except for matters that could reasonably be expected to be known already by the Lenders, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the other written reports, financial statements, certificates or other written information, taken as a whole, furnished by or on behalf of the Parent, OP LLC, the Borrower or any Restricted Subsidiary or any DevCo to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) (other than information of a general industry nature or constituting projections, projected financial information, forward-looking information or prospect information) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projections, projected financial information, forward-looking information or information regarding future prospects, the Parent, OP LLC and the Borrower represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  There are no statements or conclusions in any Reserve Report which are based upon or include materially misleading information of a material fact or fail to take into account known material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.

Section 7.12   <u>Insurance</u>.  The Parent, OP LLC and the Borrower have, and have caused all of their respective Restricted Subsidiaries and the DevCos to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and

89

all material agreements and (b) insurance coverage in at least amounts and against such risks as are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Parent, OP LLC, the Borrower and their respective Restricted Subsidiaries and the DevCos. The Administrative Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Administrative Agent has been named as loss payee with respect to Property loss insurance.

Section 7.13  Restriction on Liens.  None of the Parent, OP LLC, the Borrower nor any of the Restricted Subsidiaries nor any DevCo is a party to any material agreement or arrangement, or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent for the benefit of the Secured Parties on or in respect of their Properties constituting Collateral to secure the Indebtedness and the Loan Documents, other than as permitted under Section 9.16.

Section 7.14  Subsidiaries.  Except as set forth on Schedule 7.14, as of the Effective Date the Parent has no Subsidiaries. The Parent has no Foreign Subsidiaries. As of the Effective Date, Schedule 7.14 identifies each Subsidiary as either "Restricted" or "Unrestricted", and each Restricted Subsidiary on such schedule is a Wholly-Owned Subsidiary other than the General Partner. 100% of the Equity Interests in each DevCo is owned collectively directly or indirectly by OMS and directly or indirectly by OMP.

Section 7.15  Location of Business and Offices.  As of the Effective Date, the Borrower's jurisdiction of organization is the State of Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is "Oasis Petroleum North America LLC"; and the organizational identification number of the Borrower in its jurisdiction of organization is 4354265. As of the Effective Date, the Borrower's principal place of business and chief executive offices are located at the address specified in Section 12.01. As of the Effective Date, the jurisdiction of organization of OP LLC is the State of Delaware; the name of OP LLC as listed in the public records of its jurisdiction of organization is "Oasis Petroleum LLC", and the organizational identification number of OP LLC in its jurisdiction of organization is 4307625. As of the Effective Date, the principal place of business and chief executive offices of OP LLC are located at the address specified in Section 12.01. As of the Effective Date, the jurisdiction of organization of the Parent is the State of Delaware; the name of the Parent as listed in the public records of its jurisdiction of organization is "Oasis Petroleum Inc.", and the organizational identification number of the Parent in its jurisdiction of organization is 4793429. As of the Effective Date, the principal place of business and chief executive offices of the Parent are located at the address specified in Section 12.01. As of the Effective Date, each other Guarantor's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14.

Section 7.16  Properties; Titles, Etc.

(a)  Except as set forth in Schedule 7.16, each of the Borrower and the Restricted Subsidiaries has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report and good title to all its material personal Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03. After giving full

90

effect to the Excepted Liens, the Borrower or the Restricted Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, other than reductions in such interests resulting from any actions permitted under Section 9.12 or from the election of the Borrower to not participate in any operation in respect of an Oil and Gas Property, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such Property, other than excesses (i) relating to customary provisions of operating agreements requiring parties thereto to pay to the operator the share of costs of a defaulting party, (ii) resulting from the acquisition of the interest of any non-participating parties pursuant to customary provisions of joint operating agreements or (iii) resulting from interests acquired pursuant to compulsory pooling statutes.

(b)     All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, in each case, except as could not be reasonably expected to have a Material Adverse Effect.

(c)     The rights and Properties presently owned, leased or licensed by the Borrower and the Restricted Subsidiaries including all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Restricted Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)     All of the Properties of the Borrower and the Restricted Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, ordinary wear and tear excepted, except as could not reasonably be expected to have a Material Adverse Effect.

(e)     The Borrower and each Restricted Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Restricted Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower and the Restricted Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17   <u>Maintenance of Properties</u>.  Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and the Restricted Subsidiaries have been

91

maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries. Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (a) no Oil and Gas Property of the Borrower or any Restricted Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (b) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Restricted Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such Restricted Subsidiary.

Section 7.18    Gas Imbalances, Prepayments.  As of the Effective Date and as of the date of each certificate required to be delivered pursuant to Section 8.12(c), except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of the Restricted Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding 75,000 Mcf of gas (on an Mcf equivalent basis) in the aggregate.

Section 7.19    Marketing of Production.  As of the Effective Date and as of the date of each certificate required to be delivered pursuant to Section 8.12(c), except for contracts listed on Schedule 7.19, or otherwise either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or the Restricted Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Borrower's or the Restricted Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20    Swap Agreements and Qualified ECP Guarantor.  Schedule 7.20, as of the date hereof, and after the date hereof, as of the date of each report required to be delivered by the Borrower pursuant to Section 8.01(e), sets forth, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the estimated net mark-to-market value thereof, all credit support agreements relating thereto (including any margin required or supplied) (other than the Loan Documents) and the counterparty to each such agreement.  The Parent, OP LLC and the Borrower are each Qualified ECP Guarantors.

Section 7.21   <u>Use of Loans and Letters of Credit</u>.  The proceeds of the Loans and the Letters of Credit shall be used to (a) provide working capital for exploration and production operations, (b) provide funding for general corporate purposes and (c) repay Swingline Loans. The Parent, OP LLC, the Borrower, the Restricted Subsidiaries and the DevCos are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.22   <u>Solvency</u>.  After giving effect to the transactions contemplated hereby and on the occasion of any Borrowing (including the initial funding) and of the issuance, increase, renewal or extension of any Letter of Credit, the Parent, OP LLC, the Borrower and the Restricted Subsidiaries, taken as a whole, are Solvent.

Section 7.23   <u>Anti-Corruption Laws</u>.  None of the Parent, OP LLC or the Borrower nor any of their respective Subsidiaries nor any DevCo, nor, to their knowledge, any director, officer, agent, employee or Affiliate of the Parent, OP LLC or the Borrower or any of their respective Subsidiaries or any DevCo is aware of or has taken any action, directly or indirectly, that would result in a material violation by such Persons of any Anti-Corruption Laws, including without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of any Anti-Corruption Law; and, the Parent, OP LLC and the Borrower, and their respective Subsidiaries and the DevCos and, to their knowledge, each of their respective Affiliates have conducted their business in material compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 7.24   <u>Sanctions</u>.  None of the Parent, OP LLC, the Borrower nor any of their respective Subsidiaries nor any DevCo, nor, to knowledge of the Parent, OP LLC or the Borrower, any director, officer, agent, employee or any Affiliate of the Parent, OP LLC or the Borrower or any of their respective Subsidiaries or any DevCo is a Sanctioned Person, and the Parent, OP LLC and the Borrower will not directly or indirectly use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, any DevCo, joint venture partner or other Person, for the purpose of financing the activities of any Person currently subject to any applicable Sanctions.

Section 7.25   <u>OP International.</u> As of the Effective Date, OP International and its Subsidiaries own no assets other than Equity Interests in subsidiaries that do not own assets.

Section 7.26   <u>EEA Financial Institutions</u>.  No Credit Party or any DevCo is an EEA Financial Institution.

93

Section 7.27    DevCo Properties.

(a)    Each DevCo has good and valid title to, valid leasehold interests in, or valid easements, rights of way or other property interests in all of the Midstream Properties owned by it free and clear of all Liens except Excepted Liens and Permitted OMP Credit Facility Liens.

(b)    The Gathering Systems of each DevCo are covered by valid and subsisting recorded fee deeds, leases, easements, rights of way, servitudes, permits, licenses and other instruments and agreements (collectively, "Rights of Way") in favor of the DevCos (or their predecessors in interest), except where the failure of the Gathering Systems to be so covered, individually or in the aggregate,  (i) does not interfere with the ordinary conduct of business of such DevCo, (ii) does not materially detract from the value or the use of the portion of the Gathering Systems which are not covered and (iii) could not reasonably be expected to have a Material Adverse Effect.

(c)    The Rights of Way of each DevCo establish a contiguous and continuous right of way for the Gathering Systems and grant the DevCos (or their predecessors in interest) the right to construct, operate, and maintain the Gathering Systems in, over, under, or across the land covered thereby in the same way that a prudent owner and operator would inspect, operate, repair, and maintain similar assets and in the same way as the DevCos have inspected, operated, repaired, and maintained the Gathering Systems prior to the Effective Date; *provided*, *however*, (i) some of the Rights of Way granted to the DevCos (or their predecessors in interest) by private parties and Governmental Authorities are revocable at the right of the applicable grantor, (ii) some of the Rights of Way cross properties are subject to liens in favor of third parties that have not been subordinated to the Rights of Way, and (iii) some Rights of Way are subject to certain defects, limitations and restrictions; *provided*, *further*, none of the limitations, defects, and restrictions described in clauses (i), (ii) and (iii) above, individually or in the aggregate, (A) interfere with the ordinary conduct of business of the DevCos, (B) materially detract from the value or the use of the portion of the Gathering Systems which are covered or (C) could reasonably be expected to have a Material Adverse Effect.

(d)    Each Processing Plant of the DevCos is or will be located on lands covered by fee deeds, real property leases, or other instruments (collectively "Deeds") in favor of the DevCos (or their predecessors in interest) and their respective successors and assigns.  The Deeds grant the DevCos (or their predecessors in interest) the right to construct, operate, and maintain such Processing Plant on the land covered thereby in the same way that a prudent owner and operator would inspect, operate, repair, and maintain similar assets.

(e)    All Rights of Way and all Deeds necessary for the conduct of the business of the DevCos are valid and subsisting, in full force and effect, and there exists no breach, default or event or circumstance that, with the giving of notice or the passage of time or both, would give rise to a default under any such Rights of Way or Deeds that could reasonably be expected to have a Material Adverse Effect.  All rental and other payments due under any Rights of Way or Deeds by the DevCos (and their predecessors in interest) have been duly paid in accordance with the terms thereof, except to the extent that a failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

94

(f)      The rights and Properties presently owned, leased or licensed by the DevCos, including all Rights of Way and Deeds, include all rights and Properties necessary to permit the DevCos to conduct their businesses in all material respects in the same manner as such businesses have been conducted prior to the date hereof.

(g)      Neither the businesses nor the Properties of the DevCos is affected in any manner that could reasonably be expected to have a Material Adverse Effect as a result of any fire, explosion, earthquake, flood, drought, windstorm, accident, strike or other labor disturbance, embargo, requisition or taking of Property or cancellation of contracts, permits or concessions by a Governmental Authority, riot, activities of armed forces or acts of God or of any public enemy.

(h)      No eminent domain proceeding or taking has been commenced or, to the knowledge of the DevCos is contemplated with respect to all or any portion of the Midstream Properties of the DevCos, except for that which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(i)      [Reserved.]

(j)      Except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the offices, plants, gas processing plants, pipelines, improvements, fixtures, equipment, and other Property owned, leased or used by each DevCo in the conduct of its business is (i) being maintained in a state adequate to conduct normal operations, (ii) in good operating condition, subject to ordinary wear and tear, and routine maintenance or repair, (iii) sufficient for the operation of such business as currently conducted, and (iv) in conformity with all Governmental Requirements relating thereto.

Section 7.28   FERC.  To the extent, if any, that any portion of the Gathering Systems of any DevCo is an interstate common carrier pipeline subject to the jurisdiction of the FERC (an "Interstate Pipeline"):

(a)      The rates on file with the FERC with respect to such Interstate Pipeline are just and reasonable pursuant to the Interstate Commerce Act and Energy Policy Act of 1992 and regulations enacted thereunder, and to the knowledge of the Parent and the Borrower, no provision of the tariff containing such rates is unduly discriminatory or preferential.

(b)      Each DevCo is in compliance, in all material respects, with all rules, regulations and orders of the FERC applicable to such Interstate Pipeline.

(c)      As of the date of this Agreement, no DevCo is liable for any refunds or interest thereon as a result of an order from the FERC.

(d)      Each applicable DevCo's report, if any, on Form 6 filed with the FERC complies as to form with all applicable legal requirements and does not contain any untrue statement of a material fact or omit to state a material fact required to make the statements therein not misleading.

(e)      Without limiting the generality of Section 7.07(a) of this Agreement, no certificate, license, permit, consent, authorization or order (to the extent not otherwise obtained) is

95

US 7429795v.11

required by any DevCo from the FERC to construct, own, operate and maintain any such Interstate Pipeline or to transport and/or distribute Refined Products on such Interstate Pipeline under existing contracts and agreements as the Interstate Pipelines are presently owned, operated and maintained.

Section 7.29    State Regulation.  Each DevCo is in compliance, in all material respects, with all rules, regulations and orders of all rules, regulations and orders of any State agency with jurisdiction to regulate its Midstream Properties, and as of the date of this Agreement, no DevCo is liable for any refunds or interest thereon as a result of an order from any such State agency.

Section 7.30    Title to Refined Products.  No DevCo has title to any of the Refined Products which are transported and/or distributed through the Gathering Systems, except pursuant to agreements under which the relevant DevCo does not have any exposure to commodity price volatility as a result of having title to such Refined Products.

Section 7.31    Beneficial Ownership Certification. As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until Payment in Full has occurred, each of the Parent, OP LLC and the Borrower covenants and agrees with the Lenders that:

Section 8.01    Financial Statements; Other Information.  The Parent, OP LLC and/or the Borrower will furnish to the Administrative Agent, for distribution to each Lender:

(a)    Annual Financial Statements.  In accordance with then applicable law and not later than ninety (90) days after the end of each fiscal year of the Parent, its audited consolidated balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year (except for the fiscal year ending December 31, 2020 for which no comparison shall be required to be delivered other than as required by Accounting Standard Codification 852), all reported on by independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit, other than solely with respect to, or resulting from (i) the Maturity Date occurring within one year from the time such opinion is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent and its Consolidated Subsidiaries and the DevCos on a consolidated basis in accordance with GAAP consistently applied.

(b)    Quarterly Financial Statements.  In accordance with then applicable law and not later than sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Parent, its consolidated balance sheet and related statements of operations, members' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year

96

(except for any fiscal quarters ending on or prior to [September 30, 2020] for which no comparison shall be required to be delivered other than as required by Accounting Standard Codification 852), all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Parent and its Consolidated Subsidiaries and the DevCos on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)     <u>Certificate of Financial Officer – Compliance</u>.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer in substantially the form of <u>Exhibit D</u> hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 9.01, (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate and (iv) setting forth any update to <u>Schedule 7.14</u> that would be necessary to the extent the representations under <u>Section 7.14</u> and Section 7.15 were made as of such date (which updates shall be a supplement to <u>Schedule 7.14</u>).

(d)     <u>Certificate of Financial Officer – Consolidating Information</u>.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all Consolidated Unrestricted Subsidiaries and the eliminating entries, in each case, in such form as would be presentable to the auditors of the Parent.

(e)     <u>Certificate of Financial Officer – Swap Agreements</u>.

(i)     Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Administrative Agent, setting forth as of the last Business Day of such quarter, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the estimated net mark-to-market value therefor, any new credit support agreements relating thereto not listed on <u>Schedule 7.20</u> (other than the Loan Documents), any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(ii)     On or prior to and effective as of the date of Post-Closing Deadline, a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that (x) the Credit Parties have entered into the Minimum Hedge Volumes on or prior to such date (and with respect to the Post-Closing Minimum Hedge Volumes setting forth a true and complete list of such Post-Closing Minimum Hedge Volumes, the material terms thereof (including the average price per volume of the Post-Closing Minimum Hedge Volumes for each of the Initial Measurement Period, the Second Measurement Period and the Third Measurement Period, type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on <u>Schedule 7.20</u> (other than the Loan Documents) and any margin required or

97

supplied under any credit support document, and the counterparty to each such agreement) and the amount of any Availability Block (pursuant to clause (y) of the definition thereof) during the Final Availability Block Period.

(iii)     If an Availability Block is in place during the Final Availability Block Period, on the date of the expiration of the Final Availability Block Period, a certificate of a Financial Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying (x) to a true and complete list of the Minimum Hedge Volumes entered into by the Credit Parties on or prior to and effective as of such date (and setting forth the material terms thereof (including the average price per volume of the Minimum Hedge Volumes for each of the Initial Measurement Period, the Second Measurement Period and the Third Measurement Period, type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not listed on Schedule 7.20 (other than the Loan Documents) and any margin required or supplied under any credit support document, and the counterparty to each such agreement) and (ii) the amount of any Availability Block (pursuant to clause (y) of the definition thereof) as of such date.

(f)     Certificate of Insurer – Insurance Coverage.   Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance reasonably satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(g)     Other Accounting Reports.  Promptly upon receipt thereof, a copy of each other material report or letter submitted to the Parent, OP LLC, the Borrower or any Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Parent, OP LLC, the Borrower or any such Subsidiary, and a copy of any response by the Parent, OP LLC, the Borrower or any such Subsidiary, or the board of directors or other appropriate governing body of the Parent, OP LLC, the Borrower or any such Subsidiary, to such material letter or report.

(h)     SEC and Other Filings; Reports to Shareholders.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent, OP LLC, the Borrower or any Subsidiary with the SEC, or  with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be.

(i)     Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, material report or material notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement with respect to Material Indebtedness, other than any Loan Document and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

(j)     Lists of Purchasers. Concurrently with the delivery of any Reserve Report to the Administrative Agent pursuant to Section 8.12, a list of all Persons purchasing Hydrocarbons from the Borrower or any Restricted Subsidiary in respect of the Oil and Gas Properties expected to account for 80% of the revenues for the sale of Hydrocarbons produced

US 7429795v.11

from the Oil and Gas Properties in the three month period immediately preceding the effective date of the most recent Reserve Report.

(k)     Notice of Sales of Oil and Gas Properties, Liquidation of Commodity Swap Agreements or Casualty Events.  Prior to the sale, transfer, assignment or other disposition of any Oil or Gas Properties (or promptly following any Casualty Events with respect thereto), Liquidation of any Swap Agreements in respect of commodities or any Equity Interests in any Restricted Subsidiary pursuant to Section 9.12(d), (e) or (f), in which such single sale, transfer, assignment, disposition or Liquidation or series of sales, transfers, assignments, dispositions or Liquidations pursuant to such provisions as of such date, since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to such provisions, exceeds 5.0% of the then-effective Borrowing Base, written notice of such disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent or any Lender.

(l)     [Reserved.]

(m)     Information Regarding Borrower and Guarantors.  Prompt written notice of (and in any event at least ten (10) days prior thereto, or such later date as the Administrative Agent may agree to in its sole discretion, but in any event with respect to clauses (i), (ii) and (iii) hereof, not later than the occurrence thereof) any change (i) in the Borrower's or any Guarantor's corporate name,  (ii) in the location of the Borrower's or any Guarantor's chief executive office or principal place of business,  (iii) in the Borrower's or any Guarantor's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed,  (iv) in the Borrower's or any Guarantor's organizational identification number in such jurisdiction of organization, and  (v) in the Borrower's or any Guarantor's federal taxpayer identification number.

(n)     Production Report and Lease Operating Statements.  Within sixty (60) days after the end of each of the first three fiscal quarters for each calendar month during the then current fiscal year to date, and within ninety (90) days after the end of the fiscal year, a report setting forth the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month during such period from the Oil and Gas Properties described therein.

(o)     Notice of Certain Changes.  Promptly, but in any event within ten (10) Business Days after the execution thereof (or such later date as the Administrative Agent may agree in its sole discretion) unless earlier notice is required by Section 8.01(m), copies of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws or any other organic document of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo.

(p)     [Reserved.]

(q)     Other Requested Information.  Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of the Parent, OP LLC, the Borrower or any Restricted Subsidiary (including, without limitation, any Plan, and any reports or other information required to be filed with respect thereto under the

99

Code or under ERISA, and any Multiemployer Plan), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

(r)  Issuance of Senior Notes and Permitted Refinancing Debt.  In the event the Parent decides to issue Senior Notes (including any Convertible Notes) or any Permitted Refinancing Debt as contemplated by Section 9.02(i), three (3) Business Days prior written notice of such offering therefor, the amount thereof and the anticipated date of closing and a copy of the preliminary offering memorandum (if any) and the final offering memorandum (if any) and any other material documents relating to such offering of Senior Notes or such Permitted Refinancing Debt and whether such issuance of Debt is intended to Redeem any Senior Notes (but with respect to any fees of the agents or arrangers thereunder, to the extent permitted by, and subject to, the confidentiality provisions thereof).

(s)  Regulatory Notices.  Promptly, but in any event within five (5) Business Days after receipt thereof by any DevCo, a copy of any form of notice, summons, citation, proceeding or order received from the FERC asserting jurisdiction over any material portion of the Gathering Systems.

Documents required to be delivered pursuant to Section 8.01(a), (b), (g) or (h) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Parent or the Borrower posts such documents, or provides a link thereto on the Parent's or the Borrower's public website; or (ii) on which such documents are posted on the Parent's or the Borrower's behalf on an Internet or intranet website (including the SEC's EDGAR website), if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent).

The Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of Parent, OP LLC and/or the Borrower hereunder (collectively, "Company Materials") by posting the Company Materials on an Approved Electronic Platform. Parent, OP LLC and the Borrower hereby acknowledge that certain of the Lenders may from time to time elect to be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender") and the Borrower hereby agrees that (w) all Company Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (x) by marking Company Materials "PUBLIC," Parent, OP LLC and the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Company Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to Parent, OP LLC, the Borrower or their respective securities for purposes of United States Federal and state securities laws, (y) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Approved Electronic Platform designated "Public Investor" and (z) the Administrative Agent shall be entitled to treat Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Approved Electronic Platform not designated "Public Investor."

100

US 7429795v.11

Section 8.02    Notices of Material Events.  The Parent, OP LLC and/or the Borrower will furnish to the Administrative Agent (for distribution to each Lender) prompt written notice of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Parent, OP LLC, the Borrower or any Restricted Subsidiary or any DevCo not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lenders) that, in either case could reasonably be expected to result in liability in excess of $25,000,000, not fully covered by insurance, subject to normal deductibles;

(c)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(d)    any change in the information provided in any relevant Beneficial Ownership Certification delivered hereunder that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03    Existence; Conduct of Business.  The Parent, OP LLC and the Borrower will, and will cause each Restricted Subsidiary and DevCo to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties (or in the case of the DevCos, their Midstream Properties) are located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; *provided* that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.11.

Section 8.04    Payment of Taxes.  The Parent, OP LLC and the Borrower will, and will cause each Restricted Subsidiary and each DevCo to, pay its Tax liabilities before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and the Parent, OP LLC, the Borrower, such Restricted Subsidiary or such DevCo has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any material Property of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo.

Section 8.05    Performance of Obligations under Loan Documents.  The Parent, OP LLC and the Borrower will pay the Notes according to the reading, tenor and effect thereof, and the Parent, OP LLC and the Borrower will, and will cause each Restricted Subsidiary and each DevCo to, do and perform every act and discharge all of the obligations to be performed and discharged

101

US 7429795v.11

by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06   Operation and Maintenance of Properties.   The Borrower, at its own expense, will, and will cause each Restricted Subsidiary to:

(a)   operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(b)   keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Oil and Gas Properties and other Properties, including, without limitation, all equipment, machinery and facilities, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(c)   promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(d)   promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(e)   operate its Oil and Gas Properties and other Properties or cause or make reasonable and customary efforts to cause such Oil and Gas Properties and other Properties to be operated in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(f)   to the extent the Borrower is not the operator of any Property, the Borrower shall use commercially reasonable efforts to cause the operator to comply with this Section 8.06, but the failure of the operator to so comply will not, in and of itself, constitute a Default or an Event of Default hereunder.

102

US 7429795v.11

Section 8.07    Insurance.  The Parent, OP LLC and the Borrower will, and will cause each of their respective Restricted Subsidiaries and each DevCo to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and/or "lender loss payees" and provide that the insurer will endeavor to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent.

Section 8.08    Books and Records; Inspection Rights.  The Parent, OP LLC and the Borrower will, and will cause each Restricted Subsidiary and DevCo to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Parent, OP LLC and the Borrower will, and will cause each Restricted Subsidiary and DevCo to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; *provided* that the Credit Parties shall not be required to reimburse any cost or expense related thereto more than once in any calendar year (unless an Event of Default has occurred and is continuing).

Section 8.09    Compliance with Laws.  The Parent, OP LLC and the Borrower will, and will cause each Restricted Subsidiary and DevCo to, comply with all Governmental Requirements applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 8.10    Environmental Matters.

(a)      the Parent, OP LLC and the Borrower shall at their sole expense: (i) comply, and shall cause each Subsidiary and each DevCo to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect;  (ii) not dispose of or otherwise Release, and shall cause each Subsidiary and DevCo not to dispose of or otherwise Release, any Hazardous Material, or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' or the DevCos' Properties or any other Property to the extent caused by the Borrower's or any of its Subsidiaries' or any DevCo's operations except in compliance with applicable Environmental Laws, the disposal or Release of which could reasonably be expected to have a Material Adverse Effect;  (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all notices, and Environmental Permits, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or the Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect and  (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary and DevCo to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required of

103

Parent, OP LLC, the Borrower or any Subsidiary or DevCo under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other Release of any Hazardous Material on, under, about or from any of the Borrower's or the Subsidiaries' or the DevCos' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect.

(b)     The Parent, OP LLC and the Borrower will promptly, but in no event later than five (5) days after the Borrower's knowledge of the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any landowner or other third party against the Borrower or the Subsidiaries or the DevCos or their respective Properties of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower reasonably anticipates that such action will result in liability (whether individually or in the aggregate) in excess of $25,000,000 not fully covered by insurance, subject to normal deductibles.

(c)     The Parent, OP LLC and the Borrower will, and will cause each Subsidiary to, provide environmental audits and tests in accordance with American Society of Testing Materials standards upon reasonable request by the Administrative Agent (i) in the event of any Event of Default (or as otherwise may reasonably be requested by the Administrative Agent in the event of a Release or threatened Release of Hazardous Materials that could reasonably be expected to have a Material Adverse Effect), or (ii) obtained in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11     Further Assurances.

(a)     The Parent, OP LLC and the Borrower at their sole expense will, and will cause each Restricted Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Parent, OP LLC, the Borrower or any Restricted Subsidiary, as the case may be, in the Loan Documents, including the Notes, or to further evidence and more fully describe the collateral intended as security for the Indebtedness, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith.

(b)     The Parent, OP LLC and the Borrower hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Borrower or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.  The Parent, OP LLC and the Borrower acknowledge and agree that any such financing statement may describe the collateral as "all assets" of the applicable Credit Party or words of similar effect as may be required by the Administrative Agent

104

Section 8.12    Reserve Reports.

(a)    On or before March 1st and September 1st of each year, commencing March 1, 2021, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Credit Parties as of the immediately preceding January 1 and July 1.  The Reserve Report as of January 1 of each year shall be comprised of  (i) a report prepared by one or more Approved Petroleum Engineers with regards to not less than 90% of the total value of the Proved Reserves of the Credit Parties and  (ii) a report on the remainder of the Oil and Gas Properties of the Credit Parties prepared by or under the supervision of the chief engineer of the Borrower who shall certify that such portion of such Reserve Report (x) is true and correct in all material respects, and (y) has been prepared in accordance with the procedures used to prepare the portion of such Reserve Report that was prepared by one or more Approved Petroleum Engineers.  The July 1 Reserve Report of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report (A) to be true and accurate in all material respects and (B) to have been prepared in accordance with the procedures used in the immediately preceding January 1 Reserve Report.  For purposes of this Section 8.12(a), with respect to any Reserve Report (or portion thereof) prepared by or under the supervision of the chief engineer of the Borrower, it is understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that none of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries or such Responsible Officer warrants that such opinions, estimates and projections will ultimately prove to have been accurate.

(b)    In the event of an Interim Redetermination, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that none of the Parent, OP LLC, the Borrower, the Restricted Subsidiaries or such Responsible Officer warrants that such opinions, estimates and projections will ultimately prove to have been accurate, and to have been prepared in accordance with the procedures used in the immediately preceding January 1 Reserve Report.  For any Interim Redetermination requested by the Administrative Agent or the Borrower pursuant to Section 2.07(b), the Borrower shall provide such Reserve Report with an "as of" date as required by the Administrative Agent as soon as possible, but in any event no later than thirty (30) days following the receipt of such request.

(c)    No later than (x) March 15 in the case of the Reserve Report required to be delivered on or prior to March 1, (y) September 15 in the case of the Reserve Report required to be delivered on or prior to September 1 and (z) fifteen (15) days after any Reserve Report delivered pursuant to Section 8.12(b), the Borrower shall provide to the Administrative Agent and the Lenders a certificate from a Responsible Officer certifying that: (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that none the Parent,

105

US 7429795v.11

OP LLC, the Borrower, the Subsidiaries or such Responsible Officer warrants that such opinions, estimates and projections will ultimately prove to have been accurate, (ii) the Borrower or the Restricted Subsidiaries owns good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by Section 9.03, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any Restricted Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties (as defined in subsections (a), (b), (c), (d) and (e) of the definition thereof) have been sold pursuant to Section 9.12(d), (e) or (f) since the date of the last Borrowing Base determination except as set forth on an exhibit to the certificate, which certificate shall list all of its Oil and Gas Properties (as defined in subsections (a), (b), (c), (d) and (e) of the definition thereof) sold pursuant to Section 9.12(d), (e) or (f) and in such detail as reasonably required by the Administrative Agent; *provided* that, this clause (iv) shall not apply to the sale of oil that would not otherwise be included in such certificate but for the fact that it has been stored in tanks in the ordinary course of business for a short period of time pending collection and sale, (v)  attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the Effective Date and (vi)  attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating the percentage of the total value of Proved Reserves that such Mortgaged Properties represent in compliance with Section 8.14(a).

Section 8.13    Title Information.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), the Borrower will deliver title information in form and substance reasonably acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least 90% of the total value of the Proved Reserves evaluated by such Reserve Report.

(b)    If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within sixty (60) days of notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, either (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information, (ii) substitute acceptable Mortgaged Properties with no title defects or exceptions except for Excepted Liens (other than Excepted Liens described in clauses (e), (g) and (h) of such definition) having an equivalent value or (iii) deliver title information in form and substance reasonably acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least 90% of the value of the Proved Reserves evaluated by such Reserve Report.

US 7429795v.11

(c)      If the Borrower is unable to cure any title defect requested by the Administrative Agent or the Lenders to be cured within the sixty (60) day period or the Borrower does not comply with the requirements to provide reasonably acceptable title information covering 90% of the value of the Proved Reserves evaluated in the most recent Reserve Report, such default shall not be a Default, but instead the Administrative Agent and/or the Required Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Lenders.  To the extent that the Administrative Agent or the Required Lenders are not reasonably satisfied with title to any Mortgaged Property after the sixty (60) day period has elapsed, such unacceptable Mortgaged Property shall not count towards the 90% requirement, and the Administrative Agent may send a notice to the Borrower and the Lenders that the then outstanding Borrowing Base shall be reduced by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide reasonably acceptable title information on 90% of the value of the Proved Reserves.  This new Borrowing Base shall become effective immediately after receipt of such notice.

Section 8.14    Additional Collateral; Additional Guarantors.

(a)      In connection with each redetermination of the Borrowing Base, the Borrower shall review the Reserve Report and the list of current Mortgaged Properties (as described in Section 8.12(c)(vi)) to ascertain whether the Mortgaged Properties represent at least 90% of the total value of the Oil and Gas Properties evaluated in the most recently completed Reserve Report after giving effect to exploration and production activities, acquisitions, dispositions and production.  In the event that the Mortgaged Properties do not represent at least 90% of such total value, then the Borrower shall, and shall cause the Restricted Subsidiaries to, grant, within thirty (30) days of delivery of the certificate required under Section 8.12(c) (or such later date as the Administrative Agent may agree in its sole discretion but in any event not to exceed sixty (60) days after such delivery), to the Administrative Agent as security for the Indebtedness a first-priority Lien interest (provided that Excepted Liens of the type described in clauses (a) to (d) and (f) of the definition thereof may exist, but subject to the provisos at the end of such definition) on additional Oil and Gas Properties of the Credit Parties not already subject to a Lien of the Security Instruments such that after giving effect thereto, the Mortgaged Properties will represent at least 90% of such total value.  All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Instruments, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes.  In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its Oil and Gas Properties and such Restricted Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with Section 8.14(b).

(b)      The Parent, OP LLC and the Borrower shall promptly cause each Material Subsidiary and any other Domestic Subsidiary that guarantees any Debt of any other Credit Party (in each case other than an Excluded Subsidiary), to guarantee the Indebtedness pursuant to the Guaranty and Security Agreement.  In connection with any such guaranty, the Parent, OP LLC and the Borrower shall (A) cause such Domestic Subsidiary to execute and deliver the Guaranty and Security Agreement or a supplement thereto, as applicable, (B) cause the Credit Party that owns Equity Interests in such Domestic Subsidiary to pledge all of the Equity Interests of such

107

new Domestic Subsidiary pursuant to the Guaranty and Security Agreement (including, without limitation, delivery (if applicable) of original certificates evidencing the Equity Interests of such Domestic Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(c)     [Reserved.]

(d)     Notwithstanding any provision in any of the Loan Documents to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulations) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulations) owned by any Credit Party included in the Mortgaged Property and no Building or Manufactured (Mobile) Home shall be encumbered by any Security Instrument; *provided*, that (i) the applicable Credit Party's interests in all lands and Hydrocarbons situated under any such Building or Manufactured (Mobile) Home shall be included in the Mortgaged Property and shall be encumbered by the Security Instruments and (ii) the Parent, OP LLC and the Borrower shall not, and shall not permit any of their respective Restricted Subsidiaries to, permit to exist any Lien on any Building or Manufactured (Mobile) Home except Excepted Liens.

Section 8.15    ERISA Compliance.  The Borrower will promptly furnish and will cause its Subsidiaries and any ERISA Affiliate to promptly furnish to the Administrative Agent (i) copies of each annual and other report with respect to each Plan or any trust created thereunder to the extent such report is reasonably requested of the Borrower by the Administrative Agent and (ii) immediately upon becoming aware of the occurrence of any ERISA Event, a written notice signed by the President or principal Financial Officer of the Borrower, the Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action the Borrower, the Subsidiary or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto.

Section 8.16    DevCo Properties.  The Parent, OP LLC and the Borrower will cause each DevCo to:

(a)     operate its Midstream Properties and other material Properties or cause such Midstream and other material Properties to be operated in accordance with the customary practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable proration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(b)     keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Midstream Properties and other material Properties, including, without limitation, all

108

equipment, machinery and facilities, except where failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)     promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Midstream Properties and other material Properties, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(d)     maintain or cause the maintenance of the interests and rights (i) which are necessary to maintain the Rights of Way for the Gathering Systems and to maintain the other Midstream Properties, and (ii) which individually or in the aggregate, could, if not maintained, reasonably be expected to have a Material Adverse Effect.

(e)     subject to Excepted Liens, maintain the Gathering Systems within the confines of the Rights of Way without encroachment upon any adjoining property and maintain the Processing Plants within the boundaries of the Deeds and without encroachment upon any adjoining property, except where failure to do so could not reasonably be expected to have a Material Adverse Effect.

(f)     maintain such rights of ingress and egress necessary to permit the DevCos to inspect, operate, repair, and maintain the Gathering Systems and the other Midstream Properties to the extent that failure to maintain such rights, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect and *provided* that the DevCos may hire third parties to perform these functions.

(g)     maintain all material agreements, licenses, permits, and other rights required for any of the foregoing described in this Section 8.16 in full force and effect in accordance with their terms, timely make any payments due thereunder, and prevent any default thereunder which could result in a termination or loss thereof, except any such failure to pay or default that could not reasonably, individually or in the aggregate, be expected to cause a Material Adverse Effect.

(h)     to the extent any DevCo is not the operator of any Property, such DevCo shall use commercially reasonable efforts to cause the operator to comply with this Section 8.16, but failure of the operator to so comply will not constitute a Default or Event of Default hereunder.

Section 8.17     Marketing Activities.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (a) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (b) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries that the Borrower or one of the Restricted Subsidiaries has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business and (c) other contracts for the purchase and/or sale of

109

Hydrocarbons of third parties (i) which have generally offsetting provisions (*i.e.*, corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (ii) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 8.18   Commodity Exchange Act Keepwell Provisions.  Each of the Parent, OP LLC and the Borrower, to the extent that it is a Qualified ECP Guarantor, hereby guarantees the payment and performance of all Indebtedness of each Credit Party (other than itself) and absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Credit Party (other than itself) in order for such Credit Party to honor its obligations under the Guaranty and Security Agreement including obligations with respect to Swap Agreements (*provided*, *however*, that the Parent, OP LLC and the Borrower, to the extent each is a Qualified ECP Guarantor, shall only be liable under this Section 8.18 for the maximum amount of such liability that can be hereby incurred (a) without rendering its obligations under this Section 8.18, or otherwise under this Agreement or any Loan Document, as it relates to such other Credit Parties, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount and (b) without rendering such Credit Party liable for amounts to creditors, other than the Secured Parties, that such Credit Party would not otherwise have made  available to such creditors if this Section 8.18 was not in effect). The obligations of the Parent, OP LLC and the Borrower, to the extent each is a Qualified ECP Guarantor, under this Section 8.18 shall remain in full force and effect until Payment in Full has occurred. Each of the Parent, OP LLC and the Borrower that is a Qualified ECP Guarantor intends that this Section 8.18 constitute, and this Section 8.18 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 8.19   DevCo Parent Undertaking.  Each of the Parent, OP LLC and the Borrower shall cause OMS (and any other Credit Party that holds Equity Interests in any DevCo) to comply with the covenants contained in each DevCo Parent Undertaking, and shall cause any Credit Party that owns Equity Interests in a DevCo to become party to the applicable DevCo Parent Undertaking.

Section 8.20   Ownership of DevCo Equity Interests.  The Parent, OP LLC and the Borrower (a) shall cause 100% of the Equity Interests in each DevCo to be owned collectively (i) directly by OMS and (ii) directly or indirectly by OMP and (b) shall not permit any other Person to own any Equity Interest in any DevCo.

Section 8.21   Ownership of General Partner Equity Interests.  The Parent, OP LLC and the Borrower (a) shall cause 100% of the Equity Interests in the General Partner (other than the Class B Units) to be owned directly or indirectly by the Parent and (b) shall not permit any other Person to own any Equity Interest in the General Partner (other than the Class B Units).

Section 8.22   Unrestricted Subsidiaries.  The Parent, OP LLC and the Borrower:

(a)      will cause the management, business and affairs of each of the Borrower and its Restricted Subsidiaries to be conducted in such a manner (including, without limitation, by keeping separate books of account, furnishing separate financial statements of Unrestricted

110

Subsidiaries to creditors and potential creditors thereof and by not permitting Properties of the Borrower and its respective Restricted Subsidiaries to be commingled) so that each Unrestricted Subsidiary that is a corporation will be treated as a corporate entity separate and distinct from the Borrower and the Restricted Subsidiaries.

(b)     will not, and will not permit any of the Restricted Subsidiaries to, incur, assume, guarantee or be or become liable for any Debt of any of the Unrestricted Subsidiaries.

(c)     will not permit any Unrestricted Subsidiary to (i) hold any Equity Interest in, or any Debt of the Parent, OP LLC or the Borrower or any Restricted Subsidiary or (ii) own or operate any assets or properties other than Midstream Properties.

Section 8.23   Affirmative Hedging Covenant.  On December 31, 2020 and the last day of each fiscal quarter thereafter, the Borrower shall provide evidence satisfactory to the Administrative Agent that the Borrower and/or another Credit Party has entered into Swap Agreements with Approved Counterparties to hedge notional volumes of crude oil covering not less than (a) eighty percent (80%) of the reasonably anticipated production of such crude oil from the Credit Parties' Oil and Gas Properties constituting Proved Developed Producing Reserves for the next twelve months following such date and (b) seventy percent (70%) of the reasonably anticipated production of such crude oil from the Credit Parties' Oil and Gas Properties constituting Proved Developed Producing Reserves for the thirteenth through twenty-fourth months following such date, in each case, as such anticipated production is set forth in the most recently delivered Reserve Report as of such date.

Section 8.24   Post-Closing Covenants.

(a)     On or prior to the Post-Closing Deadline, the Credit Parties shall have entered into the Minimum Hedge Volumes at the Target Hedge Pricing Requirements provided that (i) in the event that the Credit Parties fail to enter into the Minimum Hedge Volumes by the Post-Closing Deadline, it shall be an automatic Event of Default pursuant to Section 10.01(d) and (ii) in the event that the Credit Parties enter into the Minimum Hedge Volumes on or prior to the Post-Closing Deadline but fail to satisfy the Target Hedge Pricing Requirements with respect to such volumes on or prior to the Post-Closing Deadline, it shall not be an Event of Default, but instead the Credit Parties shall have ten (10) Business Days thereafter (the "Hedge Cure Period") to satisfy the Target Hedge Pricing Requirements; *provided, further* that if the Credit Parties fail to satisfy the Target Hedge Pricing Requirements for the Minimum Hedge Volumes during the Hedge Cure Period, unless the Required Lenders otherwise agree during the Hedge Cure Period, upon the expiration of the Hedge Cure Period, the Borrowing Base shall automatically be reduced by an amount equal to the amount set forth in clause (y) of the definition of Availability Block calculated as of such date.

(b)     Each beneficiary of any Existing Letter of Credit subject to the LC Adjustment pursuant to Section 6.01(o) shall have returned (or accepted an amendment thereto reducing the stated amount thereof) such letter of credit within ten (10) Business Days of the Effective Date); provided that in the event that any beneficiary of any Existing Letter of Credit subject to the LC Adjustment fails to comply with the applicable agreement regarding such letter of credit on or before the date that is ten (10) Business Days after the Effective Date (or such later

111

date as the Administrative Agent may agree in its sole discretion), (i) the Effective Date Availability Test shall be recalculated as of the Effective Date without giving effect to the LC Adjustment with respect to the applicable letter of credit and (ii) to the extent that the Available Commitment is less than $75 million after giving effect to such recalculation, an immediate Event of Default shall occur pursuant to Section 10.01(d); provided further, that for the avoidance of doubt, if the Available Commitment is greater than or equal to $75 million after giving effect to the foregoing recalculation, no Event of Default shall be deemed to have occurred due to the failure of the applicable beneficiary to have returned (or accepted an amendment thereto the stated amount thereof) the applicable letter of credit.

## ARTICLE IX
## NEGATIVE COVENANTS

Until Payment in Full has occurred, each of the Parent, OP LLC and the Borrower covenants and agrees with the Lenders that:

Section 9.01    Financial Covenants.

(a)    Current Ratio.  The Parent, OP LLC and the Borrower will not permit, as of the last day of any Test Period (commencing with the Test Period ending March 31, 2021), the ratio of (i) consolidated current assets (including the unused amount of the total Commitments, but excluding non-cash assets under ASC 815) of the Parent and the Consolidated Restricted Subsidiaries to (ii) consolidated current liabilities (excluding non-cash obligations under ASC 815 and current maturities under this Agreement) of the Parent and the Consolidated Restricted Subsidiaries to be less than 1.0 to 1.0.

(b)    Ratio of Total Net Debt to EBITDAX.  The Parent, OP LLC and the Borrower will not, as of the last day of any Test Period (commencing with the Test Period ending March 31, 2021), permit, at any date of determination, the ratio of Total Net Debt as of such date to EBITDAX, in each case for the Parent and the Consolidated Restricted Subsidiaries (or, in the case of the Test Periods ending on March 31, 2021, June 30, 2021 and September 30, 2021, Annualized EBITDAX) for the Test Period ending on such date (the "Leverage Ratio"), to be greater than 3.00 to 1.00.

Section 9.02    Debt.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, incur, create, assume or suffer to exist any Debt, except:

(a)    the Notes or other Indebtedness or any guaranty of or suretyship arrangement for the Notes or other Indebtedness.

(b)    Debt existing on the date hereof that is reflected in the Financial Statements or in Schedule 9.02.

(c)    [Reserved.]

(d)    Purchase Money Debt and Debt under Capital Leases not to exceed $25,000,000.

(e)        Debt in respect of performance bonds, bid bonds, appeal bonds, surety bonds, completion guarantees and similar obligations (including those incurred to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guaranties or instruments related thereto, in each case, not in connection with money borrowed and provided in the ordinary course of business or consistent with past practice in connection with the operation of the Oil and Gas Properties.

(f)        intercompany Debt between or among the Restricted Parties to the extent permitted by Section 9.05; *provided* that (i) such Debt is not held, assigned, transferred, negotiated or pledged to any Person other than the Parent, OP LLC, the Borrower or one of its Wholly-Owned Subsidiaries and (ii) any such Debt owed by a Credit Party shall be (A) subordinated to the Indebtedness on terms set forth in the Guaranty and Security Agreement and  (B) shall not have any scheduled amortization prior to the date that is one (1) year after the earlier of (x) the Maturity Date and (y) the Payment in Full of the Secured Obligations.

(g)        endorsements of negotiable instruments for collection in the ordinary course of business.

(h)        other Debt not to exceed $10,000,000 in the aggregate at any one time outstanding.

(i)        unsecured Senior Notes and any guarantees thereof and any unsecured Permitted Refinancing Debt and any guarantees thereof not to exceed $400,000,000 in the aggregate at any one time outstanding; *provided* that (i) the Borrower shall have complied with Section 8.01(r), (ii) at the time of incurring such Senior Notes or Permitted Refinancing Debt,  no Default has occurred and is then continuing and  after giving effect on a pro forma basis to the incurrence of such Senior Notes or Permitted Refinancing Debt (and any concurrent repayment of Debt with the proceeds of such incurrence, if any), no Default would result from the incurrence of such Senior Notes or Permitted Refinancing Debt, (iii) the Borrower shall be in pro forma compliance with Section 9.01(a) and in pro forma compliance with a Leverage Ratio of not greater than 2.5 to 1.0, in each  case, calculated for the most recent Test Period on a pro forma basis for such Debt incurrence, (iv) on the Reduction Date, the Borrowing Base shall be adjusted to the extent required by Section 2.07(e) and prepayment is made to the extent required by Section 3.04(c)(iv) and no Borrowing Base Deficiency would then exist after giving effect to such adjustment and prepayment, (v) such Senior Notes or Permitted Refinancing Debt, as applicable, do not have any scheduled principal amortization prior to the date which is one year after the Maturity Date, (vi) such Senior Notes or Permitted Refinancing Debt do not mature sooner than the date which is one year after the Maturity Date, (vii) such Senior Notes or Permitted Refinancing Debt and any guarantees thereof are on terms, taken as a whole, at least as favorable to the Borrower and the Guarantors as market terms for issuers of similar size and credit quality given the then prevailing market conditions as determined by the Borrower in good faith and (viii) such Senior Notes or Permitted Refinancing Debt do not have any mandatory prepayment or redemption provisions (other than customary change of control or asset sale tender offer provisions) which would require a mandatory prepayment or redemption in priority to the Indebtedness; *provided* that if such Senior Notes are issued to finance all or a portion of a direct or indirect acquisition of Oil and Gas Properties, such Senior Notes may contain mandatory prepayment or redemption provisions providing for the repayment or redemption of such Senior

113

Notes in the event that such acquisition is not consummated by a certain date in an amount not to exceed the principal amount of such Senior Notes and any accrued interest thereon through the prepayment or redemption date.

(j)    Debt constituting Investments permitted by Section 9.05 (other than Section 9.05(m)).

(k)    Debt under Swap Agreements permitted pursuant to Section 9.18.

(l)    Debt owed to insurance companies for premiums on policies required by Section 8.07.

(m)    Debt in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements.

Section 9.03    Liens.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)    Liens securing the payment of any Indebtedness.

(b)    Excepted Liens.

(c)    Liens securing Purchase Money Debt or Capital Leases permitted by Section 9.02 but only on the Property under lease or acquired, constructed or improved with such Debt.

(d)    Liens securing intercompany Debt under Section 9.02(f), *provided* that such Liens on the assets of any Credit Party are subordinated to the Liens securing the Indebtedness on terms satisfactory to the Administrative Agent and the Required Lenders.

(e)    Liens on Property not constituting collateral for the Indebtedness; *provided* that the aggregate principal or face amount of all Debt secured under this Section 9.03(e) shall not exceed $10,000,000 at any time.

(f)    Liens solely on any cash earnest money deposits in an aggregate amount at any time outstanding not to exceed $25,000,000 made by the Parent or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement in connection with an acquisition or an Investment that is not prohibited by Section 9.05.

(g)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto.

(h)    Liens existing on the date hereof and listed on Schedule 9.03.

114

Section 9.04    Dividends, Distributions and Redemptions; Repayment of Senior Notes and Amendment to Terms of Senior Notes.

(a)    Restricted Payments.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, declare or make, directly or indirectly, any Restricted Payment, return any capital or make any distribution of its Property to its Equity Interest holders, except:

(i)    the Parent and OP LLC may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock),

(ii)    Subsidiaries (other than the General Partner) of the Parent may declare and pay dividends ratably with respect to their Equity Interests,

(iii)    the Parent and OP LLC may make Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower and its Subsidiaries,

(iv)    the Parent, OP LLC and the Borrower may make payments to former employees in connection with the termination of such former employee's employment in an aggregate amount not to exceed $250,000 in any calendar year for the purpose of repurchasing Equity Interests in any member of the Parent, OP LLC or the Borrower, as applicable, issued to such former employee pursuant to stock option plans or other benefit plans for management or employees of the Parent and its Subsidiaries,

(v)    any Credit Party may pay the purchase price for any Permitted Bond Hedge Transaction(s),

(vi)    the Parent may pay cash and/or deliver common stock upon the settlement, termination or redemption of any Permitted Warrant Transaction(s),

(vii)    the Parent may pay cash and/or deliver common stock in satisfaction of the Parent's obligations in respect of the Convertible Notes whether upon conversion of such securities, upon the occurrence of a change of control  (or similar event, however so defined by the terms of such securities) or other customary mandatory prepayment or redemption event permitted by Section 9.04(b)(i), upon repurchase of such securities pursuant to a Redemption thereof otherwise permitted by this Agreement or at maturity of such securities,

(viii)    the General Partner may declare and make Restricted Payments to any other Credit Party,

(ix)    so long as no Event of Default or Borrowing Base Deficiency has occurred and is continuing, the General Partner may declare and make Restricted Payments in cash (A) ratably with respect to all of its Equity Interests (inclusive of the Class A Units (as defined in the General Partners LLC Agreement) and the Class B Units and (B) to former employees of the Parent and its Subsidiaries in connection with the termination of such former employee's employment in an aggregate amount not to exceed $1,500,000 in any calendar year for the purpose

115

of repurchasing outstanding Class B Units issued to such employee, so long as any Class B Units remain outstanding,

(x)      commencing on the Test Period ending [September 30, 2021], each of the Parent, OP LLC and the Borrower shall be permitted to make other Restricted Payments provided that (A) no Event of Default is continuing or would result therefrom, (B) the pro forma Leverage Ratio after giving effect thereto for the most recent Test Period is less than 2.0 to 1.0, (C) the pro forma Available Commitment after giving effect thereto is not less than 25% of the total Commitments then in effect, and (D) if the pro forma Leverage Ratio after giving effect thereto for the most recent Test Period exceeds 1.5 to 1.0, the amount of such Restricted Payments made since the Effective Date pursuant to this clause (x) shall not exceed the amount of positive Free Cash Flow (including after giving effect to any other Restricted Payments pursuant to this clause (x), Investments pursuant to Section 9.05(l) and Capital Expenditures pursuant to Section 9.22(a) made since the Effective Date and prior to the date of determination that would otherwise reduce the amount of Free Cash Flow), and

(xi)      Restricted Payments pursuant to the Transactions substantially concurrently with the Effective Date as set forth in the Prepackaged Plan.

(b)      <u>Repayment of Senior Notes, Permitted Refinancing Debt and Convertible Notes; Amendment to Terms of Senior Notes, Permitted Refinancing Debt and Convertible Notes</u>. The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, prior to the date that is ninety-one (91) days after the Maturity Date:

(i)      call, make or offer to make any optional or voluntary Redemption of or otherwise optionally or voluntarily Redeem (whether in whole or in part) the Senior Notes, Permitted Refinancing Debt or the Convertible Notes; *provided* that

(A)      the Parent may Redeem the Senior Notes, Permitted Refinancing Debt or Convertible Notes in one or more transactions in an aggregate amount not to exceed the net cash proceeds of any sale of Equity Interests (other than Disqualified Capital Stock) of the Parent to the extent that (x) such Redemption is consummated within one hundred eighty (180) days of the consummation of such sale of Equity Interest and (y) after giving pro forma effect to such Redemption, no Default, Event of Default or Borrowing Base Deficiency shall have occurred and be continuing, and

(B)      the Parent may Redeem the Senior Notes or Permitted Refinancing Debt with the proceeds of any Permitted Refinancing Debt substantially concurrently with the incurrence of such Permitted Refinancing Debt, or

(ii)      amend, modify, waive or otherwise change, consent or agree to any amendment, modification, waiver or other change to, any of the terms of the Senior Notes or the Senior Notes Indenture or the terms of any Permitted Refinancing Debt and the agreements governing any Permitted Refinancing Debt or the terms of the Convertible Notes or the Convertible Notes Indenture if (A) the effect thereof would be to shorten its maturity or average life or increase the amount of any payment of principal thereof or increase the rate or shorten any period for payment of interest thereon or (B) such action requires the payment of a consent fee

116

(howsoever described), *provided* that the foregoing shall not prohibit the execution of supplemental indentures associated with the incurrence of additional Senior Notes, Convertible Notes or Permitted Refinancing Debt to the extent permitted by Section 9.02 or the execution of supplemental indentures to add guarantors if required by the terms of any Senior Notes Indenture, any Convertible Notes Indenture or any agreement governing any Permitted Refinancing Debt provided such Person complies with Section 8.14(b) or  with respect to Senior Notes, Convertible Notes or Permitted Refinancing Debt that are subordinated to the Indebtedness or any other Debt, designate any Debt (other than obligations of the Borrower and the Restricted Subsidiaries pursuant to the Loan Documents) as "Specified Senior Indebtedness" or "Specified Guarantor Senior Indebtedness" or give any such other Debt any other similar designation for the purposes of any Senior Notes Indenture, Convertible Notes Indenture or any agreement governing any Permitted Refinancing Debt that are subordinated to the Indebtedness or any other Debt.

Section 9.05    Investments, Loans and Advances.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, make or permit to remain outstanding, any Investments in or to any Person, except that the foregoing restrictions shall not apply to:

(a)    Investments made prior to the Effective Date reflected in the Financial Statements or which are disclosed to the Lenders in Schedule 9.05.

(b)    accounts receivable arising in the ordinary course of business.

(c)    Investments in direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof.

(d)    Investments in commercial paper maturing within one year from the date of creation thereof rated in the highest grade by S&P or Moody's.

(e)    Investments in deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively.

(f)    Investments in deposits in money market funds investing exclusively in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e).

(g)    Investments (i) made by any Credit Party  in or to any other Credit Party (or any Person that will, upon making such Investment, become a Guarantor) or (ii) made by any Restricted Party that is not a Credit Party in or to any other Restricted Party, (iii) made by any Restricted Party in or to OP International or its subsidiaries; *provided* that (A) the aggregate of all Investments made by any Credit Party in or to OP International and its subsidiaries shall not exceed $10,000,000 at any time, (B) no Event of Default exists at the time of such Investment, (C) the pro forma Leverage Ratio after giving effect to such Investment for the most recent Test Period is less

117

than 2.0 to 1.0 and (D) immediately after giving effect to such Investment, the Available Commitment hereunder is not less than 25% of the total Commitments then in effect.

(h)     subject to the limits in Section 9.06, Investments (including, without limitation, capital contributions) in general or limited partnerships or other types of entities (each a "venture") entered into by the Borrower or a Restricted Subsidiary with others in the ordinary course of business; *provided* that (i) any such venture is engaged exclusively in oil and gas exploration, development, production, processing and related activities, including transportation, (ii) the interest in such venture is acquired in the ordinary course of business and on fair and reasonable terms and (iii) such venture interests acquired and capital contributions made (valued as of the date such interest was acquired or the contribution made) do not exceed, in the aggregate at any time outstanding an amount equal to $10,000,000.

(i)     subject to the limits in Section 9.06, Investments in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, participation agreements, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America.

(j)     loans or advances to employees, officers or directors in the ordinary course of business of the Borrower or any Restricted Subsidiary, in each case only as permitted by applicable law, including Section 402 of the Sarbanes Oxley Act of 2002, but in any event not to exceed $500,000 in the aggregate at any time.

(k)     Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to any Restricted Party as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of any Restricted Party.

(l)     (i) Investments at any time outstanding that, when taken together with (ii) all Capital Expenditures made during the period beginning on January 1, 2021 and through and including December 31, 2021 pursuant to Section 9.22(a), do not exceed $25,000,000 in the aggregate; provided that, such Investments shall only be permitted to the extent that (i) no Event of Default exists at the time of such Investment, (ii) the pro forma Leverage Ratio after giving effect to such Investment for the most recent Test Period is less than 2.0 to 1.0, (iii) immediately after giving effect to such Investment, the Available Commitment hereunder is not less than 25% of the total Commitments then in effect, and (iv) the amount of such Investments made under this clause (l) since the Effective Date shall not exceed the amount of positive Free Cash Flow (including after giving effect to any other Restricted Payments pursuant to Section 9.09(a)(x), Investments pursuant to this clause (l) and Capital Expenditures pursuant to Section 9.22(a) made since the Effective Date and prior to the date of determination that would otherwise reduce the amount of Free Cash Flow).

(m)     guarantees of Debt permitted by Section 9.02(a), (h) or (i).

118

(n)      Investments made by the Credit Parties in any DevCo (other than any Investment in the form of the purchase of Equity Interests in such DevCo from OMP or one of its subsidiaries); provided that (i) no Default or Event of Default exists or results therefrom, (ii) before and after giving effect to such Investment, the current total Revolving Credit Exposures shall not exceed 80% of the total Commitments (i.e., the least of (x) the Aggregate Maximum Credit Amounts, (y) the then-effective Borrowing Base and (z) the Aggregate Elected Commitment Amounts) at such time, (iii) after giving pro forma effect to such Investment, the Borrower is in compliance with (x) the financial covenant in Section 9.01(a) and (y) a Leverage Ratio of less than 2.50 to 1.00, in each case, as of the last date of the most recently completed Test Period, (iv) such Investments shall be made solely for the purposes of funding Capital Expenditures of such DevCo in midstream projects, which expenditures the Borrower reasonably expects to be made within ninety (90) days following the date of such Investment, and (v) the amount of any such Investment shall not exceed, at the time made, the product of the DevCo Ownership Percentage with respect to such DevCo as of the date of such Investment multiplied by the total amount of such Capital Expenditures described in the foregoing clause (iv).

(o)      Investments made by the Credit Parties in any Unrestricted Subsidiaries in an aggregate amount not to exceed $50,000,000 at any time; provided that, (1) the Borrower shall be in pro forma compliance with the covenants contained in Section 9.01 after giving effect to such Investment for the most recent Test Period and (2) after giving pro forma effect to such Investment, no Default or Event of Default shall have occurred and be continuing and the current total Revolving Credit Exposures shall not exceed 85% of the total Commitments (i.e., the least of (x) the Aggregate Maximum Credit Amounts, (y) the then effective Borrowing Base and (z) the Aggregate Elected Commitment Amounts) at such time.

(p)      Investments in OMP, its subsidiaries or any DevCo made by the Credit Parties pursuant to any Drop Down Disposition permitted by Section 9.12(e).

(q)      to the extent constituting an Investment, Swap Agreements permitted under Section 9.18 and guarantees thereof.

(r)      Investments pursuant to the Transactions made substantially concurrently with the Effective Date as set forth in the Prepackaged Plan.

(s)      Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Effective Date otherwise in accordance with this Section 9.05 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation.

Section 9.06    Nature of Business; International Operations. The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, allow any material change to be made in the character of its business as an independent oil and gas exploration and production company. From and after the date hereof, the Borrower and the Domestic Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 9.07    Proceeds of Notes.  The Borrower will not permit the proceeds of the Notes to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

Section 9.08    Designation and Conversion of Restricted and Unrestricted Subsidiaries.

(a)    Unless designated as an Unrestricted Subsidiary on Schedule 7.14 as of the date hereof or otherwise in compliance with this Section 9.08 for any designation after the date hereof, assuming compliance with Section 9.08(b), any Person that becomes a Subsidiary of the Parent or any of its Restricted Subsidiaries shall be classified as a Restricted Subsidiary.

(b)    The Borrower may designate (on behalf of itself or the Person that owns the Equity Interests of the applicable Subsidiary) by written notification thereof to the Administrative Agent, any Restricted Subsidiary, including a newly formed or newly acquired Subsidiary, as an Unrestricted Subsidiary if (i) prior, and after giving effect, to such designation, neither a Default nor a Borrowing Base Deficiency would exist, and (ii) such designation is deemed to be an Investment in an Unrestricted Subsidiary in an amount equal to the fair market value as of the date of such designation of the Parent's direct and indirect ownership interest in such Subsidiary and such Investment would be permitted to be made at the time of such designation under Section 9.05.  Except as provided in this Section 9.08(b), no Restricted Subsidiary may be redesignated as an Unrestricted Subsidiary.

(c)    The Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary if after giving effect to such designation, (i)  the representations and warranties of the Parent, OP LLC Borrower and their respective Restricted Subsidiaries contained in each of the Loan Documents are true and correct in all material respects on and as of such date as if made on and as of the date of such redesignation (or, if stated to have been made expressly as of an earlier date, were true and correct in all material respects (or, if already qualified by materiality, Material Adverse Effect or a similar qualification, true and correct in all respects) as of such date), (ii)  no Default would exist, and (iii)  the Borrower complies with the requirements of Section 8.14, Section 8.22 and Section 9.15.  Any such designation shall be treated as a cash dividend in an amount equal to the lesser of the fair market value of the Parent's direct and indirect ownership interest in such Subsidiary or the amount of the Borrower's cash investment previously made for purposes of the limitation on Investments under Section 9.05.

Section 9.09    ERISA Compliance.  Except as would not reasonably be expected to result in a liability to the Borrower or any of its Subsidiaries in excess of $25,000,000, individually or in

120

the aggregate, with respect to each of the subsections of this Section 9.09 or in the aggregate, the Borrower will not, and will not permit any of its Subsidiaries to, at any time:

(a)     engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code;

(b)     fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan or Multiemployer Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto; or

(c)     contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, (i) any employee welfare benefit plan, as defined in section 3(1) of ERISA, that provides benefits to former employees of such entities, other than continuation coverage under section 4980B of the Code, that may not be terminated by the applicable plan sponsor in its sole discretion at any time without any material liability, other than the payment of claims incurred as of the date of such termination pursuant to the terms of such plan and the requirements of applicable law or (ii) any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 9.10   Sale or Discount of Receivables.  Except for receivables obtained by the Borrower or any Restricted Subsidiary out of the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, the Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.11   Mergers, Etc.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, merge into or with or consolidate with any other Person, or sell, lease or otherwise dispose of (whether in one transaction or in a series of transactions and including by division of such Person) all or substantially all of its Property to any other Person (including by division of such Person), except that (a) any Wholly-Owned Domestic Subsidiary may merge with any other Wholly-Owned Domestic Subsidiary and any Wholly-Owned Domestic Subsidiary may divide so long as each Person created as a result of such division becomes a Guarantor in accordance with Section 8.14 if such Wholly-Owned Subsidiary was a Guarantor at the time of such division, (b) the Parent, OP LLC and/or Borrower may merge with any Wholly-Owned Domestic Subsidiary so long as the Parent, OP LLC and/or Borrower is the survivor, (c) OP International may merge with and into any Credit Party so long as such Credit Party is the survivor, (d) any Foreign Subsidiary may merge with any other Foreign Subsidiary; *provided* that if one of such Foreign Subsidiaries is a Wholly-Owned Subsidiary, the survivor shall be a Wholly-Owned Subsidiary and (e) any Restricted Subsidiary may consummate any merger, consolidation or sale the purpose of which is to effect a sale permitted pursuant to Section 9.12 or an Investment

121

permitted pursuant to Section 9.05. In no event shall the Parent, OP LLC or the Borrower divide itself pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any corresponding provision of any successor statute thereof).

Section 9.12    Sale of Properties and Liquidation of Swap Agreements. The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property (including any transfer that is effected through the division of a Person) or to Liquidate any Swap Agreement in respect of commodities except for:

(a)    the sale of Hydrocarbons or Investments permitted under Section 9.05(c), (d), (e) or (f) in the ordinary course of business;

(b)    farmouts in the ordinary course of business of undeveloped acreage or undrilled depths and assignments in connection with such farmouts;

(c)    the sale or transfer of equipment that is no longer necessary for the business of the Borrower or such Restricted Subsidiary or is replaced by equipment of at least comparable value and use;

(d)    the sale or other disposition (including Casualty Events) of any Oil and Gas Property constituting Proved Reserves or any interest therein or any Restricted Subsidiary owning Oil and Gas Properties constituting Proved Reserves and the Liquidation of any Swap Agreement in respect of commodities; provided that:

(i)    75% of the consideration or settlement proceeds received in respect of such sale or other disposition or the Liquidation of any Swap Agreement in respect of commodities shall be cash; *provided* that in the case of the sale or disposition of Oil and Gas Properties, the consideration for such sale or other disposition may be newly acquired Oil and Gas Properties so long as the aggregate value (as set forth in the most recently delivered Reserve Report) of all Oil and Gas Properties exchanged or swapped for newly acquired Oil and Gas Properties since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e) or (f) does not exceed five percent (5%) of the Borrowing Base then in effect;

(ii)    the consideration or settlement proceeds received in respect of such sale or other disposition or the Liquidation of any Swap Agreement in respect of commodities shall be equal to or greater than the fair market value of the Oil and Gas Property, interest therein or Restricted Subsidiary subject of such sale or other disposition, or Swap Agreement subject of such Liquidation (as reasonably determined by a Responsible Officer of the Borrower or by the appropriate governing body of the Parent and/or the Borrower, as applicable, and, if requested by the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to that effect),

(iii)    if such sale or other disposition of Oil and Gas Property or Restricted Subsidiary owning Oil and Gas Properties included in the most recently delivered Reserve Report and Swap Agreements Liquidated pursuant to this clause (d), when aggregated with any sale or other disposition pursuant to Section 9.12(e) and (f), since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e)

122

or (f) has a value (determined by the Administrative Agent in its sole discretion in connection with the most recent determination of the Borrowing Base then in effect), individually or in the aggregate in excess of five percent (5%) of the then effective Borrowing Base, the Borrowing Base shall then be reduced, effective immediately upon such sale, disposition or Liquidation, by an amount equal to the Borrowing Base Value of such Properties sold or disposed of and Swap Agreements in respect of commodities Liquidated plus an amount determined by the Administrative Agent in its sole discretion (and confirmed by the Required Lenders) to account for any Property sold pursuant Section 9.12(e) or Section 9.12(f) since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e) or (f); provided that if a Borrowing Base Deficiency would result from such reduction in the Borrowing Base, the Borrower shall prepay the Borrowings, prior to or contemporaneously with the consummation of such sale, disposition and/or Liquidation, to the extent that such prepayment would have required pursuant to Section 3.04(c)(iii) after giving effect to such reduction in the Borrowing Base; and

(iv)     if any such sale or other disposition is of a Restricted Subsidiary owning Oil and Gas Properties constituting Proved Reserves, such sale or other disposition shall include all the Equity Interests of such Restricted Subsidiary;

(e)     Drop Down Dispositions to the extent (i) at the time of such Drop Down Disposition, no Default, Event of Default or Borrowing Base Deficiency shall exist or would result from such Drop Down Disposition,  (ii) after giving pro forma effect to such Drop Down Disposition, the Borrower shall be in compliance with the financial covenants contained in Section 9.01, (iii) after giving effect to the Drop Down Disposition, the amount of the undrawn Commitments shall represent at least 10% of the aggregate Commitments at such time,  (iv) the consideration for such Drop Down Disposition shall be fair to the Credit Parties (as reasonably determined by the board of directors (or comparable governing body) of the Parent and, if requested by the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to that effect), (v) the consideration received by the Credit Parties shall consist of cash, cash equivalents and/or Equity Interests in the Midstream MLP and (vi) if the consideration received in respect of any such Drop Down Disposition pursuant to this clause (e) since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e) or (f), when aggregated with any sales or other dispositions during such period pursuant to clauses (d) and (f) of this section or this clause (e), is in excess of five percent (5%) of the then-effective Borrowing Base, individually or in the aggregate, the Administrative Agent or the Required Lenders may elect in their sole discretion to reduce the Borrowing Base in connection with such sale or disposition and any other sales or dispositions pursuant to Section 9.12(d) or Section 9.12(f) since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e) or (f); provided further that if a Borrowing Base Deficiency would result from such any reduction in the Borrowing Base pursuant to this Section 9.12(e), the Borrower shall prepay the Borrowings, prior to or contemporaneously with the consummation of such sale, disposition and/or Liquidation, to the extent that such prepayment would have required pursuant to Section 3.04(c)(iii) after giving effect to such reduction in the Borrowing Base;

(f)     sales or other dispositions of the common limited partnership interests in the Midstream MLP to the extent at the time of such sale or disposition (i) no Default, Event of

123

Default or Borrowing Base Deficiency shall exist or would result from such sale or disposition, (ii) after giving pro forma effect to such sale or disposition, the Borrower shall be in compliance with the financial covenants contained in Section 9.01 and (iii) if the consideration received in respect of any such sales or other dispositions of the common limited partnership interests in the Midstream MLP pursuant to this clause (f) since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e) or (f), when aggregated with any sales or other dispositions during such period pursuant to clauses (d) and (e) of this section or this clause (f), is in excess of five percent (5%) of the then effective Borrowing Base, individually or in the aggregate, the Administrative Agent or the Required Lenders may elect in their sole discretion to reduce the Borrowing Base in connection with such sale or disposition and any other sales or dispositions pursuant to Section 9.12(d) or Section 9.12(e) since the later of the last Redetermination Date and the last date on which the Borrowing Base was adjusted pursuant to Section 9.12(d), (e) or (f); provided further that if a Borrowing Base Deficiency would result from such any reduction in the Borrowing Base pursuant to this Section 9.12(f), the Borrower shall prepay the Borrowings, prior to or contemporaneously with the consummation of such sale, disposition and/or Liquidation, to the extent that such prepayment would have required pursuant to Section 3.04(c)(iii) after giving effect to such reduction in the Borrowing Base;

(g)     sales and other dispositions of Properties not regulated by Section 9.12(d) to (f) having a fair market value not to exceed $2,500,000 during any 12-month period; *provided* that if any such sale or disposition is of the Equity Interests of a Restricted Subsidiary, such sale or disposition shall include all the Equity Interests of such Restricted Subsidiary;

(h)     exchanges, swaps or trades of Oil and Gas Properties not constituting Proved Reserves or other Property not regulated by Section 9.12(d) to (f); provided that (i) no Default or Event of Default has occurred and is continuing or would result from such exchange, swap or trade and (ii) the consideration received in respect of such exchange, swap or trade shall be equal to or greater than the fair market value of the Property (or interest therein) subject of such exchange, swap or trade (in each case, as reasonably determined by the Borrower and, if requested by the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to that effect); and

(i)     transfers among the Parent and the Restricted Subsidiaries; provided that (i) the provisions of Section 8.14 are complied with to the extent applicable and (ii) if the transferor is a Credit Party, the transferee shall be a Credit Party (or shall become a Credit Party contemporaneously with such Transfer).

Section 9.13    Environmental Matters.  The Parent, OP LLC and the Borrower will not, and will not permit any of their respective Restricted Subsidiaries or DevCos to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will reasonably be expected to subject any such Property to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations or Remedial Work could reasonably be expected to have a Material Adverse Effect.

Section 9.14    Transactions with Affiliates.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, enter into any transaction, including, without

124

US 7429795v.11

limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors and Wholly-Owned Subsidiaries of the Borrower) unless such transactions are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate; provided that the restrictions set forth in this Section 9.14 shall not apply to (a) Investments permitted by any of Section 9.05(j), (n) or (p), (b) any Restricted Payment permitted by Section 9.04, (c) the consummation of the Transactions, (d) employment and severance arrangements and health, disability and similar insurance or benefit plans between the Parent and the Restricted Subsidiaries and their respective future, current or former directors, officers, employees or consultants (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with future, current or former employees, officers, directors or consultants and equity option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors of the Parent and (e) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, future, current or former directors, officers, employees and consultants of the Parent and its Restricted Subsidiaries.

Section 9.15   Subsidiaries.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, create or acquire (a) any additional Domestic Subsidiary unless the Borrower complies with Section 8.14(b) and Section 8.14(c) or (b) any Foreign Subsidiary.  The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, sell, assign or otherwise dispose of any Equity Interests in any Subsidiary except in compliance with Section 9.12(d), (g) or (i), as applicable.  The Credit Parties shall not sell, assign or otherwise dispose of any Equity Interests in any DevCo except in compliance with Section 9.12(e) and Section 9.12(f).  The Parent and OP LLC shall not, and shall not permit any Restricted Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in the General Partner other than issuances of Class B Units in the General Partner pursuant to the terms of the General Partner LLC Agreement.  The Parent, OP LLC and the Borrower will not permit any Equity Interests of any DevCo or the General Partner (other than the Class B Units) to be directly owned by any Person other than the Parent or a Restricted Subsidiary that is a Guarantor, and in the case of the DevCos, the Midstream MLP and its subsidiaries.

Section 9.16   Negative Pledge Agreements; Dividend Restrictions.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary or the DevCos to, create, incur, assume or suffer to exist any contract, agreement or understanding (other than (a) the Loan Documents or Capital Leases or Purchase Money Debt creating Liens permitted by Section 9.03, (b) any leases or licenses or similar contracts as they affect any Property or Lien subject to a lease or license, (c) any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the direct or indirect sale or disposition of all or substantially all the equity or Property of such Restricted Subsidiary (or the Property that is subject to such restriction) pending the closing of such sale or disposition, (d) customary provisions with respect to the distribution of Property in joint venture agreements, or (e) in the case of the DevCos, agreements governing the OMP Credit Facility) which in any way (i) prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property constituting Collateral in favor of the Administrative Agent, for the benefit of the Lenders, or (ii) restricts any Restricted

125

Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which requires the consent of other Persons in connection therewith.

Section 9.17   Gas Imbalances, Take-or-Pay or Other Prepayments.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Restricted Subsidiary that would require the Borrower or such Restricted Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed 75,000 Mcf of gas (on an Mcf equivalent basis) in the aggregate.

Section 9.18   Swap Agreements.

(a)   The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Swap Agreements with any Person other than (i) Swap Agreements in respect of commodities (A) with an Approved Counterparty and (B) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date such Swap Agreement is executed (and for each month during the period during which such Swap Agreement is in effect), for each full calendar month during the forthcoming sixty (60) consecutive full calendar months following the date of determination, eighty-five percent (85%) of the reasonably anticipated production for each of crude oil and natural gas, calculated separately, in each case, as such production is projected from the Borrower's and its Restricted Subsidiaries' Oil and Gas Properties as set forth on the most recent Reserve Report delivered pursuant to the terms of this Agreement; *provided*, that (x) the Borrower may update such projections by providing the Administrative Agent an internal report prepared by or under the supervision of the chief engineer of the Borrower and any additional informational reasonably requested by the Administrative Agent that is, in each case, reasonably satisfactory to the Administrative Agent (and shall include new reasonably anticipated Hydrocarbon production from new wells or other production improvements  and any dispositions, well shut-ins and other reductions of, or decreases to, production) and (y) the Borrower may purchase puts and floors the notional volumes for which exceed the foregoing percentage limitations (but which do not cause all notional volumes hedged to exceed 100% of the Current Production for any period beyond the last day of the second calendar year following the calendar year in which such puts and/or floors are purchased), (ii) Swap Agreements in respect of interest rates with an Approved Counterparty, as follows:  (A) Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from fixed to floating) do not exceed 50% of the then outstanding principal amount of the Borrower's Debt for borrowed money which bears interest at a fixed rate and (B) Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed 75% of the then outstanding principal amount of the Borrower's Debt for borrowed money which bears interest at a floating rate, (iii) any Permitted Bond Hedge Transaction(s), and (iv) any Permitted Warrant Transaction.  In no event shall any Swap Agreement contain any requirement for the Borrower or any Restricted Subsidiary to post, during the term of this Agreement, collateral or margin to secure their obligations under such Swap Agreement or to cover market exposures and in no event shall (1) any Swap

126

Agreements in respect of interest rates have a term beyond 48 months from the date of execution thereof or (2) any Swap Agreements in respect of commodities have a term beyond 60 months from the date of execution thereof.

(b)      Except as permitted by Section 9.12(d), the Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to Liquidate, or create any off-setting positions in respect of any hedge position in respect of commodities (whether evidenced by a floor, put or Swap Agreement), without the prior written consent of the Majority Lenders.

Section 9.19   Covenants of Parent, OP LLC and the General Partner.  The Parent and OP LLC covenant and agree with the Administrative Agent and the Lenders that neither the Parent nor OP LLC shall own or lease any Oil and Gas Properties that are included in the Borrowing Base nor be the operator under any operating agreement governing operations thereon.  The Parent and OP LLC covenant and agree with the Administrative Agent and the Lenders that neither the Parent nor OP LLC shall directly own any Equity Interest in any DevCo.  The Parent and OP LLC covenant and agree that the General Partner shall not (a) engage in any operating or business activities other than ownership of the general partner interests of the Midstream MLP and other related and incidental activities related to the ownership of such general partnership interests or (b) own any Property or assets other than such general partnership interests and such rights or other interests incidental to such ownership.

Section 9.20   Non-Qualified ECP Guarantors.  The Parent, OP LLC and the Borrower shall not permit any Credit Party that is not a Qualified ECP Guarantor to own, at any time, any Oil and Gas Properties or any Equity Interests in any Restricted Subsidiaries or any DevCo.

Section 9.21   Changes to Organizational Documents of General Partner and DevCos.  The Parent, OP LLC and the Borrower shall not permit the General Partner to amend, supplement or otherwise modify its certificate of formation, limited liability company agreement or any other organic document of the General Partner in any manner that would be adverse to the Lenders in any material respect; *provided* that any amendment, supplement or other modification to the General Partner LLC Agreement that (a) materially alters the definition of "Available Cash" contained therein in a way that results in an increase in such "Available Cash" or (b) grants any additional rights or power to the Class B Units shall, in each case, be deemed to be adverse to Lenders in a material respect.  The Parent, OP LLC and the Borrower shall not permit OMS or any DevCo to amend, supplement or otherwise modify its certificate of formation, limited liability company agreement or any other organic document of any DevCo in any manner that would (i) be adverse to the Lenders in any material respect or (ii) permit any DevCo to take any action that would violate the DevCo Parent Undertaking without the consent of OMS and any other Credit Party that owns Equity Interests in such DevCo.

Section 9.22   Capital Expenditures.  The Parent, OP LLC and the Borrower will not, and will not permit any Restricted Subsidiary to, solely with respect to the period from January 1, 2021 and through and including December 31, 2021, incur or make any Capital Expenditures, except that the foregoing restrictions shall not apply to:

(a)      Capital Expenditures that, when taken together with all Investments made pursuant to Section 9.05(l) and then outstanding do not exceed $25,000,000 in the aggregate;

127

US 7429795v.11

provided that, such Capital Expenditures shall only be permitted to the extent that (i) no Event of Default exists at the time of such Capital Expenditure, (ii) the pro forma Leverage Ratio after giving effect to such Capital Expenditure for the most recent Test Period is less than 2.0 to 1.0, (iii) immediately after giving effect to such Capital Expenditure, the Available Commitment hereunder is not less than 25% of the total Commitments then in effect, and (iv) the amount of all such Investments made under this clause (a) since the Effective Date shall not exceed the amount of positive Free Cash Flow (including after giving effect to any other Restricted Payments pursuant to Section 9.04(a)(x), Investments pursuant to Section 9.05(l) and Capital Expenditures pursuant to this clause (a) made since the Effective Date and prior to the date of determination that would otherwise reduce the amount of Free Cash Flow).

(b)     In addition to Capital Expenditures permitted under clause (a) above, Capital Expenditures in an amount not to exceed $275,000,000 in the aggregate.

(c)     Capital Expenditures funded solely with proceeds of the issuance or sale of shares of the Parent's Equity Interests (other than Disqualified Capital Stock).

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01  Events of Default.  One or more of the following events shall constitute an "Event of Default":

(a)     the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise.

(b)     the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

(c)     any representation or warranty made or deemed made by or on behalf of the Parent, OP LLC, the Borrower, any Subsidiary or any DevCo in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made (or, if already qualified by materiality, Material Adverse Effect or a similar qualification, true and correct in all respects).

(d)     the Parent, OP LLC the Borrower, any Subsidiary or any DevCo shall fail to observe or perform any covenant, condition or agreement applicable to it contained in Section 8.01(e)(ii), Section 8.01(e)(iii), Section 8.01(i), Section 8.01(m), Section 8.02(a), Section 8.03, Section 8.14, Section 8.19, Section 8.20, Section 8.21, Section 8.24(a)(i), Section 8.24(b)(ii) or in Article IX.

128

(e)      the Parent, OP LLC, the Borrower, any Subsidiary or any DevCo shall fail to observe or perform any covenant, condition or agreement contained in this Agreement applicable to it (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier to occur of (i) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of the Majority Lenders) or (ii) a Responsible Officer of the Borrower or such Restricted Subsidiary otherwise becoming aware of such default.

(f)      Any Credit Party or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable and such failure continues beyond any applicable grace period.

(g)      (i) any event or condition (other than customary change of control or asset sale tender offer provisions of any agreement governing any Debt permitted under Section 9.02 which would require a mandatory prepayment or redemption of the Debt arising thereunder) occurs that results in any Material Indebtedness of the Credit Parties or any Restricted Subsidiary becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require any Credit Party or any Restricted Subsidiary to make an offer in respect thereof and such event or condition continues beyond any applicable grace period or (ii) any event or condition (other than customary change of control or asset sale tender offer provisions of any agreement governing any such Debt which would require a mandatory prepayment or redemption of the Debt arising thereunder) occurs that results in any Material Indebtedness of any DevCo becoming due prior to its scheduled maturity.

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for thirty (30) days or an order or decree approving or ordering any of the foregoing shall be entered.

(i)      the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 10.01(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Parent, OP LLC, Borrower, any Restricted Subsidiary or any DevCo or for a substantial part of its assets, (iv) file an answer admitting the

129

material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

(j)       the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(k)       (i) one or more judgments for the payment of money in an aggregate amount in excess of $25,000,000 (to the extent not covered by independent third party insurance provided as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Parent, OP LLC, the Borrower, any Restricted Subsidiary, any DevCo or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent, OP LLC, the Borrower, any Restricted Subsidiary or any DevCo to enforce any such judgment.

(l)       the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof or as otherwise acceptable to the Administrative Agent in its sole discretion, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor, or in the case of the Intercreditor Agreement, against any other party thereto, or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the Collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Parent, OP LLC, the Borrower or any Restricted Subsidiary or any of their Affiliates shall so state in writing.

(m)       an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower, its Subsidiaries and the ERISA Affiliates in an aggregate amount in excess of $25,000,000.

(n)       a Change in Control shall occur.

Section 10.02  Remedies.

(a)       In the case of an Event of Default other than one described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), at any time thereafter during the continuance of such Event of Default, the Administrative Agent may, and at the request of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i)  terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Notes and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other

130

obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor; and in case of an Event of Default described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), the Commitments shall automatically terminate and the Notes and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower and the Guarantors accrued hereunder and under the Notes and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)     In the case of the occurrence of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)     All proceeds realized from the liquidation or other disposition of Collateral or otherwise received after maturity of the Notes, whether by acceleration or otherwise, shall be applied:

(i)     *first*, to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Administrative Agent in its capacity as such;

(ii)     *second*, pro rata to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Lenders;

(iii)     *third*, pro rata to payment of accrued interest on the Loans;

(iv)     *fourth*, pro rata to payment of (A) principal outstanding on the Loans, (B) LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time and (C) Secured Swap Indebtedness owing to Secured Swap Parties;

(v)     *fifth*, pro rata to any other Indebtedness owing to the Secured Parties and to cash collateral to be held by the Administrative Agent to secure the remaining LC Exposure in an amount equal to 102.5% of such remaining LC Exposure; and

(vi)     *sixth*, any excess, after all of the Indebtedness shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

Notwithstanding the foregoing, amounts received from the Borrower or any Guarantor that is not an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder shall not be applied to any Excluded Swap Obligations (it being understood, that in the event that any amount is applied to Indebtedness other than Excluded Swap Obligations as a result of this clause, the Administrative Agent shall make such adjustments as it determines are appropriate to distributions pursuant to clause *fourth* above from amounts received

131

from "eligible contract participants" under the Commodity Exchange Act or any regulations promulgated thereunder to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to Indebtedness described in clause *fourth* above by the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Indebtedness pursuant to clause *fourth* above).

## ARTICLE XI
## THE AGENTS

Section 11.01  Appointment; Powers.  Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article (excluding Section 11.10) are solely for the benefit of the Administrative Agent and the Lenders, and no Credit Party shall have rights as a third-party beneficiary of any of such provisions (other than in respect of Sections 11.01, 11.06 and 11.10).  Each of the Lenders, by its execution hereof, authorizes and directs the Administrative Agent to execute and deliver the Security Instruments, binding the Lenders to the terms thereof.

Section 11.02  Duties and Obligations of Administrative Agent.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent, OP LLC, the Borrower or any of its Subsidiaries or any DevCo that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Parent, OP LLC, the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v)  the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition

132

US 7429795v.11

of the Parent, OP LLC, the Borrower and its Subsidiaries or any DevCo or any other obligor or guarantor, or (vii) any failure by the Parent, OP LLC, the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein. For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03   Action by Administrative Agent. The Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders, Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders, Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action. The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders. If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, *provided* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders. In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders, Required Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 12.02), and otherwise no Agent shall be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct.

Section 11.04   Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Parent, OP LLC, the Borrower, the Lenders and the Issuing Bank hereby waives the right to dispute the Administrative

133

US 7429795v.11

Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of any Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05  <u>Subagents</u>.  The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding Sections of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06  <u>Resignation of Administrative Agent</u>.  Subject to the appointment and acceptance of a successor Administrative Agent as provided in this Section 11.06, the Administrative Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower, and the Administrative Agent may be removed at any time by the Required Lenders if the Administrative Agent, in its capacity as a Lender, is a Defaulting Lender at such time.  Upon any such resignation or removal, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation or removal of the retiring Administrative Agent, then the retiring Administrative Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Administrative Agent's resignation hereunder, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Section 11.07  <u>Agents as Lenders</u>.  Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Parent, OP LLC, the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 11.08  <u>No Reliance</u>.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and

US 7429795v.11

decision to enter into this Agreement and each other Loan Document to which it is a party.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Agents shall not be required to keep themselves informed as to the performance or observance by the Borrower or any of its Subsidiaries or any DevCo of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries or the DevCos.  Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent or the Arranger shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of such Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Vinson & Elkins L.L.P. is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09  <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of its Subsidiaries or any DevCo, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 12.03) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 11.10  Authority of Administrative Agent to Release Collateral and Liens.  Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to release any Collateral or Guarantor or DevCo that is permitted to be sold or released pursuant to the terms of the Loan Documents.  Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property or release of a Guarantor or of a DevCo to the extent such sale or other disposition or release of Guarantor or of a DevCo is permitted by the terms of Section 9.12 or is otherwise authorized by the terms of the Loan Documents.

Section 11.11  The Arranger.  The Arranger shall have no duties, responsibilities or liabilities under this Agreement.

Section 11.12  Intercreditor Agreement.  Each Lender hereby acknowledges receipt of an executed copy of the Intercreditor Agreement and (by receiving the benefits thereunder and of the Collateral pledged pursuant to the Security Instruments) agrees that the terms of the Intercreditor Agreement are binding on such Lender and its successors and assigns, as if it were a party thereto.

**ARTICLE XII**
**MISCELLANEOUS**

Section 12.01  Notices.

(a)  Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or e-mail, as follows:

(i)  if to the Borrower or the Parent, OP LLC, to it at 1001 Fannin, Suite 1500, Houston, Texas 77002, Attention of Michael Lou (Facsimile No. (713) 574-1759, e-mail address: mlou@oasispetroleum.com);

(ii)  if to the Administrative Agent, to it at [1000 Louisiana, Suite 900, Houston, Texas, 77002; Attention of Ed Pak (Facsimile No. (713) 651-8101, e-mail address: Edward.Pak@wellsfargo.com) / Carroll Cartwright (Facsimile No. [_____], e-mail address: Carroll.Cartwright@wellsfargo.com), with a copy to WLS Charlotte Agency Services (Facsimile No. (704) 590-2782, email address: Donna.Verwold@wellsfargo.com), 1525 W. WT Harris Blvd., Charlotte, NC 28262;

(iii)  if to Wells Fargo, in its capacity as a Swingline Lender, to it at the address set forth in clause (ii) above.

136

US 7429795v.11

(iv)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including email and Internet websites) in accordance with Section 8.01 or otherwise pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the Issuing Bank or Swingline Lender, as applicable.  The Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt; *provided* that (i) notices and other communications sent to an email shall be deemed received upon the earlier of (x) the date of receipt and (y) the sender's receipt of an acknowledgment from the intended recipient (such as by the "Return receipt requested" function, as available, return email or other written acknowledgment); and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the date such item has been posted to (A) a website address previously identified to the Administrative Agent and the Lenders in accordance with the provisions hereof or (B) the SEC's EDGAR website, as applicable.

Section 12.02  Waivers; Amendments.

(a)    No failure on the part of the Administrative Agent, any other Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any other Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any other Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time. In the case of any waiver, the Borrower, the other Loan Parties, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall

extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

(b)     Subject to Section 3.03(c), neither this Agreement nor any provision hereof nor any other Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; *provided* that no such agreement shall (i) increase the Maximum Credit Amount or Elected Commitment of any Lender without the written consent of such Lender, (ii) increase the Borrowing Base without the written consent of each Lender, decrease or maintain the Borrowing Base without the consent of the Required Lenders, or modify Section 2.07 in any manner that results in an increase in the Borrowing Base without the consent of each Lender, (iii) reduce the principal amount of any Loan or LC Disbursement without the written consent of each Lender affected thereby, (iv) reduce the rate of interest thereon (it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay default interest), or reduce, or waive or excuse the payment of, any fees or any other Indebtedness hereunder or under any other Loan Document owed to any Lender, without the written consent of such Lender, (v) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or the scheduled date of any fees or any other Indebtedness payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment (it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay default interest), or postpone or extend the Termination Date or amend Section 2.08(c) in a manner that would permit the expiration of any Letter of Credit to occur after the Maturity Date without the written consent of each Lender affected thereby, (vi) change Section 4.01(b) or Section 4.01(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (vii) waive or amend Section 3.04(c), Section 6.01, Section 8.14, Section 10.02(c) or Section 12.14 or change the definition of the terms "Domestic Subsidiary", "Foreign Subsidiary", "Material Subsidiary", "Subsidiary" or "Applicable Percentage", without the written consent of each Lender (other than any Defaulting Lender), (viii) release any Guarantor (except as set forth in the Guaranty and Security Agreement or as provided for in Section 11.10), release all or substantially all of the collateral (other than as provided in Section 11.10), or reduce the percentage set forth in Section 8.14, without the written consent of each Lender (other than any Defaulting Lender), (ix) change any of the provisions of this Section 12.02(b) or the definitions of "Majority Lenders", "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender or (x) waive the application of the Availability Block during the Initial Availability Block Period or the Final Availability Block Period  without the written consent of the Required Lenders or waive the reduction of the Borrowing Base pursuant to Section 8.24(a) without the written consent of the Required Lenders; *provided*, *further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, any other Agent, the Swingline Lender or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, such other Agent, the Swingline Lender or the Issuing Bank, as the case may be.  Notwithstanding the foregoing, any supplement to Schedule 7.14 (Subsidiaries) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked

138

US 7429795v.11

as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders; *provided that* no redesignation of any Subsidiary as "Restricted" or "Unrestricted" shall be effective unless such redesignation is in compliance with Section 9.05.  Notwithstanding anything herein to the contrary, the Administrative Agent and the Borrower may, without the consent of any Lender, (x) enter into amendments or modifications to this Agreement or any of the other Loan Documents or enter into additional Loan Documents as the Administrative Agent reasonably deems appropriate in order to implement any Benchmark Replacement Rate or otherwise effectuate the terms of Section 3.03(c) in accordance with the terms of Section 3.03(c) and (y) may amend this Agreement or any other Loan Document without the consent of the Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document.

Section 12.03  Expenses, Indemnity; Damage Waiver.

(a)  The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees, charges and disbursements of counsel and other reasonably necessary outside consultants for the Administrative Agent, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of environmental audits, surveys and appraisals, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii)  all costs, expenses, Other Taxes, assessments and other charges incurred by any Agent in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, and (iv) all documented out-of-pocket expenses incurred by any Agent, the Swingline Lender, the Issuing Bank or any Lender, including the reasonable fees, charges and disbursements of any counsel for any Agent, the Swingline Lender, the Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit, except in the case of out-of-pocket expenses described in this clause (iv) to the extent that Section 12.03(b) expressly provides that the Borrower shall not indemnify such party for such out-of-pocket expenses.

(b)  THE BORROWER SHALL INDEMNIFY EACH AGENT, THE ARRANGER, THE SWINGLINE LENDER, THE ISSUING BANK AND EACH LENDER,

139

US 7429795v.11

AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE, INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF  THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY (OTHER THAN EXPENSES IN CONNECTION WITH THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS DATED OF EVEN DATE HEREWITH, WHICH EXPENSES SHALL ONLY BE PAID BY THE BORROWER TO THE EXTENT PROVIDED IN SECTION 12.03(a)),  THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT,  THE FAILURE OF THE BORROWER OR ANY RESTRICTED SUBSIDIARY OR ANY DEVCO TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT,  ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR OR ANY DEVCO SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH,  ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING, WITHOUT LIMITATION,  ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR  THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH,  ANY OTHER ASPECT OF THE LOAN DOCUMENTS,  THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ITS SUBSIDIARIES AND THE DEVCOS BY THE BORROWER AND ITS SUBSIDIARIES AND THE DEVCOS,  ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS,  ANY LIABILITY UNDER ENVIRONMENTAL LAW ARISING OUT OF THE OPERATIONS OF BORROWER OR ANY SUBSIDIARY OR ANY DEVCO OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF HAZARDOUS MATERIALS ON ANY OF THEIR PROPERTIES,  THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY OR ANY DEVCO WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY DEVCO,  THE PAST OWNERSHIP BY THE BORROWER OR ANY SUBSIDIARY OR ANY DEVCO OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY,  THE PRESENCE, USE, RELEASE, STORAGE,

140

TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF HAZARDOUS MATERIALS BY BORROWER OR ANY SUBSIDIARY OR ANY DEVCO ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY DEVCO OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES OR ANY DEVCO, ANY LIABILITY UNDER ENVIRONMENTAL LAW RELATED IN ANY WAY TO THE BORROWER OR ANY OF ITS SUBSIDIARIES OR ANY DEVCO, ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, **INCLUDING ITS OWN ORDINARY NEGLIGENCE**, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; *PROVIDED* THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE; *PROVIDED* THAT THE BORROWER SHALL NOT INDEMNIFY ANY INDEMNITEE FOR (I) ANY FINANCIAL LIABILITIES OF A LENDER TO THE PARENT, OP LLC, THE BORROWER OR ANY RESTRICTED SUBSIDIARY PURSUANT TO AND IN ACCORDANCE WITH THE TERMS OF A SWAP AGREEMENT, (II) CLAIMS AMONG LENDERS OR BETWEEN LENDERS AND THEIR RELATED PARTIES TO THE EXTENT NOT RELATED TO A BREACH OF AN OBLIGATION OF THE PARENT, OP LLC, THE BORROWER OR ANY SUBSIDIARY AND (III) LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES THAT ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO BE A DIRECT RESULT OF A MATERIAL BREACH OF THIS AGREEMENT BY SUCH INDEMNITEE. THIS SECTION 12.03(b) SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, OR DAMAGES ARISING FROM A NON-TAX CLAIM.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent, the Arranger, the Swingline Lender or the Issuing Bank under Section 12.03(a) or (b), each Lender severally agrees to pay to such Agent, the Arranger, the Swingline Lender or the Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or

141

related expense, as the case may be, was incurred by or asserted against such Agent, the Arranger or the Issuing Bank in its capacity as such.

(d)     To the extent permitted by applicable law, the Parent, OP LLC and the Borrower shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby except to the extent such damages result from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment.

(e)     All amounts due under this Section 12.03 shall be payable not later than thirty (30) days after written demand therefor; provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 12.03.

Section 12.04  Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)     the Borrower, *provided* that no consent of the Borrower shall be required (x) if such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund, or (y) if an Event of Default has occurred and is continuing; and

142

US 7429795v.11

(B)     the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender or an Affiliate of a Lender immediately prior to giving effect to such assignment.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire;

(E)     no such assignment shall be made to an Excluded Lender; and

(F)     in no event may any Lender assign all or a portion of its rights and obligations under this Agreement to the Borrower or any Affiliate of the Borrower.

(iii)     Subject to Section 12.04(b)(iv) and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Credit Amount and Elected Commitment of, and principal amount

143

US 7429795v.11

(and stated interest) of the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive (absent manifest error), and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)    (i)    Any Lender may, without the consent of the Borrower, the Administrative Agent, the Swingline Lender or the Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (a) such Lender's obligations under this Agreement shall remain unchanged, (b) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (c) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (d) no such participation may be sold to an Excluded Lender.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 12.02(b) that affects such Participant.  In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03.  Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, *provided* such Participant agrees to be subject to Section 4.01(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that

144

US 7429795v.11

such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Department of the Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 5.01 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 5.03 unless such Participant agrees, for the benefit of the Borrower, to comply with Section 5.03(f) as though it were a Lender (it being understood that the documentation required under Section 5.03(f) shall be delivered to the participating Lender).

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender (other than to an Excluded Lender), including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section 12.04(d) shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05  Survival; Revival; Reinstatement.

(a)     All covenants, agreements, representations and warranties made by Parent and the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any other Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated. The provisions of Section 5.01, Section 5.02, Section 12.03 and Article XI shall survive and remain in full force and effect for a period of one hundred eighty (180) days following the Maturity Date,

145

regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)     To the extent that any payments on the Indebtedness or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Parent, OP LLC and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders to effect such reinstatement.

Section 12.06  Counterparts; Integration; Effectiveness.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(c)     Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07  Severability.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

146

US 7429795v.11

Section 12.08 <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitations obligations under Swap Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Parent, OP LLC, the Borrower or any Subsidiary or any DevCo against any of and all the obligations of the Parent, OP LLC, the Borrower or any Subsidiary or any DevCo owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; *provided,* that the failure by any Lender to provide such notice shall not limit or affect such Lender's rights under this Section 12.08. The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have.

Section 12.09 <u>GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS</u>.

(a)      THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK EXCEPT TO THE EXTENT THAT UNITED STATES FEDERAL LAW PERMITS ANY LENDER TO CONTRACT FOR, CHARGE, RECEIVE, RESERVE OR TAKE INTEREST AT THE RATE ALLOWED BY THE LAWS OF THE STATE WHERE SUCH LENDER IS LOCATED.

(b)      ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM OBTAINING JURISDICTION OVER ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c)      EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO

US 7429795v.11

BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)    EACH    PARTY    HEREBY    (I)    IRREVOCABLY    AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (II) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; *PROVIDED* THAT NOTHING CONTAINED IN THIS SECTION 12.09(d) SHALL (A) LIMIT THE BORROWER'S INDEMNIFICATION OBLIGATIONS TO THE EXTENT SET FORTH IN SECTION 12.03 TO THE EXTENT SUCH SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARE INCLUDED IN ANY THIRD PARTY CLAIM IN CONNECTION WITH WHICH SUCH INDEMNITEE IS OTHERWISE ENTITLED TO INDEMNIFICATION HEREUNDER; (B) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (C) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS   AGREEMENT,   THE   LOAN   DOCUMENTS   AND   THE   TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 12.09.

Section 12.10  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11  Confidentiality.  Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), provided, that for purposes of this clause, the term "Affiliate" shall not include any Industry Competitor, (b) to the extent requested by any regulatory authority purporting to have jurisdiction over such Person or its directors, officers, employees and agents, including accounts, legal counsel and other advisors,  to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (c) to any other party to this Agreement or any other Loan Document,  in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (d) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to (e) any assignee of or Participant in, or any prospective assignee

148

of or Participant in, any of its rights or obligations under this Agreement (other than to an Excluded Lender) or (f) any actual or prospective counterparty (or its advisors) to any Swap Agreement relating to the Parent, OP LLC or the Borrower and its obligations, (g) with the consent of the Borrower, (h) to any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or to any collector of market data or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 12.11 or (y) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Parent, OP LLC or the Borrower.   For the purposes of this Section 12.11, "Information" means all information received from the Parent, OP LLC, the Borrower, any Subsidiary or any DevCo relating to the Parent, OP LLC, the Borrower, any Subsidiary or any DevCo and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Parent, OP LLC, the Borrower, a Subsidiary or a DevCo; *provided* that, in the case of information received from the Parent, OP LLC, the Borrower, any Subsidiary or any DevCo after the date hereof, if such information is clearly identified at the time of delivery as public or not confidential, or is confirmed not to be confidential by the Person who delivered such information after such delivery, such information will not be deemed "Information".   Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.   Notwithstanding anything herein to the contrary, "Information" shall not include, and the Borrower, the Borrower's Subsidiaries, the Administrative Agent, each Lender and the respective Affiliates of each of the foregoing (and the respective partners, directors, officers, employees, agents, advisors and other representatives of the aforementioned Persons), and any other party, may disclose to any and all Persons, without limitation of any kind (i) any information with respect to the United States federal and state income tax treatment of the transactions contemplated hereby and any facts that may be relevant to understanding the United States federal or state income tax treatment of such transactions ("tax structure"), which facts shall not include for this purpose the names of the parties or any other person named herein, or information that would permit identification of the parties or such other persons, or any pricing terms or other nonpublic business or financial information that is unrelated to such tax treatment or tax structure, and (ii) all materials of any kind (including opinions or other tax analyses) that are provided to the Borrower, the Administrative Agent or such Lender relating to such tax treatment or tax structure.

Section 12.12   Interest Rate Limitation.   It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.   Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Notes, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Notes shall under no circumstances exceed the maximum amount allowed by such applicable law, and any

149

excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (b) in the event that the maturity of the Notes is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Notes until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect.  Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13  <u>EXCULPATION PROVISIONS</u>.  EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR

US 7429795v.11

ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14 <u>Collateral Matters; Swap Agreements</u>.   The benefit of the Security Instruments and of the provisions of this Agreement relating to any Collateral securing the Indebtedness shall also extend to and be available to Secured Swap Parties on a pro rata basis (but subject to the terms of the Loan Documents, including, without limitation, provisions thereof relating to the application and priority of payments to the Persons entitled thereto) in respect of any obligations of the a Parent, the Borrower or any of its Subsidiaries which arise under Secured Swap Agreements.  No Secured Swap Party shall have any voting rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements.

Section 12.15 <u>No Third Party Beneficiaries</u>.  This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever.  There are no third party beneficiaries.

Section 12.16 <u>USA Patriot Act Notice</u>.  Each Lender hereby notifies the Parent, OP LLC and the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Parent, OP LLC and the Borrower, which information includes the name, tax identification  and address of the Parent, OP LLC and the Borrower and other information that will allow such Lender to identify the Parent, OP LLC and the Borrower in accordance with the Act.

Section 12.17 <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

US 7429795v.11

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 12.18  No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Parent, OP LLC and the Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between the Parent, OP LLC, the Borrower and their respective Subsidiaries and the Administrative Agent or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether the Administrative Agent or any Lender has advised or is advising the Parent, the Borrower or any Subsidiary on other matters; (ii) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Parent, the Borrower and their Subsidiaries, on the one hand, and the Administrative Agent and the Lenders, on the other hand;  (iii) each of the Parent OP LLC and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate; and (iv) each of the Parent, OP LLC and the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents;  and  (b) (i) the Administrative Agent and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Parent, OP LLC, the Borrower or any of their Subsidiaries, or any other Person; (ii) neither the Administrative Agent nor the Lenders has any obligation to the Parent, OP LLC, the Borrower or any of their Subsidiaries with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Lenders and their respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent, OP LLC, the Borrower and their Subsidiaries, and neither the Administrative Agent nor the Lenders has any obligation to disclose any of such interests to the Parent, OP LLC, the Borrower or their respective Subsidiaries.  To the fullest extent permitted by Governmental Requirement, each of the Parent, OP LLC and the Borrower hereby waives and releases any claims that it may have against the Administrative Agent and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.19  Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Agreement or any other agreement or instrument that is a QFC (such support, "QFC Credit Support", and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act

152

US 7429795v.11

(together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

[*Remainder of page intentionally left blank; signature pages follow*]

153

US 7429795v.11

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

[Signature pages to be provided]

US 7429795v.11

**Exhibit F**

**New Warrant Agreement[1]**

---

[1] The agreement contained in this **Exhibit F** remain subject to continuing negotiations.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement (including this **Exhibit F**), and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

*Draft: 11/2/2020*

**WARRANT AGREEMENT**

**AMONG**

**OASIS PETROLEUM INC.,**

**and**

**COMPUTERSHARE INC.**
**and**
**COMPUTERSHARE TRUST COMPANY, N.A.,**
**as Warrant Agent**

**Dated as of November [●], 2020**

**Warrants to Purchase Common Stock**

## TABLE OF CONTENTS

**Page**

1.   Definitions.................................................................................................................1

2.   Warrant Certificates ................................................................................................6
     2.1   Original Issuance of Warrants...................................................................6
     2.2   Form of Warrant Certificates ....................................................................6
     2.3   Execution and Delivery of Warrant Certificates ......................................6
     2.4   Global Warrant Certificates ......................................................................7

3.   Exercise and Expiration of Warrants ......................................................................9
     3.1   Right to Acquire Common Stock Upon Exercise ......................................9
     3.2   Exercise and Expiration of Warrants ........................................................9
     3.3   Application of Funds upon Exercise of Warrants ...................................11
     3.4   Payment of Taxes....................................................................................11
     3.5   Cancellation of Warrant Certificates......................................................12
     3.6   Shares Issuable........................................................................................12
     3.7   Cashless Exercise....................................................................................12
     3.8   Cost Basis Information ............................................................................13

4.   Dissolution, Liquidation or Winding up ...............................................................13

5.   Adjustments ...........................................................................................................14
     5.1   Adjustments .............................................................................................14
     5.2   Fractional Interest ...................................................................................20
     5.3   No Other Adjustments.............................................................................20

6.   Loss or Mutilation..................................................................................................21

7.   Reservation and Authorization of Common Stock .................................................22

8.   Warrant Transfer Books .........................................................................................22

9.   Warrant Holders .....................................................................................................24
     9.1   No Voting or Dividend Rights .................................................................24
     9.2   Rights of Action ......................................................................................24
     9.3   Treatment of Holders of Warrant Certificates........................................24

10.  Concerning the Warrant Agent...............................................................................24
     10.1   Rights and Duties of the Warrant Agent. ................................................24
     10.2   Limitation of Liability.............................................................................27
     10.3   Indemnification. ......................................................................................28
     10.4   Right to Consult Counsel ........................................................................28
     10.5   Compensation and Reimbursement .........................................................28
     10.6   Warrant Agent May Hold Company Securities.......................................28
     10.7   Resignation and Removal; Appointment of Successor............................28
     10.8   Appointment of Countersigning Agent....................................................29

11.  Notices ...................................................................................................................30

    11.1    Notices Generally................................................................................30

    11.2    Required Notices to Holders............................................................31

12.    Inspection................................................................................................32

13.    Amendments ...........................................................................................32

14.    Waivers....................................................................................................33

15.    Successor to Company............................................................................33

16.    Headings .................................................................................................33

17.    Counterparts ...........................................................................................33

18.    Severability ............................................................................................34

19.    Information Rights. .................................................................................34

20.    No Redemption .......................................................................................34

21.    Persons Benefiting .................................................................................34

22.    Applicable Law ......................................................................................35

23.    Entire Agreement ...................................................................................35

24.    Force Majeure. .......................................................................................35

25.    Further Assurances.................................................................................35

26.    Confidentiality........................................................................................35

**EXHIBITS**

Exhibit A           Form of Warrant Certificate

## WARRANT AGREEMENT

This Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "*Agreement*"), dated as of November [●], 2020, is by and among Oasis Petroleum Inc., a Delaware corporation (and any Successor Company that becomes successor to the Company in accordance with Section 15) (the "*Company*") and Computershare, Inc., a Delaware corporation ("*Computershare*"), and its wholly-owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company (collectively, with Computershare, the "*Warrant Agent*").  Capitalized terms that are used in this Agreement shall have the meanings set forth in <u>Section 1</u> hereof.

## WITNESSETH THAT:

**WHEREAS**, pursuant to the terms and conditions of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Oasis Petroleum Inc. and its Debtor Affiliates,* Case No. 20-34771 (the "*Plan*") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Company proposes to issue and deliver Warrants to purchase up to an aggregate of [●] shares of its Common Stock, subject to adjustment as provided herein, and the Warrant Certificates evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to purchase one share of the Common Stock, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the shares of Common Stock issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act afforded by Section 1145 of the Bankruptcy Code, and of any applicable state securities or "blue sky" laws; and

**WHEREAS**, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW THEREFORE,** in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

1. **Definitions**.

"*Action*" has the meaning set forth in <u>Section 11.2</u>.

"*Adjustment Events*" has the meaning set forth in <u>Section 5.1</u>.

"*Affiliate*" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"***Agent Members***" has the meaning set forth in <u>Section 2.4(b)</u>.

"***Agreement***" has the meaning set forth in the preamble hereto.

"***Applicable Procedures***" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"***Appropriate Officer***" means the Chief Executive Officer, President, Chief Operating Officer, Chief Financial Officer, General Counsel, Treasurer, Corporate Secretary or any Executive Vice President or any Senior Vice President of the Company.

"***Bankruptcy Code***" has the meaning set forth in the recitals hereto.

"***Board of Directors***" means either the board of directors of the Company or any duly authorized committee of that board.

"***Business Day***" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"***Cashless Exercise***" has the meaning set forth in <u>Section 3.7</u>.

"***Cashless Exercise Current Market Price***" means the Current Market Price of the Common Stock on the Exercise Date with respect to any Cashless Exercise.

"***Cashless Exercise Warrant***" has the meaning set forth in <u>Section 3.7</u>.

"***Commission***" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"***Common Stock***" means, subject to the provisions of <u>Section 5.1(g)</u>, the common stock, par value $0.01 per share, of the Company.

"***Company***" has the meaning set forth in the preamble hereof.

"***Company Order***" means a written request or order signed in the name of the Company by its Chairman of the Board, its Chief Executive Officer, its President, any Vice President, its Treasurer, any Assistant Treasurer, its Corporate Secretary or any Assistant Corporate Secretary, and delivered to the Warrant Agent.

"***Computershare***" has the meaning set forth in the preamble hereof.

"***Constituent Person***" has the meaning set forth in <u>Section 5.1(g)</u>.

"***Corporate Agency Office***" has the meaning set forth in <u>Section 8</u>.

"*corporation*" means a corporation, association, company (including limited liability company), joint-stock company, business trust or other similar entity.

"*Countersigning Agent*" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.

"*Current Market Price*" means on any date:

> (i)      if the reference is to the per share price of Common Stock on any date herein specified and if on such date the Common Stock is listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States:

>> (A)      for the purpose of any computation under this Agreement (except under Section 5.2), the average of the Quoted Prices for the 10 consecutive Trading Days preceding the date in question; or

>> (B)      for the purposes of any computation under Section 5.2, the Quoted Price for such date or, if such date is not a Trading Day, for the next preceding Trading Day; or

> (ii)      if the reference is to the per share price of Common Stock on any date herein specified and if on such date the Common Stock is not listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States, the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for one share of the Common Stock as determined as of such date by the Treasurer or Chief Financial Officer of the Company in good faith, whose determination shall be conclusive and evidenced by a certificate of such officer delivered to the Warrant Agent.

For the avoidance of doubt, no appraisal of any Person or third-party (other than the Treasurer or Chief Financial Officer of the Company as further described in clause (ii)) above shall be permitted or required to determine the Current Market Price.

"*Definitive Warrant Certificate*" means a Warrant Certificate registered in the name of the Holder thereof that does not bear the Global Warrant Legend and that does not have a "Schedule of Decreases of Warrants" attached thereto.

"*Depositary*" means DTC and its successors as depositary hereunder.

"*DTC*" means The Depository Trust Company.

"*Exchange Act*" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"*Exercise Date*" has the meaning set forth in Section 3.2(f).

"*Exercise Form*" has the meaning set forth in Section 3.2 (c).

3

"***Exercise Period***" means the period from and including the Original Issue Date to and including the Expiration Date.

"***Exercise Price***" means the exercise price per share of Common Stock, initially set at $[●],[1] subject to adjustment as provided in Section 5.1.

"***Expiration Date***" means the date of the earliest to occur of (x) the Scheduled Expiration Date and (y) a Winding Up.

"***Global Warrant Certificate***" means a Warrant Certificate deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases of Warrants" attached thereto.

"***Global Warrant Legend***" has the meaning set forth in Section 2.4(a).

"***Holder***" means any Person in whose name at the time any Warrant Certificate is registered upon the Warrant Register and, when used with respect to any Warrant Certificate, the Person in whose name such Warrant Certificate is registered in the Warrant Register.

"***Non-Electing Share***" has the meaning set forth in Section 5.1(g).

"***Non-Surviving Transaction***" has the meaning set forth in Section 5.1(g).

"***Original Issue Date***" means November [●], 2020, the date on which Warrants are originally issued under this Agreement.

"***outstanding***" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired pursuant to Section 3.2(b) or Section 4. and (iii) Warrants that have otherwise been acquired by the Company; provided, however, that in determining whether the Holders of the requisite amount of the outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Company or any Subsidiary or Affiliate of the Company or any of their respective employees shall be disregarded and deemed not to be outstanding.

"***Person***" means any individual, corporation, limited liability company, partnership, joint venture, trust, any other entity, unincorporated organization or government or any agency or political subdivision thereof.

"***Plan***" has the meaning set forth in the recitals hereto.

"***Qualifying Person***" has the meaning set forth in Section 5.1(g).

---

[1] Exercise Price equal to the aggregate amount of Notes Claims (including any interest thereon that would have accrued as of the Plan Effective Date).

"*Quoted Price*" means, on any Trading Day, with respect to the Common Stock, the VWAP of the Common Stock on such Trading Day on the principal U.S. national securities exchange on which the Common Stock is listed or admitted to trading or, if the Common Stock is not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Company for that purpose.

"*Recipient*" has the meaning set forth in Section 3.2(e).

"*Required Warrant Holders*" means Holders of Warrant Certificates evidencing a majority of the then-outstanding Warrants.

"*Scheduled Expiration Date*" means November [●], [2024 (the fourth (4th)] anniversary of the Original Issue Date) or, if not a Business Day, then the next Business Day thereafter.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Special Dividend*" has the meaning set forth in Section 5.1(d).

"*Subsidiary*" means a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Company or by one or more other Subsidiaries, or by the Company and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock which ordinarily has voting power for the election of directors, whether at all times or only so long as no senior class of stock has such voting power by reason of any contingency.

"*Substituted Property*" has the meaning set forth in Section 5.1(g).

"*Successor Company*" has the meaning set forth in Section 15.

"*Surviving Transaction*" has the meaning set forth in Section 5.1(g).

"*Trading Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which securities are not traded on the applicable securities exchange or in the applicable securities market.

"*Transaction*" has the meaning set forth in Section 5.1(g).

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"*Warrant Agent*" has the meaning set forth in the preamble hereto.

"*Warrant Certificates*" means those certain warrant certificates evidencing the Warrants, substantially in the form set forth in Exhibit A attached hereto, which, for the avoidance of doubt, are either Global Warrant Certificates or Definitive Warrant Certificates.

"*Warrant Register*" has the meaning set forth in Section 8.

"*Warrants*" means those certain warrants to purchase initially up to an aggregate of [●] shares of Common Stock at the Exercise Price, subject to adjustment pursuant to Section 5, issued hereunder.

"*Winding Up*" has the meaning set forth in Section 4.

**2.    Warrant Certificates**.

2.1    Original Issuance of Warrants.

(a)    On the Original Issue Date, one or more Global Warrant Certificates evidencing the Warrants shall be executed by the Company and delivered to the Warrant Agent for countersignature, and the Warrant Agent shall, upon receipt of a Company Order and at the direction of the Company set forth therein, countersign (by manual or facsimile signature) and deliver such Global Warrant Certificates for original issuance to the Depositary, or its custodian, for crediting to the accounts of its participants for the benefit of the holders of beneficial interests in the Warrants on the Original Issue Date pursuant to the Applicable Procedures of the Depositary on the Original Issue Date.

(b)    Except as set forth in Section 2.4, Section 3.2(d), Section 6 and Section 8, the Global Warrant Certificates delivered to the Depositary (or a nominee thereof) on the Original Issue Date shall be the only Warrant Certificates issued or outstanding under this Agreement.

(c)    Each Warrant Certificate shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one share of Common Stock, subject to adjustment as provided in Section 5.

2.2    Form of Warrant Certificates.

The Warrant Certificates evidencing the Warrants shall be in registered form only and substantially in the form set forth in Exhibit A hereto, shall be dated the date on which countersigned by the Warrant Agent, shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact the Warrant Agent's rights, duties or immunities) as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.

2.3    Execution and Delivery of Warrant Certificates.

(a)    Warrant Certificates evidencing the Warrants which may be countersigned and delivered under this Agreement are limited to Warrant Certificates evidencing [●] Warrants except for Warrant Certificates countersigned and delivered upon registration of transfer of, or in

6

exchange for, or in lieu of, one or more previously countersigned Warrant Certificates pursuant to Section 2.4, Section 3.2(d), Section 6 and Section 8.

(b)     The Warrant Agent is hereby authorized to countersign (by manual or facsimile signature) and deliver Warrant Certificates as required by Section 2.1 or by Section 2.4, Section 3.2(d), Section 6 or Section 8.

(c)     The Warrant Certificates shall be executed in the corporate name and on behalf of the Company by the Chairman (or any Co-Chairman) of the Board of Directors, the Chief Executive Officer, the President or any one of the Vice Presidents of the Company under corporate seal reproduced thereon (if the Company has a separate corporate seal) and attested to by the Corporate Secretary or one of the Assistant Corporate Secretaries of the Company, either manually or by facsimile signature printed thereon.  The Warrant Certificates shall be countersigned, either by manual or facsimile signature, by the Warrant Agent and shall not be valid for any purpose unless so countersigned.  In case any officer of the Company whose signature shall have been placed upon any of the Warrant Certificates shall cease to be such officer of the Company before countersignature by the Warrant Agent and issue and delivery thereof, such Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such Person had not ceased to be such officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by such Person as, at the actual date of the execution of such Warrant Certificate, shall be a proper officer of the Company, although at the date of the execution of this Agreement any such Person was not such officer.

2.4     Global Warrant Certificates.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in Exhibit A hereto (the "*Global Warrant Legend*").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("*Agent Members*") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Warrants, and as the sole Holder of such Warrant Certificate, for all purposes.  Accordingly, any such Agent Member's beneficial interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any holder of a beneficial interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in the Warrants evidenced by

7

such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a beneficial interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in Section 2.4(e).  Interests of beneficial owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures of the Depositary.

(e)     A Global Warrant Certificate registered in the name of the Depositary or its nominee shall be exchanged for Definitive Warrant Certificates only if the Depositary (i) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (ii) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, each Global Warrant Certificate registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation in accordance with Section 3.5, and the Company shall execute, and the Warrant Agent shall countersign and deliver, upon the Company's instruction, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant Certificate, Definitive Warrant Certificates evidencing, in the aggregate, the number of Warrants theretofore represented by such Global Warrant Certificate with respect to such beneficial owner's respective beneficial interest.  Any Definitive Warrant Certificate delivered in exchange for an interest in a Global Warrant Certificate pursuant to this Section 2.4(e) shall not bear the Global Warrant Legend.  Interests in any Global Warrant Certificate may not be exchanged for Definitive Warrant Certificates other than as provided in this Section 2.4(e).

(f)     The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant Certificate is entitled to take under this Agreement or such Global Warrant Certificate.

(g)     Each Global Warrant Certificate will evidence such of the outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of outstanding Warrants from time to time endorsed thereon and that the aggregate number of outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(h)     The Company initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

8

(i)      Every Warrant Certificate authenticated and delivered in exchange for, or in lieu of, a Global Warrant Certificate or any portion thereof, pursuant to this Section 2.4 or Section 8 or Section 10, shall be authenticated and delivered in the form of, and shall be, a Global Warrant Certificate, and a Global Warrant Certificate may not be exchanged for a Definitive Warrant Certificate, in each case, other than as provided in Section 2.4(e).   Whenever any provision herein refers to issuance by the Company and countersignature and delivery by the Warrant Agent of a new Warrant Certificate in exchange for the portion of a surrendered Warrant Certificate that has not been exercised, in lieu of the surrender of any Global Warrant Certificate and the issuance, countersignature and delivery of a new Global Warrant Certificate in exchange therefor, the Warrant Agent, on the Company's instruction, may endorse such Global Warrant Certificate to reflect a reduction in the number of Warrants evidenced thereby in the amount of Warrants so evidenced that have been so exercised.

(j)      Beneficial interests in any Global Warrant Certificate may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Global Warrant Certificate in accordance with the Applicable Procedures.

(k)      At such time as all Warrants evidenced by a particular Global Warrant Certificate have been exercised or expired in whole and not in part, such Global Warrant Certificate shall, if not in custody of the Warrant Agent, be surrendered to or retained by the Warrant Agent for cancellation in accordance with Section 3.5.

**3.      Exercise and Expiration of Warrants**.

3.1      Right to Acquire Common Stock Upon Exercise.  Each Warrant Certificate duly issued by the Company shall, when countersigned by the Warrant Agent, entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to acquire from the Company, for each Warrant evidenced thereby, one share of Common Stock at the Exercise Price, subject to adjustment as provided in this Agreement.  The Exercise Price, and the number of shares of Common Stock obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by Section 5.1.

3.2      Exercise and Expiration of Warrants.

(a)      Exercise of Warrants.  Subject to and upon compliance with the terms and conditions set forth herein, a Holder of a Warrant Certificate may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the shares of Common Stock obtainable thereunder.

(b)      Expiration of Warrants.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. No further action of any Person (including by, or on behalf of, any Holder, the Company, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this Section 3.2(b).

(c)      Method of Exercise.  In order for a Holder to exercise all or any of the Warrants represented by a Warrant Certificate, the Holder thereof must (i) (x) in the case of a

9

Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit A hereto (an "*Exercise Form*"), setting forth the number of Warrants being exercised and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Definitive Warrant Certificate, at the Corporate Agency Office, (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof as well as any such other necessary information the Warrant Agent may reasonably require, and (II) surrender to the Warrant Agent the Definitive Warrant Certificate evidencing such Warrants; and (ii) pay to the Warrant Agent an amount equal to (x) all taxes required to be paid by the Holder, if any, pursuant to Section 3.4 prior to, or concurrently with, exercise of such Warrants and (y) except in the case of a Cashless Exercise, the aggregate of the Exercise Price in respect of each share of Common Stock into which such Warrants are exercisable, in case of (x) and (y), by wire transfer in immediately available funds, to the account (No. [●]; ABA No. [●]; Reference: Warrant Exercise; Attention: Client Services) of the Company at the Warrant Agent or such other account of the Company at such banking institution as the Company shall have given notice to the Warrant Agent and such Holder in accordance with Section 11.1(b).

(d)     Partial Exercise.  If fewer than all the Warrants represented by a Warrant Certificate are exercised, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall cause the custodian of DTC to endorse the "Schedule of Decreases of Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Definitive Warrant Certificate, such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and for the number of Warrants which were not exercised shall be executed by the Company.  The Warrant Agent shall countersign the new Definitive Warrant Certificate, registered in such name or names, subject to the provisions of Section 8 regarding registration of transfer and payment of governmental charges in respect thereof, as may be directed in writing by the Holder, and shall deliver the new Definitive Warrant Certificate to the Person or Persons in whose name such new Definitive Warrant Certificate is so registered.  The Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Definitive Warrant Certificates duly executed on behalf of the Company for such purpose.

(e)     Issuance of Common Stock.  Upon due exercise of Warrants evidenced by any Warrant Certificate in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Company the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit all funds, in accordance with Section 3.3, received as instructed in writing by the Company and advise the Company by telephone at the end of such day of the amount of funds so deposited to its account.  The Company shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after the Exercise Date referred to below, (i) determine the number of shares of Common Stock issuable pursuant to exercise of such Warrants pursuant to Section 3.6 or, if Cashless Exercise applies, Section 3.7 and (ii) (x) in the

10

case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient (as defined below) in accordance with the Applicable Procedures shares of Common Stock in book-entry form to be so held through the facilities of DTC in an amount equal to, or, if the Common Stock may not then be held in book-entry form through the facilities of DTC, duly executed certificates representing, or (y) in the case of exercise of Warrants evidenced by Definitive Warrant Certificates, execute or cause to be executed and deliver or cause to be delivered to the Recipient (as defined below) a certificate or certificates representing, in case of (x) and (y), the aggregate number of shares of Common Stock issuable upon such exercise (based upon the aggregate number of Warrants so exercised), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Company so elects pursuant to Section 5.2. The shares of Common Stock in book-entry form or certificate or certificates representing shares of Common Stock so delivered shall be, to the extent possible, in such denomination or denominations as such Holder shall request in the applicable Exercise Form and shall be registered or otherwise placed in the name of, and delivered to, the Holder or, subject to Section 3.4, such other Person as shall be designated by the Holder in such Exercise Form (the Holder or such other Person being referred to herein as the "***Recipient***").

(f)      Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "***Exercise Date***").  At such time, subject to Section 5.1(e)(iv), shares of Common Stock in book-entry form or the certificates for the shares of Common Stock issuable upon such exercise as provided in Section 3.2(e) shall be deemed to have been issued and, for all purposes of this Agreement, the Recipient shall, as between such Person and the Company, be deemed to be and entitled to all rights of the holder or record of such Common Stock.

3.3      Application of Funds upon Exercise of Warrants.  All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of Services (the "***Funds***") shall be held by the Warrant Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the Warrant Agent in its name as agent for the Company.  Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Company, any holder or any other party.  The Warrant Agent shall forward funds received for warrant exercises in a given month by the 5th Business Day of the following month by wire transfer to an account designated by the Company.

3.4      Payment of Taxes.  The Company shall pay any and all taxes (other than income or withholding taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants pursuant hereto.  The Company or the Warrant Agent shall not be

required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of shares of Common Stock in book-entry form or any certificates for shares of Common Stock or payment of cash or other property to any Recipient other than the Holder of the Warrant Certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares of Common Stock in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (b) it has been established to the Company's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.

3.5     Cancellation of Warrant Certificates.     Any Definitive Warrant Certificate surrendered for exercise shall, if surrendered to the Company, be delivered to the Warrant Agent. All Warrant Certificates surrendered or delivered to or received by the Warrant Agent for cancellation pursuant to this Section 3.5 or Section 2.4(e) or Section 2.4(k) shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company. The Warrant Agent shall destroy any such cancelled Warrant Certificates and deliver its certificate of destruction to the Company, unless the Company shall otherwise direct in writing.

3.6     Shares Issuable.     The number of shares of Common Stock "obtainable upon exercise" of Warrants at any time shall be the number of shares of Common Stock into which such Warrants are then exercisable. The Company will confirm the number of shares issuable if so requested by the Warrant Agent. The number of shares of Common Stock "into which each Warrant is exercisable" shall be one share, subject to adjustment as provided in Section 5.1.

3.7     Cashless Exercise.     Notwithstanding any provisions herein to the contrary, if, on the Exercise Date of a Cashless Exercise, the Cashless Exercise Current Market Price of one share of Common Stock is greater than the applicable Exercise Price on the Exercise Date, then, in lieu of paying to the Company the applicable Exercise Price by wire transfer in immediately available funds, the Holder may elect to receive shares of Common Stock equal to the value (as determined below) of the Warrants or any portion thereof being exercised (such portion, the "*Cashless Exercise Warrants*" with respect to such date) by (i) in the case of Warrants evidenced by a Global Warrant Certificate, providing notice to the Warrant Agent pursuant to the Applicable Procedures and the Exercise From; or (ii) in the case of Warrants evidenced by a Definitive Warrant Certificate, providing notice pursuant to the Exercise Form, in the case of (i) or (ii), that the Holder desires to effect a "cashless exercise" (a "*Cashless Exercise*") with respect to the Cashless Exercise Warrants, in which event the Company shall issue to the Holder a number of shares of Common Stock with respect to Cashless Exercise Warrants computed using the following formula (it being understood that any portion of the Warrants being exercised on such date that are not Cashless Exercise Warrants will not be affected by this calculation):

$$X = (Y (A-B)) \div A$$

Where X =     the number of shares of Common Stock to be issued to the Holder in respect of the Cashless Exercise Warrants

Y =             the number of shares of Common Stock purchasable under the Cashless Exercise Warrants being exercised by the Holder (on the Exercise Date)

12

A =  the applicable Cashless Exercise Current Market Price of one share of Common Stock (on the Exercise Date)

B =  the applicable Exercise Price (as adjusted through and including the Exercise Date).

The Company shall calculate and transmit to the Warrant Agent the number of shares of Common Stock to be issued on such Cashless Exercise, and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

   3.8  <u>Cost Basis Information</u>.

    (a)  In the event of a cash exercise, the Company hereby instructs the Warrant Agent to record cost basis for newly issued shares at the time of such exercise in accordance with instructions by the Company.  If the Company does not provide such cost basis information to the Warrant Agent, as outlined above, then the Warrant Agent will treat those shares issued hereunder as uncovered securities or the equivalent, and each holder of such shares will need to obtain such cost basis information from the Company.

    (b)  In the event of a Cashless Exercise, the Company shall provide cost basis for shares issued pursuant to a Cashless Exercise at the time the Company provides the Cashless Exercise to the Warrant Agent pursuant to <u>Section 3.7</u> hereof.

**4.  Dissolution, Liquidation or Winding up**.

   Unless <u>Section 5.1(g)</u> applies, if, on or prior to the Expiration Date, the Company (or any other Person controlling the Company) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "***Winding Up***") of the affairs of the Company, the Company shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in <u>Section 11.1(b)</u> prior to the date on which such transaction is expected to become effective or, if earlier, the record date for such transaction.  Such notice shall also specify the date as of which the holders of record of the shares of Common Stock shall be entitled to exchange their shares for securities, money or other property deliverable upon such dissolution, liquidation or winding up, as the case may be, on which date each Holder of Warrant Certificates shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of the shares of Common Stock into which the Warrants were exercisable immediately prior to such dissolution, liquidation or winding up (net of the then applicable Exercise Price) and the rights to exercise the Warrants shall terminate.

   Unless <u>Section 5.1(g)</u> applies, in case of any such voluntary or involuntary dissolution, liquidation or winding up of the Company, the Company shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with a Company Order as to the distribution thereof.  After receipt of such deposit from the Company and after receipt of surrendered Warrant Certificates evidencing Warrants, and any such other necessary information as the Warrant Agent may reasonably require, the Warrant Agent

13

shall make payment in appropriate amount to such Person or Persons as it may be directed in writing by the Holder surrendering such Warrant Certificate.  The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this Section 4 except such as it shall agree with the Company to pay thereon.  Any moneys, securities or other property which at any time shall be deposited by the Company or on its behalf with the Warrant Agent pursuant to this Section 4 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with Section 3.3 hereof; provided, that, moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

5.    **Adjustments**.

5.1    Adjustments.  In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 5.1 (the "*Adjustment Events*") and the number of shares of Common Stock obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 5.1.

(a)    Subdivisions and Combinations.  In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, effect a subdivision (by any stock split or otherwise) of the outstanding shares of Common Stock into a greater number of shares of Common Stock (other than (x) a subdivision upon a Transaction to which Section 5.1(g) applies or (y) a stock split effected by means of a stock dividend or distribution to which Section 5.1(b) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased.  Conversely, if the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination, subdivision or otherwise) of the outstanding shares of Common Stock into a smaller number of shares of Common Stock (other than a combination upon a Transaction to which Section 5.1(g) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be proportionately increased.  Any adjustment under this Section 5.1(a) shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b)    Common Stock Dividends.  In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, make or issue to the holders of its Common Stock a dividend or distribution payable in, or otherwise make or issue a dividend or other distribution on any class of its capital stock payable in, shares of Common Stock (other than a dividend or distribution upon a Transaction to which Section 5.1(g) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date for the determination of the holders of shares of Common Stock entitled to receive such dividend or distribution shall be decreased by multiplying such Exercise Price by a fraction (not to be greater than 1):

14

(i)        the numerator of which shall be the total number of shares of Common Stock issued and outstanding at the close of business on such date for determination; and

(ii)        the denominator of which shall be the total number of shares of Common Stock issued and outstanding at the close of business on such date for determination plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Any adjustment under this Section 5.1(b) shall, subject to Section 5.1(e)(iv), become effective immediately after the opening of business on the day after the date for the determination of the holders of shares of Common Stock entitled to receive such dividend or distribution.

(c)        Reclassifications.  A reclassification of the Common Stock (other than any such reclassification in connection with a merger or consolidation or sale to which Section 5.1(g) applies) into shares of Common Stock and shares of any other class of stock shall be deemed:

(i)        a Special Dividend by the Company to the holders of its Common Stock of such shares of such other class of stock for the purposes and within the meaning of Section 5.1(d) (and the effective date of such reclassification shall be deemed to be "the date for the determination of the holders of Common Stock entitled to receive such dividend or distribution" for the purposes and within the meaning of Section 5.1(d)); and

(ii)        if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock for the purposes and within the meaning of Section 5.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 5.1(a)).

(d)        Special Dividends.  In the event the Company shall, at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, make or issue any dividend of cash or other distribution of cash and/or property, whether in a spin-off transaction or otherwise, to all holders of its Common Stock (other than any dividend or distribution (i) upon a Transaction to which Section 5.1(g) applies or (ii) made pursuant to a regular dividend policy of the Company as approved by the Board of Directors) (a "*Special Dividend*"), then and in each such event, the Exercise Price in effect immediately prior to the close of business on the date for the determination of the holders of Common Stock entitled to receive such dividend or distribution shall be decreased (to an amount not less than the lesser of the par value of the Common Stock as of the date hereof and such par value as of such date of determination) by an amount equal to (x) the amount of the cash plus (y) the fair market value of any property comprising such Special Dividend as determined as of such date by the Treasurer or Chief Financial Officer of the Company in good faith as of the date of such Special Dividend, in each case, so distributed to one share of Common Stock.

15

Any adjustment under this Section 5.1(d) shall, subject to Section 5.1(c)(i), become effective immediately prior to the opening of business on the day after the date for the determination of the holders of Common Stock entitled to receive such Special Dividend.

For purposes of clarity, if a declared Special Dividend would have reduced the Exercise Price to an amount below the par value per share of the Common Stock, the Exercise Price will be reduced to the par value per share of the Common Stock and any remaining amount of cash of the Special Dividend that would have resulted in a reduction of the Exercise Price below the par value per share of the Common Stock shall be disregarded.

(e)    Other Provisions Applicable to Adjustments.  The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of shares of Common Stock into which each Warrant is exercisable under Section 5.1:

(i)    Treasury Stock.  The dividend or distribution of any issued shares of Common Stock owned or held by or for the account of the Company shall be deemed a dividend or distribution of shares of Common Stock for purposes of Section 5.1(b).  The Company shall not make or issue any dividend or distribution on shares of Common Stock held in the treasury of the Company.  For the purposes of Section 5.1(b), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company.

(ii)    When Adjustments Are to be Made.  The adjustments required by Section 5.1(a), Section 5.1(b), Section 5.1(c) and Section 5.1(d) shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least 1%.  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 5.1(a), Section 5.1(b), Section 5.1(c) and Section 5.1(d) and not previously made, would result in such minimum adjustment.

(iii)    Fractional Interests.  In computing adjustments under Section 5.1, fractional interests in Common Stock shall be taken into account to the nearest one-thousandth of a share.

(iv)    Deferral of Issuance Upon Exercise.  In any case in which Section 5.1(b) shall require that a decrease in the Exercise Price be made effective prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment became effective but prior to the occurrence of such specified event and, in connection therewith, Section 5.1(f) shall require a corresponding increase in the number of shares of Common Stock into which each Warrant is exercisable, the Company may elect to defer, with written notice to the Warrant Agent (but not in any event later than the Expiration Date) until the occurrence of such specified event (A) the issuance to the Holder of the Warrant Certificate evidencing such Warrant (or other Person entitled thereto) of, and the

16

registration of such Holder (or other Person) as the record holder of, the Common Stock over and above the Common Stock issuable upon such exercise on the basis of the number of shares of Common Stock obtainable upon exercise of such Warrant immediately prior to such adjustment and to require payment in respect of such number of shares the issuance of which is not deferred on the basis of the Exercise Price in effect immediately prior to such adjustment and (B) the corresponding reduction in the Exercise Price; provided, however, that the Company shall deliver to such Holder or other Person a due bill or other appropriate instrument that meet any applicable requirements of the principal national securities exchange or other market on which the Common Stock is then traded and evidences the right of such Holder or other Person to receive, and to become the record holder of, such additional shares of Common Stock, upon the occurrence of such specified event requiring such adjustment (without payment of any additional Exercise Price in respect of such additional shares).

(v)     Deferral of Reduction in Exercise Price.  In any case in which Section 5.1(d) shall require that a decrease in the Exercise Price be made effective prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment became effective but prior to the occurrence of such specified event, the Company may elect to defer, with written notice to the Warrant Agent (but not in any event later than the Expiration Date) until the occurrence of such specified event the corresponding reduction in the Exercise Price; provided, however, that the Company shall deliver to the Holder of the Warrant Certificate evidencing such Warrant an appropriate instrument that evidences the right of such Holder to receive from the Company, upon the occurrence of such specified event requiring such adjustment, a cash refund equal to the difference between (x) the Exercise Price paid to the Company on the Exercise Date and (y) the Exercise Price as so reduced as a result of such adjustment pursuant to Section 5.1(d).

(f)     Adjustment to Shares Obtainable Upon Exercise.  Whenever the Exercise Price is adjusted as provided in this Section 5.1 (other than Section 5.1(d) in the case of a Special Dividend), the number of shares of Common Stock into which a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of shares of Common Stock into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(g)     Changes in Common Stock.  In case at any time or from time to time after the Original Issue Date while any Warrants remain outstanding and unexpired in whole or in part, the Company shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting: (1) a merger of the Company into, a direct or indirect sale of all of the Company's equity to, or a consolidation of the Company with, any other Person in which the previously outstanding shares of Common Stock shall be (either directly or upon subsequent liquidation) cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing, or a sale of all or substantially all of the assets of the Company and its Subsidiaries (taken as a whole) (a "***Non-Surviving Transaction***"), or (2) any merger of another Person into the Company in which the previously outstanding shares of Common Stock shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Company or other property (including cash) or any combination

17

of the foregoing (a "***Surviving Transaction***"; any Non-Surviving Transaction or Surviving Transaction being herein called a "***Transaction***") then:

(i)   as a condition to the consummation of such Transaction, the Company shall (or, in the case of any Non-Surviving Transaction, the Company shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:

(A)   so long as any Warrant remains outstanding on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement, each Warrant, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable:

a.   into, in lieu of the Common Stock issuable upon such exercise prior to such consummation, only the securities or other property ("***Substituted Property***") that would have been receivable upon such Transaction by a holder of the number of shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction, assuming (except in the case of a reclassification) such holder of Common Stock:

i.   is a Person ("***Qualifying Person***") that is neither (I) an employee of the Company or of any Subsidiary thereof nor (II) a Person with which the Company consolidated or into which the Company merged or which merged into the Company or to which such sale or transfer was made, as the case may be ("***Constituent Person***"), or an Affiliate of a Constituent Person; and

ii.   failed to exercise his rights of election, if any, as to the kind or amount of securities, cash and other property receivable upon such Transaction (provided that if the kind or amount of securities, cash and other property receivable upon such Transaction is not the same for each share of Common Stock held immediately prior to such Transaction by other than a Constituent Person or an affiliate thereof and in respect of which such rights of election shall not have been exercised ("***Non-Electing Share***"), then, for the purposes of this Section 5.1(g), the kind and amount of securities, cash and other property receivable upon such Transaction by each Non-Electing Share shall be deemed to be the kind and amount so receivable per share by a plurality of the Non-Electing Shares); and

b.   at an Exercise Price for such Substituted Property equal to the aggregate Exercise Price payable by such holder for all such shares of Common Stock into which such Warrant was exercisable immediately prior to such Transaction; and

18

(B)      the rights and obligations of the Company (or, in the event of a Non-Surviving Transaction, such other Person) and the holders in respect of Substituted Property shall be as nearly equivalent as may be practicable to the rights and obligations of the Company and holders in respect of Common Stock hereunder as set forth in Section 3.1 hereof and elsewhere herein.

Such written instrument shall provide for adjustments which, for events subsequent to the effective date of such written instrument, shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 5. The above provisions of this Section 5.1(g) shall similarly apply to successive Transactions.

(h)      Compliance with Governmental Requirements.  Before taking any action that would cause an adjustment reducing the Exercise Price below the then par value of any of the shares of Common Stock into which the Warrants are exercisable, the Company will take any corporate action that may be necessary in order that the Company may validly and legally issue fully paid and non-assessable shares of such Common Stock at such adjusted Exercise Price.

(i)      Optional Tax Adjustment.  The Company may at its option, at any time during the term of the Warrants, increase the number of shares of Common Stock into which each Warrant is exercisable, or decrease the Exercise Price, in addition to those changes required by Section 5.1(a), Section 5.1(b), Section 5.1(c)  and Section 5.1(d), as deemed advisable by the Board of Directors of the Company, in order that any event treated for Federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients.

(j)      Warrants Deemed Exercisable.  For purposes solely of this Section 5, the number of shares of Common Stock which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time shall be determined assuming such Warrant was exercisable in full at such time.

(k)      Notice of Adjustment.  Upon the occurrence of each adjustment of the Exercise Price or the number of shares of Common Stock into which a Warrant is exercisable pursuant to this Section 5.1, the Company at its expense shall promptly:

(i)      compute such adjustment in accordance with the terms hereof;

(ii)      after such adjustment becomes effective, deliver to all Holders, in accordance with Section 11.1(b) and Section 11.2 (including by means of a current report on Form 8-K), a notice setting forth such adjustment and showing in detail the facts upon which such adjustment is based; and

(iii)      deliver to the Warrant Agent a certificate of the Chief Financial Officer of the Company setting forth the Exercise Price and the number of shares of Common Stock into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Stock).  As provided in Section 10, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect

19

to any such certificate, except to exhibit the same from time to time to any Holder desiring an inspection thereof during reasonable business hours.  The Company hereby agrees that it will provide the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 5.1. The Company further agrees that it will provide to the Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any Section of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

(l)     Statement on Warrant Certificates.  Irrespective of any adjustment in the Exercise Price or amount or kind of shares into which the Warrants are exercisable, Warrant Certificates theretofore or thereafter issued may continue to express the same Exercise Price initially applicable or amount or kind of shares initially issuable upon exercise of the Warrants evidenced thereby pursuant to this Agreement.

5.2     Fractional Interest.  The Company shall not be required upon the exercise of any Warrant (including, without limitation, under Section 3.7) to issue any fractional shares of Common Stock, but may, in lieu of issuing any fractional shares of Common Stock make an adjustment therefore in cash on the basis of the Current Market Price per share of Common Stock on the date of such exercise.  If Warrant Certificates evidencing more than one Warrant shall be presented for exercise at the same time by the same Holder, the number of full shares of Common Stock which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of the Warrant Certificates, expressly waive their right to receive any fraction of a share of Common Stock or a stock certificate representing a fraction of a share of Common Stock if such amount of cash is paid in lieu thereof.  If the Company shall decide that cash will be provided instead of fractional shares, then the Company shall inform the Warrant Agent of the amount to be paid upon the fractional exercise of the Warrant.  Further, if the Company shall decide that cash will be provided instead of fractional shares, then the Company shall provide an initial funding of one thousand dollars ($1000) for the purpose of issuing cash in lieu of fractional shares.  From time to time thereafter, the Warrant Agent may request additional funding to cover fractional payments.  The Warrant Agent shall have no obligation to make fractional payments unless the Company shall have provided the necessary funds to pay in full all amounts due and payable with respect thereto.

5.3     No Other Adjustments.  Except in accordance with Section 5.1, the applicable Exercise Price and the number of shares of Common Stock obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing, including, without limitation

(i)     upon the issuance of any other securities by the Company on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of shares of Common Stock upon the exercise of any such securities;

(ii)     upon the issuance of any shares of Common Stock or other securities or any payments pursuant to any management or other equity incentive plan of the Company;

20

(iii)    upon the issuance of any shares of Common Stock pursuant to the exercise of the Warrants; or

(iv)    upon the issuance of any shares of Common Stock or other securities of the Company in connection with a business acquisition transaction.

**6.      Loss or Mutilation**.

If (a) any mutilated, lost, stolen or destroyed Warrant Certificate is surrendered to the Warrant Agent or (b) both (i) there shall be delivered to the Company and the Warrant Agent (A) a claim by a Holder as to the destruction, loss or wrongful taking of any Warrant Certificate of such Holder and a request thereby for a new replacement Warrant Certificate, and (B) such open penalty surety bond and/or indemnity bond as may be required by them to save each of them and any agent of either of them harmless and (ii) such other reasonable requirements as may be imposed by the Company or Warrant Agent as permitted by Section 8-405 of the Uniform Commercial Code have been satisfied, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a "protected purchaser" within the meaning of Section 8-405 of the Uniform Commercial Code or bona fide purchaser, and (iii) at the Company's or the Warrant Agent's request, reimbursement to the Company and the Warrant Agent of all reasonable expenses incidental thereto, the Company shall execute and upon its written request the Warrant Agent shall countersign and deliver to the registered Holder of the lost, wrongfully taken, destroyed or mutilated Warrant Certificate, in exchange therefore or in lieu thereof, a new Warrant Certificate of the same tenor and for a like aggregate number of Warrants. At the written request of such registered Holder, the new Warrant Certificate so issued shall be retained by the Warrant Agent as having been surrendered for exercise, in lieu of delivery thereof to such Holder, and shall be deemed for purposes of Section 3.2(c)(II) to have been surrendered for exercise on the date the conditions specified in clauses (A) or (B) of the preceding sentence were first satisfied.  The Warrant Agent may, at its option, issue replacement Warrants for mutilated certificates upon presentation thereof without such indemnity.

Upon the issuance of any new Warrant Certificate under this Section 6, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other expenses (including the reasonable and documented fees and expenses of the Warrant Agent and of counsel to the Company) in connection therewith.

Every new Warrant Certificate executed and delivered pursuant to this Section 6 in lieu of any lost, wrongfully taken or destroyed Warrant Certificate shall constitute an additional contractual obligation of the Company, whether or not the allegedly lost, wrongfully taken or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.

The provisions of this Section 6 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, wrongfully taken, or destroyed Warrant Certificates.

**7.     Reservation and Authorization of Common Stock**.

The Company covenants that, for the duration of the Exercise Period, the Company will at all times reserve and keep available, from its authorized and unissued Common Stock solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of shares of Common Stock and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all outstanding Warrants for cash.  The Company further covenants that it shall, from time to time, take all steps necessary to increase the authorized number of shares of its Common Stock if at any time the authorized number of shares of Common Stock remaining unissued would otherwise be insufficient to allow delivery of all the shares of Common Stock then deliverable upon the exercise in full of all outstanding Warrants.  The Company covenants that all shares of Common Stock issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously or otherwise specified herein or in connection with a Cashless Exercise).  The Company shall take all such actions as may be necessary to ensure that all such shares of Common Stock may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).  The Company covenants that all shares of Common Stock will, at all times that Warrants are exercisable, be duly approved for listing subject to official notice of issuance on each securities exchange, if any, on which the Common Stock is then listed.  The Company covenants that the stock certificates issued to evidence any shares of Common Stock issued upon exercise of Warrants, if any, will comply with the Delaware General Corporation Law and any other applicable law.

**8.     Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrant Certificates may be surrendered for registration of transfer or exchange and where Warrant Certificates may be surrendered for exercise of Warrants evidenced thereby, which office is 250 Royall Street, Canton, MA 02021 on the Original Issue Date. The Warrant Agent will give prompt written notice to all Holders of Warrant Certificates of any change in the location of such office.

The Warrant Certificates evidencing the Warrants shall be issued in registered form only. The Company shall cause to be kept at the office or offices of the Warrant Agent designated for such purpose a warrant register (the "***Warrant Register***") in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates as herein provided.

Upon surrender for registration of transfer of any Warrant Certificate at the Corporate Agency Office, the Company shall execute, and the Warrant Agent shall countersign and deliver, in the name of the designated transferee or transferees, one or more new Warrant Certificates evidencing a like aggregate number of Warrants.

22

At the option of the Holder, Warrant Certificates may be exchanged at the office or offices of the Warrant Agent upon payment of the charges hereinafter provided for other Warrant Certificates evidencing a like aggregate number of Warrants.  Whenever any Warrant Certificates are so surrendered for exchange, the Company shall execute, and the Warrant Agent shall countersign and deliver, the Warrant Certificates of the same tenor and evidencing the same number of Warrants as evidenced by the Warrant Certificates surrendered by the Holder making the exchange.

All Warrant Certificates issued upon any registration of transfer or exchange of Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrant Certificates surrendered for such registration of transfer or exchange.

Every Warrant Certificate surrendered for registration of transfer or exchange shall (if so required by the Company or the Warrant Agent) be: (i) duly endorsed and containing a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, or (ii) be accompanied by a written instrument of transfer in form satisfactory to the Company and the Warrant Agent, duly executed by the Holder thereof or his attorney duly authorized in writing, also containing a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.  Further, to effect such transfer or exchange, all other necessary information or documentation shall be provided as the Warrant Agent may reasonably request.

No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.

The Warrant Agent shall, upon request of the Company from time to time, deliver to the Company such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the shares of Common Stock as the Company may reasonably request.  The Warrant Agent shall, upon reasonable advance notice, also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may reasonably request, such original books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office.  The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

23

**9.**     **Warrant Holders**.

9.1     No Voting or Dividend Rights.

(a)     No Holder of a Warrant Certificate evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Stock of the Company, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Stock or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Stock.

(b)     The consent of any Holder of a Warrant Certificate shall not be required with respect to any action or proceeding of the Company.

(c)     Except as provided in Section 4, no Holder of a Warrant Certificate, by reason of the ownership or possession of a Warrant or the Warrant Certificate representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)     No Holder of a Warrant Certificate shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrant Certificate held by such Holder.

9.2     Rights of Action.  All rights of action against the Company in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrant Certificates, and any Holder of any Warrant Certificate, without the consent of the Warrant Agent or the Holder of any other Warrant Certificate, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

9.3     Treatment of Holders of Warrant Certificates.  Every Holder, by virtue of accepting a Warrant Certificate, consents and agrees with the Company, with the Warrant Agent and with every subsequent holder of such Warrant Certificate that, prior to due presentment of such Warrant Certificate for registration of transfer, the Company and the Warrant Agent may treat the Person in whose name the Warrant Certificate is registered as the owner thereof for all purposes and as the Person entitled to exercise the rights granted under the Warrants, and neither the Company, the Warrant Agent nor any agent thereof shall be affected by any notice to the contrary.

**10.**     **Concerning the Warrant Agent**.  Sections 10.1(d), 10.2, 10.3, 10.4, 10.5, 10.6 and 10.8 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

10.1     Rights and Duties of the Warrant Agent.

(a)     The Company hereby appoints the Warrant Agent to act as agent of the Company as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Company and agrees to perform that agency upon the terms

24

and conditions set forth in this Agreement and in the Warrant Certificates or as the Company and the Warrant Agent may hereafter agree, by all of which the Company and the Holders of Warrant Certificates, by their acceptance thereof, shall be bound; provided, however, that the terms and conditions contained in the Warrant Certificates are subject to and governed by this Agreement or any other terms and conditions hereafter agreed to by the Company and the Warrant Agent.  The Warrant Agent shall act solely as agent of the Company hereunder and does not assume any obligation or relationship of agency or trust for or with any of the Holders or any beneficial owners of Warrants.

(b)      The Warrant Agent shall not, by countersigning Warrant Certificates or by any other act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants or the Warrant Certificates (except as to its countersignature thereon), (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Company made in such certificates that the Warrant Agent receives; or (v) any of the statements of act or recitals contained in this Warrant Agreement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 5 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 5 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any shares of Common Stock or stock certificates or other securities or property upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to Section 5 hereof or to comply with any of the covenants of the Company contained in Section 5 hereof.  The Company shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable it to carry out or perform its duties under this Agreement.

(c)      The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

(d)      The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Company, including, without limiting the generality of the foregoing, any duty or

25

responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Company.

(e)	The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof, provided, however, that the selection and the continued employment of any such attorney, agent or employee was not a result of gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).

(f)	The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Company with respect to any matter relating to its acting as Warrant Agent hereunder.

(g)	The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)	 The Warrant Agent shall not be liable or responsible for any failure of the Company to comply with any of its obligations relating to any registration statement filed with the Commission or this Warrant Agreement, including without limitation obligations under applicable regulation or law.

(i)	The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrants authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Warrant Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)	The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(k)	The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon (i) any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution

26

for, the foregoing; or (ii) any law, act, regulation or any interpretation of the same even though such law, act, or regulation may thereafter have been altered, changed, amended or repealed.

(l)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to Company, the holder of any Warrant Certificate or any other Person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(m)     Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by the Chairman of the Board of Directors, the Chief Executive Officer, the President, a Vice President, the Chief Financial Officer or the Corporate Secretary of the Company and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement, and will be held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

10.2     Limitation of Liability.

(a)     The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Company to Warrant Agent as fees and charges, but not including reimbursable expenses, during the twenty four (24) months immediately preceding the event for which recovery from Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)     Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant.  The Warrant Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of Section 5 hereof or responsible for the manner, method, or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any shares of Common Stock shall, when issued, be valid and fully paid and non-assessable.

27

10.3    Indemnification.

(a)    The Company covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct.

(b)    Instructions.    From time to time, the Company may provide the Warrant Agent with instructions, by Company Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of Company for instruction, and may consult with legal counsel for the Warrant Agent or the Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Warrant Agreement.  Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by Company for any action taken, suffered or omitted to be taken by Warrant Agent in reliance upon any Company instructions or upon the advice or opinion of such counsel.

10.4    Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel.

10.5    Compensation and Reimbursement.  The Company agrees to pay to the Warrant Agent from time to time reasonable compensation for all fees and expenses relating to its services hereunder as the Company and the Warrant Agent may agree from time to time and to reimburse the Warrant Agent for reasonable expenses and disbursements, including reasonable counsel fees incurred in connection with the execution and administration of this Agreement.

10.6    Warrant Agent May Hold Company Securities.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.  Nothing herein shall preclude the Warrant Agent or any Countersigning Agent from acting in any other capacity for the Company or for any other legal entity.

10.7    Resignation and Removal; Appointment of Successor.

(a)    The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence or willful misconduct) after giving 30 days' prior written notice to the Company.  The Company may remove the Warrant Agent upon 30 days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Company, cause notice to be given in accordance with Section 11.1(b) to the Company of said notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal, the Company shall appoint in writing a new Warrant Agent.  If the Company shall fail to make such appointment within a period of 30 calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant Certificate may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  The new Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent. Not later than the effective date of any such appointment, the Company shall file notice thereof with the resigning or removed Warrant Agent.  Failure to give any notice provided for in this Section 10.7(a), however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)    Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act.  Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate at such Holder's last address as shown on the Warrant Register.

10.8    Appointment of Countersigning Agent.

(a)    The Warrant Agent may appoint a Countersigning Agent or Agents which shall be authorized to act on behalf of the Warrant Agent to countersign Warrant Certificates issued upon original issue and upon exchange, registration of transfer or pursuant to Section 6, and Warrant Certificates so countersigned shall be entitled to the benefits of this Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  Wherever reference is made in this Agreement to the countersignature and delivery of Warrant Certificates by the Warrant Agent or to Warrant Certificates countersigned by the Warrant Agent, such reference shall be deemed to include countersignature and delivery on behalf of the Warrant Agent by a Countersigning Agent and Warrant Certificates countersigned by a Countersigning Agent.

(b)    Any Person into which a Countersigning Agent may be merged or any corporation resulting from any consolidation to which such Countersigning Agent shall be a party, shall be a successor Countersigning Agent without any further act; provided, that, such corporation would be eligible for appointment as a new Countersigning Agent under the provisions of Section 10.8(a), without the execution or filing of any paper or any further act on the part of the

29

Warrant Agent or the Countersigning Agent.  Any such successor Countersigning Agent shall promptly cause notice of its succession as Countersigning Agent to be given in accordance with Section 11.1(b) to each Holder of a Warrant Certificate at such Holder's last address as shown on the Warrant Register.

(c)	A Countersigning Agent may resign at any time by giving 30 days' prior written notice thereof to the Warrant Agent and to the Company.  The Warrant Agent may at any time terminate the agency of a Countersigning Agent by giving 30 days' prior written notice thereof to such Countersigning Agent and to the Company.

(d)	The Warrant Agent agrees to pay to each Countersigning Agent from time to time reasonable compensation for its services under this Section 10.8 and the Warrant Agent shall be entitled to be reimbursed for such payments, subject to the provisions of Section 10.5.

(e)	Any Countersigning Agent shall have the same rights and immunities as those of the Warrant Agent set forth Section 10 and this Agreement.

**11.	Notices**.

11.1	Notices Generally.

(a)	Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Company or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing (including telecopy or electronic communication) and telecopied, sent via electronic means trackable or first-class mail or delivered by hand (including by courier service) as follows:

if to the Company, to:

Oasis Petroleum Inc.
1001 Fannin Street, Suite 1500
Houston, Texas 77002
Attention: Nickolas Lorenzatos
Facsimile:	(281) 404-9501
Email: nlorentzatos@oasispetroleum.com

with a copy which shall not constitute notice to:

Kirkland & Ellis LLP
609 Main Street, Suite 4700
Houston, Texas 77002
Attention:	Matthew R. Pacey; Michael W. Rigdon
Facsimile:	(713) 836-3601

30

if to the Warrant Agent, to:

> Computershare Inc.
> Computershare Trust Company, N.A.
> 250 Royall Street
> Canton, MA, 02021
> Attention:      Client Services

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 11.1(a).

All such communications shall be effective when sent.

For effective delivery under this Section 11, any Person that telecopies or sends by electronic means any communication hereunder to any Person shall, on the same date as such telecopy or electronic copy is transmitted, also send, by trackable or first class mail, postage prepaid and addressed to such Person as specified above, an original or copy of the communication so transmitted.

(b)      Where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if (i) in writing and mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register or (ii) sent by electronic means with an original or copy of the communication so transmitted sent (on the same date as such electronic copy is transmitted), by trackable or first class mail, postage prepaid and addressed to such Person as specified above.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

11.2    Required Notices to Holders.  In the event the Company shall:

(a)      take any action that would result in an adjustment to the Exercise Price and/or the number of shares of Common Stock issuable upon exercise of a Warrant pursuant to Section 5.1 or

31

(b)     consummate any Transaction (each of (a) or (b), an "**Action**");

then, in each such case, unless the Company has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Company shall cause to be delivered to the Warrant Agent and shall give to each Holder of a Warrant Certificate, in accordance with Section 11.1(b) hereof, a written notice of such Action, including, in the case of an action pursuant to Section 11.2(a), the information required under Section 5.1(k)(ii)  Such notice shall be given promptly after taking such Action.

If at any time the Company shall cancel any of the Actions for which notice has been given under this Section 11.2 prior to the consummation thereof, the Company shall give each Holder prompt notice of such cancellation in accordance with Section 11.1(b), unless the Company has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions.

## 12.    Inspection.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant Certificate. The Warrant Agent may require any such Holder to submit its Warrant Certificate for inspection by the Warrant Agent.

## 13.    Amendments.

(a)     This Agreement may be amended by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

(b)     Notwithstanding the foregoing, the Company and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrant Certificates, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Company in this Agreement further covenants and agreements of the Company thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Company in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrant Certificates hereunder in any material respect.

(c)     The consent of each Holder of any Warrant Certificate evidencing any warrants affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of shares of Common Stock receivable upon exercise of Warrants, in each case other than as provided in Section 5.1; (ii) the Expiration Date is changed to an earlier date; or (iii) modify the provisions contained in Section 5.1 in a manner adverse to the Holders of Warrant Certificates generally with respect to their Warrants.

(d)     The Warrant Agent shall join with the Company in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights,

duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided, that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Company shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 13.  Upon execution and delivery of any amendment pursuant to this Section 13, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(e)     Promptly after the execution by the Company and the Warrant Agent of any such amendment, unless the Company has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses such adjustment, the Company shall give notice to the Holders of Warrant Certificates, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 11.1(b).  Any failure of the Company to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

**14.     Waivers**.

The Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the Required Warrant Holders, as required pursuant to Section 13.

**15.     Successor to Company**.

So long as Warrants remain outstanding, the Company will not enter into any Non-Surviving Transaction unless the acquirer (a "*Successor Company*") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Company to be performed and observed and shall have provided for exercise rights in accordance with Section 5.1(g)(i).  Upon the consummation of such Non-Surviving Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Agreement with the same effect as if such acquirer had been named as the Company herein.

The terms and provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company, the Warrant Agent and the Holders and their respective successors and permitted assigns.

**16.     Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**17.     Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.  A

33

signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

**18.     Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

**19.     Information Rights.**

The Company shall (a) furnish to the Holders any reports or other information delivered to the holders of Common Stock solely in their capacity as stockholders by the Company or its Subsidiaries at the same time such reports or other information are delivered or made available to such holders of Common Stock solely in their capacity as stockholders, and (b) provide Holders access to conference calls, webcasts or similar electronic communications to which holders of Common Stock are provided access by the Company or its Subsidiaries solely in their capacity as stockholders, if any, at the same time such conference calls, webcasts or similar communications are made accessible to such holders of Common Stock solely in their capacity as stockholders. For purposes of this Section 19, the Company shall be deemed to have furnished such reports and information to, or filed such reports and information with the Holders if it has filed such reports or information with the SEC via the EDGAR filing system.

**20.     No Redemption**.

The Warrants shall not be subject to redemption by the Company or any other Person; provided, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

**21.     Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Company, the Warrant Agent and the Holders from time to time. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Warrant Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders. Each Holder, by acceptance of a Warrant Certificate, agrees to all of the terms and provisions of this Agreement applicable thereto.

**22.**     **Applicable Law**.

THIS AGREEMENT, EACH WARRANT CERTIFICATE ISSUED HEREUNDER, EACH WARRANT EVIDENCED THEREBY AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**23.**     **Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

**24.**     **Force Majeure.**

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, or civil unrest.

**25.**     **Further Assurances.**

Each of the parties hereto shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by such other party for the carrying out or performing by such party of the provisions of this Agreement.

**26.**     **Confidentiality.**

The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement shall remain confidential, and shall not be voluntarily disclosed to any other Person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions).

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**<u>Company</u>**

OASIS PETROLEUM INC.


By: _____

        Name:    Nickolas J. Lorentzatos
        Title:     Executive Vice President, General
                      Counsel and Corporate Secretary


**<u>Warrant Agent</u>**

COMPUTERSHARE INC., and
COMPUTERSHARE TRUST COMPANY, N.A.


By: _____

        Name:
        Title:


[*Signature Page to Warrant Agreement*]

EXHIBIT A

**[FACE OF WARRANT CERTIFICATE]**[2]

**OASIS PETROLEUM INC.**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON STOCK**

[FACE]

No. [___]                                                         CUSIP No. 674215 116

[UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO OASIS PETROLEUM INC. (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.][3]

---

[2] To be removed in the versions of the Definitive Warrant Certificates printed in multiple copies for use by the Warrant Agent in preparing Definitive Warrants Certificates for issuance and delivery from time to time to holders.

[3] Include only on Global Warrant Certificate.

# OASIS PETROLEUM INC.

No. [__]                                                          [__,__,___] Warrants
                                                                 CUSIP No. 674215 116

THIS CERTIFIES THAT, for value received, [_____], or registered assigns, is the registered owner of the number of Warrants to purchase Common Stock of Oasis Petroleum Inc., a Delaware corporation (the "*Company*", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "*Warrant Agreement*"), dated as of November [●], 2020, between the Company and Computershare, Inc., a Delaware corporation ("*Computershare*"), and its wholly-owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company (collectively, with Computershare, the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement)) specified above [or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto][4], and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to purchase from the Company one share of Common Stock of the Company for each Warrant evidenced hereby, at the purchase price of $[●] per share (as adjusted from time to time, the "*Exercise Price*"), payable in full at the time of purchase, the number of shares of Common Stock into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 5 of the Warrant Agreement.

All shares of Common Stock issuable by the Company upon the exercise of Warrants shall, upon such issuance, be duly and validly issued and fully paid and nonassessable. The Company shall pay any and all taxes (other than income or withholding taxes) that may be payable in respect of the issue or delivery of shares of Common Stock on exercise of Warrants. The Company shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of shares of Common Stock in book-entry form or any certificates for shares of Common Stock or payment of cash to any Person other than the Holder of the Warrant Certificate evidencing the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Company shall not be required to issue or deliver any shares of Common Stock in book-entry form or any certificate or pay any cash until (a) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Company, (b) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid or (c) the receipt of any other such information as set forth in the Warrant Agreement.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by, in the case

---

[4] Include only on Global Warrant Certificate.

A-2

of a Global Warrant Certificate, by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercise and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with Applicable Procedures in respect of the exercise of such Warrants or, in the case of a Definitive Warrant Certificate, by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercise and, if applicable, whether Cashless Exercise is being elected with respect thereto, and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and surrendering this Warrant Certificate to the Warrant Agent at its office maintained for such purpose (the "*Corporate Agency Office*"), together with payment in full of the Exercise Price as then in effect for each share of Common Stock receivable upon exercise of each Warrant being submitted for exercise unless Cashless Exercise is being elected with respect thereto.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Company at such banking institution as the Company shall have designated from time to time for such purpose.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature of an authorized officer on behalf of the Warrant Agent, this Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed under its corporate seal.

Dated:  [_____ __], 20[__]

OASIS PETROLEUM INC.

[SEAL]

By: _____
                    [Title]

ATTEST:

Countersigned:

COMPUTERSHARE INC., and                              [                    ]
COMPUTERSHARE TRUST
COMPANY, N.A.
collectively, as Warrant Agent

OR

By: _____          By: _____
        Authorized Agent                              as Countersigning Agent

A-3

By: _____
Authorized Officer

A-4

**Reverse of Warrant Certificate**

**OASIS PETROLEUM INC.**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON STOCK**

The Warrants evidenced hereby are one of a duly authorized issue of Warrants of the Company designated as its Warrants to Purchase Common Stock ("*Warrants*"), limited in aggregate number to [●] issued under and in accordance with the Warrant Agreement, dated as of November [●], 2020 (the "*Warrant Agreement*"), between the Company and Computershare, Inc., a Delaware corporation ("*Computershare*"), and its wholly-owned subsidiary, Computershare Trust Company, N.A., a federally chartered trust company (collectively, with Computershare, the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Warrant Agent, the Holders of Warrant Certificates and the owners of the Warrants evidenced thereby and of the terms upon which the Warrant Certificates are, and are to be, countersigned and delivered.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides that, in addition to certain adjustments to the number of shares of Common Stock into which a Warrant is exercisable and the Exercise Price required to be made in certain circumstances, in the case of any Non-Surviving Transaction the Company shall cause the other Person involved in such Non-Surviving Transaction to execute and deliver to the Warrant Agent a written instrument providing that (i) the Warrants evidenced hereby, if then outstanding, will be exercisable thereafter, during the period the Warrants evidenced hereby shall be exercisable as specified herein, only into the Substituted Securities that would have been receivable upon such Non-Surviving Transaction by a holder of the number of shares of Common Stock that would have been issued upon exercise of such Warrant if such Warrant had been exercised in full immediately prior to such Non-Surviving Transaction (upon certain assumptions specified in the Warrant Agreement); and (ii) the rights and obligations of the other Person involved in such Non-Surviving Transaction and the holders in respect of Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Company and Holders in respect of Common Stock.

Except as provided in the Warrant Agreement, all outstanding Warrants shall expire and all rights of the Holders of Warrant Certificates evidencing such Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date.  The "*Expiration Date*" shall mean the earlier to occur of (x) November [●], 2024 (the fourth (4th) anniversary of the Original Issue Date) or, if not a Business Day, then the next Business Day thereafter; and (y) a Winding Up.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be

A-5

issued by the Company in the name or upon the written order of the Holder of this Warrant Certificate upon the cancellation hereof.

The Warrant Certificates are issuable only in registered form in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Warrant Certificate may be exchanged for Warrant Certificates in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Warrant Certificates issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Warrant Certificate.  The Company shall cause to be kept at the office or offices of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; provided, however, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates.

Prior to due presentment of this Warrant Certificate for registration of transfer, the Company, the Warrant Agent and any agent of the Company or the Warrant Agent may treat the Person in whose name this Warrant Certificate is registered as the owner hereof for all purposes, and neither the Company, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Holders of Warrant Certificates under the Warrant Agreement at any time by the Company and the Warrant Agent with the consent of the Required Warrant Holders.

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Warrant Certificate evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Stock of the Company, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Company; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Company; (iii) except as provided with respect to a Winding Up of the Company, no such Holder, by reason of the ownership or possession of a Warrant or the Warrant Certificate representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions (except as specifically provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Company prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant or Warrant Certificate held by such Holder.

This Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of New York.

A-6

All terms used in this Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.  In the event of any conflict between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

A-7

Exercise Form for Warrant Certificate

Computershare Inc.
Computershare Trust Company, N.A.
250 Royall Street
Canton, MA 02021
Attention: Client Services

Re: Oasis Petroleum Inc. Warrant Agreement, dated as of November [●], 2020

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement, the undersigned registered Holder of this Warrant Certificate hereby irrevocably elects to exercise _____ Warrants evidenced by this Warrant Certificate and represents that for each of the Warrants evidenced hereby being exercised such Holder either has (please check one box only):

☐   tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Company at such banking institution as the Company shall have designated from time to time for such purpose; or

☐   elected a "Cashless Exercise".

The undersigned requests that the shares of Common Stock issuable upon exercise be in fully registered form in such denominations and registered in such names and delivered, together with any other property receivable upon exercise, in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if this Warrant Certificate is a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if this Warrant Certificate is a Definitive Warrant Certificate, the undersigned requests that a new Definitive Warrant Certificate representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

A-8

Dated: _____

(Insert Social Security or Other
Identifying Number of Holder)

Name: _____

(Please Print)

Address: _____

_____

_____

Signature

(Signature must conform in all respects to name of Holder as specified on the face of this Warrant Certificate and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

Signature Guaranteed:

Instructions (i) as to denominations and names of Common Stock issuable upon exercise and as to delivery of such securities and any other property issuable upon exercise and (ii) if applicable, as to Definitive Warrant Certificates evidencing unexercised Warrants:

Assignment

(Form of Assignment To Be Executed If Holder Desires To Transfer Warrant Certificate)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Warrant Certificate and does hereby irrevocably constitute and appoint _____ Attorney, to transfer said Warrant Certificate on the books of the within-named Company with full power of substitution in the premises.

Dated: _____

Signature _____

(Signature must conform in all respects to name of Holder as specified on the face of this Warrant Certificate and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

A-9

**[SCHEDULE A**

**SCHEDULE OF DECREASES IN WARRANTS**

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory][5] |
|---|---|---|---|
| | | | |

[5] Include only on Global Warrant Certificate.

A-10

## Exhibit G

## Registration Rights Agreement[1]

---

[1] The agreement contained in this **Exhibit G** remain subject to continuing negotiations.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement (including this **Exhibit G**), and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

REGISTRATION RIGHTS AGREEMENT


among


OASIS PETROLEUM INC.


AND


THE HOLDERS PARTY HERETO


DATED [●], 2020

Doc#: US1:14172315v2

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................................................ 1
    Section 1.1    Definitions.................................................................................................. 1

ARTICLE II SHELF REGISTRATION........................................................................................ 5
    Section 2.1    [Reserved] ...................................................................................................5
    Section 2.2    Shelf Registration.......................................................................................5
    Section 2.3    Deferral or Suspension of Registration.......................................................7
    Section 2.4    Effective Registration Statement ................................................................8
    Section 2.5    Selection of Underwriters; Cutback............................................................8
    Section 2.6    Lock-up.......................................................................................................9
    Section 2.7    Participation in Underwritten Offering; Information by Holder.................... 10
    Section 2.8    Registration Expenses .............................................................................. 10

ARTICLE III [RESERVED] ...................................................................................................... 11

ARTICLE IV REGISTRATION PROCEDURES ........................................................................ 11
    Section 4.1    Registration Procedures ........................................................................... 11

ARTICLE V INDEMNIFICATION............................................................................................. 16
    Section 5.1    Indemnification by the Company............................................................... 16
    Section 5.2    Indemnification by Holders ...................................................................... 16
    Section 5.3    Conduct of Indemnification Proceedings................................................... 17
    Section 5.4    Settlement Offers ..................................................................................... 18
    Section 5.5    Other Indemnification............................................................................... 18
    Section 5.6    Contribution ............................................................................................. 18

ARTICLE VI EXCHANGE ACT COMPLIANCE ..................................................................... 18
    Section 6.1    Exchange Act Compliance........................................................................ 18

ARTICLE VII MISCELLANEOUS............................................................................................ 19
    Section 7.1    Severability .............................................................................................. 19
    Section 7.2    Governing Law; Jurisdiction; Waiver of Jury Trial...................................... 19
    Section 7.3    Other Registration Rights ......................................................................... 19
    Section 7.4    Successors and Assigns............................................................................ 19
    Section 7.5    Notices .................................................................................................... 20
    Section 7.6    Headings ................................................................................................. 21
    Section 7.7    Additional Parties..................................................................................... 21
    Section 7.8    Adjustments ............................................................................................. 21
    Section 7.9    Entire Agreement ..................................................................................... 21
    Section 7.10    Counterparts; Facsimile or.pdf Signature ................................................. 21
    Section 7.11    Amendment .............................................................................................. 21
    Section 7.12    Extensions; Waivers.................................................................................. 22
    Section 7.13    Further Assurances................................................................................... 22
    Section 7.14    No Third-Party Beneficiaries.................................................................... 22

i

ii

Section 7.15    Interpretation; Construction ........................................................................... 22

Doc#: US1:14172315v2

**THIS REGISTRATION RIGHTS AGREEMENT,** dated as of [●], 2020 (this "Agreement"), is entered into by and among Oasis Petroleum Inc., a Delaware corporation (together with any successor entity thereto, the "Company"), and each of the Holders (as defined below) that are parties hereto from time to time.

**RECITALS**

A.    The Company and certain affiliated debtors (collectively, the "**Debtors**") filed the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, on September 30, 2020, which was confirmed by the United States Bankruptcy Court for the Southern District of Texas on [●], 2020.

B.    The Company proposes to issue the Common Stock (as defined below) pursuant to, and upon the terms set forth in, the Plan (as defined below).

C.    The Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders registration rights under the Securities Act (as defined below) with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holders hereby agree as follows:

**AGREEMENT**

**ARTICLE I**

**DEFINITIONS**

Section 1.1    Definitions.  As used herein, the following terms shall have the following respective meanings:

"Adoption Agreement" shall mean an Adoption Agreement in the form attached hereto as Exhibit A.

"Affiliate" means, with respect to any Person, any Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. Notwithstanding the foregoing, (a) the Company, its Subsidiaries and their respective joint ventures (if any) shall not be considered Affiliates of any Holder, (b) no Holder shall be considered an Affiliate of (i) any portfolio company in which investment funds affiliated with such Holder have made a debt or equity investment (and vice versa), (ii) any limited partners, non-managing members of, or other similar direct or indirect investors in such Holder or its investment fund affiliates, (iii) any portfolio company in which any limited partner, non-managing member

of, or other similar direct or indirect investor in such Holder or any of its investment fund affiliates have made a debt or equity investment (and vice versa) or (iv) any other Holder (other than each of the [●] Stockholders may be an Affiliate of one another), and none of the Persons described in clauses (i) through (iv) of this definition shall be considered an Affiliate of each other and (c) without giving effect to the exception set forth in the beginning of this sentence, no Holder shall be considered an Affiliate of the Persons described in clauses (a) and/or (b) of this definition (and vice versa).

"[●] Stockholders" shall mean [●] and each of its permitted successors and assigns.

"Assignee" shall have the meaning set forth in Section 7.4.

"beneficially owned", "beneficial ownership" and similar phrases have the same meanings as such terms have under Rule 13d-3 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event.

"Board of Directors" shall mean the Board of Directors of the Company.

"Business Day" shall mean any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"Commission" shall mean the Securities and Exchange Commission or any other Federal agency at the time administering the Securities Act.

"Common Stock" shall mean, collectively, the Company's common stock, par value $[●] per share as it exists on the date of this Agreement following the effectiveness of the Plan, any additional security paid, issued or distributed in respect of any such shares by way of a dividend, stock split or distribution, or in connection with a combination of shares, and any security into which such Common Stock or additional securities shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise.

"Control," and its correlative meanings, "Controlling," and "Controlled," shall mean the possession, direct or indirect (including through one or more intermediaries), of the power to direct or cause the direction of the management of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" shall mean the Financial Industry Regulatory Authority or any successor regulatory authority.

"Holders" shall mean the holders of Registrable Securities who are parties hereto (including, for the avoidance of doubt, Transferees of such Holders that acquire Registrable Securities in accordance with Section 7.4 and execute an Adoption Agreement in accordance with

2

Section 7.4) *provided*, *however*, that a Person shall cease to be a Holder if and when such Person and its affiliates own Common Stock representing in the aggregate less than five percent of the outstanding Common Stock.

"Information" shall have the meaning ascribed to it in Section 4.1(i).

"Initial Notice" shall have the meaning ascribed to it in Section 3.1.

"Inspectors" shall have the meaning ascribed to it in Section 4.1(i).

"Lock-up Period" shall have the meaning ascribed to it in Section 2.6(a).

"Marketed Underwritten Shelf Take-Down" shall have the meaning ascribed to it in Section 2.2(c)(i).

"Non-Marketed Shelf Take-Down" shall have the meaning ascribed to it in Section 2.2(d).

"Participating Holders' Counsel" shall have the meaning set forth in Section 4.1(b).

"Person" shall be construed broadly and shall include, without limitation, an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Plan" means the Debtors' Joint Chapter 11 Plan of Reorganization, dated September 29, 2020 [Docket No. 24], filed in the Company's Chapter 11 case in the United States Bankruptcy Court for the Southern District of Texas, Case No. 20-34771 (including all exhibits, schedules and supplements thereto and as it may be amended, modified or supplemented from time to time).

"Prospectus" shall mean the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the securities covered by such Registration Statement and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments and, in each case, all material incorporated by reference in such prospectus.

"Records" shall have the meaning ascribed to it in Section 4.1(i).

"Registrable Securities" shall mean, with respect to any Holder, at any time, the Shares held or beneficially owned by such Holder at such time; provided, however, that as to any Registrable Securities, such securities shall cease to be Registrable Securities (i) upon the sale thereof pursuant to an effective registration statement, (ii) upon the sale thereof pursuant to Rule 144 or Rule 145 under the Securities Act, (iii) when such securities cease to be outstanding or (iv) if such securities shall have been otherwise transferred and new certificates or book-entries for them not bearing a legend restricting transfer shall have been delivered by the Company and such securities may be publicly resold without registration under the Securities Act.

"Registration Statement" shall mean any Registration Statement of the Company which covers the Registrable Securities, including any preliminary Prospectus and the Prospectus,

3

amendments and supplements to such Registration Statement, including post-effective amendments, all exhibits thereto and all material incorporated by reference in such Registration Statement.

"Rule 144" shall mean Rule 144 under the Securities Act (or successor rule).

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Shares" shall mean shares of Common Stock and shall also include any security of the Company issued in respect of or in exchange for such securities of the Company, whether by way of dividend or other distribution, split, recapitalization, merger, rollup transaction, consolidation or reorganization.

"Shelf Holder" shall have the meaning ascribed to it in Section 2.2(a).

"Shelf Registration" shall have the meaning ascribed to it in Section 2.2(a).

"Shelf Registration Statement" shall have the meaning ascribed to it in Section 2.2(a).

"Shelf Take-Down" shall have the meaning ascribed to it in Section 2.2(a).

"Shelf Take-Down Notice" shall have the meaning ascribed to it in Section 2.2(c)(iii).

"Subsidiary" shall mean each Person in which another Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% in voting power of the outstanding capital stock or other equity interests.

"Transfer" shall mean any direct or indirect sale, assignment, transfer, conveyance, gift, bequest by will or under intestacy laws, pledge, hypothecation or other encumbrance, or any other disposition, of the stated security (or any interest therein or right thereto, including the issuance of any total return swap or other derivative whose economic value is primarily based upon the value of the stated security) or of all or part of the voting power (other than the granting of a revocable proxy) associated with the stated security (or any interest therein) whatsoever, or any other transfer of beneficial ownership of the stated security, with or without consideration and whether voluntarily or involuntarily (including by operation of law).

"Transferee" shall mean a Person acquiring Shares pursuant to a Transfer.

"Underwritten Offering" shall mean a sale, on the Company's or any Holder's behalf, of Shares by the Company or a Holder to an underwriter for reoffering to the public.

"Underwritten Shelf Take-Down" shall have the meaning ascribed to it in Section 2.2(c).

"Underwritten Shelf Take-Down Notice" shall have the meaning ascribed to it in Section 2.2(c).

Doc#: US1:14172315v2

# ARTICLE II

# SHELF REGISTRATION

Section 2.1      [Reserved].

Section 2.2      Shelf Registration.

(a)      Filing. Notwithstanding anything contained in this Agreement to the contrary, from and after such time as the Company shall have qualified for the use of a registration statement for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto (a "Shelf Registration Statement"), the Company will, pursuant to the requirements of this Section 2.2(a), file (or confidentially submit) a Shelf Registration Statement upon the written request by any of the Holders that the Company register under the Securities Act all or a portion of the Registrable Securities owned by such Holder at such time in accordance with Rule 415 under the Securities Act or any successor rule thereto (a "Shelf Registration"). Subject to Section 2.3, the Company shall give written notice of such request to all Holders promptly (but in any event within five (5) Business Days after receipt of any such written request from a Holder) and otherwise comply with Section 3.1. With respect to each Shelf Registration, (i) the Company shall add Registrable Securities of any Holder who requests in writing that the Company include the Registrable Securities owned by such Holder in the Shelf Registration Statement; provided, that, such written request is delivered to the Company at least ten (10) Business Days prior to the filing (or confidential submission) of the Shelf Registration Statement, and (ii) the Company shall use its commercially reasonable efforts to file (or confidentially submit) with the Commission as soon as reasonably practicable, and in any event within 60 days after it receives a request under this Section 2.2(a) to register all or a portion of the Registrable Securities. The Company shall use its commercially reasonable efforts to cause to be declared effective the Shelf Registration Statement as promptly as practicable after the filing (or confidential submission) thereof.

(b)      Shelf Take-Downs.  Any Holder whose Registrable Securities are included in an effective Shelf Registration Statement (a "Shelf Holder") may initiate an offering or sale of all or part of such Registrable Securities (a "Shelf Take-Down"), in which case the provisions of this Section 2.2 shall apply.  Notwithstanding the foregoing:

(i)      any such Shelf Holder may initiate an unlimited number of Non-Marketed Shelf Take-Downs pursuant to Section 2.2(d) below; and

(ii)      any such Shelf Holder may initiate an unlimited number of Underwritten Offerings (including any block trade) pursuant to Section 2.2(c) below; provided that in each case, the Registrable Securities proposed to be sold by the initiating Shelf Holder shall be required to have a reasonably anticipated aggregate offering price of at least $50 million (before deduction of underwriting discounts and commissions); provided, however, that the Company shall have no obligation to facilitate or participate in more than three Underwritten Offerings that are initiated by a Holder pursuant to this Section 2.2 during any 12-month period (and no more than one such Underwritten Offering in any 90-day period).

5

(c)        Underwritten Shelf Take-Downs.

(i)        Subject to Section 2.2(b), if a Shelf Holder so elects in a written request delivered to the Company (an "Underwritten Shelf Take-Down Notice"), a Shelf Take-Down may be in the form of an Underwritten Offering (an "Underwritten Shelf Take-Down") and, if necessary, the Company shall use its reasonable best efforts to file and effect an amendment or supplement to its Shelf Registration Statement for such purpose as soon as practicable.  Such initiating Shelf Holder shall indicate in such Underwritten Shelf Take-Down Notice the number of Registrable Securities of such Shelf Holder to be included in such Underwritten Shelf Take-Down and whether it intends for such Underwritten Shelf Take-Down to involve a customary "roadshow" (including an "electronic roadshow") or other marketing effort by the underwriters (a "Marketed Underwritten Shelf Take-Down").

(ii)        Promptly upon delivery of an Underwritten Shelf Take-Down Notice with respect to a Marketed Underwritten Shelf Take-Down (but in no event more than ten (10) days prior to the expected date of such Marketed Underwritten Shelf Take-Down), the Company shall promptly deliver a written notice of such Marketed Underwritten Shelf Take-Down to all Shelf Holders and, in each case, subject to Section 2.5(b) and Section 2.7, the Company shall include in such Marketed Underwritten Shelf Take-Down all such Registrable Securities of such Shelf Holders for which the Company has received written requests, which requests must specify the aggregate amount of such Registrable Securities of such Holder to be offered and sold pursuant to such Marketed Underwritten Shelf Take-Down, at least three (3) Business Days prior to the expected date of such Marketed Underwritten Shelf Take-Down.

(iii)        Subject to Section 2.2(b), if a Shelf Holder desires to effect an Underwritten Shelf Take-Down that is not a Marketed Underwritten Shelf Take-Down, the Shelf Holder initiating such Shelf Take-Down shall provide written notice (a "Shelf Take-Down Notice") of such Shelf Take-Down to the other Shelf Holders as far in advance of the completion of such Shelf Take-Down as shall be reasonably practicable in light of the circumstances applicable to such Shelf Take-Down, which Shelf Take-Down Notice shall set forth (A) the total number of Registrable Securities expected to be offered and sold in such Shelf Take-Down, (B) the expected plan of distribution of such Shelf Take-Down and (C) an invitation to the other Shelf Holders to elect to include in the Shelf Take-Down the Registrable Securities held by such other Shelf Holders (but subject to Section 2.5(b) and Section 2.7) and (D) the action or actions required (including the timing thereof) in connection with such Shelf Take-Down with respect to the other Shelf Holders if any such Shelf Holder elects to exercise such right.

(iv)        Upon delivery of a Shelf Take-Down Notice, the other Shelf Holders may elect to sell Registrable Securities in such Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by the initiating Shelf Holder, by sending an irrevocable written notice to the initiating Shelf Holder, indicating its election to participate in the Shelf Take-Down and the total number of its Registrable Securities to

Doc#: US1:14172315v2

include in the Shelf Take-Down (but, in all cases, subject to <u>Section 2.5(b)</u> and <u>Section 2.7</u>).

(v)     Notwithstanding the delivery of any Underwritten Shelf Take-Down Notice, all determinations as to whether to complete any Underwritten Shelf Take-Down and as to the timing, manner, price and other terms of any Underwritten Shelf Take-Down shall be at the discretion of the Shelf Holder initiating the Underwritten Shelf Take-Down.

(d)     <u>Non-Marketed Shelf Take-Downs</u>.  If a Shelf Holder desires to effect a Shelf Take-Down that does not constitute an Underwritten Shelf Take-Down (a "<u>Non-Marketed Shelf Take-Down</u>") and if such Non-Marketed Shelf Take-Down requires actions to be taken by the Company, such Shelf Holder shall so indicate in a written request delivered to the Company no later than three (3) Business Days prior to the expected date of such Non-Marketed Shelf Take-Down (or such shorter period as the Company may agree), which request shall include (i) the aggregate number and class or classes of Registrable Securities expected to be offered and sold in such Non-Marketed Shelf Take-Down, (ii) the expected plan of distribution of such Non-Marketed Shelf Take-Down and (iii) the action or actions required (including the timing thereof) in connection with such Non-Marketed Shelf Take-Down, and, if necessary, the Company shall use its reasonable best efforts to file and effect an amendment or supplement to its Shelf Registration Statement for such purpose as soon as practicable.

(e)     <u>Continued Effectiveness</u>.  The Company shall use its reasonable best efforts to keep the Shelf Registration Statement filed pursuant to <u>Section 2.2(a)</u> hereof continuously effective under the Securities Act in order to permit the Prospectus forming a part thereof to be usable by a Shelf Holder until the earlier of (i) the date as of which all Registrable Securities registered by such Shelf Registration Statement have been sold and (ii) such shorter period as Shelf Holders holding a majority of the Registrable Securities may reasonably determine.

Section 2.3     <u>Deferral or Suspension of Registration</u>.  If (a) the Company receives a request to file (or confidentially submit) a Shelf Registration Statement, or a written request from a Shelf Holder for a Shelf Take-Down and the Board of Directors, in its good faith judgment, determines that it would be materially adverse to the Company for such Registration Statement to be filed (or confidentially submitted)  or declared effective on or before the date such filing or effectiveness would otherwise be required hereunder, or for such Registration Statement or Prospectus included therein to be used to sell Shares or for such Shelf Take-Down to be effected, because such action would: (i) materially interfere with a significant acquisition, corporate reorganization, financing, securities offering or other similar transaction involving the Company; (ii) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or the Exchange Act, or (b) the Company is subject to a Commission stop order suspending the effectiveness of any Registration Statement or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, then the Company shall have the right to defer such filing (but not the preparation), initial effectiveness or continued use of a Registration Statement and the Prospectus included therein for a period of not more than 60 days (or such longer period as the Shelf Holder may determine).  Unless consented to in writing

7

by the Holders, the Company shall not use the deferral or suspension rights provided under this Section 2.3 (x) more than twice in any 12-month period (except that the Company shall be able to use this right more than twice in any 12-month period if the Company is exercising such right during the 15-day period prior to the Company's regularly scheduled quarterly earnings announcement and the total number of days of postponement in such 12-month period does not exceed 120 days) or (y) except as contemplated in the parenthetical in (x) immediately above, in the aggregate for more than 90 days in any 12-month period.  In the event of any deferral or suspension pursuant to this Section 2.3, the Company shall (i) use its reasonable best efforts to keep the Shelf Holders apprised of the estimated length of the anticipated delay; and (ii) notify the Shelf Holders, as applicable, promptly upon termination of the deferral or suspension.  After the expiration of the deferral or suspension period and without any further request from the Shelf Holders, the Company shall as promptly as reasonably practicable prepare and file (or confidentially submit)  a Registration Statement or post-effective amendment or supplement to the applicable Registration Statement or document, or file any other required document, as applicable, so that, as thereafter delivered to purchasers of the Registrable Securities included therein, the Prospectus will not include a material misstatement or omission and will be effective and useable for the sale of Registrable Securities.

Section 2.4    Effective Registration Statement.  A registration requested pursuant to this Article II shall not be deemed to have been effected:

(a)    unless a registration statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any U.S. state or other jurisdiction applicable to the disposition of Registrable Securities covered by such registration statement for not less than 180 days (or such shorter period as will terminate when all of such Registrable Securities shall have been disposed of in accordance with such registration statement) or, if such registration statement relates to an underwritten offering, such longer period as, in the opinion of counsel for the Company, a prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer;

(b)    if, after it becomes effective, such registration is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental authority or court for any reason other than a violation of applicable law solely by any participating Shelf Holder and has not thereafter become effective; or

(c)    if, in the case of an Underwritten Offering, the conditions to closing specified in an underwriting agreement applicable to the Company are not satisfied or waived other than by reason of any breach or failure by any participating Shelf Holder.

Section 2.5    Selection of Underwriters; Cutback.

(a)    Selection of Underwriters. If a Shelf Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Shelf Take-Down, the participating Shelf Holders shall mutually select the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be

Doc#: US1:14172315v2

investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company.

(b)        Underwriter's Cutback.  Notwithstanding any other provision of this Article II or Section 3.1, if the managing underwriter or underwriters of an Underwritten Offering in connection with a Shelf Registration advise the Company in their good faith opinion that the inclusion of all such Registrable Securities proposed to be included in the Registration Statement or such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities to be offered thereby or in such Underwritten Offering, then the number of Shares proposed to be included in such Registration Statement or Underwritten Offering shall be allocated among the Company, the participating Shelf Holders and all other Persons selling Shares in such Underwritten Offering in the following order:

(i)        *first*, the Registrable Securities of the class or classes proposed to be registered held by the Holder that initiated such Shelf Registration or Underwritten Offering and the Registrable Securities of the same class or classes (or convertible at the Holder's option into such class or classes) held by other Holders requested to be included in such Shelf Registration or Underwritten Offering (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Shelf Registration or Underwritten Offering);

(ii)       *second,* all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Shelf Registration or Underwritten Offering other than securities to be sold by the Company; and

(iii)      *third*, the securities of the same class or classes to be sold by the Company.

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration or offering. If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account (or for the account of any other Persons) in such registration if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

Section 2.6     Lock-up.

(a)        If requested by the managing underwriters in connection with any Underwritten Offering, each Holder (i) who beneficially owns 5% or more of the outstanding Shares or (ii) who is a natural person and serving as a director or executive officer of the Company shall agree to be bound by customary lock-up agreements providing that such Holder shall not, directly or indirectly, effect any Transfer (including sales pursuant to Rule 144) of any such Shares without prior written consent from the underwriters managing such Underwritten Offering during a period beginning on the date of launch of such Underwritten Offering and ending up to 90 days

9

from and including the date of pricing or such shorter period as reasonably requested by the underwriters managing such Underwritten Offering (the "Lock-Up Period"); provided that (A) the foregoing shall not apply to any Shares that are offered for sale as part of such Underwritten Offering, (B) such Lock-Up Period shall be no longer than and on substantially the same terms as the lock-up period applicable to the Company and the executive officers and directors of the Company and (C) such Lock-Up Period shall not commence unless the Company notifies the Holders in writing prior to the commencement of the Lock-Up Period. Each such Holder agrees to execute a customary lock-up agreement in favor of the underwriters to such effect. The provisions of this Section 2.6(a) will no longer apply to a Holder if (x) such Holder ceases to hold any Shares or (y) except in the case of any Holder who is a current director or executive officer of the Company, such Holder beneficially owns less than 5% of the outstanding Shares.

(b)      Nothing in Section 2.6(a) shall prevent: (i) any Holder that is a partnership, limited liability company or corporation from (A) making a distribution of Shares to the partners, members or stockholders thereof or (B) Transferring Shares to an Affiliate of such Holder; (ii) any Holder who is an individual from Transferring Shares to (A) an individual by will or the laws of descent or distribution or by gift without consideration of any kind or (B) a trust or estate planning-related entity for the sole benefit of such Holder or a lineal descendant or antecedent or spouse; (iii) any Holder from (A) pledging, hypothecating or otherwise granting a security interest in Shares or securities convertible into or exchangeable for Shares to one or more lending institutions as collateral or security for any loan, advance or extension of credit and any transfer upon foreclosure upon such Shares or such securities or (B) Transferring Shares pursuant to a final non-appealable order of a court or regulatory agency or (iv) any Holder from Transferring Shares in a manner that was permitted under, but subject to the conditions described in, the lock-ups entered into in connection with the Company's initial public offering; provided that, in the case of clauses (i), (ii), (iii) and (iv), such Transfer is otherwise in compliance with applicable securities laws; provided, further, that, in the case of subclause (B) of clause (i), clause (ii) and, if applicable, clause (iv), each such Transferee agrees in writing to become subject to the terms of this Agreement by executing an Adoption Agreement and agrees to be bound by the applicable underwriter lock-up.

Section 2.7      Participation in Underwritten Offering; Information by Holder. No Holder may participate in an Underwritten Offering hereunder unless such Holder (a) agrees to sell such Holder's Shares on the basis provided in any underwriting arrangements, and in accordance with the terms and provisions of this Agreement, including any lock-up arrangements, and (b) completes and executes all questionnaires, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements. In addition, the Holders shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holders, as applicable, as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Article II. Nothing in this Section 2.7 shall be construed to create any additional rights regarding the registration of Shares in any Person otherwise than as set forth herein.

Section 2.8      Registration Expenses. All expenses incident to the Company's performance of or compliance with this Agreement, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange, the Commission and FINRA (including, if applicable, the fees and expenses

10

of any "qualified independent underwriter" and its counsel as may be required by the rules and regulations of FINRA), (ii) all fees and expenses of compliance with state securities or blue sky laws (including fees and disbursements of counsel for the underwriters or participating Holders in connection with blue sky qualifications of the Shares and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate), (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Shares in a form eligible for deposit with The Depository Trust Company and of printing prospectuses, all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company and its Subsidiaries (including the expenses of any special audit and "cold comfort" letters required by or incident to such performance)), (iv) all fees and expenses incurred in connection with the listing of the Shares on any securities exchange and all rating agency fees, (v) all reasonable fees and documented out-of-pocket disbursements of a single Participating Holders' Counsel or a single legal counsel chosen by the Holders of a majority of the Registrable Securities included in such Shelf Registration, (vi) all reasonable fees and documented out-of-pocket disbursements of underwriters customarily paid by the issuer or sellers of securities, including expenses of any special experts retained in connection with the requested registration (excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Shares under the securities or blue sky laws of any state)), (vii) Securities Act liability insurance or similar insurance if the Company or the underwriters so require in accordance with then-customary underwriting practice, and (viii) fees and expenses of other Persons retained by the Company and any other reasonable expenses customarily paid by the issuers of securities, will be borne by the Company, regardless of whether the Registration Statement becomes effective (or such offering is completed) and whether or not all or any portion of the Registrable Securities originally requested to be included in such registration are ultimately included in such registration; provided, however, that (x) any underwriting discounts, commissions or fees in connection with the sale of the Registrable Securities will be borne by the Holders pro rata on the basis of the number of Shares so registered and sold, (y) transfer taxes with respect to the sale of Registrable Securities will be borne by the Holder of such Registrable Securities and (z) the fees and expenses of any accountants or other persons retained or employed by any Holder will be borne by such Holder.

**ARTICLE III**

[RESERVED]

**ARTICLE IV**

**REGISTRATION PROCEDURES**

Section 4.1    Registration Procedures.   If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use its reasonable best efforts to effect the registration of any Registrable Securities, the Company shall, as expeditiously as practicable:

(a)    in the case of Registrable Securities, use its reasonable best efforts to cause a Registration Statement that registers such Registrable Securities to become and remain effective for a period of 180 days or, if earlier, until all of such Registrable Securities covered

11

thereby have been disposed of; provided, that, in the case of any registration of Registrable Securities on a Shelf Registration Statement which are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary, to keep the registration statement continuously effective, supplemented and amended to the extent necessary to ensure that it is available for sales of such Registrable Securities, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the Commission as announced from time to time, until the earlier of when (i) the Holders have sold all of such Registrable Securities and (ii) all of such Registrable Securities have become eligible for immediate sale pursuant to Rule 144 under the Securities Act by the Holder thereof without restriction by the manner of sale, volume and other limitations under such rule;

(b)      furnish to each participating Holder, at least ten (10) Business Days before filing a Registration Statement, or such shorter period as reasonably practical, copies of such Registration Statement or any amendments or supplements thereto, which documents shall be subject to the review, comment and approval by one lead counsel (and any reasonably necessary local counsel) selected by the Holders who beneficially own a majority of such Registrable Securities, which counsel (who may also be counsel to the Company), in each case, shall be subject to the reasonable approval of each Holder whose Registrable Securities are included in such registration, and who shall represent all participating Holders as a group (the "Participating Holders' Counsel") (it being understood that such ten (10) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to the Participating Holders' Counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances);

(c)      furnish to each participating Holder and each underwriter, if any, such number of copies of final conformed versions of the applicable registration statement and of each amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference) reasonably requested by such participating Holder or underwriter in writing;

(d)      in the case of Registrable Securities, prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the applicable Prospectus or Prospectus supplement, including any free writing prospectus as defined in Rule 405 under the Securities Act, used in connection therewith as may be (i) reasonably requested by any Holder (to the extent such request relates to information relating to such Holder), or (ii) necessary to keep such Registration Statement effective for at least the period specified in Section 4.1(a) and to comply with the provisions of this Agreement and the Securities Act with respect to the sale or other disposition of such Registrable Securities, and furnish to each participating Holder and to the managing underwriter(s), if any, within a reasonable period of time prior to the filing thereof a copy of any amendment or supplement to such Registration Statement or Prospectus; provided, however, that, with respect to each free writing prospectus or other materials to be delivered to purchasers at the time of sale of the Registrable Securities, the Company shall (i) ensure that no Registrable Securities are sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such free writing prospectus or other materials without the prior written consent of the sellers of the Registrable Securities, which free writing prospectus or other materials shall be subject to the review of counsel to such sellers and (ii) make

12

all required filings of all free writing prospectuses or other materials with the Commission as are required;

(e)     notify in writing each Holder promptly (i) of the receipt by the Company of any notification with respect to any comments by the Commission with respect to such Registration Statement or any amendment or supplement thereto or any request by the Commission for the amending or supplementing thereof or for additional information with respect thereto, (ii) of the receipt by the Company of any notification with respect to the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or any amendment or supplement thereto or the initiation or threatening of any proceeding for that purpose and (iii) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes and, in any such case as promptly as reasonably practicable thereafter, prepare and file an amendment or supplement to such Registration Statement or Prospectus which will correct such statement or omission or effect such compliance;

(f)     use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the Holders reasonably request and do any and all other acts and things which may be reasonably necessary or advisable to enable such Holders to consummate their disposition in such jurisdictions; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 4.1(f);

(g)     furnish to each participating Holder such number of copies of a summary Prospectus or other prospectus, including a preliminary prospectus and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such participating Holders or any underwriter may reasonably request in writing;

(h)     notify on a timely basis each Holder of such Registrable Securities at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and, at the request of such Holder, as soon as practicable prepare and furnish to such Holder a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offeree of such securities, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(i)     make available for inspection by the participating Holders, the Participating Holders' Counsel or any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such participating Holder or underwriter (collectively, the "Inspectors"), all pertinent financial and other records, pertinent corporate documents and properties of the Company (collectively, the

13

"Records"), as shall be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information (together with the Records, the "Information") requested by any such Inspector in connection with such Registration Statement and request that the independent public accountants who have certified the Company's financial statements make themselves available, at reasonable times and for reasonable periods, to discuss the business of the Company. Any of the Information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless (i) the disclosure of such Information is necessary to avoid or correct a misstatement or omission in the Registration Statement, (ii) the release of such Information is requested or required pursuant to a subpoena, order from a court of competent jurisdiction or other interrogatory by a governmental entity or similar process; (iii) such Information has been made generally available to the public; or (iv) such Information is or becomes available to such Inspector on a non-confidential basis other than through the breach of an obligation of confidentiality (contractual or otherwise). The Holder(s) of Registrable Securities agree that they will, upon learning that disclosure of such Information is sought in a court of competent jurisdiction or by another governmental entity, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Information deemed confidential;

(j)  in the case of an Underwritten Offering, deliver to the underwriters of such Underwritten Offering a "comfort" letter in customary form and at customary times and covering matters of the type customarily covered by such comfort letters from its independent certified public accountants;

(k)  in the case of an Underwritten Offering, deliver to the underwriters of such Underwritten Offering a written and signed legal opinion or opinions in customary form from its outside or in-house legal counsel dated the closing date of the Underwritten Offering;

(l)  provide a transfer agent and registrar (which may be the same entity and which may be the Company) for such Registrable Securities and deliver to such transfer agent and registrar such customary forms, legal opinions from its outside or in-house legal counsel, agreements and other documentation as such transfer agent and/or registrar so request;

(m)  issue to any underwriter to which any participating Holders may sell Registrable Securities in such offering certificates evidencing such Registrable Securities;

(n)  upon the request of any Holder of the Registrable Securities included in such registration, use reasonable best efforts to cause such Registrable Securities to be listed on any national securities exchange on which any Shares are listed or, if the Shares are not listed on a national securities exchange, use its reasonable best efforts to qualify such Registrable Securities for inclusion on such national securities exchange as the Company shall designate;

(o)  otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Commission and make available to its security holders, as soon as reasonably practicable, earnings statements (which need not be audited) covering a period of 12 months beginning within three months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act;

14

(p)     notify the Holders and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as promptly as reasonably practicable after notice thereof is received by the Company when the applicable Registration Statement or any amendment thereto has been filed or becomes effective and when the applicable Prospectus or any amendment or supplement thereto has been filed;

(q)     use its reasonable best efforts to prevent the entry of, and use its reasonable best efforts to obtain as promptly as reasonably practicable the withdrawal of, any stop order with respect to the applicable Registration Statement or other order suspending the use of any preliminary or final Prospectus;

(r)     promptly incorporate in a prospectus supplement or post-effective amendment to the applicable Registration Statement such information as the lead underwriter or underwriters, if any, and each participating Holder agree should be included therein relating to the plan of distribution with respect to such class of Registrable Securities, which may include disposition of Registrable Securities by all lawful means, including firm-commitment underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering; and make all required filings of such prospectus supplement or post-effective amendment as promptly as reasonably practicable after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment;

(s)     cooperate with each Holder and each underwriter or agent, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(t)     provide a CUSIP number or numbers for all such shares, in each case not later than the effective date of the applicable registration statement;

(u)     to the extent reasonably requested by the lead or managing underwriters in connection with an Underwritten Offering (including an Underwritten Offering pursuant to Section 2.1 or Section 2.2), send appropriate officers of the Company to attend any "roadshows" scheduled in connection with any such Underwritten Offering, with all out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(v)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the participating Holder or participating Holders, as the case may be, owning at least a majority of the Registrable Securities covered by any applicable Registration Statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification and contribution to the effect and to the extent provided in Article V hereof, provided, however, that if a Holder becomes a party to any underwriting agreement or related documents, the Holder shall not be required in any such underwriting agreement or related documents to make any representations or warranties to or agreements with the Company or the underwriters other than customary representations, warranties or agreements regarding such Holder's title to Registrable Securities and any written information provided by the Holder to the Company expressly for inclusion in the

15

related Registration Statement, and the liability of any Holder under the underwriting agreement shall be several and not joint and in no event shall the liability of any Holder under the underwriting agreement be greater in amount than the dollar amount of the proceeds received by such Holder under the sale of the Registrable Securities pursuant to such underwriting agreement (net of underwriting discounts and commissions); and

(w)     subject to all the other provisions of this Agreement, use its reasonable best efforts to take all other steps necessary to effect the registration, marketing and sale of such Registrable Securities contemplated hereby.

## ARTICLE V

## INDEMNIFICATION

Section 5.1     <u>Indemnification by the Company</u>.  The Company agrees to indemnify and hold harmless, to the full extent permitted by law, each Holder, its Affiliates and their respective officers, directors, managers, partners, members and representatives, and each of their respective successors and assigns, against any losses, claims, damages, liabilities and expenses caused by any violation by the Company of the Securities Act or the Exchange Act applicable to the Company and relating to action or inaction required of the Company in connection with the registration contemplated by a Registration Statement or any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto, or any other disclosure document (including reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same was made in reliance on and in conformity with any information furnished in writing to the Company by such Holder expressly for use therein; <u>provided</u>, <u>however</u>, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto in reliance upon and in conformity with information furnished to the Company in writing by the Person asserting such loss, claim, damage, liability or expense specifically for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Person and shall survive the transfer of such securities. The Company will also indemnify underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, their officers and directors and each Person who Controls such Persons to the same extent as provided above with respect to the indemnification of the Holder, if requested.

Section 5.2     <u>Indemnification by Holders</u>.  Each Holder agrees to indemnify and hold harmless, to the full extent permitted by law, the Company, the Company's Controlled Affiliates and their respective directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who Controls the Company against any losses, claims, damages or liabilities and expenses caused by any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission to state therein

16

Doc#: US1:14172315v2

a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue statement or omission was made in reliance on and in conformity with any information furnished in writing by such Holder to the Company expressly for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense; provided that the obligation to indemnify shall be several, not joint and several, for each Holder and in no event shall the liability of any Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

Section 5.3    Conduct of Indemnification Proceedings.    Any Person entitled to indemnification hereunder will (i) give prompt (but in any event within 30 days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent, if at all, that it is prejudiced by reason of such delay or failure.  Any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (a) the indemnifying party has agreed in writing to pay such fees or expenses, (b) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (c) the indemnified party has reasonably concluded, based on the advice of counsel, that there may be legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party or (d) in the reasonable judgment of any such Person, based upon advice of counsel, a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if such Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person).  If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld, conditioned or delayed).  No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action or claim in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement includes (i) an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action, (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party and (iii) does not commit any indemnified party to take, or hold back from taking, any action.  No indemnified party shall, without the written consent of the indemnifying party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, and no indemnifying party shall be liable for any settlement or compromise of, or consent to the entry of judgment with respect to, any such action or claim effected without its consent, in each case which consent shall not be unreasonably withheld.

17

Section 5.4    Settlement Offers.  Whenever the indemnified party or the indemnifying party receives a firm offer to settle a claim for which indemnification is sought hereunder, it shall promptly notify the other of such offer.  If the indemnifying party refuses to accept such offer within 20 Business Days after receipt of such offer (or of notice thereof), such claim shall continue to be contested and, if such claim is within the scope of the indemnifying party's indemnity contained herein, the indemnified party shall be indemnified pursuant to the terms hereof.  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim in any one jurisdiction, unless in the written opinion of counsel to the indemnified party, reasonably satisfactory to the indemnifying party, use of one counsel would be expected to give rise to a conflict of interest between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the indemnifying party shall be obligated to pay the fees and expenses of one additional counsel.

Section 5.5    Other Indemnification.  Indemnification similar to that specified in this Article V (with appropriate modifications) shall be given by the Company and each Holder with respect to any required registration or other qualification of Registrable Securities under Federal or state law or regulation of governmental authority other than the Securities Act.

Section 5.6    Contribution.    If for any reason the indemnification provided for in Section 5.1 or Section 5.2 is unavailable to an indemnified party or insufficient to hold it harmless as contemplated by Section 5.1 and Section 5.2, then (i) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnified party and the indemnifying party or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of the Registrable Securities, provided that, no Holder shall be required to contribute in an amount greater than the dollar amount of the net proceeds received by such Holder with respect to the sale of the Registrable Securities giving rise to such indemnification obligation.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in Section 5.3, defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The Holders' obligations in this Section 5.6 to contribute shall be several in proportion to the amount of Registrable Securities registered by them and not joint.

## ARTICLE VI

## EXCHANGE ACT COMPLIANCE

Section 6.1    Exchange Act Compliance.  So long as the Company (a) has registered a class of securities under Section 12 or Section 15 of the Exchange Act and (b) files reports under Section 13 of the Exchange Act, then the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within

18

the limitation of the exemptions provided by Rule 144 under the Securities Act, as such rule may be amended from time to time or any similar rules or regulations adopted by the Commission, including, without limiting the generality of the foregoing, (i) making and keeping public information available, as those terms are understood and defined in Rule 144 promulgated under the Securities Act, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Rule 144, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in Rule 144 and make available to such Holder such information as will enable the Holder to make sales pursuant to Rule 144.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1    Severability.  If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 7.2    Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state of federal court located within the State of New York. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.3    Other Registration Rights.  If the Company shall at any time hereafter provide to any holder of any securities of the Company rights with respect to the registration of such securities under the Securities Act, such rights shall not be in conflict with or adversely affect any of the rights provided to the Holders of Registrable Securities in, or conflict (in a manner that adversely affects Holders of Registrable Securities) with any other provisions included in, this Agreement.

Section 7.4    Successors and Assigns.  Subject to Section 7.4, this Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto, each of which, in the case of the Holders, shall agree to become subject to the terms of this Agreement by executing an Adoption Agreement and be bound to the same extent as the parties hereto.  The Company may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of the Holders of a majority of the Registrable Securities.  Subject

19

to Section 2.2(b) and Section 2.2(a), any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Transferee of such Holder (each, an "Assignee"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee unless and until such Assignee delivers the Company an Adoption Agreement. If a Holder assigns its rights under this Agreement in connection with the Transfer of less than all of its Registrable Securities, the Holder shall retain its rights under this Agreement with respect to its remaining Registrable Securities. If a Holder assigns its rights under this Agreement in connection with the Transfer of all of its Registrable Securities, the Holder shall have no further rights or obligations under this Agreement, except under Article V hereof in respect of offerings in which such Holder participated or registrations in which Registrable Securities held by such Holder were included. Any purported assignment in violation of this provision shall be null and *void ab initio*.

Section 7.5    Notices.    All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail or facsimile or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties. All such notices, requests, consents and other communications shall be delivered as follows:

      (a)     if to the Company, to:

          [●]

          with a copy (which shall not constitute notice) to:

          [●]

      (b)     if to [●] Stockholder, to:

          [●]

          with a copy, in each case, (which shall not constitute notice) to:

          Paul, Weiss, Rifkind, Wharton & Garrison LLP
          1285 Avenue of the Americas
          New York, NY 10019-6064
          Attention: David S. Huntington
          Facsimile: 1 212 492 0124
          Email: dhuntington@paulweiss.com

      (c)     If to another Holder, to the address set forth under such Holder's name in Schedule I attached hereto.

20

Doc#: US1:14172315v2

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile or electronic mail, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth (5th) Business Day after the posting thereof.

Section 7.6    Headings.  The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Section 7.7    Additional Parties.  Additional parties to this Agreement shall only include each Holder (a) who has executed an Adoption Agreement, in the form attached hereto as Exhibit A, or (b) who (i) is bound by and subject to the terms of this Agreement, and (ii) has adopted this Agreement with the same force and effect as if it were originally a party hereto.

Section 7.8    Adjustments.  If, and as often as, there are any changes in the Shares or securities convertible into or exchangeable into or exercisable for Shares as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or subdivision or combination, exchange or readjustment of shares, or any stock dividend or stock distribution, merger or other similar transaction affecting such Shares or such securities, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to such Shares or such securities as so changed.

Section 7.9    Entire Agreement.  This Agreement and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

Section 7.10    Counterparts; Facsimile or.pdf Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document.  This Agreement may be executed by facsimile or.pdf signature and a facsimile or.pdf signature shall constitute an original for all purposes.

Section 7.11    Amendment.  Other than with respect to amendments to Schedule I attached hereto, which may be amended by the Company from time to time to reflect the Holders at such time, this Agreement may not be amended, modified or supplemented without the written consent of the majority of the Holders (as long as each owns Registrable Securities); provided, however, that, with respect to a particular Holder or group of Holders, any such amendment, supplement, modification or waiver that (a) would materially and adversely affect such Holder or group of Holders in any respect or (b) would disproportionately benefit any other Holder or group of Holders or confer any benefit on any other Holder or group of Holders to which such Holder of group of Holders would not be entitled, shall not be effective against such Holder or group of Holders unless approved in writing by such Holder or the Holders of a majority of the Registrable Securities held by such group of Holders, as the case may be.

21

Section 7.12    Extensions; Waivers.  Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any extension or waiver pursuant to this Section 7.12 will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 7.13    Further Assurances.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as the Company may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 7.14    No Third-Party Beneficiaries.  Except pursuant to Article V, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 7.15    Interpretation; Construction.  This Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited.  References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Agreement and the schedules, annexes and exhibits attached to this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have independent significance.  If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

\* \* \* \*

22

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

**THE COMPANY**:

**OASIS PETROLEUM INC.**


By: _____
       Name:
       Title:

[*Signature Page to Registration Rights Agreement*]

**[●] STOCKHOLDERS:**

**[●]**

By:  [●]

By: _____
     Name:
     Title:

**[●]**

By:  [●]

By: _____
     Name:
     Title:

[*Signature Page to Registration Rights Agreement*]

**[●]:**

**[●]**

By: [●]

By: _____
     Name:
     Title:

**[●]**

By: [●]

By: _____
     Name:
     Title:

[*Signature Page to Registration Rights Agreement*]

**OTHER HOLDERS:**

[●]


By: _____
      Name:
      Title:

[*Signature Page to Registration Rights Agreement*]

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("Adoption") is executed pursuant to the terms of the Registration Rights Agreement, dated as of [__], 2020, a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Adoption.  Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein.  By the execution of this Adoption, the Undersigned agrees as follows:

1.      Acknowledgment.   The Undersigned acknowledges that the Undersigned is acquiring certain Shares, subject to the terms and conditions of the Registration Rights Agreement.

2.      Agreement.   The Undersigned (i) agrees that the Shares acquired by the Undersigned, and certain other Shares and other securities of the Company that may be acquired by the Undersigned in the future, shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby adopts the Registration Rights Agreement with the same force and effect as if the undersigned were originally a party thereto.

3.      Notice.  Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

[NAME OF HOLDER]                     Address for Notices:

By: _____              [●]
Name:                                [●]
Title:                               Telephone:  [●]
Date:                                Email:      [●]

## SCHEDULE I

## List of Holders

| Name | Address for Notice | Shares |
|------|--------------------|--------|
|      |                    |        |

Doc#: US1:14172315v2

## Exhibit H

**Mirada Settlement Agreement**

*Execution Version*

## SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement and Mutual Release Agreement (this "***Settlement Agreement***") is entered into as of September 28, 2020 (the "***Execution Date***"), by and among the following parties (each, individually, a "***Party***" and, collectively, the "***Parties***"):

A.      Oasis Petroleum Inc., a Delaware corporation ("***OPI***"), Oasis Petroleum North America LLC, a Delaware limited liability company ("***OPNA***"), Oasis Midstream Services LLC, a Delaware limited liability company ("***OMS***"), Oasis Midstream Partners LP, a Delaware limited partnership ("***OMP***"), Bighorn Devco LLC, a Delaware limited liability company ("***Bighorn Devco***"), Bobcat Devco LLC, a Delaware limited liability company ("***Bobcat Devco***"), and Beartooth Devco LLC, a Delaware limited liability company ("***Beartooth Devco***" and collectively with OPI, OPNA, OMS, OMP, Bighorn Devco and Bobcat Devco, the "***Oasis Group***" or the "***Oasis Parties***", and each of the Oasis Parties individually an "***Oasis Party***");

B.      Mirada Energy, LLC, a Colorado limited liability company ("***Mirada Energy***"), Mirada Wild Basin Holding Company, LLC, a Delaware limited liability company ("***Mirada Wild Basin***"), and Mirada Energy Fund I, LLC, a Delaware limited liability company ("***Mirada Energy Fund***" and collectively with Mirada Energy and Mirada Wild Basin, the "***Mirada Group***");

C.      J. Mark McPherson and Adam Boniel (together, the "***Mirada Individuals***"); and

D.      Mirada F&C LLC, a Colorado limited liability company ("***Mirada FC***"), Orrion Energy, LLC, a Colorado limited liability company ("***Orrion***"), McP Orion, LLC, a Colorado limited liability company ("***McP***"), MCP Holding Company, LLC, a Colorado limited liability company ("***McP Holding***"), Mirada Manager, LLC, a Colorado limited liability company ("***Mirada Manager***"), Mirada Holding Company, LLC, a Colorado limited liability company ("***Mirada Holding Company***"), Brisbane Properties LLC, a Colorado limited liability company ("***Brisbane***"), and Great Barrier Energy, LLC, a Colorado limited liability company ("***Great Barrier***", and collectively with Mirada FC, Orrion, McP, McP Holding, Mirada Manager, Mirada Holding Company, and Brisbane, the "***Other Mirada Parties***", and collectively with the Mirada Group, the "***Mirada Parties***", and each of the Mirada Parties individually a "***Mirada Party***").

## RECITALS

**WHEREAS**, the Mirada Group filed a lawsuit styled Mirada Energy, LLC, Mirada Wild Basin Holding Company, LLC, and Mirada Energy Fund I, LLC v. Oasis Petroleum Inc., Oasis Petroleum North America, LLC, Oasis Midstream Services, LLC, Oasis Midstream Partners LP, Bighorn Devco LLC, Bobcat Devco LLC, and Beartooth Devco LLC, Cause No. 2017-19911 in the 334th Judicial District Court, Harris County Texas (the "***Lawsuit***" and, such court, the "***Trial Court***");

**WHEREAS**, the Mirada Group asserted claims in the Lawsuit against the Oasis Group;

**WHEREAS**, the Oasis Group has asserted counterclaims in the Lawsuit against the Mirada Group;

**WHEREAS**, the Mirada Group filed an appeal styled Mirada Energy, LLC, Mirada Wild Basin Holding Company, LLC, and Mirada Energy Fund I, LLC v. Oasis Petroleum Inc., Oasis Petroleum North America, LLC, Oasis Midstream Services, LLC, Oasis Midstream Partners LP, Bighorn Devco LLC, Bobcat Devco LLC, and Beartooth Devco LLC, Cause No. 14-20-00572 in the Fourteenth Court of Appeals of Texas (the "*Appeal*" and, such court, the "*Appellate Court*"); and

**WHEREAS**, the Oasis Group and the Mirada Group wish to settle and compromise all of their disputes as set forth herein.

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the execution of this Settlement Agreement, the recitals and mutual promises contained herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.      Definitions.  In addition to terms defined elsewhere in this Settlement Agreement, which shall have the meanings as elsewhere defined herein, as used in this Settlement Agreement, the following terms shall have the meanings set forth below:

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" and its derivatives mean, when used with respect to any Person, (A) the direct or indirect ownership of at least 50% of the Equity Interests in such Person or (B) the possession, directly or indirectly, of the power to direct, or cause or influence the direction of, the management of such Person, whether through ownership of voting securities, by Contract, or otherwise.  References herein to "Affiliates" includes any Person that is an Affiliate existing as of the Execution Date or in the future.  Affiliate with respect to a natural Person also includes the spouse, parents and children of such Person.

"*Applicable Law*" means all foreign, federal, state, local, county or municipal laws, statutes, codes, acts, treaties, ordinances, Orders, rules, regulations, charges, permits and requirements of all Governmental Authorities having jurisdiction over any Party or any asset of the Parties, as applicable.

"*Bankruptcy Court*" means the bankruptcy court where the Chapter 11 Cases are proceeding.

"*Business Day*" means a day (other than Saturday and Sunday) on which national banks are not required or authorized by law or executive order to close in the State of Texas.

"*Chapter 11 Cases*" means the voluntary chapter 11 proceedings of OPI and certain of its subsidiaries filed or to be filed pursuant to chapter 11 of the title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.

2

"***Chapter 11 Plan***" means the chapter 11 plan of reorganization of OPI and certain of its subsidiaries that commenced the Chapter 11 Cases, which shall expressly (a) incorporate and request approval of this Settlement Agreement and (b) provide for OPNA to make the payments set forth in Section 2 on the dates set forth in Section 2.

"***Chapter 11 Plan Effective Date***" means the date on which (a) all conditions precedent to the effectiveness of the Chapter 11 Plan (as set forth therein) have been satisfied or waived (in accordance with the Chapter 11 Plan), and (b) OPI and its subsidiaries that commenced the Chapter 11 Cases have declared the Chapter 11 Plan effective.

"***Confirmation Order***" means an order from the Bankruptcy Court (or other court of competent jurisdiction) confirming the Chapter 11 Plan that (a) approves this Settlement Agreement and (b) directs and orders OPNA to make the payments set forth in Section 2 on the dates set forth in Section 2.

"***Contract***" means any legally-binding contract, agreement, license, sublicense, assignment, undertaking or instrument of any kind, obligation or other arrangement, in each case, whether oral or written, including any amendments and other modifications thereto.

"***Defense Costs***" means costs and expenses (including attorneys' fees, consultants' fees, advisors' fees and other similar fees) reasonably incurred by any Indemnified Party defending against any Indemnified Claim pursuant to Section 13.

"***Discovery Information***" means any document or information produced in discovery in the Lawsuit by one or more Oasis Parties to any Mirada Parties, or by one or more Mirada Parties to any Oasis Parties.

"***EP Agreements***" means (a) the Carry and Earning Agreement between Mirada Energy, LLC and EuroPac Energy LLC dated effective January 8, 2010 (b) First Amendment to Carry and Earning Agreement dated effective July 20, 2011 by and among Mirada Energy, LLC, EuroPac Energy LLC, and EuroPac Energy III LLC; (c) Second Amendment to Carry and Earning Agreement dated August 8, 2011 by and among Mirada Energy, LLC, EuroPac Energy LLC, and EuroPac Energy III LLC; (d) the Agreement relating to Carry and Earning Agreement dated effective November 1, 2011 by and among Mirada Energy, LLC, EuroPac Energy LLC and EuroPac Energy III LLC; (e) Settlement Agreement dated effective April 1, 2012 by and among Mirada Energy, LLC, EuroPac Energy LLC, and EuroPac Energy III LLC; and (f) Farmout Agreement (Roosevelt County, Montana) dated November 2012 by and between Mirada Energy, LLC and EuroPac Energy IV LLC (g) and Farmout Agreement (McKenzie County, North Dakota) dated November 2012 by and between Great Barrier Energy, LLC and EuroPac Energy IV LLC.

"***EP Assignment***" means that certain Assignment, Bill of Sale and Conveyance (Berquist 33-28H Wellbore) dated effective as of December 20, 2011, recorded in McKenzie County, North Dakota on December 29, 2011, as Document Number 427721.

"***Equity Interest***" means (a) any shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust, other equity ownership interests in a Person, and any other interest that confers on a Person the right to receive a share of

3

any profit or loss of, or distribution of any asset of, a Person or the right to appoint or vote to appoint any person on the governing body of a Person, (b) any warrants, options or other rights entitling the holder thereof to purchase or acquire any interest described in Clause (a), and (c) any securities convertible into, or exercisable or exchangeable for, any interest described in Clause (a).

"*Excluded DSU Rights*" means the rights, or any action or omission taken or not taken in accordance with the rights, provided to the Oasis Parties or any Affiliate of any thereof pursuant to Section 12(e)(1).

"*Excluded Midstream Assets*" means any gathering lines, disposal wells or other gathering, compression, production, transportation, dehydration, treatment, processing, fractionating, blending, stabilization, recycling, storage, marketing or any other midstream facilities, equipment or assets, or any other such facilities, equipment or assets, whether related to Hydrocarbons, water, produced water, injected water, or produced fluids, that serve, in whole or in part, any area within the boundaries of Montana or North Dakota that (a) exist as of the Execution Date in which a member of the Extended Mirada Group currently owns an interest and has expended capital as of the Execution Date and that are neither (i) owned and operated by an Oasis Party or any Affiliate of an Oasis Party as of the Execution Date nor (ii) located in a drilling and spacing unit for which an Oasis Party is the operator as of the Execution Date, or (b) following the Execution Date are constructed by a Mirada Party, any Affiliate of a Mirada Party, or a Third Person to the extent a member of the Extended Mirada Group elects to participate and has expended capital for such construction.

"*Expansion*" means an expansion by an Oasis Party or any Affiliate of any thereof of an Excluded Midstream Asset in which an Oasis Party owns, an interest currently or in the future, solely to the extent such expansion ties into such Excluded Midstream Asset.

"*Extended Mirada Group*" means collectively the Mirada Group, J. Mark McPherson and the Other Mirada Parties.

"*Governmental Authority*" means any (a) federal, state, county, municipal or local government (whether domestic or foreign) or any political subdivision thereof, (b) any court or administrative tribunal, (c) any other governmental, quasi-governmental, judicial, regulatory, public or statutory instrumentality, authority, body, agency, bureau, tribal government or authority, taxing authority or entity of competent jurisdiction, or (d) any arbitrator with authority to bind a party at law.

"*Governmental Section*" means an area of land designated as a section in accordance with the Public Land Survey System of the United States.

"*Hess Agreements*" means (a) the Exploration Agreement dated March 18, 2010, as amended and restated on October 11, 2010 and further amended on November 24, 2010; (b) that certain Model Form Recording Supplement to Operating Agreement and Financing Statement recorded in McKenzie County, North Dakota on October 18, 2010 as Document Number 409028; (d) that certain Model Form Recording Supplement to Operating Agreement and Financing Statement recorded in McKenzie County, North Dakota on October 18, 2010 as Document

4

Number 409029; and (e) and that certain Memorandum of Exploration Agreement recorded in McKenzie County, North Dakota on December 23, 2010 as Document Number 411791.

"*Hess Assignment*" means that certain Assignment, Bill of Sale and Conveyance dated effective as of December 27, 2010, recorded in McKenzie County, North Dakota on January 10, 2011, as Document Number 412260.

"*Hydrocarbon*" means oil, gas, condensate and other gaseous and liquid hydrocarbons or any combination thereof, including scrubber liquid inventory and ethane, propane, isobutene, nor-butane and gasoline inventories, and sulphur and other minerals extracted from or produced from any of the foregoing.

"*Hydrocarbon Interest*" means any oil and gas lease, oil, gas and mineral lease, leasehold right, mineral interest, working interest (including any operated or non-operated working interest), net profit interest, royalty or overriding royalty, fee right, mineral servitude, license, concession or other right covering Hydrocarbons or an undivided interest therein or portion thereof, along with rights to drill for, produce and dispose of Hydrocarbons or other substances, in and under the lands covered thereby.

"*Indemnified Claim*" means any Claim, including a Third-Party Claim, for which an Indemnified Party is entitled to indemnification from an Indemnifying Party pursuant to Section 13.

"*Mirada Interested Person*" means Amy Pfannenstein and Roy Wilson.

"*Oasis Midstream Assets*" means any gathering lines, disposal wells or other gathering, compression, production, transportation, dehydration, treatment, processing, fractionating, blending, stabilization, recycling, storage, marketing or any other midstream facilities, equipment or assets, or any other such facilities, equipment or assets, whether related to Hydrocarbons, water, produced water, injected water, or produced fluids, that serve, in whole or in part, any area within the boundaries of Montana or North Dakota, that have been or are being proposed, acquired, constructed, owned or operated, or will be proposed, acquired, constructed, owned or operated in the future, by any Oasis Party or any of its Affiliates, provided, however, Oasis Midstream Assets shall exclude the Excluded Midstream Assets, except that to the extent an Oasis Party owns an interest in an Excluded Midstream Asset, such ownership interest of such Oasis Party shall not constitute an Excluded Midstream Asset.

"*Oasis Midstream Rights*" means any direct or indirect rights to participate in, own, operate or acquire any interest in any Oasis Midstream Assets or to receive discounted rates below the market price for services on such Oasis Midstream Assets, whether existing now or arising hereinafter.

"*Order*" means any legally binding award, injunction, judgment, decree, order, writ, prohibition, ruling, subpoena, verdict or other decision issued, promulgated or entered by or with any Governmental Authority (including an arbitrator of competent jurisdiction), applicable directly to any Party or any of its assets.

"***Person***" means any individual, corporation, partnership, joint venture, trust, limited liability company, limited liability limited partnership, unincorporated organization or other entity or any Governmental Authority.

"***Released Claim***" means a Claim that is a Mirada Released Claim or an Oasis Released Claim.

"***Released Contracts***" means:

(a)     the Participation Agreement (Chesapeake Purchase), dated March 16, 1999, by and among Zavanna, LLC, Palace Exploration Company and Zinke & Trumbo, Inc., as amended by that certain Amendment to Participation Agreement (Chesapeake Purchase), dated April 15, 2005 (but effective as of March 16, 2003), by and among Zavanna, LLC, Palace Exploration Company and RZ, Inc. (the "***Chesapeake PA***");

(b)     the Operating Agreement(s) referenced in or arising from Section 6 of the Chesapeake PA, including the Operating Agreement, dated March 16, 1999, by and between Bistate Oil Management Corporation, Zavanna, LLC and Zinke & Trumbo, Inc.;

(c)     the Participation Agreement (Wild Basin), dated January 21, 2005, by and among Split Creek Enterprises, LLC, Wild Basin Oil and Gas, LLC, Cody Oil and Gas Corp., Palace Exploration Company, Zinke & Trumbo, Inc., RZ, Inc. and Zavanna, LLC (the "***WBI PA***");

(d)     the Operating Agreement(s) referenced in or arising from Section 6 of the WBI PA, including the Operating Agreement, dated January 21, 2005, by and among Zinke & Trumbo, Inc., Palace Exploration Company, Zavanna, LLC, RZ, Inc., Split Creek Enterprises, LLC, Wild Basin Oil and Gas, LLC and Cody Oil and Gas Corp.;

(e)     the Participation Agreement (Wild Basin II), dated May 17, 2005, by and among Zavanna, LLC, Mirada Energy, LLC, Split Creek Enterprises, LLC, Wild Basin Oil and Gas, LLC and Cody Oil and Gas Corp. (the "***WBII PA***");

(f)     the Operating Agreement(s) referenced in or arising from Section 5 of the WBII PA; and

(g)     any clause or provision of any other Contract that grants or would grant any Oasis Midstream Rights to any member of the Extended Mirada Group or any Affiliate of any thereof, provided, however, such clause or provision shall be a Released Contract to the extent and only to the extent that such clause or provision grants or would grant any Oasis Midstream Rights to any member of the Extended Mirada Group or any Affiliate of any thereof;

in each case, (x) including any other Contract that is, or is in a form, attached thereto, and (y) without limiting the generality of Section 21(b), each reference to a Contract in this definition includes any amendment or modification thereto.

6

"*Settlement Agreement Effective Date*" means the date this Settlement Agreement becomes effective as provided for in <u>Section 3</u>.

"*Settlement Documents*" means this Settlement Agreement, the Agreed Motion and Take-Nothing Judgment, the Acknowledgement of Termination and Release of Released Contracts and the Agreed JOA (hereinafter defined).

"*Third Person*" means a Person that is not (a) a Mirada Party or an Affiliate of a Mirada Party or (b) an Oasis Party or an Affiliate of an Oasis Party.

"*Third Person Operator*" means a Person that is not (a) in the Extended Mirada Group or (b) an Oasis Party or Affiliate of an Oasis Party that is an operator under an operating agreement or Applicable Law.

2.    <u>Consideration</u>.  In addition to other good and valuable consideration as provided in this Settlement Agreement, the receipt of which is hereby acknowledged, OPNA shall (i) on the same date as the Chapter 11 Plan Effective Date, pay the sum of $20,000,000.00 U.S. dollars to Susman Godfrey L.L.P. for the benefit of the Extended Mirada Group by wire transfer thereof, and (ii) on or before the 180th day after the date the payment in clause (i) is due, pay the sum of $22,750,000.00 U.S. dollars to Susman Godfrey L.L.P. for the benefit of the Extended Mirada Group by wire transfer thereof.  All wire transfers shall be deposited into the following account:

| | |
|---|---|
| Bank Name: | Wells Fargo Bank |
| Bank Address: | 420 Montgomery |
| | San Francisco, CA 94104 |
| SWIFT Code: | WFBIUS6S |
| ABA#: | 121000248 |
| Account Name: | Susman Godfrey LLP - Multi-Client Trust Account |
| Account#: | 8073429378 |
| RE: | Matter No. 015414 |
| Contact Person: | Robert S. Safi |
| | 1000 Louisiana St., Suite 5100 |
| | Houston, TX 77002-5096 |
| | Telephone: (713) 653-7850 |
| | Fax: (713) 654-6666 |

3.    <u>Effectiveness</u>.  This Settlement Agreement shall be in full force and effect upon, but not until, the satisfaction of all the following conditions: (a) execution and delivery of this Settlement Agreement by each Party; (b) the approval of this Settlement Agreement by the Bankruptcy Court through entry of an order confirming the Chapter 11 Plan; (c) the occurrence of the Chapter 11 Plan Effective Date; and (d) payment by OPNA of the consideration provided for in <u>Section 2(i)</u>; provided, however, <u>Sections 2</u>, <u>4</u>, <u>5(b)</u>, **Error! Reference source not found.**, <u>7</u>, <u>8(i)</u>, <u>11</u>, <u>14</u>, <u>15</u>, <u>16(a)</u>, <u>16(b)</u>, <u>16(d)</u> and <u>19</u> through <u>32</u> shall be in full and force effect and binding on the Parties as of the Execution Date.  Upon satisfaction of, and subject to, all of the conditions set forth in the preceding sentence, this Settlement Agreement shall be in full force and effect as of the Execution Date.

4.        Support of Chapter 11 Plan.  Beginning on the date that each Party executes and delivers this Settlement Agreement and continuing until the Chapter 11 Plan Effective Date, unless this Settlement Agreement is terminated pursuant to Section 7 below, so long as the Chapter 11 Plan contemplates approval of this Settlement Agreement, each Mirada Party agrees to:  (a) support the Chapter 11 Plan and the transactions contemplated thereby and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the transactions contemplated by the Chapter 11 Plan; (b) vote any of its claims against any of the Oasis Parties that are the debtors in the Chapter 11 Cases to accept the Chapter 11 Plan by delivering its duly executed and completed ballot accepting the Chapter 11 Plan on a timely basis following the commencement of the solicitation of the Chapter 11 Plan and its actual receipt of the applicable solicitation materials and a ballot; and (c) to the extent it is permitted to elect whether to opt out of the releases set forth in the Chapter 11 Plan, elect not to opt out of the releases set forth in the Chapter 11 Plan by timely delivering its duly executed and completed ballot(s) indicating such election, provided, that such releases would not cause any Mirada Party to release any claims that are not Mirada Released Claims or that are claims that are not customarily released in chapter 11 proceedings.   Beginning on the date that each Party executes and delivers this Settlement Agreement and continuing until the Chapter 11 Plan Effective Date, unless this Settlement Agreement is terminated pursuant to Section 7 below, each member of the Extended Mirada Group agrees that it will not object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Chapter 11 Plan and the transactions contemplated thereby (so long as the Chapter 11 Plan expressly provides for approval of this Settlement Agreement and the Confirmation Order directs and orders OPNA to make the payments set forth in Section 2 on the dates set forth in Section 2).  Beginning on the date that each Party executes and delivers this Settlement Agreement and continuing until the Chapter 11 Plan Effective Date, unless this Settlement Agreement is terminated pursuant to Section 7 below, each Oasis Party agrees to support, pursue, and take all steps reasonably necessary and desirable to confirm and consummate a Chapter 11 Plan that expressly provides for approval of this Settlement Agreement and the Confirmation Order directs and orders OPNA to make the payments set forth in Section 2 on the dates set forth in Section 2.

5.        Agreed Motion and Take-Nothing Judgment.

(a)        Upon the Settlement Agreement Effective Date, including receipt by Susman Godfrey L.L.P. of the payment set forth in Section 2(i), each Oasis Party and each Party that is in the Mirada Group shall execute and deliver, or cause their respective legal counsel to execute and deliver, to one another an Agreed Motion to Render Take-Nothing Judgment and Agreed Take-Nothing Judgment, in the form attached hereto as Exhibit A (collectively, the "*Agreed Motion and Take-Nothing Judgment*").  Upon the effectiveness of this Settlement Agreement, including receipt by Susman Godfrey L.L.P. of the payment set forth in Section 2(i), (1) any Party may file and present, or cause its legal counsel to file and present, the Agreed Motion and Take-Nothing Judgment, with and to the Trial Court in order to obtain a take-nothing judgment on the Lawsuit and each Party agrees not to object or otherwise hinder or oppose the filing, presentment, and obtaining of the Agreed Motion and Take-Nothing Judgment and shall cooperate reasonably with any other Party to execute any additional motion or other document that may be necessary to effectuate the

8

intent to have a take-nothing judgment rendered in the Lawsuit in accordance with this Settlement Agreement; and (2) the Mirada Group will file a motion with the Appellate Court to dismiss the Appeal with prejudice not later than 10 days after the Settlement Agreement Effective Date.

(b)      Simultaneously with the execution and delivery of this Settlement Agreement, the Parties agree to abate the Lawsuit, the Appeal, and all pending audits and proceedings in connection therewith, including without limitation all pending deadlines, hearings, depositions, and other discovery matters, until the earlier of (i) the Settlement Agreement Effective Date or (ii) the date of termination of this Settlement Agreement pursuant to Section 7.   The Parties further agree to execute any motion(s) or other document(s) that may be necessary to effectuate the intent of the Parties to have a complete abeyance in the Lawsuit and the Appeal pending the effectiveness of this Settlement Agreement pursuant to Section 3.

6.      [Intentionally Omitted.]

7.      Termination.  The Mirada Group, at its option, may terminate this Settlement Agreement if: (a) the Chapter 11 Cases are not commenced on or before October 31, 2020 at 11:59 p.m. prevailing Central Time; (b) the Chapter 11 Cases commence without the support of the holders of the Oasis Parties' unsecured bonds that execute a restructuring support agreement with the Oasis Parties for a Chapter 11 Plan that expressly provides for approval of this Settlement Agreement and provides for OPNA to make the payments set forth in Section 2 on the dates set forth in Section 2; (c) the Chapter 11 Plan Effective Date has not occurred on or before the date that is thirty (30) days after the Bankruptcy Court has confirmed a Chapter 11 Plan; or (d) the Confirmation Order does not approve this Settlement Agreement and direct and order OPNA to make the payments set forth in Section 2 on the dates set forth in Section 2.  Either the Mirada Group or the Oasis Group, at their option, may terminate this Settlement Agreement if the Bankruptcy Court has not confirmed a Chapter 11 Plan that expressly provides for approval of this Settlement Agreement on the date that is on or before the date that is 180 days after the commencement of the Chapter 11 Cases. Upon termination of this Settlement Agreement by the Mirada Group or the Oasis Group, as applicable, according to this Section 7, all terms of the Settlement Documents shall become null and void.

8.      Fees and Costs.  Each Party shall bear its own costs and expenses (including attorneys' fees, consultants' fees, advisors' fees and other similar fees) in (i) the negotiation, preparation, execution, delivery, and, except as explicitly provided in this Settlement Agreement, performance of this Settlement Agreement and (ii) in connection with the Lawsuit and the Appeal.

9.      Release.

(a)      Upon the Settlement Agreement Effective Date, each Oasis Party (for itself and on behalf of each of its Affiliates, officers and directors) hereby **FULLY RELEASES, WAIVES, REMISES AND FOREVER DISCHARGES** each Mirada Party and its Affiliates, each Mirada Individual, and its and their respective heirs, assigns, shareholders, members, partners, officers, directors, employees, affiliates (including Affiliates), agents, contractors, representatives, insurers and attorneys (collectively, the "***Mirada Indemnified***

9

*Parties*") of and from any and all claims, actions, causes of action, appeals, audits, suits, rights, obligations, charges, debts, liabilities, losses, costs, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, torts, controversies, expenses, judgments, executions, and demands whatsoever, including third-party and inter-party claims, investigative costs, settlement costs and any outside legal, accounting, investigation, defense or other similar expenses (**WHETHER FORESEEN OR UNFORESEEN, KNOWN, UNKNOWN, DISCLOSED, UNDISCLOSED, MATURED, UNMATURED, ACCRUED, UNACCRUED, ASSERTED, UNASSERTED, LIQUIDATED, UNLIQUIDATED, ABSOLUTE, CONTINGENT, DIRECT, INDIRECT, CONDITIONAL, UNCONDITIONAL, SECURED, UNSECURED, VICARIOUS, DERIVATIVE, DUE, JOINT, SEVERAL OR SECONDARY**), in law, contract, equity or otherwise (collectively, "*Claims*") (i) that arise or may arise, in whole or in part, from any omission, acts, events, facts or damages that have occurred or that exist as of the Settlement Agreement Effective Date or that could arise, in whole or in part, as of the Settlement Agreement Effective Date, and (ii) relating to, or in connection with, the Released Contracts except as explicitly provided for below in this Section 9(a) (collectively, the "*Oasis Released Claims*").  The Oasis Released Claims include, by way of example, the following: (i) all Claims that were or could have been alleged in the Lawsuit or the Appeal; (ii) all Claims relating to, or in connection with, the Released Contracts (whether existing as of the Settlement Agreement Effective Date or arising thereafter, except as explicitly provided for below in this Section 9(a)); or (iii) to the extent arising from any omission, acts, events, facts or damages that have occurred or that exist as of the Settlement Agreement Effective Date, all alleged violations of any statute or regulation; breach of contract; tortious interference; breach of warranty; breach of fiduciary duty; and **FRAUD, NEGLIGENCE AND GROSS NEGLIGENCE, IN EACH CASE, OF THE PERSONS BENEFITING FROM SUCH RELEASE, WAIVER, REMISE AND DISCHARGE**. Notwithstanding anything to the contrary in this Settlement Agreement, no Oasis Party (for itself and on behalf of each of its Affiliates, officers and directors) terminates, releases, waives, remises or forever discharges any Claims for breach of the Agreed JOA after the Execution Date or any Claim to the extent relating to acts or omissions from and after the Settlement Agreement Effective Date . Notwithstanding anything to the contrary in this Settlement Agreement, the release in this Section 9(a) does not apply to (x) any charges or monies that have been billed to any Mirada Party or incurred by any Mirada Party as of the Settlement Agreement Effective Date; (y) any Claims arising from, or relating to any Mirada Party's performance of or failure to perform their obligations under, or breach of, this Settlement Agreement; or (z) any Contract, including any Released Contract, where OPNA is the operator and has sent a member of the Mirada Group joint interest billing statements which, as of the Settlement Agreement Effective Date, remain unpaid or outstanding.  Notwithstanding anything to the contrary in this Settlement Agreement, this release does not apply to any Claims (i) arising from, or relating to any Mirada Party's breach of any representation or warranty in this Settlement Agreement or (ii) for any intentional tort arising from or relating to acts committed solely during the period after the Execution Date and prior to the Settlement Agreement Effective Date by any member of the Extended Mirada Group or any Affiliate of any thereof, provided, however, that Claims arising from or related to the Agreed JOA,

the Released Contracts and/or this Settlement Agreement during such interim period shall be governed exclusively by those agreements.

(b)     Upon the Settlement Agreement Effective Date, each member of the Extended Mirada Group and Adam Boniel (for itself and on behalf of each of its Affiliates, officers and directors) hereby **FULLY RELEASES, WAIVES, REMISES AND FOREVER DISCHARGES** each Oasis Party and its Affiliates and its and their respective heirs, assigns, shareholders, members, partners, officers, directors, employees, affiliates (including Affiliates), agents, contractors, representatives, insurers and attorneys (collectively, the "*Oasis Indemnified Parties*") of and from any and all Claims (i) that arise or may arise, in whole or in part, from any omission, acts, events, facts or damages that have occurred or that exist as of the Settlement Agreement Effective Date or that could arise, in whole or in part, as of the Settlement Agreement Effective Date; (ii) relating to, or in connection with, any Released Contract or any Oasis Midstream Assets or Oasis Midstream Rights (whether existing as of the Settlement Agreement Effective Date or arising thereafter); (iii) relating to, or in connection with, any audit that has concluded, is in process or that could have occurred as of the Settlement Agreement Effective Date; or (iv) relating to, or in connection, with any complaint, issue or request made by any Mirada Party to any Oasis Party as of the Settlement Agreement Effective Date (collectively, the "*Mirada Released Claims*"). Notwithstanding anything to the contrary in this Settlement Agreement, the Mirada Released Claims shall not include any rights of the Mirada Parties under the Agreed JOA after the Execution Date.  The Mirada Released Claims include by way of example the following: (x) all Claims that were or could have been alleged in the Lawsuit; (y) all Claims relating to, or in connection with, the Released Contracts; and (z) to the extent arising from any omission, acts, events, facts or damages that have occurred or that exist as of the Settlement Agreement Effective Date, all alleged violations of any statute or regulation; breach of contract; tortious interference; breach of warranty; breach of fiduciary duty; and **FRAUD, NEGLIGENCE AND GROSS NEGLIGENCE, IN EACH CASE, OF THE PERSONS BENEFITING FROM SUCH RELEASE, WAIVER, REMISE AND DISCHARGE.** For the avoidance of doubt, each Mirada Party (for itself and on behalf of each of its Affiliates, officers and directors) fully releases, waives, remises and forever discharges all Claims related to any charges, fees, deductions, pricing, services, materials or equipment provided prior to the Settlement Agreement Effective Date or related to amounts paid to such Mirada Party for Hydrocarbons produced prior to the Settlement Agreement Effective Date, and the Parties acknowledge and agree that the releases, waivers, remises and discharges in Section 9(b)(ii) operate to fully release, waive, remise and forever discharge Claims based on conduct arising or occurring before, on and after the Settlement Agreement Effective Date and the Parties intend Section 9(b)(ii) to completely bar all Claims identified in Section 9(b)(ii) arising or occurring at any time before, on or after the Settlement Agreement Effective Date; provided, however, no Mirada Party (for itself and on behalf of each of its Affiliates, officers and directors) terminates, releases waives, remises or forever discharges any Claim to the extent relating to any acts or omissions occurring after the Settlement Agreement Effective Date under any Contract, including without limitations, for breach of the Agreed JOA, other than (1) Claims relating to charges, fees, and deductions that have been billed to any Mirada Party or the Mirada Individuals or incurred by any Mirada Party or the Mirada Individuals as of the Settlement Agreement Effective Date, or (2) Claims relating to any Released Contracts, any Oasis

11

Midstream Assets or any Oasis Midstream Rights. Notwithstanding anything to the contrary in this Settlement Agreement, this release does not apply to any Claims (i) arising from or relating to any Oasis Party's performance of or failure to perform their obligations under, or breach of, this Settlement Agreement or (ii) for any intentional tort arising from or relating to acts committed solely during the period after the Execution Date and prior to the Settlement Agreement Effective Date by any Oasis Party or any Affiliate of any thereof, provided, however, that Claims arising from or related to the Agreed JOA, the Released Contracts and/or this Settlement Agreement during such interim period shall be governed exclusively by those agreements.

(c)      Notwithstanding anything to the contrary in this Settlement Agreement, no Party terminates, releases, waives, remises or forever discharges any right to enforce this Settlement Agreement or any Settlement Document.

10.      WAIVER OF LEGAL RIGHTS.  **IN ENTERING INTO THIS SETTLEMENT AGREEMENT, EACH PARTY HEREBY RELEASES, WAIVES, REMISES AND DISCHARGES ANY AND ALL RIGHTS IT HAS UNDER ANY STATE OR FEDERAL STATUTE OR ANY COMMON LAW PRINCIPLE OF SIMILAR EFFECT, THAT PROVIDES THAT ANY RELEASE, WAIVER, REMISE, AND DISCHARGE IN SECTION 9 DOES NOT EXTEND TO CLAIMS THAT IT DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE SETTLEMENT AGREEMENT EFFECTIVE DATE, WHICH IF KNOWN BY IT WOULD HAVE MATERIALLY AFFECTED ITS SETTLEMENT OF THE RELEASED CLAIMS. EACH PARTY ACKNOWLEDGES AND AGREES THAT IT MAY HEREAFTER DISCOVER FACTS DIFFERENT FROM, OR IN ADDITION TO, THOSE WHICH IT KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE RELEASED CLAIMS, AND THAT THIS SETTLEMENT AGREEMENT SHALL BE AND REMAIN EFFECTIVE IN ALL RESPECTS NOTWITHSTANDING SUCH DIFFERENT OR ADDITIONAL FACTS OR THE DISCOVERY THEREOF.**

11.      No Admission of Liability.  Each Party acknowledges and agrees that none of the execution, delivery or performance of this Settlement Agreement shall be construed as, an admission as to any fact, the occurrence of any act or event, or of liability by such Party or an admission that such Party has engaged in any wrongful, negligent, tortious, or unlawful activity.

12.      Joint Operating Agreement.

(a)      Upon the Execution Date but subject to termination of this Settlement Agreement prior to the Settlement Agreement Effective Date as provided for in Section 7, the Joint Operating Agreement, dated as of September 28, 2020, by and between OPNA and Mirada Wild Basin, attached hereto as Exhibit B (the "***Agreed JOA***") shall immediately be in full force and effect, to the extent provided for below in Section 12(b), without the need for any further action by and of the parties thereto or the Parties to this Settlement Agreement.

(b)      The Parties acknowledge and agree that any oil and gas properties, wells or other oil, gas or mineral interests (including any Hydrocarbon Interest) of any type

12

included, in whole or in part, in the same drilling and spacing units, or in adjoining drilling and spacing units with respect to section-line wells, or in any part of the same Governmental Section (for the avoidance of doubt, whether or not such interest constitutes an undivided interest in an oil and gas or mineral interest or an oil and gas lease) in each case covering or affecting lands or minerals in North Dakota or Montana owned by the Parties as of September 1, 2020, or subsequently acquired by an Oasis Party or any Affiliate of any thereof, and as to subsequently acquired interests, prior to a Mirada Party or any Affiliate of any thereof acquiring any such interest after September 1, 2020 (as reflected by the public land records of the county in which the lands covered by such interests are located) (such oil and gas properties, wells or other oil, gas or mineral interests of any type, "*Related Interests*" and each such drilling and spacing unit or Governmental Section, a "*Related Unit*"), shall be governed solely by the Agreed JOA (as may be amended by mutual agreement) at the time that an Oasis Party or any Affiliate of any thereof is or becomes the operator.  As between any member of the Extended Mirada Group or any Affiliate of any thereof, on the one hand and any Oasis Party or any Affiliate of any thereof, on the other hand, the Agreed JOA wholly replaces and supersedes any other joint operating agreement that may have previously applied, could apply, or subsequently applies to every applicable Related Unit or Related Interests.  The one Agreed JOA shall apply to every applicable Related Unit, and if Exhibit "A" of the Agreed JOA has not been filled out with the relevant information regarding the contract area and ownership interests, such Exhibit "A" shall be deemed to reflect the applicable Related Interests of each member of the Extended Mirada Group or any Affiliate of any thereof and the Oasis Group or any Affiliate of any thereof in the respective Related Unit whether or not updated. Notwithstanding anything to the contrary in this Settlement Agreement, the Agreed JOA shall not govern a Related Unit for which the designated operator is a Third Person Operator.

(c)     With respect to any Related Interest, the Parties agree that, notwithstanding any provisions of any Contract to which such Related Interests are subject or that is otherwise applicable to such Related Interest, no member of the Extended Mirada Group or Affiliate of any thereof shall, now or in the future, own or be entitled to any Oasis Midstream Asset or Oasis Midstream Right. If an Oasis Party or any Affiliate of any thereof, constructs an Expansion, the Extended Mirada Group and any Affiliates of any thereof, shall, notwithstanding any rights under any other Contracts, not be entitled to participate in, receive any economic rights in, receive payments attributable to any use of, or own such Expansion. The Mirada Party which owns an interest in such Excluded Midstream Asset shall continue to own and receive its economic rights in such Excluded Midstream Assets, including payments attributable to any use of such Excluded Midstream Asset.

(d)     The Agreed JOA shall be binding on successors and assigns of any member of the Extended Mirada Group or Affiliate of any thereof on the one hand, and any member of the Oasis Group and any Affiliate of any thereof, on the other hand.  At and after the Execution Date, each member of the Extended Mirada Group and Affiliate of any thereof and OPNA shall promptly execute any document including, without limitation, a UCC financing statement, memorandum of lease, memorandum of financing statement, or amendment of Exhibit "A" to the Agreed JOA, if requested by OPNA, in each case that

13

may be necessary to describe lands subject to the Agreed JOA (in each case as may be amended from time to time) or to file, perfect, and effectuate the security interest or lien set forth in the Agreed JOA for any Related Interest owned as of the Execution Date or subsequently acquired, by any member of the Extended Mirada Group or any Affiliate of any thereof on the one hand, and any member of the Oasis Group and any Affiliate of any thereof, on the other hand, that secures, in part, the obligations of the Parties or such Affiliates set forth in the Agreed JOA.

(e)     The Agreed JOA shall not apply to any drilling and spacing unit or Governmental Section that is not a Related Interest or Related Unit (each an "*Excluded DSU*" to the extent located in North Dakota or Montana), provided, however, if an Oasis Party or any Affiliate of any thereof and any member of the Extended Mirada Group or any Affiliate of any thereof owns working interests in an Excluded DSU or a well located on an Excluded DSU or any other Hydrocarbon Interest in an Excluded DSU on or after the Execution Date, the Extended Mirada Group for itself and their respective Affiliates of any thereof hereby agree that:

(1)     notwithstanding any provision to the contrary in a Contract applicable to such Excluded DSU:

(i)     an Oasis Party or any Affiliate thereof, as operator of an Excluded DSU, when purchasing, selling, marketing or otherwise disposing a member of the Extended Mirada Group's share of production attributable to such Excluded DSU, shall be permitted to deduct post-production costs, charges, expenses or deductions (including marketing, transporting, gathering, treating, storing, stabilization, processing, fractionating, blending, pumpover, handling, fuel, compression or other costs, charges, expenses or deductions that are incurred in connection with the sale of Hydrocarbons attributable to such Excluded DSU) from the member of the Extended Mirada Group's share of production proceeds, and such member of the Extended Mirada Group or any Affiliate of any thereof shall indemnify the applicable Oasis Party or any Affiliate of any thereof for any Claims made against such Oasis Party or any Affiliate of any thereof by such member of the Extended Mirada Group or Affiliate of any thereof related to such post-production costs, charges, expenses or deductions, in each case provided (I) (x) such share of production is disposed of, purchased, marketed or sold for the same price per unit, cost, fee, charge, expense or other amount obtained or charged for as the production of such Oasis Party's or any Affiliate of any thereof and of the other working interest owners in the applicable well; and (y) in the case of any post-production costs, charges, expenses or deductions charged by Oasis Midstream Partners LP or its subsidiaries, any costs, charges, expenses or deductions charged that are greater than the amounts being charged as of the Execution Date (other than as a result of escalation clauses existing prior to the Execution Date) have been approved by the conflicts committee of the board of directors of the general partner of Oasis Midstream Partners LP; or (II) such disposition, marketing, purchase or sale is made by or to a third party (including pursuant to the contracts referenced in clauses (1) and

14

(2) below). Notwithstanding anything in this Settlement Agreement to the contrary, the Oasis Parties agree that: (1) if an Oasis Party or any Affiliate of any thereof buys any Hydrocarbon Interests in an Excluded DSU, such Oasis Party or Affiliate of any thereof will not terminate any Third Person midstream contracts that relate to an Excluded DSU where any Mirada Party owns a working interest prior to the expiration of their then current stated term, and (2) if an Oasis Party or any Affiliate of any thereof buys Hydrocarbon Interests and midstream assets, the applicable Oasis Party or Affiliate of any thereof will not terminate any existing Third Person midstream contracts prior to expiration of their then current stated term;

(ii)     an Oasis Party or any Affiliate of any thereof can charge the joint account costs and expenses and charges of an Affiliate of such Oasis Party in accordance with the terms of the pricing provisions set forth in Section II. 7 of Exhibit "C" to the Agreed JOA, but excluding the provision thereof permitting the charges set forth on Exhibit "I" to the Agreed JOA;

(iii)     an Oasis Party or any Affiliate of any thereof shall have the right to drill wells or propose wells in such Excluded DSU at any time, and shall not be otherwise restricted in any manner from proposing wells in such Excluded DSU or the pace of drilling wells, provided, however, an Oasis Party or any Affiliate thereof shall propose well operations in such Excluded DSU in accordance with Article VI.B.1 of the Agreed JOA;

(iv)     the Oasis Party or any Affiliate of any thereof shall not have any obligation to provide any information or data to any member of the Extended Mirada Group or any Affiliate of any thereof other than the information or data set forth in the Data Schedule in the Agreed JOA, or otherwise required to be provided in the Agreed JOA; and

(v)     an Oasis Party or any Affiliate of any thereof cannot be removed as operator for reasons other than pursuant to the operator removal terms set forth in the Agreed JOA; and

(2)     Upon an Oasis Party or any of its Affiliates becoming operator of any Excluded DSU, with respect to such Excluded DSU, each member of the Extended Mirada Group (for itself and on behalf of each of its Affiliates, officers and directors) hereby **FULLY RELEASES, WAIVES, REMISES AND FOREVER DISCHARGES** each Oasis Indemnified Party of and from any and all Claims based on (i) any clause or provision of any Contract or Applicable Law that grants or would grant to any member of the Extended Mirada Group rights that are inconsistent with or contrary to the Excluded DSU Rights, but only to the extent that such clause, provision or Applicable Law is inconsistent with or contrary to the Excluded DSU Rights; or (ii) the exercise of the Excluded DSU Rights by an Oasis Party.

13.     Joint and Several Liability.

(a)     Each Mirada Party and J. Mark McPherson shall (i) jointly and severally make any representation or warranty in this Settlement Agreement by any Mirada Party

15

with such Mirada Party, and (ii) be jointly and severally liable for any obligation or liability of any Mirada Party, J. Mark McPherson or any Affiliate of any thereof, for any breach of a representation or warranty in this Settlement Agreement.

(b)     Each Mirada Party shall be jointly and severally liable for any breach of the covenants set forth in this Settlement Agreement by any Mirada Party or any Mirada Individual.

(c)     Each Mirada Individual shall be severally liable for any breach of the covenants set forth in this Settlement Agreement by such Mirada Individual.

(d)     Each Mirada Party shall indemnify, hold harmless and defend each Oasis Indemnified Party of and from any and all Claims arising from, in connection with, or otherwise relating to, any breach of this Settlement Agreement by such Mirada Party or by a member of the Extended Mirada Group or any Affiliate of any thereof, **IN EACH CASE, REGARDLESS OF WHETHER THE CLAIMS RESULT FROM (IN WHOLE OR IN PART) THE SOLE, ACTIVE, PASSIVE, CONCURRENT, GROSS OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF ANY PERSON BEING SO INDEMNIFIED, DEFENDED OR HELD HARMLESS**.

(e)     Each Mirada Individual shall indemnify, hold harmless and defend each Oasis Indemnified Party of and from any and all Claims arising from, in connection with, or otherwise relating to, any breach of any covenants made by such Mirada individual, and J. Mark McPherson (but no other Mirada Individual) shall also jointly and severally with the Mirada Parties indemnify, hold harmless and defend each Oasis Indemnified Party of and from any and all Claims arising from, in connection with, or otherwise relating to, any breach of any representation and warranty made by any Mirada Party, **IN EACH CASE, REGARDLESS OF WHETHER THE CLAIMS RESULT FROM (IN WHOLE OR IN PART) THE SOLE, ACTIVE, PASSIVE, CONCURRENT, GROSS OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF ANY PERSON BEING SO INDEMNIFIED, DEFENDED OR HELD HARMLESS**.

(f)     Each Oasis Party shall indemnify, hold harmless and defend each Mirada Indemnified Party of and from any and all Claims arising from, in connection with, or otherwise relating to, any breach of this Settlement Agreement by such Oasis Party, **IN EACH CASE, REGARDLESS OF WHETHER THE CLAIMS RESULT FROM (IN WHOLE OR IN PART) THE SOLE, ACTIVE, PASSIVE, CONCURRENT, GROSS OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OF ANY PERSON BEING SO INDEMNIFIED, DEFENDED OR HELD HARMLESS.**

(g)     To make a claim for a remedy under this Section 13 that is not a Third-Party Claim, a Party entitled to any indemnification pursuant to this Section 13 (an "*Indemnified Party*") shall notify OPNA or Mirada Wild Basin, as applicable, of such claim under this Section 13, including the details of such claim and the basis under this Section 13 for such claim (the "*Claim Notice*").  If any claim in respect of which an Indemnified Party might seek remedy under this Section 13 is asserted against such Indemnified Party by a Person

16

other than a Party (a "***Third-Party Claim***"), such Indemnified Party shall deliver a Claim Notice therefor, including copies of all relevant pleadings, documents and information in such Indemnified Party's possession, to the applicable party required to provide indemnification pursuant to Section 13 hereof (an "***Indemnifying Party***") in accordance with Section 28 within 20 days following the receipt of such assertion of such Third-Party Claim by such Indemnified Party; provided, however, that the failure to so notify such Indemnifying Party shall not relieve such Indemnifying Party of its obligations hereunder except to the extent that such Indemnifying Party is prejudiced by such failure.  The Indemnifying Party shall have 15 days after its receipt of any such notice (the "***Third-Party Claim Response Period***"), within which to deliver notice to the Indemnified Party, in writing, either denying its obligations to or agreeing to fully indemnify, defend and hold harmless such Indemnified Party in connection with the applicable Third-Party Claim under this Section 13.

(h)	Subject to Section 13(i), if the Indemnifying Party notifies the Indemnified Party that it agrees to fully indemnify, defend and hold harmless such Indemnified Party under this Section 13 against any Third-Party Claim within the applicable Third-Party Claim Response Period, such Indemnifying Party shall assume the conduct and control through counsel that has previously been counsel to, and not adverse to, such Indemnified Party of the defense of such Third-Party Claim and of the Indemnified Party and shall, at such Indemnifying Party's expense, defend such Third-Party Claim and the Indemnified Party by all appropriate proceedings, which proceedings will be diligently prosecuted to a final conclusion or will be settled, and shall pay all Claims of such Indemnified Party incurred, accrued, paid or resulting or arising from such Third-Party Claim, subject to this Settlement Agreement; provided, however, that, unless consented in writing to by such Indemnified Party (which consent shall not be unreasonably withheld, conditioned, or delayed), such Indemnifying Party shall not enter into any settlement.  Such Indemnified Party, at its expense, may fully participate in, be kept updated, and be permitted to review all documents, advice and strategies, but, subject to Section 13(i), shall not be entitled to control any defense or settlement of any Third-Party Claim conducted by the Indemnifying Party pursuant to this Section 13(h).

(i)	If (i) the Indemnifying Party notifies the Indemnified Party that it agrees to fully indemnify, defend and hold harmless such Indemnified Party under this Section 13 against any Third-Party Claim within the applicable Third-Party Claim Response Period but fails to assume the defense of any Third-Party Claim in accordance with Section 13(h) within the applicable Third-Party Claim Response Period, or (ii) under applicable standards of professional conduct, a conflict of interest on any significant issue related to such proceeding exists between the Indemnifying Party, on the one hand, and the Indemnified Party, on the other hand, then, in each case, upon notice to the Indemnifying Party, the Indemnified Party may, in its sole discretion, retain counsel satisfactory to it to assume such defense of such Third-Party Claim on behalf of and for the sole account and risk of such Indemnifying Party, and such Indemnifying Party shall pay all reasonable fees and expenses of such counsel for, or otherwise incurred in connection with such defense by, such Indemnified Party, and such Indemnifying Party and such Indemnified Party shall reasonably cooperate in such defense.  In the event that the Indemnified Party assumes the conduct and control of the defense of a Third-Party Claim, the Indemnifying Party shall

17

not be liable for any settlement effected without its prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

(j)      In the case of a Claim for indemnification not based upon a Third-Party Claim, the Indemnifying Party shall have 30 days from its receipt of a Claim Notice to (i) pay the Claim, or (ii) dispute its liability for such Claim.  If the Indemnifying Party does not notify the Indemnified Party within such 30-day period that it disputes the Claim, the Indemnifying Party shall be deemed to have disputed its liability for such Claim.

(k)      The Oasis Parties hereby agree that they will not institute collections proceedings for a breach of representations or warranties under this Settlement Agreement from J. Mark McPherson, if the Oasis Parties receive payment in full from the Mirada Parties in connection with such breach of representations or warranties within six months of an award, settlement amount award or judgment, being awarded to an Oasis Party.

(l)      **NO PARTY SHALL BE LIABLE TO ANY INDEMNIFIED PARTY FOR ANY SPECIAL, EXEMPLARY, CONSEQUENTIAL (INCLUDING LOST PROFITS THAT ARE CONSEQUENTIAL), OR PUNITIVE DAMAGES RESULTING FROM, ARISING OUT OF, IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, IRRESPECTIVE OF WHETHER SUCH DAMAGES ARE BASED UPON CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER THEORY AT LAW OR EQUITY**. Notwithstanding anything to the contrary in this Settlement Agreement, this Settlement Agreement does not preclude an Indemnified Party from recovering (i) Defense Costs, (ii) the amount of any final, non-appealable judgment entered against the Indemnified Party on an Indemnified Claim including any amounts excluded pursuant to the first sentence of this Section 13(l) to the extent awarded, (iii) the amount required to be paid by the Indemnified Party pursuant to a settlement of an Indemnified Claim that complies with this Section 13, including any amounts excluded pursuant to the first sentence of this Section 13(l) to the extent awarded or (iv) interest on any of the foregoing that may be available under Applicable Law.

14.      No Outstanding or Known Future Claims/Causes of Action; Ratification; Transfers. Each Mirada Party and J. Mark McPherson represents and warrants, as of the Execution Date and the Settlement Agreement Effective Date, to each Oasis Party that: (i) the Mirada Group owns, and has not assigned, any Claim, or part of any Claim, asserted in the Lawsuit or Appeal, and has not assigned any interest in any Released Contract, other than, (A) as part of a leasehold or wellbore interest assignment and in the ordinary course of business, including an assignment of leasehold or wellbore interests required under the Hess Agreements or the EP Agreements that includes an assignment of a proportionate interest in contract rights related to such leasehold or wellbore interests in a form substantially similar to the Hess Assignment or the EP Assignment, as applicable, or (B) an assignment of leasehold or wellbore interests that includes a customary assignment of a proportionate interest in contract rights related to such leasehold or wellbore required to cure a title defect; (ii) no member of the Extended Mirada Group has assigned all or part of any of the Released Contracts to any current or past officer or director of a Mirada Party; (iii) the Mirada Released Claims will be released on the Settlement Agreement Effective Date; and

18

(iv) each member of the Extended Mirada Group has the authority to fully release, waive, remise and forever discharge the Released Claims as contemplated by this Settlement Agreement.

15.     Representations and Warranties.  Each Oasis Party represents and warrants, as of the Execution Date, to each Mirada Party and Mirada Individuals, and each Mirada Party and Mirada Individuals represents and warrants, as of the Execution Date, to each Oasis Party, as follows:

(a)     if such Party is an entity, such Party is duly formed and existing and in good standing under its jurisdiction of formation, and is duly qualified to do business under the laws of such jurisdiction and each other jurisdiction in which such qualification is required to perform its obligations under this Settlement Agreement;

(b)     if such Party is an entity, such Party has the requisite company power and authority to execute and deliver this Settlement Agreement and perform its obligations under this Settlement Agreement and such Party has taken all required company action to execute, deliver and perform its obligations under this Settlement Agreement;

(c)     none of the execution, delivery or performance of this Settlement Agreement by such Party (i) if such Party is an entity, breaches or will breach any governing document of such Party, (ii) breaches or will breach any Contract binding upon such Party in any material respect, (iii) violates or will violate any Applicable Law in any material respect or (iv) in the case of any Mirada Party only, results in or will result in the creation of any lien or encumbrance on any asset of such Party;

(d)     that such Party is not under any form of legal disability or incapacity at the time of the execution or delivery of this Settlement Agreement and that such Party has obtained any approvals or consents from any Third Person required for the execution, delivery or performance of this Settlement Agreement by such Party;

(e)     this Settlement Agreement has been duly executed and delivered by such Party and is legally binding upon such Party (assuming that (i) if such Party is a Mirada Party or Mirada Individuals, each Oasis Party has duly executed and delivered this Settlement Agreement, and (ii) if such Party is in the Oasis Group, each Mirada Party and Mirada Individuals has duly executed and delivered this Settlement Agreement), enforceable against such Party in accordance with its terms;

(f)     such Party has not incurred any obligation or liability, contingent or otherwise, for any brokers' or finders' fees, consultants' fees or similar fees in respect to any transaction contemplated by this Settlement Agreement for which (i) if such Party is a Mirada Party, any Oasis Party shall have any responsibility whatsoever, and (ii) if such Party is in the Oasis Group, any Mirada Party shall have any responsibility whatsoever;

(g)     that such Party is and has been represented by independent legal counsel of such Party's choosing in connection with the execution and delivery of this Settlement Agreement and in any and all matters relating thereto;

19

(h)　　that in executing and delivering this Settlement Agreement, except as set forth in Section 15(l), such Party has relied solely upon such Party's own judgment and the advice of such Party's own legal counsel;

(i)　　that after investigation and consultations with such Party's legal counsel, such Party agrees that this Settlement Agreement is fair, reasonable and supported by good, valid, and adequate consideration and such Party has received such consideration;

(j)　　that such Party is not in a significantly disparate bargaining position with any other Party;

(k)　　that such Party understands and agrees to the terms and conditions of this Settlement Agreement;

(l)　　that such Party understands and intends that each other Party has relied upon the representations and warranties in this Settlement Agreement when such other Party entered into this Settlement Agreement to the extent such other Party is a party thereto; and

(m)　　Adam Boniel, with respect to himself, has the authority to fully release, waive, remise and forever discharge the Released Claims as contemplated by this Settlement Agreement.

16.　　Confidentiality.

(a)　　Each Mirada Party and Mirada Individuals shall (and shall cause each Litigation Person and Mirada Interested Person to) maintain in strict confidence this Settlement Agreement, any negotiations or discussions in connection with, and the existence of, this Settlement Agreement, and all documents, materials and other information related to this Settlement Agreement (collectively, the "*Confidential Information*"); provided, however, that (i) Confidential Information shall not include any documents, materials and other information which (A) have become generally known or available within the industry or the public through no act or omission of any Mirada Party or Mirada Individuals (or any Litigation Person or Mirada Interested Person), or (B) was rightfully received by such Mirada Party or Mirada Individuals, after the Execution Date, from a Third Person who became aware thereof through no act or omission of such Mirada Party or Mirada Individuals (or any Litigation Person or Mirada Interested Person) and who is not under an obligation of confidentiality with respect thereto, (ii) such Mirada Party and Mirada Individuals may disclose Confidential Information as required by Applicable Law, to comply with securities laws or stock exchange rules, or to Persons who are Affiliates thereof or provide legal, accounting, or other services to such Mirada Party or Mirada Individuals or any of their respective Affiliates in connection with such Mirada Party's or Mirada Individuals' or any of their respective Affiliates' evaluation or implementation of the transactions contemplated by this Settlement Agreement, and such Mirada Party and Mirada Individuals shall instruct such Persons to comply with this Section 16(a), (iii) such Mirada Party and Mirada Individuals may disclose Confidential Information as necessary, and only to the extent required, to comply with or enforce this Settlement Agreement, and (iv) such Mirada Party that sells any assets subject to property

20

rights subject to this Settlement Agreement, may disclose the Settlement Agreement and the Agreed JOA to a prospective purchaser and/or a existing or prospective lender that has executed a customary confidentiality and non-disclosure agreement. Each Mirada Party and Mirada Individuals shall (and shall instruct each Litigation Person and Mirada Interested Person to) not use any Confidential Information except for the purpose of consummating the transactions, enforcing its rights or complying with its obligations under this Settlement Agreement. Except as required by Applicable Law, each Mirada Party and Mirada Individuals shall not (and each Mirada Party and Mirada Individuals shall instruct each Litigation Person and Mirada Interested Person to not) discuss the Lawsuit, this Settlement Agreement or any Released Claim with any Third Person. If any subpoena, order or discovery request (the "*Document Request*") is received by any Mirada Party or Mirada Individuals (or any Litigation Person or Mirada Interested Person) calling for the production of any Confidential Information, to the extent permitted by Applicable Law, such Mirada Party and Mirada Individuals shall (and shall instruct each Litigation Person and Mirada Interested Person to) promptly notify OPNA prior to any disclosure of such Confidential Information, make available as soon as practicable (and in any event prior to disclosure), for inspection and copying, a copy of such Confidential Information such Person intends to produce pursuant to such Document Request and shall not produce anything in response to such Document Request for at least 10 Business Days following such notice.

(b)     Except to the extent required by Applicable Law, no Mirada Party or Mirada Individuals shall (and each Mirada Party and Mirada Individuals shall instruct each Litigation Person and Mirada Interested Person to not) issue or make any press release or other public announcement related to this Settlement Agreement. For the avoidance of doubt, posting any notification, announcement or advertisement on a website shall be considered a public announcement for purposes of this Section 16(b).

(c)     Each Party shall (and shall instruct each Litigation Person and, in the case of the Mirada Parties, each Mirada Interested Person to) keep strictly confidential and not use any work product prepared in or for the Lawsuit or any documents or information described in Section 16(c)(i)-(iii). Within 30 days after the Settlement Agreement Effective Date, each Mirada Party shall (and shall instruct each Litigation Person and, in the case of the Mirada Parties, each Mirada Interested Person to), at the Mirada Party's election, either permanently delete, destroy and render irretrievable, or return to the producing Party, all of the following documents and other information that are in the possession, custody, or control of any such Mirada Party, Litigation Person or Mirada Interested Person and Mirada Wild Basin shall deliver a certificate from an officer certifying such deletion, destruction and rendition or return, as applicable: (i) all originals and all identical duplicate copies of all Discovery Information; (ii) all non-identical copies of any or all Discovery Information; and (iii) all documents of every kind and character, and in any and every form whatsoever, that contain, summarize, describe, note, incorporate, discuss, analyze, or in any way reveal any of the substance of any Discovery Information except attorney work product; provided, however, that the Mirada Parties, Litigation Persons and Mirada Interested Persons may retain one identical copy of each document filed in the Lawsuit that is available to the general public. This deletion, destruction and rendition or return, as applicable, of documents and information under this

21

Section 16(c) shall be performed by each Mirada Party and each of their Affiliates and its and their respective officers, directors, attorneys (including Susman Godfrey LLP), experts, consultants, and vendors, and all other Persons who had or have access to any part of the Discovery Information at any time (collectively, "*Litigation Persons*") to perform the actions provided in this Section 16(c). All Discovery Information received by an Oasis Party from or on behalf of a Mirada Party shall only be used or accessed by the such Oasis Party in connection with litigation.

(d)     Notwithstanding anything to the contrary herein, the Parties hereby agree that the Oasis Parties can disclose this Settlement Agreement in press releases, or securities filings, (i) as required by Applicable Law, (ii) to comply with securities laws or stock exchange rules, (iii) as necessary to satisfy any disclosure obligations of the Bankruptcy Court, or (iv) as determined by the Oasis Parties in connection the initiation of a solicitation period or the execution of a restructuring support agreement, provided, however, that any press release shall not identify or refer to any of the Mirada Individuals unless otherwise required by Applicable Law or the rules of an applicable stock exchange.

17.     Termination of Released Contracts as to Oasis Group and Mirada Parties.  Upon the Settlement Agreement Effective Date, including receipt by Susman Godfrey L.L.P. of the payment set forth in Section 2(i), each Oasis Party and each Mirada Party shall execute and deliver, or cause their respective legal counsel to execute and deliver, to one another the Acknowledgement of Termination and Release of Released Contracts attached hereto as Exhibit C. Upon the Settlement Agreement Effective Date, the Parties agree that as among themselves, both as of the Execution Date and at any point in the future when a Party or an Affiliate of a Party may acquire an interest in any Released Contract, (i) the Released Contracts listed as items (a) through (f) (both inclusive) of the definition of Released Contracts are terminated null and void, and no longer of any force and effect, including any provisions thereof that stipulate that they survive termination, and all provisions of the Released Contracts listed as item (g) of the definition of Released Contracts that would grant, convey or entitle a member of the Extended Mirada Group or any Affiliate of any thereof, to any Oasis Midstream Asset or any Oasis Midstream Right prior to, at or after execution of this Settlement Agreement, shall be null and void and of no force and effect. Upon the effectiveness of this Settlement Agreement, including receipt by Susman Godfrey L.L.P. of the payment set forth in Section 2(i), either Party shall be authorized to record the executed Acknowledgment of Termination and Release of Released Contracts attached hereto as Exhibit C.

18.     Covenant Not to Sue; Certain Limitations.

(a)     Except as otherwise provided in this Settlement Agreement, each Mirada Party and Mirada Individuals shall not (and shall cause each Mirada Interested Person to not), directly or indirectly (and shall cause each of its Affiliates and its and their respective officers and directors not to, directly or indirectly) initiate, assign, maintain, threaten or prosecute, or in any way aid, encourage or assist any Person in connection with the initiation, maintenance, threat or prosecution of, any Action against any Oasis Indemnified Party that asserts any matter with respect to which a release, waiver, remise or discharge has been given pursuant to Section 9(b).  "*Action*" means any action, appeal, Claim, demand, inquiry, summons, suit, proceeding, arbitration or investigation or other cause of

action by or before any Governmental Authority of any nature, whether criminal, civil, administrative, regulatory or otherwise and whether at law or at equity.

(b)      The Parties acknowledge and agree that a Mirada Party's or Mirada Individuals' compliance with a subpoena or other legally compulsive process or a Mirada Party's participation as a witness in any Action, in each case, by reason of having been summoned with a subpoena issued by a Person other than any Mirada Party or Mirada Individual will not constitute a breach of this Settlement Agreement.  In the event any Mirada Party or Mirada Individuals receives a subpoena or witness summons in an Action against any Oasis Indemnified Party that asserts any matter with respect to which a release, waiver, remise or discharge has been given pursuant to Section 9(b), such Mirada Party or Mirada Individuals shall provide written notice to OPNA of such subpoena or witness summons within 30 days after receiving such subpoena or witness summons.

(c)      Except as otherwise provided in this Settlement Agreement, each Oasis Party shall not, directly or indirectly (and shall cause each of its Affiliates and its and their respective officers and directors not to, directly or indirectly) initiate, assign, maintain, threaten or prosecute, or in any way aid, encourage or assist any Person in connection with the initiation, maintenance, threat or prosecution of, any Action against any Mirada Indemnified Party that asserts any matter with respect to which a release, waiver, remise or discharge has been given pursuant to Section 9(b).

(d)      The Parties acknowledge and agree that an Oasis Party's compliance with a subpoena or other legally compulsive process or an Oasis Party's participation as a witness in any Action, in each case, by reason of having been summoned with a subpoena issued by a Person other than any Oasis Party will not constitute a breach of this Settlement Agreement.

(e)      Each Mirada Party and Mirada Individuals shall not (and shall cause each Mirada Interested Person to not), directly or indirectly (and shall cause each of its Affiliates and its and their respective officers and directors not to, (i) directly or indirectly) assign, or otherwise transfer, the Released Contracts or Released Claims on or after the Execution Date other than (A) an assignment of leasehold or wellbore interests required under the Hess Agreements or the EP Agreements that includes an assignment of a proportionate interest in contract rights related to such leasehold or wellbore interests in a form substantially similar to the Hess Assignment or the EP Assignment, as applicable, or (B) an assignment of leasehold or wellbore interests that includes a customary assignment of a proportionate interest in contract rights related to such leasehold or wellbore required to cure a title defect; or (ii) take any action that would cause a breach of a representation or warranty set forth in this Settlement Agreement.

19.      Agreement is Legally Binding.  The Parties intend this Settlement Agreement to be legally binding upon and shall inure to the benefit of each Party and their respective successors, permitted assigns, executors, administrators, heirs, and estates.  Each Oasis Indemnified Party and Mirada Indemnified Party referred to in Section 9 or 13 is a third-party beneficiary of this Settlement Agreement and there are no other third-party beneficiaries of this Settlement Agreement.

23

20.     Entire Agreement; Amendments; Waivers.  The recitals set forth at the beginning of this Settlement Agreement are incorporated by reference and made a part of this Settlement Agreement.  This Settlement Agreement and the Settlement Documents, constitute the entire agreement and understanding of the Parties and supersede all prior negotiations or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof and thereof.  No amendment or modification of, or waiver of any rights under, this Settlement Agreement shall be binding unless in writing and signed by Mirada Wild Basin and each Oasis Party.  No waiver of any of the provisions of this Settlement Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  Except as expressly provided in this Settlement Agreement, no delay or failure to exercise any right or remedy under this Settlement Agreement shall affect a subsequent exercise of the same or any other right under this Settlement Agreement. In the event of a conflict between this Settlement Agreement and the Agreed JOA or the executed Acknowledgement of Termination and Release of Released Contracts, this Settlement Agreement will govern to the extent of such conflict.

21.     Interpretation.  The headings within this Settlement Agreement are purely for convenience and are not to be used as an aid in interpretation.  The terms and provisions of this Settlement Agreement were arrived at by mutual negotiation.  Any rule of construction to the effect that ambiguities are resolved against the drafting Party does not apply to the interpretation or construction of the Settlement Documents.  Except where otherwise expressly provided, or unless the context otherwise necessarily requires, in this Settlement Agreement: (a) any reference to any Exhibit, Section or Clause shall be to exhibits, sections or clauses of this Settlement Agreement, which exhibits are incorporated in this Settlement Agreement and are an integral part of this Settlement Agreement; (b) any reference to any Contract (including this Settlement Agreement) or other document shall be construed as a reference to such Contract or document as the same may have been, or may from time to time be, amended, supplemented, substituted, novated, assigned or otherwise transferred; (c) any reference to "herein," "herewith," "hereof" or "hereunder" shall be deemed to be a reference to this Settlement Agreement as a whole and not limited to the particular Section, Exhibit, or Clause in which the relevant reference appears; (d) the use of "or", "either" or "any" shall not be exclusive; (e) references to any Person shall include any successors and permitted assigns of such Person; (f) references to the term "include", "includes" or "including" mean "include, without limitation", "includes, without limitation" or "including, without limitation"; (g) words importing the singular include the plural and vice versa and the masculine, feminine and neuter genders include all genders; and (h) references to any Applicable Law (including any law referenced in this Settlement Agreement) are to be construed as references to the same as it may have been, or may from time to time be, amended, modified or reenacted. For the avoidance of doubt, reference herein to "interest" includes any interest in, or created by, any lease or other Contract.

22.     Governing Law and Choice of Forum.

(a)     **THIS SETTLEMENT AGREEMENT IS MADE AND ENTERED INTO WITHIN AND SHALL BE GOVERNED BY, CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF**

24

**CONFLICTS OF LAW THAT REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

(b)     **THE PARTIES HEREBY IRREVOCABLY (I) SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE HOUSTON DIVISION OF THE SOUTHERN DISTRICT OF TEXAS OR IF THE COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE HOUSTON DIVISION OF THE SOUTHERN DISTRICT OF TEXAS DO NOT HAVE JURISDICTION, SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE STATE COURTS OF THE STATE OF TEXAS LOCATED IN HARRIS COUNTY, TEXAS, IN EACH CASE SOLELY PRIOR TO THE COMMENCEMENT OF THE CHAPTER 11 CASES AND (II) DURING THE PENDENCY OF THE CHAPTER 11 CASES AND FOLLOWING THE CHAPTER 11 PLAN EFFECTIVE DATE, SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT AND (III), IN EACH CASE APPROPRIATE APPELLATE COURTS THEREFROM, IN RESPECT OF ANY DISPUTE, CONTROVERSY OR CLAIM ARISING UNDER THIS SETTLEMENT AGREEMENT AND EACH PARTY AGREES THAT ANY SUCH DISPUTE, CONTROVERSY OR CLAIM SHALL BE HEARD AND DETERMINED IN SUCH COURTS, AND CONSENTS TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR ANY SUCH DISPUTE, CONTROVERSY OR CLAIM, AND THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE, CONTROVERSY OR CLAIM BROUGHT IN ANY SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF ANY SUCH DISPUTE, CONTROVERSY OR CLAIM IN ANY SUCH COURT OR THE PERSONAL JURISDICTION OF ANY SUCH COURT FOR ANY SUCH DISPUTE, CONTROVERSY OR CLAIM; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT A JUDGMENT IN ANY SUCH DISPUTE, CONTROVERSY OR CLAIM MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAW.  EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE SERVICE OF PROCESS IN ANY SUCH DISPUTES, CONTROVERSIES OR CLAIMS IN SUCH COURTS AS MAY BE PERMITTED BY APPLICABLE LAW.**

23.     <u>Mirada Wild Basin</u>.  Each member of the Extended Mirada Group hereby irrevocably appoints Mirada Wild Basin to act as such Party's attorney-in-fact and representative, with full power and authority in its name and on its behalf, as contemplated or permitted by this Settlement Agreement or any Settlement Document to be taken by Mirada Wild Basin or otherwise with respect to any other action in connection with this Settlement Agreement or any Settlement Document, including the negotiation, execution and delivery of any Settlement Document in the name of such Party and any amendment or waiver with respect to this Settlement Agreement or any Settlement Document, including the execution and acknowledgement of the Agreed JOA, any exhibits to the Agreed JOA, and any security interests filed pursuant thereto.  Except as otherwise requested by an Oasis Party, Mirada Wild Basin shall have the sole and exclusive right to act on

25

behalf of any member of the Extended Mirada Group in connection therewith, but such right shall not limit the rights of any Oasis Party under any Contract, notice or other document executed or delivered by any member of the Extended Mirada Group (including this Settlement Agreement or any Settlement Document).  This appointment and grant of such power and authority is coupled with an interest and is in consideration of the mutual covenants made in this Settlement Agreement and will not be terminated by any act of any member of the Extended Mirada Group or by operation of law, whether by the incapacity of any member of the Extended Mirada Group or by the occurrence of any other event.  Each member of the Extended Mirada Group acknowledges and agrees that (a) each Oasis Party shall be entitled to rely on any action believed in good faith by such Oasis Party to be taken by Mirada Wild Basin, on behalf of such member of the Extended Mirada Group, through the authority granted under this Section 23 and that such action shall be binding on such member of the Extended Mirada Group as fully as if such member of the Extended Mirada Group had taken such action and (b) each Oasis Party shall be entitled to treat as genuine any Contract, notice or document furnished to it by Mirada Wild Basin, if such Oasis Party believed in good faith that such Contract, notice or document was genuine and to have been signed and presented pursuant to the authority granted in this Section 23.  No Oasis Party shall be liable to any member of the Extended Mirada Group for any action taken, or omitted to be taken, by such Oasis Party based on any such reliance or treatment.  Nothing in this Section 23 shall prevent any Oasis Party from requiring that any member of the Extended Mirada Group directly execute and deliver any Contract, notice or document permitted to be executed or delivered by Mirada Wild Basin in connection with this Settlement Agreement or any Settlement Document.  If any Oasis Party receives any conflicting notice, direction or decision from or by the Mirada Parties with respect this Settlement Agreement or any Settlement Document, such Oasis Party shall be permitted to rely on the notice, direction or decision of Mirada Wild Basin and the other members of the Extended Mirada Group shall be bound thereby.

24.     Representation of Counsel and Waiver of Reliance.  The Parties acknowledge and agree that they have had representation of counsel and have, in fact, consulted with counsel prior to the execution of this Settlement Agreement.  The Parties further acknowledge and agree that they are not relying on any inducements, promises, statements, or representations of any other Party than those contained in this Settlement Agreement.  Each Party acknowledges that he, she or it has read and understood the effect of this Settlement Agreement and is relying solely on his, her or its own judgment in entering into this Settlement Agreement.

25.     Counterparts.  This Settlement Agreement may be executed by each Party in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute but one and the same instrument.  The transmission of a signed counterpart of this Settlement Agreement by portable document format ("PDF") shall have the same force and effect as delivery of an original signed counterpart of this Settlement Agreement and shall constitute valid and effective delivery for all purposes.

26.     Assistance and Cooperation.  Each Party shall execute and deliver to any other Party all instruments, and do such further acts, as such other Party may reasonably request of such Party as necessary to effect this Settlement Agreement.

27.     Severability.  If a court of competent jurisdiction determines that any provision of this Settlement Agreement is void, illegal, or unenforceable, the other provisions of this Settlement

Agreement shall remain in full force and effect and, if possible, such provision which is determined to be void, illegal, or unenforceable shall be limited so that it shall remain in effect to the maximum extent permissible by Applicable Law.

28.     Notices.     All notices, requests, demands, waivers and other communications (collectively, "***Notices***") required or permitted to be given under this Settlement Agreement shall be in writing and may be given by any of the following methods: (a) personal delivery, (b) overnight or certified mail, postage prepaid, return receipt requested, or (c) next day air courier service.  Notices shall be sent to the applicable Party at its address given below or at such other address as such Party shall have theretofore designated by written notice delivered to the other Parties:

If to any Oasis Party (which shall constitute notice to such applicable Oasis Party):

> Oasis Petroleum North America LLC
> 1001 Fannin Street, Suite 1500
> Houston, Texas 77002
> Attention: Niko Lorentzatos, Esq.-- Executive Vice President & General Counsel
> Telephone: (281) 404-9500
> Fax: (281) 404-9704
> Email: nlorentzatos@oasispetroleum.com

with a copy to the Oasis Parties' counsel (which shall not constitute notice):

> DLA Piper LLP (US)
> 1000 Louisiana Street, Suite 2800
> Houston, Texas 77002-5005
> Attention: Jack Langlois
> Telephone: (713) 425-8419
> Fax: (713) 300-6019
> Email: jack.langlois@dlapiper.com
>
> Kirkland & Ellis
> 601 Lexington Avenue
> New York, New York 10022
> Attention:  Brian Schartz, P.C.
> Fax: (212) 446-4900
> Telephone:  (212) 446-4800
> Email: brian.schartz@kirkland.com

If to any member of the Extended Mirada Group (which shall constitute notice to such applicable member of the Extended Mirada Group):

27

        Mirada Wild Basin Holding Company, LLC
        5555 DTC Pkwy, Suite 310
        Greenwood Village, CO 8011
        Attention: Adam Boniel
        Telephone: (347) 610-4864
        Email: adam@miradaenergy.com

with a copy to Mirada Parties' counsel (which shall not constitute notice):

        Susman Godfrey L.L.P.
        1000 Louisiana St., Suite 5100
        Houston, TX 77002-5096
        Attention: Robert S. Safi
        Telephone: (713) 653-7850
        Fax: (713) 654-6666
        Email: rsafi@susmangodfrey.com

        Fox Rothschild LLP
        1225 17th Street, Suite 2200
        Denver, CO 80202
        Attention: Richard J. Saul, Esq.
        Telephone: (303) 383-7614
        Fax: (303) 292-1300
        Email: rsaul@foxrothschild.com

        Holland & Knight
        200 Crescent Court, Suite 1600
        Dallas, Texas 75201
        Telephone:  (214) 964-9500
        Fax:  (214) 964-9501
        Attention:  Robert W. Jones
        Email:  Robert.Jones@hklaw.com

All such Notices shall be deemed effective upon (x) actual receipt thereof by the addressee when physically delivered in person to the Party to which such Notice is addressed or (y) actual delivery thereof to the appropriate address.

29.     Miscellaneous.  No Party shall assign any right or obligation under this Settlement Agreement without the prior written consent of (a) if such Party is a Mirada Party or the Mirada Individuals, OPNA and (b) if such Party is in the Oasis Group, Mirada Wild Basin (in each case, which consent may be withheld for any reason) and any such assignment or delegation made without such consent shall be void.  No failure to exercise, and no delay in exercising, by any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The remedies provided herein or in any other Settlement Document are cumulative, and the exercise of one or more remedies shall not constitute an election of remedies nor waive any other remedy.

30.     <u>Reliance</u>.   None of any representation, warranty, covenant or agreement in this Settlement Agreement shall be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) or information disclosed at any time, whether before or after the Execution Date, with respect to the accuracy or inaccuracy of, or compliance with, any representation, warranty, covenant or agreement contained in this Settlement Agreement. Each Party acknowledges and agrees that the Oasis Indemnified Parties and the Mirada Indemnified Parties are relying on each representation, warranty, covenant and agreement in this Settlement Agreement.

31.     <u>Specific Performance</u>.   In the event that a Party is in breach or threatened breach of this Settlement Agreement, any other Party shall be entitled to specific performance, or other equitable relief for performance, of this Settlement Agreement (without any requirement to post a bond or other security or show irreparable injury or harm).   Each Party acknowledges and agrees that monetary damages are not sufficient to fully compensate each non-breaching Party, each non-breaching Party would be irreparably injured, and each non-breaching Party may have no adequate remedies at law (as determined in such non-breaching Party's sole discretion), and no Party shall object to the availability of any equitable remedy or order to specifically enforce this Settlement Agreement.   No Party shall have waived any right to seek any other form of relief available to such Party, at law or at equity, to the extent such remedy is not prohibited by this Settlement Agreement as a result of attempting to exercise the remedies contemplated by this <u>Section 31</u> if such remedies are not granted.

32.     <u>Prevailing Party</u>.   In the event that litigation arises with respect to this Settlement Agreement, any Party that prevails in such litigation shall recover its, his, or their attorney's fees and related costs from the other Party(ies) that did not prevail.

[SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, and intending to be legally bound, each of the Parties has caused this Settlement Agreement to be executed as of the Execution Date.

**Oasis Petroleum Inc.**

By: _____

Name:  Taylor L. Reid

Title:  President and Chief Operating Officer

**Oasis Petroleum North America LLC**

By: _____

Name:  Taylor L. Reid

Title:  President and Chief Operating Officer

**Oasis Midstream Services LLC**

By: _____

Name:  Taylor L. Reid

Title:  President and Chief Operating Officer

**Oasis Midstream Partners LP**

By: OMP GP LLC, its General Partner

By: _____

Name:  Taylor L. Reid

Title:  Chief Executive Officer

*Signature Page to Settlement and Mutual Release Agreement*

**Bighorn Devco LLC**

By: _____

Name:  Taylor L. Reid
Title:   Chief Executive Officer


**Bobcat Devco LLC**

By: _____

Name:  Taylor L. Reid
Title:   Chief Executive Officer


**Beartooth Devco LLC**

By: _____

Name:  Taylor L. Reid
Title:   Chief Executive Officer


*Signature Page to Settlement and Mutual Release Agreement*

**Mirada Energy, LLC**

By: _____
Name: Adam Boniel
Title: President

**Mirada Wild Basin Holding Company, LLC**

By: _____
Name: Adam Boniel
Title: President

**Mirada Energy Fund I, LLC**

By: _____
Name: Adam Boniel
Title: President

**Orrion Energy, LLC**

By: _____
Name: Adam Boniel
Title: President

**Mirada F&C LLC**

By: _____
Name: Adam Boniel
Title: President

Case 20-34711   Document 263   Filed in TXSB on 11/03/20   Page 339 of 632

*Signature Page to Settlement and Mutual Release Agreement*

**McP Orion, LLC**

By: _____
Name: Adam Boniel
Title:  President


**Great Barrier Energy, LLC**

By: _____
Name: Adam Boniel
Title:  President


**MCP Holding Company, LLC**

By: _____
Name: Adam Boniel
Title:  President


**Mirada Manager, LLC**

By: _____
Name: Adam Boniel
Title:  President


**Mirada Holding Company, LLC**

By: _____
Name: Adam Boniel
Title:  President


**Brisbane Properties LLC**

By: _____
Name: Adam Boniel
Title:  President


*Signature Page to Settlement and Mutual Release Agreement*



**Adam Boniel**

**J. Mark McPherson**

Adam Boniel

_____

J. Mark McPherson

## <u>EXHIBIT A</u>

**FORM OF AGREED MOTION AND TAKE-NOTHING JUDGMENT**

(See attached.)

CAUSE NO. 2017-19911

| | | |
|---|---|---|
| MIRADA ENERGY, LLC, | § | IN THE DISTRICT COURT OF |
| MIRADA WILD BASIN HOLDING | § | |
| COMPANY, LLC, and | § | |
| MIRADA ENERGY FUND I, LLC, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| OASIS PETROLEUM INC., | § | |
| OASIS PETROLEUM NORTH | § | |
| AMERICA LLC, and OASIS | § | |
| MIDSTREAM SERVICES LLC, OASIS | § | |
| MIDSTREAM PARTNERS LP, | § | |
| BIGHORN DEVCO LLC, | § | |
| BOBCAT DEVCO LLC, and | § | |
| BEARTOOTH DEVCO LLC, | § | |
| | § | |
| *Defendants.* | § | 334th JUDICIAL DISTRICT |

## AGREED TAKE-NOTHING JUDGMENT

Plaintiffs Mirada Energy, LLC, Mirada Wild Basin Holding Company, LLC, and Mirada Energy Fund I, LLC (collectively "Mirada") and Defendants Oasis Petroleum Inc., Oasis Petroleum North America LLC, Oasis Midstream Services LLC, Oasis Midstream Partners LP, Bighorn Devco LLC, Bobcat Devco LLC, and Beartooth Devco LLC (collectively "Oasis") have announced that all matters in controversy have been compromised and settled.  Mirada and Oasis have requested that the Court render judgment that Mirada and Oasis take nothing by reason of their claims in this lawsuit and that court costs be taxed against the parties incurring same.

Accordingly, it is ORDERED, ADJUDGED and DECREED that Mirada take nothing by reason of their claims in this lawsuit against Oasis.

It is further ORDERED, ADJUDGED, and DECREED that Oasis take nothing by reason of their claims in this lawsuit against Mirada.

*Exhibit A to Settlement and Mutual Release Agreement*

It is further ORDERED, ADJUDGED, and DECREED that all parties shall bear their own attorney's fees and costs.

It is further ORDERED, ADJUDGED AND DECREED that all relief sought herein by any of the parties hereto which is not expressly granted is denied.

This judgment disposes of all issues asserted in the above-referenced lawsuit and constitutes a final judgment.

SIGNED this _____ day of _____, 2020.

_____
JUDGE PRESIDING

AGREED AS TO FORM AND SUBSTANCE:

SUSMAN GODFREY L.L.P.

_____
Robert S. Safi
State Bar No. 24051280
Alejandra C. Salinas
State Bar No. 24102452
1000 Louisiana Street, Suite 5100
Houston, Texas  77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
rsafi@susmangodfrey.com
asalinas@susmangodfrey.com

**ATTORNEYS FOR PLAINTIFFS**
**MIRADA ENERGY, LLC,**
**MIRADA WILD BASIN HOLDING**
**COMPANY, LLC, AND**
**MIRADA ENERGY FUND I, LLC**

*Exhibit A to Settlement and Mutual Release Agreement*

RUSTY HARDIN & ASSOCIATES, LLP

---

Rusty Hardin
State Bar No. 08972800
Joe Roden
State Bar No. 00794549
Megan C. Moore
State Bar No. 24054322
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone:  (713) 652-9000
Facsimile:  (713) 652-9800
rhardin@rustyhardin.com
jroden@rustyhardin.com
mmoore@rustyhardin.com

and

BEATTY BANGLE STRAMA, PC

---

Michael L. Navarre
State Bar No. 00792711
Matthew R. Beatty
State Bar No. 24001169
901 S. MoPac Expressway
Building 1, Suite 200
Austin, Texas 78746
Telephone:  (512) 879-5050
Facsimile:  (512) 879-5040
mnavarre@bnsfirm.com
mbeatty@bnsfirm.com
bmollman@bnsfirm.com

**ATTORNEYS FOR DEFENDANTS,**
**OASIS PETROLEUM INC.,**
**OASIS PETROLEUM NORTH AMERICA LLC,**
**OASIS MIDSTREAM SERVICES LLC,**
**OASIS MIDSTREAM PARTNERS LP,**
**BIGHORN DEVCO LLC, BOBCAT DEVCO LLC,**
**and BEARTOOTH DEVCO LLC**

*Exhibit A to Settlement and Mutual Release Agreement*

CAUSE NO. 2017-19911

| | | |
|---|---|---|
| MIRADA ENERGY, LLC, | § | IN THE DISTRICT COURT OF |
| MIRADA WILD BASIN HOLDING | § | |
| COMPANY, LLC, and | § | |
| MIRADA ENERGY FUND I, LLC, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| OASIS PETROLEUM INC., | § | |
| OASIS PETROLEUM NORTH | § | |
| AMERICA LLC, and OASIS | § | |
| MIDSTREAM SERVICES LLC, | § | |
| OASIS MIDSTREAM PARTNERS LP, | § | |
| BIGHORN DEVCO LLC, | § | |
| BOBCAT DEVCO LLC, and | § | |
| BEARTOOTH DEVCO LLC, | § | |
| | § | |
| *Defendants.* | § | 334th JUDICIAL DISTRICT |

## JOINT MOTION TO RENDER TAKE-NOTHING JUDGMENT

Plaintiffs Mirada Energy, LLC, Mirada Wild Basin Holding Company, LLC, and Mirada Energy Fund I, LLC (collectively "Mirada"), and Defendants Oasis Petroleum Inc., Oasis Petroleum North America LLC, Oasis Midstream Services LLC, Oasis Midstream Partners LP, Bighorn Devco LLC, Bobcat Devco LLC, and Beartooth Devco LLC (collectively "Oasis"), submit this their Joint Motion to Render Take-Nothing Judgment, and would respectfully show this Court as follows:

## I.

All matters at issue between Mirada and Oasis in this lawsuit have been compromised and settled. Accordingly, Mirada and Oasis respectfully request that each and every claim brought in this lawsuit be adjudicated against the party bringing it by entry of a take-nothing judgment providing that all parties shall bear their own attorney's fees and costs.

*Exhibit A to Settlement and Mutual Release Agreement*

## II.

Mirada and Oasis respectfully request that the Court render the Agreed Take-Nothing Judgment attached hereto, which shall constitute a final judgment disposing of all parties and all issues in this case.

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, LLP

_____

Rusty Hardin
State Bar No. 08972800
Joe Roden
State Bar No. 00794549
Megan C. Moore
State Bar No. 24054322
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone:  (713) 652-9000
Facsimile:  (713) 652-9800
rhardin@rustyhardin.com
jroden@rustyhardin.com
mmoore@rustyhardin.com

BEATTY BANGLE STRAMA, PC

_____

Michael L. Navarre
State Bar No. 00792711
Matthew R. Beatty
State Bar No. 24001169
400 West 15th Street, Suite 1450
Austin, Texas  78701
Telephone:  (512) 879-5050
Facsimile:  (512) 879-5040
mnavarre@bbsfirm.com
mbeatty@bbsfirm.com
bmollman@bbsfirm.com

**ATTORNEYS FOR DEFENDANTS,**

*Exhibit A to Settlement and Mutual Release Agreement*

**OASIS PETROLEUM INC.,
OASIS PETROLEUM NORTH
AMERICA LLC, OASIS MIDSTREAM
SERVICES LLC, OASIS MIDSTREAM
PARTNERS LP, BIGHORN DEVCO
LLC, BOBCAT DEVCO LLC, and
BEARTOOTH DEVCO LLC**

SUSMAN GODFREY, LLP

_____

Robert S. Safi
State Bar No. 24051280
Ashley McMillian
State Bar No. 24070252
Alejandra C. Salinas
State Bar No. 24102452
1000 Louisiana Street, Suite 5100
Houston, Texas  77002-5096
rsafi@susmangodfrey.com
amcmillian@susmangodfrey.com
asalinas@susmangodfrey.com

**ATTORNEYS FOR PLAINTIFFS
MIRADA ENERGY, LLC,
MIRADA WILD BASIN HOLDING
COMPANY, LLC, AND
MIRADA ENERGY FUND I, LLC**

*Exhibit A to Settlement and Mutual Release Agreement*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was electronically served on council of record by electronic transmission on this ____ day of _____, 2020.

Robert S. Safi
Ashley McMillian
Alejandra C. Salinas
SUSMAN GODFREY, LLP
1000 Louisiana Street, Suite 5100
Houston, Texas  77002-5096
rsafi@susmangodfrey.com
asalinas@susmangodfrey.com

Michael L. Navarre
Matthew R. Beatty
BEATTY BANGLE STRAMA, PC
901 S. MoPac Expressway
Building 1, Suite 200
Austin, Texas 78746
mnavarre@bnsfirm.com
mbeatty@bnsfirm.com
bmollman@bnsfirm.com

_____
Joe Roden

*Exhibit A to Settlement and Mutual Release Agreement*

NO. 14-20-00572-CV

_____

IN THE

FOURTEENTH COURT OF APPEALS
_____

*MIRADA ENERGY, LLC, et al.*,
Appellants,

v.

*OASIS PETROLEUM NORTH AMERICA, et al.*,
Appellees

_____

**UNOPPOSED MOTION TO DISMISS APPEAL WITH PREJUDICE**
_____

To The Honorable Fourteenth Court of Appeals:

Pursuant to Texas Rule of Appellate Procedure 42.1(a)(1), Appellants move to dismiss the appeal with prejudice and in support thereof state:

**I.**

Appellants are Mirada Energy, LLC, Mirada Wild Basin Holding Company, LLC and Mirada Energy Fund I.

Appellees are Oasis Petroleum North America, LLC, Midstream Services LLC, Oasis Midstream Partners, LP, Bighorn Devco, LLC, Bobcat Devco, LLC, and Beartooth Devco, LLC.

**II.**

*Exhibit A to Settlement and Mutual Release Agreement*

Appellants perfected their appeal on August 18, 2020.

### III.

The parties have reached an agreement to compromise and settle their dispute.

Therefore, Appellants no longer desire to pursue their appeal.

### IV.

Appellants request that the court dismiss the appeal with prejudice and order

the parties to bear their own costs.

Respectfully submitted,

MOUNCE, GREEN, MYERS, SAFI,
  PAXSON & GALATZAN, P.C.

_/s/ S. Anthony Safi_
S. Anthony Safi
State Bar No. 17516800
100 N. Stanton, Suite 1000
El Paso, Texas  79901
Telephone:  (915) 532-2000
Facsimile:  (915) 541-1548
safi@mgmsg.com

SUSMAN GODFREY, LLP
Robert S. Safi
State Bar No. 24051280
Ashley McMillian
State Bar No. 24070252
Alejandra C. Salinas
State Bar No. 24102452
Stuart Kusin
State Bar No. 11770100
1000 Louisiana Street, Suite 5100
Houston, Texas  77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

rsafi@susmangodfrey.com
amcmillian@susmangodfrey.com
asalinas@susmangodfrey.com
skusin@susmangodfrey.com

Ian Michael Gore
(admitted *pro hac vice*)
SUSMAN GODFREY, LLP
1201 Third Avenue, Suite 3800
Seattle, Washington  98101
igore@susmangodfrey.com

**ATTORNEYS FOR
APPELLANTS,
MIRADA ENERGY, LLC,
MIRADA WILD BASIN
HOLDING COMPANY, LLC, and
MIRADA ENERGY FUND I, LLC**

## CERTIFICATE OF CONFERENCE

In compliance with Texas Rule of Appellate Procedure 10.1(a)(5), I certify that on September ____, 2020, I conferred with counsel for Appellees and he stated that they are not opposed to this motion.

        */s/ S. Anthony Safi*
        S. Anthony Safi

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was electronically served on counsel of record by electronic transmission on this ___th day of September, 2020.

*/s/ S. Anthony Safi*
S. Anthony Safi

*Exhibit A to Settlement and Mutual Release Agreement*

## EXHIBIT B

## AGREED JOA

(See attached.)

*Exhibit B to Settlement and Mutual Release Agreement*

A.A.P.L. FORM 610 - 1989

# MODEL FORM OPERATING AGREEMENT
## HORIZONTAL MODIFICATIONS

**OPERATING AGREEMENT**

**DATED**

September 28, 2020

**OPERATOR**     OASIS PETROLEUM NORTH AMERICA LLC

**CONTRACT AREA**          See attached Exhibit "A"

**COUNTY OR COUNTY OF**   See attached Exhibit "A"          , **STATE OF**     See attached Exhibit "A"

COPYRIGHT 2013 – ALL RIGHTS RESERVED
AMERICAN ASSOCIATION OF PROFESSIONAL
LANDMEN, 4100 FOSSIL CREEK BLVD. FORT
WORTH, TEXAS, 76137, APPROVED FORM.
A.A.P.L. NO. 610 - 1989 (Horz.)

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**TABLE OF CONTENTS**

Article                                                                      Title                                                                      Page

  **I.**   **DEFINITIONS** ................................................................................................................1
  **II.**  **EXHIBITS** ....................................................................................................................2
 **III.**  **INTERESTS OF PARTIES** ........................................................................................2
     A. OIL AND GAS INTERESTS ..........................................................................................2
     B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION.........................................2
     C. SUBSEQUENTLY CREATED INTERESTS ....................................................................2
 **IV.**  **TITLES** ........................................................................................................................*3*
     A. TITLE EXAMINATION ..................................................................................................3
     B. LOSS OR FAILURE OF TITLE ......................................................................................3
        1. Failure of Title ..........................................................................................................3
        2. Loss by Non-Payment or Erroneous Payment of Amount Due....................................3
        3. Other Losses ..............................................................................................................4
        4. Curing Title................................................................................................................4
  **V.**   **OPERATOR** ................................................................................................................4
     A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR .......................................4
     B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR .............4
        1. Resignation or Removal of Operator ..........................................................................4
        2. Selection of Successor Operator ................................................................................4
        3. Effect of Bankruptcy..................................................................................................4
     C. EMPLOYEES AND CONTRACTORS ............................................................................4
     D. RIGHTS AND DUTIES OF OPERATOR .......................................................................5
        1. Competitive Rates and Use of Affiliates. ....................................................................5
        2. Discharge of Joint Account Obligations ....................................................................5
        3. Protection from Liens ................................................................................................5
        4. Custody of Funds.......................................................................................................5
        5. Access to Contract Area and Records ........................................................................5
        6. Filing and Furnishing Governmental Reports ............................................................5
        7. Drilling and Testing Operations .................................................................................5
        8. Cost Estimates...........................................................................................................5
        9. Insurance ...................................................................................................................5
 **VI.**  **DRILLING AND DEVELOPMENT** ...........................................................................5
     A. INITIAL WELL................................................................................................................5
     B. SUBSEQUENT OPERATIONS .......................................................................................6
        1. Proposed Operations .................................................................................................6
        2. Operations by Less Than All Parties...........................................................................6
        3. Stand-By Costs ..........................................................................................................7
        4. Deepening .................................................................................................................8
        5. Sidetracking ..............................................................................................................8
        ~~6. Order of Preference of Operations~~ .........................................................................8
        7. Conformity to Spacing Pattern...................................................................................9
        8. Paying Wells .............................................................................................................9
        9. Spudder Rigs.............................................................................................................9
        10. Multi-Well Pads.......................................................................................................9
     C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK .........................9
        1. Completion................................................................................................................9
        2. Rework, Recomplete or Plug Back .............................................................................9
     D. OTHER OPERATIONS ................................................................................................10
     E. ABANDONMENT OF WELLS ......................................................................................10
        1. Abandonment of Dry Holes ....................................................................................10
        2. Abandonment of Wells That Have Produced. ...........................................................10
        3. Abandonment of Non-Consent Operations ..............................................................10
     F. TERMINATION OF OPERATIONS .............................................................................11
     G. TAKING PRODUCTION IN KIND .............................................................................11
        (Option 1) Gas Balancing Agreement .........................................................................11
        ~~(Option 2) No Gas Balancing Agreement~~ ...............................................................11
 **VII.** **EXPENDITURES AND LIABILITY OF PARTIES** .................................................12
     A. LIABILITY OF PARTIES ..............................................................................................12
     B. LIENS AND SECURITY INTERESTS ..........................................................................12
     C. ADVANCES .................................................................................................................12
     D. DEFAULTS AND REMEDIES .....................................................................................13
        1. Suspension of Rights ...............................................................................................13
        2. Suit for Damages .....................................................................................................13
        3. Deemed Non-Consent .............................................................................................13
        4. Advance Payment ....................................................................................................13
        5. Costs and Attorneys' Fees ........................................................................................13
     E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES ...............13
     F. TAXES ..........................................................................................................................13
 **VIII.** **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** ......................14
     A. SURRENDER OF LEASES ...........................................................................................14
     B. RENEWAL OR EXTENSION OF LEASES ...................................................................14
     C. ACREAGE OR CASH CONTRIBUTIONS ...................................................................14
     D. ASSIGNMENT~~, MAINTENANCE OF UNIFORM INTEREST~~ ..............................15

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**TABLE OF CONTENTS**

| Article | Title | Page |
|---|---|---|
| | E. WAIVER OF RIGHTS TO PARTITION | 15 |
| | F. PREFERENTIAL RIGHT TO PURCHASE | 15 |
| IX. | **INTERNAL REVENUE CODE ELECTION** | 15 |
| X. | **CLAIMS AND LAWSUITS** | 15 |
| XI. | **FORCE MAJEURE** | 16 |
| XII. | **NOTICES** | 16 |
| XIII. | **TERM OF AGREEMENT** | 16 |
| XIV. | **COMPLIANCE WITH LAWS AND REGULATIONS** | 16 |
| | A. LAWS, REGULATIONS AND ORDERS | 16 |
| | B. GOVERNING LAW | 16 |
| | C. REGULATORY AGENCIES | 16 |
| XV. | **MISCELLANEOUS** | 17 |
| | A. EXECUTION | 17 |
| | B. SUCCESSORS AND ASSIGNS | 17 |
| | C. COUNTERPARTS | 17 |
| | D. SEVERABILITY | 17 |
| XVI. | **OTHER PROVISIONS** | 18 |
| | A. CONFLICT OF TERMS | 18 |
| | B. OPERATOR'S DUTY | 18 |
| | C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS | 18 |

i

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

<b>OPERATING AGREEMENT</b>

THIS AGREEMENT, entered into by and between **Oasis Petroleum North America LLC** _____

hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators." Except as expressly provided to the contrary, and except as set forth in Exhibits "C," "E," "H" and "J" hereto, each of the Operator and each Non-Operator may be referred to herein as a "party" and together as the "parties."

<b>WITNESSETH:</b>

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

<b>ARTICLE I.</b>
<b>DEFINITIONS</b>

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made in good faith.

B. The term "Completion", ~~or~~ "Complete" / <sup>or "Completing"</sup> shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation**,** / <sup>initial cleanout operations</sup> and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser. When used in connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which the Lateral was drilled pursuant to a previous proposal.

E. The term "Displacement" shall ~~have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall otherwise~~ mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean (i) the surface hole location, and (ii) the Oil and Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. / <sup>The term "Affiliate" /*See: Article XVI, Other Provisions, Note 1.</sup> The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location, which shall not exceed 180 days .

J. The term "Horizontal Well" shall ~~have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall~~ mean a well containing one or more Laterals which are drilled, Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet (100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.

L. The term "Lateral" shall mean that portion of a wellbore that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

O. The term "Oil and Gas" / <sup>or "Oil and/or Gas"</sup> shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by any party to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by any party to this agreement.

R. The term "Plug Back" / <sup>or "Plugging Back"</sup> shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" / <sup>or "Plugging Back"</sup> shall mean an operation to test or Complete the well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" / <sup>or "Recompleting"</sup> shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" / <sup>or "Reworking"</sup> shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations / <sup>or refracing operations,</sup> but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" / <sup>or "Sidetracking"</sup> shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole / <sup>or</sup> to overcome other mechanical difficulties. When used in connection with a Horizontal Well, the term "Sidetrack" / <sup>or "Sidetracking"</sup> shall mean the directional control and deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral from / <sup>a prior drilling operation or</sup> the approved proposal unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

V. The term "Spudder Rig" shall mean a drilling rig utilized ~~only~~ for drilling all or part of the vertical component of a Horizontal Well; ~~a rig used only for setting conductor pipe shall not be considered a Spudder Rig~~**.**

W. The term "Terminus" shall ~~have the same meaning as the term defined by the state regulatory agency having jurisdiction~~

-1-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

over the Contract Area, in the absence of which the term shall ~~mean the furthest point drilled in the Lateral.~~

X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.

Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**
**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

**X** A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

(6) Burdens on production.

**X** B. Exhibit "B," Form of Lease.

**X** C. Exhibit "C," Accounting Procedure.

**X** D. Exhibit "D," Insurance.

**X** E. Exhibit "E," Gas Balancing Agreement.

**X** F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

**X** G. Exhibit "G," Raw Data Sheet.

**X** H. Other: **Exhibit "H," Memorandum of Operating Agreement and Financing Statement.**

**X** I. Other: **Exhibit "I," Chart of Affiliate Rates and Charges.**

**X** J. Other: **Exhibit "J," Oil Balancing Agreement.**

If any provision of any exhibit, except Exhibits "E" or "F," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of,     **1/8th**                                    and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. Furthermore, each Non-Operator shall indemnify, defend, and hold the Operator harmless from any and all obligations to pay, or claims arising from, any interest owed for the improper payment of royalties , regardless of whether such obligations or claims arise from any law, regulation, or statute. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless

-2

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

-3

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ARTICLE IV.**

**TITLES**

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys **or landmen** / on its staff or by outside attorneys **or landmen** / **and outside landmen**. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) **, title curative** / and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the **to their participating interest in the well.  All title opinions shall be rendered by an attorney.** proportion / ~~that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A."~~ Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

Each party shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests contributed by such party. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) ~~the title~~ **an opinion rendered** /has been /~~approved~~ by the examining attorney **and title has been accepted by Operator** /~~or title has been accepted by all of the Drilling~~ **or, in the event that a title opinion** **has not been rendered, title has been accepted by all of the Drilling Parties in such well.  Notwithstanding the foregoing, in the absence of a title opinion,** **an election by a Drilling Party to participate in the drilling of a well pursuant to a well proposal shall be deemed acceptance of title for such well,** **however such acceptance shall not limit said Drilling Party's rights to dispute title credited to it once a title opinion has been rendered.** ~~Parties in such well.~~

**B. Loss or Failure of Title:**

1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,

(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure **shall be borne by the parties whose interest is affected by the title failure in the same proportions on** **which they bear such title failure and such party or parties affected by such title failure hereby release and shall** ~~severally~~ ~~by each party~~ **(including a predecessor to a current party)** ~~who received production for which such accounting is required based on the~~ ~~amount of such production received, and each such party shall severally~~ **indemnify,** defend and hold harmless all other parties hereto for any such **liability** ~~to account;~~

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease

-4-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an

-5-

-5-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement. *See: Article XVI.N, Other Provisions.

3. <u>Other Losses</u>: **/** All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest **/** through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. <u>Curing Title:</u> In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

**ARTICLE V.**

**OPERATOR**

**A. Designation and Responsibilities of Operator:**

<u>**Oasis Petroleum North America LLC**</u>   shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. <u>Resignation or Removal of Operator:</u> Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach or failure to perform its obligations under Article V.A of. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent**, /** **Affiliate** or successor corporation shall not be the basis for removal of Operator, provided the transferee assumes the obligations of the Operator as set forth under this agreement.

2. <u>Selection of Successor Operator:</u> Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting *See: Article XVI, Other Provisions, Note 2. interest of the Operator that was removed or resigned. **/** The former Operator shall promptly deliver to the successor Operator all **/** **raw** records and **directly** **raw** data **/** relating to the operations conducted by the former Operator to the extent such **/** records and data are not already in the possession of the successor Operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. <u>Effect of Bankruptcy:</u> If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined **/** **by** Operator, and all such employees or contractors shall be the employees or contractors of Operator.

-6-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled ~~on a competitive contract basis~~ **and Completion** at the average or usual commercial rates in the area, as set forth in this agreement. If it so desires, Operator may employ its own tools and equipment in the drilling / of wells, but its

charges therefor shall not exceed the ~~prevailing~~ average or usual commercial rates in the area for the same or similar goods or services ~~rates in the area and the rate of such charges shall be agreed upon by the / parties in writing~~

~~before drilling operations are commenced~~, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All ~~work performed or~~ **goods and services** **Affiliates** **billed to the Joint Account** **Exhibit "C"** ~~materials~~ / supplied by / ~~affiliates~~ or related parties of Operator / shall be performed or supplied at ~~competitive~~ rates~~,~~ pursuant to / ~~written~~ ~~agreement, and in accordance with customs and standards prevailing in the industry~~.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose**.** ~~other than to account for Non-Operator funds as herein specifically provided.~~ Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

**Consenting Party**
5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each / ~~Non-Operator~~ **Consenting Party's** or its duly authorized representative, at the / ~~Non-Operator's~~ sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom~~, including Operator's books and records relating thereto~~. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder. ~~and shall not obligate Operator to furnish any geologic or geophysical data of an~~ **Consenting Party** ~~interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each /Non-~~ ~~Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items,~~ ~~including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding~~ **Consenting Party** ~~purchase contracts and pricing information to the extent not applicable to the production of the / Non-Operator seeking the information.~~ Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with ~~the audit protocol specified in Exhibit "C."~~

**Consenting Party**
6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting / ~~Non-Operator~~ not in default of its payment obligations, all operational notices, reports or applications required to be filed by **Consenting Party** local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each / ~~Non-Operator~~ shall provide to Operator on a timely basis all information necessary to Operator to make such filings. **\*See: Article XVI, Other Provisions, Note 3.**
**, Reworked, Sidetracked, Deepened, Recompleted, or Plugged Back**
7. Drilling and Testing Operations: The following provisions shall apply to each well drilled / hereunder, including but not limited to the Initial Well:
**Consenting Parties**
(a) Operator will promptly advise / ~~Non-Operators~~ of the date on which the well is spudded, or the date on which drilling operations are commenced.
**Consenting Parties**
(b) Operator will send to / ~~Non-Operators~~ such reports, test results and notices regarding the progress of operations on the well **such** **Consenting parties** as ~~the~~ / ~~Non-Operators~~ / shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.
~~(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil~~ ~~and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.~~
**reasonable**
8. Cost Estimates: Upon / request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall  be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**
~~**A. Initial Well:**~~

~~On or before the_____ day of_____, _____, Operator shall commence / the drilling of the Initial Well~~ ~~at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)):~~

~~and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due diligence to~~

-7-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**are**
~~The drilling of the Initial Well and the participation therein by all parties /~~ is obligatory, subject to Article VI.C.1. as to participation in ~~Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

      1. <u>Proposed Operations:</u> If any party hereto should desire to drill any well on the Contract Area ~~other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in ~~paying~~ paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth, **and/or an accompanying well proposal** objective Zone and the estimated cost of the operation as outlined in an AFE /. A proposal for the drilling of or other operations for a Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), **objective Zone** (v) / ~~utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3)~~ **and/or an accompanying well proposal. *See: Article XVI, Other Provisions, Note 4.** include estimated drilling and Completion costs as set forth in an AFE. / The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. ~~Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.~~

      If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

      2. <u>Operations by Less Than All Parties:</u>

      (a) <u>Determination of Participation.</u> If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. **or is deemed to have elected** (Option No. 2) elects / not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and **Operator may** if Operator is a Non-Consenting Party, the / ~~Consenting Parties shall~~ either: (i) ~~request Operator to~~ perform the work required by such **Interim** proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as / Operator to perform such **See Article XVI.C., Other Provisions** work /. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement. **Failure to timely and properly respond to any proposal under this Article VI.B shall be deemed an election not to participate or consent.**

      If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall provide one notice to all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the applicable part of the Contract Area by the interests of all Consenting Parties in the a p p l i c a b l e  p a r t  o f  t h e Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

      (b) <u>Relinquishment of Interest for Non-Participation.</u> The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties **valid** shall keep the leasehold estates involved in such operations free and clear of all / liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles ~~VI.B.6. and~~ VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened,

-8-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying

-9

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective participating interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) __100__ % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) __400__ % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party ~~who submitted or voted for an alternative proposal under Article VI.B.6.~~ to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties __400__ % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

**Upon written request made by a Non-Consenting Party** ~~W~~within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. **Upon written request made by a Non-Consenting Party, each quarter** / ~~Each month~~ thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding ~~month~~ **quarter**. In determining the quantity of Oil and Gas produced during any month, **the party conducting the operations for the** /Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled **Sidetracked** / or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to

-10-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling, **Sidetracking,** / or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to ~~five (5)~~ / **two (2)** additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting Party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C."

**\*See: Article XVI, Other Provisions, Note 5.**

This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well. /

~~6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period~~

-11-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

shall be deemed an election ~~not~~ to participate in the prevailing proposal.

7. ~~Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing,~~ **(or an exception thereto)** ~~unless such well conforms to the then-existing well spacing pattern / for such Zone.~~

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of ~~all parties~~ **the party or parties owning a majority interest based on ownership as shown on Exhibit "A," provided, however, the consent of Non-Operator shall be required if Non-Operator owns at least a 20% working interest in the well and Operator does not own at least a 70% working interest in the well, in each case on an 8/8ths basis.**

9. Spudder Rigs. **\*See: Article XVI, Other Provisions, Note 6.**

(a) ~~Within Approved Horizontal Well proposals (*i.e.* proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed_____days only upon notice and the affirmative vote of not less than_____% in interest of the Consenting Parties to the drilling of the proposed well.~~

_____(b) ~~Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than_____% in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.~~

(c) Failure to meet Horizontal Rig Move-On Period. If a Spudder Rig is utilized to commence an operation and  a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof or pursuant to the force majeure provisions of Article XI, and if any Consenting Party hereto still desires to conduct said operation,  ~~unless_____% in interest of the Consenting Parties agree to abandon the operation,~~ Operator shall re-propose the ~~well~~ operation in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows, if the operation is re-proposed  on or before ninety (90) days after the expiration of the Horizontal Rig Move On Period or any approved extension thereof, or pursuant to the force majeure provisions of Article XI:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

If on the other hand the operation is re-proposed after the ninetieth (90th) day after the expiration of the Horizontal Rig Move On Period or any approved extension thereof, or pursuant to the force majeure provisions of Article XI, then the costs of the operation, incurred both before and after such re-proposal, shall be borne shall be borne pursuant to Article VI.B.9(c)(3).

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of **, or of the initial separation facilities,** such pad or location **/** shall be allocated, and/or reallocated as necessary, to the Consenting Parties of each of the wells thereon.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

**With respect to a Horizontal Well all**
✓ Option No. 1: ~~All~~ **/** necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of the Well, including tankage and/or surface facilities.
**With respect to a Vertical Well all**
✓ Option No. 2: ~~All~~ **/** necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties;        provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting Party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything to the contrary, including the selection of Option 2 above, or anything else in this agreement, Option 1 shall apply to all Horizontal Wells.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or

-12

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

-13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

-13

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of **two hundred twenty-five thousand** Dollars (\$ **225,000.00** ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of **one hundred thousand** Dollars (\$ **100,000.00** ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities ~~such as salt water disposal wells~~ or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least **50** % of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. <u>Abandonment of Dry Holes:</u> Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been **, Reworked, Sidetracked, Recompleted, Plugged Back,** drilled / or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in **, Reworking, Sidetracking, Recompleting, Plugging Back,** accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling / or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of **to the extent such costs were not increased as a result of non-abandoning parties subsequent operations** plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable / .

2. <u>Abandonment of Wells That Have Produced:</u> Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed **Consenting Parties.** as a producer shall not be plugged and abandoned without the consent of all / ~~parties~~. If all Consenting Parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes an ~~d~~ Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. ~~Upon request,~~ Operator **has the right but not the obligation** ~~shall continue~~ / to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. <u>Abandonment of Non-Consent Operations:</u> The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

-14-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing_____**50**_____% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical / **or imminent threat to health, safety or the environment** , Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☑ **Option No. 1:** **Gas Balancing Agreement and Oil Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, at or near the wellhead, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator, Affiliates of Operator, or third party owned ~~surface~~ facilities which

**provided, however, Non-Operator shall not be required to pay additional amounts for the use of any facilities for which Non-Operator has already paid its proportionate share pursuant to an AFE under Article VI.B, but Non-Operator shall also pay for any resulting increased costs to Operator, as determined by the Operator, in its reasonable discretion** it uses (but shall not obtain any ownership interest in such facilities ) /.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil / **and/or Gas** produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil / **and/or Gas** or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ~~ten~~ / (~~10~~ **30**) **thirty** days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ~~ten~~ / (~~10~~ **30**) **thirty** days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil / **and/or Gas** not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil / **and/or Gas** shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil / **and/or Gas** under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. ~~No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing~~

**Each Non-Operator does hereby release, and shall indemnify and defend Operator against any claims made against Operator by Non-Operator relating to price, costs, fees, charges, deductions, expenses or other amounts obtained or charged by Operator or its Affiliates in connection with Operator's purchase, sale or other disposition of any additional production arising from any instance in which any Non-Operator does not take in kind or separately dispose of its proportionate share of its Oil and/or Gas, provided (i) such Oil and/or Gas is disposed of for the same price per unit, costs, fees, deductions, charges, expenses or other amounts obtained or charged for Operator's production and the other working interest owners' production in the applicable well, and further provided that in the case of any post-production costs, charges, expenses or deductions charged by Oasis Midstream Partners LP or its subsidiaries, any costs, fees, charges, deductions, expenses or other amount obtained or charged that are greater than the amounts being charged by such Affiliate as of the date of this agreement (other than as a result of escalation clauses existing prior to the date of this agreement) have been approved by the conflicts committee of the board of directors of the general partner of Oasis Midstream Partners LP, or (ii) such purchase or disposition is made to a third party. Operator can charge Non-Operator its proportionate share of any capacity reservation charges, minimum volume commitment charges, or similar charges when Operator is marketing Non-Operator's share of production. A Non-Operator shall not bear its proportionate share of any capacity reservation charges, minimum volume commitment charges, or similar charges attributable to the period when Non-Operator is actually taking in kind its share of production. If Operator enters into an acreage dedication with a non-affiliated third-party that provides for an upfront cash payment in exchange for the acreage dedication, and Non-Operator also dedicates its acreage in the dedicated area to the same contract with the same midstream provider on the same terms, Non-Operator shall receive a portion of the upfront cash payment pro-rated to its net acres on an 8/8ths basis in the dedicated area, unless Non-Operator receives a cash payment from the same midstream provider. For the avoidance of doubt, this provision shall exclude all dedications or transactions between Oasis Midstream Partners LP and its affiliates and Operator and its affiliates.**

~~basis to be used~~. /

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Oil and/or Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion- ate share of total Oil and/or Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Oil and/or Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or Exhibit "J" or is a separate agreement. ~~Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.~~

~~☐ **Option No. 2: No Gas Balancing Agreement:**~~
~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~
~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~
~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

-16-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:   *See: Article XVI.BB, Other Provisions.**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper

performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security interest provided herein, each **/** party hereto shall **/** execute and acknowledge the recording **any**          **may** supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted **a recording supplement in the form of Exhibit "H" to** hereunder. Any party may file **/** this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.
**Subject to any liens of record that currently exist as of the effective date hereof,**
**/** ~~E~~each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights **financial obligations** (costs, or other charges, pursuant to this agreement) or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses **/** , interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within ninety (90) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount **interests** shall be secured by the liens and security rights **/** described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any **interests** property that is subject to the lien and security **/** rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due

hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be

-17-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

within fifteen / (15 **thirty** 30) days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. <u>Suspension of Rights:</u> Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to **access to the Contract Area or to** / receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement. **/\*See: Article XVI, Other Provisions, Note 7.**

2. <u>Suit for Damages:</u> Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. <u>Deemed Non-Consent:</u> The non-defaulting party may deliver a written Notice of Non-Consent Election to the  defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party /, **as of such date and all costs going forward** notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be / **subject to Article VI.B. or VI.C.** ~~offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.~~

4. <u>Advance Payment:</u> If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. <u>Costs and Attorneys' Fees:</u> In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease,

-19-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless / **if decides** ~~all parties agree~~ to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto / **, provided, no consent shall be needed to release a lease that has expired or otherwise terminated** .

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a  party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, such lease to be on the form attached hereto as Exhibit "B." Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this  agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the  extent possible, be

-20-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof. **/*See: Article XVI, Other Provisions Note 8.**

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F. Preferential Right to Purchase:**

☐ (Optional: Check if applicable)

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

**ARTICLE IX.**

**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other an agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

**ARTICLE X.**

**CLAIMS AND LAWSUITS**

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed **one hundred thousand** Dollars ($ **100,000.00** ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party

-21-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form **each of which may also be delivered by attachment to electronic mail ("Email Notice"),** of facsimile, / postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in **email address,** accordance with this agreement, or to the telecopy, / facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, **, email address** telecopy / or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 **Email Notice** hours, such response shall be given orally or by telephone, telex, telecopy**, /** or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice. **/\*See: Article XVI, Other Provisions, Note 9.**

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of~~ **180** ~~days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re- completing, Plugging Back or Reworking operations are commenced within~~ **180** ~~days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination. **For the avoidance of doubt, the obligation to plug and abandon a well attaches when a well is drilled, provided that this provision shall not release a party from its obligation to plug a well pursuant to Article VI.E.1, VI.E.2 or VI.E.3 herein.**

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders. **/ \*See: Article XVI, Other Provisions, Note 10.**

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of** **North Dakota** **shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting

-22-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of ~~the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies~~ / **a government entity having jurisdiction** to the extent such interpretation or application was made in good faith and does not constitute gross negligence / **or willful misconduct**. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application. **/*See: Article XVI, Other Provisions, Note 11.**

## ARTICLE XV.
## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. ~~Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:~~

☑ ~~Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same.~~

☐ ~~Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i).~~

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes. **Delivery of an executed counterpart signature page by facsimile or electronic transmittal (PDF) is as effective as executing and delivering this agreement in the presence of the other parties to this agreement.**

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**[See next page for Article XVI]**

-23

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

## ARTICLE XVI
## Other Provisions

A.   Conflict of Terms

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement or the provisions of any exhibit to this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern and control to the extent of such conflict.

B.   Operator's Duty

Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.

C.   Interim Operator

If under Article VI.B.2.a.(ii) Operator designates an interim operator ("Interim Operator") for the applicable proposal, such Interim Operator must (X) first provide all the parties hereto with (i) sufficient evidence of insurability as required for Operator under this agreement, (ii) evidence showing such Interim Operator has been approved as the Operator in the state in which the Contract Area is located and is sufficiently bonded, and (iii) copies of all regulatory paperwork indicating such Interim Operator is acting as Operator of the applicable proposal and (Y) include the then current Operator in all communications with the applicable surface owners in anticipation of and throughout the time that a Consenting Party is named as Interim Operator.  Furthermore, if a Consenting Party succeeds in becoming an Interim Operator for a proposal, upon the day following completion of the operations or first sales of/from the applicable proposal (whichever occurs first), the named Operator under this agreement may elect to resume its position for operations on the applicable proposal, in which event the Interim Operator shall promptly resign from its position as Interim Operator.

D.   Disputes concerning Objective Depths

If, during the drilling of any well being drilled hereunder, a bona fide dispute shall exist as to whether the proposed depth has been reached in such well (as for example, whether a well has been drilled to a depth sufficient to test a particular sand or formation or if the well has reached the stratigraphic equivalent of a particular depth) the opinion of a majority in interest, and not in numbers, of the parties participating in the drilling of such well shall control and be binding upon all parties.  If the parties are equally divided, the opinion of the Operator shall control.

E.   Direct Charges and Expenses:

The following items shall not be considered as administrative overhead, and Operator shall be entitled to make a direct charge against the Joint Account (as defined in Exhibit "C" hereto) for same: (i) reasonable fees and expenses charged by third party consultants or contractors for land, legal and consulting services performed for the benefit of the Consenting Parties under this agreement, including without limitation permitting and preparation and presentation of evidence and exhibits before the North Dakota Industrial Commission or other governmental or regulatory bodies having jurisdiction over the Contract Area operations, (ii) costs and expenses in connection with preparation of drilling or division order title opinions and curing material requirements thereunder for any Oil and Gas Leases in which both Operator and Non-Operator own an interest, and (iii) consulting services including contract technical personnel necessarily and directly employed for the Contract Area for the purpose of monitoring and supervising daily drilling and/or producing activities and for which Operator is invoiced directly.

F.   Non-Consent Penalties – Unleased Mineral Owner

Notwithstanding the provisions of Article VI.B(2) herein above concerning Non-Consenting Parties, if an unleased mineral owner is a Non-Consenting Party, such unleased mineral owner shall be a Non-Consenting Party and the royalty and Non-Consent penalty applicable to the interest of such unleased mineral owner shall be the royalty and risk penalty set out in N.D. Century Code §38-08-08.3.b, as amended from time to time or any successor statute thereto. Should a party to this agreement contribute both a leasehold interest and an unleased mineral interest, the risk penalties set out in Article VI. B (2) shall only apply to the leasehold interest subject to this agreement, and this paragraph shall govern any risk penalties assessed on unleased mineral interests.

G.   Substitute Well:

Should Operator encounter mechanical or other problems with a well wherein it has commenced drilling operations but subsequently determines that it must abandon such operation, Operator may, at its sole election, permit a substitute/twin well in the same objective Zone, obtain a new API number for such well and drill a substitute well subject to following limitations:

   a.   The total costs for the abandoned well that have been incurred or committed, plus the estimated costs of plugging and abandoning such well, shall not have exceeded twenty-five percent (25%) of the prior approved AFE for such well, and

   b.   The substitute well must be spud within ninety (90) days of the abandonment of the abandoned well.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

If Operator elects to drill the substitute well, Operator will re-propose the substitute well to Non-Operator pursuant to the provisions of Article VI.B.2 and Non-Operator will have the right within the time periods set forth in Article VI.B.2 to elect whether it is a Consenting Party to such substitute well or, if it does not timely elect to be a Consenting Party, it shall have forfeited all of its interest in such substitute well; provided that the Operator may carry out drilling operations for the substitute well during the time periods set forth in Article VI.B.2 during which Non-Operator has the right to elect whether it is a Consenting Party to such substitute well, and the requirement to re-propose the well shall in no way delay commencement of drilling operations on the substitute well.

If conditions (a) and (b) have been met, all costs incurred and/or committed on the abandoned well may be migrated to the AFE for the substitute well.

H.  Additional Acquired Interest:

Should any party hereto acquire any Oil and Gas Leases or Interests within the boundaries of the Contract Area that are not subject to this agreement, such uncommitted Lease or Interest shall be deemed committed and subject to this agreement upon the effective date of such acquisition, and the Lease and/or Interest shall be depicted on Exhibit "A" hereto to the extent and only to the extent such Oil and Gas Leases or Interests are located within the boundaries of the Contract Area; provided, however, that even if such Lease or Interest is not depicted on Exhibit "A" hereto it shall nonetheless be committed to, and be deemed to be reflected on, and subject to this agreement. The interests of the parties hereto contained on Exhibit "A" shall be revised on an acreage basis, as of the effective date of such acquisition, and Operator shall have the right to unilaterally (without requiring the signature of any Non-Operator) amend Exhibit "A" to this agreement to account for any additional acquired Oil and Gas Lease or Oil and Gas Interest within the boundaries of the Contract Area and to reflect the additional Lease or Interest credited to the acquiring party and any corresponding reduction in interest of all other parties hereto.  For avoidance of doubt, if any Oil and Gas Lease contains lands that lie both inside and outside the Contract Area then only that portion of the Oil and Gas Lease that contains lands located within Contract Area shall be committed to this agreement and the corresponding Exhibit "A" and the lands on the Oil and Gas Lease located outside of the Contract Area shall not be committed to this agreement or the corresponding Exhibit "A".

I.  Fair Meaning of the Provisions:

This agreement shall not be interpreted strictly for or against any party hereto, but strictly in accordance with the fair meaning of the provisions hereof to effectuate the purposes and intent of this agreement.

J.  Drafted by All Parties:

This agreement, and all the provisions of this agreement, shall be deemed drafted by all parties hereto and arrived at by mutual negotiation.

K.  Section Titles:

The section titles are for the convenience of the parties hereto and are not intended to be used for the purpose of construing or interpreting the meaning of any section.

L.  Invalid Provisions:

In the event any provision contained in this agreement is contrary to any law, rule, regulation or order and is held to be invalid, void, illegal or unenforceable in any respect, the parties hereto shall either modify the provision to properly conform with such law, rule, regulation or order or delete such provision from this agreement, and in either case the remaining provision hereof shall remain unaffected and will continue in full force and effect.

M.  Other JOAs

In the event any portion of the Oil and Gas Leases or Oil and Gas Interests insofar and only insofar as the Oil and Gas Leases or Oil and Gas Interests are located within the boundaries of the Contract Area, whether now owned or acquired by a party hereto following the date of this agreement, is or becomes governed by a joint operating agreement to which a third party is a party (a "Third Party Operating Agreement"), the terms of that Third Party Operating Agreement shall control; provided, however, that this agreement will apply as between the parties hereto.  Notwithstanding anything in this agreement to the contrary, as it relates to the parties hereto, and all Affiliates of the parties hereto, the terms of this agreement shall supersede and entirely replace any other Joint Operating Agreement covering any lands in the Contract Area.

N.  Other Losses

The following shall be inserted in Article IV.B.3:

"All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1 and IV.B. 2 above, shall be individual losses to the party credited with contributing the affected Lease or Interest to the Contract Area. This shall include but not be limited to the loss or partial loss of any Lease, Interest, or portion of either through failure to develop, or because express or implied covenants have not been performed (other than performance that requires only the payment of money), and the loss of any Lease by expiration of the primary term if it is not renewed or extended. Unless the party contributing such Lease or Interest secures a new Lease or Interest to replace the loss within ninety (90) days from discovery of the loss, the interest of the

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party incurring the loss shall no longer be credited with the Lease or Interest which has terminated. If the party bearing such loss shall not have been fully reimbursed at the time of the loss from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for such unrecovered costs previously paid in in the same manner as provided in Article IV.B.2."

O.   Transfers

In the event that any Operator or Non-Operator party hereto sells, transfers or assigns, any or all of its leasehold estate committed to this agreement, the transferring Operator or Non-Operator, as applicable shall be released from all of the obligations under this agreement relating to the period beginning on the date of any such sale, transfer or assignment, provided that the transferee or assignee has agreed to assume such obligations. If the Operator resigns or is removed, the Operator has no further liabilities under this agreement as Operator relating to the period after the effective date of any such removal or resignation.

P.   Time is of the Essence

The parties agree that time is of the essence with respect to this agreement.

Q.   Carried Interests

It is agreed by the parties that should an Oil and Gas Interest(s) owned by a third party be unleased or otherwise uncommitted to this agreement or the drilling of a proposed well on the Contract Area, Operator may offer (but shall not be obligated to offer) to the Non-Operators the right to share the cost and/or net revenue interest burden represented by such uncommitted interest(s) proportionate to their respective ownership interests in the proposed well.  In no event shall this provision be interpreted to mean that either party hereto is obligated to agree to share the costs and/or the net revenue burden represented by such uncommitted interest.

R.   Testing Operations

Notwithstanding anything contained in this agreement to the contrary, Operator shall have the exclusive right to conduct all testing and other types of data gathering activities or operations on the Contract Area, provided, however, that any party hereto, including without limitation the Operator, may but is not required to propose such activities or operations to the other parties hereto.  Any party hereto that participates in such activities or operations shall, upon paying for its share of the applicable costs, be entitled to receive any of the raw results obtained therefrom.

S.   Midstream Rights

Notwithstanding anything contained in this agreement to the contrary, the parties hereto understand and agree that this agreement does not grant, convey or entitle any party to any rights or claims of any type or nature, and shall never be used as a basis for granting, conveying or asserting any rights or claims of any type or nature, to any past, current or future midstream assets of any type owned, operated, acquired or constructed, or to be owned, operated, acquired or constructed, by a party hereto, including without limitation, any gathering, transportation, processing, compression, stabilizing, storage, gas lift, treatment, produced water, or fresh water assets, regardless of whether such assets currently exist or are located on or off of the Contract Area (collectively "Midstream Assets").  Each party hereto agrees that it shall not, directly or indirectly (and shall cause each of its Affiliates and its and their respective officers and directors not to, directly or indirectly) initiate, assign, maintain, threaten or prosecute, or in any way aid, encourage or assist any other person (as the term "person" is defined in the definition of Affiliate in Note 1 of Article XVI of this agreement) in connection with the initiation, maintenance, threat or prosecution of, any rights or claims to participate in the construction, ownership, operation, or acquisition of any Midstream Assets under this agreement.

T.   Post-Production Deductions

Notwithstanding anything contained in this agreement to the contrary, Non-Operators understand and agree that if the Operator purchases or sells the Oil and/or Gas for a Non-Operator in connection with Article VI.G, then the Operator shall be entitled to charge post-production deductions, costs or expenses to the Non-Operators, including without limitation those charged by Affiliates of Operator, as provided in Article VI.G.

U.   Limitation on Damages

NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, WITH RESPECT TO ANY DISPUTE, CLAIM, COUNTERCLAIM, CONTROVERSY OR OTHER MATTERS ("DISPUTE") ARISING BETWEEN THE PARTIES HERETO OUT OF OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, OR ANY ALLEGED BREACH THEREOF, OR THE RELATIONSHIP BETWEEN THE PARTIES HERETO CREATED BY THIS AGREEMENT, EVEN THOUGH SOME OR ALL OF SUCH DISPUTES MAY BE EXTRA-CONTRACTUAL IN NATURE, AND WHETHER SOUNDING IN TORT, CONTRACT, WARRANTY OR OTHERWISE, INCLUDING ALLEGATIONS OF FRAUD IN THE INDUCEMENT, DUTY TO DEAL IN GOOD FAITH OR CONFIDENTIAL RELATIONSHIP, NO PARTY HERETO SHALL EVER BE LIABLE FOR EXEMPLARY, PUNITIVE, CONSEQUENTIAL, SPECIAL, OR INCIDENTAL DAMAGES, INCLUDING LOST PROFITS, BUSINESS INTERRUPTION OR LOSS OF OPPORTUNITY, WHETHER SUCH DAMAGES ARE CLAIMED UNDER BREACH OF CONTRACT, BREACH OF WARRANTY, TORT OR ANY OTHER THEORY OR CAUSE OF ACTION AT LAW OR IN EQUITY.  THE PROVISIONS OF THIS

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

PARAGRAPH ARE PART OF THE MATERIAL, BARGAINED-FOR CONSIDERATION FOR ENTERING INTO THIS AGREEMENT.

V.    Other Operations

The dollar amounts set forth in the first two sentences of Article VI.D and the amounts set forth in Article X shall escalate on an annual basis at the end of each calendar year in the amount of a 2% increase to the prior year's amount.

W.    Horizontal Well Acknowledgment

The drilling, completion and fracture stimulation of multiple Horizontal Wells adjacent to one or more existing Horizontal Well or Vertical Well is contemplated as a means to achieve maximum production and recovery of reserves.  The fact that such operations are conducted shall not constitute negligence, gross negligence or willful misconduct under the terms of this agreement.  All parties acknowledge and are fully aware that the drilling, fracturing and completion or any other lawful operational activity associated with an adjacent Horizontal Well(s) may impact the operation of existing Horizontal Well(s) or Vertical Well(s), including without limitation daily flow rates and recoverable reserves and that such impact may have a negative economic or other effect on any one or more of the existing Horizontal Well or Vertical Well in which the parties own an interest. Each party hereby acknowledges and agrees that the party designated as Operator (including any substitute operator permitted under this agreement) hereunder and its and their shareholders, officers, directors, subsidiaries, affiliates, agents, contractors, and employees (collectively, the "Operator Parties") shall NOT BE LIABLE, RESPONSIBLE, OR ACCOUNTABLE IN DAMAGES OR OTHERWISE TO NON-OPERATORS, OR TO OPERATOR IF IT IS A NON-CONSENTING PARTY, THEIR SHAREHOLDERS, OFFICERS, DIRECTORS, SUBSIDIARES, AFFILATIES, AGENTS, CONTRACTORS, AND EMPLOYEES (COLLECTIVELY, THE "NON-OPERATOR PARTIES") FOR ANY LOSS, LIABILITY, DAMAGE OR COSTS THAT THE NON-OPERATOR PARTIES MAY INCUR OR SUFFER AS A RESULT OF SUCH PARTY'S NON-CONSENT OR FAILURE TO PARTICIPATE PURSUANT TO THIS AGREEMENT IN ANY HORIZTONAL WELL DRILLED TO THE SAME OBJECTIVE PRODUCING ZONE AS AN EXISTING HORIZTONAL WELL OR VERTICAL WELL IN WHICH SUCH NON-OPERATOR PARTIES ARE CONSENTING PARTIES.   FURTHER, NON-OPERATOR PARTIES HEREBY RELEASE, WAIVE, DISCHARGE AND COVENANT NOT TO SUE FOR ANY CLAIM THEY MIGHT HAVE AS A RESULT OF ANY LOSS, LIABILITY, DAMAGE OR COSTS SUFFERED BY ANY NON-OPERATOR PARTY WITH RESPECT TO ITS INTEREST IN ANY EXISTING HORIZTONAL WELL(S) OR VERTICAL WELL(S) IN THE CONTRACT AREA OR OTHERWISE, ARISING OUT OF, OR RELATED TO, THE DRILLING, COMPLETION, FRACTURING STIMULATION OR ANY OTHER OPERATIONAL ACTIVITY AT A LAWFUL LOCATION ASSOCIATED WITH A HORIZONTAL WELL IN WHICH SUCH PARTY IS A CONSENTING OR A NON-CONSENTING PARTICIPANT.   THE FOREGOING RELEASE OF LIABILITY SHALL NOT COVER OR INCLUDE ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF ANY MEMBER OF OPERATOR PARTIES.

X.    Jurisdiction

NOTWITHSTANDING ANYTHING CONTAINED IN THIS AGREEMENT TO THE CONTRARY, THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE HOUSTON DIVISION OF THE SOUTHERN DISTRICT OF TEXAS, AND, ONLY IF SUCH FEDERAL COURT LACKS JURISDICTION, THE STATE COURTS OF TEXAS LOCATED IN HARRIS COUNTY, TEXAS, AND, ONLY IF SUCH STATE COURTS OF TEXAS DETERMINE THAT THEY LACK SUBJECT MATTER JURISDICTION, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE COUNTY IN WHICH THE LANDS THAT ARE THE SUBJECT OF THE DISPUTE ARE LOCATED, AND, ONLY IF SUCH FEDERAL COURT LACKS JURISDICTION, THE STATE COURTS LOCATED IN THE COUNTY IN WHICH SUCH LANDS ARE LOCATED, AND, IN EACH CASE APPROPRIATE APPELLATE COURTS THEREFROM, IN RESPECT OF ANY DISPUTE, CONTROVERSY OR CLAIM ARISING UNDER THIS AGREEMENT AND EACH PARTY AGREES THAT ANY SUCH DISPUTE, CONTROVERSY OR CLAIM SHALL BE HEARD AND DETERMINED IN SUCH COURTS, AND CONSENTS TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR ANY SUCH DISPUTE, CONTROVERSY OR CLAIM, AND THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE, CONTROVERSY OR CLAIM BROUGHT IN ANY SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF ANY SUCH DISPUTE, CONTROVERSY OR CLAIM IN ANY SUCH COURT OR THE PERSONAL JURISDICTION OF ANY SUCH COURT FOR ANY SUCH DISPUTE, CONTROVERSY OR CLAIM; PROVIDED, HOWEVER, THAT A JUDGMENT IN ANY SUCH DISPUTE, CONTROVERSY OR CLAIM MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAW. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE SERVICE OF PROCESS IN ANY SUCH DISPUTES, CONTROVERSIES OR CLAIMS IN SUCH COURTS AS MAY BE PERMITTED BY APPLICABLE LAW.

Y.    Memorandum of Operating Agreement

Operator shall be authorized to file a memorandum of operating agreement, in substantially the form attached hereto as Exhibit "H," for interests that are covered by this agreement, even if such memorandum is not executed by the Non-Operator(s); provided, that if an interest is no longer subject to this agreement, the person or entity holding such interest may require Operator to terminate the memorandum of record by recording a full or partial

Page 18-d

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

release thereof, as applicable. Operator shall have the authority to unilaterally (without requiring the signature of any Non-Operator) file a separate memorandum of operating agreement, in substantially the form attached hereto as Exhibit "H," or amendments or supplements to any such memorandum, including for the avoidance of doubt, to evidence an amended Exhibit "A" to this agreement accounting for any additional Oil and Gas Lease or Oil and Gas Interest, insofar and only insofar as the additional Oil and Gas Lease or Oil and Gas Interest is located within the boundaries of the Contract Area acquired by a party after the date of this agreement. This agency is coupled with an interest and shall be irrevocable.

Z.  Information Rights

Notwithstanding anything contained in this agreement to the contrary, except for the information in Exhibit "G" to this agreement, the Operator shall not be required to provide any information to any Non-Operator or Affiliate of Non-Operator except to the extent expressly required in this agreement; provided, however, that Operator shall not be required to provide information to any Non-Operator or its Affiliate pursuant to Article V of this agreement, other than as set forth in Exhibit "G".

AA. NDIC

Notwithstanding anything contained in this agreement to the contrary, any removal of Operator pursuant to Article V.B. or otherwise in this agreement shall not be effective until the North Dakota Industrial Commission issues an order removing such party as Operator and appointing a new Operator.

BB. Intentionally Omitted

CC. Intentionally Omitted.

DD. Intentionally Omitted

EE. Confidential Information

Each Non-Operator acknowledges that in the course of Operator's conduct pursuant to this agreement, including, for the avoidance of doubt, the exhibits hereto, the Non-Operator will receive information from or regarding the Operator in the nature of trade secrets or that otherwise is confidential information or proprietary information (as such information received in the course of Operator's conduct pursuant to this agreement, "Confidential Information"), the release of which would be damaging to the Operator and/or Affiliates or third parties with which Operator conducts business. Confidential Information shall include the information in Exhibit "G" to this agreement. Each Non-Operator shall hold in strict confidence any Confidential Information that it receives, and each Non-Operator shall not disclose such Confidential Information to any person (including any other Non-Operator and any Affiliates of Non-Operator) other than another Operator or an Affiliate of Operator, or otherwise use such information for any purpose other than to conduct the audit or exercise its rights under this agreement pursuant to which such Confidential Information was provided by Operator, except for disclosures which are required in order for Non-Operator to comply with any applicable laws or governmental regulations, provided, however, that the Non-Operator must notify the Operator promptly of any disclosure of Confidential Information which is required by law or governmental regulations, and any such disclosure of Confidential Information shall be to the minimum extent required by law or governmental regulations. For the avoidance of doubt, nothing in this provision shall be deemed to impose any duty of confidentiality upon Operator or its Affiliates with respect to the Confidential Information.

FF. Audit Rights

Notwithstanding anything contained in this agreement to the contrary, with respect to Operator and its Affiliates, Non-Operators' audit rights are limited to those rights expressly set forth in Exhibit "C," Exhibit "E" and Exhibit "J" to this agreement. Notwithstanding the any other provision contained herein, under no circumstances may any Non-Operator conduct any audit of the Operator's revenues earned from activities conducted under this agreement, except to the extent provided under Exhibit "E" and Exhibit "J" to this agreement. Furthermore, all audits shall be limited to expenditures charged to the Joint Account except to the extent provided under Exhibit "E" and Exhibit "J".

GG. Contract Area Interpretation

Any reference in this agreement to the Contract Area, or to a party's interest in Oil and Gas Leases or Oil and Gas Interests located in the Contract Area, shall refer to the applicable Contract Area or such party's interest in Oil and Gas Leases or Oil and Gas Interests located in the applicable Contract Area, in all cases, as set forth on, or deemed to be set forth on, Exhibit "A" to this agreement. This agreement covers and includes an Oil and Gas Lease or Oil Gas Interests covering lands in the Contract Area whether owned jointly by one or more parties or owned solely by a party.

HH. The Operator shall have the right, using its reasonable discretion, and without the consent of any Non-Operator, to conduct so-called "frac protect" operations on any well at time if the Operator deems such operation to be necessary to protect the integrity, production or safety of such well.

II.  Notes

Note 1, Article I, I, Definitions:

"Affiliate" means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means (i) the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of

Page 18-e

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

a corporation or, for other persons, the equivalent ownership interest (such as partnership interests) or (ii) the possession, directly or indirectly, of the power to direct, or cause or influence the direction of, the management of such person, whether through ownership of voting securities, by contract, or otherwise, and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity. (This definition is identical to the definition of "Affiliate" found in COPAS, Exhibit "C" attached hereto)

Note 1.A, Article I, I, Definitions:

For the avoidance of doubt, except to the extent expressly provided to the contrary, and except as provided otherwise in Exhibit "E", all references to "this agreement" in Articles I through XVI and all exhibits attached hereto shall be deemed to incorporate all exhibits to this agreement.

Note 2, Article V.B.2, Selection of Successor Operator:

It is expressly understood and agreed that in the event the Operator conveys all of its working interest in the Contract Area, and the transfer agreement grants such rights to the transferee, the party that acquires such interest shall be entitled to vote with that interest for any party, including itself, as successor Operator, provided that the transferee shall not be entitled to vote for itself as the successor Operator if the Operator has been removed under this agreement prior to the date of such transfer.

Note 3, Article V.A., Designation and Responsibility of Operator:

Non-Operators hereby designate and appoint Operator as their agent and attorney-in-fact for the sole purpose of executing, filing for approval by a governmental agency if required under applicable law or regulation, and recording a declaration of pooling or communitization agreement to effectuate the pooling or communitization of the Oil and Gas Leases (to the extent legally allowed under their respective terms and conditions).

Note 4, Article VI.B.1, Proposed Operations:

If, in the Operator's reasonable judgment, there is a material change in scope to VI.B.1.(2)(i),(iii) and (iv) (Total Measured Depth(s), Terminus/Termini, and Displacement(s)), wherein the projected aggregate AFE costs for such materially changed operation would exceed one hundred twenty-five percent (125%) of the total AFE costs on an approved AFE, the applicable proposal must be withdrawn and a new proposal shall be submitted to the Consenting Parties for balloting purposes. If there is a change in objective Zone described in Article VI.B.1.(2)(v), the applicable proposal must be withdrawn and a new proposal shall be submitted to all parties for balloting purposes, regardless of whether the costs would exceed one hundred twenty-five percent (125%) of the total AFE costs on an approved AFE. The parties shall have thirty (30) days or forty-eight (48) hours to elect, whichever is applicable, as defined in Article VI.B.1. The terms of this provision do not apply to costs associated with mechanical failures or emergencies. Furthermore, the parties acknowledge that the "estimate" in VI.B.1 is an estimate only, and that the actual costs and charges related to the underlying operation may be materially different from such estimates. To the extent a new proposal is issued pursuant to this paragraph, and a Consenting Party elects to become a Non-Consenting Party, then such election to become a Non-Consenting Party shall only apply to the time period from and after such election is made and such Non-Consenting Party shall remain liable for all costs incurred prior to such election.

Note 5, Article VI.B.5, Sidetracking:

Drilling operations which are intended to re-establish penetration of objective formation(s) which are conducted in a Horizontal Well shall be considered as included in the original proposed drilling operation.

Note 6, Article VI.B.9, Spudder Rigs:

Operator has the right but not the obligation to utilize Spudder Rigs.

Note 7, Article VII.D.1, Suspension of Rights:

This provision shall only be applicable if a party's payments are more than sixty (60) days past due.

Note 8, Article VIII.D, Assignment:

In the event that a party hereto sells, encumbers, transfers or otherwise disposes of the interests in Oil and Gas Leases, Oil and Gas Interests or wells and as the result of such sale, encumbrance, transfer, or disposition, separate holding or measuring facilities are needed, the party making the sale, encumbrances, transfer or disposition shall pay all of the costs of such facilities.

Note 9, Article XII, Notices:

Each Email Notice shall clearly state that it is a notice or response to a notice under this agreement. An Email Notice shall be deemed delivered only when affirmatively acknowledged by email reply from the receiving party. Automatic delivery receipts issued, without direct acknowledgment of the Email Notice, are not evidence of Receipt for purposes of this agreement. With respect to a well proposal notice, if the receiving party fails or declines to affirmatively acknowledge an Email Notice, then Receipt of the notice shall only be deemed to have occurred when the well proposal is received by the party as otherwise provided in Article XII.

Note 10, Article XIV.A., Laws, Regulations and Orders:

Page 18-f

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Each party hereto agrees that it and its Affiliates have not made, offered, authorized, requested, received or accepted, and will not make, offer, authorize, request, receive or accept, with respect to the matters which are the subject of this agreement, any payment, gift, promise or other advantage, whether directly or indirectly through any other person or entity, to or for the use or benefit of any person, where such payment, gift, promise or advantage would violate applicable anti-corruption laws of the United States or the country of incorporation of such party or such party's ultimate parent company, or of the principal place of business of such ultimate parent company.

Note 11, Article XIV.C., Regulatory Agencies:

Non-Operators agree that, to the best of their ability, they shall timely provide Operator with all the documentation, affidavits, reports, or other materials and information which Operator must have in order to perform those tasks and make the necessary reports to the regulatory authorities.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

IN WITNESS WHEREOF, this agreement shall be effective as of the ___28th___ day of _____September, 2020_____ .


**ATTEST OR WITNESS:**

**OPERATOR**
**OASIS PETROLEUM NORTH AMERICA LLC_____**

By _____

 Taylor L. Reid_____
Type or print name


Title _President and Chief Operating Officer_____

Date _September_____ , 2020_____

Tax ID or S.S. No.  _____

**Email** _____


**NON-OPERATORS**

**MIRADA WILD BASIN HOLDING COMPANY, LLC, SIGNING ON BEHALF OF ITSELF, AND AS AGENT FOR, MIRADA ENERGY, LLC, MIRADA ENERGY FUND I, LLC, MIRADA F&C LLC, ORRION ENERGY, LLC, MCP ORION, LLC, MCP HOLDING COMPANY, LLC, MIRADA MANAGER, LLC, MIRADA HOLDING COMPANY, LLC, BRISBANE PROPERTIES LLC, AND GREAT BARRIER ENERGY, LLC.**

By _____

 Adam Boniel_____
Type or print name

Title _President_____

Date _September_____ , 2020_____

Tax ID or S.S. No.  _____

**Email** _____

By _____

_____
Type or print name

Title _____

Date _____

Tax ID or S.S. No.  _____
**Email** _____

By _____

_____
Type or print name

Title _____

Date _____

Tax ID or S.S. No.  _____

-19-

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect

of these forms in any state will depend upon the statutes of that state.

State of    _____ )

                                ) ss.

County of   _____ )

This instrument was acknowledged before me on

by **Adam Boniel**                   as

**President** of **MIRADA WILD BASIN HOLDING COMPANY, LLC**   .

signing on behalf of itself, and as agent for, Mirada Energy, LLC, Mirada Energy Fund I, LLC, Mirada F&C LLC, Orrion Energy, LLC, McP Orion, LLC, MCP Holding Company, LLC, Mirada Manager, LLC, Mirada Holding Company, LLC, Brisbane Properties LLC, and Great Barrier Energy, LLC.

(Seal, if any)

                                            _____

                                            Title (and Rank)   _____

                                            My commission expires   _____

State of    _____ )

                                ) ss.

County of   _____ )

This instrument was acknowledged before me on

by **Taylor L. Reid**                   as

**President and Chief Operating Officer** of **Oasis Petroleum North America LLC**   .

(Seal, if any)

                                            _____

                                            Title (and Rank)   _____

                                            My commission expires   _____

**EXHIBIT "A"**

Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020, by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.

1. Identification of lands subject to this agreement (which shall include, in addition to the items specified below, all lands included within any drilling and spacing units and/or an area of land designated as a section in accordance with the Public Land Survey System of the United States in which (i) Operator under this agreement, or any of its Affiliates, is the designated operator, or is in the process of applying for a well permit with the applicable governmental agency which would likely result in it becoming the operator, of one or more well(s), as identified by the relevant governmental agencies in the States of North Dakota or Montana, and (ii) both Operator and Non-Operator, and/or the respective Affiliates thereof, (A) own an Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore (including any section line wellbores) interest as of the date of this agreement and/or (B) hereafter acquire an Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest, but as to such hereafter acquired Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest, only if Operator and/or its Affiliates acquired its interest in such Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest prior to the date Non-Operator and/or its Affiliates acquired their interest in such Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest, as reflected by the public land records of the county in which the lands covered by such Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest are located). Without limiting the foregoing, the Contract Area includes, without limitation, all of the lands located in the following drilling and spacing units:

| Drilling And Spacing Unit Name (entire Drilling And Spacing Unit is subject to this agreement) | Township/Range/Section | County | State |
|---|---|---|---|
| A JOHNSON 12-1H | 152-98-1/12 | McKenzie | ND |
| A JOHNSON 12-1H (2560) | 152-97-1/6/7/12 | McKenzie | ND |
| BERQUIST 33-28H | 152-98-28/33 | McKenzie | ND |
| BERQUIST 33-28H (2560) | 152-98-27/28/33/34 | McKenzie | ND |
| BERQUIST 34-27H | 152-98-27/34 | McKenzie | ND |
| BERQUIST 34-27H (2560) | 152-98-26/27/34/35 | McKenzie | ND |
| CATHERINE 2759 12-17H | 27-59-5/8 | Roosevelt | MT |
| CEYNAR 29-32H | 152-98-29/32 | McKenzie | ND |
| CEYNAR 29-32H (2560) | 152-98-28/29/32/33 | McKenzie | ND |
| CORNELL 5501 13-1H | 155-101-1/12 | Williams | ND |
| ELLA MARIE 2759 42-9H | 27-59-4/9 | Roosevelt | MT |
| FORLAND 28-33H | 151-98-28/33 | McKenzie | ND |
| FORLAND 28-33H (2560) | 151-98-28/29/32/33 | McKenzie | ND |
| HAGEN 31-30H | 152-98-30/31 | McKenzie | ND |
| HAGEN 31-30H (2560) | 152-98-29/30/31/32 | McKenzie | ND |
| HAGEN 31-30H (2560) (2) | 152-98-25/30/31/36 | McKenzie | ND |
| JOHNSRUD 19-18H | 151-98-18/19 | McKenzie | ND |
| JOHNSRUD 19-18H  (2560) | 151-98-17/18/19/20 | McKenzie | ND |
| JOHNSRUD 19-18H  (2560) (2) | 151-98-13/18/19/24 | McKenzie | ND |
| LAWLAR 23-14H (2560) | 151-99-13/14/23/24 | McKenzie | ND |
| LAWLAR 26-35H | 151-99-26/35 | McKenzie | ND |
| LAWLAR 26-35H (2560) | 151-99-25/26/35/36 | McKenzie | ND |
| LUNDEEN 4-26H | 152-98-26/35 | McKenzie | ND |
| LUNDEEN 4-26H (2560) | 152-98-25/26/35/36 | McKenzie | ND |
| MARY WILSON 10-3H | 27-59-3/10 | Roosevelt | MT |
| MILDRED NELSON 4-25H (2560) | 152-97-25/30/31/36 | McKenzie | ND |
| MILDRED NELSON 4-25H | 152-98-25/36 | McKenzie | ND |
| NELSON 11-2H | 152-98-2/11 | McKenzie | ND |
| NELSON 11-2H (2560) | 152-98-1/2/11/12 | McKenzie | ND |
| NELSON 14-23H | 152-98-14/23 | McKenzie | ND |
| NELSON 14-23H (2560) | 152-98-14/15/22/23 | McKenzie | ND |
| NELSON 14-23H (2560) (2) | 152-98-13/14/23/24 | McKenzie | ND |

| | | | |
|---|---|---|---|
| NORDENG 24-13H | 152-98-13/24 | McKenzie | ND |
| NORDENG 24-13H  (2560) | 152-97-13/18/19/24 | McKenzie | ND |
| PATSY 5-8H | 151-98-5/8 | McKenzie | ND |
| PEDERSON 1-10H | 152-98-3/10 | McKenzie | ND |
| ROLFSON 20-17H | 151-98-17/20 | McKenzie | ND |
| ROLFSON 20-17H (2560) | 151-98-16/17/20/21 | McKenzie | ND |
| ROLFSON 29-32H | 151-98-29/32 | McKenzie | ND |
| ROLFSON 29-32H (2560) | 151-98-29/30/31/32 | McKenzie | ND |
| ROLFSRUD 18-19H | 152-97-18/19 | McKenzie | ND |
| ROLFSRUD 18-19H (2560) | 152-97-17/18/19/20 | McKenzie | ND |
| ROLFSRUD 7-6H | 152-97-6/7 | McKenzie | ND |
| ROLFSRUD 7-6H (2560) | 152-97-5/6/7/8 | McKenzie | ND |
| TALEN 2759 43-7H | 27-59-6/7 | Roosevelt | MT |
| WHITE 6-7H | 151-98-6/7 | McKenzie | ND |
| WHITE 6-7H (2560) | 151-98-1/6/7/12 | McKenzie | ND |
| WHITE 6-7H (2560) (2) | 151-98-5/6/7/8 | McKenzie | ND |
| WOLD 15-33H | 153-97-28/33 | McKenzie | ND |
| WOLD 34-27H | 153-97-27/34 | McKenzie | ND |

**2.**     **Restrictions as to Depths: None**

**3.**     **Wells Subject to this Agreement and Percentage Interest of the Parties:**

The working interest of each party is its interest reflected of record as of the date of this agreement, or with respect to a subsequently acquired Oil and Gas Interest, Oil and Gas Lease, mineral or working interest, and/or wellbore interest described in section 1 of this Exhibit "A," at the time of such acquisition. This agreement covers all wells located on the Contract Area that are operated by the Operator or its Affiliates and in which Non-Operator also owns an interest, including, without limitation, the following:

| Well Name | Township/Range/Section |
|---|---|
| MARY WILSON 10-3H | 27-59-3/10 |
| ELLA MARIE 2759 42-9H | 27-59-4/9 |
| CATHERINE 2759 12-17H | 27-59-5/8 |
| TALEN 2759 43-7H | 27-59-6/7 |
| ROMO BRO MARGARET 2759 43-9B | 27-59-4/9 |
| ROMO BRO RAY 2759 43-9B | 27-59-4/9 |
| HERB 5501 14-1B | 155-101-1/12 |
| MARLENE 5501 14-1T | 155-101-1/12 |
| VAUGHN BECKY 5501 11-1B | 155-101-1/12 |
| NADINE BOB 5501 11-1T | 155-101-1/12 |
| KALEB 5501 12-1B | 155-101-1/12 |
| HANNAH-KAYDENCE 5501 12-1T | 155-101-1/12 |
| A. JOHNSON 12-1H | 152-98-1/12 |
| AAGVIK 1-35H | 152-98-35 |
| BERQUIST 33-28H | 152-98-28/33 |
| BERQUIST 34-27H | 152-98-27/34 |
| CEYNAR 29-32H | 152-98-29/32 |
| FORLAND 28-33H | 151-98-28/33 |
| HAGEN 31-30H | 152-98-30/31 |
| JOHNSRUD 19-18H | 151-98-18/19 |
| LAWLAR 26-35H | 151-99-26/35 |
| LUNDEEN 4-26H | 152-98-26 |
| NELSON 11-2H | 152-98-2/11 |
| NELSON 14-23H | 152-98-14/23 |
| NORDENG 24-13H | 152-98-13/24 |
| PATSY 5-8HTF | 151-98-5/8 |
| PEDERSON 10-3H | 152-98-3/10 |
| ROLFSON 20-17H | 151-98-17/20 |

| | |
|---|---|
| ROLFSON 29-32H | 151-98-29/32 |
| ROLFSRUD FEDERAL 18-19H | 152-97-18/19 |
| ROLFSRUD 7-6H | 152-97-6/7 |
| WHITE 6-7H | 151-98-6/7 |
| WOLD 34-27H | 153-97-27/34 |
| HAGEN BANKS 5298 #42-31 2T2 | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 3T | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 4T2 | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 5B | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 6T | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 7T3 | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 8B | 152-98-30/31 |
| CORNELL 5501 14-1 8T2 | 155-101-1/12 |
| WHITE 5198 12-6 4T2 | 151-98-6/7 |
| WHITE 5198 12-6 3T | 151-98-6/7 |
| WHITE 5198 12-6 2T3 | 151-98-6/7 |
| WHITE 5198 12-6 1T2 | 151-98-6/7 |
| WHITE 5198 13-6 13T3 | 151-98-6/7 |
| WHITE 5198 13-6 14T | 151-98-6/7 |
| WHITE 5198 13-6 12B | 151-98-6/7 |
| OYLOE 5199 42-23 2B | 151-99-26/35 |
| JOHNSRUD 5198 12-18 5B | 151-98-18/19 |
| ROLFSON N 5198 11-17 2B | 151-98-17/20 |
| ROLFSON S 5198 12-29 5B | 151-98-29/32 |
| FORLAND 5198 41-33 3B | 151-98-28/33 |
| OYLOE 5199 42-23 4B | 151-99-26/35 |
| OYLOE 5199 42-23 3T | 151-99-26/35 |
| OYLOE 5199 42-23 5T | 151-99-26/35 |
| OYLOE 5199 42-23 6B | 151-99-26/35 |
| OYLOE 5199 42-23 7T | 151-99-26/35 |
| OYLOE 5199 43-23 8T | 151-99-26/35 |
| OYLOE 5199 43-23 9B | 151-99-26/35 |
| OYLOE 5199 14-26 10T | 151-99-26/35 |
| OYLOE 5199 14-26 11B | 151-99-26/35 |
| FORLAND 5198 41-33 5B | 151-98-28/33 |
| FORLAND 5098 13-4 7B | 151-98-28/33 |
| FORLAND 5098 13-4 9B | 151-98-28/33 |
| FORLAND 5198 44-33 12B | 151-98-28/33 |
| FORLAND 5198 41-33 2TX | 151-98-28/29/32/33 |
| ROLFSON S 5198 41-33 14BX | 151-98-28/29/32/33 |
| JOHNSRUD 5198 12-18 6T | 151-98-18/19 |
| JOHNSRUD 5198 12-18 4T2 | 151-98-18/19 |
| JOHNSRUD 5198 12-18 7B | 151-98-18/19 |
| JOHNSRUD 5198 12-18 10T | 151-98-18/19 |
| JOHNSRUD 5198 12-18 8T2 | 151-98-18/19 |
| JOHNSRUD 5198 12-18 9B | 151-98-18/19 |
| JOHNSRUD 5198 14-18 11T | 151-98-18/19 |
| JOHNSRUD 5198 14-18 13T | 151-98-18/19 |
| JOHNSRUD 5198 14-18 12B | 151-98-18/19 |
| JOHNSRUD 5198 14-18 15TX | 151-98-17/18/19/20 |
| ROLFSON N 5198 11-17 3T | 151-98-17/20 |
| ROLFSON N 5198 11-17 4B | 151-98-17/20 |
| ROLFSON N 5198 12-17 5T | 151-98-17/20 |
| ROLFSON N 5198 12-17 6B | 151-98-17/20 |
| ROLFSON N 5198 12-17 7T | 151-98-17/20 |
| ROLFSON N 5198 13-17 8T | 151-98-17/20 |
| ROLFSON N 5198 14-17 9B | 151-98-17/20 |

| | |
|---|---|
| ROLFSON N 5198 14-17 10T | 151-98-17/20 |
| ROLFSON N 5198 14-17 11BX | 151-98-16/17/20/21 |
| ROLFSON S 5198 11-29 4T | 151-98-29/32 |
| ROLFSON S 5198 12-29 6T | 151-98-29/32 |
| ROLFSON S 5198 12-29 7B | 151-98-29/32 |
| ROLFSON S 5198 12-29 8T | 151-98-29/32 |
| ROLFSON S 5198 43-20 9B | 151-98-29/32 |
| ROLFSON S 5198 43-20 10T | 151-98-29/32 |
| ROLFSON S 5198 14-29 11T | 151-98-29/32 |
| ROLFSON S 5198 14-29 12B | 151-98-29/32 |
| ROLFSON S 5198 11-29 2TX | 151-98-29/30/31/32 |
| ROLFSON S 5198 11-29 3BX | 151-98-29/30/31/32 |
| PATSY 5198 12-17 6B | 151-98-5/8 |
| PATSY 5198 12-17 5T | 151-98-5/8 |
| PATSY 5198 12-17 8B | 151-98-5/8 |
| PATSY 5198 12-17 7T | 151-98-5/8 |
| PATSY 5198 12-17 10B | 151-98-5/8 |
| PATSY 5198 12-17 9T | 151-98-5/8 |
| PATSY 5198 14-17 11B | 151-98-5/8 |
| PATSY 5198 14-17 12T | 151-98-5/8 |
| PATSY 5198 12-17 4B | 151-98-5/8 |
| PATSY 5198 14-17 13B | 151-98-5/8 |
| WHITE 5198 12-6 6T | 151-98-6/7 |
| WHITE 5198 12-6 5B | 151-98-6/7 |
| WHITE 5198 13-6 15T | 151-98-6/7 |
| WHITE 5198 12-6 7B | 151-98-6/7 |
| WHITE 5198 11-18 8TX | 151-98-1/6/7/12 |
| PATSY 5198 11-5 2BX | 151-98-5/6/7/8 |
| PATSY 5198 11-5 3TX | 151-98-5/6/7/8 |
| LAWLAR N FEDERAL 5199 44-23 11BX | 151-99-13/14/23/24 |
| LAWLAR N FEDERAL 5199 44-23 12TX | 151-99-13/14/23/24 |
| JOHNSRUD 5198 14-18 14B | 151-98-18/19 |
| JOHNSRUD FEDERAL 5198 11-18 3BX | 151-98-13/18/19/24 |
| OYLOE 5199 14-26 12TX | 151-99-25/26/35/36 |
| ROLFSON S 5198 14-29 13T | 151-98-29/32 |
| CEYNAR 5198 12-5 6B | 152-98-29/32 |
| CEYNAR 5198 12-5 7T | 152-98-29/32 |
| CEYNAR 5298 42-32 8B | 152-98-29/32 |
| CEYNAR 5298 42-32 9T | 152-98-29/32 |
| CEYNAR 5298 42-32 10B | 152-98-29/32 |
| CEYNAR 5298 42-32 11T | 152-98-29/32 |
| CEYNAR 5298 44-32 12T | 152-98-29/32 |
| CEYNAR 5298 44-32 13B | 152-98-29/32 |
| HAGEN BANKS 5198 13-6 10T | 152-98-30/31 |
| HAGEN BANKS 5198 13-6 11B | 152-98-30/31 |
| MURI 5298 14-28 13TX | 152-98-27/28/33/34 |
| CEYNAR 5198 11-5 3TX | 152-98-29/30/31/32 |
| CEYNAR 5298 44-32 14TX | 152-98-28/29/32/33 |
| AAGVIK 5298 41-35 3BX | 152-98-26/27/34/35 |
| BERQUIST 5298 11-27 2B | 152-98-27/34 |
| BERQUIST 5298 11-27 3T | 152-98-27/34 |
| BERQUIST 5298 11-27 4T | 152-98-27/34 |
| BERQUIST 5298 11-27 5B | 152-98-27/34 |
| BERQUIST 5298 13-27 6T | 152-98-27/34 |
| BERQUIST 5298 13-27 7B | 152-98-27/34 |
| BERQUIST 5298 13-27 8T | 152-98-27/34 |
| MURI 5198 11-4 3B | 152-98-28/33 |

| | |
|---|---|
| MURI 5198 11-4 4T | 152-98-28/33 |
| MURI 5198 12-4 5B | 152-98-28/33 |
| MURI 5198 12-4 6T | 152-98-28/33 |
| MURI 5198 12-4 7B | 152-98-28/33 |
| MURI 5198 12-4 8T | 152-98-28/33 |
| HAGEN BANKS 5198 12-6 9BX | 152-98-25/30/31/36 |
| HAGEN BANKS 5198 13-6 12T | 152-98-30/31 |
| CEYNAR 5198 12-5 4B | 152-98-29/32 |
| CEYNAR 5198 12-5 5T | 152-98-29/32 |
| CEYNAR 5198 11-5 2BX | 152-98-29/30/31/32 |
| CEYNAR 5298 44-32 15BX | 152-98-28/29/32/33 |
| MURI 5298 14-28 9T | 152-98-28/33 |
| MURI 5298 14-28 10B | 152-98-28/33 |
| MURI 5198 11-4 2T | 152-98-28/33 |
| BERQUIST 5298 13-27 9B | 152-98-27/34 |
| AAGVIK 5298 41-35 2TX | 152-98-26/27/34/35 |
| HAGEN BANKS 5198 12-6 13TX | 152-98-25/30/31/36 |
| WOLD FEDERAL 15-33H | 153-97-28/33 |
| AAGVIK 5298 41-35 4T | 152-98-26/35 |
| AAGVIK 5298 41-35 5B | 152-98-26/35 |
| AAGVIK 5298 41-35 6T | 152-98-26/35 |
| AAGVIK 5298 42-23 7B | 152-98-26/35 |
| AAGVIK 5298 42-23 8T | 152-98-26/35 |
| AAGVIK 5298 42-23 9B | 152-98-26/35 |
| AAGVIK 5298 13-26 10T | 152-98-26/35 |
| AAGVIK 5298 13-26 11B | 152-98-26/35 |
| AAGVIK 5298 14-26 14TX | 152-98-25/26/35/36 |
| AAGVIK 5298 14-26 13BX | 152-98-25/26/35/36 |
| MILDRED NELSON FED 5297 11-30 11TX | 152-97-25/30/31/36 |
| MILDRED NELSON FED 5297 11-30 12BX | 152-97-25/30/31/36 |
| MILDRED NELSON 5298 12-25W 3T | 152-98-25/36 |
| MILDRED NELSON 5298 12-25W 2B | 152-98-25/36 |
| MILDRED NELSON 5298 12-25E 5T | 152-98-25/36 |
| MILDRED NELSON 5298 12-25W 4B | 152-98-25/36 |
| MILDRED NELSON 5298 12-25E 7T | 152-98-25/36 |
| MILDRED NELSON 5298 12-25E 6B | 152-98-25/36 |
| MILDRED NELSON 5298 13-25 9T | 152-98-25/36 |
| MILDRED NELSON 5298 13-25 8B | 152-98-25/36 |
| NELSON 5298 11-14 2TX | 152-98-14/15/22/23 |
| NELSON 5298 11-14 3B | 152-98-14/23 |
| NELSON 5298 42-23 6B | 152-98-14/23 |
| NELSON 5298 13-26 8B | 152-98-14/23 |
| NELSON 5298 11-14 4T | 152-98-14/23 |
| NELSON 5298 42-23 5T | 152-98-14/23 |
| NELSON 5298 42-23 7T | 152-98-14/23 |
| NORDENG 5298 12-25W 3B | 152-98-13/24 |
| NELSON 5298 14-26 12BX | 152-98-13/14/23/24 |
| NELSON 5298 14-26 11TX | 152-98-13/14/23/24 |
| NELSON 5298 13-26 9T | 152-98-14/23 |
| NORDENG 5298 12-25W 2T | 152-98-13/24 |
| NORDENG 5298 12-25E 5B | 152-98-13/24 |
| NORDENG 5298 12-25W 4T | 152-98-13/24 |
| NORDENG 5298 13-25 7T | 152-98-13/24 |
| NORDENG 5298 13-25 8B | 152-98-13/24 |
| KELLOGG FEDERAL 5297 11-30 2BX | 152-97-13/18/19/24 |
| KELLOGG FEDERAL 5297 11-30 4B | 152-97-18/19 |
| KELLOGG FEDERAL 5297 11-30 5T | 152-97-18/19 |

| KELLOGG FEDERAL 5297 12-30 6T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 12-30 7B | 152-97-18/19 |
| KELLOGG FEDERAL 5297 12-30 8T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 44-19 13BX | 152-97-17/18/19/20 |
| MURI 5198 11-4 14T | 152-98-28/33 |
| NELSON 5298 13-26 10B | 152-98-14/23 |
| AAGVIK 5298 13-26 12T | 152-98-26/35 |
| NORDENG 5298 12-25E 6T | 152-98-13/24 |
| NORDENG 5298 13-25 9T | 152-98-13/24 |
| KELLOGG FEDERAL 5297 11-30 3T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 44-19 12T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 44-19 11B | 152-97-18/19 |
| MILDRED NELSON 5298 13-25 10B | 152-98-25/36 |
| AAGVIK 5298 41-35 15T | 152-98-26/35 |
| JOPLIN 5397 41-32 3T | 152-98-2/11 |
| JOPLIN 5397 42-32 4T | 152-98-2/11 |
| JOPLIN 5397 41-32 2B | 152-98-2/11 |
| JOPLIN 5397 42-32 6T | 152-98-2/11 |
| JOPLIN 5397 42-32 5B | 152-98-2/11 |
| JOPLIN 5397 42-32 8T | 152-98-2/11 |
| A. JOHNSON 5298 11-1 3TX | 152-98-1/2/11/12 |
| A. JOHNSON 5298 11-1 5T | 152-98-1/12 |
| A. JOHNSON 5298 11-1 4B | 152-98-1/12 |
| A. JOHNSON 5397 42-33 6T | 152-98-1/12 |
| A. JOHNSON 5397 42-33 7B | 152-98-1/12 |
| A. JOHNSON 5397 43-33 8T | 152-98-1/12 |
| A. JOHNSON 5397 43-33 10B | 152-98-1/12 |
| THELEN 5297 11-6 3TX | 152-97-1/6/7/12 |
| THELEN 5297 11-6 4B | 152-97-6/7 |
| THELEN 5297 11-6 5T | 152-97-6/7 |
| THELEN 5297 12-6 6T | 152-97-6/7 |
| THELEN 5297 12-6 8T | 152-97-6/7 |
| THELEN 5297 12-6 7B | 152-97-6/7 |
| THELEN FEDERAL 5397 44-34 14TX | 152-97-5/6/7/8 |
| JOPLIN 5397 42-32 7B | 152-98-2/11 |
| JOPLIN 5397 42-32 9B | 152-98-2/11 |
| THELEN 5397 43-34 10B | 152-97-6/7 |
| A. JOHNSON 5397 43-33 9B | 152-98-1/12 |

The ownership will be based upon record title and shall be subject to change based on the participation elections of the parties in each well proposed under this agreement.

Title opinion(s) may be rendered on the Contract Area. Notwithstanding Article IV.B. to the contrary, the interests of the parties may be revised at the discretion of the Operator on a net acreage basis after such title opinion verification or other title examination with retroactive adjustments of expenses incurred or revenues received, provided that Non-Operator will be provided notice of any such retroactive adjustments of expenses incurred or revenues received prior to or after same are made.

It is the intent of the parties herein to make all Oil and Gas Leases and Oil and Gas Interests owned by the parties within the Contract Area and filed of record as of the date of this agreement, or hereafter acquired, subject to this agreement, whether set out herein or not.

**4.**     **Addresses of the Parties:**

Oasis Petroleum North America LLC
1001 Fannin, Suite 1500
Houston, Texas 77002
Attn: Land Manager

Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Mirada Energy, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Mirada Energy Fund I, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Mirada F&C LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Orrion Energy, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

McP Orion, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

MCP Holding Company, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Mirada Manager, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Mirada Holding Company, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Brisbane Properties LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

Great Barrier Energy, LLC
c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
5555 DTC Parkway, Suite 310
Greenwood Village, CO 80111

**5.      Oil and Gas Leases Subject to this Agreement:**

All (i) Leases (owned individually or jointly) currently owned or hereafter acquired within the Contract Area, only insofar as (A) such Leases cover lands included within the boundaries of the drilling and spacing units listed in section 1 of this Exhibit "A," or (B) the ownership of, or production from, the wells listed in section 3 of this Exhibit "A" are attributable to such Lease, including without limitation the Oil and Gas Leases listed on Annex A-1 to this Exhibit "A" and (ii) all Leases (owned individually or jointly) hereafter acquired that become part of the Contract Area pursuant to subclause (ii)(B) of Section 1 of this Exhibit A.

**6.      Burdens on Production:**

Each party's burden on production as reflected of record as of the effective date of this agreement with respect to any subsequently acquired Oil and Gas Interest, the burdens on such Oil and Gas Interest at the time of the acquisition thereof.

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Effective | TWN | RNG | SEC | Description | Recording | County | State |
|---|---|---|---|---|---|---|---|---|---|
| A.V.M. Inc. | Missouri Basin Well Service | 4/24/2008 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 380392 | McKenzie | ND |
| A.V.M. Inc. | Diamond Resources Inc. | 12/8/2005 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 380392 | McKenzie | ND |
| A.V.M., Inc. | Diamond Resources, Inc. | 12/8/2005 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 361349 | McKenzie | ND |
| Abe Owan | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360817 | McKenzie | ND |
| Abe Owan | Continental Resources, Inc. | 5/25/2010 | 152 | 98 | 30 | LOT 1 | 403091 | McKenzie | ND |
| Abe Owan | Continental Resources, Inc. | 5/25/2010 | 152 | 98 | 30 | LOT4 | 403091 | McKenzie | ND |
| Abe Owan | Continental Resources, Inc. | 5/25/2010 | 152 | 98 | 30 | SE/4SW/4 | 403091 | McKenzie | ND |
| Abner C Tufto By A-I-F Darla Tufto | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 793935 | Williams | ND |
| Acoma Oil Corporation | Diamond Resources, Inc. | 9/1/2006 | 152 | 99 | 25 | SWSW | 364885 | McKenzie | ND |
| Acoma Oil Corporation | Diamond Resources, Inc. | 5/29/2008 | 152 | 99 | 25 | NWNE, N2NW | 379082 | McKenzie | ND |
| Acoma Oil Corporation | Panther Entergy Company, LLC | 7/7/2008 | 151 | 99 | 14 | SW | 385471 | McKenzie | ND |
| Acoma Oil Corporation | Diamond Resources Inc | 9/1/2006 | 152 | 99 | 25 | SWSW | 365855 | McKenzie | ND |
| Ada S Burton | Brigham Oil & Gas Lp | 8/5/2010 | 155 | 101 | 12 | E/2SW/4 | 695470 | Williams | ND |
| Ada S Burton | Brigham Oil & Gas Lp | 8/5/2010 | 155 | 101 | 12 | S/2NE/4 | 695470 | Williams | ND |
| Ada S Burton | Brigham Oil & Gas Lp | 8/5/2010 | 155 | 101 | 12 | SE/4 | 695470 | Williams | ND |
| Adela Marie Briske | Petro-Hunt, LLC | 9/28/2007 | 27 | 59 | 4 | Lots 1, 2, 3, 4, S2NE, S2NW | 375543 | Roosevelt | MT |
| Adeline Nordeng, A Widow | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355175 | McKenzie | ND |
| Adeline Nordeng, A Widow | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355175 | McKenzie | ND |
| Adeline Nordeng, A Widow | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355175 | McKenzie | ND |
| Adeline Nordeng, A Widow | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355175 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2009 | 152 | 97 | 19 | NE4SW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 13 | NE4, N2SW4, SW4SW4, Irregular tract 19 in the NE4NW4, A 1.00 acre tract mfd in book 7, page 256 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/12/2009 | 152 | 98 | 24 | N2NW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson, Life Estate | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 2 | SE | 379084 | McKenzie | ND |
| Agribank FCB #20842 | Continental Resources Inc. | 2/5/2010 | 151 | 98 | 5 | LOTS 3 & 4 | 398691 | McKenzie | ND |
| Agribank FCB #20843 | Continental Resources, Inc. | 2/5/2010 | 151 | 98 | 6 | LOT1&2, S/2NE/4 | 398692 | McKenzie | ND |
| Agribank, FCB | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 5 | Lots 3, 4 | 355177 | McKenzie | ND |
| Agribank, FCB | Diamond Resources, Inc. | 2/2/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355177 | McKenzie | ND |
| Alan G. Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349806 | McKenzie | ND |
| Alan Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382067 | Roosevelt | MT |
| Alan Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382067 | Roosevelt | MT |
| Alan Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | 382067 | Roosevelt | MT |
| Albert Dan Phillips, A Married Man | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | E2SW | 571491 | Williams | ND |
| Albert Dan Phillips, A Married Man | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | S2NE | 571491 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Albert Dan Phillips, A Married Man | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | SE/4 | 571491 | Williams | ND |
| Alden H. Gjevre, As Trustee Of That Certain Trust Document Dtd 3/31/94 | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 1 | LOTS 1, 2, 4, S2NE4, S2SE4 | 365465 | McKenzie | ND |
| Alden H. Gjevre, As Trustee Of That Certain Trust Document Dtd 3/31/94 | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 12 | ALL | 365465 | McKenzie | ND |
| Alden H. Gjevre, Trustee Of The Certain Trust Document Dated 31St Day Of March, 1994 | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 13 | NE, N2SE | 365465 | McKenzie | ND |
| Alexander Lee Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 24 | N2NW | 432981 | McKenzie | ND |
| Alexander Lee Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 13 | N2SW,SWSW | 432981 | McKenzie | ND |
| Alfred Wittinger, A Single Man | Diamond Resources, Inc. | 2/7/2006 | 152 | 98 | 30 | Lot 1 | 362276 | McKenzie | ND |
| Alicia C. Vorland, A Married Woman | Diamond Resources, Inc. | 6/17/2008 | 151 | 98 | 20 | SW4 | 380172 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 3/22/2010 | 151 | 98 | 29 | 151N-098W-29-SE/4 | 400214 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 3/22/2010 | 151 | 98 | 29 | NE/4 | 400214 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 3/22/2010 | 151 | 98 | 29 | N/2NW/4 | 400214 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 7/9/2010 | 151 | 98 | 32 | NE/4 | 404900 | McKenzie | ND |
| Allan Jones, A Single Man | Great Northern Energy, Inc. | 12/31/2009 | 152 | 98 | 30 | Lot 1(33.53) | 400926 | McKenzie | ND |
| Allan T. Halldorson, A Married Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360815 | McKenzie | ND |
| Allan T. Halldorson, A Married Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 360815 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 401483 | McKenzie | ND |
| Allen Jones | Diamond Resources , Inc | 7/24/2006 | 152 | 98 | 30 | Lot 1 | 365288 | McKenzie | ND |
| Alvin Keith Wold, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399014 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Alvin Keith Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399012 | McKenzie | ND |
| Alvin S Moody Trust | Zenergy, Inc. | 1/22/2010 | 152 | 97 | 7 | LOT 1,2 | 397332 | McKenzie | ND |
| Alvin W. Johnsrud, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 378799 | McKenzie | ND |
| American Cancer Society | Continental Resources, Inc. | 5/18/2006 | 152 | 97 | 19 | E/2SE/4 | 364303 | McKenzie | ND |
| American Cancer Society | Continental Resources, Inc. | 5/18/2006 | 152 | 97 | 19 | E/2SE/4 | 364303 | McKenzie | ND |
| American Heart Association | Continental Resources, Inc. | 2/23/2010 | 152 | 97 | 19 | E/2SE/4 | 399762 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | E2W2, E2 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 18 | N2NE4, NE4NW4, SE4SE4 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 19 | Lots 1, 2, N2NE4, E2NW4 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 98 | 24 | E2NE4 | 364266 | McKenzie | ND |
| American Syringomyelia Alliance Pr | Continental Resources, Inc. | 6/10/2005 | 152 | 97 | 19 | E/2SE/4 | 361803 | McKenzie | ND |
| American Syringomyelia Alliance Pr | Continental Resources, Inc. | 6/10/2005 | 152 | 97 | 19 | E/2SE/4 | 361803 | McKenzie | ND |
| Andrew Scott Rowe | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355696 | McKenzie | ND |
| Andrew Scott Rowe | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | SW4, S2NE4 | 355696 | McKenzie | ND |
| Andrew Scott Rowe | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355696 | McKenzie | ND |
| Andrew Scott Rowe, A Single Man | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355696 | McKenzie | ND |
| Anita Rose Keahev, A Widow | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378801 | McKenzie | ND |
| Ann E Kilzer; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | NWNE | 396690 | McKenzie | ND |
| Ann E Kilzer; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | N2NW | 396690 | McKenzie; | ND |
| Ann E. Kilzer, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396682 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ann E. Kilzer, A Married Woman,  Individually, And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | SWSW | 396697 | McKenzie | ND |
| Ann Parsons | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349808 | McKenzie | ND |
| Ann Sheehan | Unknown Lessee | 4/5/2005 | 27 | 59 | 7 | S/2SE/4 | 367178 | Roosevelt | MT |
| Ann Sheehan | Unknown Lessee | 4/5/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367178 | Roosevelt | MT |
| Ann Youree, A Widow, Individually, And As Heir To The Estate Of Paul William Harper, Deceased, And E.R. Harper, Deceased | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396675 | McKenzie | ND |
| Anna M. Thompson And Herman C. Thompson, Her Husband | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357539 | McKenzie | ND |
| Anna M. Thompson And Herman C. Thompson, Individually And As Wife And Husband | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400916 | McKenzie | ND |
| Anna M. Thompson And Herman C. Thompson, Individually And As Wife And Husband | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400916 | McKenzie | ND |
| Anne Carlsen Center For Children | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | 348596 | McKenzie | ND |
| Annette Brown, A/K/A Annette M. Brown, A Single Woman | Great Northern Energy, Inc. | 12/1/2009 | 152 | 98 | 30 | NE4, SE4SE4 | 396693 | McKenzie | ND |
| Annette E Terry | Continental Resources, Inc. | 12/10/2008 | 153 | 97 | 27 | SE4SE4 | 387484 | McKenzie | ND |
| Anthoney Gutierrez | Zenergy, Inc. | 7/1/2011 | 152 | 98 | 11 | E2SW, SWSW | 420435 | McKenzie | ND |
| Anthoney Gutierrez | Zenergy, Inc. | 7/1/2011 | 152 | 98 | 14 | N2NW | 420435 | McKenzie | ND |
| Anthony Gutierrez (Purchased By Bridgepoint Mineral Acqsition Fund Doc 429255) | Diamond Resources, Inc. | 4/11/2006 | 152 | 98 | 11 | SWSW, E2SW | 420435 | McKenzie | ND |
| Anthony Gutierrez, A Single Man(Puchased By Bridgepoint Mineral Acquisition Fund Doc 429255) | Diamond Resources, Inc. | 4/11/2006 | 152 | 98 | 14 | N2NW4 | 420435 | McKenzie | ND |
| Anthony L Mullins Aka Tony Mullins; | Chesapeake Operating, Inc. | 10/20/1997 | 155 | 101 | 12 | S2NE | 577051 | Williams | ND |
| Anthony L Mullins Aka Tony Mullins; | Chesapeake Operating, Inc. | 10/20/1997 | 155 | 101 | 12 | E2SW | 577051 | Williams | ND |
| Anthony L Mullins Aka Tony Mullins; | Chesapeake Operating, Inc. | 10/20/1997 | 155 | 101 | 12 | SE4 | 577051 | Williams | ND |
| Ardell Thomley | Oasis Petroleum North America | 5/23/2018 | 152 | 98 | 13 | N/2SW/4, SW/4SW/4 | 509354 | McKenzie | ND |
| Ardell Thomley | Oasis Petroleum North America | 5/23/2018 | 152 | 98 | 24 | N/2NW/4 | 509354 | McKenzie | ND |
| Ardell Thomley, A Single Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358433 | McKenzie | ND |
| Ardell Thomley, A Single Woman | Diamond Resources, Inc. | 8/2/2005 | 152 | 98 | 24 | N2NW4 | 358433 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Arla J. Smith, A Married Woman Dealing In Her Sole And Separate Property, Individually, And As Heir To The Estates Of Evelyn P. Mastvelten, Deceased, And Oscar J. Mastvelten, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | | 399029 | McKenzie | ND |
| Arlene Reindel, A Widow | Great Northern Energy, Inc. | 11/3/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 395728 | McKenzie | ND |
| Arlene Reindel,A Widow | Great Northern Energy, Inc. | 12/3/2009 | 152 | 99 | 25 | SWSW | | 395740 | McKenzie | ND |
| Arnold Anderson, Trustee Of The June Anderson Mineral Trust | Diamond Resources, Inc. | 2/9/2006 | 152 | 98 | 33 | NW4, N2SW4 | | 361530 | McKenzie | ND |
| Arnold Anderson, Trustee Of The June Anderson Mineral Trust | Diamond Resources, Inc. | 2/9/2006 | 152 | 98 | 32 | S2NE4 | | 361530 | McKenzie | ND |
| Arnold E. Rolfsrud And Metha A. Rolfsrud, Husband And Wife | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 33 | NW4, N2SW4 | | 360263 | McKenzie | ND |
| Arnold E. Rolfsrud And Metha A. Rolfsrud, Husband And Wife | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 32 | S2NE4 | | 360263 | McKenzie | ND |
| Arnold N. Rensbarger, Trustee Of The Arnold And Borgny Renbarger Minerals Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | | 357175 | McKenzie | ND |
| Arnold N. Rensbarger, Trustee Of The Arnold And Borgny Renbarger Minerals Trust | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 11 | W2NW, NWSW | | 357175 | McKenzie | ND |
| Arthur R. Diercks And Mary Ellen Diercks, As Trustees Of The Arthur R. Diercks Trust And Mary Ellen Diercks Trust Tr-Ua April 28, 2003, | Great Northern Energy, Inc. | 4/23/2010 | 151 | 99 | 1 | Lots 1(40.01), 2(40.03), 4(40.07), S2SE4, W2SW4,S2NE4 | | 397576 | McKenzie | ND |
| Arthur R. Diercks And Mary Ellen Diercks, As Trustees Of The Arthur R. Diercks Trust And Mary Ellen Diercks Trust Tr-Ua April 28, 2003, | Great Northern Energy, Inc. | 4/23/2010 | 151 | 99 | 12 | All | | 397576 | McKenzie | ND |
| Arthur R. Diercks And Mary Ellen Diercks, As Trustees Of The Arthur R. Doercks Trust And Mary Ellen Diercks Trust, Tr-Ua April 28, 2003 | Great Northern Energy, Inc. | 1/7/2010 | 151 | 99 | 13 | NE, N2SE | | 397576 | McKenzie | ND |
| Arthur W. Gunderson And Mary Gunderson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SW/4 | | 351136 | McKenzie | ND |
| Arvid L. Johnston | Diamond Resources, Inc. | 10/27/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 385025 | McKenzie | ND |
| Arvid L. Johnston, A Married Man | Diamond Resources, Inc. | 10/27/2008 | 151 | 99 | 1 | W2SW4 | | 385025 | McKenzie | ND |
| Audrey Hartsell, A Married Woman | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 (Protective) | | 361883 | McKenzie | ND |
| Audrey L. Hartsell, A/K/A Audrey Hartsell, A Married Woman, Individually And As Beneficiary Of The Adolf Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | | 395737 | McKenzie | ND |
| Aurthur W. And Mary Gunderson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 11 | SE4 | | 349783 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Aurthur W. And Mary Gunderson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349783 | McKenzie | ND |
| Austin Louise Annette | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | 379761 | McKenzie | ND |
| Austin Louise Annette | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | 379761 | McKenzie | ND |
| Avonne Dahl And Einar Dahl Jr., Her Husband | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NE4NE4, NW4 | 364270 | McKenzie | ND |
| Baillon Oilgas Corporation | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 6 | Lots 3(39.94), 4(39.20), 5(34.26), 7(34.34), SENW, SESW, SE | 402404 | McKenzie | ND |
| Baillon Oilgas Corporation | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 7 | Lots 1(34.38), 2(34.44), 3(34.48), 4(34.54), SENW, E2SW | 402404 | McKenzie | ND |
| Baker Mineral Trust Created 6-10-19 | Cody Oil & Gas Corporation | 12/14/1994 | 155 | 101 | 12 | E2SW | 561646 | Williams | ND |
| Baker Mineral Trust Created 6-10-19 | Cody Oil & Gas Corporation | 12/14/1994 | 155 | 101 | 12 | S2NE | 561646 | Williams | ND |
| Baker Mineral Trust Created 6-10-19 | Cody Oil & Gas Corporation | 12/14/1994 | 155 | 101 | 12 | SE/4 | 561646 | Williams | ND |
| Bandera Minerals LLC | Zenergy, Inc. | 4/26/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385138 | Roosevelt | MT |
| Banks Lutheran Church | Diamond Resources, Inc. | 7/7/2005 | 152 | 98 | 10 | A 4.50 acre tract of land in the NE1/4SE1/4, mfd in book 7, page 15 | 358184 | McKenzie | ND |
| Barbara A. Ehresman, A/K/A Bobbi A. Ehresman, A Widow | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | 400056 | McKenzie | ND |
| Barbara C Howe; Married | Diamond Resources Inc | 10/19/2005 | 152 | 98 | 33 | NW,N2SW | 359827 | McKenzie | ND |
| Barbara C Howe; Married | Diamond Resources Inc | 10/19/2005 | 152 | 98 | 32 | SE4NE4 | 359827 | McKenzie | ND |
| Barbara C Howe; Married | Diamond Resources Inc | 10/19/2005 | 152 | 98 | 32 | SW4NE4 | 359827 | McKenzie | ND |
| Barbara C. Howe, A Married Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 365507 | McKenzie | ND |
| Barbara C. Howe, A Married Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 365507 | McKenzie | ND |
| Barbara E Pederson, Widow | Cody Oil & Gas Corporation | 1/10/1995 | 155 | 101 | 12 | S2NE | 561647 | Williams | ND |
| Barbara E Pederson, Widow | Cody Oil & Gas Corporation | 1/10/1995 | 155 | 101 | 12 | E2SW | 561647 | Williams | ND |
| Barbara E Pederson, Widow | Cody Oil & Gas Corporation | 1/10/1995 | 155 | 101 | 12 | SE/4 | 561647 | Williams | ND |
| Barbara J. Tschetter | Diamond Resources, Inc. | 5/23/2005 | 152 | 98 | 15 | SW/4 | 357185 | McKenzie | ND |
| Barbara K. Schafer, A Single Woman | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360061 | McKenzie | ND |
| Barbara K. Shafer | Diamond Resources, Inc. | 6/1/2009 | 152 | 98 | 11 | SWSW, E2SW | 389764 | McKenzie | ND |
| Barbara M Blewett | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370932 | Roosevelt | MT |
| Barbara M Blewett Tst | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370931 | Roosevelt | MT |
| Barbara Thorud, A Single Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360257 | McKenzie | ND |
| Barbara Thorud, A Single Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360257 | McKenzie | ND |
| Bergeron Raymond J | St. Mary Land & Exploration Company | 10/24/2009 | 151 | 99 | 26 | NE4NW4, NW4SE4, W2NE4 | 396243 | McKenzie | ND |
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 356147 | McKenzie | ND |
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | SE4, SW4, S2NE4 | 356147 | McKenzie | ND |
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | N2 | 356147 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 356147 | McKenzie | ND |
| Beth Teed, A Single Woman | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 351150 | McKenzie | ND |
| Betty (Dolly) Zingleman, A Married Woman | Diamond Resources, Inc. | 12/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360809 | McKenzie | ND |
| Betty Fairbanks, A Single Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355566 | McKenzie | ND |
| Betty Fairbanks, A Single Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355566 | McKenzie | ND |
| Betty Jo Rogers | Unknown Lessee | 4/4/2005 | 27 | 59 | 7 | S/2SE/4 | 367175 | Roosevelt | MT |
| Betty Jo Rogers | Unknown Lessee | 4/4/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367175 | Roosevelt | MT |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 1 | SW/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | S/2SW/4, SE/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | NE/4SW/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 29 | SE/4SE/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NW4NE4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NE4NE4 | 398218 | McKenzie | ND |
| Betty L. Mills | Missouri Basin Well Service | 3/10/2005 | 152 | 98 | 11 | NE4, E2NW4 | 355410 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 1 | SW4 | 358181 | McKenzie | A ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 358181 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 29 | SE4SE4 | 358181 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/24/2005 | 152 | 98 | 32 | N2NE4 | 358181 | McKenzie | ND |
| Beverly A. Hildre, A/K/A Bev Hildre, A Married Woman | Diamond Resources, Inc. | 6/6/2006 | 152 | 97 | 6 | Lot 1 | 364263 | McKenzie | ND |
| Beverly A. Hildre, A/K/A Bev Hildre, A Married Woman | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 27 | SW4NE4, E2W2, N2SE4, SW4SE4 | 364263 | McKenzie | ND |
| Beverly A. Hildre, A/K/A Bev Hildre, A Married Woman | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NW4NE4, S2NE4, S2 | 364263 | McKenzie | ND |
| Beverly Ann Roberts Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382273 | Roosevelt | MT |
| Beverly Ann Roberts Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382273 | Roosevelt | MT |
| Beverly Jean Murohy, A Married Woman | Diamond Resources, Inc | 3/24/2006 | 152 | 97 | 18 | N2NE, NENW | 362879 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman | Diamond Resources, Inc. | 11/8/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, and 10 | 360543 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman | Diamond Resources, Inc . | 3/24/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 360543 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 399019 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399019 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 18 | Sec 18: N2NE4, NE4NW4 | 399019 | McKenzie | ND |
| Beverly Jean Murphy; Mdssp | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | LOT 9,E2SE,PORTION LOT 7,8,10 | 399020 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Beverly Maxey, A Married Woman | Cody Oil & Gas Corporation | 5/19/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351146 | McKenzie | ND |
| Bill Buschbom, A/K/A Charles Buschbom | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364279 | McKenzie | ND |
| Billie Lou Morgan | Oasis Petroleum North America LLC | 3/7/2010 | 27 | 59 | 10 | W/2E/2, W/2 | 384071 | Roosevelt | MT |
| Billie Lou Morgan | Oasis Petroleum North America LLC | 3/7/2010 | 27 | 59 | 10 | NE/4SW/4 | 384071 | Roosevelt | MT |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc | 8/31/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc | 8/31/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc | 8/31/2005 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc. | 8/31/2005 | 152 | 98 | 30 | Lot 1 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc. | 9/1/2005 | 152 | 98 | 31 | Lots 3, 4 | 359348 | McKenzie | ND |
| Black Stone Minerals Company, L.P. | Diamond Resources, Inc. | 8/31/2005 | 151 | 98 | 18 | Lots 1, 3 | 359348 | McKenzie | ND |
| Black STone Minerals Company, Lp | Panther Entergy Company, LLC | 6/26/2008 | 151 | 99 | 14 | SW | 381605 | McKenzie | ND |
| Blaine Russell, Trustee Of The Sigrid M. Russell Inter Vivos Trust | Diamond Resources, Inc. | 8/31/2005 | 151 | 98 | 18 | Lots 2, 4, NE, E2NW, E2SW, SE | 359097 | McKenzie | ND |
| Blaine Russell, Trustee Of The Sigrid M. Russell Inter Vivos Trust | Diamond Resources, Inc. | 9/1/2005 | 151 | 98 | 19 | Lots 1, 2, W2NE, E2NW | 359097 | McKenzie | ND |
| BLM NDM97031 | Conoco Phillips Company | 9/1/2007 | 152 | 97 | 19 | LOTS 3, 4 SE4SW4, SW4SE4 | 372470 | McKenzie | ND |
| Board Of Trustees Of Trinity Univer | Diamond Resources Inc | 3/28/1997 | 155 | 101 | 12 | E2SW | 571144 | Williams | ND |
| Board Of Trustees Of Trinity Univer | Diamond Resources Inc | 3/28/1997 | 155 | 101 | 12 | S2NE | 571144 | Williams | ND |
| Board Of Trustees Of Trinity Univer | Diamond Resources Inc | 3/28/1997 | 155 | 101 | 12 | SE/4 | 571144 | Williams | ND |
| Bobbi A. Ehresmann, A/K/A Barbara A. Ehresmann, A Widow | Diamond Resources, Inc. | 7/14/2009 | 152 | 98 | 30 | Lot 1 | 381026 | McKenzie | ND |
| Bonnie J Delzer | Continental Resources, Inc. | 7/1/2010 | 152 | 98 | 30 | LOT 1 | 405474 | McKenzie | ND |
| Bonnie J. Delzer, A Single Woman | Diamond Resources, Inc. | 5/9/2006 | 152 | 98 | 30 | Lot 1 | 363716 | McKenzie | ND |
| Bradley C Rogers | Unknown Lessee | 4/13/2006 | 27 | 59 | 7 | S/2SE/4 | 371528 | Roosevelt | MT |
| Bradley C Rogers | Unknown Lessee | 4/13/2006 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 371528 | Roosevelt | MT |
| Bradley D. Thomley, A/K/A Brad Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 359418 | McKenzie | ND |
| Bradley D. Thomley, A/K/A Brad Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 359418 | McKenzie | ND |
| Bradley Harrison; Single | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 23 | SE | 448627 | McKenzie | ND |
| Bradley Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360259 | McKenzie | ND |
| Bradley Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360259 | McKenzie | ND |
| Branex Resources Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 728353 | Williams | ND |
| Branex Resources Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 728353 | Williams | ND |
| Branex Resources Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 728353 | Williams | ND |
| Brenda Anderson, A Married Woman | Diamond Resources, Inc. | 2/4/2009 | 152 | 98 | 27 | SW4 | 378525 | McKenzie | ND |
| Brenda Anderson, A Married Woman | Diamond Resources, Inc. | 2/5/2009 | 152 | 98 | 34 | W2NW4 | 378525 | McKenzie | ND |
| Brenda H Yirsa | Arkota Energy, Inc. | 6/1/2011 | 151 | 98 | 33 | NW/4NE/4,S/2NE/4,SE/4NW/4 | 418636 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Brian D. Thomley, A Married Man A/K/A Brian Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 359343 | McKenzie | ND |
| Brian D. Thomley, A Married Man A/K/A Brian Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 359343 | McKenzie | ND |
| Bridgepoint Mineral Acq Fund II LLC | H.L. Brown Operating, LLC | 5/1/2011 | 151 | 99 | 14 | S/2NW/4 | 419720 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Zenergy, Inc. | 10/20/2011 | 152 | 97 | 19 | NESW | 426165 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Brigham Oil & Gas, Lp | 11/4/2010 | 152 | 98 | 1 | SW | 411493 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Brigham Oil & Gas, Lp | 11/4/2010 | 152 | 98 | 28 | NESW | 411493 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Brigham Oil & Gas, Lp | 11/4/2010 | 152 | 98 | 28 | S2SW,SE | 411493 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 9/15/2010 | 152 | 98 | 29 | SE/4SE/4 | 408141 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 9/15/2010 | 152 | 98 | 32 | NE4NE4 | 408141 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 9/15/2010 | 152 | 98 | 32 | NW4NE4 | 408141 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 12/22/2010 | 152 | 98 | 12 | SW/4 | 412344 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 12/15/2010 | 152 | 98 | 13 | IT 19 IN THE NE4NW4 OF SECTION 13, A 1.00 ACRE TRACT MORE FULLY DESCRIBED IN BOOK 7, PAGE 256, CONTAINING 1.00 ACRES, MORE OR LESS | 411771 | McKenzie | ND |
| Bruce Birdsall, As Trustee Of The Helen Birdsall Family Mineral Trust | Great Northern Energy, Inc. | 3/5/2010 | 152 | 99 | 25 | SWSW | 400044 | McKenzie | ND |
| Bruce W. And Patricia Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 11 | SE4 | 349785 | McKenzie | ND |
| Bruce W. And Patricia Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349785 | McKenzie | ND |
| Bruce W. Gunderson And Patricia Gunderson, Husband And Wife | Cody Oil & Gas Corporation | 5/4/2004 | 152 | 98 | 10 | SW/4 | 351137 | McKenzie | ND |
| Bruce-Andersen Co., Inc. | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 359693 | McKenzie | ND |
| Bryan A. Gumm, A Married Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 383619 | McKenzie | ND |
| Bryan A. Gumm, A Married Man | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 366076 | McKenzie | ND |
| Bryan A. Gumm, A Married Man | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 383619 | McKenzie | ND |
| Bryce A Romo Et Ux Denise A | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382069 | Roosevelt | MT |
| Bryce A Romo Et Ux Denise A | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382069 | Roosevelt | MT |
| C. John Anderson, A/K/A Carl John Anderson And Violet Anderson, A/K/A Violet L. Anderson, Husband And Wife | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 12 | N2 | 355707 | McKenzie | ND |
| C. John Anderson, Aka Carl John Anderson And Violet L. Anderson, Aka Violet Anderson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/11/2009 | 152 | 98 | 12 | N2 | 394861 | McKenzie | ND |
| C. John Anderson, Aka Carl John Anderson And Violet L. Anderson, Aka Violet Anderson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/11/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 394861 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| C. John Anderson, Aka Carl John Anderson And Violet L. Anderson, Aka Violet Anderson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/11/2009 | 152 | 98 | 29 | E2NE4 | | 394861 | McKenzie | ND |
| Calvin C Rogers | Unknown Lessee | 4/8/2005 | 27 | 59 | 7 | S/2SE/4 | | 367170 | Roosevelt | MT |
| Calvin C Rogers | Unknown Lessee | 4/8/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 367170 | Roosevelt | MT |
| Calvin H. Haugan, Aka Calvin Haugan And Pamela C. Johnson- Haugan, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | | 399024 | McKenzie | ND |
| Calvin H. Haugan, Aka Calvin Haugan And Pamela C. Johnson- Haugan, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | | 399024 | McKenzie | ND |
| Calvin H. Haugen, A/K/A Calvin Haugen And Pamela C. Johnson- Haugen, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 4/25/2010 | 152 | 98 | 22 | NW/4 | | 399024 | McKenzie | ND |
| Calvin N Rolfson | Cody Oil & Gas Corporation | 4/9/2008 | 151 | 98 | 20 | SW/4 | | 377662 | McKenzie | ND |
| Calvin N. Rolfson, A Married Man | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | | 351154 | McKenzie | ND |
| Carl Bruce Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 13 | N2SW,SWSW | | 432979 | McKenzie | ND |
| Carl Bruce Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 24 | N2NW | | 432979 | McKenzie | ND |
| Carl Gustav Melby And Maxine Melby; | Panther Entergy Company, LLC | 6/5/2008 | 151 | 99 | 14 | E2 | | 381555 | McKenzie | ND |
| Carl Gustov Melby | Panther Entergy Company, LLC | 6/13/2008 | 151 | 99 | 14 | SW | | 386305 | McKenzie | ND |
| Carl Melby, A/K/A Carl Gustav Melby | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | | 378789 | McKenzie | ND |
| Carl V. Olson, A Single Man | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357531 | McKenzie | ND |
| Carl V. Olson, A Single Man | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | | 400918 | McKenzie | ND |
| Carl V. Olson, A Single Man | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | | 357531 | McKenzie | ND |
| Carmen D. Haugan, A/K/A Carmen Haugan And Naomi Haugan, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 4/25/2010 | 152 | 98 | 22 | NW/4 | | 399018 | McKenzie | ND |
| Carmen D. Haugan, Aka Carmen Haugan And Naomi Haugan, Husband And Wife | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | | 399018 | McKenzie | ND |
| Carmen D. Haugan, Aka Carmen Haugan And Naomi Haugan, Husband And Wife | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | | 399018 | McKenzie | ND |
| Carmen Leroy Wold, A/K/A Carmen L. Wold And Carol Wold, Husband And Wife | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355723 | McKenzie | ND |
| Carmen Leroy Wold, A/K/A. Carmen L. Wold And Carol Wold, Husband And Wife | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | | 355723 | McKenzie | ND |
| Carol D. Byerly, A Married Woman | Diamond Resources, Inc. | 3/24/2005 | 152 | 98 | 26 | N2NE4, NW4 | | 355702 | McKenzie | ND |
| Carol J. Jung, A Married Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | | 395741 | McKenzie | ND |
| Carol J. Jung, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 395731 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Carol Jean Pattee, A/K/A Carol J. Pattee, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/15/2009 | 152 | 98 | 23 | Sec 23: SE4 | 396688 | McKenzie | ND |
| Carol L Gragg | 7 O'S Oil Corporation | 4/12/2005 | 27 | 59 | 7 | S/2SE/4 | 367171 | Roosevelt | MT |
| Carol L Gragg | 7 O'S Oil Corporation | 4/12/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367171 | Roosevelt | MT |
| Carole J. Sukman | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 11 | SWSW, E2SW | 358441 | McKenzie | ND |
| Carole J. Sukman, A Married Woman | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 14 | N2NW4 | 358441 | McKenzie | ND |
| Carolyn L. Benjamin | Diamond Resources, Inc. | 3/3/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin | Diamond Resources, Inc. | 3/4/2005 | 152 | 98 | 11 | W2NW, NWSW | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355183 | McKenzie | ND |
| Carolyn S. Melby | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | 379080 | McKenzie | ND |
| Carolyn Sue Melby; Single | Panther Entergy Company, LLC | 7/7/2008 | 151 | 99 | 14 | SW | 385482 | McKenzie | ND |
| Carolyn Sue Melby; Single | Panther Entergy Company, LLC | 7/7/2008 | 151 | 99 | 14 | E2 | 385482 | McKenzie | ND |
| Catherine Ann Farrell | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496423 | McKenzie | ND |
| Catherine C Herman | Sundance Oil & Gas | 3/21/2005 | 27 | 59 | 6 | S/2NE/4, N/2SE/4, SE/4NW/4, SW/4SE/4 | 367814 | Roosevelt | MT |
| Catherine C Herman | Sundance Oil & Gas | 3/21/2005 | 27 | 59 | 6 | S/2NE/4, N/2SE/4, SE/4NW/4, SW/4SE/4 | 367814 | Roosevelt | MT |
| Catherine L. Tuttle | Unknown Lessee | 6/12/2008 | 27 | 59 | 7 | S/2SE/4 | 377722 | Roosevelt | MT |
| Catherine L. Tuttle | Unknown Lessee | 6/12/2008 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 377722 | Roosevelt | MT |
| Catherine W. Herman, A Widow | Diamond Resources, Inc. | 7/14/2005 | 27 | 59 | 5 | SWNW, NWSW | 368033 | Roosevelt | MT |
| Cathryn R Clark | Trz Energy LLC | 9/10/2009 | 155 | 101 | 12 | NW/4 | 659115 | Williams | ND |
| Cecelia A Otteson And Selmer D Otte | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 354098 | McKenzie | ND |
| Chad L Harmon | Zenergy, Inc. | 6/1/2011 | 153 | 97 | 27 | E2NE,NWNE | 424921 | McKenzie | ND |
| Charles Buschbom, A/K/A Bill Buschbom And Karen Wolf, Indivdually And As Husband And Wife | Great Northern Energy, Inc. | 11/20/2009 | 152 | 99 | 25 | SWSW | 395732 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Charles Buschbom, A/K/A Bill Buschbom And Karen Wolf, Individually And As Husband And Wife | Great Northern Energy, Inc. | 11/20/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395732 | McKenzie | ND |
| Charles D Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382274 | Roosevelt | MT |
| Charles D Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382274 | Roosevelt | MT |
| Charles E. Niesen II | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 732608 | Williams | ND |
| Charles E. Niesen II | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 732608 | Williams | ND |
| Charles E. Niesen II | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 732608 | Williams | ND |
| Charles Parsons | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349807 | McKenzie | ND |
| Charles R Spentnagel | Mj Oil | 2/12/2010 | 155 | 101 | 12 | NW/4 | 683358 | Williams | ND |
| Charles Youree, Jr., A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396676 | McKenzie | ND |
| Charlotte Corley Kuser | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 733789 | Williams | ND |
| Charlotte Corley Kuser | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 733789 | Williams | ND |
| Charlotte Corley Kuser | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 733789 | Williams | ND |
| Cheryl Wegley, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364017 | McKenzie | ND |
| Cheryl Wegley, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 397586 | McKenzie | ND |
| Christine M. Arnold, A/K/A Christine Arnold And Steven C. Arnold, Individually, And As Wife And Husband | Great Northern Energy, Inc. | 4/25/2010 | 152 | 98 | 22 | NW/4 | 397562 | McKenzie | ND |
| Christine M. Arnold, Aka Christine Arnold And Steven C. Arnold, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397562 | McKenzie | ND |
| Christine M. Arnold, Aka Christine Arnold And Steven C. Arnold, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397562 | McKenzie | ND |
| Christopher Erwin Miles, A/K/A Christopher Miles, A Single Man | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378793 | McKenzie | ND |
| Cindy Thomley, A Single Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358458 | McKenzie | ND |
| Cindy Thomley, A Single Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358458 | McKenzie | ND |
| Clair Forland, A Married Man | Diamond Resources, Inc. | 6/5/2008 | 151 | 98 | 33 | NENE | 379577 | McKenzie | ND |
| Clair Forland, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/13/2010 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 400039 | McKenzie | ND |
| Claire Beer, A Single Woman | Cody Oil & Gas Corporation | 5/13/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351144 | McKenzie | ND |
| Clarence C. Thompson And Barbara L. Thompson, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 5/18/2010 | 152 | 99 | 25 | SWSW, E2NE, SWNE, SE, S2NW, N2SW | 403825 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Clarence C. Thompson, Et Ux | Great Northern Energy, Inc. | 5/18/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 403825 | McKenzie | ND |
| Clarence Jore | Diamond Resources, Co. | 5/17/2006 | 151 | 99 | 26 | NE/4SW/4,W/2NW/4,SE/4NW/4 | 364234 | McKenzie | ND |
| Clarence Jore | Diamond Resources, Co. | 5/17/2006 | 151 | 99 | 26 | SE4SW4,S2SE4,NE4SE4 | 364234 | McKenzie | ND |
| Clarence Jore | Diamond Resources, Co. | 5/17/2006 | 151 | 99 | 35 | E/2E/2 | 364234 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White | Diamond Resources, Inc. | 4/13/2005 | 152 | 98 | 33 | E2SE4 | 356313 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White | Diamond Resources, Inc. | 4/13/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356313 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 355729 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 17 | N2NE4 | 355729 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355729 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 355729 | McKenzie | ND |
| Clayton Okland | Zenergy, Inc. | 10/1/2011 | 151 | 98 | 33 | NWNE,S2NE,SENW | 424920 | McKenzie | ND |
| Connie Brownson | Diamond Resources | 9/10/2009 | 155 | 101 | 12 | NW/4 | 659444 | Williams | ND |
| Constance S Bruins; Single | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | 395875 | McKenzie | ND |
| Cordell Wold | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355724 | McKenzie | ND |
| Cordell Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355724 | McKenzie | ND |
| Craig Peters Heir Of Martin Peters | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NW4SW4 | 416089 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/4/2009 | 152 | 98 | 11 | SWSW, E2SW | 394859 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 11 | SWSW, E2SW | 394859 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 11/4/2009 | 152 | 98 | 14 | Sec 14: N2NW4 | 394860 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 11/4/2009 | 152 | 98 | 14 | Sec 14: N2NW4 | 394860 | McKenzie | ND |
| Curtiss A. Dahl, A Single Man, Individually, And As Beneficiary Of The Mildred G. Dahl Mineral Trust | Great Northern Energy, Inc. | 3/2/2010 | 152 | 99 | 25 | SWSW | 402725 | McKenzie | ND |
| Cynthia L Wilcox | Zenergy, Inc. | 5/17/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385549 | Roosevelt | MT |
| D & V Johnson Family Irr. Min Trust | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410346 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 400162 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustee | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SW4 | 400159 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustee | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 400159 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustee | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 400159 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Tr | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410344 | McKenzie | ND |
| D & V Johnson Family Irrevocable Tr | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | 410344 | McKenzie | ND |
| D&V Johnson Family Irrevocable Mine | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 400161 | McKenzie | ND |
| Dale Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 32 | S2NE4 | 438233 | McKenzie | ND |
| Dale Anderson | Zenergy, Inc. | 9/1/2010 | 152 | 98 | 33 | NW, N2SW | 438233 | McKenzie | ND |
| Dale Brown | Zenergy, Inc. | 6/1/2011 | 152 | 98 | 30 | SESE | 419694 | McKenzie | ND |
| Dale Brown | Zenergy, Inc. | 6/1/2011 | 152 | 98 | 30 | NE | 419694 | McKenzie | ND |
| Dale Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382070 | Roosevelt | MT |
| Dale Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382070 | Roosevelt | MT |
| Dale Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | 382070 | Roosevelt | MT |
| Dan O'Hearn, A/K/A Daniel O'Hearn, A Single Amn | Diamond Resources, Inc. | 7/3/2006 | 152 | 99 | 25 | SWSW | 365289 | McKenzie | ND |
| Dan O'Hearn, Aka Daniel O'Hearn, A Single Man | Great Northern Energy, Inc. | 3/31/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400927 | McKenzie | ND |
| Dan O'Hearn, Aka Daniel O'Hearn, A Single Man | Diamond Resources , Inc | 7/3/2006 | 152 | 98 | 30 | Lot 1 | 400927 | McKenzie | ND |
| Darla T O'Donnell | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | E/2SW/4 | 656996 | Williams | ND |
| Darla T O'Donnell | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | SE/4 | 656996 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Darla T O'Donnell | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | S/2NE/4 | 656996 | Williams | ND |
| Darlene M STevens And Lee W STevens | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 353043 | McKenzie | ND |
| Darlene O. Lee And Raymond V. Lee Her Husband | Diamond Resources, Inc. | 9/30/2008 | 155 | 101 | 12 | E2SW, SE, S2NE | 660711 | Williams | ND |
| Darrell L Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 4 | S/2 | 382902 | Roosevelt | MT |
| Darrell L Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 9 | N/2 | 382902 | Roosevelt | MT |
| Darrell L Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 382902 | Roosevelt | MT |
| Daryl J. Johnson And Molly 0. Johnson, Husband And Wife | Diamond Resources, Inc. | 5/5/2005 | 151 | 98 | 7 | NE4, NE4NW4 | 356855 | McKenzie | ND |
| Daryl J. Johnson And Molly 0. Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/12/2010 | 151 | 98 | 7 | NE4, NE4NW4 | 400041 | McKenzie | ND |
| Daryl J. Johnson And Molly O. Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 4/27/2010 | 151 | 99 | 1 | SW4NW4 | 400041 | McKenzie | ND |
| David A. Johnsrud And Shirley Johnsrud, Husband And Wife | Diamond Resources, Inc. | 5/2/2009 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 378516 | McKenzie | ND |
| David Allen Panasuk Et Ux | Unknown Lessee | 5/12/2005 | 27 | 59 | 3 | SE/4 | 367302 | Roosevelt | MT |
| David Allen Panasuk Et Ux | Unknown Lessee | 5/12/2005 | 27 | 59 | 10 | E/2E/2 | 367302 | Roosevelt | MT |
| David D. Machala, A Single Man | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381435 | McKenzie | ND |
| David F Bruce | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT 1 | 398219 | McKenzie | ND |
| David F Bruce | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT4 | 398219 | McKenzie | ND |
| David F Bruce | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | SE/4SW/4 | 398219 | McKenzie | ND |
| David F. Irwin | Diamond Resources, Inc. | 6/26/2006 | 151 | 99 | 26 | NE4NE4 | 364920 | McKenzie | ND |
| David F. Machala, A Single Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381435 | McKenzie | ND |
| David Falcon | Diamond Resources, Inc. | 11/7/2008 | 151 | 99 | 1 | W2SW4 | 385024 | McKenzie | ND |
| David Falcon | Diamond Resources, Inc. | 11/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 385024 | McKenzie | ND |
| David G. Rogers | Unknown Lessee | 5/27/2008 | 27 | 59 | 7 | S/2SE/4 | 377723 | Roosevelt | MT |
| David G. Rogers | Unknown Lessee | 5/27/2008 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 377723 | Roosevelt | MT |
| David Gililland, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396672 | McKenzie | ND |
| David Hagen | Continental Resources, Inc. | 9/10/2010 | 152 | 98 | 30 | LOT 1 | 408661 | McKenzie | ND |
| David J Peters Heir Of Martin Peter | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NW4SW4 | 416087 | McKenzie | ND |
| David K Selid And Veanna Selid | Empire Oil Company | 1/20/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372761 | McKenzie | ND |
| David R. Johnson | Diamond Resources, Inc. | 11/10/2008 | 152 | 98 | 11 | SWSW, E2SW | 384323 | McKenzie | ND |
| David R. Johnson, A Married Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 14 | N2NW4 | 359692 | McKenzie | ND |
| David R. Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349802 | McKenzie | ND |
| David Rolfson And Jan Rolfson, Husband And Wife | Cody Oil & Gas Corporation | 6/29/2004 | 151 | 98 | 20 | SW/4 | 351157 | McKenzie | ND |
| David Rolfsrud | Oasis Petroleum North America | 8/1/2018 | 152 | 97 | 18 | NE/4NE/4 | 510527 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| David Rolfsrud | Oasis Petroleum North America | 8/1/2018 | 152 | 98 | 24 | E/2NE/4 | 510106 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E2NW4, E2SE4 | 378857 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E/2SW/4, W/2SE/4 | 378857 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 6 | LOT9,E/2SE/4,PORTION LOTS 7,8 & 10 | 378857 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | N2NE4,SW4NE4 | 378857 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 423639 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 18 | SE/4SE/4 | 423639 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 18 | SW/4SE/4 | 423639 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 423639 | McKenzie | ND |
| Dawn L Coleman | Zenergy, Inc. | 6/1/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385779 | Roosevelt | MT |
| Dean D. Nelson And Jean Nelson, Husband And Wife | Diamond Resources Inc. | 1/14/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367593 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 3 | SW/4 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | S/2 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 9 | N/2 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | LOT3(40.08),LOT4(40.08 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | S/2NW/4 | 378067 | Roosevelt | MT |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 400415 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 400415 | McKenzie | ND |
| Deanne R. Frarck, A/K/A Deanne Frarck, A Married Woman | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 363395 | McKenzie | ND |
| Debbera Hagen, A/K/A Deb Hagen And Doyle Hagen, Her Husband | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355731 | McKenzie | ND |
| Debbera Hagen, A/K/A Deb Hagen, And Doyle Hagen, Her Husband | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356442 | McKenzie | ND |
| Debbera Hagen, A/K/A Deb Hagen, And Doyle Hagen, Her Husband | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356442 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, W2E2 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | N2NE4 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 400040 | McKenzie | ND |
| Debbie L. Johnson, A./K/A Debbie Johnson | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N1/2SW1/4, SW1/4SW1/4 | 358455 | McKenzie | ND |
| Debbie L. Johnson, A./K/A Debbie Johnson | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N1/2NW1/4 | 358455 | McKenzie | ND |
| Debbra Ann Olson-Clark, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 6/13/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400913 | McKenzie | ND |
| Debbra Ann Olson-Clark, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400913 | McKenzie | ND |
| Debby Houk Aka Debbie Houk | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | 796482 | Williams | ND |
| Debby Houk Aka Debbie Houk | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | 796482 | Williams | ND |
| Debby Houk Aka Debbie Houk | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | 796482 | Williams | ND |
| Deborah Anderson; Single | Great Northern Energy, Inc. | 6/6/2010 | 152 | 98 | 14 | E2SE,SWSE | 404760 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Deborah Anderson; Single | Great Northern Energy, Inc. | 6/6/2010 | 152 | 98 | 23 | NENE | | 404760 | McKenzie | ND |
| Deborah Ann Miles, A Single Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | | 378802 | McKenzie | ND |
| Deborah Kinzel, A/K/A Deborah Kay Kinzel, A Married Woman | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | | 400047 | McKenzie | ND |
| Deborah Kinzel, A/K/A Deborah Kay Kinzel, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | | 400047 | McKenzie | ND |
| Deborah L Tomas | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | | 381553 | McKenzie | ND |
| Deborah Tomas Aka Deborah L Tomas | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | | 386821 | McKenzie | ND |
| Deborah Tomas Aka Deborah L Tomas | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | | 388401 | McKenzie | ND |
| Debra Ann Olson, A Single Woman | Diamond Resources, Inc. | 6/13/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357800 | McKenzie | ND |
| Debra E. Kolember, A/K/A Debra E. Kolenber, A Married Woman | Great Northern Energy, Inc. | 2/2/2010 | 152 | 99 | 25 | SWSW | | 399001 | McKenzie | ND |
| Debra E. Kolember, A/K/A Debra E. Kolenber, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/2/2010 | 152 | 98 | 30 | Lot 1(33.53) | | 399002 | McKenzie | ND |
| Debra L. Rose, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358451 | McKenzie | ND |
| Debra L. Rose, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | | 358451 | McKenzie | ND |
| Debra Payne Brown Exempt Trust | Great Northern Energy, Inc. | 5/18/2010 | 151 | 98 | 28 | N2SW,SESW,SWSE | | 403824 | McKenzie | ND |
| Dede Gumm Waggoner, F/K/A Dede Gumm, A Widow | Diamond Resources, Inc. | 10/31/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 381434 | McKenzie | ND |
| Dede Gumm Waggoner, F/K/A Dede Gumm, A Widow | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | | 367434 | McKenzie | ND |
| Dede Gumm Waggoner, F/K/A Dede Gumm, A Widow | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | | 381434 | McKenzie | ND |
| Della R. And Theodore Knight | Missouri Basin Well Service | 4/28/2004 | 152 | 98 | 2 | SW4 | | 349752 | McKenzie | ND |
| Della R. And Theodore Knight | Missouri Basin Well Service | 4/28/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, N2S2 | | 349752 | McKenzie | ND |
| Delores M. Greathouse, Vida Delores M. Moe, F/K/A Delores Moe, A Married Woman | Diamond Resources, Inc. | 8/16/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358725 | McKenzie | ND |
| Delores M. Greathouse, Vida Delores M. Moe, F/K/A Delores Moe, A Married Woman | Diamond Resources, Inc. | 8/16/2005 | 152 | 98 | 24 | N2NW4 | | 358725 | McKenzie | ND |
| Delores Maston, Individually And As Attorney-In-Fact For Herbert Maston, Her Husband | Cody Oil & Gas Corporation | 4/29/2004 | 152 | 98 | 10 | N/2 | | 351135 | McKenzie | ND |
| Denalie Ann Bruins | Panther Entergy Company, LLC | 6/4/2008 | 151 | 99 | 14 | SW | | 386822 | McKenzie | ND |
| Denalie Bruins Aka Denalie Ann Brui | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | | 386823 | McKenzie | ND |
| Denalie Bruins Aka Denalie Ann Brui | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | | 386139 | McKenzie | ND |
| Denise Nordeng, A Single Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355174 | McKenzie | ND |
| Denise Nordeng, A Single Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | SE4, SW4, S2NE4 | | 355174 | McKenzie | ND |
| Denise Nordeng, A Single Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | | 355174 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Denise Nordeng, A Single Woman | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355174 | McKenzie | ND |
| Dennis Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 32 | S2NE4 | 438235 | McKenzie | ND |
| Dennis Anderson | Zenergy, Inc. | 9/1/2010 | 152 | 98 | 33 | NW, N2SW | 438235 | McKenzie | ND |
| Dennis E. Johnson And Vonnie E. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/13/2006 | 152 | 98 | 13 | IT 19 in the NE4NW4, a 1.00 acre tract | 365096 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 97 | 7 | Lots 3, 4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 97 | 18 | Lots 1, 2, 3, 4, S2NE4,N2SE4, NE4SW4, SE4NW4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 98 | 12 | SE4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 7/18/2009 | 152 | 98 | 13 | NE4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 98 | 13 | E2SE4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 12 | SE4 | 355171 | McKenzie | ND |
| Dennis R. Brown, Trustee Of The Leone E. Brown June 10, 1992 Trust | Diamond Resources, Inc. | 5/20/2005 | 152 | 98 | 30 | NE4, SE4SE4 | 358459 | McKenzie | ND |
| Dennis W Yockim | Empire Oil Company | 10/8/2010 | 151 | 98 | 32 | S/2SW/4 | 411709 | McKenzie | ND |
| Devereux Foundation | Diamond Resources, Inc. | 3/2/2006 | 152 | 98 | 14 | N2NW4 | 361528 | McKenzie | ND |
| Dg Minerals LLC | Oasis Petroleum North America | 2/1/2014 | 152 | 98 | 30 | NE4 | 466977 | McKenzie | ND |
| Diane Shockley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | 796480 | Williams | ND |
| Diane Shockley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | 796480 | Williams | ND |
| Diane Shockley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | 796480 | Williams | ND |
| Diane Woodward-Frost Rev T | Unknown Lessee | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370862 | Roosevelt | MT |
| Dianna M Briske | Oasis Petroleum North America LLC | 11/3/2010 | 27 | 59 | 4 | S/2NE/4 | 384754 | Roosevelt | MT |
| Dianna M Briske | Oasis Petroleum North America LLC | 11/3/2010 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 384754 | Roosevelt | MT |
| Dianna M Briske | Unknown Lessee | 12/4/2011 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 392047 | Roosevelt | MT |
| Dianna M Briske | Unknown Lessee | 12/4/2011 | 27 | 59 | 4 | S/2NW/4 | 392047 | Roosevelt | MT |
| Donald E. Roesner, A Single Man And Kenneth G. Roesner A/K/A Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355699 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Donald E. Roesner, A Single Man And Kenneth G. Roesner, A/K/A Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | | 355699 | McKenzie | ND |
| Donald Elroy Brandt | Continental Resources, Inc. | 1/11/2011 | 152 | 98 | 30 | LOT 1 | | 412791 | McKenzie | ND |
| Donald Erikson, A Single Man | Diamond Resources, Inc. | 4/26/2005 | 152 | 98 | 33 | E2E2 | | 356438 | McKenzie | ND |
| Donald Erikson, A Single Man | Diamond Resources, Inc. | 4/26/2005 | 152 | 98 | 34 | E2W2, W2SW4 | | 356438 | McKenzie | ND |
| Donald Forland, A Single Man | Great Northern Energy, Inc. | 1/13/2010 | 151 | 98 | 28 | N2, SE, N2SW, SESW | | 400037 | McKenzie | ND |
| Donald Forland, A Single Man | Diamond Resources, Inc. | 6/5/2008 | 151 | 98 | 33 | NENE | | 400037 | McKenzie | ND |
| Donald G. Olson And Sharon K. Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | | 400917 | McKenzie | ND |
| Donald G. Olson And Sharon K. Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | | 400917 | McKenzie | ND |
| Donald G. Olson And Sharon Olson, Husband And Wife | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357541 | McKenzie | ND |
| Donald Hoglund; Mdssp | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | | 395068 | McKenzie | ND |
| Donald J. Albers, Attorney-In-Fact For Gladys M. Albers | Diamond Resources, Inc. | 4/14/2005 | 151 | 98 | 7 | NE4, NE4NW4 | | 357533 | McKenzie | ND |
| Donald J. Albers, Attorney-In-Fact For Gladys M. Albers | Diamond Resources, Inc. | 4/14/2009 | 151 | 98 | 7 | NE4, NE4NW4 | | 357533 | McKenzie | ND |
| Donald J. Kilwein, A Single Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | | 360986 | McKenzie | ND |
| Donald J. Schmidt, A Married Man | Diamond Resources, Inc. | 6/1/2006 | 151 | 99 | 26 | SE4NE4 | | 364282 | McKenzie | ND |
| Donald J. Schmidt, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 6/1/2010 | 151 | 99 | 25 | SW4NW4,N2SW4 | | 394856 | McKenzie | ND |
| Donald J. Schmidt, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 11/11/2009 | 151 | 99 | 26 | SE4NE4 | | 394856 | McKenzie | ND |
| Donald L. Johnsrud, A Married Man | Diamond Resources, Inc. | 5/2/2009 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | | 378507 | McKenzie | ND |
| Donald L. Karst, A Single Man | Diamond Resources, Inc. | 11/8/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 360044 | McKenzie | ND |
| Donald L. Krast, A Single Man | Diamond Resources, Inc. | 11/8/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | | 360044 | McKenzie | ND |
| Donald Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 97 | 19 | NE4SW4 | | 358435 | McKenzie | ND |
| Donald Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 13 | IT 19 (A 1.00 acre tract) | | 358435 | McKenzie | ND |
| Donald Wittinger, A Widower | Great Northern Energy, Inc. | 12/11/2009 | 152 | 99 | 25 | SWSW | | 396702 | McKenzie | ND |
| Donald Wittinger, A Widower | Great Northern Energy, Inc. | 12/11/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 396686 | McKenzie | ND |
| Donna Anfinson | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT 1 | | 398121 | McKenzie | ND |
| Donna Anfinson | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT4 | | 398121 | McKenzie | ND |
| Donna Anfinson | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | SE/4SW/4 | | 398121 | McKenzie | ND |
| Donna Anfinson, A Married Woman | Diamond Resources, Inc. | 7/14/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 358183 | McKenzie | ND |
| Donna Bordner | Empire Oil Company | 8/28/2007 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | | 374020 | McKenzie | ND |
| Donna Bordner, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | | 400418 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Donna Bordner, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400418 | McKenzie | ND |
| Donna Jewell, A Widow | Cody Oil & Gas Corporation | 5/13/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351143 | McKenzie | ND |
| Donna Katherine Miles Brown, A Married Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 379223 | McKenzie | ND |
| Donna M Anderson; Widow, Ind | Great Northern Energy, Inc. | 6/28/2010 | 152 | 99 | 25 | NWNE | 402730 | McKenzie | ND |
| Donna M Anderson; Widow, Ind | Great Northern Energy, Inc. | 6/28/2010 | 152 | 99 | 25 | N2NW | 402730 | McKenzie | ND |
| Donna M. Anderson | Diamond Resources, Inc. | 7/20/2009 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381636 | McKenzie | ND |
| Donna M. Anderson | Diamond Resources, Inc. | 6/28/2006 | 152 | 99 | 25 | NWNE, N2NW | 364918 | McKenzie | ND |
| Donna M. Anderson | Diamond Resources, Inc. | 7/18/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381636 | McKenzie | ND |
| Donna M. Critzer, A Single Woman | Great Northern Energy, Inc. | 4/27/2010 | 151 | 99 | 1 | SW4NW4 | 400042 | McKenzie | ND |
| Donna M. Critzer, A Single Woman | Great Northern Energy, Inc. | 3/12/2010 | 151 | 98 | 7 | NE4, NE4NW4 | 400042 | McKenzie | ND |
| Donna Wald | Diamond Resources, Inc. | 10/27/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 384320 | McKenzie | ND |
| Donna Wald, A Married Woman | Diamond Resources, Inc. | 10/27/2008 | 151 | 99 | 1 | W2SW4 | 384320 | McKenzie | ND |
| Donna Willis | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382207 | Roosevelt | MT |
| Donna Willis | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382207 | Roosevelt | MT |
| Doris E Liffrig | Arkota Energy, Inc. | 6/1/2011 | 151 | 98 | 33 | NW/4NE/4,S/2NE/4,SE/4NW/4 | 419066 | McKenzie | ND |
| Doris Koch | Unknown Lessee | 3/28/2005 | 27 | 59 | 7 | S/2SE/4 | 367181 | Roosevelt | MT |
| Doris Koch | Unknown Lessee | 3/28/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367181 | Roosevelt | MT |
| Dorothy Dalzell Bankerd Pace | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 792777 | Williams | ND |
| Dorothy Dalzell Bankerd Pace | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 792777 | Williams | ND |
| Dorothy Dalzell Bankerd Pace | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 792777 | Williams | ND |
| Dorothy Elvrum, Individually And As Attorney-In-Fact For Orville Selid, Loraine Selid, Rodney Selid, Gregory Selid, Marcia Van Ackern, Sharon Bishop, Alvin Selid, Annie Amb, Laila B. Selid, David K. Selid, Stewart Selid And Russel V. Elvrum | Diamond Resources, Inc. | 3/13/2006 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 362491 | McKenzie | ND |
| Dorothy Elvrum, Individually, And As Attorney-In-Fact For Orville Selid, Loraine Selid, Rodney Selid, Gregory Selid, Marcia Hines (Fka Marcia Van Ackern), Sharon Bishop, Alvin Selid, Annie Amb, Laila B. Selid, David K. Selid, Steward Selid And Russel V. Elvrum | Diamond Resources, Inc. | 3/13/2006 | 151 | 98 | 29 | S2NW, SW | 362491 | McKenzie | ND |
| Doug M. Geck, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 (Protective) | 361881 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | | | | Description | Doc # | County | State |
|---|---|---|---|---|---|---|---|---|---|
| Douglas M. Geck, A/K/A Doug M. Geck, A Married Man, Individually, And As Beneficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 395738 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 6 | LOT9,E/2SE/4,PORTION LOTS 7,8 & 10 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E/2SW/4, W/2SE/4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E2NW4, E2SE4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | 152N-097W-07 SE4NE4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | N2NE4,SW4NE4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 417355 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 18 | SE/4SE/4 | 417355 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 18 | SW/4SE/4 | 417355 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 417355 | McKenzie | ND |
| Douglas W. Van Dyke And Marcia Van Dyke, Individually And As Husband And Wife | Great Northern Energy, Inc. | 4/7/2010 | 152 | 98 | 30 | Lot 1(33.53) | 401491 | McKenzie | ND |
| Douglas W. Van Dyke And Marcia Van Dyke, Individually And As Husband And Wife | Great Northern Energy, Inc. | 4/7/2010 | 152 | 99 | 25 | SWSW | 401492 | McKenzie | ND |
| Driscoll Childrens Hospital | Brigham Oil & Gas Lp | 8/30/2010 | 155 | 101 | 12 | E/2SW/4 | 698765 | Williams | ND |
| Driscoll Childrens Hospital | Brigham Oil & Gas Lp | 8/30/2010 | 155 | 101 | 12 | S/2NE/4 | 698765 | Williams | ND |
| Driscoll Childrens Hospital | Brigham Oil & Gas Lp | 8/30/2010 | 155 | 101 | 12 | SE/4 | 698765 | Williams | ND |
| Duane L Peterson | Panther Energy Company, LLC | 6/3/2008 | 151 | 99 | 14 | S2NW | 381554 | McKenzie | ND |
| Duane Leon Wold, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 402723 | McKenzie | ND |
| Duane Leon Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399005 | McKenzie | ND |
| E. Ward Koeser, Trustee Of The Edwin Koeser'S Children'S Trust | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 32 | SW4 | 359828 | McKenzie | ND |
| Earl Wilson | Diamond Resources, Inc. | 2/14/2006 | 152 | 98 | 14 | N2NW4 | 361832 | McKenzie | ND |
| Eddy D Ulledalen; Mdssp | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | 394941 | McKenzie | ND |
| Edith L. Wold, A Widow | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6 | 355705 | McKenzie | ND |
| Edith L. Wold, A Widow | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355705 | McKenzie | ND |
| Edith M Devine | 7 0'S Oil Corporation | 5/12/2005 | 27 | 59 | 7 | S/2SE/4 | 367382 | Roosevelt | MT |
| Edith M Devine | 7 0'S Oil Corporation | 5/12/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367382 | Roosevelt | MT |
| Edna L. Dahl, A/K/A Edna Dahl, A Married Woman | Diamond Resources, Inc. | 7/25/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358456 | McKenzie | ND |
| Edna L. Dahl, A/K/A Edna Dahl, A Married Woman | Diamond Resources, Inc. | 7/25/2005 | 152 | 98 | 24 | N2NW4 | 358456 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Edward D Schmit Family Trust | Panther Energy Company, LLC | 7/7/2008 | 151 | 99 | 14 | S2NW | 385462 | McKenzie | ND |
| Edward J Anfinson Et Ux | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT 1 | 398122 | McKenzie | ND |
| Edward J Anfinson Et Ux | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT4 | 398122 | McKenzie | ND |
| Edward J Anfinson Et Ux | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | SE/4SW/4 | 398122 | McKenzie | ND |
| Edward J. Anfinson And Donna Anfinson, Husband And Wife | Diamond Resources, Inc. | 7/14/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 358182 | McKenzie | ND |
| Edwin G. Olson And Beverly Olson, Husband And Wife | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357540 | McKenzie | ND |
| Edwin G. Olson And Beverly Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400922 | McKenzie | ND |
| Edwin G. Olson And Beverly Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400922 | McKenzie | ND |
| Edwin J Peet | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | E/2SW/4 | 688505 | Williams | ND |
| Edwin J Peet | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | SE/4 | 688505 | Williams | ND |
| Edwin J Peet | Brigham Oil & Gas Lp | 3/23/2010 | 155 | 101 | 12 | S/2NE/4 | 686322 | Williams | ND |
| Edwin L. Fields, A Married Man | Diamond Resources, Inc. | 3/15/2005 | 152 | 98 | 35 | NE4SE4, W2SE4, SW4, S2NW4 | 355571 | McKenzie | ND |
| Edwin L. Fields, A Married Man | Diamond Resources, Inc. | 3/15/2005 | 152 | 98 | 34 | N2SE4 | 355571 | McKenzie | ND |
| Elaine Hudson | 7 O'S Oil Corporation | 5/9/2005 | 27 | 59 | 7 | S/2SE/4 | 367381 | Roosevelt | MT |
| Elaine Hudson | 7 O'S Oil Corporation | 5/9/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367381 | Roosevelt | MT |
| Elaine L. Grantier, Individually, And As Heir To The Estate Of John J. Grantier, Deceased | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399021 | McKenzie | ND |
| Elaine Lingor | Empire Oil Company | 3/6/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372765 | McKenzie | ND |
| Elaine Lingor, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | 400920 | McKenzie | ND |
| Elaine Lingor, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400920 | McKenzie | ND |
| Eldon Mastvelten, A Single Man, Ind. And As Heir To The Estates Of Evelyn P Mastvelten, Dec. And Oscar J Mastvelten, Dec. | Great Northern Energy, Inc. | 5/10/2010 | 152 | 98 | 1 | Sec 1: Lots 3(29.89), 4(29.83) | 402722 | McKenzie | ND |
| Elise Renbarger, Life Tenant With Full Participation Rights And Authority To Grant Leases For Up To Five Years Without Consent Of Remainderman | Diamond Resources, Inc. | 3/3/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 356621 | McKenzie | ND |
| Elise Renbarger, Life Tenant With Full Participation Rights And Authority To Grant Leases For Up To Five Years Without Consent Of Remainderman | Diamond Resources, Inc. | 3/4/2005 | 152 | 98 | 11 | W2NW, NWSW | 356621 | McKenzie | ND |
| Elizabeth Ann Kallus, Personal Representative Of The Estate Of Liola Kallus | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 384659 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Elizabeth Ann Kallus, Pr For The Estate Of Liola Kallus | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 384659 | McKenzie | ND |
| Elizabeth Grantier, Jane Miller And Brooks Grantier, Co-Trustees Of The Elizabeth I. Keogh Trust 2 | Diamond Resources, Inc. | 12/16/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, and 10 | 360977 | McKenzie | ND |
| Elizabeth I Keogh Trust #2 | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | LOT 9,E2SE,PORTION LOT 7,8,10 | 399034-36 | McKenzie | ND |
| Elizabeth I. Keogh Trust 2, Elizabeth Grantier, Jayne Miller And Brooks Grantier, Co-Trustees | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399036 | McKenzie | ND |
| Elizabeth I. Keogh Trust 2, Elizabeth Grantier, Jayne Miller And Brooks Grantier, Co-Trustees | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399036 | McKenzie | ND |
| Elizabeth I. Keogh Trust 2, Elizabeth Grantier, Jayne Miller And Brooks Grantier, Co-Trustees | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399036 | McKenzie | ND |
| Elizabeth Rolfson, A Widow | Cody Oil & Gas Corporation | 7/1/2004 | 151 | 98 | 20 | SW/4 | 351159 | McKenzie | ND |
| Ellen J Edwards  Fuller Fam Tr | Sundance Oil & Gas Inc | 4/6/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370849 | Roosevelt | MT |
| Elmer R. Johnson, A Single Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355733 | McKenzie | ND |
| Elvin F Anderson Et Ux | Amoco Production Company | 9/15/1977 | 152 | 98 | 33 | NW/4, N/2SW/4 | 204906 | McKenzie | ND |
| Emg Properties Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 726870 | Williams | ND |
| Emg Properties Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 726870 | Williams | ND |
| Emg Properties Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 726870 | Williams | ND |
| Emma M Burcham | 7 O'S Oil Corporation | 4/8/2005 | 27 | 59 | 7 | S/2SE/4 | 367179 | Roosevelt | MT |
| Emma M Burcham | 7 O'S Oil Corporation | 4/8/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367179 | Roosevelt | MT |
| Empire Oil Company | Panther Energy Company | 4/23/2010 | 153 | 97 | 28 | NW4 | 401310 | McKenzie | ND |
| Endco Oil Company, Inc | Great Northern Energy, Inc. | 3/5/2010 | 152 | 99 | 25 | N2NW | 400053 | McKenzie | ND |
| Endco Oil Company, Inc | Great Northern Energy, Inc. | 3/5/2010 | 152 | 99 | 25 | NWNE | 400053 | McKenzie | ND |
| Eric T Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | E/2SW/4 | 656993 | Williams | ND |
| Eric T Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | SE/4 | 656993 | Williams | ND |
| Eric T Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | S/2NE/4 | 656993 | Williams | ND |
| Erling 0. Rolfson, A Married Man | Diamond Resources, Inc. | 6/17/2008 | 151 | 98 | 20 | SW4 | 379827 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | 151N-098W-29-SE/4 | 401353 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | NE/4 | 401353 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | N/2NW/4 | 401353 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 7/9/2010 | 151 | 98 | 32 | NE/4 | 405830 | McKenzie | ND |
| Estate Of Lars Iver Sundfor | Continental Resources, Inc. | 6/6/2011 | 153 | 97 | 27 | SE4SE4 | 419213 | McKenzie | ND |
| Estate Of Richard E Dirickson | Zenergy, Inc. | 5/10/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385547 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Esther M. Samuel John, A/K/A Esther Samuel John, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 4/26/2010 | 152 | 98 | 22 | NW/4 | 397558 | McKenzie | ND |
| Esther M. Samuel John, Aka Esther Samuel John, A Widow, June A. Lynner, Attorney-In- Fact | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397558 | McKenzie | ND |
| Esther M. Samuel John, Aka Esther Samuel John, A Widow, June A. Lynner, Attorney-In- Fact | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397558 | McKenzie | ND |
| Eugene A. And Gayle M. Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 11 | SE4 | 349784 | McKenzie | ND |
| Eugene A. And Gayle M. Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349784 | McKenzie | ND |
| Eugene A. Gunderson And Gayle M. Gunderson, Husband And Wife | Cody Oil & Gas Corporation | 5/4/2004 | 152 | 98 | 10 | SW/4 | 351138 | McKenzie | ND |
| Eugene Anderson And Ruth N. Anderson, Husband And Wife, As Joint Tenants | Cody Oil & Gas Corporation | 9/9/2004 | 151 | 98 | 20 | SE/4 | 351168 | McKenzie | ND |
| Eunice D Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382205 | Roosevelt | MT |
| Eunice D Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382205 | Roosevelt | MT |
| Evelyn P. Mastvelten, A/K/A Evelyn Mastvelten And Oscar N.J. Mastvelten, A/K/A Oscar Mastvelten, Wife And Husband | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E1/2SW1/4, W1/2SE1/4 | 362681 | McKenzie | ND |
| Evelyn P. Mastvelten, A/K/A Evelyn Mastvelten, And Oscar N.J. Mastvelten, A/K/A Oscar Mastvelten, Her Husband | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | Lots 3, 4 | 357178 | McKenzie | ND |
| Everett Crum Jr | 7 O'S Oil Corporation | 3/28/2005 | 27 | 59 | 7 | S/2SE/4 | 367180 | Roosevelt | MT |
| Everett Crum Jr | 7 O'S Oil Corporation | 3/28/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367180 | Roosevelt | MT |
| Exploration Nad Development Company, Inc. | Great Northern Energy, Inc. | 1/16/2010 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW, NWNE, N2NW | 399031 | McKenzie | ND |
| Florence Dyste Anderson, A Widow | Diamond Resources, Inc. | 6/6/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 357797 | McKenzie | ND |
| Florence Dyste Anderson, A Widow | Diamond Resources, Inc. | 6/7/2005 | 152 | 98 | 23 | NE4NE4 | 357797 | McKenzie | ND |
| Florence E Dyste; Widow, Ind And He | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 14 | E2SE,SWSE | 402724 | McKenzie | ND |
| Florence E Dyste; Widow, Ind And He | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 23 | NENE | 402724 | McKenzie | ND |
| Florence E. Berwick | Diamond Resources Inc. | 5/25/2005 | 28 | 58 | 25 | SE4SE4 | 609-130 | Roosevelt | MT |
| Frank P Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 14 | N2NW | 431197 | McKenzie | ND |
| Frank P Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 11 | E2SW,SWSW | 431197 | McKenzie | ND |
| Frederic C. Leiner, As Successor Trustee Of The Joan G. Leiner Family Trust Dtd 12-1985 | Diamond Resources, Inc. | 5/24/2006 | 151 | 99 | 26 | NE4NE4 | 364659 | McKenzie | ND |
| Frost National Bank As Trustee Of T | Diamond Resources Inc | 8/22/1997 | 155 | 101 | 12 | E2SW | 573372 | Williams | ND |
| Frost National Bank As Trustee Of T | Diamond Resources Inc | 8/22/1997 | 155 | 101 | 12 | S2NE | 573372 | Williams | ND |
| Frost National Bank As Trustee Of T | Diamond Resources Inc | 8/22/1997 | 155 | 101 | 12 | SE/4 | 573372 | Williams | ND |
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 3 | SW/4 | 378224 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | S/2 | 378224 | Roosevelt | MT |
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 9 | N/2 | 378224 | Roosevelt | MT |
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 378224 | Roosevelt | MT |
| Garvin O. Muri, Robert C. Muri And Karen L. Erickson | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 13 | NE, N2SE | 362270 | McKenzie | ND |
| Garvin Pederson, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355569 | McKenzie | ND |
| Garvin Pederson, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355569 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 393428 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SW4 | 393428 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | 393428 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | 393428 | McKenzie | ND |
| Gary Hamann And Sharon Hamann, Individually , And As Husband And Wife | Great Northern Energy, Inc. | 3/10/2010 | 152 | 99 | 25 | SWSW | 400421 | McKenzie | ND |
| Gary Hamann And Sharon Hamman, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400421 | McKenzie | ND |
| Gary Horst, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361884 | McKenzie | ND |
| Gary Horst, A Married Man | Great Northern Energy, Inc. | 4/17/2010 | 152 | 99 | 25 | SWSW | 402078 | McKenzie | ND |
| Gary James Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378522 | McKenzie | ND |
| Gary James Fetveit, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378522 | McKenzie | ND |
| Gary James Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 29 | E2NE4 | 378522 | McKenzie | ND |
| Gary James Fetveit; Married | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378313 | McKenzie | ND |
| Gary Mehlisch And Roxann Mehlisch, Ind And As Husband And Wife | Great Northern Energy, Inc. | 5/23/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 402727 | McKenzie | ND |
| Gary Mehlisch And Roxanne Mehlisch, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 4/12/2010 | 152 | 99 | 25 | SWSW | 402727 | McKenzie | ND |
| Gary Quale And Beverly Quale, Husband And Wife | Cody Oil & Gas Corporation | 5/6/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351140 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 17 | N2NW4 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 7 | SE4 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | 378792 | McKenzie | ND |
| Gem Razorback LLC | Oasis Petroleum North America LLC | 10/16/2010 | 152 | 98 | 32 | SE4NE4 | 499178 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Gem Razorback LLC | Oasis Petroleum North America LLC | 10/16/2010 | 152 | 98 | 32 | SW4NE4 | 499178 | McKenzie | ND |
|---|---|---|---|---|---|---|---|---|---|
| Gem Razorback LLC | Oasis Petroleum North America LLC | 10/16/2010 | 152 | 98 | 33 | NW4, N2SW4 | 499178 | McKenzie | ND |
| Gene W Murphy And Beverly Jean Murphy Joint Revoacble Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NWNE, NENW | 424469 | McKenzie | ND |
| Gene W Murphy And Beverly Jean Murphy Joint Revoacble Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NENE | 424469 | McKenzie | ND |
| Geneva Roggenbuck | Sundance Oil & Gas Inc | 10/29/2005 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 369183 | Roosevelt | MT |
| Genevieve Lemley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | 796483 | Williams | ND |
| Genevieve Lemley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | 796483 | Williams | ND |
| Genevieve Lemley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | 796483 | Williams | ND |
| Gennet M L Martin | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | S/2NE/4 | 389617 | Roosevelt | MT |
| Gennet M L Martin | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | LOT1, LOT2 | 389617 | Roosevelt | MT |
| Gennet Martin | Sundance Oil & Gas Inc | 10/29/2005 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 369118 | Roosevelt | MT |
| Gennet Smith Family Min Trust | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | S/2NE/4 | 389616 | Roosevelt | MT |
| Gennet Smith Family Min Trust | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 389616 | Roosevelt | MT |
| Gerald A. Olson And Marian Olson, As Trustees Under That Certain Trust Dated 05/02/1984 | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 362674 | McKenzie | ND |
| Gerald Gessner | Sundance Oil & Gas Inc | 11/25/2008 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 379373 | Roosevelt | MT |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 1 | SW4 | 397577 | McKenzie | ND |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 397577 | McKenzie | ND |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 29 | SE4SE4 | 397577 | McKenzie | ND |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/9/2010 | 152 | 98 | 32 | N2NE4 | 397577 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S2NE4, SE4 | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378301 | McKenzie | ND |
| Gerald P. Melby And Marion Melby, Husband And Wife | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | 379077 | McKenzie | ND |
| Gerald Peter Melby | Panther Entergy Company, LLC | 6/13/2008 | 151 | 99 | 14 | SW | 385480 | McKenzie | ND |
| Gerald Peter Melby And Marion Melby | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | E2 | 381552 | McKenzie | ND |
| Gerald Wade | Great Northern Energy, Inc. | 2/26/2010 | 152 | 98 | 11 | SWSW, E2SW | 400048 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Gerald Wade, Aka Jerry Wade, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 2/26/2010 | 152 | 98 | 14 | Sec 14: N2NW4 | 400048 | McKenzie | ND |
| Geraldine A. Botner, A Single Woman | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NE4NE4, NW4 | 364269 | McKenzie | ND |
| Geraldine Ann Brown Aka Jeri A Brow | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | 395876 | McKenzie | ND |
| Gjevre Alden H Trust | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 13 | NE4, N2SE4 | 356465 | McKenzie | ND |
| Gladys M Albers | Diamond Resources Inc | 4/14/2009 | 151 | 98 | 7 | NE,NENW | 378796 | McKenzie | ND |
| Glen Sloglund And Patricia Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 364414 | McKenzie | ND |
| Glen Sloglund And Patricia Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 364414 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 32 | NE | 364412 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | SE | 364412 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | NE | 364412 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | N2NW | 364412 | McKenzie | ND |
| Glenda C. Berg And Robert A. Berg, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 388495 | McKenzie | ND |
| Glenda C. Berg And Robert A. Berg, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 388495 | McKenzie | ND |
| Gloria Brunner Et Vir | Oasis Petroleum North America LLC | 11/9/2005 | 27 | 59 | 4 | S/2NE/4 | 385264 | Roosevelt | MT |
| Gloria Brunner Et Vir | Oasis Petroleum North America LLC | 11/9/2005 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 385264 | Roosevelt | MT |
| Gloria Brunner, Et Vir | Oasis Petroleum North America LLC | 12/8/2011 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 392048 | Roosevelt | MT |
| Gloria Brunner, Et Vir | Oasis Petroleum North America LLC | 12/8/2011 | 27 | 59 | 4 | S/2NW/4 | 392048 | Roosevelt | MT |
| Gloria Scott Berry | Unknown Lessee | 6/16/2008 | 27 | 59 | 10 | W/2E/2, W/2 | 377614 | Roosevelt | MT |
| Gloria Scott Berry | Unknown Lessee | 6/16/2008 | 27 | 59 | 10 | NE/4SW/4 | 377614 | Roosevelt | MT |
| Gordon Horst, A Married Man | Diamond Resources, Inc. | 12/4/2009 | 152 | 99 | 25 | SWSW | 395736 | McKenzie | ND |
| Gordon Horst, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/4/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395727 | McKenzie | ND |
| Gordon J. Kay | Diamond Resources, Inc. | 11/28/2008 | 152 | 98 | 11 | SWSW, E2SW | 385417 | McKenzie | ND |
| Gordon J. Kay, A Married Man | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360060 | McKenzie | ND |
| Gracie Sharbono | Unknown Lessee | 3/28/2005 | 27 | 59 | 7 | S/2SE/4 | 367182 | Roosevelt | MT |
| Gracie Sharbono | Unknown Lessee | 3/28/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367182 | Roosevelt | MT |
| Gregory Jon Nygard, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355568 | McKenzie | ND |
| Gregory Jon Nygard, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355568 | McKenzie | ND |
| Gregory Jon Nygard, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 36 | S2 | 355568 | McKenzie | ND |
| Gregory Macklin | Brigham Oil & Gas Lp | 2/5/2010 | 155 | 101 | 12 | N/2NE/4 | 685758 | Williams | ND |
| Gudrun Nygard, As Trustee Of That Certain Trust Established 4-14-93 And Entitled Gudrun Nygard Declaration Of Trust | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | SW4, S2NW4, W2SE4, NE4SE4 | 355698 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Gudrun Nygard, As Trustee Of That Certain Trust Established 4-14-93 And Entitled Gudrun Nygard Declaration Of Trust | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355698 | McKenzie | ND |
| Gudrun Nygard, As Trustee Of That Certain Trust Established 4-14-93 And Entitled Gudrun Nygard Declaration Of Trust | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 36 | S2 | 355698 | McKenzie | ND |
| Gus F. Lindemann And Marian K. Lindemann, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381438 | McKenzie | ND |
| Gus F. Lindemann And Marian K. Lindemann, Husband And Wife | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381438 | McKenzie | ND |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 3/20/2011 | 27 | 59 | 4 | S/2NE/4 | 388769 | Roosevelt | MT |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 3/20/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 388769 | Roosevelt | MT |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 4/14/2011 | 27 | 59 | 4 | LOT 3(40.08),LOT 4(40.08) | 388770 | Roosevelt | MT |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 4/14/2011 | 27 | 59 | 4 | S/2NW/4 | 388770 | Roosevelt | MT |
| Harley Shelley Aka Harley F Shelley | Diamond Resources Inc | 6/23/2009 | 152 | 98 | 14 | NE | 378494 | McKenzie | ND |
| Harley Shelley, A/K/A Harley F. Shelley, A Married Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | 378495 | McKenzie | ND |
| Harley Shelley, A/K/A Harley F. Shelley, A Married Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 32 | S2NE4 | 378495 | McKenzie | ND |
| Harley Shelley, A/K/A Harley F. Shelley, A Married Man | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | 378495 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 18 | SE/4SE/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 18 | SW/4SE/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E2NW4, E2SE4 | 378858 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E/2SW/4, W/2SE/4 | 378858 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 6 | LOT9,E/2SE/4,PORTION LOTS 7,8 & 10 | 378858 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | N2NE4,SW4NE4 | 378858 | McKenzie | ND |
| Harold Alvin Rolfsrud, A/K/A Harold Rolfsrud, A Married Man | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360062 | McKenzie | ND |
| Harold Alvin Rolfsrud, A/K/A Harold Rolfsrud, A Married Man | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 32 | S2NE4 | 360062 | McKenzie | ND |
| Harold M Rolfson | Cody Oil & Gas Corporation | 4/9/2008 | 151 | 98 | 20 | SW/4 | 379417 | McKenzie | ND |
| Harold M. Rolfson, A Married Man | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351155 | McKenzie | ND |
| Harriett M Rossi; Single | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 14 | N2NW | 400050 | McKenzie | ND |
| Harriett M Rossi; Single | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 11 | E2SW,SWSW | 400050 | McKenzie | ND |
| Harry Mazurkiewicz, A Single Man | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381433 | McKenzie | ND |
| Harry Mazurkiewicz, A Single Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381433 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Harvey And Elizabeth Thompson Revocable Living Trust | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349800 | McKenzie | ND |
| Hattie A. Haugan, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 4/26/2010 | 152 | 98 | 22 | NW/4 | 397565 | McKenzie | ND |
| Hattie A. Haugan, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397565 | McKenzie | ND |
| Hattie A. Haugan, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397565 | McKenzie | ND |
| Heath Harmon Et Ux | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 380984 | McKenzie | ND |
| Heidi H. Morris, A/K/A Heidi Morris, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To Wallace Geck And As Beneficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/9/2009 | 152 | 98 | 30 | Lot 1(33.53) | 400924 | McKenzie | ND |
| Heidi H. Morris, A/K/A Heidi Morris, A Married Woman, Individually, And As Heir To Wallace Geck And As Beneficiary Of The Adolf Geck  And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/9/2009 | 152 | 99 | 25 | SWSW | 400928 | McKenzie | ND |
| Helen Birdsall Family Mineral Trust, Bruce Birdsall, As Trustee | Great Northern Energy, Inc. | 3/5/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400044 | McKenzie | ND |
| Helen Fosshage Ringeisen | Golden Eye Resources | 12/29/2009 | 155 | 101 | 12 | W/2SW/4 | 681610 | Williams | ND |
| Helen J. Neils, A Married Woman | Diamond Resources, Inc. | 5/24/2006 | 152 | 98 | 30 | Lot 1 | 364280 | McKenzie | ND |
| Helen Marie Lovro, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399013 | McKenzie | ND |
| Helen Marie Lovro, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399013 | McKenzie | ND |
| Helen Marie Lovro; Mdssp | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 399017 | McKenzie | ND |
| Henry G Newell, Et Ux | Brigham Oil & Gas Lp | 9/24/2010 | 155 | 101 | 12 | E/2SW/4 | 698754 | Williams | ND |
| Henry G Newell, Et Ux | Brigham Oil & Gas Lp | 9/24/2010 | 155 | 101 | 12 | SE/4 | 698754 | Williams | ND |
| Henry G Newell, Et Ux | Brigham Oil & Gas Lp | 9/24/2010 | 155 | 101 | 12 | S/2NE/4 | 698754 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | LOTS 1 & 2 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SE/4 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SW/4 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SW/4NW/4 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | LOTS 3 & 4 | 680974 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | S/2NE/4 | | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SE/4NW/4 | | 680974 | Williams | ND |
| Herma C. Altshule | Diamond Resources, Inc. | 1/4/2009 | 152 | 98 | 11 | SWSW, E2SW | | 386185 | McKenzie | ND |
| Herma C. Altshule, A Married Woman | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 14 | N2NW4 | | 358179 | McKenzie | ND |
| Herman Schimtz, As Trustee Of The Helen Anderson Trust No. 2 U/A Dated February 9, 1994 | Diamond Resources, Inc. | 10/7/2005 | 152 | 98 | 33 | NW4, N2SW4 | | 359345 | McKenzie | ND |
| Herman Schimtz, As Trustee Of The Helen Anderson Trust No. 2 U/A Dated February 9, 1994 | Diamond Resources, Inc. | 10/7/2005 | 152 | 98 | 32 | S2NE4 | | 359345 | McKenzie | ND |
| Hobomodo Minerals Trust | Zenergy, Inc. | 10/1/2011 | 151 | 98 | 33 | NWNE,S2NE,SENW | | 424919 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355694 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | | 355694 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | | 355694 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | | 355694 | McKenzie | ND |
| Holly Washburn, A Married Woman | Great Northern Energy, Inc. | 3/2/2010 | 152 | 99 | 25 | SWSW | | 400054 | McKenzie | ND |
| Howard J Brown And Constance A Brow | St Mary Land & Exploration Company | 11/25/2009 | 151 | 99 | 23 | SW | | 396238 | McKenzie | ND |
| Howard J Brown And Constance A Brow | St Mary Land & Exploration Company | 11/25/2009 | 151 | 99 | 26 | NE4NW4, NW4SE4, W2NE4 | | 396238 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | | 378786 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | | 378786 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 4/20/2005 | 151 | 98 | 7 | SE4 | | 378786 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | | 378786 | McKenzie | ND |
| Howard M Mullins | Oasis Petroleum North America LLC | 12/28/2011 | 155 | 101 | 12 | E/2SW/4 | | 732603 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Howard M Mullins | Oasis Petroleum North America LLC | 12/28/2011 | 155 | 101 | 12 | S/2NE/4 | | 732603 | Williams | ND |
| Howard M Mullins | Oasis Petroleum North America LLC | 12/28/2011 | 155 | 101 | 12 | SE/4 | | 732603 | Williams | ND |
| Ida Evans | Diamond Resources, Inc. | 1/12/2009 | 152 | 98 | 11 | SWSW, E2SW | | 386429 | McKenzie | ND |
| Ida Evans, A Widow | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | | 360053 | McKenzie | ND |
| Iona M. Lawlar, A Single Woman | Cody Oil & Gas Corporation | 9/21/2004 | 151 | 98 | 20 | NW/4 | | 353347 | McKenzie | ND |
| Irene Henry | Missouri Basin Well Service | 12/8/2004 | 152 | 98 | 11 | NE4 | | 353728 | McKenzie | ND |
| Irene Henry | Missouri Basin Well Service | 7/14/2004 | 152 | 98 | 11 | E2NW4 | | 353728 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW4 | | 356862 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 28 | S2SW4, NE4SW4, SE4 | | 356862 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 29 | SE4SE4 | | 356862 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/11/2005 | 152 | 98 | 32 | N2NE4 | | 356862 | McKenzie | ND |
| Irene Henry; Widow | Missouri Basin Well Service, Inc. | 7/14/2004 | 152 | 98 | 11 | E2NW | | 349848 | McKenzie | ND |
| Isabelle Carlson | Oasis Petroleum North America | 2/15/2019 | 152 | 98 | 14 | E/2SE/4, SW/4SE/4 | | 514098 | McKenzie | ND |
| Isabelle Carlson | Oasis Petroleum North America | 2/15/2019 | 152 | 98 | 23 | NE/4NE/4 | | 514098 | McKenzie | ND |
| Ivan B Rogers | Unknown Lessee | 4/13/2005 | 27 | 59 | 7 | S/2SE/4 | | 367173 | Roosevelt | MT |
| Ivan B Rogers | Unknown Lessee | 4/13/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 367173 | Roosevelt | MT |
| Jack Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | | 401499 | McKenzie | ND |
| Jack Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | | 401499 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc | 3/2/2005 | 152 | 97 | 18 | Lots 1, 2, 3, 4, S2NE4, N2SE4, NE4SW4, SE4NW4 | | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | | 355258 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc . | 3/2/2005 | 152 | 98 | 13 | E2SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | S2NW4, N2SW4, S2NE4, N2SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 1-4, S2NE4, N2SE4, NE4SW4, SE4NW4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | E2SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson, Trustee And Jeanette A. Richardson, Individually And As Trustee Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 381033 | McKenzie | ND |
| James A. Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349801 | McKenzie | ND |
| James C Christensen By Atty In Fact | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 804984 | Williams | ND |
| James C Christensen By Atty In Fact | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 804984 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| James C Christensen By Atty In Fact | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | | 804984 | Williams | ND |
| James C Walla; Single | St Mary Land & Exploration Company | 10/23/2009 | 151 | 99 | 23 | SW | | 397874 | McKenzie | ND |
| James C Walla; Single | St Mary Land & Exploration Company | 10/23/2009 | 151 | 99 | 26 | NE4NW4, NW4SE4, W2NE4 | | 397874 | McKenzie | ND |
| James D. Renbarger | Diamond Resources, Inc. | 3/4/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | | 355735 | McKenzie | ND |
| James D. Renbarger | Diamond Resources, Inc. | 3/5/2005 | 152 | 98 | 11 | W2NW, NWSW | | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | | 355735 | McKenzie | ND |
| James H Williams Real Estate Trust | Missouri Basin Well Service, Inc. | 7/15/2004 | 152 | 98 | 11 | E2NW | | 351687 | McKenzie | ND |
| James H. Williams Real Estate Trust | Missouri Basin Well Service | 12/8/2004 | 152 | 98 | 11 | NE4 | | 354487 | McKenzie | ND |
| James H. Williams Real Estate Trust | Missouri Basin Well Service | 7/15/2004 | 152 | 98 | 11 | E2NW4 | | 354487 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW4 | | 357187 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 29 | SE4SE4 | | 357187 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/11/2005 | 152 | 98 | 32 | N2NE4 | | 357187 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | | 357187 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | S2NE4, SE4 | | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 33 | E2E2 | | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 34 | E2W2, W2SW4 | | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | | 378302 | McKenzie | ND |
| James Johnston And Elva Lou Johnston, Husband And Wife | Diamond Resources, Inc. | 12/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 360981 | McKenzie | ND |
| James L Moe | Oasis Petroleum North America LLC | 1/6/2012 | 151 | 98 | 28 | N2SW4, SE4SW4, SW4SE4 | | 491451 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a Tract in Lots 7, 8, 10 | | 364265 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | E2W2, E2 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | E2W2, E2 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 18 | N2NE4, NE4NW4, S2SE4 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 19 | Lots 1, 2, N2NE4, E2NW4 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 98 | 24 | E2NE4 | 364265 | McKenzie | ND |
| James Lewis Fosshage | Golden Eye Resources | 12/29/2009 | 155 | 101 | 12 | W/2SW/4 | 680047 | Williams | ND |
| James M. Melby, A/K/A James Michael Melby | Diamond Resources, Inc. | 5/21/2008 | 151 | 98 | 19 | Lot 3 | 379085 | McKenzie | ND |
| James Michael Melby | Panther Entergy Company, LLC | 7/3/2008 | 151 | 99 | 14 | SW | 385479 | McKenzie | ND |
| James Michael Melby And Pamela Melb | Panther Entergy Company, LLC | 6/12/2008 | 151 | 99 | 14 | E2 | 381551 | McKenzie | ND |
| James R Macklin, Et Ux | Brigham Oil & Gas Lp | 2/5/2010 | 155 | 101 | 12 | N/2NE/4 | 685759 | Williams | ND |
| James Sundfor | Continental Resources Inc | 7/15/2008 | 153 | 97 | 27 | SE4SE4 | 381656 | McKenzie | ND |
| James T Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382417 | Roosevelt | MT |
| James T Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382417 | Roosevelt | MT |
| James Thomley, A Single Man | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358467 | McKenzie | ND |
| James Thomley, A Single Man | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358467 | McKenzie | ND |
| James William Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401505 | McKenzie | ND |
| James William Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401505 | McKenzie | ND |
| Jan Sell, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364014 | McKenzie | ND |
| Jan Sell, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 396679 | McKenzie | ND |
| Janet Kay Edwards Bull Fam Tr | Sundance Oil & Gas Inc | 4/6/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370848 | Roosevelt | MT |
| Janice F. Burns, A/K/A Janice Faye Burns | Diamond Resources, Inc. | 12/19/2005 | 152 | 98 | 23 | SE4 | 364655 | McKenzie | ND |
| Janice Heckel, A Married Woman | Cody Oil & Gas Corporation | 5/19/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351147 | McKenzie | ND |
| Janice K. Mcnamara, A Single Woman | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401495 | McKenzie | ND |
| Janice K. Mcnamara, A Single Woman | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401495 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355695 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 26 | S2, S2NE4 | 355695 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 36 | NW4 | 355695 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc | 2/15/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355695 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Janice Rikustad Aka Janice B Rikustad, A Widow | Great Northern Energy, Inc. | 3/22/2010 | 151 | 99 | 25 | SW4NW4,N2SW4 | 394857 | McKenzie | ND |
| Janice Rikustad, A/K/A Janice B. Rikustad, A Widow | Great Northern Energy, Inc. | 11/18/2009 | 151 | 99 | 26 | SE4NE4 | 394857 | McKenzie | ND |
| Janice Rikustad, A/K/A Janice B. Rikustad, Individually And As Attorney-In-Fact For Kenneth N. Rikustad, Her Husband | Diamond Resources, Inc. | 3/22/2006 | 151 | 99 | 26 | SE4NE4 | 362676 | McKenzie | ND |
| Jason Bruins Aka Jason E Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | 386824 | McKenzie | ND |
| Jason Bruins Aka Jason E Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | 386828 | McKenzie | ND |
| Jason E Bruins | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | 386830 | McKenzie | ND |
| Jayne E. Miller And Elizabeth M. Grantier, As Co-Trustees Of The Elizabeth I. Keogh Trust 2 | Diamond Resources, Inc. | 5/25/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 364262 | McKenzie | ND |
| Jayne E. Miller And Elizabeth M. Grantier, As Co-Trustees Of The Elizabeth I. Keogh Trust 2 | Diamond Resources, Inc. | 5/25/2006 | 152 | 97 | 18 | N2NE4, NE4NW4 | 364262 | McKenzie | ND |
| Jean B Davies; Mdssp | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | 396393 | McKenzie | ND |
| Jean Kathleen Lenzmeier | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496424 | McKenzie | ND |
| Jean L. Schroeder, A/K/A Jean Schroeder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/29/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | 399032 | McKenzie | ND |
| Jean L. Schroeder, A/K/A Jean Schroeder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/30/2010 | 152 | 98 | 24 | N2NW4 | 399032 | McKenzie | ND |
| Jeanette A. Gilbertson, Anda Jeannette Gilbertson, A Married Woman | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358460 | McKenzie | ND |
| Jeanette A. Gilbertson, Anda Jeannette Gilbertson, A Married Woman | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 24 | N2NW4 | 358460 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 1 | SW4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 28 | SE4, S2SW4, NE4SW4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 29 | SE4SE4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 32 | N2NE4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 11 | E2NW4, NE4 | 361245 | McKenzie | ND |
| Jeffrey S Harmon Et Ux | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 381469 | McKenzie | ND |
| Jeffrey Thomley, A Single Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358452 | McKenzie | ND |
| Jeffrey Thomley, A Single Man | Diamond Resources, Inc. | 8/2/2005 | 152 | 98 | 24 | N2NW4 | 358452 | McKenzie | ND |
| Jennifer Anderson, A Single Woman | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401497 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jennifer Anderson, A Single Woman | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401497 | McKenzie | ND |
| Jennifer Schantz, A Single Woman, Individually And As Heir To The Estate Of Susan Schantz, Deceased | Great Northern Energy, Inc. | 1/23/2010 | 152 | 98 | 30 | Lot 1(33.53) | 401501 | McKenzie | ND |
| Jennifer Schantz, A Single Woman, Individually, And As Heir To The Estate Of Susan Schantz | Great Northern Energy, Inc. | 2/23/2010 | 152 | 99 | 25 | SWSW | 401502 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 28 | NE4, E2NW4, NW4NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 28 | NE4, E2NW4, NW4NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W2NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W1/2NW1/4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 22 | SWSW | 357175 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2002 | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355572/ 357175 | McKenzie | ND |
| Jerome Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358461 | McKenzie | ND |
| Jerome Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358461 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jim Horst | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361080 | McKenzie | ND |
| Jim Horst, A/K/A James Horst, A Married Man | Great Northern Energy, Inc. | 3/31/2010 | 152 | 99 | 25 | SWSW | 402084 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | E/2NE/4, SW/4NE/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | N/2NW/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | N/2SW/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | NW/4NE/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | SE/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | S/2NW/4 | 498673 | McKenzie | ND |
| Jo Ann Anderson | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | NW/2SW/4, W/2NW/4 | 376940 | McKenzie | ND |
| Joan G Leiner Family Trust | St. Mary Land & Exploration Company | 5/24/2010 | 151 | 99 | 26 | NENE | 403930 | McKenzie | ND |
| Joan G Leiner Family Trust | St. Mary Land & Exploration Company | 5/24/2010 | 151 | 99 | 25 | NW4NW4 | 403930 | McKenzie | ND |
| Joan Hruby | Continental Resources, Inc. | 9/10/2010 | 152 | 98 | 30 | LOT 1 | 408660 | McKenzie | ND |
| Joan Peet Mcmullan | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | E/2SW/4 | 690278 | Williams | ND |
| Joan Peet Mcmullan | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | SE/4 | 690278 | Williams | ND |
| Joan Peet Mcmullan | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | S/2NE/4 | 690278 | Williams | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378303 | McKenzie | ND |
| Joann Bornholdt, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364021 | McKenzie | ND |
| Joann Bornholdt, A Widow | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 399015 | McKenzie | ND |
| Joann Quale, A Single Woman | Cody Oil & Gas Corporation | 6/8/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351148 | McKenzie | ND |
| Joanne Kjelstad | Diamond Resources, Inc. | 4/29/2008 | 151 | 99 | 13 | S2SW, SWSE | 377948 | McKenzie | ND |
| Joanne Kjelstad | Diamond Resources, Inc. | 4/29/2008 | 151 | 99 | 24 | W2E2, NENE, NESW, NW | 377948 | McKenzie | ND |
| Joanne Kjelstad, A Widow | Diamond Resources, Inc. | 4/26/2009 | 152 | 98 | 33 | E2E2 | 377949 | McKenzie | ND |
| Joanne Kjelstad, A Widow | Diamond Resources, Inc. | 4/26/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 377949 | McKenzie | ND |
| Joe Gieb Iii, A Single Man | Diamond Resources, Inc. | 7/18/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 382031 | McKenzie | ND |
| Joe Robert Niesen | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 732631 | Williams | ND |
| Joe Robert Niesen | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 732631 | Williams | ND |
| Joe Robert Niesen | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 732631 | Williams | ND |
| John Anderson, A/K/A Carl John Anderson And Violet Anderson, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 7 | Lots 1, 2 | 362478 | McKenzie | ND |
| John B Easterling | 7 O'S Oil Corporation | 7/25/2005 | 27 | 59 | 7 | S/2SE/4 | 368060 | Roosevelt | MT |
| John B Easterling | 7 O'S Oil Corporation | 7/25/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368060 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| John C. Peterson And Dorothy M. Peterson, Trustees Of The Peterson Trust Dated July 15, 1988 | Diamond Resources, Inc. | 4/29/2008 | 151 | 98 | 19 | Lot 4, E2SW, W2SE | 378317 | McKenzie | ND |
| John David Peet; Mdssp | Diamond Resources Inc | 7/2/1997 | 155 | 101 | 12 | S2NE | 574623 | Williams | ND |
| John David Peet; Mdssp | Diamond Resources Inc | 7/2/1997 | 155 | 101 | 12 | E2SW | 574623 | Williams | ND |
| John David Peet; Mdssp | Diamond Resources Inc | 7/2/1997 | 155 | 101 | 12 | SE/4 | 574623 | Williams | ND |
| John E. Suckerman, A Married Man | Diamond Resources, Inc. | 11/11/2005 | 152 | 98 | 30 | Lot 1 | 360050 | McKenzie | ND |
| John E. Suckerman, A Married Man | Great Northern Energy, Inc. | 4/12/2010 | 152 | 99 | 25 | SWSW | 401485 | McKenzie | ND |
| John Edward Rossi And Virginia Ross | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 11 | E2SW,SWSW | 400049 | McKenzie | ND |
| John Edward Rossi And Virginia Ross | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 14 | N2NW | 400049 | McKenzie | ND |
| John H Neyer | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687484 | Williams | ND |
| John H Neyer | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687484 | Williams | ND |
| John H Neyer | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687484 | Williams | ND |
| John Horst | Oasis Petroleum North America, LLC | 2/1/2014 | 152 | 98 | 30 | LOT1 | 463788 | McKenzie | ND |
| John J. Grainier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 11/8/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 361072 | McKenzie | ND |
| John J. Grantier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 364268 | McKenzie | ND |
| John J. Grantier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | NE4, E2N W4, E2SE4 | 364268 | McKenzie | ND |
| John J. Grantier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 18 | N2NE4, NE4NW4 | 364268 | McKenzie | ND |
| John Modisett | Continental Resources, Inc. | 9/8/2010 | 152 | 98 | 30 | LOT 1 | 408241 | McKenzie | ND |
| John Modisett, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364278 | McKenzie | ND |
| John Robert Dyste, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401496 | McKenzie | ND |
| John Robert Dyste, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401496 | McKenzie | ND |
| John S Benson | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 793941 | Williams | ND |
| John S Benson | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 793941 | Williams | ND |
| John S Benson | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 793941 | Williams | ND |
| John Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 360054 | McKenzie | ND |
| John Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 360054 | McKenzie | ND |
| Johnsrud & Sons | Diamond Resources, Inc. | 4/30/2009 | 152 | 98 | 34 | S2SE4 | 388732 | McKenzie | ND |
| Jolene Christensen, A Married Woman | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351149 | McKenzie | ND |
| Jolyn F Sigvaldsen | Zenergy, Inc. | 9/1/2011 | 151 | 98 | 33 | NWNE,S2NE,SENW | 423493 | McKenzie | ND |
| Jolyn F Sigvaldsen | Zenergy, Inc. | 9/1/2011 | 151 | 98 | 32 | S2SW | 423493 | McKenzie | ND |
| Joseph C. Hild And Doris Hild, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381432 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Joseph C. Hild And Doris Hild, Husband And Wife | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 365662 | McKenzie | ND |
| Joseph C. Hild And Doris Hild, Husband And Wife | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381432 | McKenzie | ND |
| Joseph J. Geck, A/K/A Joseph Geck, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To Wallace Geck And As Beneficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 98 | 30 | Lot 1(33.53) | 397560 | McKenzie | ND |
| Joseph J. Geck, A/K/A Joseph Geck, A Married Man Individually And As Heir To Wallace Geck And As Beneficiary Of The Adolf Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 397556 | McKenzie | ND |
| Joseph L. And Caroline Waggoner | Missouri Basin Well Service | 6/26/2008 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 380393 | McKenzie | ND |
| Josephine Ehemann Trust | Brigham Oil & Gas Lp | 9/15/2010 | 155 | 101 | 12 | E/2SW/4 | 698751 | Williams | ND |
| Josephine Ehemann Trust | Brigham Oil & Gas Lp | 9/15/2010 | 155 | 101 | 12 | SE/4 | 698751 | Williams | ND |
| Josephine Ehemann Trust | Brigham Oil & Gas Lp | 9/15/2010 | 155 | 101 | 12 | S/2NE/4 | 698751 | Williams | ND |
| Joshua Lynn Shaw | Zenergy, Inc. | 3/7/2012 | 152 | 98 | 24 | N2NW | 432980 | McKenzie | ND |
| Joshua Lynn Shaw | Zenergy, Inc. | 3/7/2012 | 152 | 98 | 13 | N2SW,SWSW | 432980 | McKenzie | ND |
| Joyce A. Brown, A/K/A Joyce Anne Brown, A Widow | Great Northern Energy, Inc. | 12/15/2009 | 152 | 98 | 23 | Sec 23: SE4 | 396687 | McKenzie | ND |
| Joyce Boughton, A Widow | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401498 | McKenzie | ND |
| Joyce Boughton, A Widow | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401498 | McKenzie | ND |
| Joyce Marie Johnson | Continental Resources, Inc. | 5/4/2010 | 151 | 98 | 7 | NE/4, NE/4NW/4 | 402625 | McKenzie | ND |
| Joyce Marie Johnson, A Single Woman | Diamond Resources, Inc. | 5/4/2005 | 151 | 98 | 7 | NE4, NE4NW4 | 357182 | McKenzie | ND |
| Juanita I Neff | Brigham Oil & Gas Lp | 6/11/2010 | 155 | 101 | 12 | E/2SW/4 | 693946 | Williams | ND |
| Juanita I Neff | Brigham Oil & Gas Lp | 6/11/2010 | 155 | 101 | 12 | S/2NE/4 | 693946 | Williams | ND |
| Juanita I Neff | Brigham Oil & Gas Lp | 6/11/2010 | 155 | 101 | 12 | SE/4 | 693946 | Williams | ND |
| Judi Quale, A Single Woman | Cody Oil & Gas Corporation | 5/14/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351145 | McKenzie | ND |
| Judith Cruz Trust | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370930 | Roosevelt | MT |
| Judith L Doughty | Oasis Petroleum North America | 12/1/2010 | 152 | 98 | 13 | N/2SW/4, SW/4SW/4 | 510781 | McKenzie | ND |
| Judith L Doughty | Oasis Petroleum North America | 12/1/2010 | 152 | 98 | 24 | N/2NW/4 | 510781 | McKenzie | ND |
| Judith R Cruz | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370929 | Roosevelt | MT |
| Judith STenehjem Minerals Trust | St Mary Land & Exploration Company | 11/22/2009 | 151 | 99 | 35 | W2SW | 394946 | McKenzie | ND |
| Judy Bender; Mdssp | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | LOTS 11-14,E2SW,W2SE | 397557 | McKenzie | ND |
| Judy Hagen, A Married Woman | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 357802 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Judy K. Olsen, A/K/A Judy Olsen, A Married Woman, Individually And As Bebeficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 395735 | McKenzie | ND |
| Judy Miller, A Single Woman | Diamond Resources, Inc. | 12/28/2005 | 152 | 98 | 30 | Lot 1 | 360812 | McKenzie | ND |
| Judy Miller, A/K/A Judith A. Miller, A Single Woman | Great Northern Energy, Inc. | 2/9/2010 | 152 | 99 | 25 | SWSW | 397575 | McKenzie | ND |
| Judy Olson, F/K/A Judy Geck A Married Woman | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 (Protective) | 361880 | McKenzie | ND |
| Judy Robinet | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 14 | E2SE,SWSE | 443438 | McKenzie | ND |
| Judy Robinet | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 23 | NENE | 443438 | McKenzie | ND |
| Julia Mae Belcher | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382195 | Roosevelt | MT |
| Julia Mae Belcher | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382195 | Roosevelt | MT |
| Julia P. Kipp, F/K/A Julia P. Rikustad And Wallace M. Kipp, Individually, And Husband And Wife | Great Northern Energy, Inc. | 3/2/2010 | 151 | 99 | 25 | SW4NW4,N2SW4 | 397574 | McKenzie | ND |
| Julia P. Kipp, F/K/A Julia P. Rikustad And Wallace M. Kipp, Wife And Husband | Great Northern Energy, Inc. | 11/18/2009 | 151 | 99 | 26 | SE4NE4 | 397574 | McKenzie | ND |
| Julia P. Kipp, F/K/A Julia P. Rikustad, And Wallace M. Kipp, Her Husband | Diamond Resources, Inc. | 3/22/2006 | 151 | 99 | 26 | SE4NE4 | 362672 | McKenzie | ND |
| Julie A. Beaman, A/K/A Julie Beaman, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358464 | McKenzie | ND |
| Julie A. Beaman, A/K/A Julie Beaman, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358464 | McKenzie | ND |
| Julie Brandon, F/K/A Julie Misemer, A Single Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364028 | McKenzie | ND |
| Julie Brandon, F/K/A Julie Misemer, A Single Woman | Great Northern Energy, Inc. | 12/31/2009 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364028 | McKenzie | ND |
| Julie Dolney And Gyle Dolney; H/W | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | 394939 | McKenzie | ND |
| Julie Gray | Empire Oil Company | 3/6/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372764 | McKenzie | ND |
| Julie Gray, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | 400419 | McKenzie | ND |
| Julie Gray, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400419 | McKenzie | ND |
| Julie S Mueller | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | E/2SW/4 | 700137 | Williams | ND |
| Julie S Mueller | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | SE/4 | 700137 | Williams | ND |
| Julie S Mueller | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | S/2NE/4 | 700137 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Juliet Brown, A/K/A Juliet L. Brown, A Single Woman, Individually And As Beneficiary To The Leone E. Brown June 10, 1992 Trust | Great Northern Energy, Inc. | 12/1/2009 | 152 | 98 | 30 | NE4, SE4SE4 | 396694 | McKenzie | ND |
| June A. Lynner, A Widow | Great Northern Energy, Inc. | 4/26/2010 | 152 | 98 | 22 | NW/4 | 397559 | McKenzie | ND |
| June A. Lynner, A Widow | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397559 | McKenzie | ND |
| June A. Lynner, A Widow | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397559 | McKenzie | ND |
| June Anderson Mineral Trust, Beverly A. Marthaller, Trustee | Great Northern Energy, Inc. | 3/23/2010 | 152 | 98 | 33 | NW4, N2SW4 | 400420 | McKenzie | ND |
| June Anderson Mineral Trust, Beverly A. Marthaller, Trustee | Great Northern Energy, Inc. | 3/23/2010 | 152 | 98 | 32 | S2NE4 | 400420 | McKenzie | ND |
| Justin Johnson, A Married Man | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | 355194 | McKenzie | ND |
| Justin Johnson, A Married Man | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 355194 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378316 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | 378316 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378316 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378316 | McKenzie | ND |
| Karen Caturay, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364027 | McKenzie | ND |
| Karen J Kirmis Trust Udt 7/23/96 | Empire Oil Company | 3/30/2011 | 151 | 98 | 32 | S/2SW/4 | 411708 | McKenzie | ND |
| Karen J. Kirmis, A Married Woman | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360068 | McKenzie | ND |
| Karen J. Kirmis, A Married Woman | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 32 | S2NE4 | 360068 | McKenzie | ND |
| Karen L. Snyder, Vida Karen White, F/K/A Karen L. White, A Single Woman | Diamond Resources, Inc. | 5/8/2006 | 152 | 98 | 34 | E2W2 | 363738 | McKenzie | ND |
| Karen L. Tillemans, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401507 | McKenzie | ND |
| Karen L. Tillemans, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401507 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 355195 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 17 | N2NE4 | 355195 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355195 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 355195 | McKenzie | ND |
| Karen White, A Single Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356866 | McKenzie | ND |
| Karen White, A Single Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356866 | McKenzie | ND |
| Karen White, A Single Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | W2SW4 | 356866 | McKenzie | ND |
| Karen White, A/K/A Karen L. Snyder, A Married Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | W1/2SW1/4 | 377202 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | | 400416 | McKenzie | ND |
| Katherine Lynn Knight, A/K/A Katherine Kay Knight, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 400051 | McKenzie | ND |
| Katherine Lynn Knight, A/K/A Katherine Kay Knight, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/26/2010 | 152 | 98 | 24 | N2NW4 | | 400051 | McKenzie | ND |
| Kathleen Anderson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | | 360261 | McKenzie | ND |
| Kathleen Anderson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | | 360261 | McKenzie | ND |
| Kathleen Ann Rowe, A/K/A Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355693 | McKenzie | ND |
| Kathleen Ann Rowe, A/K/A Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 26 | S2, S2NE4 | | 355693 | McKenzie | ND |
| Kathleen Ann Rowe, A/K/A Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 36 | NW4 | | 355693 | McKenzie | ND |
| Kathleen Ann Rowe, Aka Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc | 2/15/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | | 355693 | McKenzie | ND |
| Kathleen M. Ward, A Married Woamn | Great Northern Energy, Inc. | 2/2/2010 | 152 | 99 | 25 | SWSW | | 399007 | McKenzie | ND |
| Kathleen M. Ward, A/K/A Kathleen Mae Ward, A Married Woman | Diamond Resources, Inc. | 7/14/2009 | 152 | 98 | 30 | Lot 1 | | 381027 | McKenzie | ND |
| Kathleen Tschetter | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 20 | SW | | 378308 | McKenzie | ND |
| Kathleen Tschetter, A Married Woman | Cody Oil & Gas Corporation | 7/8/2004 | 151 | 98 | 20 | SW/4 | | 351162 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Kathleen Tschetter, A Married Woman | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 20 | SW4 | 351162 | McKenzie | ND |
| Kathryn A. Pearson, A Single Woman | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401489 | McKenzie | ND |
| Kathryn A. Pearson, A Single Woman | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401489 | McKenzie | ND |
| Kathy Adamic, A Married Woman | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378510 | McKenzie | ND |
| Kathy Dorgan, A Married Woman | Diamond Resources, Inc. | 2/24/2006 | 152 | 98 | 30 | Lot 1 | 362271 | McKenzie | ND |
| Kathy Dorgan, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396680 | McKenzie | ND |
| Kathy Dorgan, A Married Woman, Individually, And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | SWSW | 396696 | McKenzie | ND |
| Kathy Dorgan; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | N2NW | 396689 | McKenzie | ND |
| Kathy Dorgan; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | NWNE | 396689 | McKenzie | ND |
| Kay Foster And William Foster | Diamond Resources, Inc. | 4/15/2008 | 152 | 99 | 25 | SWSW | 377715 | McKenzie | ND |
| Kay Foster And William Foster, Her Husband | Diamond Resources, Inc. | 4/15/2008 | 152 | 98 | 30 | Lot 1 | 377715 | McKenzie | ND |
| Kay Kauffman Gilbert | Diamond Resources, Inc. | 8/7/2009 | 152 | 98 | 11 | SWSW, E2SW | 391274 | McKenzie | ND |
| Kay Kauffman Gilbert, A Married Woman | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360058 | McKenzie | ND |
| Keith Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 32 | S2NE4 | 438234 | McKenzie | ND |
| Keith Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 33 | NW, N2SW | 438234 | McKenzie | ND |
| Ken Altschuld, A Married Man | Diamond Resources, Inc | 10/26/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4, SE4 | 360264 | McKenzie | ND |
| Ken Altschuld, A Married Man | Diamond Resources, Inc | 10/26/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | 360264 | McKenzie | ND |
| Kenneth D Neyer Living Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687486 | Williams | ND |
| Kenneth D Neyer Living Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687486 | Williams | ND |
| Kenneth D Neyer Living Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687486 | Williams | ND |
| Kenneth D Romo Et Ux Marie | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382276 | Roosevelt | MT |
| Kenneth D Romo Et Ux Marie | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382276 | Roosevelt | MT |
| Kenneth J Haugen Marital Trust | Empire Oil Company | 3/30/2011 | 151 | 98 | 32 | S/2SW/4 | 412013 | McKenzie | ND |
| Kenneth K. Kauffman | Diamond Resources, Inc. | 12/17/2008 | 152 | 98 | 11 | SWSW, E2SW | 385873 | McKenzie | ND |
| Kenneth K. Kauffman, A Married Man | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360055 | McKenzie | ND |
| Kenneth Merril Johnson And Lois Johnson, Husband And Wife | Diamond Resources, Inc. | 5/4/2005 | 151 | 98 | 7 | NE4, NE4NW4 | 358057 | McKenzie | ND |
| Kenneth Merril Johnson Et Ux | Continental Resources, Inc. | 5/4/2010 | 151 | 98 | 7 | NE/4, NE/4NW/4 | 401076 | McKenzie | ND |
| Kenneth R Berry Jr Et Ux | Unknown Lessee | 6/27/2005 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 379466 | Roosevelt | MT |
| Kenneth R Berry, Jr, Et Ux | Oasis Petroleum North America LLC | 9/15/2011 | 27 | 59 | 4 | S/2 | 391458 | Roosevelt | MT |
| Kenneth R Berry, Jr, Et Ux | Oasis Petroleum North America LLC | 9/15/2011 | 27 | 59 | 9 | N/2 | 391458 | Roosevelt | MT |
| Kenneth R. Berry And Leslie A. Berry, Husband And Wife | Diamond Resources, Inc. | 7/27/2005 | 27 | 59 | 5 | Lot 1 (40.07), 2 (40.07), 3 (40.05), 4 (40.05), S2NE, SENW, E2SW, SWSW, SE | 367896 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | Twp | Rng | Sec | Description | Doc# | County | State |
|---|---|---|---|---|---|---|---|---|---|
| Kenneth R. Berry And Leslie A. Berry, Husband And Wife | Estancia Petroleum Corporation | 6/27/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367896 | Roosevelt | MT |
| Kenneth R. Berry, Jr. And Leslie A. Berry, Husband And Wife | Petro-Hunt, LLC | 10/2/2007 | 27 | 59 | 3 | SW4 | 375417 | Roosevelt | MT |
| Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 97 | 19 | NE4SW4 | 358434 | McKenzie | ND |
| Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 13 | IT 19 (A 1.00 acre tract) | 358434 | McKenzie | ND |
| Kenneth Roesner, A Single Man, And Donald Roesner, A Single Man | Diamond Resources, Inc. | 7/7/2005 | 152 | 98 | 13 | NE4 | 358428 | McKenzie | ND |
| Kenneth Stevenson And Rosalie Stevenson, Husband Ad Wife | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381436 | McKenzie | ND |
| Kenneth Stevenson And Rosalie Stevenson, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381436 | McKenzie | ND |
| Kenneth Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349803 | McKenzie | ND |
| Kenneth W. Miles, | Diamond Resources, Inc. | 3/22/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378794 | McKenzie | ND |
| Kenneth Wittinger, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/3/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395730 | McKenzie | ND |
| Kenneth Wittingrer, A Married Man | Great Northern Energy, Inc. | 12/3/2009 | 152 | 99 | 25 | SWSW | 395739 | McKenzie | ND |
| Kent Johnsrud, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 400914 | McKenzie | ND |
| Kevin Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360260 | McKenzie | ND |
| Kevin Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360260 | McKenzie | ND |
| Kevin Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6 | 355720 | McKenzie | ND |
| Kevin Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355720 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 33 | E2E2 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 31 | Lots 1, 2,, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378311 | McKenzie | ND |
| Kirk Wold, A Single Man | Diamond Resources, Inc. | 5/13/2008 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 9, E2SE4, and a tract in lots 7, 8, 10 less 38.00 ACRES more fully described in book 11, page 221 | 378785 | McKenzie | ND |
| Kirk Wold, A Single Man | Diamond Resources, Inc. | 5/13/2008 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, SE4 | 378785 | McKenzie | ND |
| Knudtson Family Trust Dated 11/2/89 | Great Northern Energy, Inc | 4/26/2010 | 151 | 98 | 24 | S2NE,SENW,E2SW,SE | 400038 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4, SW4NE4, W2SE4, NE4SW4 | 395055 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 395055 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | 395055 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | 395055 | McKenzie | ND |
| Kraig Falcon | Oasis Petroleum North America | 10/1/2018 | 152 | 98 | 30 | LOT 1 | 511321 | McKenzie | ND |
| Kraig Falcon | Oasis Petroleum North America | 10/1/2018 | 152 | 98 | 30 | LOT4 | 511321 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Kraig Falcon | Oasis Petroleum North America | 10/1/2018 | 152 | 98 | 30 | SE/4SW/4 | | 511321 | McKenzie | ND |
| Kris B Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | E/2SW/4 | | 656999 | Williams | ND |
| Kris B Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | SE/4 | | 656999 | Williams | ND |
| Kris B Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | S/2NE/4 | | 656999 | Williams | ND |
| Kris Wold | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355721 | McKenzie | ND |
| Kris Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | | 355721 | McKenzie | ND |
| Ladd G Bjorneby; Single | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | | 378504 | McKenzie | ND |
| Ladd G. Bjorneby, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | | 378505 | McKenzie | ND |
| Ladd G. Bjorneby, A Single Man | Diamond Resources, Inc. | 4/29/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 378505 | McKenzie | ND |
| Ladd G. Bjorneby, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | | 378505 | McKenzie | ND |
| Lance Bruins | Panther Entergy Company, LLC | 7/15/2008 | 151 | 99 | 14 | SW | | 385636 | McKenzie | ND |
| Larry D Armstrong | Brigham Oil & Gas, Lp | 7/28/2010 | 151 | 99 | 14 | S2NW | | 406941 | McKenzie | ND |
| Larry Gunderson, A Married Man | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | | 378513 | McKenzie | ND |
| Larry H. Nelson And Myrna L. Nelson, Husband And Wife | Cody Oil & Gas Corporation | 7/27/2004 | 151 | 98 | 20 | NE/4 | | 351164 | McKenzie | ND |
| Larry J Lindland Aka Larry Jack Lin | Great Northern Energy, Inc. | 12/15/2009 | 152 | 98 | 23 | SE | | 397563 | McKenzie | ND |
| Larry James Johnson | Continental Resources, Inc. | 5/4/2010 | 151 | 98 | 7 | NE/4, NE/4NW/4 | | 401072 | McKenzie | ND |
| Larry James Johnson, A Single Man | Diamond Resources, Inc. | 5/4/2005 | 151 | 98 | 7 | NE4, NE4NW4 | | 356863 | McKenzie | ND |
| Larry L Mellum | Lonetree Energy & Associates LLC | 5/11/2010 | 27 | 59 | 4 | S/2 | | 382776 | Roosevelt | MT |
| Larry L Mellum | Lonetree Energy & Associates LLC | 5/11/2010 | 27 | 59 | 9 | N/2 | | 382776 | Roosevelt | MT |
| Larry L Mellum | Lonetree Energy & Associates LLC | 5/11/2010 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 382776 | Roosevelt | MT |
| Larry Lundeen, A Single Man | Diamond Resources, Inc. | 3/24/2005 | 152 | 98 | 26 | N2NE4, NW4 | | 355739 | McKenzie | ND |
| Larry W. Colgrove, A Married Man | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | | 397567 | McKenzie | ND |
| Larry W. Colgrove, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 397566 | McKenzie | ND |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SE/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SE/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SW/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SW/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | NE/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | NE/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2SE/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2SE/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | NW/4SW/4 | | 367827 | Roosevelt | MT |
| Larsen Farms | Zenergy, Inc. | 5/2/2005 | 27 | 59 | 8 | NW/4NW/4 | | 382271 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/13/2006 | 152 | 98 | 24 | N2NW4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc . | 3/2/2005 | 152 | 98 | 13 | E2SE4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SW4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | | 397196 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 18 | LOTS 1,2,3,4,S2NE,N2SE,NESW,SENW | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NW,N2SW | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NE,N2SE | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 7 | LOTS 3,4 | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 13 | E2SE | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 12 | SE | | 355182 | McKenzie | ND |
| Laura West Et Vir | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | | 410675 | McKenzie | ND |
| Laura West Et Vir | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | | 410669 | McKenzie | ND |
| Laura West Et Vir | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | | 410669 | McKenzie | ND |
| Laurel J Erikson-Schillie; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | | 393626 | McKenzie | ND |
| Laurel J Erikson-Schillie; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | | 393626 | McKenzie | ND |
| Laurence D. Melby, A/K/A Lawrence Dale Melby | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | | 379076 | McKenzie | ND |
| Laurence Dale Melby And Lucy M Melb | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | E2 | | 385478 | McKenzie | ND |
| Laurence Dale Melby And Lucy M Melb | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | SW/4 | | 385478 | McKenzie | ND |
| Laurentz A Rolfson | Cody Oil & Gas Corporation | 4/9/2008 | 151 | 98 | 20 | SW/4 | | 379416 | McKenzie | ND |
| Laurentz A. Rolfson, A Married Man | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | | 351153 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Laurie Deutsch, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | | 358841 | McKenzie | ND |
| Laurie Deutsch, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358841 | McKenzie | ND |
| Lawlar Camilla Estate | St. Mary Land & Exploration Company | 12/10/2009 | 151 | 98 | 19 | LOT 4, E2SW4, W2SE4 | | 396106 | McKenzie | ND |
| Lawlar Camilla Estate | St. Mary Land & Exploration Company | 12/10/2009 | 151 | 99 | 25 | E2NW4, NW4NE4 | | 396106 | McKenzie | ND |
| Lawlar Iona M Trust | St. Mary Land & Exploration Company | 11/1/2009 | 151 | 99 | 14 | N/2NW/4 | | 394943 | McKenzie | ND |
| Lawlar Iona M Trust | St. Mary Land & Exploration Company | 11/1/2009 | 151 | 99 | 14 | S/2NW/4 | | 394943 | McKenzie | ND |
| Lawrence A Bahn Et Ux Dena | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 368120 | Roosevelt | MT |
| Lawrence A Bahn Et Ux Dena | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 368120 | Roosevelt | MT |
| Lawrence H Derby Jr And Marilyn Der | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | E2SW | | 569939 | Williams | ND |
| Lawrence H Derby Jr And Marilyn Der | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | S2NE | | 569939 | Williams | ND |
| Lawrence H Derby Jr And Marilyn Der | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | SE/4 | | 569939 | Williams | ND |
| Lawrence Romo | Oasis Petroleum N America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382071 | Roosevelt | MT |
| Lawrence Romo | Oasis Petroleum N America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382071 | Roosevelt | MT |
| Lawrence Romo | Oasis Petroleum N America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | | 382071 | Roosevelt | MT |
| Leigh Franklin Nygard, A/K/A Leigh Nygard | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | SW4, S2NW4, W2SE4, NE4SE4 | | 355697 | McKenzie | ND |
| Leigh Franklin Nygard, A/K/A Leigh Nygard | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | | 355697 | McKenzie | ND |
| Leigh Franklin Nygard, A/K/A Leigh Nygard | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 36 | S2 | | 355697 | McKenzie | ND |
| Lela Ormond, A Widow | Diamond Resources Inc | 4/14/1997 | 155 | 101 | 12 | S2NE | | 573013 | Williams | ND |
| Lela Ormond, A Widow | Diamond Resources Inc | 4/14/1997 | 155 | 101 | 12 | E2SW | | 573013 | Williams | ND |
| Lela Ormond, A Widow | Diamond Resources Inc | 4/14/1997 | 155 | 101 | 12 | SE/4 | | 573013 | Williams | ND |
| Leland Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382072 | Roosevelt | MT |
| Leland Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382072 | Roosevelt | MT |
| Leland Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | | 382072 | Roosevelt | MT |
| Leon H Shelley; Single | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE | | 378499 | McKenzie | ND |
| Leon H. Shelley, A Single Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | | 378498 | McKenzie | ND |
| Leon H. Shelley, A Single Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 32 | S2NE4 | | 378498 | McKenzie | ND |
| Leon H. Shelley, A Single Man | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | | 378498 | McKenzie | ND |
| Leon Shelley | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 14 | NE4 | | 357791 | McKenzie | ND |
| Leon Shelley, A Single Man | Diamond Resources, Inc. | 5/5/2005 | 152 | 98 | 32 | S2NE4 | | 356875 | McKenzie | ND |
| Leroy T Pang Et Ux | Oasis Petroleum N America LLC | 2/22/2011 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 385899 | Roosevelt | MT |
| Leslie A. Knudson And Greg Knudson, Her Husband | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NE4NE4, NW4 | | 364421 | McKenzie | ND |
| Leslie Maye, A Married Man | Diamond Resources, Inc. | 5/21/2008 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | | 378797 | McKenzie | ND |
| Lillian W Kaiser | Continental Resources, Inc. | 8/17/2010 | 152 | 98 | 30 | LOT 1 | | 406999 | McKenzie | ND |
| Linda And Richard Salley; H/W | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | E2 | | 385481 | McKenzie | ND |
| Linda Berquist And Ray A. Berquist, Her Husband | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 33 | E2SE4, E2NE4 | | 355253 | McKenzie | ND |
| Linda Berquist And Ray A. Berquist, Her Husband | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 33 | E2SE4, E2NE4 | | 355253 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Linda Berquist And Ray A. Berquist, Her Husband | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 355253 | McKenzie | ND |
| Linda Buffington | Unknown Lessee | 4/18/2005 | 27 | 59 | 7 | S/2SE/4 | 367167 | Roosevelt | MT |
| Linda Buffington | Unknown Lessee | 4/18/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367167 | Roosevelt | MT |
| Linda F. Peterman, A Single Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 396701 | McKenzie | ND |
| Linda F. Peterman, A Single Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396684 | McKenzie | ND |
| Linda Hanson, A Married Woman | Cody Oil & Gas Corporation | 5/6/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351139 | McKenzie | ND |
| Linda Haralson | Zenergy, Inc. | 12/1/2010 | 152 | 98 | 13 | N2SW,SWSW | 412869 | McKenzie | ND |
| Linda Haralson | Zenergy, Inc. | 12/1/2010 | 152 | 98 | 24 | N2NW | 412869 | McKenzie | ND |
| Linda Haralson, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358726 | McKenzie | ND |
| Linda Haralson, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358726 | McKenzie | ND |
| Linda Jean Andrews Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382266 | Roosevelt | MT |
| Linda Jean Andrews Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382266 | Roosevelt | MT |
| Linda Kozak And Rodney A. Kozak, Her Huband | Diamond Resources, Inc | 3/22/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355567 | McKenzie | ND |
| Linda Kozak And Rodney A. Kozak, Her Husband | Diamond Resources, Inc. | 3/22/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355567 | McKenzie | ND |
| Linda Kozak And Rodney A. Kozak, Her Husband | Diamond Resources, Inc. | 3/22/2005 | 152 | 98 | 26 | S2, S2NE4 | 355567 | McKenzie | ND |
| Linda Kozak And Rodney A. Kozak, Her Husband | Diamond Resources, Inc. | 3/22/2005 | 152 | 98 | 36 | NW4 | 355567 | McKenzie | ND |
| Linda Lee Hudson, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396673 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 1 | SW4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 28 | S2SW4, NE4SW4, SE4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 29 | SE4SE4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/24/2005 | 152 | 98 | 32 | N2NE4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Missouri Basin Well Service | 12/10/2004 | 152 | 98 | 11 | NE4, E2NW4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Missouri Basin Well Service, Inc. | 12/10/2004 | 152 | 98 | 11 | NE | 354486 | McKenzie | ND |
| Linda Lee Johnson | Missouri Basin Well Service, Inc. | 12/10/2004 | 152 | 98 | 11 | E2NW | 354486 | McKenzie | ND |
| Linda Salley, A Married Woman | Diamond Resources, Inc. | 5/22/2008 | 151 | 98 | 19 | Lot 3 | 379079 | McKenzie | ND |
| Linda Stack, Co-Trustee And Attorney-In-Fact For V. Mae Shelley, Co-Trustee Of The Edith B. Shelley Revocable Living Trust | Diamond Resources, Inc. | 12/19/2005 | 152 | 98 | 23 | SE4 | 360975 | McKenzie | ND |
| Linell R. Patchin, A Widow | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 396700 | McKenzie | ND |
| Linell R. Patchin, A Widow | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396683 | McKenzie | ND |
| Liola Kallus, A Widow | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | v | 365658 | McKenzie | ND |
| Lois I Rutz Life Estate | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | 381546 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Lona M. Lawlar, A Widow | Diamond Resources, Inc. | 3/14/2005 | 151 | 98 | 17 | S2NW4, SW4 | | 356146 | McKenzie | ND |
| Loren Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358439 | McKenzie | ND |
| Loren Thomley, A Married Man | Diamond Resources, Inc. | 8/2/2005 | 152 | 98 | 24 | N2NW4 | | 358439 | McKenzie | ND |
| Lorin B. Simonson | Diamond Resources, Inc. | 2/21/2005 | 152 | 98 | 13 | NW4 | | 355186 | McKenzie | ND |
| Lorinda J. Sudduth, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 8 | W2 | | 355727 | McKenzie | ND |
| Lorinda J. Sudduth, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | N2NW4 | | 355727 | McKenzie | ND |
| Lorinda J. Sudduth, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 7 | SE4 | | 355727 | McKenzie | ND |
| Lorraine Melby Life Estate | Panther Entergy Company, LLC | 6/12/2008 | 151 | 99 | 14 | SW | | 385485 | McKenzie | ND |
| Lorraine Melby Life Estate | Panther Entergy Company, LLC | 6/12/2008 | 151 | 99 | 14 | E2 | | 385485 | McKenzie | ND |
| Lorraine Melby, A Widow | Diamond Resources, Inc. | 5/1/2008 | 151 | 98 | 19 | Lot 3 | | 378798 | McKenzie | ND |
| Louise A. Haugen | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 33 | NW4, N2SW4 | | 360065 | McKenzie | ND |
| Louise A. Haugen | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 32 | S2NE4 | | 360065 | McKenzie | ND |
| Louise Annette Austin, A Single Woman, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | | 399004 | McKenzie | ND |
| Louise Annette Austin, A Single Woman, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 399004 | McKenzie | ND |
| Louise Annette Austin; Single | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | | 399030 | McKenzie | ND |
| Lovro Helen Marie | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 379760 | McKenzie | ND |
| Lovro Helen Marie | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 379760 | McKenzie | ND |
| Lucy Cave And Jerry Cave, Her Husband | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | | 378512 | McKenzie | ND |
| Luella M Boss | Continental Resources, Inc. | 3/2/2010 | 152 | 98 | 30 | SE/4SW/4 | | 401318 | McKenzie | ND |
| Luella M Boss | Continental Resources, Inc. | 3/2/2010 | 152 | 98 | 30 | LOT4 | | 401318 | McKenzie | ND |
| Luella M. Boss, A Widow | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 30 | Lot 1 | | 381984 | McKenzie | ND |
| Luella M. Boss, A Widow | Diamond Resources, Inc. | 7/1/2006 | 152 | 99 | 25 | NWNE, N2NW | | 364919 | McKenzie | ND |
| Luverne A Tufto | Empire Oil Company | 2/11/1997 | 155 | 101 | 12 | E2SW | | 569942 | Williams | ND |
| Luverne A Tufto | Empire Oil Company | 2/11/1997 | 155 | 101 | 12 | S2NE | | 569942 | Williams | ND |
| Luverne A Tufto | Empire Oil Company | 2/11/1997 | 155 | 101 | 12 | SE/4 | | 569942 | Williams | ND |
| Lyla A Ableidinger Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382192 | Roosevelt | MT |
| Lyla A Ableidinger Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382192 | Roosevelt | MT |
| Lyle E. Larson & Melba L. Larson, Trustees Of The Larson Family Nominee Trust U/D Dated 2-9-99 | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | | 355722 | McKenzie | ND |
| Lyle E. Larson & Melba L. Larson, Trustees Of The Larson Family Nominee Trust U/D Dated 2-9-99 | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6 | | 355722 | McKenzie | ND |
| Lyle Flatland | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | | 380227 | McKenzie | ND |
| Lyle Flatland | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | NW/2SW/4, W/2NW/4 | | 380227 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lynden E. Johnson | Diamond Resources, Inc. | 8/15/2004 | 152 | 98 | 2 | SE | 382033 | McKenzie | ND |
| Lynden E. Johnson And Kathleen M. Johnson, Trustees Of The Johnson Farm Revocable Trust Created U/A January 28, 2010 | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 2 | SE | 379083 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 97 | 19 | NE4SW4 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 13 | NE4, N2SW4, SW4SW4, Irregular tract 19 in the NE4NW4, A 1.00 acre tract mfd in book 7, page 256 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/12/2009 | 152 | 98 | 24 | N2NW4 | 355574 | McKenzie | ND |
| Lynn And Linda Wold | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 2 | SW4 | 349576 | McKenzie | ND |
| Lynn And Linda Wold | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, N2SE4 | 349576 | McKenzie | ND |
| Lynn And Linda Wold | Missouri Basin Well Service | 5/2/2004 | 153 | 97 | 28 | NE4 | 349576 | McKenzie | ND |
| Lynn Haugen, A Married Woman | Diamond Resources, Inc. | 11/3/2008 | 152 | 98 | 33 | NW4,N2SW4 | 385866 | McKenzie | ND |
| Lynn Haugen, A Married Woman | Diamond Resources , Inc | 11/3/2008 | 152 | 98 | 32 | S2NE4 | 385866 | McKenzie | ND |
| Lynn Wold And Linda Wold; H/W | Missouri Basin Well Service, Inc. | 5/2/2004 | 152 | 98 | 2 | SW | 349756 | McKenzie | ND |
| Lynn Wold And Linda Wold; H/W | Missouri Basin Well Service, Inc. | 5/2/2004 | 152 | 98 | 3 | N2SE | 349756 | McKenzie | ND |
| Lynn Wold Trust | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, N2S2 | 349753 | McKenzie | ND |
| Lynne S Edwards Fam Trust | Oasis Petroleum North America LLC | 4/6/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370847 | Roosevelt | MT |
| Lynne W Phillips Trust | Sundance Oil & Gas Inc | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370955 | Roosevelt | MT |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 13 | SE4SW4, W2SE4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 24 | S2, W2NE4, S2NW4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | 152N-098W-25 NE4NE4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | NW4NE4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 27 | SE4, E2NE4 | 348964 | McKenzie | ND |
| Madeline G Miller, Fka Madeline G A | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | NW4NE4 | 348964 | McKenzie | ND |
| Madeline G Miller, Fka Madeline G A | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | NE4NE4 | 348964 | McKenzie | ND |
| Manley Gayle | St. Mary Land & Exploration Company | 10/24/2009 | 151 | 99 | 26 | NESW,W2NW,SENW | 395069 | McKenzie | ND |
| Marc Larson, A Married Man | Diamond Resources, Inc. | 2/4/2009 | 152 | 98 | 27 | SW4 | 378506 | McKenzie | ND |
| Marc Larson, A Married Man | Diamond Resources, Inc. | 2/5/2009 | 152 | 98 | 34 | W2NW4 | 378506 | McKenzie | ND |
| Marc Richard Lattin | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496425 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 388494 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 388494 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | N2NW | 364411 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | NE | 364411 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | SE | 364411 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 32 | NE | 364411 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Marcia Safely | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382075 | Roosevelt | MT |
| Marcia Safely | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382075 | Roosevelt | MT |
| Margaret A. Muri,A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 13 | NE, N2SE | | 362270 | McKenzie | ND |
| Margaret Ann Bohannan, A/K/A Margaret Ann Gililland Bohannan, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | | 402716 | McKenzie | ND |
| Margaret Anne Sitte, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | S2NW4, SW4, W2SE4, NE4SE4 | | 355180 | McKenzie | ND |
| Margaret Anne Sitte, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | | 355180 | McKenzie | ND |
| Margaret Meduna, A Married Woman | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | | 360985 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 26 | NE1/4SW1/4, W1/2NW1/4, SE1/4NW1/4 | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 26 | SE1/4SW1/4, S1/2SE1/4, NE1/4SE1/4 | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 35 | E1/2E1/2 | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 26 | E2SW4, W2NW4, SE4NW4, S2SE4, NE4SE4 | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 35 | E2E2 | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 1 | LOTS 1, 2, 4, S2NE4, SE4NW4, S2 | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 12 | ALL | | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources Inc. | 3/3/2006 | 151 | 99 | 36 | SW4 | | 362270 | McKenzie | ND |
| Margaret Muri. A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 5/26/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4, SE4 | | 357181 | McKenzie | ND |
| Margaret Muri. A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 5/26/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | | 357181 | McKenzie | ND |
| Margaret Nelson | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | | 349805 | McKenzie | ND |
| Marie I. Skoglund, A Widow | Cody Oil & Gas Corporation | 7/1/2004 | 151 | 98 | 20 | SW/4 | | 351160 | McKenzie | ND |
| Marilyn Back Weinstein,Mdssp | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | S2NE | | 573488 | Williams | ND |
| Marilyn Back Weinstein,Mdssp | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | E2SW | | 573488 | Williams | ND |
| Marilyn Back Weinstein,Mdssp | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | SE/4 | | 573488 | Williams | ND |
| Marilyn Carlson | Oasis Petroleum  North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | | 781549 | Williams | ND |
| Marilyn Carlson | Oasis Petroleum  North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | | 781549 | Williams | ND |
| Marilyn Carlson | Oasis Petroleum  North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | | 781549 | Williams | ND |
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | | 375008 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 18 | SE/4SE/4 | 375008 | McKenzie | ND |
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 18 | SW/4SE/4 | 375008 | McKenzie | ND |
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 375008 | McKenzie | ND |
| Marilyn Mcnamee | Diamond Resources, Inc. | 5/10/2006 | 152 | 98 | 30 | Lot 1 | 363729 | McKenzie | ND |
| Marilyn Mcnamee, A/K/A Marilyn A. Mcnamee | Diamond Resources, Inc. | 7/5/2006 | 152 | 99 | 25 | SWSW, NWNE, N2NW | 366572 | McKenzie | ND |
| Marilyn Newsom Mchaney; Single | Zenergy, Inc. | 3/15/2012 | 155 | 101 | 12 | E2SW | 751904 | Williams | ND |
| Marilyn Newsom Mchaney; Single | Zenergy, Inc. | 3/15/2012 | 155 | 101 | 12 | S2NE | 751904 | Williams | ND |
| Marilyn Newsom Mchaney; Single | Zenergy, Inc. | 3/15/2012 | 155 | 101 | 12 | SE | 751904 | Williams | ND |
| Marilynn K. Riggs, A Married Woman | Diamond Resources, Inc. | 4/20/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378524 | McKenzie | ND |
| Marion L. Fitzroy | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349804 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henery, Deceased | Diamond Resources, Inc. | 1/8/2010 | 152 | 98 | 32 | N2NE4 | 397572 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henry, Deceased | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 1 | SW4 | 397572 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henry, Deceased | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 397572 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henry, Deceased | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 29 | SE4SE4 | 397572 | McKenzie | ND |
| Marjorie L Ryon | Unknown Lessee | 5/20/2005 | 27 | 59 | 7 | S/2SE/4 | 368059 | Roosevelt | MT |
| Marjorie L Ryon | Unknown Lessee | 5/20/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368059 | Roosevelt | MT |
| Marjorie Swett And Darwin Swett, Her Husband | Diamond Resources, Inc. | 4/16/2008 | 152 | 98 | 30 | Lot 1 | 379768 | McKenzie | ND |
| Marjorie Swett And Darwin Swett, Her Husband | Diamond Resources, Inc. | 4/16/2008 | 152 | 99 | 25 | SWSW | 379768 | McKenzie | ND |
| Mark A. Thomley, A Married Man | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358438 | McKenzie | ND |
| Mark A. Thomley, A Married Man | Diamond Resources, Inc. | 7/28/2005 | 152 | 98 | 24 | N2NW4 | 358438 | McKenzie | ND |
| Mark E Pacovsky | Diamond Resources Inc. | 5/24/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-38 | Roosevelt | MT |
| Mark Hagen | Continental Resources, Inc. | 9/10/2010 | 152 | 98 | 30 | LOT 1 | 408662 | McKenzie | ND |
| Mark L Peters Heir Of Martin Peters | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | 416092 | McKenzie | ND |
| Mark W. Pearson, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401506 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mark W. Pearson, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401506 | McKenzie | ND |
| Marlene E Grantier Mineral Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NWNE, NENW | 423494 | McKenzie | ND |
| Marlene E Grantier Mineral Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NENE | 423494 | McKenzie | ND |
| Marlene E Grantier, A Widow | Diamond Resources Inc | 3/23/2006 | 152 | 97 | 7 | E2NW,E2SE | 362662 | McKenzie | ND |
| Marlene E Grantier, A Widow | Diamond Resources Inc | 3/23/2006 | 152 | 97 | 7 | N2NE4,SW4NE4 | 362662 | McKenzie | ND |
| Marlene E Grantier, A Widow | Diamond Resources Inc | 3/23/2006 | 152 | 97 | 7 | SE4NE4 | 362662 | McKenzie | ND |
| Marlene E. Grantier Minerals Trust Agreement, Marlene E. Grantier, Trustee | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 399033 | McKenzie | ND |
| Marlene E. Grantier Minerals Trust Agreement, Marlene E. Grantier, Trustee | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 7 | Sec 7: NE4, E2NW4, E2SE4 | 399033 | McKenzie | ND |
| Marlene E. Grantier Minerals Trust Agreement, Marlene E. Grantier, Trustee | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 18 | Sec 18: N2NE4, NE4NW4 | 399033 | McKenzie | ND |
| Marlene E. Grantier, A Widow | Diamond Resources, Inc. | 11/8/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 360544 | McKenzie | ND |
| Marlene E. Grantier, A Widow | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 360544 | McKenzie | ND |
| Marlene E. Grantier, A Widow | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 18 | N2NE4, NE4NW4 | 360544 | McKenzie | ND |
| Marlene Mead | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382200 | Roosevelt | MT |
| Marlene Mead | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382200 | Roosevelt | MT |
| Marlene Taft; Mdssp | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | 394945 | McKenzie | NDSP |
| Marlene Wessel, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355570 | McKenzie | ND |
| Marlene Wessel, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355570 | McKenzie | ND |
| Marshall Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358463 | McKenzie | ND |
| Marshall Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358463 | McKenzie | ND |
| Martha B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 7 | S/2SE/4 | 367174 | Roosevelt | MT |
| Martha B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367174 | Roosevelt | MT |
| Martha Jo Nichols Et Ux | Unknown Lessee | 7/19/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 371613 | Roosevelt | MT |
| Martha Sue Jobe, A/K/A Martha Sue Gililland Jobe, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396674 | McKenzie | ND |
| Martin Vettleson, A Single Man | Diamond Resources, Inc. | 5/1/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 377950 | McKenzie | ND |
| Martin Vettleson, A Single Man | Diamond Resources, Inc. | 4/20/2009 | 152 | 98 | 30 | Lots 2, 3, E2NW4 | 377950 | McKenzie | ND |
| Marvin L Kaiser | Continental Resources, Inc. | 9/14/2010 | 152 | 98 | 30 | LOT 1 | 410680 | McKenzie | ND |
| Mary Gililland, A Widow, Individually, And As Heir To The Estate Of Paul William Harper, Deceased, And E.R. Harper, Deceased | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 397564 | McKenzie | ND |
| Mary Jane Waters | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496426 | McKenzie | ND |
| Mary Josephine Mcknight Runge, Ind/ | Empire Oil Company | 9/17/1996 | 155 | 101 | 12 | E2SW | 569937 | Williams | ND |
| Mary Josephine Mcknight Runge, Ind/ | Empire Oil Company | 9/17/1996 | 155 | 101 | 12 | S2NE | 569937 | Williams | ND |
| Mary Josephine Mcknight Runge, Ind/ | Empire Oil Company | 9/17/1996 | 155 | 101 | 12 | SE/4 | 569937 | Williams | ND |
| Mary K. Miller, A Married Woman | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360984 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Mary Kathleen Meyer, A Married Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378791 | McKenzie | ND |
| Mary Kay Mate, A/K/A Mary Kay Horst, A Married Woman | Diamond Resources , Inc | 10/11/2006 | 152 | 98 | 30 | Lot 1 | 366811 | McKenzie | ND |
| Mary Kay Mate, A/K/A Mary Kay Horst, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 10/11/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 402728 | McKenzie | ND |
| Mary Kay Mate, F/K/A Mary Kay Horst, A Married Woman | Diamond Resources, Inc. | 10/11/2006 | 152 | 99 | 25 | SWSW | 366811 | McKenzie | ND |
| Mary Kilwein, A Married Woman | Diamond Resources, Inc. | 5/4/2006 | 152 | 99 | 25 | SWSW | 363751 | McKenzie | ND |
| Mary Stenberg, Trustee Of The Ole Borseth Family Trust | Diamond Resources, Inc. | 8/16/2005 | 152 | 98 | 23 | SE1/4 | 358721 | McKenzie | ND |
| Mary Wilson Gaines | Zenergy, Inc. | 3/7/2010 | 27 | 59 | 10 | W/2E/2, W/2 | 384072 | Roosevelt | MT |
| Mary Wilson Gaines | Zenergy, Inc. | 3/7/2010 | 27 | 59 | 10 | NE/4SW/4 | 384072 | Roosevelt | MT |
| Maryann Anderson | Diamond Resources, Inc | 8/1/2012 | 152 | 98 | 32 | S2NE4 | 438236 | McKenzie | ND |
| Maryann Anderson | Diamond Resources, Inc | 8/1/2012 | 152 | 98 | 33 | NW, N2SW | 438236 | McKenzie | ND |
| Maryann Macklin | Brigham Oil & Gas Lp | 2/5/2010 | 155 | 101 | 12 | N/2NE/4 | 685757 | Williams | ND |
| Mastvelten Eldon | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | S2 | 379602 | McKenzie | ND |
| Mastvelten Eldon | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | N2 | 379602 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355179 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 26 | SW4, S2NE4 | 355179 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 36 | NW4 | 355179 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc | 2/23/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355179 | McKenzie | ND |
| Maury Pederson And Lara Pederson, Husband And Wife | Cody Oil & Gas Corporation | 8/19/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351152 | McKenzie | ND |
| Max R. Borseth, A Married Man | Diamond Resources, Inc. | 4/29/2008 | 151 | 98 | 19 | Lot 4, E2SW, W2SE | 378318 | McKenzie | ND |
| Max R. Borseth, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 3/9/2010 | 151 | 98 | 30 | LOTS 1, 2, 3, W/2NE, NENE, E/2NW, NESW | 395724 | McKenzie | ND |
| Max R. Borseth, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 3/9/2010 | 151 | 99 | 25 | E2NW4,NW4NE4 | 395724 | McKenzie | ND |
| Mckenzie County School District No. 1, F/K/A Twin Valley School No. 5 | Diamond Resources, Inc. | 9/8/2006 | 152 | 98 | 22 | 2.00 ACRE TRACT IN SESE MFD IN BK 55, PG 466 | 365857 | McKenzie | ND |
| Megan K Debaere | Sundance Oil & Gas Inc | 11/26/2008 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 379549 | Roosevelt | MT |
| Megan K Debaere | Sundance Oil & Gas Inc | 11/26/2008 | 27 | 59 | 4 | S/2NW/4 | 379549 | Roosevelt | MT |
| Megan K Smith | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | S/2NE/4 | 388887 | Roosevelt | MT |
| Megan K Smith | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 388887 | Roosevelt | MT |
| Melby Lorraine | St. Mary Land & Exploration Company | 4/25/2010 | 151 | 99 | 24 | E2SE4, SE4NE4 | 395070 | McKenzie | ND |
| Melby Lorraine | St. Mary Land & Exploration Company | 4/25/2010 | 151 | 99 | 13 | NW4, N2SW4 | 395070 | McKenzie | ND |
| Melissa Mathiesen, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 359098 | McKenzie | ND |
| Melissa Mathiesen, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 359098 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Melvin & Gudve Norby Revocable Trus | Continental Resources, Inc. | 10/4/2010 | 152 | 98 | 30 | LOT 1 | | 408981 | McKenzie | ND |
| Melvin & Gudve Norby Revocable Trus | Continental Resources, Inc. | 10/4/2010 | 152 | 98 | 30 | LOT4 | | 408981 | McKenzie | ND |
| Melvin & Gudve Norby Revocable Trus | Continental Resources, Inc. | 10/4/2010 | 152 | 98 | 30 | SE/4SW/4 | | 408981 | McKenzie | ND |
| Melvin B. Norby And Gudve Norby, As Trustees Of The Norby Revocable Living Trust | Diamond Resources, Inc. | 7/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 358462 | McKenzie | ND |
| Melvin B. Norby And Gudve Norbym As Trustees Of The Norby Revocable Trust | Diamond Resources, Inc. | 7/28/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | | 358462 | McKenzie | ND |
| Melvin B. Norby And Gugve Norbym As Trustees Of The Norby Revocable Trust | Diamond Resources, Inc. | 9/5/2006 | 152 | 99 | 25 | NWNE, N2NW | | 365859 | McKenzie | ND |
| Mercy Medical Foundation | Zenergy, Inc. | 2/21/2012 | 152 | 97 | 19 | E2SE | | 432267 | McKenzie | ND |
| Mercy Medical Foundation | Oasis Petroleum North America LLC | 2/21/2019 | 152 | 97 | 20 | NW/4SW/4, S/2SW/4 | | 514596 | McKenzie | ND |
| Merlin E. Mcwilliams, &Ida Merlin Mcwilliams, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/29/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 399006 | McKenzie | ND |
| Merlin E. Mcwilliams, &Ida Merlin Mcwilliams, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/29/2010 | 152 | 98 | 24 | N2NW4 | | 399006 | McKenzie | ND |
| Merlyn L Kleppen | Continental Resources, Inc. | 6/24/2010 | 151 | 98 | 6 | LOT6, NE/4SW/4 | | 398897 | McKenzie | ND |
| Merlyn L. Kleppen, A Single Man | Diamond Resources, Inc. | 6/24/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357794 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc. | 3/7/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355578 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc. | 3/7/2005 | 152 | 98 | 26 | SE4, SW4, S2NE4 | | 355578 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc. | 3/7/2005 | 152 | 98 | 36 | NW4 | | 355578 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc | 3/7/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | | 355578 | McKenzie | ND |
| Michael Bacon Et Ux Jane Ann | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | | 687196 | Williams | ND |
| Michael Bacon Et Ux Jane Ann | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | | 687196 | Williams | ND |
| Michael Bacon Et Ux Jane Ann | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | | 687196 | Williams | ND |
| Michael C Theriault | Sundance Oil & Gas Inc | 5/23/2006 | 27 | 59 | 10 | NE/4SW/4 | | 371083 | Roosevelt | MT |
| Michael D Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 4 | S/2 | | 382655 | Roosevelt | MT |
| Michael D Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 9 | N/2 | | 382655 | Roosevelt | MT |
| Michael D Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | | 382655 | Roosevelt | MT |
| Michael Fitzmaurice, Hr-10, Under Agreement With First Western Bank And Trust | Diamond Resources, Inc. | 11/9/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4, SE4 | | 360066 | McKenzie | ND |
| Michael Fitzmaurice, Hr-10, Under Agreement With First Western Bank And Trust | Diamond Resources, Inc. | 11/9/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | | 360066 | McKenzie | ND |
| Michael Gostola Et Ux Patricia | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | | 687193 | Williams | ND |
| Michael Gostola Et Ux Patricia | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | | 687193 | Williams | ND |
| Michael Gostola Et Ux Patricia | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | | 687193 | Williams | ND |
| Michael Hr-10 Fitzmaurice | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 6 | Lots 3(39.94), 4(39.20), 5(34.26), 7(34.34), SENW, SESW, SE | | 402402 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Michael Hr-10 Fitzmaurice | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 7 | Lots 1(34.38), 2(34.44), 3(34.48), 4(34.54), SENW, E2SW | 402402 | McKenzie | ND |
| Michael J Peters Heir Of Martin Pet | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | 416091 | McKenzie | ND |
| Michael John Ehresman, A/K/A Michael Ehresman,A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | 400046 | McKenzie | ND |
| Michael John Ehresmann, A/K/A Michael Ehresmann, A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400046 | McKenzie | ND |
| Michael Mellum, As Successor Trustee Of The Mellum Family Trust U/A Date December 19, 1989 | Diamond Resources Inc. | 5/11/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367770 | Roosevelt | MT |
| Michael Pacovsky | Diamond Resources Inc. | 5/24/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-37 | Roosevelt | MT |
| Michael Ryder | Unknown Lessee | 8/25/2005 | 27 | 59 | 7 | S/2SE/4 | 368206 | Roosevelt | MT |
| Michael Ryder | Unknown Lessee | 8/25/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368206 | Roosevelt | MT |
| Michael Treffry | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 14 | E2SE,SWSE | 443437 | McKenzie | ND |
| Michael Treffry | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 23 | NENE | 443437 | McKenzie | ND |
| Michael Ulmen, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | S2NW4, SW4, W2SE4, NE4SE4 | 355576 | McKenzie | ND |
| Michael Ulmen, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355576 | McKenzie | ND |
| Michele Cook, A Single Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 1, 12, 13, 14, E2SW4, W2SE4 | 364917 | McKenzie | ND |
| Michelle R Fox Aif Samuel C Denton | Empire Oil Company | 3/4/2011 | 151 | 98 | 32 | 151N-098W-32-SE4 | 411718 | McKenzie | ND |
| Michelle R Fox Aif Samuel C Denton | Empire Oil Company | 3/4/2011 | 151 | 98 | 33 | 151N-098W-33-S2 | 411718 | McKenzie | ND |
| Michelle R Fox Aif Samuel C Denton | Empire Oil Company | 3/4/2011 | 151 | 98 | 33 | 151N-098W-33-N2NW, SW4NW4 | 411718 | McKenzie | ND |
| Mike Kulhanek | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 365665 | McKenzie | ND |
| Mike Kulhanek | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381437 | McKenzie | ND |
| Mike Kulhanek, A Single Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381437 | McKenzie | ND |
| Mildred A. Rogstad, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358457 | McKenzie | ND |
| Mildred A. Rogstad, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 24 | N2NW4 | 358457 | McKenzie | ND |
| Mildred G. Dahl, A/K/A Mildred Dahl, A Widow | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 30 | Lot 1 | 358840 | McKenzie | ND |
| Mildred S Robinson Et Vir | Unknown Lessee | 4/8/2005 | 27 | 59 | 7 | S/2SE/4 | 367168 | Roosevelt | MT |
| Mildred S Robinson Et Vir | Unknown Lessee | 4/8/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367168 | Roosevelt | MT |
| Mildred Shelley, A Widow | Diamond Resources, Inc. | 2/17/2009 | 151 | 98 | 5 | Lots 1, 2 | 380170 | McKenzie | ND |
| Mildred Shelley, A Widow | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 33 | W2E2, S2SW4 | 380170 | McKenzie | ND |
| Mildred Shelley, A Widow | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 31 | SE4NE4, NE4SE4 | 380170 | McKenzie | ND |
| Mildred Shelley, A Widow | Diamond Resources , Inc | 2/17/2009 | 152 | 98 | 32 | S2NW, S2 | 380170 | McKenzie | ND |
| Milton T. Wold, A Widower | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 363131 | McKenzie | ND |
| Milton Wold, A Married Man | Diamond Resources, Inc. | 5/9/2005 | 152 | 98 | 1 | Lots 3, 4 | 357174 | McKenzie | ND |
| Milton Wold, A Single Man | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 356311 | McKenzie | ND |
| Mimi Back Loeb, A Widow | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | S2NE | 573489 | Williams | ND |
| Mimi Back Loeb, A Widow | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | E2SW | 573489 | Williams | ND |
| Mimi Back Loeb, A Widow | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | SE/4 | 573489 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | | 392766 | McKenzie | ND |
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SE4 | | 392766 | McKenzie | ND |
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 152 | 98 | 33 | E2NE | | 392766 | McKenzie | ND |
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 152 | 98 | 33 | E2SE | | 392766 | McKenzie | ND |
| Mrs Dennis Sower Aka Muriel Sower | Panther Entergy Company, LLC | 6/27/2008 | 151 | 99 | 14 | E2 | | 385483 | McKenzie | ND |
| Mrs Dennis Sower Aka Muriel Sower | Panther Entergy Company, LLC | 6/27/2008 | 151 | 99 | 14 | SW | | 385483 | McKenzie | ND |
| Mrs Richard (Linda) Salley | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | SW | | 385486 | McKenzie | ND |
| Muriel Mjelstad And Robert Mjelstad, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W2NE4, E2NW4 | | 355586 | McKenzie | ND |
| Muriel Mjelstad And Robert Mjelstad, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 22 | W/2SE, E/2SW, NWSW | | 355586 | McKenzie | ND |
| Muriel Sower, A/K/A Mrs. Dennis (Muriel) Sower, A Married Woman | Diamond Resources, Inc. | 5/23/2008 | 151 | 98 | 19 | Lot 3 | | 379078 | McKenzie | ND |
| Murray Oil Trust Two, Nancy A. Murray, Trustee | Diamond Resources, Inc. | 11/30/2005 | 152 | 98 | 11 | SWSW, E2SW | | 360378 | McKenzie | ND |
| Muscular Dystrophy Association | Continental Resources, Inc. | 11/30/2011 | 152 | 97 | 19 | E/2SE/4 | | 427299 | McKenzie | ND |
| Muscular Dystrophy Association | Continental Resources, Inc. | 11/30/2011 | 152 | 97 | 19 | E/2SE/4 | | 427299 | McKenzie | ND |
| Myers Nancy | Sm Energy Company | 12/1/2011 | 153 | 97 | 28 | NW4 | | 446752 | McKenzie | ND |
| Myrna K. Dahl,  A Single Woman | Great Northern Energy, Inc. | 3/2/2010 | 152 | 99 | 25 | SWSW | | 400055 | McKenzie | ND |
| Myron Cook, A Married Man | Diamond Resources, Inc. | 3/20/2008 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E1/2SW1/4, W1/2SE1/4 | | 377197 | McKenzie | ND |
| Myron Forland, A Married Man | Diamond Resources, Inc. | 6/5/2008 | 151 | 98 | 33 | NENE | | 379576 | McKenzie | ND |
| Myron Forland, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/13/2010 | 151 | 98 | 28 | N2, SE, N2SW, SESW | | 397570 | McKenzie | ND |
| Myron Wold And Darlene Wold, Husband And Wife | Diamond Resources, Inc. | 6/6/2006 | 152 | 97 | 6 | Lot 1 | | 364264 | McKenzie | ND |
| Myron Wold And Darlene Wold, Husband And Wife | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NW4NE4, S2NE4, S2 | | 364264 | McKenzie | ND |
| Myron Wold And Darlene Wold, Husband And Wife | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 27 | SW4NE4, E2W2, N2SE4, SW4SE4 | | 364264 | McKenzie | ND |
| Nadine Tetrault | Panther Entergy Company, LLC | 7/15/2008 | 151 | 99 | 14 | SW | | 385469 | McKenzie | ND |
| Nadine Tetrault | Brigham Oil & Gas, Lp | 7/15/2010 | 151 | 99 | 35 | E2E2 | | 409475 | McKenzie | ND |
| Nadine Tetrault | Brigham Oil & Gas, Lp | 7/15/2010 | 151 | 99 | 26 | SESW,S2SE,NESE | | 409475 | McKenzie | ND |
| Nan Blake Leavell | Oasis Petroleum North America LLC | 1/26/2014 | 155 | 101 | 12 | W/2SW/4 | | 787687 | Williams | ND |
| Nancy A. Murray, Trustee Of The Murray Oil Trust Two | Diamond Resources, Inc . | 11/30/2005 | 152 | 98 | 14 | N2NW4 | | 360378 | McKenzie | ND |
| Nancy Coleman | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 14 | NE4 | | 357789 | McKenzie | ND |
| Nancy J Coleman; Single | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE | | 378497 | McKenzie | ND |
| Nancy J. Coleman, A Single Woman | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | | 378496 | McKenzie | ND |
| Nancy J. Coleman, A Single Woman | Diamond Resources, Inc. | 9/1/2010 | 152 | 98 | 32 | S2NE4 | | 378496 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Nancy J. Coleman, A Single Woman | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | | 378496 | McKenzie | ND |
| Nancy L Beaudet | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | | 395877 | McKenzie | ND |
| Nelson Terry | Sundance Oil And Gas, Inc. | 5/10/2006 | 27 | 59 | 6 | LOT 1-4, SW4, SWNW, SESE | | 370936 | Roosevelt | MT |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SW4 | | 393631 | McKenzie | ND |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | | 393631 | McKenzie | ND |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | | 393631 | McKenzie | ND |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | | 393631 | McKenzie | ND |
| Noreen Wollan | Zenergy, Inc. | 5/1/2012 | 152 | 98 | 23 | W2 | | 433795 | McKenzie | ND |
| Noreen Wollan | Continental Resources Inc. | 4/26/2008 | 152 | 98 | 34 | NE4 | | 368054 | McKenzie | ND |
| Noreen Wollan | Continental Resources Inc. | 4/26/2008 | 152 | 98 | 34 | NE4 | | 368054 | McKenzie | ND |
| Norma Breeding | 7 0'S Oil Corporation | 4/13/2005 | 27 | 59 | 7 | S/2SE/4 | | 367172 | Roosevelt | MT |
| Norma Breeding | 7 0'S Oil Corporation | 4/13/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 367172 | Roosevelt | MT |
| Norma J. Casper, A/K/A Norma Casper, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358450 | McKenzie | ND |
| Norma J. Casper, A/K/A Norma Casper, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 24 | N2NW4 | | 358450 | McKenzie | ND |
| Norma Sue Lundstrom | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 2 | SW4 | | 349755 | McKenzie | ND |
| Norma Sue Lundstrom | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, N2SE4 | | 349755 | McKenzie | ND |
| Norma Sue Lundstrom | Missouri Basin Well Service | 5/2/2004 | 153 | 97 | 28 | NE4 | | 349755 | McKenzie | ND |
| Norma Sue Lundstrom Trust | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, N2S2 | | 349754 | McKenzie | ND |
| North Dakota Elks | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | | 358270 | McKenzie | ND |
| North Dakota Elks | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | | 358270 | McKenzie | ND |
| North Dakota Lung Association | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | | 348476 | McKenzie | ND |
| North Dakota Lung Association | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | | 348476 | McKenzie | ND |
| NWFCS Flca 10-0076 | Oasis Petroleum North America LLC | 5/12/2010 | 27 | 59 | 8 | E/2E/2 | | 385395 | Roosevelt | MT |
| NWFCS, Flca | Diamond Resources Inc. | 3/16/2005 | 28 | 58 | 25 | NE4SE4 | | 609-30 | Roosevelt | MT |
| Olga Reese, A Widow | Cody Oil & Gas Corporation | 5/6/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | | 351141 | McKenzie | ND |
| Oliver Dyste, A Widower | Diamond Resources, Inc. | 6/7/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | | 357535 | McKenzie | ND |
| Oliver Dyste, A Widower | Diamond Resources, Inc. | 6/8/2005 | 152 | 98 | 23 | NE4NE4 | | 357535 | McKenzie | ND |
| Oliver Nelson Dyste, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | | 401494 | McKenzie | ND |
| Oliver Nelson Dyste, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | | 401494 | McKenzie | ND |
| Orin A Hermundstad | Arkota Energy, Inc. | 6/1/2011 | 151 | 98 | 33 | NW/4NE/4,S/2NE/4,SE/4NW/4 | | 418637 | McKenzie | ND |
| Orvin T. Boss And Luella Boss, Husband And Wife | Diamond Resources, Inc. | 5/5/2005 | 152 | 98 | 30 | Lot 1 | | 356865 | McKenzie | ND |
| Orvin T. Boss And Luella Boss, Husband And Wife | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 30 | Lot 4, SE4SW4 | | 356865 | McKenzie | ND |
| Oscar Quarne | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | | 791474 | Williams | ND |
| Oscar Quarne | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | | 791474 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Pamela Jackson, A Single Woman | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378309 | McKenzie | ND |
| Patricia Ann Leiseth And Kenneth Leiseth, Her Husband | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 27 | W2NE4, E2NW4 | 355191 | McKenzie | ND |
| Patricia Ann Leiseth And Kenneth Leiseth, Her Husband | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 22 | W/2SE, E/2SW, NWSW | 355191 | McKenzie | ND |
| Patricia J. Pechtel,A Single Woman, Individually, And Elizabeth A. Myers And Patricia J. Pechtl, Trustees Of The Myers Pechtl 2006 Revocable Trust, Under The Trust Agreement Dtd September 13, 2006 | Great Northern Energy, Inc. | 12/4/2009 | 152 | 99 | 25 | SWSW | 395734 | McKenzie | ND |
| Patricia J. Pechtl | Diamond Resources, Inc. | 2/9/2006 | 152 | 98 | 30 | Lot 1 | 361835 | McKenzie | ND |
| Patricia Madej | Continental Resources, Inc. | 7/30/2008 | 153 | 97 | 27 | SE4SE4 | 382242 | McKenzie | ND |
| Patricia Poole, F/K/A Patricia Erickstadt, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358466 | McKenzie | ND |
| Patricia Poole, F/K/A Patricia Erickstadt, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358466 | McKenzie | ND |
| Patricia Wanaka | Oasis Petroleum North America LLC | 1/6/2012 | 151 | 98 | 28 | N/2SW/4,SE/4SW/4,SW/4SE/4 | 491450 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355181 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355181 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355181 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355181 | McKenzie | ND |
| Paul & Betty Phillips Tst | Sundance Oil & Gas Inc | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370861 | Roosevelt | MT |
| Paul Dyste And Mena C. Dyste, Husband And Wife | Diamond Resources, Inc. | 5/12/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 357542 | McKenzie | ND |
| Paul Dyste And Mena C. Dyste, Husband And Wife | Diamond Resources, Inc. | 5/13/2005 | 152 | 98 | 23 | NE4NE4 | 357542 | McKenzie | ND |
| Paul H Bergem | Kodiak Oil And Gas (Usa) Inc | 2/25/2011 | 151 | 99 | 35 | 151N-099W-35-E2W2, W2E2 | 415549 | McKenzie | ND |
| Paul Linseth & Vivian L. Linseth, Husband And Wife As Joint Tenants; With Full Participation Rights And Right To Grant Lease Up To Five Years Without Consent | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 355736 | McKenzie | ND |
| Paul Linseth & Vivian L. Linseth, Husband And Wife As Joint Tenants; With Full Participation Rights And Right To Grant Lease Up To Five Years Without Consent | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 11 | W2NW, NWSW | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355736 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | 355736 | McKenzie | ND |
| Paul R. Dyste Trust U/A Dated 3-2-1995, Paul R. Dyste, Trustee | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401488 | McKenzie | ND |
| Paul R. Dyste Trust U/A Dated 3-2-1995, Paul R. Dyste, Trustee | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401488 | McKenzie | ND |
| Pearl Marian Njus, F/K/A Marian Wold And Irving Njus, Her Husband | Diamond Resources, Inc. | 2/23/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355706 | McKenzie | ND |
| Pearl Marian Njus, F/K/A Marian Wold And Irving Njus, Her Husband | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355706 | McKenzie | ND |
| Per STeinar Havn | Zenergy, Inc. | 6/1/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 423495 | McKenzie | ND |
| Peterson Trust Dated 7/15/88 | St. Mary Land & Exploration Company | 3/20/2010 | 151 | 99 | 24 | SE4SW4 | 396247 | McKenzie | ND |
| Peterson Trust Dated 7/15/88 | St. Mary Land & Exploration Company | 3/9/2010 | 151 | 99 | 25 | E2NW4, NW4NE4 | 396246 | McKenzie | ND |
| Philip Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355577 | McKenzie | ND |
| Philip Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355577 | McKenzie | ND |
| Philip Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355577 | McKenzie | ND |
| Phillip Nordeng | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355577 | McKenzie | ND |
| Phillips Family Trust | Sundance Oil & Gas Inc | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 374174 | Roosevelt | MT |
| Phillips-Murray Rev Trust | Unknown Lessee | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370875 | Roosevelt | MT |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | N2NW4 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 7 | SE4 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | 378790 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355173 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355173 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355173 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355173 | McKenzie | ND |
| Phyllis Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382074 | Roosevelt | MT |
| Phyllis Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382074 | Roosevelt | MT |
| R. H.Gifford, A Married Man | Diamond Resources, Inc. | 10/28/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 360377 | McKenzie | ND |
| R. H.Gifford, A Married Man | Diamond Resources, Inc. | 6/30/2006 | 152 | 99 | 25 | NWNE, N2NW | 365291 | McKenzie | ND |
| R.H. Gifford, A Married Man | Diamond Resources, Inc. | 10/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360377 | McKenzie | ND |
| Rachel Cox | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | 151N-098W-29-SE/4 | 401354 | McKenzie | ND |
| Rachel Cox | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | NE/4 | 401354 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rachel Cox | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | N/2NW/4 | 401354 | McKenzie | ND |
| Rachel Cox | Continental Resources, Inc. | 7/9/2010 | 151 | 98 | 32 | NE/4 | 405470 | McKenzie | ND |
| Rachel E. Cox, A Married Woman | Diamond Resources, Inc. | 6/7/2008 | 151 | 98 | 20 | SW4 | 379769 | McKenzie | ND |
| Ragene Sovak, A Married Woman | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351156 | McKenzie | ND |
| Ragene Sovak, A Single Woman | Diamond Resources, Inc, | 5/2/2008 | 151 | 98 | 20 | SW4 | 378314 | McKenzie | ND |
| Raida C Pfeifer Aka Rida C Pfeifer, | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | E2SW4 | 571490 | Williams | ND |
| Raida C Pfeifer Aka Rida C Pfeifer, | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | S2NE | 571490 | Williams | ND |
| Raida C Pfeifer Aka Rida C Pfeifer, | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | SE/4 | 571490 | Williams | ND |
| Ralph Skoglund And Debra A. Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 364622 | McKenzie | ND |
| Ralph Skoglund And Debra A. Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 364622 | McKenzie | ND |
| Ramona Curry, Individually And As Trustees, U/D/T Dated 5/24/1989 F/B/Of G. Leslie Curry And Ramona Curry | Diamond Resources Inc. | 1/14/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367592 | Roosevelt | MT |
| Randall Bruins Aka Randall H Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | 386140 | McKenzie | ND |
| Randall Bruins Aka Randall H Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | 386829 | McKenzie | ND |
| Randall H Bruins | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | 386831 | McKenzie | ND |
| Randy Gumm, A Married Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381441 | McKenzie | ND |
| Randy Gumm, A Married Man | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 366075 | McKenzie | ND |
| Randy Gumm, A Married Man | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381441 | McKenzie | ND |
| Randy Teed, A Single Man | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 353919 | McKenzie | ND |
| Ray A Berquist And Linda Berquist; | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 353045 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 |  S2NE4, SE4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378517 | McKenzie | ND |
| Raymond And Donrose M. Sharkey | Missouri Basin Well Service | 8/10/2004 | 152 | 98 | 11 | E2NW4 | 350139 | McKenzie | ND |
| Raymond And Donrose M. Sharkey | Missouri Basin Well Service | 12/8/2004 | 152 | 98 | 11 | NE4 | 350139 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 17 | N2NW4 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 7 | SE4 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | 378795 | McKenzie | ND |
| Raymond Misemer, A Single Man | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 397582 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Raymond Misemer, A/K/A Ray Misemer, A Single Man | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364018 | McKenzie | ND |
| Raymond Sharkey And Donrose M Shark | Missouri Basin Well Service, Inc. | 12/8/2004 | 152 | 98 | 11 | NE | 354488 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW1/4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 29 | SE4SE4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/11/2005 | 152 | 98 | 32 | N2NE4 | 356869 | McKenzie | ND |
| Red Wing Oil LLC | Sundance Oil & Gas Inc | 2/20/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370368 | Roosevelt | MT |
| Reeves A. Thielen, A Single Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360059 | McKenzie | ND |
| Reeves A. Thielen, A Single Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 360059 | McKenzie | ND |
| Renee Y Pearson Heir Of Martin Pete | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | 416086 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 393630 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SW4 | 393630 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | 393630 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | 393630 | McKenzie | ND |
| Reuben I Wolfson Properties | Oasis Petroleum North America LLC | 2/7/2012 | 155 | 101 | 12 | E/2SW/4 | 730408 | Williams | ND |
| Reuben I Wolfson Properties | Oasis Petroleum North America LLC | 2/7/2012 | 155 | 101 | 12 | S/2NE/4 | 730408 | Williams | ND |
| Reuben I Wolfson Properties | Oasis Petroleum North America LLC | 2/7/2012 | 155 | 101 | 12 | SE/4 | 730408 | Williams | ND |
| Revelle Christina Phillips | Unknown Lessee | 2/20/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 371240 | Roosevelt | MT |
| Richard Bruins; Single | St Mary Land & Exploration Company | 11/4/2009 | 151 | 99 | 23 | NE | 395072 | McKenzie | ND |
| Richard Enderud And Cheryl Enderud, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W2NE4, E2NW4 | 355185 | McKenzie | ND |
| Richard Enderud And Cheryl Enderud, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 22 | W/2SE, E/2SW, NWSW | 355185 | McKenzie | ND |
| Richard G. Cernosek And Amalie Cernosek, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381439 | McKenzie | ND |
| Richard G. Cernosek And Amalie Cernosek, Husband And Wife | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381439 | McKenzie | ND |
| Richard Gifford Aka R H Gifford; Md | Great Northern Energy, Inc. | 7/1/2010 | 152 | 99 | 25 | N2NW | 404761 | McKenzie | ND |
| Richard Gifford Aka R H Gifford; Md | Great Northern Energy, Inc. | 7/1/2010 | 152 | 99 | 25 | NWNE | 404761 | McKenzie | ND |
| Richard K. Horst | Great Northern Energy, Inc. | 3/31/2010 | 152 | 99 | 25 | SWSW | 401493 | McKenzie | ND |
| Richard K. Horst, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 360811 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Richard M. Olson And Ida Olson, Husband And Wife | Diamond Resources, Inc. | 7/28/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 358444 | McKenzie | ND |
| Richard M. Olson And Ida Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 7/28/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400919 | McKenzie | ND |
| Richard M. Olson And Ida Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400919 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378518 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | 378518 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources, Inc. | 4/30/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378518 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378519 | McKenzie | ND |
| Richard N. Dyste, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401504 | McKenzie | ND |
| Richard N. Dyste, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401504 | McKenzie | ND |
| Richard P. Kilwein, A Single Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360979 | McKenzie | ND |
| Richard Thomas Lattin Jr | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496422 | McKenzie | ND |
| Richard W. Jones, A Widower, Individually And As Heir To The Estate Of Bernadine M. Jones, Deceased | Great Northern Energy, Inc. | 12/31/2009 | 152 | 98 | 30 | Lot 1(33.53) | 400925 | McKenzie | ND |
| Richard W. Jones, A Widower, Individually, And As Heir To The Estate Of Nernadine M. Jones, Deceased | Great Northern Energy, Inc. | 12/31/2009 | 152 | 99 | 25 | SWSW | 400925 | McKenzie | ND |
| Richardson Living Trust 4/19/99 And | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 397200 | McKenzie | ND |
| Richardson Living Trust Dtd 4.19.99 | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410664 | McKenzie | ND |
| Richardson Living Trust Dtd 4.19.99 | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410666 | McKenzie | ND |
| Richardson Living Trust Dtd 4.19.99 | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19  IN NE4NW4 | 410666 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 397199 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SW4 | 397199 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 397199 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 397199 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 397198 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | 397198 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | 397198 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | 397198 | McKenzie | ND |
| Rickey L. Thomley, A/K/A Rickey Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358468 | McKenzie | ND |
| Rickey L. Thomley, A/K/A Rickey Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358468 | McKenzie | ND |
| Robert A Dyste And Vivian E Dyste; | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 14 | E2SE,SWSE | 402080 | McKenzie | ND |
| Robert A Dyste And Vivian E Dyste; | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 23 | NENE | 402080 | McKenzie | ND |
| Robert A. Dyste | Diamond Resources, Inc. | 8/11/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 358469 | McKenzie | ND |
| Robert A. Dyste | Diamond Resources, Inc. | 8/12/2005 | 152 | 98 | 23 | NE4NE4 | 358469 | McKenzie | ND |
| Robert A. Kilwein, A Married Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360988 | McKenzie | ND |
| Robert Buschbom, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364419 | McKenzie | ND |
| Robert Buschbom, A Married Man | Great Northern Energy, Inc. | 11/20/2009 | 152 | 99 | 25 | SWSW | 399026 | McKenzie | ND |
| Robert Buschbom, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 11/20/2009 | 152 | 98 | 30 | Lot 1(33.53) | 399026 | McKenzie | ND |
| Robert C Johnston And Marlai Johnst | Great Northern Energy, Inc. | 8/12/2008 | 152 | 98 | 30 | LOT 1 | 381619 | McKenzie | ND |
| Robert C Johnston And Marlai Johnst | Great Northern Energy, Inc. | 8/12/2008 | 152 | 98 | 30 | LOT 4 | 381619 | McKenzie | ND |
| Robert C Johnston Et Ux | Continental Resources, Inc. | 3/26/2010 | 152 | 98 | 30 | SE/4SW/4 | 400483 | McKenzie | ND |
| Robert C. Johnson And Marlai Johnson, Husband And Wife | Cody Oil & Gas Corporation | 7/31/2004 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 351167 | McKenzie | ND |
| Robert D. And Ardis M. Pederson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 11 | SE4 | 349782 | McKenzie | ND |
| Robert D. And Ardis M. Pederson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349782 | McKenzie | ND |
| Robert D. Gisvold | Diamond Resources, Inc. | 11/3/2008 | 152 | 98 | 30 | Lot 1 | 385406 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Robert D. Gisvold, A Married Man | Diamond Resources, Inc. | 11/3/2008 | 152 | 99 | 25 | SWSW | | 385406 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | N1/2, SW1/4 | | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SE/4 less 4.50 acre tract | | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | N/2 | | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SW/4 | | 351134 | McKenzie | ND |
| Robert Dee Theriault | Unknown Lessee | 5/22/2006 | 27 | 59 | 10 | NE/4SW/4 | | 371251 | Roosevelt | MT |
| Robert Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | | 378297 | McKenzie | ND |
| Robert Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | | 378297 | McKenzie | ND |
| Robert Fetveit, A Married Man | Diamond Resources, Inc. | 2/14/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 378297 | McKenzie | ND |
| Robert Fetveit; Married | Diamond Resources, Inc. | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | | 378298 | McKenzie | ND |
| Robert Horst, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | | 361885 | McKenzie | ND |
| Robert Horst, A Married Man | Great Northern Energy, Inc. | 3/31/2010 | 152 | 99 | 25 | SWSW | | 402726 | McKenzie | ND |
| Robert J Neyer Restated Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | | 687485 | Williams | ND |
| Robert J Neyer Restated Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | | 687485 | Williams | ND |
| Robert J Neyer Restated Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | | 687485 | Williams | ND |
| Robert L Peters Heir Of Martin Pete | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | | 416088 | McKenzie | ND |
| Robert Patrick Wilson | Zenergy, Inc. | 3/6/2010 | 27 | 59 | 10 | W/2E/2, W/2 | | 384070 | Roosevelt | MT |
| Robert Patrick Wilson | Zenergy, Inc. | 3/6/2010 | 27 | 59 | 10 | NE/4SW/4 | | 384070 | Roosevelt | MT |
| Robert Post Johnson | Missouri Basin Well Service | 4/22/2008 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | | 377704 | McKenzie | ND |
| Robert Post Johnson, A Married Man | Diamond Resources, Inc. | 12/8/2005 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | | 360542 | McKenzie | ND |
| Roberta G, Ketterling, A Married Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | | 396699 | McKenzie | ND |
| Roberta G. Ketterling, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 396681 | McKenzie | ND |
| Roda Drilling, Lp And Zeneco, Inc. | Zenergy, Inc. | 5/31/2012 | 151 | 98 | 1 | SENE,NESE | | 435778 | McKenzie | ND |
| Rodney Johnsrud | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | | 357798 | McKenzie | ND |
| Roger Flatland Et Ux | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | | 377172 | McKenzie | ND |
| Roger Flatland Et Ux | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | NW/2SW/4, W/2NW/4 | | 377172 | McKenzie | ND |
| Ronald Curtis Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | | 399011 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ronald Curtis Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399011 | McKenzie | ND |
| Ronald Curtis Wold; Mdssp | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 399016 | McKenzie | ND |
| Ronald Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378305 | McKenzie | ND |
| Ronald Fetveit, A Married Man | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378305 | McKenzie | ND |
| Ronald Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | 378305 | McKenzie | ND |
| Ronald Fetveit; Married | Diamond Resources Inc | 2/17/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378304 | McKenzie | ND |
| Ronald Gunderson, A Single Man | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378508 | McKenzie | ND |
| Ronald Teed, A Married Man | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351151 | McKenzie | ND |
| Ronald Teed, A Married Man | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 15 | NW/4 | 356450 | McKenzie | ND |
| Ronald Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358448 | McKenzie | ND |
| Ronald Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358448 | McKenzie | ND |
| Rose Marie Mcfarlane | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687487 | Williams | ND |
| Rose Marie Mcfarlane | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687487 | Williams | ND |
| Rose Marie Mcfarlane | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687487 | Williams | ND |
| Roxy G Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 3 | SW/4 | 387170 | Roosevelt | MT |
| Roxy G Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 4 | S/2 | 387170 | Roosevelt | MT |
| Roxy G Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 9 | N/2 | 387170 | Roosevelt | MT |
| Roxy G. Houck | Diamond Resources, Inc. | 6/24/2005 | 27 | 59 | 5 | Lot 1 (40.07), 2 (40.07), 3 (40.05), 4 (40.05), S2NE, SENW, E2SW, SWSW, SE | 369582 | Roosevelt | MT |
| Roxy G. Houck, A Married Woman | Diamond Resources Inc. | 6/24/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 369582 | Roosevelt | MT |
| Roy A Berquist And Marlyn Berquist; | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 353044 | McKenzie | ND |
| Royce J Harmon | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 380610 | McKenzie | ND |
| Royce Rolfson | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351161 | McKenzie | ND |
| Royce Rolfson, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 20 | SW4 | 378307 | McKenzie | ND |
| Ruby R Rogers | Unknown Lessee | 4/5/2005 | 27 | 59 | 7 | S/2SE/4 | 367176 | Roosevelt | MT |
| Ruby R Rogers | Unknown Lessee | 4/5/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367176 | Roosevelt | MT |
| Russell B Johnson Et Ux | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410676 | McKenzie | ND |
| Russell B Johnson Et Ux | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410679 | McKenzie | ND |
| Russell B Johnson Et Ux | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | 410679 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 400156 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | | | | Description | | County | State |
|---|---|---|---|---|---|---|---|---|---|
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SW4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | 400156 | McKenzie | ND |
| Russell E Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 3 | SW/4 | 379549 | Roosevelt | MT |
| Russell E Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 4 | S/2 | 379549 | Roosevelt | MT |
| Russell E Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 9 | N/2 | 379549 | Roosevelt | MT |
| Russell E. Houck | Diamond Resources, Inc. | 6/24/2005 | 27 | 59 | 5 | Lot 1 (40.07), 2 (40.07), 3 (40.05), 4 (40.05), S2NE, SENW, E2SW, SWSW, SE | 367763 | Roosevelt | MT |
| Russell E. Houck | Diamond Resources Inc. | 6/24/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367763 | Roosevelt | MT |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 18 | Lots 1-4, S2NE4, N2SE4, NE4SW4, SE4NW4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc . | 3/2/2005 | 152 | 98 | 13 | E2SE4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 7 | LOTS 3,4 | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NW,N2SW | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NE,N2SE | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 18 | LOTS 1,2,3,4,S2NE,N2SE,NESW,SENW | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 12 | SE | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 13 | E2SE | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 400153 | McKenzie | ND |
| Ruth Rolfson, A Widow | Cody Oil & Gas Corporation | 6/29/2004 | 151 | 98 | 20 | SW/4 | 351158 | McKenzie | ND |
| Sacred Heart Church | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381637 | McKenzie | ND |
| Sacred Heart Church | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 387633 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 5 | Lots 3, 4 | 363133 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 8 | W2 | | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 17 | N2NW4 | | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 6 | Lots 1, 2, 3, 4, 5, 7, S2NE4, SE4NW4, SE4SW4, SE4 | | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4, SE4 | | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 9/6/2005 | 152 | 98 | 32 | N2NW4 | | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 31 | Lots 1, 2, E2NW4, SW4NE4, E2SW4, W2SE4, SE4SE4 | | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 3 | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 4, SE4, SE4SW, N2NE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 19 | LOT 1,NENW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 19 | LOT 2,SENW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 19 | W2NE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 1 | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 2,E2NW,NESW,SWNE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 17 | N2NW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | SE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 7 | LOT 1,2,3,4,SENW,E2SW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 7 | SE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 8 | NW,N2SW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 8 | S2SW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | LOT 3,4,5,SENW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | LOTS 1,2,S2NE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | SESW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | LOT 7 | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 5 | LOTS 3,4 | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 99 | 13 | NE4, N2SE4 | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 32 | N2NW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 31 | S2SE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 29 | W2NE,N2SE,NESW | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 31 | LOTS 1,2,E2NW,SWNE,E2SW,NWSE | | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 30 | NESW,N2SE,SWSE | | 408301 | McKenzie | ND |
| Samuel A Derby And Bobbie S Derby; | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | S2NE | | 569938 | Williams | ND |
| Samuel A Derby And Bobbie S Derby; | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | E2SW | | 569938 | Williams | ND |
| Samuel A Derby And Bobbie S Derby; | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | SE/4 | | 569938 | Williams | ND |
| Samuel C. Denton | Diamond Resources, Inc. | 3/9/2006 | 151 | 98 | 28 | SWSW | | 364276 | McKenzie | ND |
| Sandi Wisness | Empire Oil Company | 8/10/2010 | 151 | 98 | 29 | S/2NW/4, SW/4 | | 411703 | McKenzie | ND |
| Sandi Wisness | Empire Oil Company | 1/23/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | | 411705 | McKenzie | ND |
| Sandra Edwards, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | | 364019 | McKenzie | ND |
| Sandra Edwards, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/8/2009 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | | 396678 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sandra Fullerton | Diamond Resources, Inc. | 4/20/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378788 | McKenzie | ND |
| Sandra Nelson, F/K/A Sandra Deguire, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358453 | McKenzie | ND |
| Sandra Nelson, F/K/A Sandra Deguire, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358453 | McKenzie | ND |
| Sara Alexander Gieb, A Single Woman | Diamond Resources, Inc. | 7/18/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 382030 | McKenzie | ND |
| Sara Hubler, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358454 | McKenzie | ND |
| Sara Hubler, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358454 | McKenzie | ND |
| Sara L Udland; Widow | Great Northern Energy, Inc. | 5/12/2010 | 152 | 99 | 25 | SWSW | 400057 | McKenzie | Widow |
| Sara L. Udland, A Widow | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 30 | Lot 1 | 358056 | McKenzie | ND |
| Sarah Surly | Diamond Resources, Inc. | 2/24/2006 | 152 | 98 | 30 | Lot 1 | 362275 | McKenzie | ND |
| Sarah Surry, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | Sec 30: Lot 1(33.53) | 396685 | McKenzie | ND |
| Sarah Surry; Mdssp | Great Northern Energy, Inc. | 5/1/2010 | 152 | 99 | 25 | SWSW | 396698 | McKenzie | ND |
| Sarah Surry; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | NWNE | 396691 | McKenzie | ND |
| Sarah Surry; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | N2NW | 396691 | McKenzie | ND |
| Scott A. Brown, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 8 | W2 | 355728 | McKenzie | ND |
| Scott A. Brown, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | N2NW4 | 355728 | McKenzie | ND |
| Scott A. Brown, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 7 | SE4 | 355728 | McKenzie | ND |
| Scott D. White | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356447 | McKenzie | ND |
| Scott D. White | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356447 | McKenzie | ND |
| Scott D. White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract known as IT 1200, MFD in Doc. 243641 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 401484 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Scott Vance, Trustee Of The Rose Lawlar Minerals Trust | Diamond Resources, Inc. | 4/28/2005 | 151 | 98 | 19 | Lot 4, E2SW, W2SE | 356874 | McKenzie | ND |
| Sharon Blake Bromberg | Oasis Petroleum North America LLC | 1/26/2014 | 155 | 101 | 12 | W/2SW/4 | 787690 | Williams | ND |
| Sharon Eastwood | Empire Oil Company | 8/28/2007 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372767 | McKenzie | ND |
| Sharon Eastwood, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | 400921 | McKenzie | ND |
| Sharon Eastwood, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400921 | McKenzie | ND |
| Sherry Cole, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358720 | McKenzie | ND |
| Sherry Cole, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358720 | McKenzie | ND |
| Shirley M. Lindeman And Donald L. Lindeman, Her Husband | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357534 | McKenzie | ND |
| Shirley M. Lindeman, A Widow | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 401486 | McKenzie | ND |
| Shirley M. Lindeman, A Widow | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 401486 | McKenzie | ND |
| Sigrid M. Russell Revocable Inter Vivos Trust, Blaine Russell, Trustee | Great Northern Energy, Inc. | 1/29/2010 | 151 | 98 | 28 | SWSW | 400417 | McKenzie | ND |
| Six T. LLC | Diamond Resources Inc. | 6/22/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-122 | Roosevelt | MT |
| Slemaker Royalty Company | Sundance Oil & Gas Inc | 4/14/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370844 | Roosevelt | MT |
| Smith Arla Et Al | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | N2 | 380017 | McKenzie | ND |
| Smith Arla Et Al | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | S2 | 380017 | McKenzie | ND |
| Smokey Oil LLC | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 6 | Lots 3(39.94), 4(39.20), 5(34.26), 7(34.34), SENW, SESW, SE | 402403 | McKenzie | ND |
| Smokey Oil LLC | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 7 | Lots 1(34.38), 2(34.44), 3(34.48), 4(34.54), SENW, E2SW | 402403 | McKenzie | ND |
| ST ND OG-09-00865 | Empire Oil | 8/4/2009 | 151 | 98 | 8 | E2NE4 | 391809 | McKenzie | ND |
| ST ND OG-09-00866 | Empire Oil | 8/4/2009 | 151 | 98 | 8 | E2SE4 | 391810 | McKenzie | ND |
| ST ND OG-09-00877 | St. Mary Land & Exploration Company | 8/4/2009 | 151 | 98 | 19 | W2NE4 | 391725 | McKenzie | ND |
| ST ND OG-09-00878 | St. Mary Land & Exploration Company | 8/4/2009 | 151 | 98 | 19 | LOT 2, SE4NW4 | 391726 | McKenzie | ND |
| ST Of ND OG-09-00905 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 2 | SE/4 | 391529 | McKenzie | ND |
| ST Of ND OG-09-00906 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 3 | LOTS 11-12 | 391530 | McKenzie | ND |
| ST Of ND OG-09-00916 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 23 | SE/4 | 391536 | McKenzie | ND |
| ST Of ND OG-09-00917 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 27 | W/2NW/4 | 391537 | McKenzie | ND |
| ST Of ND OG-09-00918 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 28 | NE4 | 397538 | McKenzie | ND |
| ST Of ND OG-09-00919 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 28 | E2NW4, NW4NW4 | 391539 | McKenzie | ND |
| ST Of ND OG-09-00922 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 34 | N/2SE/4 | 391540 | McKenzie | ND |
| Stallings Properties, Ltd | Diamond Resources, Inc. | 7/18/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 382032 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 151 | 98 | 5 | LOT 1,2 | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 31 | SENE | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 31 | NESE | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 32 | SW | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 33 | W2SE,W2NE,S2SW | 382036 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 32 | S2NW,SE | 382036 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Keith G.Shelley, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, John F. Laughter, Leon H. Shelley, Nancy J. Goddard And Kl & Hazel Shelley Trust | Diamond Resources, Inc. | 2/17/2005 | 152 | 98 | 31 | SE4NE4, NE4SE4 | 380171 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 5 | Lots 1, 2 | 380171 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 33 | W2E2, S2SW4 | 380171 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 32 | S2NW4, S2 | 380171 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 31 | SE4NE4, NE4SE4 | 380171 | McKenzie | ND |
| State Of ND # OG-0900907 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 3 | N2SW4 | 391531 | McKenzie | ND |
| State Of North Dakota | Johnsrud And Sons | 8/3/2004 | 151 | 98 | 8 | E2NE4 | 351668 | McKenzie | ND |
| State Of North Dakota | Johnsrud And Sons | 8/3/2004 | 151 | 98 | 8 | E2SE4 | 351668 | McKenzie | ND |
| State Of North Dakota | Cody Oil & Gas Corporation | 8/6/2002 | 152 | 98 | 30 | Lot 2, E/2NW/4 | 351668 | McKenzie | ND |
| State Of North Dakota | Cody Oil & Gas Corporation | 8/6/2002 | 152 | 98 | 30 | Lot 3 | 351668 | McKenzie | ND |
| State Of North Dakota | Cody Oil & Gas Corporation | 8/6/2002 | 152 | 98 | 30 | Lot 4, SE/4SW/4 | 351668 | McKenzie | ND |
| State Of North Dakota | Lasalle Leasing, LLC C/O St Mary La | 2/2/2010 | 151 | 99 | 14 | SW | 429619 | McKenzie | ND |
| State Of North Dakota | Powers Energy Corporation | 8/3/2004 | 152 | 98 | 35 | SW | 353249 | McKenzie | ND |
| State Of North Dakota | Powers Energy Corporation | 8/3/2004 | 152 | 98 | 35 | S2NW | 353248 | McKenzie | ND |
| Stephany Beaver, A Married Woman Dealing In Her Sole And Separate Property, Ind And As Heir To The Estate Of Susan Schantz, Dec. | Great Northern Energy, Inc. | 7/9/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 405835 | McKenzie | ND |
| Stephany Beaver, A Married Woman, Individually, And As Heir To The Estate Of Susan Schantz, Deceased | Great Northern Energy, Inc. | 7/9/2010 | 152 | 99 | 25 | SWSW | 405835 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 7 | NE4, E2W2, SE4 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 18 | N2NE4, NE4NW4, S2SE4 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 19 | Lots 1, 2, N2NE4, E2NW4 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 98 | 24 | E2NE4 | 364029 | McKenzie | ND |
| STeve A Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 11 | E2SW,SWSW | 431198 | McKenzie | ND |
| STeve A Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 14 | N2NW | 431198 | McKenzie | ND |
| STeve Shafer Trust | Great Northern Energy, Inc. | 4/29/2010 | 151 | 98 | 13 | E2NE | 402713 | McKenzie | ND |
| Steven A. Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | S2NE4, SE4 | 355719 | McKenzie | ND |
| Steven A. Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 355719 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Steven A. Johnson, A/K/A Steven Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 33 | E2E2 | 377947 | McKenzie | ND |
| Steven A. Johnson, A/K/A Steven Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 377947 | McKenzie | ND |
| Steven A. Johnson, A/K/A Steven Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 377947 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 151 | 98 | 5 | LOT 1,2 | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 31 | SENE | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 33 | W2SE,W2NE,S2SW | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 32 | SW | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 32 | S2NW,SE | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources Inc | 4/14/2009 | 152 | 98 | 33 | NW,N2SW | 378300 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources Inc | 4/14/2009 | 152 | 98 | 32 | SE4NE4 | 378300 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources Inc | 4/14/2009 | 152 | 98 | 32 | SW4NE4 | 378300 | McKenzie | ND |
| Steven D. Shelley | Diamond Resources, Inc. | 4/14/2005 | 152 | 98 | 33 | W2NE4, NW4, N2SW4 | 356315 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 151 | 98 | 5 | Lots 1, 2 | 356312 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2005 | 152 | 98 | 33 | W2SE4, W2NE4, S2SW4 | 356312 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 4/14/2009 | 152 | 98 | 33 | NW4, N2SW4 | 356312 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 33 | W2E2, S2SW4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 32 | S1/2NW1/4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/19/2009 | 152 | 98 | 32 | SE1/4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/20/2009 | 152 | 98 | 32 | SW1/4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 4/14/2009 | 152 | 98 | 32 | S2NE4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 31 | SE1/4NE1/4 | 356312 | McKenzie | ND |
| STeven Martin Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378523 | McKenzie | ND |
| STeven Martin Fetveit, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378523 | McKenzie | ND |
| STeven Martin Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 29 | E2NE4 | 378523 | McKenzie | ND |
| STeven Martin Fetveit; Married | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378521 | McKenzie | ND |
| STeven Ryder | Unknown Lessee | 10/19/2005 | 27 | 59 | 7 | S/2SE/4 | 368726 | Roosevelt | MT |
| STeven Ryder | Unknown Lessee | 10/19/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368726 | Roosevelt | MT |
| STewart J Fetveit And Carla R Fetve | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378500 | McKenzie | ND |
| STewart J. Fetveit And Carla R. Fetveit, Husband And Wife | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378502 | McKenzie | ND |
| STewart J. Fetveit And Carla R. Fetveit, Husband And Wife | Diamond Resources, Inc. | 2/14/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378502 | McKenzie | ND |
| STewart J. Fetveit And Carla R. Fetveit, Husband And Wife | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 29 | E2NE4 | 378502 | McKenzie | ND |
| Susan D. Zimmerman Et Vir | Sundance Oil And Gas | 6/16/2008 | 27 | 59 | 10 | W/2E/2, W/2 | 377618 | Roosevelt | MT |
| Susan D. Zimmerman Et Vir | Sundance Oil And Gas | 6/16/2008 | 27 | 59 | 10 | NE/4SW/4 | 377618 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Susan Elizabeth Murphy, A Single Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378787 | McKenzie | ND |
| Susan Eyre, F/K/A Susan Looft, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358724 | McKenzie | ND |
| Susan Eyre, F/K/A Susan Looft, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358724 | McKenzie | ND |
| Susan Lemley | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 14 | NE4 | 357790 | McKenzie | ND |
| Susan M Lemley; Married | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE | 378784 | McKenzie | ND |
| Susan M. Lemley, A Married Woman | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | 378493 | McKenzie | ND |
| Susan M. Lemley, A Married Woman | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 32 | S2NE4 | 378493 | McKenzie | ND |
| Susan M. Lemley, A Married Woman | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | 378493 | McKenzie | ND |
| Susan Nilson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360258 | McKenzie | ND |
| Susan Nilson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360258 | McKenzie | ND |
| Susan Olson, A Married Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358445 | McKenzie | ND |
| Susan Olson, A Married Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358445 | McKenzie | ND |
| Susan R. Harris Et Vir | Unknown Lessee | 6/4/2008 | 27 | 59 | 7 | S/2SE/4 | 377716 | Roosevelt | MT |
| Susan R. Harris Et Vir | Unknown Lessee | 6/4/2008 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 377716 | Roosevelt | MT |
| Susan Schantz | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361882 | McKenzie | ND |
| Suzanne Miles, F/K/A Suzanna Miles Robken, A Single Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 379828 | McKenzie | ND |
| Sylvia K Heiney | Sundance Oil & Gas Inc | 11/25/2008 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 379550 | Roosevelt | MT |
| T Rex & Fart LLC | Oasis Petroleum North America | 2/1/2014 | 152 | 98 | 30 | NE4 | 466579 | McKenzie | ND |
| T Rex & Fart LLC | Oasis Petroleum North America | 2/1/2014 | 152 | 98 | 30 | SE4SE4 | 466579 | McKenzie | ND |
| Ted Sheraris, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364026 | McKenzie | ND |
| Ted Sherarts | Continental Resources, Inc. | 9/8/2010 | 152 | 98 | 30 | LOT 1 | 407846 | McKenzie | ND |
| Ted Sherarts, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364026 | McKenzie | ND |
| Teresa Anne Miles Pacheco, A/K/A Teresa Miles Pacheco, A Married Woman | Diamond Resources, Inc. | 3/30/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 379081 | McKenzie | ND |
| Teresa STockford, A Single Woman | Diamond Resources Inc. | 6/27/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-192 | Roosevelt | MT |
| Terry Nelson | Sundance Oil And Gas | 5/10/2006 | 27 | 59 | 3 | SW/4 | 370936 | Roosevelt | MT |
| Terry Nelson | Sundance Oil And Gas | 5/10/2006 | 27 | 59 | 6 | LOTS 1, 2,3,4, SW/4NW/4, SW/4, SE/4SE/4 | 370936 | Roosevelt | MT |
| Terry Nelson | Oasis Petroleum N America LLC | 7/13/2011 | 27 | 59 | 4 | S/2 | 390636 | Roosevelt | MT |
| Terry Nelson | Oasis Petroleum N America LLC | 7/13/2011 | 27 | 59 | 9 | N/2 | 390636 | Roosevelt | MT |
| Terry Nelson | Oasis Petroleum N America LLC | 7/13/2011 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 390636 | Roosevelt | MT |
| Terry Nordeng, A Single Man | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355176 | McKenzie | ND |
| Terry Nordeng, A Single Man | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355176 | McKenzie | ND |
| Terry Nordeng, A Single Man | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355176 | McKenzie | ND |
| Terry Nordeng, A Single Man | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355176 | McKenzie | ND |
| The Good Shepherd Home | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | 358275 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| The Good Shepherd Home | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | 358275 | McKenzie | ND |
| The Myers And Pechtl 2006 Revocable Trust, Under Trust Agreement Dated September 13, 2006, Elizabeth A. Meyers And Patricia J. Pechtl, Trustees | Great Northern Energy, Inc. | 12/4/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395729 | McKenzie | ND |
| The Rosen Mineral Trust, Louis Rose | Empire Oil Company | 9/20/1996 | 155 | 101 | 12 | E2SW | 569936 | Williams | ND |
| The Rosen Mineral Trust, Louis Rose | Empire Oil Company | 9/20/1996 | 155 | 101 | 12 | SE/4 | 569936 | Williams | ND |
| The Rosen Mineral Trust, Louis Rose | Empire Oil Company | 9/20/1996 | 155 | 101 | 12 | S/2NE/4 | 569936 | Williams | ND |
| Thelma I Draughon | 7 O'S Oil Corporation | 4/14/2005 | 27 | 59 | 7 | S/2SE/4 | 367169 | Roosevelt | MT |
| Thelma I Draughon | 7 O'S Oil Corporation | 4/14/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367169 | Roosevelt | MT |
| Thelma Mcintire | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | SW | 385463 | McKenzie | ND |
| Thelma Mcintire | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | E2 | 385463 | McKenzie | ND |
| Thelma Mcintire, A Widow | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | 378800 | McKenzie | ND |
| Theresa Andre, F/K/A/ Theresa Thomley, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358432 | McKenzie | ND |
| Theresa Andre, F/K/A/ Theresa Thomley, A Married Woman | Diamond Resources, Inc. | 8/5/2005 | 152 | 98 | 24 | N2NW4 | 358432 | McKenzie | ND |
| Thomas A. Kilwein, A Married Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360987 | McKenzie | ND |
| Thomas D Theriault Ut Ex | Sundance Oil & Gas Inc | 5/23/2006 | 27 | 59 | 10 | NE/4SW/4 | 371082 | Roosevelt | MT |
| Thomas J. Van Osdel, A Married Man | Great Northern Energy, Inc. | 12/3/2009 | 152 | 99 | 25 | SWSW | 396695 | McKenzie | ND |
| Thomas J. Van Osdel, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/3/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396695 | McKenzie | ND |
| Thomas P Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382201 | Roosevelt | MT |
| Thomas P Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382201 | Roosevelt | MT |
| Thomas S Kjos, Sole Heir Of Evelyn | Zenergy, Inc. | 7/1/2012 | 152 | 98 | 14 | E2SE,SWSE | 436910 | McKenzie | ND |
| Thomas S Kjos, Sole Heir Of Evelyn | Zenergy, Inc. | 7/1/2012 | 152 | 98 | 23 | NENE | 436910 | McKenzie | ND |
| Thomas U Kellogg Et Ux | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | 348213 | McKenzie | ND |
| Thomas U Kellogg Et Ux | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | 348213 | McKenzie | ND |
| Timothy Geck, A Married Man, Individually, And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | SWSW | 399009 | McKenzie | ND |
| Timothy James Bergee; Single | Great Northern Energy Inc | 4/16/2010 | 151 | 98 | 24 | S2NE,SENW,E2SW,SE | 402082 | McKenzie | ND |
| Timothy R Geck; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | LOT 1 | 399010 | McKenzie | ND |
| Todd D. Ehresmann, A/K/Atodd Ehresmann, A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | 400045 | McKenzie | ND |
| Todd D. Ehresmann, A/K/A Todd Ehresmann, A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400045 | McKenzie | ND |
| Tracy R Barbee | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 381653 | McKenzie | ND |
| USA NDM97028 Segregated NDM108450 | Whiting Oil And Gas Corporation | 9/1/2007 | 152 | 97 | 18 | SE4SW4 | | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | 155N-101W-01-LOTS 1 & 2 | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | SE/4 | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | S/2NE/4 | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | SE/4NW/4 | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | 155N-101W-01-SW/4 | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | 155N-101W-01-LOTS 3 & 4 | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | SW/4NW/4 | 693086 | Williams | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | 355734 | McKenzie | ND |
| Vicki Schelde And Jack Schelde, Her Husband | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 379074 | McKenzie | ND |
| Victoria Ruderman, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | 401490 | McKenzie | ND |
| Victoria Ruderman, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 98 | 24 | N2NW4 | 401490 | McKenzie | ND |
| Virginia Lee Lewis | Zenergy, Inc. | 6/1/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385548 | Roosevelt | MT |
| Virginia Pearson, A Married Woman | Diamond Resources, Inc. | 6/6/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 358058 | McKenzie | ND |
| Virginia Pearson, A Married Woman | Diamond Resources, Inc. | 6/7/2005 | 152 | 98 | 23 | NE4NE4 | 358058 | McKenzie | ND |
| Vvv Holdings, LLC, A North Dakota Corporation | Great Northern Energy, Inc. | 11/13/2009 | 152 | 97 | 19 | Sec 19: S2NE4, NW4SE4 | 394858 | McKenzie | ND |
| W & A Wold Minerals Trust Dated 4-21-04, Gary Wold, Trustee | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 400923 | McKenzie | ND |
| Wallace F. Dyste, A Married Woman | Diamond Resources, Inc. | 8/11/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 358470 | McKenzie | ND |
| Wallace F. Dyste, A Married Woman | Diamond Resources, Inc. | 8/12/2005 | 152 | 98 | 23 | NE4NE4 | 358470 | McKenzie | ND |
| Walter Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382204 | Roosevelt | MT |
| Walter Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382204 | Roosevelt | MT |
| Warren Reese, A Married Man | Cody Oil & Gas Corporation | 5/12/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 351142 | McKenzie | ND |
| Wayne R Johnson | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410672 | McKenzie | ND |
| Wayne R Johnson | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410674 | McKenzie | ND |
| Wayne R Johnson | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | 410674 | McKenzie | ND |
| Wayne R Johnson; Single | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 400163 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 24 | E1/2NE1/4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NESW4, SENW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 Note: Wayne R. Johnson overpaid by 1.34 acres, Zenergy, Inc. refunded $100.00 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc | 3/2/2005 | 152 | 97 | 18 | Lots 1, 2, 3, 4, S2NE, N2SE, NESW, SENW | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SW4 Note: Wayne R. Johnson overpaid by 2.67 acres, Zenergy, Inc. refunded $200.25 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SE4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 Note: Wayne R. Johnson overpaid by 15.55 acres, Zenergy, Inc. refunded $1166.00 | 355575 | McKenzie | ND |
| Weldon B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 7 | S/2SE/4 | 367177 | Roosevelt | MT |
| Weldon B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367177 | Roosevelt | MT |
| Wendell Tasker And Carol Tasker, Husband And Wife | Diamond Resources, Inc. | 11/3/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 360373 | McKenzie | ND |
| Wendell Tasker And Carol Tasker, Husband And Wife | Diamond Resources, Inc. | 8/14/2006 | 152 | 99 | 25 | NWNE, N2NW | 365466 | McKenzie | ND |
| Wendell Tasker, A Married Man | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360373 | McKenzie | ND |
| Wendy A Frisk | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | S/2NE/4 | 388760 | Roosevelt | MT |
| Wendy A Frisk | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 388760 | Roosevelt | MT |
| Wendy A. Frisk | Unknown Lessee | 11/26/2008 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 379372 | Roosevelt | MT |
| Wendy A. Frisk | Unknown Lessee | 11/26/2008 | 27 | 59 | 4 | S/2NW/4 | 379372 | Roosevelt | MT |
| Wesley Misemer, A Single Man | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 397571 | McKenzie | ND |
| Wesley Misemer, A/K/A Wes Misemer, A Single Man | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364267 | McKenzie | ND |
| Wesley Wold & Arlene Wold, As Trustees Of The W. & A. Wold Minerals Trust Dated 4/21/04 | Diamond Resources, Inc. | 5/9/2005 | 152 | 98 | 1 | Lots 3, 4 | 357176 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Wesley Wold And Arlene J. Wold, As Trustees Of The W&A Wold Minerals Trust | Diamond Resources, Inc. | 4/11/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 363132 | McKenzie | ND |
| Westhoma Oil Company | Zenergy, Inc. | 1/1/2010 | 152 | 98 | 34 | W2SW | 397331 | McKenzie | ND |
| Westhoma Oil Company | Zenergy, Inc. | 1/1/2010 | 152 | 98 | 33 | E2SE | 397331 | McKenzie | ND |
| White Rock Trust | Brigham Oil & Gas, Lp | 7/13/2010 | 151 | 99 | 35 | E2E2 | 409476 | McKenzie | ND |
| White Rock Trust | Brigham Oil & Gas, Lp | 7/13/2010 | 151 | 99 | 26 | SESW,S2SE,NESE | 409476 | McKenzie | ND |
| William A. Dyste And Marlys K. Dyste | Great Northern Energy, Inc. | 4/19/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 402083 | McKenzie | ND |
| William A. Dyste And Marlys K. Dyste | Great Northern Energy, Inc. | 4/20/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 402083 | McKenzie | ND |
| William D Utke | Panther Energy Company, LLC | 7/2/2008 | 151 | 99 | 14 | S2NW | 386835 | McKenzie | ND |
| William E. Bucshbom, A Merried Man | Great Northern Energy, Inc. | 11/20/2009 | 152 | 99 | 25 | SWSW | 394862 | McKenzie | ND |
| William E. Buschbom, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 11/20/2009 | 152 | 98 | 30 | Lot 1(33.53) | 394862 | McKenzie | ND |
| William H Sutton | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | E/2SW/4 | 700147 | Williams | ND |
| William H Sutton | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | SE/4 | 700147 | Williams | ND |
| William H Sutton | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | S/2NE/4 | 700147 | Williams | ND |
| William L Halldorson And Marilyn Ha | Zenergy, Inc. | 10/1/2010 | 152 | 98 | 33 | NW,N2SW | 410000 | McKenzie | ND |
| William L Halldorson And Marilyn Ha | Zenergy, Inc. | 10/1/2010 | 152 | 98 | 32 | SE4NE4 | 410000 | McKenzie | ND |
| William L Halldorson And Marilyn Ha | Zenergy, Inc. | 10/1/2010 | 152 | 98 | 32 | SW4NE4 | 410000 | McKenzie | ND |
| William L Mills | Panther Energy Company, LLC | 3/11/2010 | 152 | 98 | 11 | E2NW | 403345 | McKenzie | ND |
| William L Mills | Panther Energy Company, LLC | 3/11/2010 | 152 | 98 | 11 | NE | 403345 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 1 | SW/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | S/2SW/4, SE/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | NE/4SW/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 29 | SE/4SE/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NE4NE4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NW4NE4 | 401346 | McKenzie | ND |
| William L. Mills | Missouri Basin Well Service | 3/10/2005 | 152 | 98 | 11 | NE4, E2NW4 | 356255 | McKenzie | ND |
| William R Andersen | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT 1 | 398686 | McKenzie | ND |
| William R Andersen | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT4 | 398686 | McKenzie | ND |
| William R Andersen | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | SE/4SW/4 | 398686 | McKenzie | ND |
| Wilma Ebensteiner, F/K/A Wilma Paul, A Married Woman | Diamond Resources, Inc. | 9/28/2009 | 152 | 98 | 33 | NW4, N2SW4 | 381440 | McKenzie | ND |
| Wilma Ebensteiner, F/K/A Wilma Paul, A Married Woman | Diamond Resources, Inc. | 9/28/2009 | 152 | 98 | 32 | S2NE4 | 381440 | McKenzie | ND |
| Winnie M. Shull, A Single Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360057 | McKenzie | ND |
| Winnie M. Shull, A Single Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 360057 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Winton Dale Wold, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | | 399037 | McKenzie | ND |
| Winton Dale Wold, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 399037 | McKenzie | ND |
| Winton Dale Wold; Mdssp | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | | 399003 | McKenzie | ND |
| Wold Alvin Keith | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 379505 | McKenzie | ND |
| Wold Alvin Keith | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 379505 | McKenzie | ND |
| Wold Duane Leon | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 379506 | McKenzie | ND |
| Wold Duane Leon | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 379506 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | NE4 | | 349761 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | SWNE | | 349761 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | SWNE | | 349761 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | SWNE | | 349761 | McKenzie | ND |
| Wold Ronald Curtis | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 380014 | McKenzie | ND |
| Wold Ronald Curtis | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 380014 | McKenzie | ND |
| Wold W & A Minerals Trust | St. Mary Land & Exploration Company | 5/12/2008 | 153 | 97 | 33 | N2 | | 381104 | McKenzie | ND |
| Wold W & A Minerals Trust | St. Mary Land & Exploration Company | 5/12/2008 | 153 | 97 | 33 | S2 | | 381104 | McKenzie | ND |
| Wold Winton Dale | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 380880 | McKenzie | ND |
| Wold Winton Dale | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 380880 | McKenzie | ND |
| Wood River Investment Co., LLC | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 14 | N2NW4 | | 360266 | McKenzie | ND |
| Wood River Investment Company, LLC | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 11 | SWSW, E2SW | | 360266 | McKenzie | ND |
| Woodbine Financial Corporation | Diamond Resources, Inc. | 6/13/2008 | 151 | 98 | 28 | N2SW, SESW, SWSE | | 379578 | McKenzie | ND |
| Woodbine Financial Corporation | Zenergy, Inc. | 7/15/2011 | 151 | 98 | 28 | N2SW,SESW,SWSE | | 420434 | McKenzie | ND |
| Yellowstone Boys & Girls | Unknown Lessee | 3/9/2005 | 27 | 59 | 3 | SE/4 | | 367815 | Roosevelt | MT |
| Yellowstone Boys & Girls | Unknown Lessee | 3/9/2005 | 27 | 59 | 10 | E/2E/2 | | 367815 | Roosevelt | MT |

# Exhibit "B"

**Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020, by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED OF RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

**OIL AND GAS LEASE**
(PAID-UP)

STATE OF North Dakota                    §
                                         §
COUNTY OF _____                  §

THIS   LEASE   AGREEMENT   IS   made   as   of   the   __   day   of   _____,   20_____,   between _____,   as   Lessor   (whether   one   or   more)   whose   address   is   _____, _____, North Dakota _____ and _____, _____, as Lessee. All printed portions of this lease were prepared by the party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1. **Description**. In consideration of a cash bonus in hand paid, the receipt and sufficiency of which is acknowledged, for other good and valuable consideration, and of the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee the following described land, hereinafter called "leased premises":

## [Land Description]

in the County of _____, State of North Dakota, containing _____ gross acres, more or less (including any interests therein which Lessor may hereafter acquire by reversion, prescription or otherwise), for the purpose of exploring for, developing, producing and marketing oil and gas, along with all hydrocarbon and nonhydrocarbon substances produced in association therewith. The term "gas" as used herein includes helium, carbon dioxide, gaseous sulfur compounds, coalbed methane and other commercial gases, as well as normal hydrocarbon gases.  In addition to the above-described land, this lease and the term "leased premises" also covers accretions and any small strips or parcels of land now or hereafter owned by Lessor which are contiguous or adjacent to the above-described land, and in consideration of the aforementioned cash bonus, Lessor agrees to execute at Lessee's request any additional or supplemental instruments for a more complete or accurate description of the land so covered.  For the purpose of determining the amount of any bonus payment, extension bonus payment (if applicable), delay rental payment (if applicable), or shut-in royalty payments based on acreage hereunder, the number of gross acres above specified shall be deemed correct, whether actually more or less. During the term of this lease, Lessee shall have the exclusive right to explore, develop, produce and market oil and gas, and all hydrocarbons and nonhydrocarbons produced in association therewith, from the leased premises by any method inclusive of, without limitation, geophysical or seismic operations.  For the same consideration stated above and irrespective of the term of the lease granted herein, Lessor further grants, sells, conveys and warrants to Lessee, to the extent Lessor has the right to do so, a perpetual subsurface right-of-way, right to use and easement in, through and under all of the leased premises for the purpose of drilling oil and/or gas wells to, and producing through said wells oil, gas or other minerals from, the leased premises, lands other than the leased premises or lands pooled or unitized with any of the foregoing, together with the right to obtain and use information from said operations and the right of ingress and egress to said wells.

2. **Term of Lease**. This lease, which is a "paid-up" lease requiring no rentals, shall be in force for a primary term of Three (3) years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled or unitized therewith or this lease is otherwise maintained in effect pursuant to the provisions hereof.

3. **Royalty Payment**.  Royalties on oil, gas and other substances produced and saved hereunder shall be paid by Lessee to Lessor as follows: (a) for oil and other liquid hydrocarbons separated at Lessee's separator facilities, the royalty shall be one-eighth of such production, to be delivered at Lessee's option to Lessor at the wellhead or to Lessor's credit at the oil purchaser's transportation facilities, provided that Lessee shall have the continuing right to sell such production to itself or an affiliate at the wellhead market price then prevailing in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) for production of similar grade and gravity;* (b) for gas (including casinghead gas) and all other substances covered hereby, the royalty shall be one-eighth of the proceeds realized by Lessee from the sale thereof, provided that Lessee shall have the continuing right to sell such production to itself or an affiliate at the prevailing wellhead market price paid for production of similar quality in the same field (or if there is no such price then prevailing in the same field, then in the nearest field in which there is such a prevailing price) pursuant to comparable purchase arrangements entered into on the same or nearest preceding date as the date on which Lessee or its affiliate commences its purchases hereunder;* and (c) in calculating royalties on production hereunder, Lessee may deduct Lessor's proportionate part of any ad valorem, production and excise taxes, and any costs incurred by Lessee in treating, processing, delivering and otherwise marketing such production, whether charged by or incurred to third parties or affiliates of Lessee.  If at the end of the primary term or any time thereafter one or more wells on the leased premises or lands pooled or unitized therewith are capable of producing oil or gas or other substances covered hereby in paying quantities, but such well or wells are either shut in or production therefrom is not being sold by Lessee, such well or wells shall nevertheless be deemed to be producing in paying quantities for the purpose of maintaining this lease.  If for a period of 180 consecutive days such well or wells are shut in or production therefrom is not being sold by Lessee, then Lessee shall pay an aggregate shut-in royalty of one dollar per acre then covered by this lease, such payment to be made to Lessor or to Lessor's credit in the depository designated below, on or before the end of said 180-day period and thereafter on or before each anniversary of the end of said 180-day period while the well or wells are shut in or production therefrom is not being sold by Lessee; provided that if this lease is otherwise being maintained by operations, or if production is being sold by Lessee from another well or wells on the leased premises or lands pooled or unitized therewith, no shut-in royalty shall be due until the end of the 180-day period next following cessation of such operations or production.  Lessee's failure to properly pay shut-in royalty shall render Lessee liable for the amount due, but shall not operate to terminate this lease. *Provided at Lessee's option, in lieu of the payments under clauses (a) or (b) as applicable,  Lessee may at its sole option, deliver to the credit of Lessor, free of costs (other than post-production costs paid or incurred to third parties or affiliates as provided in clause (c)), in the pipeline to which Lessee may connect wells on said lands, the equal one-eighth (1/8th) part of all oil or gas produced and saved from the leased premises.

4. **Depository Agent**. All royalty, shut-in royalty or other payments under this lease shall be paid or tendered direct to Lessor or to its successors at the above address of Lessor, or to the following depository designated by Lessor: _____. All payments or tenders may be made in currency, or by check or by draft, and such payments or tenders to Lessor or to the depository by deposit in the U.S. Mails in a stamped envelope addressed to the depository or to the Lessor at the last address known to Lessee shall constitute proper payment.  If the depository should liquidate or be succeeded by another institution, or for any reason fail or refuse to accept payment hereunder, Lessor shall, at Lessee's request, deliver to Lessee a proper recordable instrument naming another institution as depository agent to receive payments.

5. **Operations**. If Lessee drills a well which is incapable of producing in paying quantities (hereinafter called "dry hole") on the leased premises or lands pooled or unitized therewith, or if all production (whether or not in paying quantities) permanently ceases from any cause, including a revision of unit boundaries pursuant to the provisions of Paragraph 6 or the action of any governmental authority, then in the event this lease is not otherwise being maintained in force it shall nevertheless remain in force if Lessee commences operations for reworking an existing well or for drilling an additional well or for otherwise obtaining or restoring production on the leased premises or lands pooled or unitized therewith within 90 days after completion of operations on such dry hole or within 90 days after such cessation of all production. If at any point within 90 days immediately prior to the end of the primary term, or if at the end of the primary term or at any time thereafter, this lease is not otherwise being maintained in force but Lessee is then engaged in drilling, reworking or any other operations reasonably calculated to obtain or restore production therefrom, this lease shall remain in force so long as any one or more of such operations are prosecuted with no interruption of more than 90 consecutive days, and if any such operations result in the production of oil or gas or other substances covered hereby, as long thereafter as there is production in paying quantities from the leased premises or lands pooled or unitized therewith. After completion of a well capable of producing in paying quantities hereunder, Lessee shall drill such additional wells on the leased premises or lands pooled or unitized therewith as a reasonably prudent operator would drill under the same or similar circumstances to (a) develop the leased premises as to reservoirs then capable of producing in paying quantities on the leased premises or land pooled or unitized therewith, or (b) protect the leased premises from uncompensated drainage by any well or wells located on other lands not pooled or unitized therewith. There shall be no covenant to drill exploratory wells or any additional wells except as expressly provided herein.

6. **Pooling**. Lessee shall have the right but not the obligation to pool all or any part of the leased premises or interest therein with any other lands or interests, as to any or all depths or zones and as to any or all substances covered by this lease, either before or after the commencement of drilling or production, whenever Lessee deems it necessary or proper to do so in order to prudently develop or operate the leased premises, whether or not similar pooling authority exists with respect to such other lands or interests. The creation of a unit by such pooling shall be based on the following criteria (hereinafter called "pooling criteria"): a unit for an oil well (other than a horizontal completion) shall not exceed 40 acres plus a maximum acreage tolerance of 10%, and for a gas well or a horizontal completion shall not exceed 640 acres plus a maximum acreage tolerance of 10%; provided that a larger unit may be formed for an oil well or gas well or horizontal completion to conform to any well spacing or density pattern that may be prescribed or permitted by any governmental authority having jurisdiction to do so. For the purpose of the foregoing, the terms "oil well" and "gas well" shall have the meanings prescribed or permitted by applicable law or the appropriate governmental authority, or, if no definition is so prescribed, "oil well" means a well with an initial gas-oil ratio of less than 100,000 cubic feet per barrel and "gas well" means a well with an initial gas-oil ratio of 100,000 cubic feet or more per barrel, based on a 24-hour production test conducted under normal producing conditions using standard lease separator facilities or equivalent testing equipment; and the term "horizontal completion" means any well that has a horizontal displacement within the correlative internal of a field of at least 100 feet. In exercising its pooling rights hereunder, Lessee shall file of record a written declaration describing the unit and stating the effective date of pooling. Production, drilling or reworking operations anywhere on a unit which includes all or any part of the leased premises shall be treated as if it were production, drilling or reworking operations on the leased premises, except that the production on which Lessor's royalty is calculated shall be that proportion of the total unit production which the net acreage covered by this lease and included in the unit bears to the total gross acreage in the unit, but only to the extent such proportion of unit production is sold by Lessee. In the event a unit is formed hereunder before the unit well is drilled and completed, so that the applicable pooling criteria are not yet known, the unit shall be based on the pooling criteria Lessee expects in good faith to apply upon completion of the well; provided that within a reasonable time after completion of the well, the unit shall be revised if necessary to conform to the pooling criteria that actually exist. Pooling in one or more instances shall not exhaust Lessee's pooling rights hereunder and Lessee shall have the recurring right but not the obligation to revise any unit formed hereunder by expansion or contraction or both, either before or after commencement of production, in order to conform to the well spacing or density pattern prescribed or permitted by the governmental authority having jurisdiction, or to conform to any productive acreage determination made by such governmental authority. To revise a unit hereunder, Lessee shall file of record a written declaration describing the revised unit and stating the effective date of revision. To the extent any portion of the leased premises is included in or excluded from the unit by virtue of such revision, the proportion of unit production on which royalties are payable hereunder shall thereafter be adjusted accordingly. In the absence of production in paying quantities from a unit, or upon permanent cessation thereof, Lessee may terminate the unit by filing of record a written declaration describing the unit and stating the date of termination. Pooling hereunder shall not constitute a cross-conveyance of interests.

7. **Payment Reductions.** If Lessor owns less than the full mineral estate in all or any part of the leased premises, the royalties and shut-in royalties payable hereunder for any well on any part of the leased premises or lands pooled therewith, and all other sums due and payable hereunder, shall be reduced to the proportion that Lessor's interest in such part of the leased premises bears to the full mineral estate in such part of the leased premises. To the extent any royalty or other payment attributable to the mineral estate covered by this lease is payable to someone other than Lessor, such royalty or other payment shall be deducted from the corresponding amount otherwise payable to Lessor hereunder.

8. **Ownership Changes.** The interest of either Lessor or Lessee hereunder may be assigned, devised or otherwise transferred in whole or in part, by area and/or by depth or zone, and the rights and obligations of the parties hereunder shall extend to their respective heirs, devisees, executors, administrators, successors and assigns. No change in Lessor's ownership shall have the effect of reducing the rights or enlarging the obligations of Lessee hereunder, and no change in ownership shall be binding on Lessee until 60 days after Lessee has been furnished the original or duly authenticated copies of the documents establishing such change of ownership to the satisfaction of Lessee or until Lessor has satisfied the notification requirements contained in Lessee's usual form of division order. In the event of the death of any person entitled to royalties or shut-in royalties hereunder, Lessee may pay or tender such royalties or shut-in royalties to the credit of decedent or decedent's estate in the depository designated above. If at any time two or more persons are entitled to royalties or shut-in royalties hereunder, Lessee may pay or tender such royalties or shut-in royalties to such persons or to their credit in the depository, either jointly or separately in proportion to the interest which each owns. If Lessee transfers its interest hereunder in whole or in part, Lessee shall be relieved of all obligations thereafter arising with respect to the transferred interest, and failure of the transferee to satisfy such obligations with respect to the transferred interest shall not affect the rights of Lessee with respect to any interest not so transferred. If Lessee transfers a full or undivided interest in all or any portion of the area covered by this lease, the obligation to pay or tender royalties or shut-in royalties hereunder shall be divided between Lessee and the transferee in proportion to the net acreage interest in this lease then held by each.

9. **Release of Lease.** Lessee may, at any time and from time to time, deliver to Lessor or file of record a written release of this lease as to a full or undivided interest in all or any portion of the area covered by this lease or any depths or zones thereunder, and shall thereupon be relieved of all obligations thereafter arising with respect to the interest so released. If Lessee releases less than all of the interest or area covered hereby, Lessee's obligation to pay or tender royalties or shut-in royalties shall be proportionately reduced in accordance with the net acreage interest retained hereunder.

10. **Ancillary Rights**. In exploring for, developing, producing and marketing oil, gas and other substances covered hereby on the leased premises or lands pooled or unitized therewith, in primary and/or enhanced recovery, Lessee shall have the right of ingress and egress along with the right to conduct such operations on the leased premises, or other lands in which Lessor now owns or hereafter acquires an interest, as may be reasonably necessary for such purposes, including but not limited to, geophysical operations, the drilling of wells, and the construction and use of roads, canals, pipelines, tanks, water wells, disposal wells, injection wells, pits, electric and telephone lines, power stations, and other facilities deemed necessary by Lessee to discover, produce, store, treat and/or transport such production and other products or to dispose of produced water from the leased premises or from other lands in which Lessor now owns or hereafter acquires an interest. Lessee may use in such operations, free of cost, any oil, gas, water and/or other substances produced on the leased premises, except water from Lessor's wells or ponds. In exploring, developing, producing or marketing from the leased premises or lands pooled or unitized therewith, the ancillary rights granted herein shall apply (a) to the entire leased premises described in Paragraph 1 above, notwithstanding any partial release or other partial termination of this lease; and (b) to any other lands in which Lessor now or hereafter has authority to grant such rights in the vicinity of the leased premises or lands pooled or unitized therewith. When

requested by Lessor in writing, Lessee shall bury its pipelines below ordinary plow depth on cultivated lands. No well shall be located less than 200 feet from any house or barn now on the leased premises or other lands of Lessor used by Lessee hereunder, without Lessor's consent, and Lessee shall pay for damage caused by its operations to buildings and other improvements now on the leased premises, or such other lands, and to commercial timber and growing crops thereon. Lessee shall have the right at any time to remove its fixtures, equipment and materials, including well casing, from the leased premises or such other lands during the term of this lease or within a reasonable time thereafter.

11. **Regulation and Delay.** Lessee's obligations under this lease, whether express or implied, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction, including restrictions on the drilling and production of wells, and regulation of the price or transportation of oil, gas and other substances covered hereby. When drilling, reworking, production or other operations are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this lease shall not terminate because of such prevention or delay, and, at Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any provisions or implied covenants of this lease when drilling, production or other operations are so prevented or delayed.

12. **Breach or Default**. No litigation shall be initiated by Lessor for damages, forfeiture or cancellation with respect to any breach or default by Lessee hereunder for a period of at least 180 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default within such period. In the event the matter is litigated and there is a final judicial determination that a breach or default has occurred, this lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after said judicial determination to remedy the breach or default and Lessee fails to do so.

13. **Warranty of Title**. Lessor hereby warrants and agrees to defend title conveyed to Lessee hereunder, and agrees that Lessee at Lessee's option may pay and discharge any taxes, mortgages or liens existing, levied or assessed on or against the leased premises. Lessor further agrees that, if Lessee exercises such right to make payment(s), the amount of such payment(s) may be deducted out of any royalties or shut-in royalties otherwise payable to Lessor hereunder. In the event Lessee is made aware of any claim inconsistent with Lessor's title, Lessee may suspend the payment of royalties and shut-in royalties hereunder, without interest, until Lessee has been furnished satisfactory evidence that such claim has been resolved.

14. **Unitization**. Lessee shall have the right but not the obligation to commit all or any part of the leased premises or interest therein to one or more unit plans or agreements for the cooperative development or operation of one or more oil and/or gas reservoirs or portions thereof, if in Lessee's judgment such plan or agreement will prevent waste and protect correlative rights, and if such plan or agreement is approved by the federal, state or local governmental authority having jurisdiction. When such a commitment is made, this lease shall be subject to the terms and conditions of the unit plan or agreement, including any formula prescribed therein for the allocation of production.

15. **Offer to Lease.** In the event that Lessor, during the primary term of this lease, receives a bona fide offer which Lessor is willing to accept from any party offering to purchase from Lessor a lease covering any or all of the substances covered by this lease and covering all or a portion of the land described herein, with the lease becoming effective upon expiration of this lease, Lessor hereby agrees to notify Lessee in writing of said offer immediately, including in the notice the name and address of the offeror, the price offered, and all other pertinent terms and conditions of the offer. Lessee, for a period of thirty (30) days after receipt of the notice, shall have the prior and preferred right and option to purchase the lease or part thereof or interest therein, covered by the offer at the price and according to the terms and conditions specified in the offer.

16. **Option to Extend**. In the event this lease not continued beyond the primary term by production, on-going operations or by any other means or provisions herein contained, Lessee shall have the option, but not the obligation, to extend the primary term of this lease as to all or any portion of the leased premises for an additional and extended term of two (2) years, and for so long thereafter as this lease is continued or maintained in force and effect by the production, or allocation to the leased premises, of oil, gas or other hydrocarbons, or by any other means or provisions herein contained. Lessee may exercise the option to extend this lease as to all or any portion of the leased premises by tendering to Lessor, at the address stated above and on or before the expiration date of the initial primary term of this lease, an additional per acre bonus consideration equal to the same per acre bonus consideration originally paid for the lease.

**IN WITNESS WHEREOF,** this lease is executed to be effective as of the date first written above, but upon execution shall be binding on the signatory and the signatory's heirs, devisees, executors, administrators, successors and assigns, whether or not this lease has been executed by all parties hereinabove named as Lessor.

**LESSOR:**


_____
**[Lessor]**


### ACKNOWLEDGMENT


**STATE OF NORTH DAKOTA**                    §
                                             §
**COUNTY OF _____**                §

This instrument was acknowledged before me on the _____day of _____, 2020, by _____.


_____
Notary Public, State of North Dakota

# Exhibit " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of **that certain Joint Operating Agreement dated    September 28, 2020, by and between Oasis Petroleum North America LLC**

**as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering lands located in _____**

**See Exhibit "A" to the Joint Operating Agreement.**

## I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

1.    **DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached, together with all exhibits attached to any of the foregoing.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

                                   or contractors
**"First Level Supervision"** means those employees / whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

1

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

~~**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.~~

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure~~.~~ **Including Real Time Operational Centers.**

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Real Time Operational Center" means a facility, regardless of location, having dedicated technical and/or operations staffing, that directly monitors and/or controls Joint Operations on a real-time basis.**

~~**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.~~

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

**2.**

**STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

2

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding **two** / month's operations within ~~fifteen (15)~~ / **thirty (30)** days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within ~~fifteen (15)~~ / **thirty (30)** days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within ~~fifteen (15)~~ / **thirty (30)** days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus ~~three~~ / **one** percent ~~(3%)~~ / **(1%)** per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus ~~three~~ / **one** percent ~~(3%)~~ / **(1%)** per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or

(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or

(3) a government/regulatory audit, or

(4) a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered. Notwithstanding any other provision contained herein, with respect to any particular well, only the Non-Operator which has the largest working interest in that well, on an eight eighths (8/8) basis, may request and conduct an audit. Furthermore, no Party may conduct audits, during any twelve month period, with respect to more than one half (1/2) of all the wells in which it owns a working interest.

The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. ~~If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).~~

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. ~~Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).~~

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

E. ☐ *(Optional Provision – Forfeiture Penalties)*
~~If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.~~

6. **APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B.   AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of _____**two**_____ (___**2**___) or more Parties, one of which is the Operator, having a combined working interest of at least_____**eighty**_____percent ( __**80**__ %), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C.   AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1.   RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2.   LABOR**

A.   Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), **as amended or replaced,** / for:

(1)   Operator's field employees **and contractors** directly employed On-site in the conduct of Joint Operations,

(2)   Operator's employees **and contractors** directly employed **in Real Time Operational Centers** / ~~on Shore Base Facilities, Offshore Facilities,~~ or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3)   Operator's employees **and contractors** providing First Level Supervision,

(4)   Operator's employees **and contractors** providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5)   Operator's employees **and contractors** providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees **and contractors** identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B.   Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C.   Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") **, as amended or replaced,** / for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), **as amended or replaced,** / applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") **, as amended or replaced,** / for personnel whose salaries and wages are chargeable under Section II.2.A.

3. **MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

4. **TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged **based upon the actual charges** / to the receiving property ~~using one of the methods listed below.~~ Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property **based on actual charges.** / ~~using one of the methods listed below:~~

~~(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.~~

~~(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.~~

5. **SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors") **, as amended or replaced** / . -

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

6. **EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, ~~Shore Base Facilities, Offshore Facilities,~~ and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed_____**ten**_____percent (_____**10**_____%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

6

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average or usual commercial rates in the area for the same or similar goods or services ~~average commercial rates currently prevailing in the immediate area of the Joint Property~~.

B.    In lieu of charges in Section II.6.A above, the Operator may elect to use average or usual commercial rates in the area for the same or similar goods or services ~~of the Joint Property, less twenty percent (20%)~~. If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7.    AFFILIATES**

A.    Charges for an Affiliate's goods and/or services used in operations ~~requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_____ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (General Matters).~~

~~B.For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (General Matters), if the charges exceed $_____ in a given calendar year.~~

C.    The cost of the Affiliate's goods or services shall not exceed average or usual commercial rates in the area for the same or similar goods or services, unless the Operator obtains the Non-Operators' approval of such rates. / * ~~The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services.~~ Notwithstanding the foregoing, direct charges for

**\*Furthermore, notwithstanding any provision of the Agreement to the contrary, Affiliates may always be used for any purpose, including providing goods and services (including without limitation equipment and material) and Operator shall be entitled to charge the Joint Account as a direct charge for same to the extent the rates and charges of Affiliates do not exceed average or usual commercial rates in the area for the same or similar goods or services in the area, including without limitation rates and charges of under long term contracts of similar duration as such contracts with Affiliates of Operator. Notwithstanding the foregoing and any other provision of this Agreement, Non-Operator shall not be entitled to contest or refuse to pay rates or charges of Affiliates to the extent such rates or charges are at or below the rates and charges set forth in the table of rates and charges attached as Exhibit "I" and are the same as the rates being charged to Operator. The determination of whether rates and charges charged under long term contracts with Affiliates do not exceed average or usual commercial rates in the area for the same or similar goods or services in the area shall be made at the time such long term contract was executed.  If there are no long term contracts of the same or similar duration or goods or services, then rates and charges made under such long term contracts with Affiliates may be charged to the Joint Account to the extent they are commercially reasonable.**

Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 / (*Communications*).

~~If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).~~

**8.    DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9.    LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or  necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff ~~or outside attorneys,~~ including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys / **and outside landmen** for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10.    TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then

notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

7

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

## 11. INSURANCE

Net premiums paid for insurance ~~required to be~~ carried for Joint Operations for the protection of the Parties / **covered by the Joint Operations insurance as provided for in Exhibit "D"** . If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

## 12. COMMUNICATIONS

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems")/ **, as amended or replaced** . If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

## 13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

## 14. ABANDONMENT AND RECLAMATION

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

## 15. OTHER EXPENDITURES

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. ~~Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).~~

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)



- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1.     OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

- ✓ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
- ☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

A.     TECHNICAL SERVICES

(i)     Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

- ✓ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

- ☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii)     Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

- ☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

- ☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

- ✓ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B.     OVERHEAD—FIXED RATE BASIS

(1)     The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ **12,000.00**          (prorated for less than a full month)

Producing Well Rate per month $ **1,200.00**

(2)     Application of Overhead—Drilling Well Rate shall be as follows:

(a)     Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates")/ **, as amended or replaced** .

C. ~~OVERHEAD — PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate_____percent (_____) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate_____percent (_____%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead–Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead–Major Construction and Catastrophe*).~~

**2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A.    If the Operator absorbs the engineering, design and drafting costs related to the project:

    (1) _____5_____% of total costs if such costs are less than $100,000; plus

    (2) _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3) _____2_____% of total costs in excess of $1,000,000.

B.If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

    (1) _____5_____% of total costs if such costs are less than $100,000; plus

    (2) _____3_____% of total costs in excess of $100,000 but less than $1,000,000; plus

    (3) _____2_____% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

3.    **AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

1.    **DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid **to a third party or an Affiliate** by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party **or an Affiliate** for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent. Purchases paid to an Affiliate or related party of the Operator shall be priced as provided in Section II.7.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

## 2.   TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A.   PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1)   Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

    (a)   For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, TX, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

    (b)   For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2)   Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3)   Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4)   As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

### B.   FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1)   Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2)   Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3)   Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4)   Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C.   TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

D.   CONDITION

**and credited**

(1)   Condition "A" – New and unused Material in sound and serviceable condition shall be charged / at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). ~~Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*).~~ All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2)   Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

~~Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.~~

(3)   Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4)   Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5)   Condition "E" – Junk shall be priced at prevailing scrap value prices.

E.   OTHER PRICING PROVISIONS

(1)   Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with **Section II (Direct Charges).** ~~COPAS MFI-38 ("Material Pricing Manual")/.~~

(2)   Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with **Section II (Direct Charges)** ~~the methods specified in COPAS MFI-38 ("Material Pricing Manual").~~

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

13

COPAS 2005 Accounting Procedure
Recommended by COPAS, Inc.

### 3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

### 4. SPECIAL PRICING PROVISIONS

#### A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

#### B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

#### C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

### V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**1.   DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A.   A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B.   Actual transportation costs and Personal Expenses for the inventory team.

C.   Reasonable charges for report preparation and distribution to the Non-Operators.

**2.   NON-DIRECTED INVENTORIES**

A.   OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B.   NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C.   SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**EXHIBIT "D"**
**(Cost of Well Control Insurance Included)**

**Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020, by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.**

I.      INSURANCE CARRIED BY OPERATOR AND BILLED TO JOINT ACCOUNT

At all times on and after the date above listed, while operations are conducted hereunder, Operator shall carry on behalf of and charge to the Joint Account, insurance of the types and in at least the amounts as follows:

A.   1)      <u>Worker's Compensation Insurance</u> in full compliance with all applicable state and federal laws and regulations; and

2)      <u>Employer's Liability Insurance:</u>
$1,000,000 each accident
$1,000,000 each employee (disease)
$1,000,000 each policy limit (disease)

B.   <u>Comprehensive or Commercial General Liability Insurance</u> with a combined single limit of $1,000,000 per occurrence, for bodily injury and property damage. Non-operating working interest owners shall be named as additional insured under this policy, but only with respect to the performance of the work hereunder.

C.   <u>Automobile Liability Insurance</u> covering owned, non-owned, and hired automotive equipment with limits of $1,000,000 combined single limit bodily injury and property damage. No direct charge shall be made by the Operator for premiums paid for such insurance for Operator's fully owned automotive equipment.

D.   <u>Cost of Well Control Insurance,</u> limited to only the time periods during which drilling, completion and workover operations are being conducted on the unit, with limits of a minimum of $25,000,000 occurrence on land with a maximum of $175,000 deductible per occurrence. Limits and deductibles may be adjusted from time to time and are scaled to the interest covered by the Operator. Each non-operating working interest owner shall pay its pro rata share of the Cost of Well Control Insurance unless a certificate of insurance, is produced using insurance underwriter(s) acceptable to Operator, evidencing comparable coverage to that carried by Operator and approved by Operator, accompanies return of that working interest owner's executed Joint Operating Agreement. Such insurance evidenced by the Non-Operator shall be primary. A working interest owner who fails to execute the Joint Operating Agreement will be charged for its pro rata share of the cost of such insurance applicable to its proportionate participating interest in the covered operation.

It is understood and agreed that Operator is not a warrantor of the financial responsibility of the insurer with whom any insurance is carried, and that except for willful misconduct, Operator shall not be liable to Non-operators for any loss suffered on account of the insufficiency of the insurance carried or of the insurers with whom carried.

Operator retains the right in its sole discretion to determine the level of deductibles to be borne by the joint account on an 8/8ths basis. If Operator self-insures any of the coverages in I.A., I.B., I.C., or I.D. and Operator charges self-insurance premiums to the joint account, then Operator will fund 100% of the insurance portion of any claim up to the self-insured policy limit. If Operator elects to self-insure any of the above risks below the stated limits, or to materially reduce the limits of coverage obtained from third party insurers, then Operator will give written notice to all parties to this agreement of such events. Written notice required by this Exhibit will be given by mailing, by regular United States Postal Service mail, a substitute Exhibit "D" bearing a new effective date, to all parties then being billed by Operator for costs in the unit, at the current address available for such parties as

listed on Operator's then current billing division of interest.  Such written notice will be binding on the parties for all purposes.

## II. INSURANCE NOT CARRIED BY OPERATOR: UNINSURED LOSSES ARE JOINT LOSSES

**OPERATOR EXPRESSLY HEREBY GIVES NOTICE THAT IT WILL NOT CARRY INSURANCE FOR THE BENEFIT OF THE JOINT ACCOUNT COVERING (A) LOSS OR DAMAGE TO THE JOINTLY OWNED PROPERTY OR PRODUCTION THERE FROM CAUSED BY FIRE, EXPLOSION, WINDSTORM, TORNADO, FLOOD, VANDALISM, MALICIOUS MISCHIEF, OR OTHER EXTENDED PERILS, (B) THE  WELLBORE ITSELF DURING THE PRODUCING LIFE OF THE WELL, INCLUDING THE PERIOD WHEN THE WELL IS TEMPORARILY ABANDONED, OR AWAITING WORKOVER OR FORMAL PLUGGING; PROVIDED, HOWEVER, THAT OPERATOR MAY, AT ITS DISCRETION, ELECT TO CARRY ONE OR MORE CONTROL OF WELL INSURANCE POLICIES AND MAY BILL ANY COSTS OF SUCH INSURANCE POLICIES TO THE JOINT ACCOUNT.**

**THE JOINT ACCOUNT SHALL BE CHARGED WITH ALL LOSSES AND EXPENDITURES CAUSED OR INCURRED AS THE RESULT OF SUCH CAUSES AND/OR DURING SUCH TIME PERIODS OR AS THE RESULT OF ANY OTHER CASUALTY FOR WHICH THE OPERATOR IS NOT REQUIRED TO CARRY INSURANCE HEREUNDER. OPERATOR SHALL NOTIFY THE THEN PARTICIPATING NON-OPERATING WORKING INTEREST OWNERS OF ANY AND ALL LOSSES OF THIS DESCRIPTION. TO THE EXTENT OF THE OPERATOR OR NON-OPERATOR'S INSURANCE COVERAGE, EACH PARTY WAIVES ITS RIGHTS OF RECOVERY UNDER THE INSURANCE CONTRACT AGAINST ALL OTHER PARTIES TO THIS AGREEMENT.**

**LIABILITY, EXCEPT THAT COVERED BY INSURANCE, AGAINST ANY OF THE PARTIES FOR DAMAGES TO PROPERTY OF THIRD PERSONS, OR INJURY TO OR DEATH OF THIRD PERSONS, OR INJURY TO OR DEATH OF THIRD PERSONS ARISING OUT OF THE JOINT OPERATIONS, INCLUDING EXPENSES INCURRED IN DEFENDING CLAIMS OR ACTIONS ASSERTING LIABILITY OF THIS CHARACTER, SHALL BE BORNE BY EACH OF THE PARTIES HERETO IN PROPORTION TO THEIR RESPECTIVE UNDIVIDED INTEREST IN THE JOINT OPERATIONS.**

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

AMERICAN ASSOCIATION OF PETROLEUM LANDMEN
APPROVED FORM                              A.A.P.L. NO. 610-E

NOTE: Instructions For Use of Gas Balancing Agreement MUST be reviewed before finalizing this document.

**EXHIBIT "E"**

**GAS BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**JOINT OPERATING AGREEMENT DATED**              **September 28, 2020**

**BY AND BETWEEN**    **OASIS PETROLEUM NORTH AMERICA LLC**          **,**       **AS OPERATOR**

**AND**      **MIRADA WILD BASIN HOLDING COMPANY, LLC, ET AL,**  **AS NON-OPERATORS**                **("OPERATING AGREEMENT")**

**RELATING TO THE**                                                             **AREA,**

**See Exhibit "A" to the Operating Agreement**       **county, state of**     **See Exhibit "A" to the Operating Agreement**

1.   **DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Affiliate" shall have the meaning set forth in the Operating Agreement.

1.02 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time (for a long term contract, at the time such contract was entered into) for natural gas of comparable quality and quantity.

1.03 "Balancing Area" shall mean **(select one):**

☑ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

☐ ~~all of the acreage and depths subject to the Operating Agreement.~~

☐ _____

1.04 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.05 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.06 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.07 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.08 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.09 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement ~~or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.~~

1.10 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.12 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.13 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.14 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

"Reference Price" shall mean, if there is a published index for the Balancing Area, such reference price applicable at the time of the sale, and if there is no published index, the average price for which Gas is sold in the geographic area by Operator or its Affiliate where the Balancing Area is located, provided that if

the terms of a gas sales agreement with an Affiliate of the Overproduced Party are reasonable then such terms shall be the Reference Price; provided, further, that any contracts that have been executed on or prior to the execution date of the Operating Agreement, pursuant to which contracts Gas is being sold by Operator to its Affiliates, are deemed Arm's Length Agreements.

1.15 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.16 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.17 ☑ **(Optional)** "Winter Period" shall mean the month(s) of          **October, November and December**                     in one calendar year and the month(s) of         **January, February and March**                 in the succeeding calendar year.

2.        **BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☑ Mcfs or **(Alternative 2)** ☐ MMBtus.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

3.   **RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other

- 2 -

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties. To the extent Gas is flared, such Gas shall first be allocated to the Parties who failed to take their Full Share of Current Production at the time of flaring, as reasonably determined by the Operator. In no event shall flared Gas be allocated to a Party who took at least its Full Share of Current Production, except that if, at the time of flaring, each of the Parties has taken at least its Full Share of Current Production, then the flared Gas shall be allocated to each Party in proportion to each Party's respective Percentage Interest, except to the extent that Operator determines, in its sole reasonable discretion, that a different allocation methodology is required.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production; provided, further, that this limitation shall not apply to the extent there is Gas in excess of such 300% that is not taken by any Party. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event the Operator reasonably determines / that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or shall, to the extent practicable, make available to the Underproduced Party(ies) any part of such Party's Full Share of Current Production that such Party fails to take, or / pursuant to the provisions of Article VI.G of the Operating Agreement / to maintain oil production, the Operator / may sell / any part of such Party's Full Share of Current Production that such Party fails . to take for the account of such Party / and render to such Party, on a current basis, the full proceeds of the sale, less any fuel, processing, blending, storage or other reasonable marketing, stabilization, compression, treating, gathering / or transportation / costs deductions, charges and fees (including percentage of production payments), and each case whether paid to third-parties or Affiliates of a Party incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. The Underproduced Party shall not be charged for any capacity reservation charges, minimum volume commitment charges, or similar charges incurred by the Overproduced Party only when the Underproduced Party is separately disposing of its share of Gas. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event shall commit such Gas for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party. **See Article 14(a).  Non-Operator has the right to review the records to the extent that the records relate to Gas sold under such sale.**

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following at least __thirty__ (__30__) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying __twenty-five__ percent (__25__%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than __twenty-five__ percent (__25__%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

4.2 ☐ **(Optional - Seasonal Limitation on Makeup - Option 1)** Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the _____ (_____) months immediately preceding the Winter Period.

4.2 ☑ **(Optional - Seasonal Limitation on Makeup - Option 2)** Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than __zero__ percent (__0__%) of its Full Share of Current Production for Makeup Gas during the Winter Period.

4.3 ☐ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to _____ percent (_____%) of such Overproduced Party's Full Share of Current Production.

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five / sixty (45) / (60) / days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, and (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder, and each Party shall require that its gatherer, transporter or purchaser timely furnish such data and information to Operator. To the extent not already allowed as a Direct Charge to the Joint Account, under the applicable

Accounting Procedure, or if there is no Accounting Procedure, the Operator may charge the Parties taking in kind, the actual costs of Labor (as defined in the

- 3 -

## A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

form Accounting Procedure (COPAS form Accounting Procedure) relating to Operator's or its Affiliates employees or consultants  for preparation of statements or otherwise administering the take in kind process

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

### 6. PAYMENTS ON PRODUCTION

6.1 Each Party taking Gas shall pay or cause to be paid all / production and severance taxes due on all volumes of Gas
**Royalty,**
actually taken by such Party.

6.2 ☑ **(Alternative 1 - Entitlements)** ~~Each Party shall pay or cause to be paid all Royalty due with respect to Royalty~~

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

~~owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.~~

~~6.2.1 ☐ (Optional - For use only with Section 6.2 - Alternative I - Entitlement) Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

6.2 ☑ (Alternative 2 - Sales) Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7. CASH SETTLEMENTS**

7.1 Upon the earlier of <sup>(i)</sup> / the plugging and abandonment of the last producing interval in the Balancing Area, <sup>(ii)</sup> / the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, ~~or at~~ / <sup>(iii)</sup> any time no Gas is taken **or (iv) all leases in the Balancing Area have expired,** from the Balancing Area for a period of twelve (12) consecutive months, / any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 ☑ (Alternative I - Direct Party-to-Party Settlement) Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3 ☐ (Alternative 2 - Settlement Through Operator) Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ (Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator) Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ☑ (Alternative 1 - Historical Sales Basis) The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

~~7.4 ☐ (Alternative 2 - Most Recent Sales Basis) The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any ~~reasonable~~ marketing, compression, treating, gathering or transportation costs deductions, charges and fees (including percentage of production payments), and each case whether paid to third-parties or Affiliates of a Party incurred directly in connection with the sale of the Overproduction.

7.5.1 ☑ (Optional - For Valuation Under Percentage of Proceeds Contracts) For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

7.5.2 ☑ (Optional - Valuation for Processed Gas - Option 1) ~~For~~ Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction/ **(adjusted on a MMBtu basis)** .

~~7.5.2 ☐ (Optional - Valuation for Processed Gas - Option 2) For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.~~

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the

- 5 -

## A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be **"Reference Price", less any marketing, stabilization, compression, fuel, processing, blending, storage, treating, gathering or transportation or other costs, charges and fees (including percentage of production payments) incurred directly in connection with the sale of the Overproduction.** based on the / ~~spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.~~

**"Prime Rate" published in the Wall Street Journal plus one**

7.7   Interest compounded at the ~~rate of /~~_____percent (____1____%) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8   In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9   ☑ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.

~~7.10   ☐ **(Optional - Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.~~ **(See Article 14 (c))**

## 8.   TESTING

Notwithstanding any provision of this Agreement to the contrary, subject to the prior approval of the Operator, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after   **thirty**_____(____30) days' prior written notice to the Operator and shall last no longer than **Consent of Parties then taking all or any part of their share of gas shall be required to conduct testing during Winter Period.** **seventy-two**_____(____72____) hours./

## 9.   OPERATING COSTS

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

## 10.   LIQUIDS

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

## 11.   AUDIT RIGHTS

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

## 12.   MISCELLANEOUS

12.1   As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2   Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3   Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4   This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives

- 6 -

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 ~~If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.~~

12.9 ~~In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service~~ **(select one)** ☐ ~~as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or~~ ☐ ~~based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations.~~

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ☐ ~~**(Optional - Cash Settlement Upon Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least_____(_____) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within **thirty**_____(____**30**____) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning~~ **the first day following the closing of** ~~/ sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.~~

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**14. OTHER PROVISIONS**

    (a)   **"Notwithstanding anything contained herein to the contrary, no agency relationship or other relationship of trust and confidence shall be created by such sale and Operator's sale of production under the terms hereof shall be subject to the terms of Section 12.3 hereof."**

    (b)   **"Notwithstanding anything contained herein to the contrary, it is understood and agreed that any Party may call for a cash settlement as provided in Section 7: (i) at such time as the Balancing Area is included in a unit which causes the change in the Percentage Interest of some or all of the Parties; and (ii) in the event that this Agreement covers a Federal Exploratory Unit, upon the expansion or revision of the participating area which constitutes the Balancing Area. The right to call for a cash settlement hereunder shall be in addition to the rights provided for in Section 7.1."**

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

**15.  COUNTERPARTS**

This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a ___ percent (_____%) therein fail(s) to execute this Agreement on or before_____, this Agreement shall not be binding upon any Party and shall be of no further force and effect.

IN WITNESS WHEREOF, this Agreement shall be effective as of the   28th   day of September, 2020.

**ATTEST OR WITNESS:**                                    **OPERATOR**

                                                        OASIS PETROLEUM NORTH AMERICA LLC

_____                 BY: _____

_____                     Taylor L. Reid

                                                    Type or print name

                                                    Title President and Chief Operating Officer

                                                    Date September     , 2020

                                                    Tax ID or S.S. No. _____

                                                    NON-OPERATORS

                                                    MIRADA WILD BASIN HOLDING COMPANY, LLC,
                                                    SIGNING ON BEHALF OF ITSELF, AND AS AGENT FOR, MIRADA
_____                     ENERGY, LLC, MIRADA ENERGY FUND I, LLC, MIRADA F&C LLC,
                                                    ORRION ENERGY, LLC, MCP ORION, LLC, MCP HOLDING
_____                     COMPANY, LLC, MIRADA MANAGER, LLC, MIRADA HOLDING
                                                    COMPANY, LLC, BRISBANE PROPERTIES LLC, AND GREAT
                                                    BARRIER ENERGY, LLC.

                                                BY: _____

                                                    Adam Boniel

                                                    Type or print name

                                                    Title President

                                                    Date September     , 2020

                                                    Tax ID or S.S. No. _____

_____

_____                     _____

                                                BY: _____

                                                    _____

                                                    Type or print name

                                                    Title _____

                                                    Date _____

                                                    Tax ID or S.S. No. _____

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

State of_____)

                  ) ss.

County of_____)

       This instrument was acknowledged before me on _____

_____by_Adam Boniel_____as

President_____of  MIRADA WILD BASIN HOLDING COMPANY, LLC_____,
Mirada Wild Basin Holding Company, LLC, signing on behalf of itself, and as agent for, Mirada Energy, LLC, Mirada Energy Fund I, LLC, Mirada F&C LLC, Orrion Energy, LLC, McP Orion, LLC, MCP Holding Company, LLC, Mirada Manager, LLC, Mirada Holding Company, LLC, Brisbane Properties LLC, and Great Barrier Energy, LLC.

(Seal, if any)

                                  Title (and Rank) _____

                                  My commission expires: _____

State of_____)

                  ) ss.

County of_____)

       This instrument was acknowledged before me on _____

_____by_Taylor L. Reid_____as

President and Chief Operating Officer_____of  OASIS PETROLEUM NORTH AMERICA LLC_____.

(Seal, if any)

                                  Title (and Rank) _____

                                  My commission expires: _____

**EXHIBIT "F"**

**Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020, by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.**

## NON-DISCRIMINATION AND CERTIFICATION
## OF NON-SEGREGATED FACILITIES

In order to ensure compliance with the Equal Employment Opportunity provisions of Executive Orders 11246, 11375, 11598, 11141 and 11758, the Operator agrees to and shall be bound by these provisions and all rules and regulations promulgated thereunder, and with all amendments and additions thereto.

I.    Equal Opportunity Clause

(Applicable to all contracts in excess of $10,000)

Operator shall be bound by and agrees to the following provisions as contained in Section 202 of Executive Order 11246, to-wit:

(1)    The Operator will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. The Operator will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Operator agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2)    The Operator will, in all solicitations or advertisements for employees placed by or on behalf of the Operator, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, age or national origin.

(3)    The Operator will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the Operator's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4)    The Operator will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5)    The Operator will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6)    In the event of the Operator's noncompliance with the non-discrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the Operator may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order

11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7)     The Operator will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Operator will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance; PROVIDED, HOWEVER, that in the event the Operator becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, the Operator may request the United States to enter into such litigation to protect the interests of the United States.

II.     Certification of Non-Segregated Facilities

Operator certifies that he does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that he does not and will not permit his employees to perform their services at any location under his control, where segregated facilities are maintained. Operator agrees that a breach of this certification is a violation of the Equal Employment Opportunity Clause in this Contract.  As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom or otherwise. Operator further agrees that (except where he has obtained identical certifications from proposed subcontractors for specific time periods) he will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of Equal Employment Opportunity Clause; that he will retain such certification in his files; and that he will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods):

NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NON-SEGREGATED FACILITIES.

A Certification of Non-Segregated Facilities, as required by the May 9, 1967, order on Elimination of Segregated Facilities by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967) must be submitted prior to the award of subcontract exceeding $10,000, which is not exempt from the provisions of the Equal Employment Opportunity Clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually). (Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.)

III.    Employer Information Report (EEO-1, Standard Form 100)

If Operator has 50 or more employees and is required under Part 60 of Title 41 of the Code of Federal Regulations to file Employer Information Report, EEO-1 (Standard Form 100), Operator hereby certifies that he has done so or if not, agrees that he will file report in accordance with the applicable instructions and will continue to file such report unless or until Operator is not required by law or regulation to so file.

IV.     Affirmative Action Compliance Program

If the value of this Contract is $50,000 or more and The Operator has 50 or more employees, Operator agrees to develop a written affirmative action compliance program as required by law.

V.     Utilization of Minority Business Enterprises

(Applicable to all contracts in excess of $5,000, except contracts for services which are personal in nature)

(a)     It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(b)     The Operator agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract.  As used in this contract, the term "minority business enterprise" means a business, at least 50 percent of which is owned by minority group members or, in case of publicly owned businesses, at least 51 percent of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are African-Americans, Mexican-Americans, Asian-Americans, American-Indians, American-Eskimos, and American Aleuts.  Operator may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

VI.     Minority Business Enterprises Subcontractor Program

(Applicable to all contracts in excess of $500,000)

(a)     The Operator agrees to establish and conduct a program which will enable minority business enterprises (as defined in the clause entitled "Utilization of Minority Business Enterprises") to be considered fairly as subcontractors and suppliers under this contract.  In this connection, the Operator shall:

(1)     Designate a liaison officer who will administer the Operator's minority business enterprises program.

(2)     Provide adequate and timely consideration of the potentialities of known minority business enterprises in all "make-or-buy" decisions.

(3)     Assure that known minority business enterprises will have an equitable opportunity to compete for subcontracts, particularly by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of minority business enterprises.

(4)     Maintain records showing (i) procedures which have been adopted to comply with the policies set forth in this clause, including the establishment of a source list of minority business enterprises, (ii) awards to minority business enterprises on the source list, and (iii) specific efforts to identify and award contracts to minority business enterprises.

(5)     Include the Utilization of Minority Business Enterprises clause in subcontracts which offer substantial minority business enterprises subcontracting opportunities.

(6)     Cooperate with the Contracting Officer in any studies and surveys of the Operator's minority business enterprises procedures and practices that the Contracting Officer may from time to time conduct.

(7)     Submit periodic reports of subcontracting to known minority business enterprises with respect to the records referred to in subparagraph (4), above, in such form and manner and at such time (no more often than quarterly) as the Contracting Officer may prescribe.

(b)     The Operator further agrees to insert, in any subcontract hereunder which may exceed $500,000, provisions which shall conform substantially to the language of this clause, including this paragraph (b), and to notify the Contracting Officer of the names of such subcontractors.

VII.     <u>Employment of the Handicapped</u>

(Applicable to all contracts for $2,500 or more)

The affirmative action clause and regulations (as amended from time to time) promulgated by the Secretary of Labor, or his designee, and to implement Section 503 of the Rehabilitation Act of 1973, P.L. 93-112, as amended, and found in Part 60 of Title 41 of the Code of Federal Regulations, are incorporated by reference and made a part hereof, and Seller agrees to comply with such affirmative action clause and regulations to the extent applicable.

VIII.     <u>Disabled Veterans and Veterans of the Vietnam Era</u>

(Applicable to contracts for $10,000 or more)

The affirmative action clause and regulations (as amended from time to time) promulgated by the Secretary of Labor, or his designee, and to implement Section 2012 of the Vietnam Era Readjustment Act of 1974, P.L. 93-508, and found in Part 60 of Title 41 of the Code of Federal Regulations, are incorporated by reference and made a part hereof, and Seller agrees to comply with such affirmative action clause and regulations to the extent applicable.

IX.     <u>Certification of Compliance With Environmental Laws</u>

Operator agrees to comply with the Clean Air Act (42 U.S.C. Paragraph 1857) and the Federal Water Pollution Control Act (33 U.S.C. Paragraph 1251) when conducting operations involving nonexempt contracts. In all nonexempt contracts with subcontractors, Operator shall require:

(1)     No facility to be utilized by Subcontractor in the performance of this contract with Operator is listed on the Environmental Protection Agency (EPA) List of Violating Facilities. See Executive Order No. 11738 of September 12, 1973, and 40 CFR Paragraph 15.20.

(2)     Prompt written notification shall be given by Subcontractor to Operator of any communication indicating that any such facility is under consideration to be included on the EPA List of Violating Facilities.

(3)     Subcontractor shall comply with all requirements of Section 114 of the Clean Air Act (42 U.S.0 Paragraph 1857) and Section 308 of the Federal Water Pollution Contract Act (33 U.S.C. Paragraph 1251), relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in these Sections, and all regulations and guidelines issued thereunder.

(4)     The foregoing criteria and requirements shall be included in all of Subcontractor's nonexempt subcontracts, and Subcontractor shall take such action as the Government may direct as a means of enforcing such provisions. See 40 CFR Paragraph 15.4 & 5.

(5)     Operator agrees to notify non-operators of any violations in the aforementioned provisions.

**EXHIBIT "G"**

**Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020, by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.**

**RAW DATA**

Raw data to be sent to the following email address:  wellreports@miradaenergy.com

Operator shall provide the following raw data to Non-Operator who is a Consenting Party in the applicable operation, and only to the extent Operator has such raw data available and it is not otherwise restricted from sharing with, or is not publicly available to, Non-Operator (it is understood by Operator and Non-Operator that Operator shall only be required to provide raw data to Non-Operator and shall never be required to provide Operator's own analysis, interpreted data, reports or views on such raw data):

BEFORE SPUD:
1. Geological Prognosis & Drilling Program, Wellsite Survey
2. Approved Drilling Permit
3. Copy of Title Opinion

DURING DRILLING:
1. Spud Notice
2. Daily Drilling Reports, commencing on or about Spud Date
3. 12-hour advance notice of Intended Core, Test & Log Operations
4. LAS & PAS open hole logs when available from service provider
5. 24 Hour Abandonment Notice

FOLLOWING TO BE SUPPLIED AS SOON AS PRACTICABLE AFTER DRILLING:
1. All Logs: Open Hole/Cased Hole (Final Prints)
2. DST (drill stem test) Reports and Charts
3. Lithological Reports (Cores & Samples)
4. Oil/Gas/Water/Core Raw Samples
5. Completion Report, Well History Report, Geological Summary
6. Flowback and pressure reports related to production test raw data
7. Abandonment Report (if applicable)

BEFORE COMPLETION:
1. Estimate of (i) pounds of proppant, (ii) barrels of fluid and (iii) stage count (which estimate is subject to change at any time at Operator's sole discretion without further notice)

DURING COMPLETION:
1. Daily completion reports

RAW DATA TO BE SUPPLIED AS SOON AS PRACTICABLE AFTER COMPLETION:
1. Monthly Historical Oil, Gas and Water Production Reports; provided that for the first 60 days, Operator will provide estimated daily oil, gas and water production
2. Estimated daily oil, gas and water production
3. Run tickets and/or meter runs, where appropriate, if reasonably requested by Non-Operator
4. All raw data resulting from geological and engineering tests performed on the well by the Operator to the extent such tests are billed to the Joint Account

On a quarterly basis, Operator shall provide to Non-Operator, a one year drilling and completion capital forecast, provided that Non-Operator accepts and acknowledges that such forecast is subject to change at any time at Operator's sole discretion without further notice, and that Non-Operator shall not use such forecast as a basis for any cause of action against Operator

**EXHIBIT "H"**

**Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020, by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.**

**MEMORANDUM OF OPERATING AGREEMENT AND FINANCING STATEMENT**

STATE OF _____§

COUNTIES OF _____§

**WHEREAS,** pursuant to that certain Settlement and Mutual Release Agreement dated as of September 28, 2020, Oasis Petroleum North America, LLC, whose address is 1001 Fannin, Suite 1500, Houston, Texas, 77002, as operator ("Operator"), and Mirada Wild Basin Holding Company, LLC, whose address is 5555 DTC Pwky, Suite 310, Greenwood Village, Colorado 80111, et al, as non-operators (each, a "Non-Operator," and together, the "Non-Operators") and Mirada Wild Basin Holding Company, LLC as agent for the other Non-Operators, have entered into that certain Operating Agreement dated effective September 28, 2020 ("Operating Agreement"), covering Oil and Gas (as such terms are defined in the Operating Agreement) operations being conducted by the Operator on those certain lands described in Exhibit "A" (the "Contract Area"), attached hereto and made a part hereof, as said Exhibit "A" may be amended from time to time; and

**WHEREAS**, Operator and Non-Operators desire to give third parties notice of the existence of the Operating Agreement and of the rights and obligations of Operator and Non-Operators (collectively the "parties" or individually a "party") thereunder.

**NOW, THEREFORE**, for and in consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Operator and Non-Operators hereby stipulate and agree as follows:

**I.**

The Operating Agreement is on an A.A.P.L. Form 610 Model Form Operating Agreement – 1989 Horizontal Modifications as amended by the parties, plus attachments.

**II.**

Article VI.G. of the Operating Agreement grants each party to the Operating Agreement the right to take in kind its proportionate share of all Oil and Gas produced from the Contract Area. Additionally, the parties have agreed to be bound by that certain volumetric Gas Balancing Agreement which is attached as Exhibit "E" to the Operating Agreement and that certain Oil Balancing Agreement which is attached as Exhibit "J" to the Operating Agreement.

**III.**

Pursuant to the provisions of the Operating Agreement, including without limitation Article VII.B., the parties hereby grant reciprocal liens and security interests as follows:

A.    Each party grants to the other parties hereto a lien and security interest upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests (as such terms are defined in the Operating Agreement) in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property, fixtures on or used or obtained for use in connection therewith and all of its as-extracted collateral located in or relating to the Contract Area (including Oil and Gas and all other substances of value which may be extracted from the ground), to secure the full payment and performance of all of its obligations under this Memorandum of Operating Agreement and Financing Statement

1

(this Agreement") including but not limited to payment of expenses, interest and fees, the proper disbursement of all monies paid under this Agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this Agreement and the Operating Agreement, and the proper performance of operations under this Agreement and the Operating Agreement.

B.    Subject to any liens of record that currently exist as of the date hereof, each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this Agreement and the Operating Agreement by, through or under such party.

C.    To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, the parties shall each be entitled to exercise the rights and remedies of a secured party under the Uniform Commercial Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of  costs, other charges, interests or fees or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D.    If any party fails to pay its share of costs or expenses within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security interests described in this paragraph and in Article VII.B of the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E.    If any party does not perform all of its obligations under this Agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this Agreement and the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security interests granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F.    To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under the Operating Agreement for services performed or materials supplied by Operator.  Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any other state in which the Contract Area is situated to enforce the obligations of each party hereunder.

G.    The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Agreement may be filed in the land records in the County in

which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

H.     All rights and obligations of the parties under the Operating Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Operating Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Operating Agreement itself or the rights or obligations of the parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Operating Agreement, the terms of the Operating Agreement shall prevail.

## IV.

This Agreement may be executed in any number of counterparts, each of which shall be considered an original for all purposes and shall be binding upon the heirs, successors and assigns of the parties.  The Operator is hereby authorized to compile the signature and notary pages from each of the counterparts in order to have one instrument containing signature and notarial acknowledgments of all parties for recording purposes.  Furthermore, the Operating Agreement contains a provision authorizing Operator to file this Agreement   (or any supplement or amendment hereto, including any supplement or amendment to Exhibit "A" hereto) even if it is not executed by the Non-Operators, and also authorizes Operator to file  this  Agreement  in the appropriate records of the County and the Secretary of State's office of the state where the land affected by the agreement is located.

The Operating Agreement contains a provision stating that it is "binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, devisees, legal representatives, successors and assigns".

Operator may, on behalf of all parties, terminate the effect of this Agreement as to all or any portion of the Contract Area by recording a full or partial release hereof.

*[Remainder of page intentionally blank; signature pages follow.]*

**IN WITNESS WHEREOF**, this Agreement is executed this 28th day of September, 2020.

OASIS PETROLEUM NORTH AMERICA LLC


_____

By: _____

Its: _____




**MIRADA WILD BASIN HOLDING COMPANY, LLC, SIGNING ON BEHALF OF ITSELF, AND AS AGENT FOR, MIRADA ENERGY, LLC, MIRADA ENERGY FUND I, LLC, MIRADA F&C LLC, ORRION ENERGY, LLC, MCP ORION, LLC, MCP HOLDING COMPANY, LLC, MIRADA MANAGER, LLC, MIRADA HOLDING COMPANY, LLC, BRISBANE PROPERTIES LLC, AND GREAT BARRIER ENERGY, LLC.**


_____

By: _____

Its: _____]

*Signature Page to Memorandum of Operating Agreement and Financing Statement*

**ACKNOWLEDGEMENTS**

**STATE OF** _____§

**COUNTY OF** _____§

     This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Oasis North America Petroleum LLC, a Delaware limited liability company, on behalf of said company.

 

_____

Notary Public in and for the State of

_____

**STATE OF** _____§

**COUNTY OF** _____§

     This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Mirada Wild Basin Holding Company, LLC, a Delaware limited liability company, signing on behalf of itself, and as agent for, Mirada Energy, LLC, Mirada Energy Fund I, LLC, Mirada F&C LLC, Orrion Energy, LLC, McP Orion, LLC, MCP Holding Company, LLC, Mirada Manager, LLC, Mirada Holding Company, LLC, Brisbane Properties LLC, and Great Barrier Energy, LLC.

 

_____

Notary Public in and for the State of

_____

*Acknowledgement Page to Memorandum of Operating Agreement*
*and Financing Statement*

**EXHIBIT "A"**

Attached to and made a part of that certain Memorandum of Operating Agreement and Financing Statement dated September 28, 2020, by and between OASIS PETROLEUM NORTH AMERICA LLC, as Operator and MIRADA WILD BASIN HOLDING COMPANY, LLC et al, as Non-Operators.

1. **Identification of lands subject to this agreement (which shall include, in addition to the items specified below, all lands included within any drilling and spacing units and/or an area of land designated as a section in accordance with the Public Land Survey System of the United States in which (i) Operator under Operating Agreement, or any of its Affiliates (as such term is defined in the Operating Agreement), is the designated operator, or is in the process of applying for a well permit with the applicable governmental agency which would likely result in it becoming the operator, of one or more well(s), as identified by the relevant governmental agencies in the States of North Dakota or Montana, and (ii) both Operator and Non-Operator, and/or the respective Affiliates thereof, (A) own an Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore (including any section line wellbores) interest as of the date of this agreement and/or (B) hereafter acquire an Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest,  but as to such hereafter acquired Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest, only if Operator and/or its Affiliates acquired its interest in such Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest prior to the date Non-Operator and/or its Affiliates acquired their interest in such Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest, as reflected by the public land records of the county in which the lands covered by such Oil and Gas Interest, Oil and Gas Lease, mineral or working interest and/or wellbore interest are located). Without limiting the foregoing, the Contract Area includes, without limitation, all of the lands located in the following drilling and spacing units:**

| Drilling And Spacing Unit Name (entire Drilling And Spacing Unit is subject to this agreement) | Township/Range/Section | County | State |
|---|---|---|---|
| A JOHNSON 12-1H | 152-98-1/12 | McKenzie | ND |
| A JOHNSON 12-1H (2560) | 152-97-1/6/7/12 | McKenzie | ND |
| BERQUIST 33-28H | 152-98-28/33 | McKenzie | ND |
| BERQUIST 33-28H (2560) | 152-98-27/28/33/34 | McKenzie | ND |
| BERQUIST 34-27H | 152-98-27/34 | McKenzie | ND |
| BERQUIST 34-27H (2560) | 152-98-26/27/34/35 | McKenzie | ND |
| CATHERINE 2759 12-17H | 27-59-5/8 | Roosevelt | MT |
| CEYNAR 29-32H | 152-98-29/32 | McKenzie | ND |
| CEYNAR 29-32H (2560) | 152-98-28/29/32/33 | McKenzie | ND |
| CORNELL 5501 13-1H | 155-101-1/12 | Williams | ND |
| ELLA MARIE 2759 42-9H | 27-59-4/9 | Roosevelt | MT |
| FORLAND 28-33H | 151-98-28/33 | McKenzie | ND |
| FORLAND 28-33H (2560) | 151-98-28/29/32/33 | McKenzie | ND |
| HAGEN 31-30H | 152-98-30/31 | McKenzie | ND |
| HAGEN 31-30H (2560) | 152-98-29/30/31/32 | McKenzie | ND |
| HAGEN 31-30H (2560) (2) | 152-98-25/30/31/36 | McKenzie | ND |
| JOHNSRUD 19-18H | 151-98-18/19 | McKenzie | ND |
| JOHNSRUD 19-18H  (2560) | 151-98-17/18/19/20 | McKenzie | ND |
| JOHNSRUD 19-18H  (2560) (2) | 151-98-13/18/19/24 | McKenzie | ND |
| LAWLAR 23-14H (2560) | 151-99-13/14/23/24 | McKenzie | ND |
| LAWLAR 26-35H | 151-99-26/35 | McKenzie | ND |
| LAWLAR 26-35H (2560) | 151-99-25/26/35/36 | McKenzie | ND |
| LUNDEEN 4-26H | 152-98-26/35 | McKenzie | ND |
| LUNDEEN 4-26H (2560) | 152-98-25/26/35/36 | McKenzie | ND |
| MARY WILSON 10-3H | 27-59-3/10 | Roosevelt | MT |
| MILDRED NELSON 4-25H (2560) | 152-97-25/30/31/36 | McKenzie | ND |
| MILDRED NELSON 4-25H | 152-98-25/36 | McKenzie | ND |
| NELSON 11-2H | 152-98-2/11 | McKenzie | ND |
| NELSON 11-2H (2560) | 152-98-1/2/11/12 | McKenzie | ND |
| NELSON 14-23H | 152-98-14/23 | McKenzie | ND |

| NELSON 14-23H (2560) | 152-98-14/15/22/23 | McKenzie | ND |
| NELSON 14-23H (2560) (2) | 152-98-13/14/23/24 | McKenzie | ND |
| NORDENG 24-13H | 152-98-13/24 | McKenzie | ND |
| NORDENG 24-13H  (2560) | 152-97-13/18/19/24 | McKenzie | ND |
| PATSY 5-8H | 151-98-5/8 | McKenzie | ND |
| PEDERSON 1-10H | 152-98-3/10 | McKenzie | ND |
| ROLFSON 20-17H | 151-98-17/20 | McKenzie | ND |
| ROLFSON 20-17H (2560) | 151-98-16/17/20/21 | McKenzie | ND |
| ROLFSON 29-32H | 151-98-29/32 | McKenzie | ND |
| ROLFSON 29-32H (2560) | 151-98-29/30/31/32 | McKenzie | ND |
| ROLFSRUD 18-19H | 152-97-18/19 | McKenzie | ND |
| ROLFSRUD 18-19H (2560) | 152-97-17/18/19/20 | McKenzie | ND |
| ROLFSRUD 7-6H | 152-97-6/7 | McKenzie | ND |
| ROLFSRUD 7-6H (2560) | 152-97-5/6/7/8 | McKenzie | ND |
| TALEN 2759 43-7H | 27-59-6/7 | Roosevelt | MT |
| WHITE 6-7H | 151-98-6/7 | McKenzie | ND |
| WHITE 6-7H (2560) | 151-98-1/6/7/12 | McKenzie | ND |
| WHITE 6-7H (2560) (2) | 151-98-5/6/7/8 | McKenzie | ND |
| WOLD 15-33H | 153-97-28/33 | McKenzie | ND |
| WOLD 34-27H | 153-97-27/34 | McKenzie | ND |

2. **Restrictions as to Depths: None**

3. **Wells Subject to this Agreement and Percentage Interest of the Parties:**

The working interest of each party is its interest reflected of record as of the date of the Operating Agreement, or with respect to a subsequently acquired Oil and Gas Interest, Oil and Gas Lease, mineral or working interest, and/or wellbore interest described in section 1 of this Exhibit "A,"  at the time of such acquisition. This Agreement covers all wells located on the Contract Area that are operated by the Operator or its Affiliates and in which Non-Operator also owns an interest, including, without limitation, the following:

| Well Name | Township/Range/Section |
|---|---|
| MARY WILSON 10-3H | 27-59-3/10 |
| ELLA MARIE 2759 42-9H | 27-59-4/9 |
| CATHERINE 2759 12-17H | 27-59-5/8 |
| TALEN 2759 43-7H | 27-59-6/7 |
| ROMO BRO MARGARET 2759 43-9B | 27-59-4/9 |
| ROMO BRO RAY 2759 43-9B | 27-59-4/9 |
| HERB 5501 14-1B | 155-101-1/12 |
| MARLENE 5501 14-1T | 155-101-1/12 |
| VAUGHN BECKY 5501 11-1B | 155-101-1/12 |
| NADINE BOB 5501 11-1T | 155-101-1/12 |
| KALEB 5501 12-1B | 155-101-1/12 |
| HANNAH-KAYDENCE 5501 12-1T | 155-101-1/12 |
| A. JOHNSON 12-1H | 152-98-1/12 |
| AAGVIK 1-35H | 152-98-35 |
| BERQUIST 33-28H | 152-98-28/33 |
| BERQUIST 34-27H | 152-98-27/34 |
| CEYNAR 29-32H | 152-98-29/32 |
| FORLAND 28-33H | 151-98-28/33 |
| HAGEN 31-30H | 152-98-30/31 |
| JOHNSRUD 19-18H | 151-98-18/19 |
| LAWLAR 26-35H | 151-99-26/35 |
| LUNDEEN 4-26H | 152-98-26 |
| NELSON 11-2H | 152-98-2/11 |
| NELSON 14-23H | 152-98-14/23 |
| NORDENG 24-13H | 152-98-13/24 |

| | |
|---|---|
| PATSY 5-8HTF | 151-98-5/8 |
| PEDERSON 10-3H | 152-98-3/10 |
| ROLFSON 20-17H | 151-98-17/20 |
| ROLFSON 29-32H | 151-98-29/32 |
| ROLFSRUD FEDERAL 18-19H | 152-97-18/19 |
| ROLFSRUD 7-6H | 152-97-6/7 |
| WHITE 6-7H | 151-98-6/7 |
| WOLD 34-27H | 153-97-27/34 |
| HAGEN BANKS 5298 #42-31 2T2 | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 3T | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 4T2 | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 5B | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 6T | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 7T3 | 152-98-30/31 |
| HAGEN BANKS 5298 #42-31 8B | 152-98-30/31 |
| CORNELL 5501 14-1 8T2 | 155-101-1/12 |
| WHITE 5198 12-6 4T2 | 151-98-6/7 |
| WHITE 5198 12-6 3T | 151-98-6/7 |
| WHITE 5198 12-6 2T3 | 151-98-6/7 |
| WHITE 5198 12-6 1T2 | 151-98-6/7 |
| WHITE 5198 13-6 13T3 | 151-98-6/7 |
| WHITE 5198 13-6 14T | 151-98-6/7 |
| WHITE 5198 13-6 12B | 151-98-6/7 |
| OYLOE 5199 42-23 2B | 151-99-26/35 |
| JOHNSRUD 5198 12-18 5B | 151-98-18/19 |
| ROLFSON N 5198 11-17 2B | 151-98-17/20 |
| ROLFSON S 5198 12-29 5B | 151-98-29/32 |
| FORLAND 5198 41-33 3B | 151-98-28/33 |
| OYLOE 5199 42-23 4B | 151-99-26/35 |
| OYLOE 5199 42-23 3T | 151-99-26/35 |
| OYLOE 5199 42-23 5T | 151-99-26/35 |
| OYLOE 5199 42-23 6B | 151-99-26/35 |
| OYLOE 5199 42-23 7T | 151-99-26/35 |
| OYLOE 5199 43-23 8T | 151-99-26/35 |
| OYLOE 5199 43-23 9B | 151-99-26/35 |
| OYLOE 5199 14-26 10T | 151-99-26/35 |
| OYLOE 5199 14-26 11B | 151-99-26/35 |
| FORLAND 5198 41-33 5B | 151-98-28/33 |
| FORLAND 5098 13-4 7B | 151-98-28/33 |
| FORLAND 5098 13-4 9B | 151-98-28/33 |
| FORLAND 5198 44-33 12B | 151-98-28/33 |
| FORLAND 5198 41-33 2TX | 151-98-28/29/32/33 |
| ROLFSON S 5198 41-33 14BX | 151-98-28/29/32/33 |
| JOHNSRUD 5198 12-18 6T | 151-98-18/19 |
| JOHNSRUD 5198 12-18 4T2 | 151-98-18/19 |
| JOHNSRUD 5198 12-18 7B | 151-98-18/19 |
| JOHNSRUD 5198 12-18 10T | 151-98-18/19 |
| JOHNSRUD 5198 12-18 8T2 | 151-98-18/19 |
| JOHNSRUD 5198 12-18 9B | 151-98-18/19 |
| JOHNSRUD 5198 14-18 11T | 151-98-18/19 |
| JOHNSRUD 5198 14-18 13T | 151-98-18/19 |
| JOHNSRUD 5198 14-18 12B | 151-98-18/19 |
| JOHNSRUD 5198 14-18 15TX | 151-98-17/18/19/20 |
| ROLFSON N 5198 11-17 3T | 151-98-17/20 |
| ROLFSON N 5198 11-17 4B | 151-98-17/20 |
| ROLFSON N 5198 12-17 5T | 151-98-17/20 |

| | |
|---|---|
| ROLFSON N 5198 12-17 6B | 151-98-17/20 |
| ROLFSON N 5198 12-17 7T | 151-98-17/20 |
| ROLFSON N 5198 13-17 8T | 151-98-17/20 |
| ROLFSON N 5198 14-17 9B | 151-98-17/20 |
| ROLFSON N 5198 14-17 10T | 151-98-17/20 |
| ROLFSON N 5198 14-17 11BX | 151-98-16/17/20/21 |
| ROLFSON S 5198 11-29 4T | 151-98-29/32 |
| ROLFSON S 5198 12-29 6T | 151-98-29/32 |
| ROLFSON S 5198 12-29 7B | 151-98-29/32 |
| ROLFSON S 5198 12-29 8T | 151-98-29/32 |
| ROLFSON S 5198 43-20 9B | 151-98-29/32 |
| ROLFSON S 5198 43-20 10T | 151-98-29/32 |
| ROLFSON S 5198 14-29 11T | 151-98-29/32 |
| ROLFSON S 5198 14-29 12B | 151-98-29/32 |
| ROLFSON S 5198 11-29 2TX | 151-98-29/30/31/32 |
| ROLFSON S 5198 11-29 3BX | 151-98-29/30/31/32 |
| PATSY 5198 12-17 6B | 151-98-5/8 |
| PATSY 5198 12-17 5T | 151-98-5/8 |
| PATSY 5198 12-17 8B | 151-98-5/8 |
| PATSY 5198 12-17 7T | 151-98-5/8 |
| PATSY 5198 12-17 10B | 151-98-5/8 |
| PATSY 5198 12-17 9T | 151-98-5/8 |
| PATSY 5198 14-17 11B | 151-98-5/8 |
| PATSY 5198 14-17 12T | 151-98-5/8 |
| PATSY 5198 12-17 4B | 151-98-5/8 |
| PATSY 5198 14-17 13B | 151-98-5/8 |
| WHITE 5198 12-6 6T | 151-98-6/7 |
| WHITE 5198 12-6 5B | 151-98-6/7 |
| WHITE 5198 13-6 15T | 151-98-6/7 |
| WHITE 5198 12-6 7B | 151-98-6/7 |
| WHITE 5198 11-18 8TX | 151-98-1/6/7/12 |
| PATSY 5198 11-5 2BX | 151-98-5/6/7/8 |
| PATSY 5198 11-5 3TX | 151-98-5/6/7/8 |
| LAWLAR N FEDERAL 5199 44-23 11BX | 151-99-13/14/23/24 |
| LAWLAR N FEDERAL 5199 44-23 12TX | 151-99-13/14/23/24 |
| JOHNSRUD 5198 14-18 14B | 151-98-18/19 |
| JOHNSRUD FEDERAL 5198 11-18 3BX | 151-98-13/18/19/24 |
| OYLOE 5199 14-26 12TX | 151-99-25/26/35/36 |
| ROLFSON S 5198 14-29 13T | 151-98-29/32 |
| CEYNAR 5198 12-5 6B | 152-98-29/32 |
| CEYNAR 5198 12-5 7T | 152-98-29/32 |
| CEYNAR 5298 42-32 8B | 152-98-29/32 |
| CEYNAR 5298 42-32 9T | 152-98-29/32 |
| CEYNAR 5298 42-32 10B | 152-98-29/32 |
| CEYNAR 5298 42-32 11T | 152-98-29/32 |
| CEYNAR 5298 44-32 12T | 152-98-29/32 |
| CEYNAR 5298 44-32 13B | 152-98-29/32 |
| HAGEN BANKS 5198 13-6 10T | 152-98-30/31 |
| HAGEN BANKS 5198 13-6 11B | 152-98-30/31 |
| MURI 5298 14-28 13TX | 152-98-27/28/33/34 |
| CEYNAR 5198 11-5 3TX | 152-98-29/30/31/32 |
| CEYNAR 5298 44-32 14TX | 152-98-28/29/32/33 |
| AAGVIK 5298 41-35 3BX | 152-98-26/27/34/35 |
| BERQUIST 5298 11-27 2B | 152-98-27/34 |
| BERQUIST 5298 11-27 3T | 152-98-27/34 |
| BERQUIST 5298 11-27 4T | 152-98-27/34 |

| | |
|---|---|
| BERQUIST 5298 11-27 5B | 152-98-27/34 |
| BERQUIST 5298 13-27 6T | 152-98-27/34 |
| BERQUIST 5298 13-27 7B | 152-98-27/34 |
| BERQUIST 5298 13-27 8T | 152-98-27/34 |
| MURI 5198 11-4 3B | 152-98-28/33 |
| MURI 5198 11-4 4T | 152-98-28/33 |
| MURI 5198 12-4 5B | 152-98-28/33 |
| MURI 5198 12-4 6T | 152-98-28/33 |
| MURI 5198 12-4 7B | 152-98-28/33 |
| MURI 5198 12-4 8T | 152-98-28/33 |
| HAGEN BANKS 5198 12-6 9BX | 152-98-25/30/31/36 |
| HAGEN BANKS 5198 13-6 12T | 152-98-30/31 |
| CEYNAR 5198 12-5 4B | 152-98-29/32 |
| CEYNAR 5198 12-5 5T | 152-98-29/32 |
| CEYNAR 5198 11-5 2BX | 152-98-29/30/31/32 |
| CEYNAR 5298 44-32 15BX | 152-98-28/29/32/33 |
| MURI 5298 14-28 9T | 152-98-28/33 |
| MURI 5298 14-28 10B | 152-98-28/33 |
| MURI 5198 11-4 2T | 152-98-28/33 |
| BERQUIST 5298 13-27 9B | 152-98-27/34 |
| AAGVIK 5298 41-35 2TX | 152-98-26/27/34/35 |
| HAGEN BANKS 5198 12-6 13TX | 152-98-25/30/31/36 |
| WOLD FEDERAL 15-33H | 153-97-28/33 |
| AAGVIK 5298 41-35 4T | 152-98-26/35 |
| AAGVIK 5298 41-35 5B | 152-98-26/35 |
| AAGVIK 5298 41-35 6T | 152-98-26/35 |
| AAGVIK 5298 42-23 7B | 152-98-26/35 |
| AAGVIK 5298 42-23 8T | 152-98-26/35 |
| AAGVIK 5298 42-23 9B | 152-98-26/35 |
| AAGVIK 5298 13-26 10T | 152-98-26/35 |
| AAGVIK 5298 13-26 11B | 152-98-26/35 |
| AAGVIK 5298 14-26 14TX | 152-98-25/26/35/36 |
| AAGVIK 5298 14-26 13BX | 152-98-25/26/35/36 |
| MILDRED NELSON FED 5297 11-30 11TX | 152-97-25/30/31/36 |
| MILDRED NELSON FED 5297 11-30 12BX | 152-97-25/30/31/36 |
| MILDRED NELSON 5298 12-25W 3T | 152-98-25/36 |
| MILDRED NELSON 5298 12-25W 2B | 152-98-25/36 |
| MILDRED NELSON 5298 12-25E 5T | 152-98-25/36 |
| MILDRED NELSON 5298 12-25W 4B | 152-98-25/36 |
| MILDRED NELSON 5298 12-25E 7T | 152-98-25/36 |
| MILDRED NELSON 5298 12-25E 6B | 152-98-25/36 |
| MILDRED NELSON 5298 13-25 9T | 152-98-25/36 |
| MILDRED NELSON 5298 13-25 8B | 152-98-25/36 |
| NELSON 5298 11-14 2TX | 152-98-14/15/22/23 |
| NELSON 5298 11-14 3B | 152-98-14/23 |
| NELSON 5298 42-23 6B | 152-98-14/23 |
| NELSON 5298 13-26 8B | 152-98-14/23 |
| NELSON 5298 11-14 4T | 152-98-14/23 |
| NELSON 5298 42-23 5T | 152-98-14/23 |
| NELSON 5298 42-23 7T | 152-98-14/23 |
| NORDENG 5298 12-25W 3B | 152-98-13/24 |
| NELSON 5298 14-26 12BX | 152-98-13/14/23/24 |
| NELSON 5298 14-26 11TX | 152-98-13/14/23/24 |
| NELSON 5298 13-26 9T | 152-98-14/23 |
| NORDENG 5298 12-25W 2T | 152-98-13/24 |
| NORDENG 5298 12-25E 5B | 152-98-13/24 |

| | |
|---|---|
| NORDENG 5298 12-25W 4T | 152-98-13/24 |
| NORDENG 5298 13-25 7T | 152-98-13/24 |
| NORDENG 5298 13-25 8B | 152-98-13/24 |
| KELLOGG FEDERAL 5297 11-30 2BX | 152-97-13/18/19/24 |
| KELLOGG FEDERAL 5297 11-30 4B | 152-97-18/19 |
| KELLOGG FEDERAL 5297 11-30 5T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 12-30 6T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 12-30 7B | 152-97-18/19 |
| KELLOGG FEDERAL 5297 12-30 8T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 44-19 13BX | 152-97-17/18/19/20 |
| MURI 5198 11-4 14T | 152-98-28/33 |
| NELSON 5298 13-26 10B | 152-98-14/23 |
| AAGVIK 5298 13-26 12T | 152-98-26/35 |
| NORDENG 5298 12-25E 6T | 152-98-13/24 |
| NORDENG 5298 13-25 9T | 152-98-13/24 |
| KELLOGG FEDERAL 5297 11-30 3T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 44-19 12T | 152-97-18/19 |
| KELLOGG FEDERAL 5297 44-19 11B | 152-97-18/19 |
| MILDRED NELSON 5298 13-25 10B | 152-98-25/36 |
| AAGVIK 5298 41-35 15T | 152-98-26/35 |
| JOPLIN 5397 41-32 3T | 152-98-2/11 |
| JOPLIN 5397 42-32 4T | 152-98-2/11 |
| JOPLIN 5397 41-32 2B | 152-98-2/11 |
| JOPLIN 5397 42-32 6T | 152-98-2/11 |
| JOPLIN 5397 42-32 5B | 152-98-2/11 |
| JOPLIN 5397 42-32 8T | 152-98-2/11 |
| A. JOHNSON 5298 11-1 3TX | 152-98-1/2/11/12 |
| A. JOHNSON 5298 11-1 5T | 152-98-1/12 |
| A. JOHNSON 5298 11-1 4B | 152-98-1/12 |
| A. JOHNSON 5397 42-33 6T | 152-98-1/12 |
| A. JOHNSON 5397 42-33 7B | 152-98-1/12 |
| A. JOHNSON 5397 43-33 8T | 152-98-1/12 |
| A. JOHNSON 5397 43-33 10B | 152-98-1/12 |
| THELEN 5297 11-6 3TX | 152-97-1/6/7/12 |
| THELEN 5297 11-6 4B | 152-97-6/7 |
| THELEN 5297 11-6 5T | 152-97-6/7 |
| THELEN 5297 12-6 6T | 152-97-6/7 |
| THELEN 5297 12-6 8T | 152-97-6/7 |
| THELEN 5297 12-6 7B | 152-97-6/7 |
| THELEN FEDERAL 5397 44-34 14TX | 152-97-5/6/7/8 |
| JOPLIN 5397 42-32 7B | 152-98-2/11 |
| JOPLIN 5397 42-32 9B | 152-98-2/11 |
| THELEN 5397 43-34 10B | 152-97-6/7 |
| A. JOHNSON 5397 43-33 9B | 152-98-1/12 |

The ownership will be based upon record title and shall be subject to change based on the participation elections of the parties in each well proposed under the Operating Agreement.

Title opinion(s) may be rendered on the Contract Area.  Notwithstanding Article IV.B. to the contrary, the interests of the parties may be revised at the discretion of the Operator on a net acreage basis after such title opinion verification or other title examination with retroactive adjustments of expenses incurred or revenues received, provided that Non-Operator will be provided reasonable notice before any retroactive adjustments of expenses incurred or revenues received are made.

It is the intent of the parties herein to make all Oil and Gas Leases and Oil and Gas Interests owned by the parties within the Contract Area and filed of record as of the date of this Agreement, or hereafter acquired, subject to this agreement, whether set out herein or not.

4. **Addresses of the Parties:**

> Oasis Petroleum North America LLC
> 1001 Fannin, Suite 1500
> Houston, Texas 77002
> Attn: Land Manager

> Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Mirada Energy, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Mirada Energy Fund I, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Mirada F&C LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Orrion Energy, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> McP Orion, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> MCP Holding Company, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Mirada Manager, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Mirada Holding Company, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Brisbane Properties LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

> Great Barrier Energy, LLC
> c/o Mirada Wild Basin Holding Company, LLC, et al as Non-Operators
> 5555 DTC Parkway, Suite 310
> Greenwood Village, CO 80111

5. **Oil and Gas Leases Subject to this Agreement:**
All (i) Leases (owned individually or jointly) currently owned or hereafter acquired within the Contract Area, only insofar as (A) such Leases cover lands included within the boundaries of the drilling and spacing units listed in section 1 of this Exhibit "A," or (B) the ownership of, or production from, the wells listed in section 3 of this Exhibit "A" are attributable such Lease, including without limitation the Oil and Gas Leases listed on Annex A-1 to this Exhibit "A" and (ii) all Leases (owned individually or jointly) hereafter acquired that become part of the Contract Area pursuant to subclause (ii)(B) of Section 1 of this Exhibit A.

6. **Burdens on Production:**
Each party's burden on production as reflected of record as of the effective date of this agreement with respect to any

subsequently acquired Oil and Gas Interest, the burdens on such Oil and Gas Interest at the time of the acquisition thereof.

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Effective | TWN | RNG | SEC | Description | Recording | County | State |
|---|---|---|---|---|---|---|---|---|---|
| A.V.M. Inc. | Missouri Basin Well Service | 4/24/2008 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 380392 | McKenzie | ND |
| A.V.M. Inc. | Diamond Resources Inc. | 12/8/2005 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 380392 | McKenzie | ND |
| A.V.M., Inc. | Diamond Resources, Inc. | 12/8/2005 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 361349 | McKenzie | ND |
| Abe Owan | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360817 | McKenzie | ND |
| Abe Owan | Continental Resources, Inc. | 5/25/2010 | 152 | 98 | 30 | LOT 1 | 403091 | McKenzie | ND |
| Abe Owan | Continental Resources, Inc. | 5/25/2010 | 152 | 98 | 30 | LOT4 | 403091 | McKenzie | ND |
| Abe Owan | Continental Resources, Inc. | 5/25/2010 | 152 | 98 | 30 | SE/4SW/4 | 403091 | McKenzie | ND |
| Abner C Tufto By A-I-F Darla Tufto | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 793935 | Williams | ND |
| Acoma Oil Corporation | Diamond Resources, Inc. | 9/1/2006 | 152 | 99 | 25 | SWSW | 364885 | McKenzie | ND |
| Acoma Oil Corporation | Diamond Resources, Inc. | 5/29/2008 | 152 | 99 | 25 | NWNE, N2NW | 379082 | McKenzie | ND |
| Acoma Oil Corporation | Panther Entergy Company, LLC | 7/7/2008 | 151 | 99 | 14 | SW | 385471 | McKenzie | ND |
| Acoma Oil Corporation | Diamond Resources Inc | 9/1/2006 | 152 | 99 | 25 | SWSW | 365855 | McKenzie | ND |
| Ada S Burton | Brigham Oil & Gas Lp | 8/5/2010 | 155 | 101 | 12 | E/2SW/4 | 695470 | Williams | ND |
| Ada S Burton | Brigham Oil & Gas Lp | 8/5/2010 | 155 | 101 | 12 | S/2NE/4 | 695470 | Williams | ND |
| Ada S Burton | Brigham Oil & Gas Lp | 8/5/2010 | 155 | 101 | 12 | SE/4 | 695470 | Williams | ND |
| Adela Marie Briske | Petro-Hunt, LLC | 9/28/2007 | 27 | 59 | 4 | Lots 1, 2, 3, 4, S2NE, S2NW | 375543 | Roosevelt | MT |
| Adeline Nordeng, A Widow | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355175 | McKenzie | ND |
| Adeline Nordeng, A Widow | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355175 | McKenzie | ND |
| Adeline Nordeng, A Widow | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355175 | McKenzie | ND |
| Adeline Nordeng, A Widow | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355175 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2009 | 152 | 97 | 19 | NE4SW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 13 | NE4, N2SW4, SW4SW4, Irregular tract 19 in the NE4NW4, A 1.00 acre tract mfd in book 7, page 256 | 355573 | McKenzie | ND |
| Agnes S. Johnson | Diamond Resources, Inc. | 3/12/2009 | 152 | 98 | 24 | N2NW4 | 355573 | McKenzie | ND |
| Agnes S. Johnson, Life Estate | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 2 | SE | 379084 | McKenzie | ND |
| Agribank FCB #20842 | Continental Resources Inc. | 2/5/2010 | 151 | 98 | 5 | LOTS 3 & 4 | 398691 | McKenzie | ND |
| Agribank FCB #20843 | Continental Resources, Inc. | 2/5/2010 | 151 | 98 | 6 | LOT1&2, S/2NE/4 | 398692 | McKenzie | ND |
| Agribank, FCB | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 5 | Lots 3, 4 | 355177 | McKenzie | ND |
| Agribank, FCB | Diamond Resources, Inc. | 2/2/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355177 | McKenzie | ND |
| Alan G. Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349806 | McKenzie | ND |
| Alan Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382067 | Roosevelt | MT |
| Alan Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382067 | Roosevelt | MT |
| Alan Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | 382067 | Roosevelt | MT |
| Albert Dan Phillips, A Married Man | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | E2SW | 571491 | Williams | ND |
| Albert Dan Phillips, A Married Man | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | S2NE | 571491 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Albert Dan Phillips, A Married Man | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | SE/4 | 571491 | Williams | ND |
| Alden H. Gjevre, As Trustee Of That Certain Trust Document Dtd 3/31/94 | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 1 | LOTS 1, 2, 4, S2NE4, S2SE4 | 365465 | McKenzie | ND |
| Alden H. Gjevre, As Trustee Of That Certain Trust Document Dtd 3/31/94 | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 12 | ALL | 365465 | McKenzie | ND |
| Alden H. Gjevre, Trustee Of The Certain Trust Document Dated 31St Day Of March, 1994 | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 13 | NE, N2SE | 365465 | McKenzie | ND |
| Alexander Lee Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 24 | N2NW | 432981 | McKenzie | ND |
| Alexander Lee Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 13 | N2SW,SWSW | 432981 | McKenzie | ND |
| Alfred Wittinger, A Single Man | Diamond Resources, Inc. | 2/7/2006 | 152 | 98 | 30 | Lot 1 | 362276 | McKenzie | ND |
| Alicia C. Vorland, A Married Woman | Diamond Resources, Inc. | 6/17/2008 | 151 | 98 | 20 | SW4 | 380172 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 3/22/2010 | 151 | 98 | 29 | 151N-098W-29-SE/4 | 400214 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 3/22/2010 | 151 | 98 | 29 | NE/4 | 400214 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 3/22/2010 | 151 | 98 | 29 | N/2NW/4 | 400214 | McKenzie | ND |
| Alicia Vorland | Continental Resources, Inc. | 7/9/2010 | 151 | 98 | 32 | NE/4 | 404900 | McKenzie | ND |
| Allan Jones, A Single Man | Great Northern Energy, Inc. | 12/31/2009 | 152 | 98 | 30 | Lot 1(33.53) | 400926 | McKenzie | ND |
| Allan T. Halldorson, A Married Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360815 | McKenzie | ND |
| Allan T. Halldorson, A Married Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 360815 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 401483 | McKenzie | ND |
| Allen Clark White, A/K/A Clark Allen White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 401483 | McKenzie | ND |
| Allen Jones | Diamond Resources , Inc | 7/24/2006 | 152 | 98 | 30 | Lot 1 | 365288 | McKenzie | ND |
| Alvin Keith Wold, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399014 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Alvin Keith Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399012 | McKenzie | ND |
| Alvin S Moody Trust | Zenergy, Inc. | 1/22/2010 | 152 | 97 | 7 | LOT 1,2 | 397332 | McKenzie | ND |
| Alvin W. Johnsrud, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 378799 | McKenzie | ND |
| American Cancer Society | Continental Resources, Inc. | 5/18/2006 | 152 | 97 | 19 | E/2SE/4 | 364303 | McKenzie | ND |
| American Cancer Society | Continental Resources, Inc. | 5/18/2006 | 152 | 97 | 19 | E/2SE/4 | 364303 | McKenzie | ND |
| American Heart Association | Continental Resources, Inc. | 2/23/2010 | 152 | 97 | 19 | E/2SE/4 | 399762 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | E2W2, E2 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 18 | N2NE4, NE4NW4, SE4SE4 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 19 | Lots 1, 2, N2NE4, E2NW4 | 364266 | McKenzie | ND |
| American State Bank And Trust Company Of Williston, Trustee Of The Lawrence J. Grantier Trust Dated March 6, 1979 | Diamond Resources, Inc. | 6/5/2006 | 152 | 98 | 24 | E2NE4 | 364266 | McKenzie | ND |
| American Syringomyelia Alliance Pr | Continental Resources, Inc. | 6/10/2005 | 152 | 97 | 19 | E/2SE/4 | 361803 | McKenzie | ND |
| American Syringomyelia Alliance Pr | Continental Resources, Inc. | 6/10/2005 | 152 | 97 | 19 | E/2SE/4 | 361803 | McKenzie | ND |
| Andrew Scott Rowe | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355696 | McKenzie | ND |
| Andrew Scott Rowe | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | SW4, S2NE4 | 355696 | McKenzie | ND |
| Andrew Scott Rowe | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355696 | McKenzie | ND |
| Andrew Scott Rowe, A Single Man | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355696 | McKenzie | ND |
| Anita Rose Keahev, A Widow | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378801 | McKenzie | ND |
| Ann E Kilzer; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | NWNE | 396690 | McKenzie | ND |
| Ann E Kilzer; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | N2NW | 396690 | McKenzie; | ND |
| Ann E. Kilzer, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396682 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ann E. Kilzer, A Married Woman, Individually, And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | SWSW | 396697 | McKenzie | ND |
| Ann Parsons | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349808 | McKenzie | ND |
| Ann Sheehan | Unknown Lessee | 4/5/2005 | 27 | 59 | 7 | S/2SE/4 | 367178 | Roosevelt | MT |
| Ann Sheehan | Unknown Lessee | 4/5/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367178 | Roosevelt | MT |
| Ann Youree, A Widow, Individually, And As Heir To The Estate Of Paul William Harper, Deceased, And E.R. Harper, Deceased | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396675 | McKenzie | ND |
| Anna M. Thompson And Herman C. Thompson, Her Husband | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357539 | McKenzie | ND |
| Anna M. Thompson And Herman C. Thompson, Individually And As Wife And Husband | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400916 | McKenzie | ND |
| Anna M. Thompson And Herman C. Thompson, Individually And As Wife And Husband | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400916 | McKenzie | ND |
| Anne Carlsen Center For Children | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | 348596 | McKenzie | ND |
| Annette Brown, A/K/A Annette M. Brown, A Single Woman | Great Northern Energy, Inc. | 12/1/2009 | 152 | 98 | 30 | NE4, SE4SE4 | 396693 | McKenzie | ND |
| Annette E Terry | Continental Resources, Inc. | 12/10/2008 | 153 | 97 | 27 | SE4SE4 | 387484 | McKenzie | ND |
| Anthoney Gutierrez | Zenergy, Inc. | 7/1/2011 | 152 | 98 | 11 | E2SW, SWSW | 420435 | McKenzie | ND |
| Anthoney Gutierrez | Zenergy, Inc. | 7/1/2011 | 152 | 98 | 14 | N2NW | 420435 | McKenzie | ND |
| Anthony Gutierrez (Purchased By Bridgepoint Mineral Acqusition Fund Doc 429255) | Diamond Resources, Inc. | 4/11/2006 | 152 | 98 | 11 | SWSW, E2SW | 420435 | McKenzie | ND |
| Anthony Gutierrez, A Single Man(Puchased By Bridgepoint Mineral Acquisition Fund Doc 429255) | Diamond Resources, Inc. | 4/11/2006 | 152 | 98 | 14 | N2NW4 | 420435 | McKenzie | ND |
| Anthony L Mullins Aka Tony Mullins; | Chesapeake Operating, Inc. | 10/20/1997 | 155 | 101 | 12 | S2NE | 577051 | Williams | ND |
| Anthony L Mullins Aka Tony Mullins; | Chesapeake Operating, Inc. | 10/20/1997 | 155 | 101 | 12 | E2SW | 577051 | Williams | ND |
| Anthony L Mullins Aka Tony Mullins; | Chesapeake Operating, Inc. | 10/20/1997 | 155 | 101 | 12 | SE4 | 577051 | Williams | ND |
| Ardell Thomley | Oasis Petroleum North America | 5/23/2018 | 152 | 98 | 13 | N/2SW/4, SW/4SW/4 | 509354 | McKenzie | ND |
| Ardell Thomley | Oasis Petroleum North America | 5/23/2018 | 152 | 98 | 24 | N/2NW/4 | 509354 | McKenzie | ND |
| Ardell Thomley, A Single Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358433 | McKenzie | ND |
| Ardell Thomley, A Single Woman | Diamond Resources, Inc. | 8/2/2005 | 152 | 98 | 24 | N2NW4 | 358433 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Arla J. Smith, A Married Woman Dealing In Her Sole And Separate Property, Individually, And As Heir To The Estates Of Evelyn P. Mastvelten, Deceased, And Oscar J. Mastvelten, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399029 | McKenzie | ND |
| Arlene Reindel, A Widow | Great Northern Energy, Inc. | 11/3/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395728 | McKenzie | ND |
| Arlene Reindel,A Widow | Great Northern Energy, Inc. | 12/3/2009 | 152 | 99 | 25 | SWSW | 395740 | McKenzie | ND |
| Arnold Anderson, Trustee Of The June Anderson Mineral Trust | Diamond Resources, Inc. | 2/9/2006 | 152 | 98 | 33 | NW4, N2SW4 | 361530 | McKenzie | ND |
| Arnold Anderson, Trustee Of The June Anderson Mineral Trust | Diamond Resources, Inc. | 2/9/2006 | 152 | 98 | 32 | S2NE4 | 361530 | McKenzie | ND |
| Arnold E. Rolfsrud And Metha A. Rolfsrud, Husband And Wife | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360263 | McKenzie | ND |
| Arnold E. Rolfsrud And Metha A. Rolfsrud, Husband And Wife | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 32 | S2NE4 | 360263 | McKenzie | ND |
| Arnold N. Rensbarger, Trustee Of The Arnold And Borgny Renbarger Minerals Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 357175 | McKenzie | ND |
| Arnold N. Rensbarger, Trustee Of The Arnold And Borgny Renbarger Minerals Trust | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 11 | W2NW, NWSW | 357175 | McKenzie | ND |
| Arthur R. Diercks And Mary Ellen Diercks, As Trustees Of The Arthur R. Diercks Trust And Mary Ellen Diercks Trust Tr-Ua April 28, 2003, | Great Northern Energy, Inc. | 4/23/2010 | 151 | 99 | 1 | Lots 1(40.01), 2(40.03), 4(40.07), S2SE4, W2SW4,S2NE4 | 397576 | McKenzie | ND |
| Arthur R. Diercks And Mary Ellen Diercks, As Trustees Of The Arthur R. Diercks Trust And Mary Ellen Diercks Trust Tr-Ua April 28, 2003, | Great Northern Energy, Inc. | 4/23/2010 | 151 | 99 | 12 | All | 397576 | McKenzie | ND |
| Arthur R. Diercks And Mary Ellen Diercks, As Trustees Of The Arthur R. Doercks Trust And Mary Ellen Diercks Trust, Tr-Ua April 28, 2003 | Great Northern Energy, Inc. | 1/7/2010 | 151 | 99 | 13 | NE, N2SE | 397576 | McKenzie | ND |
| Arthur W. Gunderson And Mary Gunderson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SW/4 | 351136 | McKenzie | ND |
| Arvid L. Johnston | Diamond Resources, Inc. | 10/27/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 385025 | McKenzie | ND |
| Arvid L. Johnston, A Married Man | Diamond Resources, Inc. | 10/27/2008 | 151 | 99 | 1 | W2SW4 | 385025 | McKenzie | ND |
| Audrey Hartsell, A Married Woman | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 (Protective) | 361883 | McKenzie | ND |
| Audrey L. Hartsell, A/K/A Audrey Hartsell, A Married Woman, Individually And As Beneficiary Of The Adolf Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 395737 | McKenzie | ND |
| Aurthur W. And Mary Gunderson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 11 | SE4 | 349783 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Aurthur W. And Mary Gunderson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349783 | McKenzie | ND |
| Austin Louise Annette | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | 379761 | McKenzie | ND |
| Austin Louise Annette | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | 379761 | McKenzie | ND |
| Avonne Dahl And Einar Dahl Jr., Her Husband | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NE4NE4, NW4 | 364270 | McKenzie | ND |
| Baillon Oilgas Corporation | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 6 | Lots 3(39.94), 4(39.20), 5(34.26), 7(34.34), SENW, SESW, SE | 402404 | McKenzie | ND |
| Baillon Oilgas Corporation | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 7 | Lots 1(34.38), 2(34.44), 3(34.48), 4(34.54), SENW, E2SW | 402404 | McKenzie | ND |
| Baker Mineral Trust Created 6-10-19 | Cody Oil & Gas Corporation | 12/14/1994 | 155 | 101 | 12 | E2SW | 561646 | Williams | ND |
| Baker Mineral Trust Created 6-10-19 | Cody Oil & Gas Corporation | 12/14/1994 | 155 | 101 | 12 | S2NE | 561646 | Williams | ND |
| Baker Mineral Trust Created 6-10-19 | Cody Oil & Gas Corporation | 12/14/1994 | 155 | 101 | 12 | SE/4 | 561646 | Williams | ND |
| Bandera Minerals LLC | Zenergy, Inc. | 4/26/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385138 | Roosevelt | MT |
| Banks Lutheran Church | Diamond Resources, Inc. | 7/7/2005 | 152 | 98 | 10 | A 4.50 acre tract of land in the NE1/4SE1/4, mfd in book 7, page 15 | 358184 | McKenzie | ND |
| Barbara A. Ehresman, A/K/A Bobbi A. Ehresman, A Widow | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | 400056 | McKenzie | ND |
| Barbara C Howe; Married | Diamond Resources Inc | 10/19/2005 | 152 | 98 | 33 | NW,N2SW | 359827 | McKenzie | ND |
| Barbara C Howe; Married | Diamond Resources Inc | 10/19/2005 | 152 | 98 | 32 | SE4NE4 | 359827 | McKenzie | ND |
| Barbara C Howe; Married | Diamond Resources Inc | 10/19/2005 | 152 | 98 | 32 | SW4NE4 | 359827 | McKenzie | ND |
| Barbara C. Howe, A Married Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 365507 | McKenzie | ND |
| Barbara C. Howe, A Married Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 365507 | McKenzie | ND |
| Barbara E Pederson, Widow | Cody Oil & Gas Corporation | 1/10/1995 | 155 | 101 | 12 | S2NE | 561647 | Williams | ND |
| Barbara E Pederson, Widow | Cody Oil & Gas Corporation | 1/10/1995 | 155 | 101 | 12 | E2SW | 561647 | Williams | ND |
| Barbara E Pederson, Widow | Cody Oil & Gas Corporation | 1/10/1995 | 155 | 101 | 12 | SE/4 | 561647 | Williams | ND |
| Barbara J. Tschetter | Diamond Resources, Inc. | 5/23/2005 | 152 | 98 | 15 | SW/4 | 357185 | McKenzie | ND |
| Barbara K. Schafer, A Single Woman | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360061 | McKenzie | ND |
| Barbara K. Shafer | Diamond Resources, Inc. | 6/1/2009 | 152 | 98 | 11 | SWSW, E2SW | 389764 | McKenzie | ND |
| Barbara M Blewett | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370932 | Roosevelt | MT |
| Barbara M Blewett Tst | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370931 | Roosevelt | MT |
| Barbara Thorud, A Single Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360257 | McKenzie | ND |
| Barbara Thorud, A Single Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360257 | McKenzie | ND |
| Bergeron Raymond J | St. Mary Land & Exploration Company | 10/24/2009 | 151 | 99 | 26 | NE4NW4, NW4SE4, W2NE4 | 396243 | McKenzie | ND |
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 356147 | McKenzie | ND |
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | SE4, SW4, S2NE4 | 356147 | McKenzie | ND |
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | N2 | 356147 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Bernice Nordeng, Trustee U/A Dated 2-25-97 Of The Bernice Nordeng Living Revocable Trust | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 356147 | McKenzie | ND |
| Beth Teed, A Single Woman | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351150 | McKenzie | ND |
| Betty (Dolly) Zingleman, A Married Woman | Diamond Resources, Inc. | 12/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360809 | McKenzie | ND |
| Betty Fairbanks, A Single Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355566 | McKenzie | ND |
| Betty Fairbanks, A Single Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355566 | McKenzie | ND |
| Betty Jo Rogers | Unknown Lessee | 4/4/2005 | 27 | 59 | 7 | S/2SE/4 | 367175 | Roosevelt | MT |
| Betty Jo Rogers | Unknown Lessee | 4/4/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367175 | Roosevelt | MT |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 1 | SW/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | S/2SW/4, SE/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | NE/4SW/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 29 | SE/4SE/4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NW4NE4 | 398218 | McKenzie | ND |
| Betty L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NE4NE4 | 398218 | McKenzie | ND |
| Betty L. Mills | Missouri Basin Well Service | 3/10/2005 | 152 | 98 | 11 | NE4, E2NW4 | 355410 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 1 | SW4 | 358181 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 358181 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 29 | SE4SE4 | 358181 | McKenzie | ND |
| Betty L. Mills, A Widow | Diamond Resources, Inc. | 6/24/2005 | 152 | 98 | 32 | N2NE4 | 358181 | McKenzie | ND |
| Beverly A. Hildre, A/K/A Bev Hildre, A Married Woman | Diamond Resources, Inc. | 6/6/2006 | 152 | 97 | 6 | Lot 1 | 364263 | McKenzie | ND |
| Beverly A. Hildre, A/K/A Bev Hildre, A Married Woman | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 27 | SW4NE4, E2W2, N2SE4, SW4SE4 | 364263 | McKenzie | ND |
| Beverly A. Hildre, A/K/A Bev Hildre, A Married Woman | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NW4NE4, S2NE4, S2 | 364263 | McKenzie | ND |
| Beverly Ann Roberts Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382273 | Roosevelt | MT |
| Beverly Ann Roberts Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382273 | Roosevelt | MT |
| Beverly Jean Murohy, A Married Woman | Diamond Resources, Inc | 3/24/2006 | 152 | 97 | 18 | N2NE, NENW | 362879 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman | Diamond Resources, Inc. | 11/8/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, and 10 | 360543 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman | Diamond Resources, Inc . | 3/24/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 360543 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 399019 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399019 | McKenzie | ND |
| Beverly Jean Murphy, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 18 | Sec 18: N2NE4, NE4NW4 | 399019 | McKenzie | ND |
| Beverly Jean Murphy; Mdssp | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | LOT 9,E2SE,PORTION LOT 7,8,10 | 399020 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Beverly Maxey, A Married Woman | Cody Oil & Gas Corporation | 5/19/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351146 | McKenzie | ND |
| Bill Buschbom, A/K/A Charles Buschbom | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364279 | McKenzie | ND |
| Billie Lou Morgan | Oasis Petroleum North America LLC | 3/7/2010 | 27 | 59 | 10 | W/2E/2, W/2 | 384071 | Roosevelt | MT |
| Billie Lou Morgan | Oasis Petroleum North America LLC | 3/7/2010 | 27 | 59 | 10 | NE/4SW/4 | 384071 | Roosevelt | MT |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc | 8/31/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc | 8/31/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc | 8/31/2005 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc. | 8/31/2005 | 152 | 98 | 30 | Lot 1 | 359348 | McKenzie | ND |
| Black Stone Minerals Co., L.P. | Diamond Resources, Inc. | 9/1/2005 | 152 | 98 | 31 | Lots 3, 4 | 359348 | McKenzie | ND |
| Black Stone Minerals Company, L.P. | Diamond Resources, Inc. | 8/31/2005 | 151 | 98 | 18 | Lots 1, 3 | 359348 | McKenzie | ND |
| Black STone Minerals Company, Lp | Panther Entergy Company, LLC | 6/26/2008 | 151 | 99 | 14 | SW | 381605 | McKenzie | ND |
| Blaine Russell, Trustee Of The Sigrid M. Russell Inter Vivos Trust | Diamond Resources, Inc. | 8/31/2005 | 151 | 98 | 18 | Lots 2, 4, NE, E2NW, E2SW, SE | 359097 | McKenzie | ND |
| Blaine Russell, Trustee Of The Sigrid M. Russell Inter Vivos Trust | Diamond Resources, Inc. | 9/1/2005 | 151 | 98 | 19 | Lots 1, 2, W2NE, E2NW | 359097 | McKenzie | ND |
| BLM NDM97031 | Conoco Phillips Company | 9/1/2007 | 152 | 97 | 19 | LOTS 3, 4 SE4SW4, SW4SE4 | 372470 | McKenzie | ND |
| Board Of Trustees Of Trinity Univer | Diamond Resources Inc | 3/28/1997 | 155 | 101 | 12 | E2SW | 571144 | Williams | ND |
| Board Of Trustees Of Trinity Univer | Diamond Resources Inc | 3/28/1997 | 155 | 101 | 12 | S2NE | 571144 | Williams | ND |
| Board Of Trustees Of Trinity Univer | Diamond Resources Inc | 3/28/1997 | 155 | 101 | 12 | SE/4 | 571144 | Williams | ND |
| Bobbi A. Ehresmann, A/K/A Barbara A. Ehresmann, A Widow | Diamond Resources, Inc. | 7/14/2009 | 152 | 98 | 30 | Lot 1 | 381026 | McKenzie | ND |
| Bonnie J Delzer | Continental Resources, Inc. | 7/1/2010 | 152 | 98 | 30 | LOT 1 | 405474 | McKenzie | ND |
| Bonnie J. Delzer, A Single Woman | Diamond Resources, Inc. | 5/9/2006 | 152 | 98 | 30 | Lot 1 | 363716 | McKenzie | ND |
| Bradley C Rogers | Unknown Lessee | 4/13/2006 | 27 | 59 | 7 | S/2SE/4 | 371528 | Roosevelt | MT |
| Bradley C Rogers | Unknown Lessee | 4/13/2006 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 371528 | Roosevelt | MT |
| Bradley D. Thomley, A/K/A Brad Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 359418 | McKenzie | ND |
| Bradley D. Thomley, A/K/A Brad Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 359418 | McKenzie | ND |
| Bradley Harrison; Single | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 23 | SE | 448627 | McKenzie | ND |
| Bradley Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360259 | McKenzie | ND |
| Bradley Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360259 | McKenzie | ND |
| Branex Resources Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 728353 | Williams | ND |
| Branex Resources Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 728353 | Williams | ND |
| Branex Resources Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 728353 | Williams | ND |
| Brenda Anderson, A Married Woman | Diamond Resources, Inc. | 2/4/2009 | 152 | 98 | 27 | SW4 | 378525 | McKenzie | ND |
| Brenda Anderson, A Married Woman | Diamond Resources, Inc. | 2/5/2009 | 152 | 98 | 34 | W2NW4 | 378525 | McKenzie | ND |
| Brenda H Yirsa | Arkota Energy, Inc. | 6/1/2011 | 151 | 98 | 33 | NW/4NE/4,S/2NE/4,SE/4NW/4 | 418636 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Brian D. Thomley, A Married Man A/K/A Brian Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 359343 | McKenzie | ND |
| Brian D. Thomley, A Married Man A/K/A Brian Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 359343 | McKenzie | ND |
| Bridgepoint Mineral Acq Fund II LLC | H.L. Brown Operating, LLC | 5/1/2011 | 151 | 99 | 14 | S/2NW/4 | 419720 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Zenergy, Inc. | 10/20/2011 | 152 | 97 | 19 | NESW | 426165 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Brigham Oil & Gas, Lp | 11/4/2010 | 152 | 98 | 1 | SW | 411493 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Brigham Oil & Gas, Lp | 11/4/2010 | 152 | 98 | 28 | NESW | 411493 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Brigham Oil & Gas, Lp | 11/4/2010 | 152 | 98 | 28 | S2SW,SE | 411493 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 9/15/2010 | 152 | 98 | 29 | SE/4SE/4 | 408141 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 9/15/2010 | 152 | 98 | 32 | NE4NE4 | 408141 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 9/15/2010 | 152 | 98 | 32 | NW4NE4 | 408141 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 12/22/2010 | 152 | 98 | 12 | SW/4 | 412344 | McKenzie | ND |
| Bridgepoint Mineral Acquisition Fun | Newkumet Exploration | 12/15/2010 | 152 | 98 | 13 | IT 19 IN THE NE4NW4 OF SECTION 13, A 1.00 ACRE TRACT MORE FULLY DESCRIBED IN BOOK 7, PAGE 256, CONTAINING 1.00 ACRES, MORE OR LESS | 411771 | McKenzie | ND |
| Bruce Birdsall, As Trustee Of The Helen Birdsall Family Mineral Trust | Great Northern Energy, Inc. | 3/5/2010 | 152 | 99 | 25 | SWSW | 400044 | McKenzie | ND |
| Bruce W. And Patricia Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 11 | SE4 | 349785 | McKenzie | ND |
| Bruce W. And Patricia Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349785 | McKenzie | ND |
| Bruce W. Gunderson And Patricia Gunderson, Husband And Wife | Cody Oil & Gas Corporation | 5/4/2004 | 152 | 98 | 10 | SW/4 | 351137 | McKenzie | ND |
| Bruce-Andersen Co., Inc. | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 359693 | McKenzie | ND |
| Bryan A. Gumm, A Married Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 383619 | McKenzie | ND |
| Bryan A. Gumm, A Married Man | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 366076 | McKenzie | ND |
| Bryan A. Gumm, A Married Man | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 383619 | McKenzie | ND |
| Bryce A Romo Et Ux Denise A | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382069 | Roosevelt | MT |
| Bryce A Romo Et Ux Denise A | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382069 | Roosevelt | MT |
| C. John Anderson, A/K/A Carl John Anderson And Violet Anderson, A/K/A Violet L. Anderson, Husband And Wife | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 12 | N2 | 355707 | McKenzie | ND |
| C. John Anderson, Aka Carl John Anderson And Violet L. Anderson, Aka Violet Anderson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/11/2009 | 152 | 98 | 12 | N2 | 394861 | McKenzie | ND |
| C. John Anderson, Aka Carl John Anderson And Violet L. Anderson, Aka Violet Anderson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/11/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 394861 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | | | | Description | | County | State |
|---|---|---|---|---|---|---|---|---|---|
| C. John Anderson, Aka Carl John Anderson And Violet L. Anderson, Aka Violet Anderson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/11/2009 | 152 | 98 | 29 | E2NE4 | 394861 | McKenzie | ND |
| Calvin C Rogers | Unknown Lessee | 4/8/2005 | 27 | 59 | 7 | S/2SE/4 | 367170 | Roosevelt | MT |
| Calvin C Rogers | Unknown Lessee | 4/8/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367170 | Roosevelt | MT |
| Calvin H. Haugan, Aka Calvin Haugan And Pamela C. Johnson- Haugan, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 399024 | McKenzie | ND |
| Calvin H. Haugan, Aka Calvin Haugan And Pamela C. Johnson- Haugan, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 399024 | McKenzie | ND |
| Calvin H. Haugen, A/K/A Calvin Haugen And Pamela C. Johnson- Haugen, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 4/25/2010 | 152 | 98 | 22 | NW/4 | 399024 | McKenzie | ND |
| Calvin N Rolfson | Cody Oil & Gas Corporation | 4/9/2008 | 151 | 98 | 20 | SW/4 | 377662 | McKenzie | ND |
| Calvin N. Rolfson, A Married Man | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351154 | McKenzie | ND |
| Carl Bruce Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 13 | N2SW,SWSW | 432979 | McKenzie | ND |
| Carl Bruce Shaw | Zenergy, Inc. | 3/1/2012 | 152 | 98 | 24 | N2NW | 432979 | McKenzie | ND |
| Carl Gustav Melby And Maxine Melby; | Panther Entergy Company, LLC | 6/5/2008 | 151 | 99 | 14 | E2 | 381555 | McKenzie | ND |
| Carl Gustov Melby | Panther Entergy Company, LLC | 6/13/2008 | 151 | 99 | 14 | SW | 386305 | McKenzie | ND |
| Carl Melby, A/K/A Carl Gustav Melby | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | 378789 | McKenzie | ND |
| Carl V. Olson, A Single Man | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357531 | McKenzie | ND |
| Carl V. Olson, A Single Man | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400918 | McKenzie | ND |
| Carl V. Olson, A Single Man | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 357531 | McKenzie | ND |
| Carmen D. Haugan, A/K/A Carmen Haugan And Naomi Haugan, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 4/25/2010 | 152 | 98 | 22 | NW/4 | 399018 | McKenzie | ND |
| Carmen D. Haugan, Aka Carmen Haugan And Naomi Haugan, Husband And Wife | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 399018 | McKenzie | ND |
| Carmen D. Haugan, Aka Carmen Haugan And Naomi Haugan, Husband And Wife | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 399018 | McKenzie | ND |
| Carmen Leroy Wold, A/K/A Carmen L. Wold And Carol Wold, Husband And Wife | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355723 | McKenzie | ND |
| Carmen Leroy Wold, A/K/A. Carmen L. Wold And Carol Wold, Husband And Wife | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355723 | McKenzie | ND |
| Carol D. Byerly, A Married Woman | Diamond Resources, Inc. | 3/24/2005 | 152 | 98 | 26 | N2NE4, NW4 | 355702 | McKenzie | ND |
| Carol J. Jung, A Married Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 395741 | McKenzie | ND |
| Carol J. Jung, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395731 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Carol Jean Pattee, A/K/A Carol J. Pattee, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/15/2009 | 152 | 98 | 23 | Sec 23: SE4 | 396688 | McKenzie | ND |
| Carol L Gragg | 7 O'S Oil Corporation | 4/12/2005 | 27 | 59 | 7 | S/2SE/4 | 367171 | Roosevelt | MT |
| Carol L Gragg | 7 O'S Oil Corporation | 4/12/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367171 | Roosevelt | MT |
| Carole J. Sukman | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 11 | SWSW, E2SW | 358441 | McKenzie | ND |
| Carole J. Sukman, A Married Woman | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 14 | N2NW4 | 358441 | McKenzie | ND |
| Carolyn L. Benjamin | Diamond Resources, Inc. | 3/3/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin | Diamond Resources, Inc. | 3/4/2005 | 152 | 98 | 11 | W2NW, NWSW | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355183 | McKenzie | ND |
| Carolyn L. Benjamin And Kenneth R. Benjamin, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355183 | McKenzie | ND |
| Carolyn S. Melby | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | 379080 | McKenzie | ND |
| Carolyn Sue Melby; Single | Panther Entergy Company, LLC | 7/7/2008 | 151 | 99 | 14 | SW | 385482 | McKenzie | ND |
| Carolyn Sue Melby; Single | Panther Entergy Company, LLC | 7/7/2008 | 151 | 99 | 14 | E2 | 385482 | McKenzie | ND |
| Catherine Ann Farrell | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496423 | McKenzie | ND |
| Catherine C Herman | Sundance Oil & Gas | 3/21/2005 | 27 | 59 | 6 | S/2NE/4, N/2SE/4, SE/4NW/4, SW/4SE/4 | 367814 | Roosevelt | MT |
| Catherine C Herman | Sundance Oil & Gas | 3/21/2005 | 27 | 59 | 6 | S/2NE/4, N/2SE/4, SE/4NW/4, SW/4SE/4 | 367814 | Roosevelt | MT |
| Catherine L. Tuttle | Unknown Lessee | 6/12/2008 | 27 | 59 | 7 | S/2SE/4 | 377722 | Roosevelt | MT |
| Catherine L. Tuttle | Unknown Lessee | 6/12/2008 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 377722 | Roosevelt | MT |
| Catherine W. Herman, A Widow | Diamond Resources, Inc. | 7/14/2005 | 27 | 59 | 5 | SWNW, NWSW | 368033 | Roosevelt | MT |
| Cathryn R Clark | Trz Energy LLC | 9/10/2009 | 155 | 101 | 12 | NW/4 | 659115 | Williams | ND |
| Cecelia A Otteson And Selmer D Otte | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 354098 | McKenzie | ND |
| Chad L Harmon | Zenergy, Inc. | 6/1/2011 | 153 | 97 | 27 | E2NE,NWNE | 424921 | McKenzie | ND |
| Charles Buschbom, A/K/A Bill Buschbom And Karen Wolf, Indivdually And As Husband And Wife | Great Northern Energy, Inc. | 11/20/2009 | 152 | 99 | 25 | SWSW | 395732 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Charles Buschbom, A/K/A Bill Buschbom And Karen Wolf, Individually And As Husband And Wife | Great Northern Energy, Inc. | 11/20/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395732 | McKenzie | ND |
| Charles D Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382274 | Roosevelt | MT |
| Charles D Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382274 | Roosevelt | MT |
| Charles E. Niesen II | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 732608 | Williams | ND |
| Charles E. Niesen II | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 732608 | Williams | ND |
| Charles E. Niesen II | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 732608 | Williams | ND |
| Charles Parsons | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349807 | McKenzie | ND |
| Charles R Spentnagel | Mj Oil | 2/12/2010 | 155 | 101 | 12 | NW/4 | 683358 | Williams | ND |
| Charles Youree, Jr., A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396676 | McKenzie | ND |
| Charlotte Corley Kuser | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 733789 | Williams | ND |
| Charlotte Corley Kuser | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 733789 | Williams | ND |
| Charlotte Corley Kuser | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 733789 | Williams | ND |
| Cheryl Wegley, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364017 | McKenzie | ND |
| Cheryl Wegley, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 397586 | McKenzie | ND |
| Christine M. Arnold, A/K/A Christine Arnold And Steven C. Arnold, Individually, And As Wife And Husband | Great Northern Energy, Inc. | 4/25/2010 | 152 | 98 | 22 | NW/4 | 397562 | McKenzie | ND |
| Christine M. Arnold, Aka Christine Arnold And Steven C. Arnold, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397562 | McKenzie | ND |
| Christine M. Arnold, Aka Christine Arnold And Steven C. Arnold, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397562 | McKenzie | ND |
| Christopher Erwin Miles, A/K/A Christopher Miles, A Single Man | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378793 | McKenzie | ND |
| Cindy Thomley, A Single Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358458 | McKenzie | ND |
| Cindy Thomley, A Single Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358458 | McKenzie | ND |
| Clair Forland, A Married Man | Diamond Resources, Inc. | 6/5/2008 | 151 | 98 | 33 | NENE | 379577 | McKenzie | ND |
| Clair Forland, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/13/2010 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 400039 | McKenzie | ND |
| Claire Beer, A Single Woman | Cody Oil & Gas Corporation | 5/13/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351144 | McKenzie | ND |
| Clarence C. Thompson And Barbara L. Thompson, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 5/18/2010 | 152 | 99 | 25 | SWSW, E2NE, SWNE, SE, S2NW, N2SW | 403825 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Clarence C. Thompson, Et Ux | Great Northern Energy, Inc. | 5/18/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 403825 | McKenzie | ND |
| Clarence Jore | Diamond Resources, Co. | 5/17/2006 | 151 | 99 | 26 | NE/4SW/4,W/2NW/4,SE/4NW/4 | 364234 | McKenzie | ND |
| Clarence Jore | Diamond Resources, Co. | 5/17/2006 | 151 | 99 | 26 | SE4SW4,S2SE4,NE4SE4 | 364234 | McKenzie | ND |
| Clarence Jore | Diamond Resources, Co. | 5/17/2006 | 151 | 99 | 35 | E/2E/2 | 364234 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White | Diamond Resources, Inc. | 4/13/2005 | 152 | 98 | 33 | E2SE4 | 356313 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White | Diamond Resources, Inc. | 4/13/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356313 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 355729 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 17 | N2NE4 | 355729 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355729 | McKenzie | ND |
| Clark Allen White, A/K/A Clark White, A/K/A Allen Clark White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 355729 | McKenzie | ND |
| Clayton Okland | Zenergy, Inc. | 10/1/2011 | 151 | 98 | 33 | NWNE,S2NE,SENW | 424920 | McKenzie | ND |
| Connie Brownson | Diamond Resources | 9/10/2009 | 155 | 101 | 12 | NW/4 | 659444 | Williams | ND |
| Constance S Bruins; Single | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | 395875 | McKenzie | ND |
| Cordell Wold | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355724 | McKenzie | ND |
| Cordell Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355724 | McKenzie | ND |
| Craig Peters Heir Of Martin Peters | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NW4SW4 | 416089 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 11/4/2009 | 152 | 98 | 11 | SWSW, E2SW | 394859 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Husband And Wife As Joint Tenants | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 11 | SWSW, E2SW | 394859 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 11/4/2009 | 152 | 98 | 14 | Sec 14: N2NW4 | 394860 | McKenzie | ND |
| Craig R. Nelson And Julie R. Nelson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 11/4/2009 | 152 | 98 | 14 | Sec 14: N2NW4 | 394860 | McKenzie | ND |
| Curtiss A. Dahl, A Single Man, Individually, And As Beneficiary Of The Mildred G. Dahl Mineral Trust | Great Northern Energy, Inc. | 3/2/2010 | 152 | 99 | 25 | SWSW | 402725 | McKenzie | ND |
| Cynthia L Wilcox | Zenergy, Inc. | 5/17/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385549 | Roosevelt | MT |
| D & V Johnson Family Irr. Min Trust | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410346 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 400162 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustee | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SW4 | 400159 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustee | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 400159 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustee | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 400159 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Minerals Trust, Sara Goodman And Andrew K. Johnson, Initial Co-Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | 400158 | McKenzie | ND |
| D & V Johnson Family Irrevocable Tr | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410344 | McKenzie | ND |
| D & V Johnson Family Irrevocable Tr | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | 410344 | McKenzie | ND |
| D&V Johnson Family Irrevocable Mine | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 400161 | McKenzie | ND |
| Dale Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 32 | S2NE4 | 438233 | McKenzie | ND |
| Dale Anderson | Zenergy, Inc. | 9/1/2010 | 152 | 98 | 33 | NW, N2SW | 438233 | McKenzie | ND |
| Dale Brown | Zenergy, Inc. | 6/1/2011 | 152 | 98 | 30 | SESE | 419694 | McKenzie | ND |
| Dale Brown | Zenergy, Inc. | 6/1/2011 | 152 | 98 | 30 | NE | 419694 | McKenzie | ND |
| Dale Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382070 | Roosevelt | MT |
| Dale Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382070 | Roosevelt | MT |
| Dale Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | 382070 | Roosevelt | MT |
| Dan O'Hearn, A/K/A Daniel O'Hearn,A Single Amn | Diamond Resources, Inc. | 7/3/2006 | 152 | 99 | 25 | SWSW | 365289 | McKenzie | ND |
| Dan O'Hearn, Aka Daniel O'Hearn, A Single Man | Great Northern Energy, Inc. | 3/31/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400927 | McKenzie | ND |
| Dan O'Hearn, Aka Daniel O'Hearn, A Single Man | Diamond Resources , Inc | 7/3/2006 | 152 | 98 | 30 | Lot 1 | 400927 | McKenzie | ND |
| Darla T O'Donnell | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | E/2SW/4 | 656996 | Williams | ND |
| Darla T O'Donnell | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | SE/4 | 656996 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Darla T O'Donnell | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | S/2NE/4 | 656996 | Williams | ND |
| Darlene M STevens And Lee W STevens | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 353043 | McKenzie | ND |
| Darlene O. Lee And Raymond V. Lee Her Husband | Diamond Resources, Inc. | 9/30/2008 | 155 | 101 | 12 | E2SW, SE, S2NE | 660711 | Williams | ND |
| Darrell L Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 4 | S/2 | 382902 | Roosevelt | MT |
| Darrell L Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 9 | N/2 | 382902 | Roosevelt | MT |
| Darrell L Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 382902 | Roosevelt | MT |
| Daryl J. Johnson And Molly 0. Johnson, Husband And Wife | Diamond Resources, Inc. | 5/5/2005 | 151 | 98 | 7 | NE4, NE4NW4 | 356855 | McKenzie | ND |
| Daryl J. Johnson And Molly 0. Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/12/2010 | 151 | 98 | 7 | NE4, NE4NW4 | 400041 | McKenzie | ND |
| Daryl J. Johnson And Molly O. Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 4/27/2010 | 151 | 99 | 1 | SW4NW4 | 400041 | McKenzie | ND |
| David A. Johnsrud And Shirley Johnsrud, Husband And Wife | Diamond Resources, Inc. | 5/2/2009 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 378516 | McKenzie | ND |
| David Allen Panasuk Et Ux | Unknown Lessee | 5/12/2005 | 27 | 59 | 3 | SE/4 | 367302 | Roosevelt | MT |
| David Allen Panasuk Et Ux | Unknown Lessee | 5/12/2005 | 27 | 59 | 10 | E/2E/2 | 367302 | Roosevelt | MT |
| David D. Machala, A Single Man | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381435 | McKenzie | ND |
| David F Bruce | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT 1 | 398219 | McKenzie | ND |
| David F Bruce | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT4 | 398219 | McKenzie | ND |
| David F Bruce | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | SE/4SW/4 | 398219 | McKenzie | ND |
| David F. Irwin | Diamond Resources, Inc. | 6/26/2006 | 151 | 99 | 26 | NE4NE4 | 364920 | McKenzie | ND |
| David F. Machala, A Single Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381435 | McKenzie | ND |
| David Falcon | Diamond Resources, Inc. | 11/7/2008 | 151 | 99 | 1 | W2SW4 | 385024 | McKenzie | ND |
| David Falcon | Diamond Resources, Inc. | 11/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 385024 | McKenzie | ND |
| David G. Rogers | Unknown Lessee | 5/27/2008 | 27 | 59 | 7 | S/2SE/4 | 377723 | Roosevelt | MT |
| David G. Rogers | Unknown Lessee | 5/27/2008 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 377723 | Roosevelt | MT |
| David Gililland, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396672 | McKenzie | ND |
| David Hagen | Continental Resources, Inc. | 9/10/2010 | 152 | 98 | 30 | LOT 1 | 408661 | McKenzie | ND |
| David J Peters Heir Of Martin Peter | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NW4SW4 | 416087 | McKenzie | ND |
| David K Selid And Veanna Selid | Empire Oil Company | 1/20/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372761 | McKenzie | ND |
| David R. Johnson | Diamond Resources, Inc. | 11/10/2008 | 152 | 98 | 11 | SWSW, E2SW | 384323 | McKenzie | ND |
| David R. Johnson, A Married Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 14 | N2NW4 | 359692 | McKenzie | ND |
| David R. Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349802 | McKenzie | ND |
| David Rolfson And Jan Rolfson, Husband And Wife | Cody Oil & Gas Corporation | 6/29/2004 | 151 | 98 | 20 | SW/4 | 351157 | McKenzie | ND |
| David Rolfsrud | Oasis Petroleum North America | 8/1/2018 | 152 | 97 | 18 | NE/4NE/4 | 510527 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| David Rolfsrud | Oasis Petroleum North America | 8/1/2018 | 152 | 98 | 24 | E/2NE/4 | 510106 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E2NW4, E2SE4 | 378857 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E/2SW/4, W/2SE/4 | 378857 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 6 | LOT9,E/2SE/4,PORTION LOTS 7,8 & 10 | 378857 | McKenzie | ND |
| David Rolfsrud And Gena Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | N2NE4,SW4NE4 | 378857 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 423639 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 18 | SE/4SE/4 | 423639 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 18 | SW/4SE/4 | 423639 | McKenzie | ND |
| David Rolfsrud Et Ux | Continental Resources, Inc. | 1/1/2011 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 423639 | McKenzie | ND |
| Dawn L Coleman | Zenergy, Inc. | 6/1/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385779 | Roosevelt | MT |
| Dean D. Nelson And Jean Nelson, Husband And Wife | Diamond Resources Inc. | 1/14/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367593 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 3 | SW/4 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | S/2 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 9 | N/2 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | LOT3(40.08),LOT4(40.08 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 378067 | Roosevelt | MT |
| Dean D. Nelson Et Ux | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | S/2NW/4 | 378067 | Roosevelt | MT |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Husband And Wife | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 356531 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 400415 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 400415 | McKenzie | ND |
| Dean R. White And Carolyn White, Individually And As Husband And Wife | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 400415 | McKenzie | ND |
| Deanne R. Frarck, A/K/A Deanne Frarck, A Married Woman | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 363395 | McKenzie | ND |
| Debbera Hagen, A/K/A Deb Hagen And Doyle Hagen, Her Husband | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 355731 | McKenzie | ND |
| Debbera Hagen, A/K/A Deb Hagen, And Doyle Hagen, Her Husband | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356442 | McKenzie | ND |
| Debbera Hagen, A/K/A Deb Hagen, And Doyle Hagen, Her Husband | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356442 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, W2E2 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | N2NE4 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 400040 | McKenzie | ND |
| Debbera Hagen, Aka Deb Hagen And Doyle Hagen, Wife And Husband As Joint Tenants | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 400040 | McKenzie | ND |
| Debbie L. Johnson, A./K/A Debbie Johnson | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N1/2SW1/4, SW1/4SW1/4 | 358455 | McKenzie | ND |
| Debbie L. Johnson, A./K/A Debbie Johnson | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N1/2NW1/4 | 358455 | McKenzie | ND |
| Debbra Ann Olson-Clark, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 6/13/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400913 | McKenzie | ND |
| Debbra Ann Olson-Clark, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400913 | McKenzie | ND |
| Debby Houk Aka Debbie Houk | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | 796482 | Williams | ND |
| Debby Houk Aka Debbie Houk | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | 796482 | Williams | ND |
| Debby Houk Aka Debbie Houk | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | 796482 | Williams | ND |
| Deborah Anderson; Single | Great Northern Energy, Inc. | 6/6/2010 | 152 | 98 | 14 | E2SE,SWSE | 404760 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Deborah Anderson; Single | Great Northern Energy, Inc. | 6/6/2010 | 152 | 98 | 23 | NENE | | 404760 | McKenzie | ND |
| Deborah Ann Miles, A Single Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | | 378802 | McKenzie | ND |
| Deborah Kinzel, A/K/A Deborah Kay Kinzel, A Married Woman | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | | 400047 | McKenzie | ND |
| Deborah Kinzel, A/K/A Deborah Kay Kinzel, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | | 400047 | McKenzie | ND |
| Deborah L Tomas | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | | 381553 | McKenzie | ND |
| Deborah Tomas Aka Deborah L Tomas | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | | 386821 | McKenzie | ND |
| Deborah Tomas Aka Deborah L Tomas | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | | 388401 | McKenzie | ND |
| Debra Ann Olson, A Single Woman | Diamond Resources, Inc. | 6/13/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357800 | McKenzie | ND |
| Debra E. Kolember, A/K/A Debra E. Kolenber, A Married Woman | Great Northern Energy, Inc. | 2/2/2010 | 152 | 99 | 25 | SWSW | | 399001 | McKenzie | ND |
| Debra E. Kolember, A/K/A Debra E. Kolenber, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/2/2010 | 152 | 98 | 30 | Lot 1(33.53) | | 399002 | McKenzie | ND |
| Debra L. Rose, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358451 | McKenzie | ND |
| Debra L. Rose, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | | 358451 | McKenzie | ND |
| Debra Payne Brown Exempt Trust | Great Northern Energy, Inc. | 5/18/2010 | 151 | 98 | 28 | N2SW,SESW,SWSE | | 403824 | McKenzie | ND |
| Dede Gumm Waggoner, F/K/A Dede Gumm, A Widow | Diamond Resources, Inc. | 10/31/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 381434 | McKenzie | ND |
| Dede Gumm Waggoner, F/K/A Dede Gumm, A Widow | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | | 367434 | McKenzie | ND |
| Dede Gumm Waggoner, F/K/A Dede Gumm, A Widow | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | | 381434 | McKenzie | ND |
| Della R. And Theodore Knight | Missouri Basin Well Service | 4/28/2004 | 152 | 98 | 2 | SW4 | | 349752 | McKenzie | ND |
| Della R. And Theodore Knight | Missouri Basin Well Service | 4/28/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, N2S2 | | 349752 | McKenzie | ND |
| Delores M. Greathouse, Vida Delores M. Moe, F/K/A Delores Moe, A Married Woman | Diamond Resources, Inc. | 8/16/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358725 | McKenzie | ND |
| Delores M. Greathouse, Vida Delores M. Moe, F/K/A Delores Moe, A Married Woman | Diamond Resources, Inc. | 8/16/2005 | 152 | 98 | 24 | N2NW4 | | 358725 | McKenzie | ND |
| Delores Maston, Individually And As Attorney-In-Fact For Herbert Maston, Her Husband | Cody Oil & Gas Corporation | 4/29/2004 | 152 | 98 | 10 | N/2 | | 351135 | McKenzie | ND |
| Denalie Ann Bruins | Panther Entergy Company, LLC | 6/4/2008 | 151 | 99 | 14 | SW | | 386822 | McKenzie | ND |
| Denalie Bruins Aka Denalie Ann Brui | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | | 386823 | McKenzie | ND |
| Denalie Bruins Aka Denalie Ann Brui | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | | 386139 | McKenzie | ND |
| Denise Nordeng, A Single Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355174 | McKenzie | ND |
| Denise Nordeng, A Single Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | SE4, SW4, S2NE4 | | 355174 | McKenzie | ND |
| Denise Nordeng, A Single Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | | 355174 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | | | | Description | | County | State |
|---|---|---|---|---|---|---|---|---|---|
| Denise Nordeng, A Single Woman | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355174 | McKenzie | ND |
| Dennis Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 32 | S2NE4 | 438235 | McKenzie | ND |
| Dennis Anderson | Zenergy, Inc. | 9/1/2010 | 152 | 98 | 33 | NW, N2SW | 438235 | McKenzie | ND |
| Dennis E. Johnson And Vonnie E. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/13/2006 | 152 | 98 | 13 | IT 19 in the NE4NW4, a 1.00 acre tract | 365096 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 97 | 7 | Lots 3, 4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 97 | 18 | Lots 1, 2, 3, 4, S2NE4,N2SE4, NE4SW4, SE4NW4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 98 | 12 | SE4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 7/18/2009 | 152 | 98 | 13 | NE4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2009 | 152 | 98 | 13 | E2SE4 | 381039 | McKenzie | ND |
| Dennis E. Johnson And Vonnie J. Johnson, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 12 | SE4 | 355171 | McKenzie | ND |
| Dennis R. Brown, Trustee Of The Leone E. Brown June 10, 1992 Trust | Diamond Resources, Inc. | 5/20/2005 | 152 | 98 | 30 | NE4, SE4SE4 | 358459 | McKenzie | ND |
| Dennis W Yockim | Empire Oil Company | 10/8/2010 | 151 | 98 | 32 | S/2SW/4 | 411709 | McKenzie | ND |
| Devereux Foundation | Diamond Resources, Inc. | 3/2/2006 | 152 | 98 | 14 | N2NW4 | 361528 | McKenzie | ND |
| Dg Minerals LLC | Oasis Petroleum North America | 2/1/2014 | 152 | 98 | 30 | NE4 | 466977 | McKenzie | ND |
| Diane Shockley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | 796480 | Williams | ND |
| Diane Shockley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | 796480 | Williams | ND |
| Diane Shockley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | 796480 | Williams | ND |
| Diane Woodward-Frost Rev T | Unknown Lessee | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370862 | Roosevelt | MT |
| Dianna M Briske | Oasis Petroleum North America LLC | 11/3/2010 | 27 | 59 | 4 | S/2NE/4 | 384754 | Roosevelt | MT |
| Dianna M Briske | Oasis Petroleum North America LLC | 11/3/2010 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 384754 | Roosevelt | MT |
| Dianna M Briske | Unknown Lessee | 12/4/2011 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 392047 | Roosevelt | MT |
| Dianna M Briske | Unknown Lessee | 12/4/2011 | 27 | 59 | 4 | S/2NW/4 | 392047 | Roosevelt | MT |
| Donald E. Roesner, A Single Man And Kenneth G. Roesner A/K/A Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355699 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Donald E. Roesner, A Single Man And Kenneth G. Roesner, A/K/A Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | | 355699 | McKenzie | ND |
| Donald Elroy Brandt | Continental Resources, Inc. | 1/11/2011 | 152 | 98 | 30 | LOT 1 | | 412791 | McKenzie | ND |
| Donald Erikson, A Single Man | Diamond Resources, Inc. | 4/26/2005 | 152 | 98 | 33 | E2E2 | | 356438 | McKenzie | ND |
| Donald Erikson, A Single Man | Diamond Resources, Inc. | 4/26/2005 | 152 | 98 | 34 | E2W2, W2SW4 | | 356438 | McKenzie | ND |
| Donald Forland, A Single Man | Great Northern Energy, Inc. | 1/13/2010 | 151 | 98 | 28 | N2, SE, N2SW, SESW | | 400037 | McKenzie | ND |
| Donald Forland, A Single Man | Diamond Resources, Inc. | 6/5/2008 | 151 | 98 | 33 | NENE | | 400037 | McKenzie | ND |
| Donald G. Olson And Sharon K. Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | | 400917 | McKenzie | ND |
| Donald G. Olson And Sharon K. Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | | 400917 | McKenzie | ND |
| Donald G. Olson And Sharon Olson, Husband And Wife | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357541 | McKenzie | ND |
| Donald Hoglund; Mdssp | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | | 395068 | McKenzie | ND |
| Donald J. Albers, Attorney-In-Fact For Gladys M. Albers | Diamond Resources, Inc. | 4/14/2005 | 151 | 98 | 7 | NE4, NE4NW4 | | 357533 | McKenzie | ND |
| Donald J. Albers, Attorney-In-Fact For Gladys M. Albers | Diamond Resources, Inc. | 4/14/2009 | 151 | 98 | 7 | NE4, NE4NW4 | | 357533 | McKenzie | ND |
| Donald J. Kilwein, A Single Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | | 360986 | McKenzie | ND |
| Donald J. Schmidt, A Married Man | Diamond Resources, Inc. | 6/1/2006 | 151 | 99 | 26 | SE4NE4 | | 364282 | McKenzie | ND |
| Donald J. Schmidt, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 6/1/2010 | 151 | 99 | 25 | SW4NW4,N2SW4 | | 394856 | McKenzie | ND |
| Donald J. Schmidt, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 11/11/2009 | 151 | 99 | 26 | SE4NE4 | | 394856 | McKenzie | ND |
| Donald L. Johnsrud, A Married Man | Diamond Resources, Inc. | 5/2/2009 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | | 378507 | McKenzie | ND |
| Donald L. Karst, A Single Man | Diamond Resources, Inc. | 11/8/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 360044 | McKenzie | ND |
| Donald L. Krast, A Single Man | Diamond Resources, Inc. | 11/8/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | | 360044 | McKenzie | ND |
| Donald Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 97 | 19 | NE4SW4 | | 358435 | McKenzie | ND |
| Donald Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 13 | IT 19 (A 1.00 acre tract) | | 358435 | McKenzie | ND |
| Donald Wittinger, A Widower | Great Northern Energy, Inc. | 12/11/2009 | 152 | 99 | 25 | SWSW | | 396702 | McKenzie | ND |
| Donald Wittinger, A Widower | Great Northern Energy, Inc. | 12/11/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 396686 | McKenzie | ND |
| Donna Anfinson | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT 1 | | 398121 | McKenzie | ND |
| Donna Anfinson | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT4 | | 398121 | McKenzie | ND |
| Donna Anfinson | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | SE/4SW/4 | | 398121 | McKenzie | ND |
| Donna Anfinson, A Married Woman | Diamond Resources, Inc. | 7/14/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 358183 | McKenzie | ND |
| Donna Bordner | Empire Oil Company | 8/28/2007 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | | 374020 | McKenzie | ND |
| Donna Bordner, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | | 400418 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Donna Bordner, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400418 | McKenzie | ND |
| Donna Jewell, A Widow | Cody Oil & Gas Corporation | 5/13/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 351143 | McKenzie | ND |
| Donna Katherine Miles Brown, A Married Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 379223 | McKenzie | ND |
| Donna M Anderson; Widow, Ind | Great Northern Energy, Inc. | 6/28/2010 | 152 | 99 | 25 | NWNE | 402730 | McKenzie | ND |
| Donna M Anderson; Widow, Ind | Great Northern Energy, Inc. | 6/28/2010 | 152 | 99 | 25 | N2NW | 402730 | McKenzie | ND |
| Donna M. Anderson | Diamond Resources, Inc. | 7/20/2009 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381636 | McKenzie | ND |
| Donna M. Anderson | Diamond Resources, Inc. | 6/28/2006 | 152 | 99 | 25 | NWNE, N2NW | 364918 | McKenzie | ND |
| Donna M. Anderson | Diamond Resources, Inc. | 7/18/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381636 | McKenzie | ND |
| Donna M. Critzer, A Single Woman | Great Northern Energy, Inc. | 4/27/2010 | 151 | 99 | 1 | SW4NW4 | 400042 | McKenzie | ND |
| Donna M. Critzer, A Single Woman | Great Northern Energy, Inc. | 3/12/2010 | 151 | 98 | 7 | NE4, NE4NW4 | 400042 | McKenzie | ND |
| Donna Wald | Diamond Resources, Inc. | 10/27/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 384320 | McKenzie | ND |
| Donna Wald, A Married Woman | Diamond Resources, Inc. | 10/27/2008 | 151 | 99 | 1 | W2SW4 | 384320 | McKenzie | ND |
| Donna Willis | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382207 | Roosevelt | MT |
| Donna Willis | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382207 | Roosevelt | MT |
| Doris E Liffrig | Arkota Energy, Inc. | 6/1/2011 | 151 | 98 | 33 | NW/4NE/4,S/2NE/4,SE/4NW/4 | 419066 | McKenzie | ND |
| Doris Koch | Unknown Lessee | 3/28/2005 | 27 | 59 | 7 | S/2SE/4 | 367181 | Roosevelt | MT |
| Doris Koch | Unknown Lessee | 3/28/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367181 | Roosevelt | MT |
| Dorothy Dalzell Bankerd Pace | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 792777 | Williams | ND |
| Dorothy Dalzell Bankerd Pace | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 792777 | Williams | ND |
| Dorothy Dalzell Bankerd Pace | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 792777 | Williams | ND |
| Dorothy Elvrum, Individually And As Attorney-In-Fact For Orville Selid, Loraine Selid, Rodney Selid, Gregory Selid, Marcia Van Ackern, Sharon Bishop, Alvin Selid, Annie Amb, Laila B. Selid, David K. Selid, Stewart Selid And Russel V. Elvrum | Diamond Resources, Inc. | 3/13/2006 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 362491 | McKenzie | ND |
| Dorothy Elvrum, Individually, And As Attorney-In-Fact For Orville Selid, Loraine Selid, Rodney Selid, Gregory Selid, Marcia Hines (Fka Marcia Van Ackern), Sharon Bishop, Alvin Selid, Annie Amb, Laila B. Selid, David K. Selid, Steward Selid And Russel V. Elvrum | Diamond Resources, Inc. | 3/13/2006 | 151 | 98 | 29 | S2NW, SW | 362491 | McKenzie | ND |
| Doug M. Geck, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 (Protective) | 361881 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | | | | Description | | | |
|---|---|---|---|---|---|---|---|---|---|
| Douglas M. Geck, A/K/A Doug M. Geck, A Married Man, Individually, And As Beneficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 395738 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 6 | LOT9,E/2SE/4,PORTION LOTS 7,8 & 10 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E/2SW/4, W/2SE/4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E2NW4, E2SE4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | 152N-097W-07 SE4NE4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud & Debbie Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | N2NE4,SW4NE4 | 378856 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 417355 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 18 | SE/4SE/4 | 417355 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 18 | SW/4SE/4 | 417355 | McKenzie | ND |
| Douglas Rolfsrud Et Ux | Burlington Reources Oil & Gas | 1/1/2011 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 417355 | McKenzie | ND |
| Douglas W. Van Dyke And Marcia Van Dyke, Individually And As Husband And Wife | Great Northern Energy, Inc. | 4/7/2010 | 152 | 98 | 30 | Lot 1(33.53) | 401491 | McKenzie | ND |
| Douglas W. Van Dyke And Marcia Van Dyke, Individually And As Husband And Wife | Great Northern Energy, Inc. | 4/7/2010 | 152 | 99 | 25 | SWSW | 401492 | McKenzie | ND |
| Driscoll Childrens Hospital | Brigham Oil & Gas Lp | 8/30/2010 | 155 | 101 | 12 | E/2SW/4 | 698765 | Williams | ND |
| Driscoll Childrens Hospital | Brigham Oil & Gas Lp | 8/30/2010 | 155 | 101 | 12 | S/2NE/4 | 698765 | Williams | ND |
| Driscoll Childrens Hospital | Brigham Oil & Gas Lp | 8/30/2010 | 155 | 101 | 12 | SE/4 | 698765 | Williams | ND |
| Duane L Peterson | Panther Energy Company, LLC | 6/3/2008 | 151 | 99 | 14 | S2NW | 381554 | McKenzie | ND |
| Duane Leon Wold, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 402723 | McKenzie | ND |
| Duane Leon Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399005 | McKenzie | ND |
| E. Ward Koeser, Trustee Of The Edwin Koeser'S Children'S Trust | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 32 | SW4 | 359828 | McKenzie | ND |
| Earl Wilson | Diamond Resources, Inc. | 2/14/2006 | 152 | 98 | 14 | N2NW4 | 361832 | McKenzie | ND |
| Eddy D Ulledalen; Mdssp | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | 394941 | McKenzie | ND |
| Edith L. Wold, A Widow | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6 | 355705 | McKenzie | ND |
| Edith L. Wold, A Widow | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355705 | McKenzie | ND |
| Edith M Devine | 7 0'S Oil Corporation | 5/12/2005 | 27 | 59 | 7 | S/2SE/4 | 367382 | Roosevelt | MT |
| Edith M Devine | 7 0'S Oil Corporation | 5/12/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367382 | Roosevelt | MT |
| Edna L. Dahl, A/K/A Edna Dahl, A Married Woman | Diamond Resources, Inc. | 7/25/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358456 | McKenzie | ND |
| Edna L. Dahl, A/K/A Edna Dahl, A Married Woman | Diamond Resources, Inc. | 7/25/2005 | 152 | 98 | 24 | N2NW4 | 358456 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Edward D Schmit Family Trust | Panther Energy Company, LLC | 7/7/2008 | 151 | 99 | 14 | S2NW | | 385462 | McKenzie | ND |
| Edward J Anfinson Et Ux | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT 1 | | 398122 | McKenzie | ND |
| Edward J Anfinson Et Ux | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | LOT4 | | 398122 | McKenzie | ND |
| Edward J Anfinson Et Ux | Continental Resources, Inc. | 1/28/2010 | 152 | 98 | 30 | SE/4SW/4 | | 398122 | McKenzie | ND |
| Edward J. Anfinson And Donna Anfinson, Husband And Wife | Diamond Resources, Inc. | 7/14/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 358182 | McKenzie | ND |
| Edwin G. Olson And Beverly Olson, Husband And Wife | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | | 357540 | McKenzie | ND |
| Edwin G. Olson And Beverly Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | | 400922 | McKenzie | ND |
| Edwin G. Olson And Beverly Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | | 400922 | McKenzie | ND |
| Edwin J Peet | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | E/2SW/4 | | 688505 | Williams | ND |
| Edwin J Peet | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | SE/4 | | 688505 | Williams | ND |
| Edwin J Peet | Brigham Oil & Gas Lp | 3/23/2010 | 155 | 101 | 12 | S/2NE/4 | | 686322 | Williams | ND |
| Edwin L. Fields, A Married Man | Diamond Resources, Inc. | 3/15/2005 | 152 | 98 | 35 | NE4SE4, W2SE4, SW4, S2NW4 | | 355571 | McKenzie | ND |
| Edwin L. Fields, A Married Man | Diamond Resources, Inc. | 3/15/2005 | 152 | 98 | 34 | N2SE4 | | 355571 | McKenzie | ND |
| Elaine Hudson | 7 O'S Oil Corporation | 5/9/2005 | 27 | 59 | 7 | S/2SE/4 | | 367381 | Roosevelt | MT |
| Elaine Hudson | 7 O'S Oil Corporation | 5/9/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 367381 | Roosevelt | MT |
| Elaine L. Grantier, Individually, And As Heir To The Estate Of John J. Grantier, Deceased | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | | 399021 | McKenzie | ND |
| Elaine Lingor | Empire Oil Company | 3/6/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | | 372765 | McKenzie | ND |
| Elaine Lingor, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | | 400920 | McKenzie | ND |
| Elaine Lingor, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | | 400920 | McKenzie | ND |
| Eldon Mastvelten, A Single Man, Ind. And As Heir To The Estates Of Evelyn P Mastvelten, Dec. And Oscar J Mastvelten, Dec. | Great Northern Energy, Inc. | 5/10/2010 | 152 | 98 | 1 | Sec 1: Lots 3(29.89), 4(29.83) | | 402722 | McKenzie | ND |
| Elise Renbarger, Life Tenant With Full Participation Rights And Authority To Grant Leases For Up To Five Years Without Consent Of Remainderman | Diamond Resources, Inc. | 3/3/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | | 356621 | McKenzie | ND |
| Elise Renbarger, Life Tenant With Full Participation Rights And Authority To Grant Leases For Up To Five Years Without Consent Of Remainderman | Diamond Resources, Inc. | 3/4/2005 | 152 | 98 | 11 | W2NW, NWSW | | 356621 | McKenzie | ND |
| Elizabeth Ann Kallus, Personal Representative Of The Estate Of Liola Kallus | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | | 384659 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Elizabeth Ann Kallus, Pr For The Estate Of Liola Kallus | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 384659 | McKenzie | ND |
| Elizabeth Grantier, Jane Miller And Brooks Grantier, Co-Trustees Of The Elizabeth I. Keogh Trust 2 | Diamond Resources, Inc. | 12/16/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, and 10 | 360977 | McKenzie | ND |
| Elizabeth I Keogh Trust #2 | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | LOT 9,E2SE,PORTION LOT 7,8,10 | 399034-36 | McKenzie | ND |
| Elizabeth I. Keogh Trust 2, Elizabeth Grantier, Jayne Miller And Brooks Grantier, Co-Trustees | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399036 | McKenzie | ND |
| Elizabeth I. Keogh Trust 2, Elizabeth Grantier, Jayne Miller And Brooks Grantier, Co-Trustees | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399036 | McKenzie | ND |
| Elizabeth I. Keogh Trust 2, Elizabeth Grantier, Jayne Miller And Brooks Grantier, Co-Trustees | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lot 9(40.00), E2SE4, and a 38.00 acre tract in Lots 7, 8, and 10, MFD in Bk 11, Pg 221 | 399036 | McKenzie | ND |
| Elizabeth Rolfson, A Widow | Cody Oil & Gas Corporation | 7/1/2004 | 151 | 98 | 20 | SW/4 | 351159 | McKenzie | ND |
| Ellen J Edwards  Fuller Fam Tr | Sundance Oil & Gas Inc | 4/6/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370849 | Roosevelt | MT |
| Elmer R. Johnson, A Single Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355733 | McKenzie | ND |
| Elvin F Anderson Et Ux | Amoco Production Company | 9/15/1977 | 152 | 98 | 33 | NW/4, N/2SW/4 | 204906 | McKenzie | ND |
| Emg Properties Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 726870 | Williams | ND |
| Emg Properties Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 726870 | Williams | ND |
| Emg Properties Inc | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 726870 | Williams | ND |
| Emma M Burcham | 7 O'S Oil Corporation | 4/8/2005 | 27 | 59 | 7 | S/2SE/4 | 367179 | Roosevelt | MT |
| Emma M Burcham | 7 O'S Oil Corporation | 4/8/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367179 | Roosevelt | MT |
| Empire Oil Company | Panther Energy Company | 4/23/2010 | 153 | 97 | 28 | NW4 | 401310 | McKenzie | ND |
| Endco Oil Company, Inc | Great Northern Energy, Inc. | 3/5/2010 | 152 | 99 | 25 | N2NW | 400053 | McKenzie | ND |
| Endco Oil Company, Inc | Great Northern Energy, Inc. | 3/5/2010 | 152 | 99 | 25 | NWNE | 400053 | McKenzie | ND |
| Eric T Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | E/2SW/4 | 656993 | Williams | ND |
| Eric T Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | SE/4 | 656993 | Williams | ND |
| Eric T Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | S/2NE/4 | 656993 | Williams | ND |
| Erling 0. Rolfson, A Married Man | Diamond Resources, Inc. | 6/17/2008 | 151 | 98 | 20 | SW4 | 379827 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | 151N-098W-29-SE/4 | 401353 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | NE/4 | 401353 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | N/2NW/4 | 401353 | McKenzie | ND |
| Erling Rolfson | Continental Resources, Inc. | 7/9/2010 | 151 | 98 | 32 | NE/4 | 405830 | McKenzie | ND |
| Estate Of Lars Iver Sundfor | Continental Resources, Inc. | 6/6/2011 | 153 | 97 | 27 | SE4SE4 | 419213 | McKenzie | ND |
| Estate Of Richard E Dirickson | Zenergy, Inc. | 5/10/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 385547 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Esther M. Samuel John, A/K/A Esther Samuel John, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 4/26/2010 | 152 | 98 | 22 | NW/4 | 397558 | McKenzie | ND |
| Esther M. Samuel John, Aka Esther Samuel John, A Widow, June A. Lynner, Attorney-In- Fact | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397558 | McKenzie | ND |
| Esther M. Samuel John, Aka Esther Samuel John, A Widow, June A. Lynner, Attorney-In- Fact | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397558 | McKenzie | ND |
| Eugene A. And Gayle M. Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 11 | SE4 | 349784 | McKenzie | ND |
| Eugene A. And Gayle M. Gunderson | Missouri Basin Well Service | 5/4/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349784 | McKenzie | ND |
| Eugene A. Gunderson And Gayle M. Gunderson, Husband And Wife | Cody Oil & Gas Corporation | 5/4/2004 | 152 | 98 | 10 | SW/4 | 351138 | McKenzie | ND |
| Eugene Anderson And Ruth N. Anderson, Husband And Wife, As Joint Tenants | Cody Oil & Gas Corporation | 9/9/2004 | 151 | 98 | 20 | SE/4 | 351168 | McKenzie | ND |
| Eunice D Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382205 | Roosevelt | MT |
| Eunice D Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382205 | Roosevelt | MT |
| Evelyn P. Mastvelten, A/K/A Evelyn Mastvelten And Oscar N.J. Mastvelten, A/K/A Oscar Mastvelten, Wife And Husband | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E1/2SW1/4, W1/2SE1/4 | 362681 | McKenzie | ND |
| Evelyn P. Mastvelten, A/K/A Evelyn Mastvelten, And Oscar N.J. Mastvelten, A/K/A Oscar Mastvelten, Her Husband | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | Lots 3, 4 | 357178 | McKenzie | ND |
| Everett Crum Jr | 7 O'S Oil Corporation | 3/28/2005 | 27 | 59 | 7 | S/2SE/4 | 367180 | Roosevelt | MT |
| Everett Crum Jr | 7 O'S Oil Corporation | 3/28/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367180 | Roosevelt | MT |
| Exploration Nad Development Company, Inc. | Great Northern Energy, Inc. | 1/16/2010 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW, NWNE, N2NW | 399031 | McKenzie | ND |
| Florence Dyste Anderson, A Widow | Diamond Resources, Inc. | 6/6/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 357797 | McKenzie | ND |
| Florence Dyste Anderson, A Widow | Diamond Resources, Inc. | 6/7/2005 | 152 | 98 | 23 | NE4NE4 | 357797 | McKenzie | ND |
| Florence E Dyste; Widow, Ind And He | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 14 | E2SE,SWSE | 402724 | McKenzie | ND |
| Florence E Dyste; Widow, Ind And He | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 23 | NENE | 402724 | McKenzie | ND |
| Florence E. Berwick | Diamond Resources Inc. | 5/25/2005 | 28 | 58 | 25 | SE4SE4 | 609-130 | Roosevelt | MT |
| Frank P Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 14 | N2NW | 431197 | McKenzie | ND |
| Frank P Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 11 | E2SW,SWSW | 431197 | McKenzie | ND |
| Frederic C. Leiner, As Successor Trustee Of The Joan G. Leiner Family Trust Dtd 12-1985 | Diamond Resources, Inc. | 5/24/2006 | 151 | 99 | 26 | NE4NE4 | 364659 | McKenzie | ND |
| Frost National Bank As Trustee Of T | Diamond Resources Inc | 8/22/1997 | 155 | 101 | 12 | E2SW | 573372 | Williams | ND |
| Frost National Bank As Trustee Of T | Diamond Resources Inc | 8/22/1997 | 155 | 101 | 12 | S2NE | 573372 | Williams | ND |
| Frost National Bank As Trustee Of T | Diamond Resources Inc | 8/22/1997 | 155 | 101 | 12 | SE/4 | 573372 | Williams | ND |
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 3 | SW/4 | 378224 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 4 | S/2 | 378224 | Roosevelt | MT |
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 9 | N/2 | 378224 | Roosevelt | MT |
| G. Leslie Curry Trust Et Al | Sundance Oil & Gas Inc | 1/14/2009 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 378224 | Roosevelt | MT |
| Garvin O. Muri, Robert C. Muri And Karen L. Erickson | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 13 | NE, N2SE | 362270 | McKenzie | ND |
| Garvin Pederson, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355569 | McKenzie | ND |
| Garvin Pederson, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355569 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 393428 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SW4 | 393428 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | 393428 | McKenzie | ND |
| Gary E Erikson; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | 393428 | McKenzie | ND |
| Gary Hamann And Sharon Hamann, Individually , And As Husband And Wife | Great Northern Energy, Inc. | 3/10/2010 | 152 | 99 | 25 | SWSW | 400421 | McKenzie | ND |
| Gary Hamann And Sharon Hamman, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400421 | McKenzie | ND |
| Gary Horst, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361884 | McKenzie | ND |
| Gary Horst, A Married Man | Great Northern Energy, Inc. | 4/17/2010 | 152 | 99 | 25 | SWSW | 402078 | McKenzie | ND |
| Gary James Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378522 | McKenzie | ND |
| Gary James Fetveit, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378522 | McKenzie | ND |
| Gary James Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 29 | E2NE4 | 378522 | McKenzie | ND |
| Gary James Fetveit; Married | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378313 | McKenzie | ND |
| Gary Mehlisch And Roxann Mehlisch, Ind And As Husband And Wife | Great Northern Energy, Inc. | 5/23/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 402727 | McKenzie | ND |
| Gary Mehlisch And Roxanne Mehlisch, Individually, And As Husband And Wife | Great Northern Energy, Inc. | 4/12/2010 | 152 | 99 | 25 | SWSW | 402727 | McKenzie | ND |
| Gary Quale And Beverly Quale, Husband And Wife | Cody Oil & Gas Corporation | 5/6/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351140 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 17 | N2NW4 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 7 | SE4 | 378792 | McKenzie | ND |
| Gayle B. Manley, F/K/A Gayle B. Jenkins, F/K/A Gayle B. Bergeron, A Married Woman | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | 378792 | McKenzie | ND |
| Gem Razorback LLC | Oasis Petroleum North America LLC | 10/16/2010 | 152 | 98 | 32 | SE4NE4 | 499178 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Gem Razorback LLC | Oasis Petroleum North America LLC | 10/16/2010 | 152 | 98 | 32 | SW4NE4 | | 499178 | McKenzie | ND |
| Gem Razorback LLC | Oasis Petroleum North America LLC | 10/16/2010 | 152 | 98 | 33 | NW4, N2SW4 | | 499178 | McKenzie | ND |
| Gene W Murphy And Beverly Jean Murphy Joint Revoacble Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NWNE, NENW | | 424469 | McKenzie | ND |
| Gene W Murphy And Beverly Jean Murphy Joint Revoacble Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NENE | | 424469 | McKenzie | ND |
| Geneva Roggenbuck | Sundance Oil & Gas Inc | 10/29/2005 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 369183 | Roosevelt | MT |
| Genevieve Lemley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | | 796483 | Williams | ND |
| Genevieve Lemley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | | 796483 | Williams | ND |
| Genevieve Lemley | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | | 796483 | Williams | ND |
| Gennet M L Martin | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | S/2NE/4 | | 389617 | Roosevelt | MT |
| Gennet M L Martin | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | LOT1, LOT2 | | 389617 | Roosevelt | MT |
| Gennet Martin | Sundance Oil & Gas Inc | 10/29/2005 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 369118 | Roosevelt | MT |
| Gennet Smith Family Min Trust | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | S/2NE/4 | | 389616 | Roosevelt | MT |
| Gennet Smith Family Min Trust | Oasis Petroleum North America LLC | 2/21/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | | 389616 | Roosevelt | MT |
| Gerald A. Olson And Marian Olson, As Trustees Under That Certain Trust Dated 05/02/1984 | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | | 362674 | McKenzie | ND |
| Gerald Gessner | Sundance Oil & Gas Inc | 11/25/2008 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 379373 | Roosevelt | MT |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 1 | SW4 | | 397577 | McKenzie | ND |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | | 397577 | McKenzie | ND |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 29 | SE4SE4 | | 397577 | McKenzie | ND |
| Gerald Henry And Kathy Henry, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/9/2010 | 152 | 98 | 32 | N2NE4 | | 397577 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S2NE4, SE4 | | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | | 378301 | McKenzie | ND |
| Gerald Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | | 378301 | McKenzie | ND |
| Gerald P. Melby And Marion Melby, Husband And Wife | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | | 379077 | McKenzie | ND |
| Gerald Peter Melby | Panther Entergy Company, LLC | 6/13/2008 | 151 | 99 | 14 | SW | | 385480 | McKenzie | ND |
| Gerald Peter Melby And Marion Melby | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | E2 | | 381552 | McKenzie | ND |
| Gerald Wade | Great Northern Energy, Inc. | 2/26/2010 | 152 | 98 | 11 | SWSW, E2SW | | 400048 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Gerald Wade, Aka Jerry Wade, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 2/26/2010 | 152 | 98 | 14 | Sec 14: N2NW4 | 400048 | McKenzie | ND |
| Geraldine A. Botner, A Single Woman | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NE4NE4, NW4 | 364269 | McKenzie | ND |
| Geraldine Ann Brown Aka Jeri A Brow | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | 395876 | McKenzie | ND |
| Gjevre Alden H Trust | Diamond Resources, Inc. | 8/7/2006 | 151 | 99 | 13 | NE4, N2SE4 | 356465 | McKenzie | ND |
| Gladys M Albers | Diamond Resources Inc | 4/14/2009 | 151 | 98 | 7 | NE,NENW | 378796 | McKenzie | ND |
| Glen Sloglund And Patricia Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 364414 | McKenzie | ND |
| Glen Sloglund And Patricia Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 364414 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 32 | NE | 364412 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | SE | 364412 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | NE | 364412 | McKenzie | ND |
| Glenda C Berg And Robert A Berg; W/ | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | N2NW | 364412 | McKenzie | ND |
| Glenda C. Berg And Robert A. Berg, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 388495 | McKenzie | ND |
| Glenda C. Berg And Robert A. Berg, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 388495 | McKenzie | ND |
| Gloria Brunner Et Vir | Oasis Petroleum North America LLC | 11/9/2005 | 27 | 59 | 4 | S/2NE/4 | 385264 | Roosevelt | MT |
| Gloria Brunner Et Vir | Oasis Petroleum North America LLC | 11/9/2005 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 385264 | Roosevelt | MT |
| Gloria Brunner, Et Vir | Oasis Petroleum North America LLC | 12/8/2011 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 392048 | Roosevelt | MT |
| Gloria Brunner, Et Vir | Oasis Petroleum North America LLC | 12/8/2011 | 27 | 59 | 4 | S/2NW/4 | 392048 | Roosevelt | MT |
| Gloria Scott Berry | Unknown Lessee | 6/16/2008 | 27 | 59 | 10 | W/2E/2, W/2 | 377614 | Roosevelt | MT |
| Gloria Scott Berry | Unknown Lessee | 6/16/2008 | 27 | 59 | 10 | NE/4SW/4 | 377614 | Roosevelt | MT |
| Gordon Horst, A Married Man | Diamond Resources, Inc. | 12/4/2009 | 152 | 99 | 25 | SWSW | 395736 | McKenzie | ND |
| Gordon Horst, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/4/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395727 | McKenzie | ND |
| Gordon J. Kay | Diamond Resources, Inc. | 11/28/2008 | 152 | 98 | 11 | SWSW, E2SW | 385417 | McKenzie | ND |
| Gordon J. Kay, A Married Man | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360060 | McKenzie | ND |
| Gracie Sharbono | Unknown Lessee | 3/28/2005 | 27 | 59 | 7 | S/2SE/4 | 367182 | Roosevelt | MT |
| Gracie Sharbono | Unknown Lessee | 3/28/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367182 | Roosevelt | MT |
| Gregory Jon Nygard, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | 355568 | McKenzie | ND |
| Gregory Jon Nygard, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355568 | McKenzie | ND |
| Gregory Jon Nygard, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 36 | S2 | 355568 | McKenzie | ND |
| Gregory Macklin | Brigham Oil & Gas Lp | 2/5/2010 | 155 | 101 | 12 | N/2NE/4 | 685758 | Williams | ND |
| Gudrun Nygard, As Trustee Of That Certain Trust Established 4-14-93 And Entitled Gudrun Nygard Declaration Of Trust | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | SW4, S2NW4, W2SE4, NE4SE4 | 355698 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Gudrun Nygard, As Trustee Of That Certain Trust Established 4-14-93 And Entitled Gudrun Nygard Declaration Of Trust | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355698 | McKenzie | ND |
| Gudrun Nygard, As Trustee Of That Certain Trust Established 4-14-93 And Entitled Gudrun Nygard Declaration Of Trust | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 36 | S2 | 355698 | McKenzie | ND |
| Gus F. Lindemann And Marian K. Lindemann, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381438 | McKenzie | ND |
| Gus F. Lindemann And Marian K. Lindemann, Husband And Wife | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381438 | McKenzie | ND |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 3/20/2011 | 27 | 59 | 4 | S/2NE/4 | 388769 | Roosevelt | MT |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 3/20/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 388769 | Roosevelt | MT |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 4/14/2011 | 27 | 59 | 4 | LOT 3(40.08),LOT 4(40.08) | 388770 | Roosevelt | MT |
| Gwendolyn D Johnson | Oasis Petroleum North America LLC | 4/14/2011 | 27 | 59 | 4 | S/2NW/4 | 388770 | Roosevelt | MT |
| Harley Shelley Aka Harley F Shelley | Diamond Resources Inc | 6/23/2009 | 152 | 98 | 14 | NE | 378494 | McKenzie | ND |
| Harley Shelley, A/K/A Harley F. Shelley, A Married Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | 378495 | McKenzie | ND |
| Harley Shelley, A/K/A Harley F. Shelley, A Married Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 32 | S2NE4 | 378495 | McKenzie | ND |
| Harley Shelley, A/K/A Harley F. Shelley, A Married Man | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | 378495 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 18 | SE/4SE/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 18 | SW/4SE/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud | Continental Resources, Inc. | 1/8/2008 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | 375007 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E2NW4, E2SE4 | 378858 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | E/2SW/4, W/2SE/4 | 378858 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 6 | LOT9,E/2SE/4,PORTION LOTS 7,8 & 10 | 378858 | McKenzie | ND |
| Harold A Rolfsrud &Marilyn Rolfsrud | Empire Oil Company | 4/25/2008 | 152 | 97 | 7 | N2NE4,SW4NE4 | 378858 | McKenzie | ND |
| Harold Alvin Rolfsrud, A/K/A Harold Rolfsrud, A Married Man | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360062 | McKenzie | ND |
| Harold Alvin Rolfsrud, A/K/A Harold Rolfsrud, A Married Man | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 32 | S2NE4 | 360062 | McKenzie | ND |
| Harold M Rolfson | Cody Oil & Gas Corporation | 4/9/2008 | 151 | 98 | 20 | SW/4 | 379417 | McKenzie | ND |
| Harold M. Rolfson, A Married Man | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351155 | McKenzie | ND |
| Harriett M Rossi; Single | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 14 | N2NW | 400050 | McKenzie | ND |
| Harriett M Rossi; Single | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 11 | E2SW,SWSW | 400050 | McKenzie | ND |
| Harry  Mazurkiewicz, A Single Man | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381433 | McKenzie | ND |
| Harry Mazurkiewicz, A Single Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381433 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Harvey And Elizabeth Thompson Revocable Living Trust | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349800 | McKenzie | ND |
| Hattie A. Haugan, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 4/26/2010 | 152 | 98 | 22 | NW/4 | 397565 | McKenzie | ND |
| Hattie A. Haugan, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | 397565 | McKenzie | ND |
| Hattie A. Haugan, A Widow, June A. Lynner, Attorney-In-Fact | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | 397565 | McKenzie | ND |
| Heath Harmon Et Ux | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 380984 | McKenzie | ND |
| Heidi H. Morris, A/K/A Heidi Morris, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To Wallace Geck And As Beneficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/9/2009 | 152 | 98 | 30 | Lot 1(33.53) | 400924 | McKenzie | ND |
| Heidi H. Morris, A/K/A Heidi Morris, A Married Woman, Individually, And As Heir To Wallace Geck And As Beneficiary Of The Adolf Geck  And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/9/2009 | 152 | 99 | 25 | SWSW | 400928 | McKenzie | ND |
| Helen Birdsall Family Mineral Trust, Bruce Birdsall, As Trustee | Great Northern Energy, Inc. | 3/5/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400044 | McKenzie | ND |
| Helen Fosshage Ringeisen | Golden Eye Resources | 12/29/2009 | 155 | 101 | 12 | W/2SW/4 | 681610 | Williams | ND |
| Helen J. Neils, A Married Woman | Diamond Resources, Inc. | 5/24/2006 | 152 | 98 | 30 | Lot 1 | 364280 | McKenzie | ND |
| Helen Marie Lovro, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399013 | McKenzie | ND |
| Helen Marie Lovro, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399013 | McKenzie | ND |
| Helen Marie Lovro; Mdssp | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 399017 | McKenzie | ND |
| Henry G Newell, Et Ux | Brigham Oil & Gas Lp | 9/24/2010 | 155 | 101 | 12 | E/2SW/4 | 698754 | Williams | ND |
| Henry G Newell, Et Ux | Brigham Oil & Gas Lp | 9/24/2010 | 155 | 101 | 12 | SE/4 | 698754 | Williams | ND |
| Henry G Newell, Et Ux | Brigham Oil & Gas Lp | 9/24/2010 | 155 | 101 | 12 | S/2NE/4 | 698754 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | LOTS 1 & 2 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SE/4 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SW/4 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SW/4NW/4 | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | LOTS 3 & 4 | 680974 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | S/2NE/4 | | 680974 | Williams | ND |
| Herbert R Cornell, Jr Et Ux Marlene | Golden Eye Resources | 12/31/2009 | 155 | 101 | 1 | SE/4NW/4 | | 680974 | Williams | ND |
| Herma C. Altshule | Diamond Resources, Inc. | 1/4/2009 | 152 | 98 | 11 | SWSW, E2SW | | 386185 | McKenzie | ND |
| Herma C. Altshule, A Married Woman | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 14 | N2NW4 | | 358179 | McKenzie | ND |
| Herman Schimtz, As Trustee Of The Helen Anderson Trust No. 2 U/A Dated February 9, 1994 | Diamond Resources, Inc. | 10/7/2005 | 152 | 98 | 33 | NW4, N2SW4 | | 359345 | McKenzie | ND |
| Herman Schimtz, As Trustee Of The Helen Anderson Trust No. 2 U/A Dated February 9, 1994 | Diamond Resources, Inc. | 10/7/2005 | 152 | 98 | 32 | S2NE4 | | 359345 | McKenzie | ND |
| Hobomodo Minerals Trust | Zenergy, Inc. | 10/1/2011 | 151 | 98 | 33 | NWNE,S2NE,SENW | | 424919 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355694 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | | 355694 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | | 355694 | McKenzie | ND |
| Holly Dewhirst And Lynn Dewhirst, Her Husband | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | | 355694 | McKenzie | ND |
| Holly Washburn, A Married Woman | Great Northern Energy, Inc. | 3/2/2010 | 152 | 99 | 25 | SWSW | | 400054 | McKenzie | ND |
| Howard J Brown And Constance A Brow | St Mary Land & Exploration Company | 11/25/2009 | 151 | 99 | 23 | SW | | 396238 | McKenzie | ND |
| Howard J Brown And Constance A Brow | St Mary Land & Exploration Company | 11/25/2009 | 151 | 99 | 26 | NE4NW4, NW4SE4, W2NE4 | | 396238 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | | 378786 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | | 378786 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 4/20/2005 | 151 | 98 | 7 | SE4 | | 378786 | McKenzie | ND |
| Howard J. Brown And Lorinda J. Sudduth, Co-Trustees Of The Howard J. Brown And Constance A. Brown Trust Dated January 12, 1993 | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | | 378786 | McKenzie | ND |
| Howard M Mullins | Oasis Petroleum North America LLC | 12/28/2011 | 155 | 101 | 12 | E/2SW/4 | | 732603 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Howard M Mullins | Oasis Petroleum North America LLC | 12/28/2011 | 155 | 101 | 12 | S/2NE/4 | 732603 | Williams | ND |
| Howard M Mullins | Oasis Petroleum North America LLC | 12/28/2011 | 155 | 101 | 12 | SE/4 | 732603 | Williams | ND |
| Ida Evans | Diamond Resources, Inc. | 1/12/2009 | 152 | 98 | 11 | SWSW, E2SW | 386429 | McKenzie | ND |
| Ida Evans, A Widow | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | 360053 | McKenzie | ND |
| Iona M. Lawlar, A Single Woman | Cody Oil & Gas Corporation | 9/21/2004 | 151 | 98 | 20 | NW/4 | 353347 | McKenzie | ND |
| Irene Henry | Missouri Basin Well Service | 12/8/2004 | 152 | 98 | 11 | NE4 | 353728 | McKenzie | ND |
| Irene Henry | Missouri Basin Well Service | 7/14/2004 | 152 | 98 | 11 | E2NW4 | 353728 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW4 | 356862 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 28 | S2SW4, NE4SW4, SE4 | 356862 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 29 | SE4SE4 | 356862 | McKenzie | ND |
| Irene Henry, A Widow | Diamond Resources, Inc. | 5/11/2005 | 152 | 98 | 32 | N2NE4 | 356862 | McKenzie | ND |
| Irene Henry; Widow | Missouri Basin Well Service, Inc. | 7/14/2004 | 152 | 98 | 11 | E2NW | 349848 | McKenzie | ND |
| Isabelle Carlson | Oasis Petroleum North America | 2/15/2019 | 152 | 98 | 14 | E/2SE/4, SW/4SE/4 | 514098 | McKenzie | ND |
| Isabelle Carlson | Oasis Petroleum North America | 2/15/2019 | 152 | 98 | 23 | NE/4NE/4 | 514098 | McKenzie | ND |
| Ivan B Rogers | Unknown Lessee | 4/13/2005 | 27 | 59 | 7 | S/2SE/4 | 367173 | Roosevelt | MT |
| Ivan B Rogers | Unknown Lessee | 4/13/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367173 | Roosevelt | MT |
| Jack Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401499 | McKenzie | ND |
| Jack Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401499 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc | 3/2/2005 | 152 | 97 | 18 | Lots 1, 2, 3, 4, S2NE4, N2SE4, NE4SW4, SE4NW4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | 355258 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jack K. Richardson And Jeanette A. Richardson, As Trustees Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc . | 3/2/2005 | 152 | 98 | 13 | E2SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | S2NW4, N2SW4, S2NE4, N2SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 1-4, S2NE4, N2SE4, NE4SW4, SE4NW4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson And Jeanette A. Richardson, As Trustees, Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | E2SE4 | 355258 | McKenzie | ND |
| Jack K. Richardson, Trustee And Jeanette A. Richardson, Individually And As Trustee Or Their Successors In Trust, Under The Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 381033 | McKenzie | ND |
| James A. Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349801 | McKenzie | ND |
| James C Christensen By Atty In Fact | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 804984 | Williams | ND |
| James C Christensen By Atty In Fact | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 804984 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| James C Christensen By Atty In Fact | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 804984 | Williams | ND |
| James C Walla; Single | St Mary Land & Exploration Company | 10/23/2009 | 151 | 99 | 23 | SW | 397874 | McKenzie | ND |
| James C Walla; Single | St Mary Land & Exploration Company | 10/23/2009 | 151 | 99 | 26 | NE4NW4, NW4SE4, W2NE4 | 397874 | McKenzie | ND |
| James D. Renbarger | Diamond Resources, Inc. | 3/4/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 355735 | McKenzie | ND |
| James D. Renbarger | Diamond Resources, Inc. | 3/5/2005 | 152 | 98 | 11 | W2NW, NWSW | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355735 | McKenzie | ND |
| James D. Renbarger And Jody M. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | 355735 | McKenzie | ND |
| James H Williams Real Estate Trust | Missouri Basin Well Service, Inc. | 7/15/2004 | 152 | 98 | 11 | E2NW | 351687 | McKenzie | ND |
| James H. Williams Real Estate Trust | Missouri Basin Well Service | 12/8/2004 | 152 | 98 | 11 | NE4 | 354487 | McKenzie | ND |
| James H. Williams Real Estate Trust | Missouri Basin Well Service | 7/15/2004 | 152 | 98 | 11 | E2NW4 | 354487 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW4 | 357187 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 29 | SE4SE4 | 357187 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/11/2005 | 152 | 98 | 32 | N2NE4 | 357187 | McKenzie | ND |
| James H. Williams, Trustee Of The James H. Williams Real Estate Trust | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 357187 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 33 | E2E2 | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378302 | McKenzie | ND |
| James Johnson, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378302 | McKenzie | ND |
| James Johnston And Elva Lou Johnston, Husband And Wife | Diamond Resources, Inc. | 12/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360981 | McKenzie | ND |
| James L Moe | Oasis Petroleum North America LLC | 1/6/2012 | 151 | 98 | 28 | N2SW4, SE4SW4, SW4SE4 | 491451 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a Tract in Lots 7, 8, 10 | 364265 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | E2W2, E2 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | E2W2, E2 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 18 | N2NE4, NE4NW4, S2SE4 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 19 | Lots 1, 2, N2NE4, E2NW4 | 364265 | McKenzie | ND |
| James L. Grantier And Rita M. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 98 | 24 | E2NE4 | 364265 | McKenzie | ND |
| James Lewis Fosshage | Golden Eye Resources | 12/29/2009 | 155 | 101 | 12 | W/2SW/4 | 680047 | Williams | ND |
| James M. Melby, A/K/A James Michael Melby | Diamond Resources, Inc. | 5/21/2008 | 151 | 98 | 19 | Lot 3 | 379085 | McKenzie | ND |
| James Michael Melby | Panther Entergy Company, LLC | 7/3/2008 | 151 | 99 | 14 | SW | 385479 | McKenzie | ND |
| James Michael Melby And Pamela Melb | Panther Entergy Company, LLC | 6/12/2008 | 151 | 99 | 14 | E2 | 381551 | McKenzie | ND |
| James R Macklin, Et Ux | Brigham Oil & Gas Lp | 2/5/2010 | 155 | 101 | 12 | N/2NE/4 | 685759 | Williams | ND |
| James Sundfor | Continental Resources Inc | 7/15/2008 | 153 | 97 | 27 | SE4SE4 | 381656 | McKenzie | ND |
| James T Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382417 | Roosevelt | MT |
| James T Romo Et Ux | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382417 | Roosevelt | MT |
| James Thomley, A Single Man | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358467 | McKenzie | ND |
| James Thomley, A Single Man | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358467 | McKenzie | ND |
| James William Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401505 | McKenzie | ND |
| James William Dyste, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401505 | McKenzie | ND |
| Jan Sell, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364014 | McKenzie | ND |
| Jan Sell, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 396679 | McKenzie | ND |
| Janet Kay Edwards Bull Fam Tr | Sundance Oil & Gas Inc | 4/6/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370848 | Roosevelt | MT |
| Janice F. Burns, A/K/A Janice Faye Burns | Diamond Resources, Inc. | 12/19/2005 | 152 | 98 | 23 | SE4 | 364655 | McKenzie | ND |
| Janice Heckel, A Married Woman | Cody Oil & Gas Corporation | 5/19/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351147 | McKenzie | ND |
| Janice K. Mcnamara, A Single Woman | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401495 | McKenzie | ND |
| Janice K. Mcnamara, A Single Woman | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401495 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355695 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 26 | S2, S2NE4 | 355695 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 36 | NW4 | 355695 | McKenzie | ND |
| Janice Kolding, A Married Woman | Diamond Resources, Inc | 2/15/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355695 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | | | | Description | | County | State |
|---|---|---|---|---|---|---|---|---|---|
| Janice Rikustad Aka Janice B Rikustad, A Widow | Great Northern Energy, Inc. | 3/22/2010 | 151 | 99 | 25 | SW4NW4,N2SW4 | 394857 | McKenzie | ND |
| Janice Rikustad, A/K/A Janice B. Rikustad, A Widow | Great Northern Energy, Inc. | 11/18/2009 | 151 | 99 | 26 | SE4NE4 | 394857 | McKenzie | ND |
| Janice Rikustad, A/K/A Janice B. Rikustad, Individually And As Attorney-In-Fact For Kenneth N. Rikustad, Her Husband | Diamond Resources, Inc. | 3/22/2006 | 151 | 99 | 26 | SE4NE4 | 362676 | McKenzie | ND |
| Jason Bruins Aka Jason E Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | 386824 | McKenzie | ND |
| Jason Bruins Aka Jason E Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | 386828 | McKenzie | ND |
| Jason E Bruins | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | 386830 | McKenzie | ND |
| Jayne E. Miller And Elizabeth M. Grantier, As Co-Trustees Of The Elizabeth I. Keogh Trust 2 | Diamond Resources, Inc. | 5/25/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 364262 | McKenzie | ND |
| Jayne E. Miller And Elizabeth M. Grantier, As Co-Trustees Of The Elizabeth I. Keogh Trust 2 | Diamond Resources, Inc. | 5/25/2006 | 152 | 97 | 18 | N2NE4, NE4NW4 | 364262 | McKenzie | ND |
| Jean B Davies; Mdssp | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | 396393 | McKenzie | ND |
| Jean Kathleen Lenzmeier | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496424 | McKenzie | ND |
| Jean L. Schroeder, A/K/A Jean Schroeder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/29/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | 399032 | McKenzie | ND |
| Jean L. Schroeder, A/K/A Jean Schroeder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/30/2010 | 152 | 98 | 24 | N2NW4 | 399032 | McKenzie | ND |
| Jeanette A. Gilbertson, Anda Jeannette Gilbertson, A Married Woman | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358460 | McKenzie | ND |
| Jeanette A. Gilbertson, Anda Jeannette Gilbertson, A Married Woman | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 24 | N2NW4 | 358460 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 1 | SW4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 28 | SE4, S2SW4, NE4SW4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 29 | SE4SE4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 32 | N2NE4 | 361245 | McKenzie | ND |
| Jeanette Gehrts | Northern Energy Corporation | 1/18/2006 | 152 | 98 | 11 | E2NW4, NE4 | 361245 | McKenzie | ND |
| Jeffrey S Harmon Et Ux | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 381469 | McKenzie | ND |
| Jeffrey Thomley, A Single Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358452 | McKenzie | ND |
| Jeffrey Thomley, A Single Man | Diamond Resources, Inc. | 8/2/2005 | 152 | 98 | 24 | N2NW4 | 358452 | McKenzie | ND |
| Jennifer Anderson, A Single Woman | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401497 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jennifer Anderson, A Single Woman | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401497 | McKenzie | ND |
| Jennifer Schantz, A Single Woman, Individually And As Heir To The Estate Of Susan Schantz, Deceased | Great Northern Energy, Inc. | 1/23/2010 | 152 | 98 | 30 | Lot 1(33.53) | 401501 | McKenzie | ND |
| Jennifer Schantz, A Single Woman, Individually, And As Heir To The Estate Of Susan Schantz | Great Northern Energy, Inc. | 2/23/2010 | 152 | 99 | 25 | SWSW | 401502 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 28 | NE4, E2NW4, NW4NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 28 | NE4, E2NW4, NW4NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W2NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W1/2NW1/4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | 355572 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2001 | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 22 | SWSW | 357175 | McKenzie | ND |
| Jerome Renbarger, Successor Trustee Of The Arnold & Borgny Renbarger Mineral Trust Dated 10-3-2002 | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355572/ 357175 | McKenzie | ND |
| Jerome Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358461 | McKenzie | ND |
| Jerome Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358461 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jim Horst | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361080 | McKenzie | ND |
| Jim Horst, A/K/A James Horst, A Married Man | Great Northern Energy, Inc. | 3/31/2010 | 152 | 99 | 25 | SWSW | 402084 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | E/2NE/4, SW/4NE/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | N/2NW/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | N/2SW/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | NW/4NE/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | SE/4 | 498673 | McKenzie | ND |
| JIP Minerals, LLC | Oasis Petroleum North America LLC | 1/15/2017 | 152 | 99 | 25 | S/2NW/4 | 498673 | McKenzie | ND |
| Jo Ann Anderson | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | NW/2SW/4, W/2NW/4 | 376940 | McKenzie | ND |
| Joan G Leiner Family Trust | St. Mary Land & Exploration Company | 5/24/2010 | 151 | 99 | 26 | NENE | 403930 | McKenzie | ND |
| Joan G Leiner Family Trust | St. Mary Land & Exploration Company | 5/24/2010 | 151 | 99 | 25 | NW4NW4 | 403930 | McKenzie | ND |
| Joan Hruby | Continental Resources, Inc. | 9/10/2010 | 152 | 98 | 30 | LOT 1 | 408660 | McKenzie | ND |
| Joan Peet Mcmullan | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | E/2SW/4 | 690278 | Williams | ND |
| Joan Peet Mcmullan | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | SE/4 | 690278 | Williams | ND |
| Joan Peet Mcmullan | Brigham Oil & Gas Lp | 4/7/2010 | 155 | 101 | 12 | S/2NE/4 | 690278 | Williams | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378303 | McKenzie | ND |
| Joani Odden, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378303 | McKenzie | ND |
| Joann Bornholdt, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364021 | McKenzie | ND |
| Joann Bornholdt, A Widow | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 399015 | McKenzie | ND |
| Joann Quale, A Single Woman | Cody Oil & Gas Corporation | 6/8/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351148 | McKenzie | ND |
| Joanne Kjelstad | Diamond Resources, Inc. | 4/29/2008 | 151 | 99 | 13 | S2SW, SWSE | 377948 | McKenzie | ND |
| Joanne Kjelstad | Diamond Resources, Inc. | 4/29/2008 | 151 | 99 | 24 | W2E2, NENE, NESW, NW | 377948 | McKenzie | ND |
| Joanne Kjelstad, A Widow | Diamond Resources, Inc. | 4/26/2009 | 152 | 98 | 33 | E2E2 | 377949 | McKenzie | ND |
| Joanne Kjelstad, A Widow | Diamond Resources, Inc. | 4/26/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 377949 | McKenzie | ND |
| Joe Gieb IIi, A Single Man | Diamond Resources, Inc. | 7/18/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 382031 | McKenzie | ND |
| Joe Robert Niesen | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 732631 | Williams | ND |
| Joe Robert Niesen | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 732631 | Williams | ND |
| Joe Robert Niesen | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 732631 | Williams | ND |
| John Anderson, A/K/A Carl John Anderson And Violet Anderson, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 7 | Lots 1, 2 | 362478 | McKenzie | ND |
| John B Easterling | 7 O'S Oil Corporation | 7/25/2005 | 27 | 59 | 7 | S/2SE/4 | 368060 | Roosevelt | MT |
| John B Easterling | 7 O'S Oil Corporation | 7/25/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368060 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| John C. Peterson And Dorothy M. Peterson, Trustees Of The Peterson Trust Dated July 15, 1988 | Diamond Resources, Inc. | 4/29/2008 | 151 | 98 | 19 | Lot 4, E2SW, W2SE | 378317 | McKenzie | ND |
| John David Peet; Mdssp | Diamond Resources Inc | 7/2/1997 | 155 | 101 | 12 | S2NE | 574623 | Williams | ND |
| John David Peet; Mdssp | Diamond Resources Inc | 7/2/1997 | 155 | 101 | 12 | E2SW | 574623 | Williams | ND |
| John David Peet; Mdssp | Diamond Resources Inc | 7/2/1997 | 155 | 101 | 12 | SE/4 | 574623 | Williams | ND |
| John E. Suckerman, A Married Man | Diamond Resources, Inc. | 11/11/2005 | 152 | 98 | 30 | Lot 1 | 360050 | McKenzie | ND |
| John E. Suckerman, A Married Man | Great Northern Energy, Inc. | 4/12/2010 | 152 | 99 | 25 | SWSW | 401485 | McKenzie | ND |
| John Edward Rossi And Virginia Ross | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 11 | E2SW,SWSW | 400049 | McKenzie | ND |
| John Edward Rossi And Virginia Ross | Great Northern Energy, Inc. | 2/23/2010 | 152 | 98 | 14 | N2NW | 400049 | McKenzie | ND |
| John H Neyer | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687484 | Williams | ND |
| John H Neyer | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687484 | Williams | ND |
| John H Neyer | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687484 | Williams | ND |
| John Horst | Oasis Petroleum North America, LLC | 2/1/2014 | 152 | 98 | 30 | LOT1 | 463788 | McKenzie | ND |
| John J. Grainier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 11/8/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 361072 | McKenzie | ND |
| John J. Grantier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | 364268 | McKenzie | ND |
| John J. Grantier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 7 | NE4, E2N W4, E2SE4 | 364268 | McKenzie | ND |
| John J. Grantier And Elaine L. Grantier, Husband And Wife | Diamond Resources, Inc. | 6/5/2006 | 152 | 97 | 18 | N2NE4, NE4NW4 | 364268 | McKenzie | ND |
| John Modisett | Continental Resources, Inc. | 9/8/2010 | 152 | 98 | 30 | LOT 1 | 408241 | McKenzie | ND |
| John Modisett, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364278 | McKenzie | ND |
| John Robert Dyste, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401496 | McKenzie | ND |
| John Robert Dyste, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401496 | McKenzie | ND |
| John S Benson | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | S/2NE/4 | 793941 | Williams | ND |
| John S Benson | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | E/2SW/4 | 793941 | Williams | ND |
| John S Benson | Oasis Petroleum North America LLC | 12/16/2011 | 155 | 101 | 12 | SE/4 | 793941 | Williams | ND |
| John Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 360054 | McKenzie | ND |
| John Thomley, A Married Man | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 360054 | McKenzie | ND |
| Johnsrud & Sons | Diamond Resources, Inc. | 4/30/2009 | 152 | 98 | 34 | S2SE4 | 388732 | McKenzie | ND |
| Jolene Christensen, A Married Woman | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351149 | McKenzie | ND |
| Jolyn F Sigvaldsen | Zenergy, Inc. | 9/1/2011 | 151 | 98 | 33 | NWNE,S2NE,SENW | 423493 | McKenzie | ND |
| Jolyn F Sigvaldsen | Zenergy, Inc. | 9/1/2011 | 151 | 98 | 32 | S2SW | 423493 | McKenzie | ND |
| Joseph C. Hild And Doris Hild, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381432 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Joseph C. Hild And Doris Hild, Husband And Wife | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 365662 | McKenzie | ND |
| Joseph C. Hild And Doris Hild, Husband And Wife | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381432 | McKenzie | ND |
| Joseph J. Geck, A/K/A Joseph Geck, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To Wallace Geck And As Beneficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 98 | 30 | Lot 1(33.53) | 397560 | McKenzie | ND |
| Joseph J. Geck, A/K/A Joseph Geck, A Married Man Individually And As Heir To Wallace Geck And As Beneficiary Of The Adolf Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 397556 | McKenzie | ND |
| Joseph L. And Caroline Waggoner | Missouri Basin Well Service | 6/26/2008 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 380393 | McKenzie | ND |
| Josephine Ehemann Trust | Brigham Oil & Gas Lp | 9/15/2010 | 155 | 101 | 12 | E/2SW/4 | 698751 | Williams | ND |
| Josephine Ehemann Trust | Brigham Oil & Gas Lp | 9/15/2010 | 155 | 101 | 12 | SE/4 | 698751 | Williams | ND |
| Josephine Ehemann Trust | Brigham Oil & Gas Lp | 9/15/2010 | 155 | 101 | 12 | S/2NE/4 | 698751 | Williams | ND |
| Joshua Lynn Shaw | Zenergy, Inc. | 3/7/2012 | 152 | 98 | 24 | N2NW | 432980 | McKenzie | ND |
| Joshua Lynn Shaw | Zenergy, Inc. | 3/7/2012 | 152 | 98 | 13 | N2SW,SWSW | 432980 | McKenzie | ND |
| Joyce A. Brown, A/K/A Joyce Anne Brown, A Widow | Great Northern Energy, Inc. | 12/15/2009 | 152 | 98 | 23 | Sec 23: SE4 | 396687 | McKenzie | ND |
| Joyce Boughton, A Widow | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401498 | McKenzie | ND |
| Joyce Boughton, A Widow | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401498 | McKenzie | ND |
| Joyce Marie Johnson | Continental Resources, Inc. | 5/4/2010 | 151 | 98 | 7 | NE/4, NE/4NW/4 | 402625 | McKenzie | ND |
| Joyce Marie Johnson, A Single Woman | Diamond Resources, Inc. | 5/4/2005 | 151 | 98 | 7 | NE4, NE4NW4 | 357182 | McKenzie | ND |
| Juanita I Neff | Brigham Oil & Gas Lp | 6/11/2010 | 155 | 101 | 12 | E/2SW/4 | 693946 | Williams | ND |
| Juanita I Neff | Brigham Oil & Gas Lp | 6/11/2010 | 155 | 101 | 12 | S/2NE/4 | 693946 | Williams | ND |
| Juanita I Neff | Brigham Oil & Gas Lp | 6/11/2010 | 155 | 101 | 12 | SE/4 | 693946 | Williams | ND |
| Judi Quale, A Single Woman | Cody Oil & Gas Corporation | 5/14/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351145 | McKenzie | ND |
| Judith Cruz Trust | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370930 | Roosevelt | MT |
| Judith L Doughty | Oasis Petroleum North America | 12/1/2010 | 152 | 98 | 13 | N/2SW/4, SW/4SW/4 | 510781 | McKenzie | ND |
| Judith L Doughty | Oasis Petroleum North America | 12/1/2010 | 152 | 98 | 24 | N/2NW/4 | 510781 | McKenzie | ND |
| Judith R Cruz | Sundance Oil & Gas Inc | 3/13/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370929 | Roosevelt | MT |
| Judith STenehjem Minerals Trust | St Mary Land & Exploration Company | 11/22/2009 | 151 | 99 | 35 | W2SW | 394946 | McKenzie | ND |
| Judy Bender; Mdssp | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 6 | LOTS 11-14,E2SW,W2SE | 397557 | McKenzie | ND |
| Judy Hagen, A Married Woman | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 357802 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Judy K. Olsen, A/K/A Judy Olsen, A Married Woman, Individually And As Bebeficiary Of The Adolph Geck And Helen Geck Family Trust | Great Northern Energy, Inc. | 12/8/2009 | 152 | 99 | 25 | SWSW | 395735 | McKenzie | ND |
| Judy Miller, A Single Woman | Diamond Resources, Inc. | 12/28/2005 | 152 | 98 | 30 | Lot 1 | 360812 | McKenzie | ND |
| Judy Miller, A/K/A Judith A. Miller, A Single Woman | Great Northern Energy, Inc. | 2/9/2010 | 152 | 99 | 25 | SWSW | 397575 | McKenzie | ND |
| Judy Olson, F/K/A Judy Geck A Married Woman | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 (Protective) | 361880 | McKenzie | ND |
| Judy Robinet | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 14 | E2SE,SWSE | 443438 | McKenzie | ND |
| Judy Robinet | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 23 | NENE | 443438 | McKenzie | ND |
| Julia Mae Belcher | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382195 | Roosevelt | MT |
| Julia Mae Belcher | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382195 | Roosevelt | MT |
| Julia P. Kipp, F/K/A Julia P. Rikustad And Wallace M. Kipp, Individually, And Husband And Wife | Great Northern Energy, Inc. | 3/2/2010 | 151 | 99 | 25 | SW4NW4,N2SW4 | 397574 | McKenzie | ND |
| Julia P. Kipp, F/K/A Julia P. Rikustad And Wallace M. Kipp, Wife And Husband | Great Northern Energy, Inc. | 11/18/2009 | 151 | 99 | 26 | SE4NE4 | 397574 | McKenzie | ND |
| Julia P. Kipp, F/K/A Julia P. Rikustad, And Wallace M. Kipp, Her Husband | Diamond Resources, Inc. | 3/22/2006 | 151 | 99 | 26 | SE4NE4 | 362672 | McKenzie | ND |
| Julie A. Beaman, A/K/A Julie Beaman, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358464 | McKenzie | ND |
| Julie A. Beaman, A/K/A Julie Beaman, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358464 | McKenzie | ND |
| Julie Brandon, F/K/A Julie Misemer, A Single Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364028 | McKenzie | ND |
| Julie Brandon, F/K/A Julie Misemer, A Single Woman | Great Northern Energy, Inc. | 12/31/2009 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364028 | McKenzie | ND |
| Julie Dolney And Gyle Dolney; H/W | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | 394939 | McKenzie | ND |
| Julie Gray | Empire Oil Company | 3/6/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372764 | McKenzie | ND |
| Julie Gray, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | 400419 | McKenzie | ND |
| Julie Gray, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400419 | McKenzie | ND |
| Julie S Mueller | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | E/2SW/4 | 700137 | Williams | ND |
| Julie S Mueller | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | SE/4 | 700137 | Williams | ND |
| Julie S Mueller | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | S/2NE/4 | 700137 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Juliet Brown, A/K/A Juliet L. Brown, A Single Woman, Individually And As Beneficiary To The Leone E. Brown June 10, 1992 Trust | Great Northern Energy, Inc. | 12/1/2009 | 152 | 98 | 30 | NE4, SE4SE4 | | 396694 | McKenzie | ND |
| June A. Lynner, A Widow | Great Northern Energy, Inc. | 4/26/2010 | 152 | 98 | 22 | NW/4 | | 397559 | McKenzie | ND |
| June A. Lynner, A Widow | Great Northern Energy, Inc. | 1/20/2010 | 152 | 98 | 14 | Sec 14: NE4 | | 397559 | McKenzie | ND |
| June A. Lynner, A Widow | Great Northern Energy, Inc. | 1/21/2010 | 152 | 98 | 23 | Sec 23: NW4NE4, S2NE4 | | 397559 | McKenzie | ND |
| June Anderson Mineral Trust, Beverly A. Marthaller, Trustee | Great Northern Energy, Inc. | 3/23/2010 | 152 | 98 | 33 | NW4, N2SW4 | | 400420 | McKenzie | ND |
| June Anderson Mineral Trust, Beverly A. Marthaller, Trustee | Great Northern Energy, Inc. | 3/23/2010 | 152 | 98 | 32 | S2NE4 | | 400420 | McKenzie | ND |
| Justin Johnson, A Married Man | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | | 355194 | McKenzie | ND |
| Justin Johnson, A Married Man | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | | 355194 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | | 378316 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | | 378316 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | | 378316 | McKenzie | ND |
| Justin Johnson, A Single Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | | 378316 | McKenzie | ND |
| Karen Caturay, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | | 364027 | McKenzie | ND |
| Karen J Kirmis Trust Udt 7/23/96 | Empire Oil Company | 3/30/2011 | 151 | 98 | 32 | S/2SW/4 | | 411708 | McKenzie | ND |
| Karen J. Kirmis, A Married Woman | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 33 | NW4, N2SW4 | | 360068 | McKenzie | ND |
| Karen J. Kirmis, A Married Woman | Diamond Resources, Inc. | 11/10/2005 | 152 | 98 | 32 | S2NE4 | | 360068 | McKenzie | ND |
| Karen L. Snyder, Vida Karen White, F/K/A Karen L. White, A Single Woman | Diamond Resources, Inc. | 5/8/2006 | 152 | 98 | 34 | E2W2 | | 363738 | McKenzie | ND |
| Karen L. Tillemans, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | | 401507 | McKenzie | ND |
| Karen L. Tillemans, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | | 401507 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | | 355195 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 17 | N2NE4 | | 355195 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | | 355195 | McKenzie | ND |
| Karen White | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | | 355195 | McKenzie | ND |
| Karen White, A Single Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | | 356866 | McKenzie | ND |
| Karen White, A Single Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | | 356866 | McKenzie | ND |
| Karen White, A Single Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | W2SW4 | | 356866 | McKenzie | ND |
| Karen White, A/K/A Karen L. Snyder, A Married Woman | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | W1/2SW1/4 | | 377202 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 400416 | McKenzie | ND |
| Karen White, A/K/A Karen Snyder, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 400416 | McKenzie | ND |
| Katherine Lynn Knight, A/K/A Katherine Kay Knight, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | 400051 | McKenzie | ND |
| Katherine Lynn Knight, A/K/A Katherine Kay Knight, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/26/2010 | 152 | 98 | 24 | N2NW4 | 400051 | McKenzie | ND |
| Kathleen Anderson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360261 | McKenzie | ND |
| Kathleen Anderson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360261 | McKenzie | ND |
| Kathleen Ann Rowe, A/K/A Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355693 | McKenzie | ND |
| Kathleen Ann Rowe, A/K/A Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 26 | S2, S2NE4 | 355693 | McKenzie | ND |
| Kathleen Ann Rowe, A/K/A Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 36 | NW4 | 355693 | McKenzie | ND |
| Kathleen Ann Rowe, Aka Kathleen A. Berge Rowe, A Married Woman | Diamond Resources, Inc | 2/15/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355693 | McKenzie | ND |
| Kathleen M. Ward, A Married Woamn | Great Northern Energy, Inc. | 2/2/2010 | 152 | 99 | 25 | SWSW | 399007 | McKenzie | ND |
| Kathleen M. Ward, A/K/A Kathleen Mae Ward, A Married Woman | Diamond Resources, Inc. | 7/14/2009 | 152 | 98 | 30 | Lot 1 | 381027 | McKenzie | ND |
| Kathleen Tschetter | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 20 | SW | 378308 | McKenzie | ND |
| Kathleen Tschetter, A Married Woman | Cody Oil & Gas Corporation | 7/8/2004 | 151 | 98 | 20 | SW/4 | 351162 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Kathleen Tschetter, A Married Woman | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 20 | SW4 | | 351162 | McKenzie | ND |
| Kathryn A. Pearson, A Single Woman | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | | 401489 | McKenzie | ND |
| Kathryn A. Pearson, A Single Woman | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | | 401489 | McKenzie | ND |
| Kathy Adamic, A Married Woman | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | | 378510 | McKenzie | ND |
| Kathy Dorgan, A Married Woman | Diamond Resources, Inc. | 2/24/2006 | 152 | 98 | 30 | Lot 1 | | 362271 | McKenzie | ND |
| Kathy Dorgan, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | Lot 1(33.53) | | 396680 | McKenzie | ND |
| Kathy Dorgan, A Married Woman, Individually, And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | SWSW | | 396696 | McKenzie | ND |
| Kathy Dorgan; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | N2NW | | 396689 | McKenzie | ND |
| Kathy Dorgan; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | NWNE | | 396689 | McKenzie | ND |
| Kay Foster And William Foster | Diamond Resources, Inc. | 4/15/2008 | 152 | 99 | 25 | SWSW | | 377715 | McKenzie | ND |
| Kay Foster And William Foster, Her Husband | Diamond Resources, Inc. | 4/15/2008 | 152 | 98 | 30 | Lot 1 | | 377715 | McKenzie | ND |
| Kay Kauffman Gilbert | Diamond Resources, Inc. | 8/7/2009 | 152 | 98 | 11 | SWSW, E2SW | | 391274 | McKenzie | ND |
| Kay Kauffman Gilbert, A Married Woman | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | | 360058 | McKenzie | ND |
| Keith Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 32 | S2NE4 | | 438234 | McKenzie | ND |
| Keith Anderson | Diamond Resources, Inc | 9/1/2010 | 152 | 98 | 33 | NW, N2SW | | 438234 | McKenzie | ND |
| Ken Altschuld, A Married Man | Diamond Resources, Inc | 10/26/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4, SE4 | | 360264 | McKenzie | ND |
| Ken Altschuld, A Married Man | Diamond Resources, Inc | 10/26/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | | 360264 | McKenzie | ND |
| Kenneth D Neyer Living Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | | 687486 | Williams | ND |
| Kenneth D Neyer Living Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | | 687486 | Williams | ND |
| Kenneth D Neyer Living Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | | 687486 | Williams | ND |
| Kenneth D Romo Et Ux Marie | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382276 | Roosevelt | MT |
| Kenneth D Romo Et Ux Marie | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382276 | Roosevelt | MT |
| Kenneth J Haugen Marital Trust | Empire Oil Company | 3/30/2011 | 151 | 98 | 32 | S/2SW/4 | | 412013 | McKenzie | ND |
| Kenneth K. Kauffman | Diamond Resources, Inc. | 12/17/2008 | 152 | 98 | 11 | SWSW, E2SW | | 385873 | McKenzie | ND |
| Kenneth K. Kauffman, A Married Man | Diamond Resources, Inc. | 11/1/2005 | 152 | 98 | 14 | N2NW4 | | 360055 | McKenzie | ND |
| Kenneth Merril Johnson And Lois Johnson, Husband And Wife | Diamond Resources, Inc. | 5/4/2005 | 151 | 98 | 7 | NE4, NE4NW4 | | 358057 | McKenzie | ND |
| Kenneth Merril Johnson Et Ux | Continental Resources, Inc. | 5/4/2010 | 151 | 98 | 7 | NE/4, NE/4NW/4 | | 401076 | McKenzie | ND |
| Kenneth R Berry Jr Et Ux | Unknown Lessee | 6/27/2005 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | | 379466 | Roosevelt | MT |
| Kenneth R Berry, Jr, Et Ux | Oasis Petroleum North America LLC | 9/15/2011 | 27 | 59 | 4 | S/2 | | 391458 | Roosevelt | MT |
| Kenneth R Berry, Jr, Et Ux | Oasis Petroleum North America LLC | 9/15/2011 | 27 | 59 | 9 | N/2 | | 391458 | Roosevelt | MT |
| Kenneth R. Berry And Leslie A. Berry, Husband And Wife | Diamond Resources, Inc. | 7/27/2005 | 27 | 59 | 5 | Lot 1 (40.07), 2 (40.07), 3 (40.05), 4 (40.05), S2NE, SENW, E2SW, SWSW, SE | | 367896 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Kenneth R. Berry And Leslie A. Berry, Husband And Wife | Estancia Petroleum Corporation | 6/27/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367896 | Roosevelt | MT |
| Kenneth R. Berry, Jr. And Leslie A. Berry, Husband And Wife | Petro-Hunt, LLC | 10/2/2007 | 27 | 59 | 3 | SW4 | 375417 | Roosevelt | MT |
| Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 97 | 19 | NE4SW4 | 358434 | McKenzie | ND |
| Kenneth Roesner, A Single Man | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 13 | IT 19 (A 1.00 acre tract) | 358434 | McKenzie | ND |
| Kenneth Roesner, A Single Man, And Donald Roesner, A Single Man | Diamond Resources, Inc. | 7/7/2005 | 152 | 98 | 13 | NE4 | 358428 | McKenzie | ND |
| Kenneth Stevenson And Rosalie Stevenson, Husband Ad Wife | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381436 | McKenzie | ND |
| Kenneth Stevenson And Rosalie Stevenson, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381436 | McKenzie | ND |
| Kenneth Vick | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349803 | McKenzie | ND |
| Kenneth W. Miles, | Diamond Resources, Inc. | 3/22/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378794 | McKenzie | ND |
| Kenneth Wittinger, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/3/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395730 | McKenzie | ND |
| Kenneth Wittingrer, A Married Man | Great Northern Energy, Inc. | 12/3/2009 | 152 | 99 | 25 | SWSW | 395739 | McKenzie | ND |
| Kent Johnsrud, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 5 | S2NE4, SE4NW4, NE4SE4 | 400914 | McKenzie | ND |
| Kevin Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360260 | McKenzie | ND |
| Kevin Thorud, A Married Man | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360260 | McKenzie | ND |
| Kevin Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6 | 355720 | McKenzie | ND |
| Kevin Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355720 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 33 | E2E2 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378311 | McKenzie | ND |
| Kimberly Hilton, A Married Woman | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 31 | Lots 1, 2,, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378311 | McKenzie | ND |
| Kirk Wold, A Single Man | Diamond Resources, Inc. | 5/13/2008 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 9, E2SE4, and a tract in lots 7, 8, 10 less 38.00 ACRES more fully described in book 11, page 221 | 378785 | McKenzie | ND |
| Kirk Wold, A Single Man | Diamond Resources, Inc. | 5/13/2008 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, SE4 | 378785 | McKenzie | ND |
| Knudtson Family Trust Dated 11/2/89 | Great Northern Energy, Inc | 4/26/2010 | 151 | 98 | 24 | S2NE,SENW,E2SW,SE | 400038 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4, SW4NE4, W2SE4, NE4SW4 | 395055 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 395055 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | 395055 | McKenzie | ND |
| Kori Erikson; Widow | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | 395055 | McKenzie | ND |
| Kraig Falcon | Oasis Petroleum North America | 10/1/2018 | 152 | 98 | 30 | LOT 1 | 511321 | McKenzie | ND |
| Kraig Falcon | Oasis Petroleum North America | 10/1/2018 | 152 | 98 | 30 | LOT4 | 511321 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Kraig Falcon | Oasis Petroleum North America | 10/1/2018 | 152 | 98 | 30 | SE/4SW/4 | 511321 | McKenzie | ND |
| Kris B Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | E/2SW/4 | 656999 | Williams | ND |
| Kris B Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | SE/4 | 656999 | Williams | ND |
| Kris B Tufto | Diamond Resources | 6/25/2008 | 155 | 101 | 12 | S/2NE/4 | 656999 | Williams | ND |
| Kris Wold | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355721 | McKenzie | ND |
| Kris Wold, A Married Man | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355721 | McKenzie | ND |
| Ladd G Bjorneby; Single | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378504 | McKenzie | ND |
| Ladd G. Bjorneby, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378505 | McKenzie | ND |
| Ladd G. Bjorneby, A Single Man | Diamond Resources, Inc. | 4/29/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378505 | McKenzie | ND |
| Ladd G. Bjorneby, A Single Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | 378505 | McKenzie | ND |
| Lance Bruins | Panther Entergy Company, LLC | 7/15/2008 | 151 | 99 | 14 | SW | 385636 | McKenzie | ND |
| Larry D Armstrong | Brigham Oil & Gas, Lp | 7/28/2010 | 151 | 99 | 14 | S2NW | 406941 | McKenzie | ND |
| Larry Gunderson, A Married Man | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378513 | McKenzie | ND |
| Larry H. Nelson And Myrna L. Nelson, Husband And Wife | Cody Oil & Gas Corporation | 7/27/2004 | 151 | 98 | 20 | NE/4 | 351164 | McKenzie | ND |
| Larry J Lindland Aka Larry Jack Lin | Great Northern Energy, Inc. | 12/15/2009 | 152 | 98 | 23 | SE | 397563 | McKenzie | ND |
| Larry James Johnson | Continental Resources, Inc. | 5/4/2010 | 151 | 98 | 7 | NE/4, NE/4NW/4 | 401072 | McKenzie | ND |
| Larry James Johnson, A Single Man | Diamond Resources, Inc. | 5/4/2005 | 151 | 98 | 7 | NE4, NE4NW4 | 356863 | McKenzie | ND |
| Larry L Mellum | Lonetree Energy & Associates LLC | 5/11/2010 | 27 | 59 | 4 | S/2 | 382776 | Roosevelt | MT |
| Larry L Mellum | Lonetree Energy & Associates LLC | 5/11/2010 | 27 | 59 | 9 | N/2 | 382776 | Roosevelt | MT |
| Larry L Mellum | Lonetree Energy & Associates LLC | 5/11/2010 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 382776 | Roosevelt | MT |
| Larry Lundeen, A Single Man | Diamond Resources, Inc. | 3/24/2005 | 152 | 98 | 26 | N2NE4, NW4 | 355739 | McKenzie | ND |
| Larry W. Colgrove, A Married Man | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 397567 | McKenzie | ND |
| Larry W. Colgrove, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 397566 | McKenzie | ND |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SE/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SE/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SW/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | SW/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | NE/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | NE/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2SE/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | N/2SE/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Sundance | 5/2/2005 | 27 | 59 | 7 | NW/4SW/4 | 367827 | Roosevelt | MT |
| Larsen Farms | Zenergy, Inc. | 5/2/2005 | 27 | 59 | 8 | NW/4NW/4 | 382271 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc. | 3/13/2006 | 152 | 98 | 24 | N2NW4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Her Husband | Diamond Resources, Inc . | 3/2/2005 | 152 | 98 | 13 | E2SE4 | | 356167 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SW4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | | 397193 | McKenzie | ND |
| Laura West And Denny West, Individually And As Wife And Husband | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | | 397196 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 18 | LOTS 1,2,3,4,S2NE,N2SE,NESW,SENW | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NW,N2SW | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NE,N2SE | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 7 | LOTS 3,4 | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 13 | E2SE | | 355182 | McKenzie | ND |
| Laura West And Denny West; W/H | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 12 | SE | | 355182 | McKenzie | ND |
| Laura West Et Vir | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | | 410675 | McKenzie | ND |
| Laura West Et Vir | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | | 410669 | McKenzie | ND |
| Laura West Et Vir | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | | 410669 | McKenzie | ND |
| Laurel J Erikson-Schillie; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | | 393626 | McKenzie | ND |
| Laurel J Erikson-Schillie; Mdssp | St Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | | 393626 | McKenzie | ND |
| Laurence D. Melby, A/K/A Lawrence Dale Melby | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | | 379076 | McKenzie | ND |
| Laurence Dale Melby And Lucy M Melb | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | E2 | | 385478 | McKenzie | ND |
| Laurence Dale Melby And Lucy M Melb | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | SW/4 | | 385478 | McKenzie | ND |
| Laurentz A Rolfson | Cody Oil & Gas Corporation | 4/9/2008 | 151 | 98 | 20 | SW/4 | | 379416 | McKenzie | ND |
| Laurentz A. Rolfson, A Married Man | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | | 351153 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Laurie Deutsch, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | | 358841 | McKenzie | ND |
| Laurie Deutsch, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358841 | McKenzie | ND |
| Lawlar Camilla Estate | St. Mary Land & Exploration Company | 12/10/2009 | 151 | 98 | 19 | LOT 4, E2SW4, W2SE4 | | 396106 | McKenzie | ND |
| Lawlar Camilla Estate | St. Mary Land & Exploration Company | 12/10/2009 | 151 | 99 | 25 | E2NW4, NW4NE4 | | 396106 | McKenzie | ND |
| Lawlar Iona M Trust | St. Mary Land & Exploration Company | 11/1/2009 | 151 | 99 | 14 | N/2NW/4 | | 394943 | McKenzie | ND |
| Lawlar Iona M Trust | St. Mary Land & Exploration Company | 11/1/2009 | 151 | 99 | 14 | S/2NW/4 | | 394943 | McKenzie | ND |
| Lawrence A Bahn Et Ux Dena | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 368120 | Roosevelt | MT |
| Lawrence A Bahn Et Ux Dena | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 368120 | Roosevelt | MT |
| Lawrence H Derby Jr And Marilyn Der | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | E2SW | | 569939 | Williams | ND |
| Lawrence H Derby Jr And Marilyn Der | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | S2NE | | 569939 | Williams | ND |
| Lawrence H Derby Jr And Marilyn Der | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | SE/4 | | 569939 | Williams | ND |
| Lawrence Romo | Oasis Petroleum N America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382071 | Roosevelt | MT |
| Lawrence Romo | Oasis Petroleum N America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382071 | Roosevelt | MT |
| Lawrence Romo | Oasis Petroleum N America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | | 382071 | Roosevelt | MT |
| Leigh Franklin Nygard, A/K/A Leigh Nygard | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | SW4, S2NW4, W2SE4, NE4SE4 | | 355697 | McKenzie | ND |
| Leigh Franklin Nygard, A/K/A Leigh Nygard | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | | 355697 | McKenzie | ND |
| Leigh Franklin Nygard, A/K/A Leigh Nygard | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 36 | S2 | | 355697 | McKenzie | ND |
| Lela Ormond, A Widow | Diamond Resources Inc | 4/14/1997 | 155 | 101 | 12 | S2NE | | 573013 | Williams | ND |
| Lela Ormond, A Widow | Diamond Resources Inc | 4/14/1997 | 155 | 101 | 12 | E2SW | | 573013 | Williams | ND |
| Lela Ormond, A Widow | Diamond Resources Inc | 4/14/1997 | 155 | 101 | 12 | SE/4 | | 573013 | Williams | ND |
| Leland Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382072 | Roosevelt | MT |
| Leland Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382072 | Roosevelt | MT |
| Leland Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 9 | S/2 | | 382072 | Roosevelt | MT |
| Leon H Shelley; Single | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE | | 378499 | McKenzie | ND |
| Leon H. Shelley, A Single Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | | 378498 | McKenzie | ND |
| Leon H. Shelley, A Single Man | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 32 | S2NE4 | | 378498 | McKenzie | ND |
| Leon H. Shelley, A Single Man | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | | 378498 | McKenzie | ND |
| Leon Shelley | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 14 | NE4 | | 357791 | McKenzie | ND |
| Leon Shelley, A Single Man | Diamond Resources, Inc. | 5/5/2005 | 152 | 98 | 32 | S2NE4 | | 356875 | McKenzie | ND |
| Leroy T Pang Et Ux | Oasis Petroleum N America LLC | 2/22/2011 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 385899 | Roosevelt | MT |
| Leslie A. Knudson And Greg Knudson, Her Husband | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NE4NE4, NW4 | | 364421 | McKenzie | ND |
| Leslie Maye, A Married Man | Diamond Resources, Inc. | 5/21/2008 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | | 378797 | McKenzie | ND |
| Lillian W Kaiser | Continental Resources, Inc. | 8/17/2010 | 152 | 98 | 30 | LOT 1 | | 406999 | McKenzie | ND |
| Linda And Richard Salley; H/W | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | E2 | | 385481 | McKenzie | ND |
| Linda Berquist And Ray A. Berquist, Her Husband | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 33 | E2SE4, E2NE4 | | 355253 | McKenzie | ND |
| Linda Berquist And Ray A. Berquist, Her Husband | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 33 | E2SE4, E2NE4 | | 355253 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Linda Berquist And Ray A. Berquist, Her Husband | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 355253 | McKenzie | ND |
| Linda Buffington | Unknown Lessee | 4/18/2005 | 27 | 59 | 7 | S/2SE/4 | 367167 | Roosevelt | MT |
| Linda Buffington | Unknown Lessee | 4/18/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367167 | Roosevelt | MT |
| Linda F. Peterman, A Single Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 396701 | McKenzie | ND |
| Linda F. Peterman, A Single Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396684 | McKenzie | ND |
| Linda Hanson, A Married Woman | Cody Oil & Gas Corporation | 5/6/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 351139 | McKenzie | ND |
| Linda Haralson | Zenergy, Inc. | 12/1/2010 | 152 | 98 | 13 | N2SW,SWSW | 412869 | McKenzie | ND |
| Linda Haralson | Zenergy, Inc. | 12/1/2010 | 152 | 98 | 24 | N2NW | 412869 | McKenzie | ND |
| Linda Haralson, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358726 | McKenzie | ND |
| Linda Haralson, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358726 | McKenzie | ND |
| Linda Jean Andrews Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382266 | Roosevelt | MT |
| Linda Jean Andrews Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382266 | Roosevelt | MT |
| Linda Kozak And Rodney A. Kozak, Her Huband | Diamond Resources, Inc | 3/22/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355567 | McKenzie | ND |
| Linda Kozak And Rodney A. Kozak, Her Husband | Diamond Resources, Inc. | 3/22/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355567 | McKenzie | ND |
| Linda Kozak And Rodney A. Kozak, Her Husband | Diamond Resources, Inc. | 3/22/2005 | 152 | 98 | 26 | S2, S2NE4 | 355567 | McKenzie | ND |
| Linda Kozak And Rodney A. Kozak, Her Husband | Diamond Resources, Inc. | 3/22/2005 | 152 | 98 | 36 | NW4 | 355567 | McKenzie | ND |
| Linda Lee Hudson, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 396673 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 1 | SW4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 28 | S2SW4, NE4SW4, SE4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 29 | SE4SE4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Diamond Resources, Inc. | 6/24/2005 | 152 | 98 | 32 | N2NE4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Missouri Basin Well Service | 12/10/2004 | 152 | 98 | 11 | NE4, E2NW4 | 357792 | McKenzie | ND |
| Linda Lee Johnson | Missouri Basin Well Service, Inc. | 12/10/2004 | 152 | 98 | 11 | NE | 354486 | McKenzie | ND |
| Linda Lee Johnson | Missouri Basin Well Service, Inc. | 12/10/2004 | 152 | 98 | 11 | E2NW | 354486 | McKenzie | ND |
| Linda Salley, A Married Woman | Diamond Resources, Inc. | 5/22/2008 | 151 | 98 | 19 | Lot 3 | 379079 | McKenzie | ND |
| Linda Stack, Co-Trustee And Attorney-In-Fact For V. Mae Shelley, Co-Trustee Of The Edith B. Shelley Revocable Living Trust | Diamond Resources, Inc. | 12/19/2005 | 152 | 98 | 23 | SE4 | 360975 | McKenzie | ND |
| Linell R. Patchin, A Widow | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 396700 | McKenzie | ND |
| Linell R. Patchin, A Widow | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396683 | McKenzie | ND |
| Liola Kallus, A Widow | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | v | 365658 | McKenzie | ND |
| Lois I Rutz Life Estate | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | 381546 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lona M. Lawlar, A Widow | Diamond Resources, Inc. | 3/14/2005 | 151 | 98 | 17 | S2NW4, SW4 | 356146 | McKenzie | ND |
| Loren Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358439 | McKenzie | ND |
| Loren Thomley, A Married Man | Diamond Resources, Inc. | 8/2/2005 | 152 | 98 | 24 | N2NW4 | 358439 | McKenzie | ND |
| Lorin B. Simonson | Diamond Resources, Inc. | 2/21/2005 | 152 | 98 | 13 | NW4 | 355186 | McKenzie | ND |
| Lorinda J. Sudduth, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 8 | W2 | 355727 | McKenzie | ND |
| Lorinda J. Sudduth, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | N2NW4 | 355727 | McKenzie | ND |
| Lorinda J. Sudduth, A Married Woman | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 7 | SE4 | 355727 | McKenzie | ND |
| Lorraine Melby Life Estate | Panther Entergy Company, LLC | 6/12/2008 | 151 | 99 | 14 | SW | 385485 | McKenzie | ND |
| Lorraine Melby Life Estate | Panther Entergy Company, LLC | 6/12/2008 | 151 | 99 | 14 | E2 | 385485 | McKenzie | ND |
| Lorraine Melby, A Widow | Diamond Resources, Inc. | 5/1/2008 | 151 | 98 | 19 | Lot 3 | 378798 | McKenzie | ND |
| Louise A. Haugen | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360065 | McKenzie | ND |
| Louise A. Haugen | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 32 | S2NE4 | 360065 | McKenzie | ND |
| Louise Annette Austin, A Single Woman, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399004 | McKenzie | ND |
| Louise Annette Austin, A Single Woman, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399004 | McKenzie | ND |
| Louise Annette Austin; Single | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 399030 | McKenzie | ND |
| Lovro Helen Marie | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | 379760 | McKenzie | ND |
| Lovro Helen Marie | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | 379760 | McKenzie | ND |
| Lucy Cave And Jerry Cave, Her Husband | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378512 | McKenzie | ND |
| Luella M Boss | Continental Resources, Inc. | 3/2/2010 | 152 | 98 | 30 | SE/4SW/4 | 401318 | McKenzie | ND |
| Luella M Boss | Continental Resources, Inc. | 3/2/2010 | 152 | 98 | 30 | LOT4 | 401318 | McKenzie | ND |
| Luella M. Boss, A Widow | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 30 | Lot 1 | 381984 | McKenzie | ND |
| Luella M. Boss, A Widow | Diamond Resources, Inc. | 7/1/2006 | 152 | 99 | 25 | NWNE, N2NW | 364919 | McKenzie | ND |
| Luverne A Tufto | Empire Oil Company | 2/11/1997 | 155 | 101 | 12 | E2SW | 569942 | Williams | ND |
| Luverne A Tufto | Empire Oil Company | 2/11/1997 | 155 | 101 | 12 | S2NE | 569942 | Williams | ND |
| Luverne A Tufto | Empire Oil Company | 2/11/1997 | 155 | 101 | 12 | SE/4 | 569942 | Williams | ND |
| Lyla A Ableidinger Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382192 | Roosevelt | MT |
| Lyla A Ableidinger Et Vir | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382192 | Roosevelt | MT |
| Lyle E. Larson & Melba L. Larson, Trustees Of The Larson Family Nominee Trust U/D Dated 2-9-99 | Diamond Resources, Inc. | 2/9/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355722 | McKenzie | ND |
| Lyle E. Larson & Melba L. Larson, Trustees Of The Larson Family Nominee Trust U/D Dated 2-9-99 | Diamond Resources, Inc. | 2/9/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6 | 355722 | McKenzie | ND |
| Lyle Flatland | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 380227 | McKenzie | ND |
| Lyle Flatland | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | NW/2SW/4, W/2NW/4 | 380227 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lynden E. Johnson | Diamond Resources, Inc. | 8/15/2004 | 152 | 98 | 2 | SE | 382033 | McKenzie | ND |
| Lynden E. Johnson And Kathleen M. Johnson, Trustees Of The Johnson Farm Revocable Trust Created U/A January 28, 2010 | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 2 | SE | 379083 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 97 | 19 | NE4SW4 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2005 | 152 | 98 | 12 | SW4 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 13 | NE4, N2SW4, SW4SW4, Irregular tract 19 in the NE4NW4, A 1.00 acre tract mfd in book 7, page 256 | 355574 | McKenzie | ND |
| Lynden E. Johnson, A Married Man | Diamond Resources, Inc. | 3/12/2009 | 152 | 98 | 24 | N2NW4 | 355574 | McKenzie | ND |
| Lynn And Linda Wold | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 2 | SW4 | 349576 | McKenzie | ND |
| Lynn And Linda Wold | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, N2SE4 | 349576 | McKenzie | ND |
| Lynn And Linda Wold | Missouri Basin Well Service | 5/2/2004 | 153 | 97 | 28 | NE4 | 349576 | McKenzie | ND |
| Lynn Haugen, A Married Woman | Diamond Resources, Inc. | 11/3/2008 | 152 | 98 | 33 | NW4,N2SW4 | 385866 | McKenzie | ND |
| Lynn Haugen, A Married Woman | Diamond Resources , Inc | 11/3/2008 | 152 | 98 | 32 | S2NE4 | 385866 | McKenzie | ND |
| Lynn Wold And Linda Wold; H/W | Missouri Basin Well Service, Inc. | 5/2/2004 | 152 | 98 | 2 | SW | 349756 | McKenzie | ND |
| Lynn Wold And Linda Wold; H/W | Missouri Basin Well Service, Inc. | 5/2/2004 | 152 | 98 | 3 | N2SE | 349756 | McKenzie | ND |
| Lynn Wold Trust | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, N2S2 | 349753 | McKenzie | ND |
| Lynne S Edwards Fam Trust | Oasis Petroleum North America LLC | 4/6/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370847 | Roosevelt | MT |
| Lynne W Phillips Trust | Sundance Oil & Gas Inc | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370955 | Roosevelt | MT |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 13 | SE4SW4, W2SE4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 24 | S2, W2NE4, S2NW4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | 152N-098W-25 NE4NE4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | NW4NE4 | 348964 | McKenzie | ND |
| Madeline G Miller | Bill L Seerup | 4/26/2004 | 152 | 98 | 27 | SE4, E2NE4 | 348964 | McKenzie | ND |
| Madeline G Miller, Fka Madeline G A | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | NW4NE4 | 348964 | McKenzie | ND |
| Madeline G Miller, Fka Madeline G A | Bill L Seerup | 4/26/2004 | 152 | 98 | 25 | NE4NE4 | 348964 | McKenzie | ND |
| Manley Gayle | St. Mary Land & Exploration Company | 10/24/2009 | 151 | 99 | 26 | NESW,W2NW,SENW | 395069 | McKenzie | ND |
| Marc Larson, A Married Man | Diamond Resources, Inc. | 2/4/2009 | 152 | 98 | 27 | SW4 | 378506 | McKenzie | ND |
| Marc Larson, A Married Man | Diamond Resources, Inc. | 2/5/2009 | 152 | 98 | 34 | W2NW4 | 378506 | McKenzie | ND |
| Marc Richard Lattin | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496425 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 388494 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson, Her Husband | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 388494 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | N2NW | 364411 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | NE | 364411 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 29 | SE | 364411 | McKenzie | ND |
| Marcella Nelson And Kenneth Nelson; | Diamond Resources Inc | 6/14/2006 | 151 | 98 | 32 | NE | 364411 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Marcia Safely | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382075 | Roosevelt | MT |
| Marcia Safely | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382075 | Roosevelt | MT |
| Margaret A. Muri,A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 13 | NE, N2SE | 362270 | McKenzie | ND |
| Margaret Ann Bohannan, A/K/A Margaret Ann Gililland Bohannan, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 402716 | McKenzie | ND |
| Margaret Anne Sitte, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | S2NW4, SW4, W2SE4, NE4SE4 | 355180 | McKenzie | ND |
| Margaret Anne Sitte, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355180 | McKenzie | ND |
| Margaret Meduna, A Married Woman | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360985 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 26 | NE1/4SW1/4, W1/2NW1/4, SE1/4NW1/4 | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 26 | SE1/4SW1/4, S1/2SE1/4, NE1/4SE1/4 | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 35 | E1/2E1/2 | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 26 | E2SW4, W2NW4, SE4NW4, S2SE4, NE4SE4 | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 35 | E2E2 | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 1 | LOTS 1, 2, 4, S2NE4, SE4NW4, S2 | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 3/3/2006 | 151 | 99 | 12 | ALL | 362270 | McKenzie | ND |
| Margaret Muri, A/K/A Margaret A. Muri, A Widow | Diamond Resources Inc. | 3/3/2006 | 151 | 99 | 36 | SW4 | 362270 | McKenzie | ND |
| Margaret Muri. A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 5/26/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4, SE4 | 357181 | McKenzie | ND |
| Margaret Muri. A/K/A Margaret A. Muri, A Widow | Diamond Resources, Inc. | 5/26/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | 357181 | McKenzie | ND |
| Margaret Nelson | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | 349805 | McKenzie | ND |
| Marie I. Skoglund, A Widow | Cody Oil & Gas Corporation | 7/1/2004 | 151 | 98 | 20 | SW/4 | 351160 | McKenzie | ND |
| Marilyn Back Weinstein,Mdssp | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | S2NE | 573488 | Williams | ND |
| Marilyn Back Weinstein,Mdssp | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | E2SW | 573488 | Williams | ND |
| Marilyn Back Weinstein,Mdssp | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | SE/4 | 573488 | Williams | ND |
| Marilyn Carlson | Oasis Petroleum  North America LLC | 11/1/2011 | 155 | 101 | 12 | S/2NE/4 | 781549 | Williams | ND |
| Marilyn Carlson | Oasis Petroleum  North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | 781549 | Williams | ND |
| Marilyn Carlson | Oasis Petroleum  North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | 781549 | Williams | ND |
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 18 | NW/4NE/4,NE/4NW/4 | 375008 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 18 | SE/4SE/4 | | 375008 | McKenzie | ND |
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 18 | SW/4SE/4 | | 375008 | McKenzie | ND |
| Marilyn G Rolfsrud | Continental Resources, Inc. | 1/7/2008 | 152 | 97 | 19 | LOT1,2,N/2NE/4,E/2NW/4 | | 375008 | McKenzie | ND |
| Marilyn Mcnamee | Diamond Resources, Inc. | 5/10/2006 | 152 | 98 | 30 | Lot 1 | | 363729 | McKenzie | ND |
| Marilyn Mcnamee, A/K/A Marilyn A. Mcnamee | Diamond Resources, Inc. | 7/5/2006 | 152 | 99 | 25 | SWSW, NWNE, N2NW | | 366572 | McKenzie | ND |
| Marilyn Newsom Mchaney; Single | Zenergy, Inc. | 3/15/2012 | 155 | 101 | 12 | E2SW | | 751904 | Williams | ND |
| Marilyn Newsom Mchaney; Single | Zenergy, Inc. | 3/15/2012 | 155 | 101 | 12 | S2NE | | 751904 | Williams | ND |
| Marilyn Newsom Mchaney; Single | Zenergy, Inc. | 3/15/2012 | 155 | 101 | 12 | SE | | 751904 | Williams | ND |
| Marilynn K. Riggs, A Married Woman | Diamond Resources, Inc. | 4/20/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 378524 | McKenzie | ND |
| Marion L. Fitzroy | Missouri Basin Well Service | 5/1/2004 | 152 | 98 | 2 | Lots 1, 2, 3, 4 | | 349804 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henery, Deceased | Diamond Resources, Inc. | 1/8/2010 | 152 | 98 | 32 | N2NE4 | | 397572 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henry, Deceased | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 1 | SW4 | | 397572 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henry, Deceased | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | | 397572 | McKenzie | ND |
| Marjorie Deschamp And Thomas Deschamp, Individually And As Wife And Husband, And As Heirs To The Estate Of Irene Henry, Deceased | Great Northern Energy, Inc. | 1/8/2010 | 152 | 98 | 29 | SE4SE4 | | 397572 | McKenzie | ND |
| Marjorie L Ryon | Unknown Lessee | 5/20/2005 | 27 | 59 | 7 | S/2SE/4 | | 368059 | Roosevelt | MT |
| Marjorie L Ryon | Unknown Lessee | 5/20/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 368059 | Roosevelt | MT |
| Marjorie Swett And Darwin Swett, Her Husband | Diamond Resources, Inc. | 4/16/2008 | 152 | 98 | 30 | Lot 1 | | 379768 | McKenzie | ND |
| Marjorie Swett And Darwin Swett, Her Husband | Diamond Resources, Inc. | 4/16/2008 | 152 | 99 | 25 | SWSW | | 379768 | McKenzie | ND |
| Mark A. Thomley, A Married Man | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358438 | McKenzie | ND |
| Mark A. Thomley, A Married Man | Diamond Resources, Inc. | 7/28/2005 | 152 | 98 | 24 | N2NW4 | | 358438 | McKenzie | ND |
| Mark E Pacovsky | Diamond Resources Inc. | 5/24/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | | 609-38 | Roosevelt | MT |
| Mark Hagen | Continental Resources, Inc. | 9/10/2010 | 152 | 98 | 30 | LOT 1 | | 408662 | McKenzie | ND |
| Mark L Peters Heir Of Martin Peters | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | | 416092 | McKenzie | ND |
| Mark W. Pearson, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | | 401506 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mark W. Pearson, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | | 401506 | McKenzie | ND |
| Marlene E Grantier Mineral Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NWNE, NENW | | 423494 | McKenzie | ND |
| Marlene E Grantier Mineral Trust | Zenergy, Inc. | 9/1/2011 | 152 | 97 | 18 | NENE | | 423494 | McKenzie | ND |
| Marlene E Grantier, A Widow | Diamond Resources Inc | 3/23/2006 | 152 | 97 | 7 | E2NW,E2SE | | 362662 | McKenzie | ND |
| Marlene E Grantier, A Widow | Diamond Resources Inc | 3/23/2006 | 152 | 97 | 7 | N2NE4,SW4NE4 | | 362662 | McKenzie | ND |
| Marlene E Grantier, A Widow | Diamond Resources Inc | 3/23/2006 | 152 | 97 | 7 | SE4NE4 | | 362662 | McKenzie | ND |
| Marlene E. Grantier Minerals Trust Agreement, Marlene E. Grantier, Trustee | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | | 399033 | McKenzie | ND |
| Marlene E. Grantier Minerals Trust Agreement, Marlene E. Grantier, Trustee | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 7 | Sec 7: NE4, E2NW4, E2SE4 | | 399033 | McKenzie | ND |
| Marlene E. Grantier Minerals Trust Agreement, Marlene E. Grantier, Trustee | Great Northern Energy, Inc. | 1/25/2010 | 152 | 97 | 18 | Sec 18: N2NE4, NE4NW4 | | 399033 | McKenzie | ND |
| Marlene E. Grantier, A Widow | Diamond Resources, Inc. | 11/8/2005 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | | 360544 | McKenzie | ND |
| Marlene E. Grantier, A Widow | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 7 | NE4, E2NW4, E2SE4 | | 360544 | McKenzie | ND |
| Marlene E. Grantier, A Widow | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 18 | N2NE4, NE4NW4 | | 360544 | McKenzie | ND |
| Marlene Mead | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382200 | Roosevelt | MT |
| Marlene Mead | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382200 | Roosevelt | MT |
| Marlene Taft; Mdssp | St Mary Land & Exploration Company | 10/27/2009 | 151 | 99 | 23 | NE | | 394945 | McKenzie | NDSP |
| Marlene Wessel, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | W2SE4, NE4SE4, SW4, S2NW4 | | 355570 | McKenzie | ND |
| Marlene Wessel, A Married Woman | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | | 355570 | McKenzie | ND |
| Marshall Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358463 | McKenzie | ND |
| Marshall Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | | 358463 | McKenzie | ND |
| Martha B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 7 | S/2SE/4 | | 367174 | Roosevelt | MT |
| Martha B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 367174 | Roosevelt | MT |
| Martha Jo Nichols Et Ux | Unknown Lessee | 7/19/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 371613 | Roosevelt | MT |
| Martha Sue Jobe, A/K/A Martha Sue Gililland Jobe, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | | 396674 | McKenzie | ND |
| Martin Vettleson, A Single Man | Diamond Resources, Inc. | 5/1/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 377950 | McKenzie | ND |
| Martin Vettleson, A Single Man | Diamond Resources, Inc. | 4/20/2009 | 152 | 98 | 30 | Lots 2, 3, E2NW4 | | 377950 | McKenzie | ND |
| Marvin L Kaiser | Continental Resources, Inc. | 9/14/2010 | 152 | 98 | 30 | LOT 1 | | 410680 | McKenzie | ND |
| Mary Gililland, A Widow, Individually, And As Heir To The Estate Of Paul William Harper, Deceased, And E.R. Harper, Deceased | Great Northern Energy, Inc. | 12/11/2009 | 151 | 98 | 28 | N2, SE, N2SW, SESW | | 397564 | McKenzie | ND |
| Mary Jane Waters | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | | 496426 | McKenzie | ND |
| Mary Josephine Mcknight Runge, Ind/ | Empire Oil Company | 9/17/1996 | 155 | 101 | 12 | E2SW | | 569937 | Williams | ND |
| Mary Josephine Mcknight Runge, Ind/ | Empire Oil Company | 9/17/1996 | 155 | 101 | 12 | S2NE | | 569937 | Williams | ND |
| Mary Josephine Mcknight Runge, Ind/ | Empire Oil Company | 9/17/1996 | 155 | 101 | 12 | SE/4 | | 569937 | Williams | ND |
| Mary K. Miller, A Married Woman | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | | 360984 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mary Kathleen Meyer, A Married Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | | 378791 | McKenzie | ND |
| Mary Kay Mate, A/K/A Mary Kay Horst, A Married Woman | Diamond Resources , Inc | 10/11/2006 | 152 | 98 | 30 | Lot 1 | | 366811 | McKenzie | ND |
| Mary Kay Mate, A/K/A Mary Kay Horst, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 10/11/2010 | 152 | 98 | 30 | Lot 1 (33.53) | | 402728 | McKenzie | ND |
| Mary Kay Mate, F/K/A Mary Kay Horst, A Married Woman | Diamond Resources, Inc. | 10/11/2006 | 152 | 99 | 25 | SWSW | | 366811 | McKenzie | ND |
| Mary Kilwein, A Married Woman | Diamond Resources, Inc. | 5/4/2006 | 152 | 99 | 25 | SWSW | | 363751 | McKenzie | ND |
| Mary Stenberg, Trustee Of The Ole Borseth Family Trust | Diamond Resources, Inc. | 8/16/2005 | 152 | 98 | 23 | SE1/4 | | 358721 | McKenzie | ND |
| Mary Wilson Gaines | Zenergy, Inc. | 3/7/2010 | 27 | 59 | 10 | W/2E/2, W/2 | | 384072 | Roosevelt | MT |
| Mary Wilson Gaines | Zenergy, Inc. | 3/7/2010 | 27 | 59 | 10 | NE/4SW/4 | | 384072 | Roosevelt | MT |
| Maryann Anderson | Diamond Resources, Inc | 8/1/2012 | 152 | 98 | 32 | S2NE4 | | 438236 | McKenzie | ND |
| Maryann Anderson | Diamond Resources, Inc | 8/1/2012 | 152 | 98 | 33 | NW, N2SW | | 438236 | McKenzie | ND |
| Maryann Macklin | Brigham Oil & Gas Lp | 2/5/2010 | 155 | 101 | 12 | N/2NE/4 | | 685757 | Williams | ND |
| Mastvelten Eldon | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | S2 | | 379602 | McKenzie | ND |
| Mastvelten Eldon | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | N2 | | 379602 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 35 | NE4, N2NW4 | | 355179 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 26 | SW4, S2NE4 | | 355179 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 36 | NW4 | | 355179 | McKenzie | ND |
| Matthew Robert Rowe, A Single Man | Diamond Resources, Inc | 2/23/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | | 355179 | McKenzie | ND |
| Maury Pederson And Lara Pederson, Husband And Wife | Cody Oil & Gas Corporation | 8/19/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351152 | McKenzie | ND |
| Max R. Borseth, A Married Man | Diamond Resources, Inc. | 4/29/2008 | 151 | 98 | 19 | Lot 4, E2SW, W2SE | | 378318 | McKenzie | ND |
| Max R. Borseth, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 3/9/2010 | 151 | 98 | 30 | LOTS 1, 2, 3, W/2NE, NENE, E/2NW, NESW | | 395724 | McKenzie | ND |
| Max R. Borseth, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 3/9/2010 | 151 | 99 | 25 | E2NW4,NW4NE4 | | 395724 | McKenzie | ND |
| Mckenzie County School District No. 1, F/K/A Twin Valley School No. 5 | Diamond Resources, Inc. | 9/8/2006 | 152 | 98 | 22 | 2.00 ACRE TRACT IN SESE MFD IN BK 55, PG 466 | | 365857 | McKenzie | ND |
| Megan K Debaere | Sundance Oil & Gas Inc | 11/26/2008 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | | 379549 | Roosevelt | MT |
| Megan K Debaere | Sundance Oil & Gas Inc | 11/26/2008 | 27 | 59 | 4 | S/2NW/4 | | 379549 | Roosevelt | MT |
| Megan K Smith | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | S/2NE/4 | | 388887 | Roosevelt | MT |
| Megan K Smith | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | | 388887 | Roosevelt | MT |
| Melby Lorraine | St. Mary Land & Exploration Company | 4/25/2010 | 151 | 99 | 24 | E2SE4, SE4NE4 | | 395070 | McKenzie | ND |
| Melby Lorraine | St. Mary Land & Exploration Company | 4/25/2010 | 151 | 99 | 13 | NW4, N2SW4 | | 395070 | McKenzie | ND |
| Melissa Mathiesen, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 359098 | McKenzie | ND |
| Melissa Mathiesen, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | | 359098 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| Lessor | Lessee | Date | Twp | Rng | Sec | Description | No | County | State |
|---|---|---|---|---|---|---|---|---|---|
| Melvin & Gudve Norby Revocable Trus | Continental Resources, Inc. | 10/4/2010 | 152 | 98 | 30 | LOT 1 | 408981 | McKenzie | ND |
| Melvin & Gudve Norby Revocable Trus | Continental Resources, Inc. | 10/4/2010 | 152 | 98 | 30 | LOT4 | 408981 | McKenzie | ND |
| Melvin & Gudve Norby Revocable Trus | Continental Resources, Inc. | 10/4/2010 | 152 | 98 | 30 | SE/4SW/4 | 408981 | McKenzie | ND |
| Melvin B. Norby And Gudve Norby, As Trustees Of The Norby Revocable Living Trust | Diamond Resources, Inc. | 7/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 358462 | McKenzie | ND |
| Melvin B. Norby And Gudve Norbym As Trustees Of The Norby Revocable Trust | Diamond Resources, Inc. | 7/28/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 358462 | McKenzie | ND |
| Melvin B. Norby And Gugve Norbym As Trustees Of The Norby Revocable Trust | Diamond Resources, Inc. | 9/5/2006 | 152 | 99 | 25 | NWNE, N2NW | 365859 | McKenzie | ND |
| Mercy Medical Foundation | Zenergy, Inc. | 2/21/2012 | 152 | 97 | 19 | E2SE | 432267 | McKenzie | ND |
| Mercy Medical Foundation | Oasis Petroleum North America LLC | 2/21/2019 | 152 | 97 | 20 | NW/4SW/4, S/2SW/4 | 514596 | McKenzie | ND |
| Merlin E. Mcwilliams, &Ida Merlin Mcwilliams, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/29/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | 399006 | McKenzie | ND |
| Merlin E. Mcwilliams, &Ida Merlin Mcwilliams, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/29/2010 | 152 | 98 | 24 | N2NW4 | 399006 | McKenzie | ND |
| Merlyn L Kleppen | Continental Resources, Inc. | 6/24/2010 | 151 | 98 | 6 | LOT6, NE/4SW/4 | 398897 | McKenzie | ND |
| Merlyn L. Kleppen, A Single Man | Diamond Resources, Inc. | 6/24/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357794 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc. | 3/7/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355578 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc. | 3/7/2005 | 152 | 98 | 26 | SE4, SW4, S2NE4 | 355578 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc. | 3/7/2005 | 152 | 98 | 36 | NW4 | 355578 | McKenzie | ND |
| Mervin Nordeng, A Married Man | Diamond Resources, Inc | 3/7/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355578 | McKenzie | ND |
| Michael Bacon Et Ux Jane Ann | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687196 | Williams | ND |
| Michael Bacon Et Ux Jane Ann | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687196 | Williams | ND |
| Michael Bacon Et Ux Jane Ann | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687196 | Williams | ND |
| Michael C Theriault | Sundance Oil & Gas Inc | 5/23/2006 | 27 | 59 | 10 | NE/4SW/4 | 371083 | Roosevelt | MT |
| Michael D Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 4 | S/2 | 382655 | Roosevelt | MT |
| Michael D Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 9 | N/2 | 382655 | Roosevelt | MT |
| Michael D Mellum | Lonetree Energy & Associates LLC | 5/10/2010 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 382655 | Roosevelt | MT |
| Michael Fitzmaurice, Hr-10, Under Agreement With First Western Bank And Trust | Diamond Resources, Inc. | 11/9/2005 | 151 | 98 | 6 | Lots 3, 4, 5, 7, SE4NW4, SE4SW4, SE4 | 360066 | McKenzie | ND |
| Michael Fitzmaurice, Hr-10, Under Agreement With First Western Bank And Trust | Diamond Resources, Inc. | 11/9/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4 | 360066 | McKenzie | ND |
| Michael Gostola Et Ux Patricia | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687193 | Williams | ND |
| Michael Gostola Et Ux Patricia | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687193 | Williams | ND |
| Michael Gostola Et Ux Patricia | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687193 | Williams | ND |
| Michael Hr-10 Fitzmaurice | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 6 | Lots 3(39.94), 4(39.20), 5(34.26), 7(34.34), SENW, SESW, SE | 402402 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Michael Hr-10 Fitzmaurice | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 7 | Lots 1(34.38), 2(34.44), 3(34.48), 4(34.54), SENW, E2SW | 402402 | McKenzie | ND |
| Michael J Peters Heir Of Martin Pet | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | 416091 | McKenzie | ND |
| Michael John Ehresman, A/K/A Michael Ehresman,A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | 400046 | McKenzie | ND |
| Michael John Ehresmann, A/K/A Michael Ehresmann, A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400046 | McKenzie | ND |
| Michael Mellum, As Successor Trustee Of The Mellum Family Trust U/A Date December 19, 1989 | Diamond Resources Inc. | 5/11/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367770 | Roosevelt | MT |
| Michael Pacovsky | Diamond Resources Inc. | 5/24/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-37 | Roosevelt | MT |
| Michael Ryder | Unknown Lessee | 8/25/2005 | 27 | 59 | 7 | S/2SE/4 | 368206 | Roosevelt | MT |
| Michael Ryder | Unknown Lessee | 8/25/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368206 | Roosevelt | MT |
| Michael Treffry | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 14 | E2SE,SWSE | 443437 | McKenzie | ND |
| Michael Treffry | Zenergy, Inc. | 6/1/2012 | 152 | 98 | 23 | NENE | 443437 | McKenzie | ND |
| Michael Ulmen, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 35 | S2NW4, SW4, W2SE4, NE4SE4 | 355576 | McKenzie | ND |
| Michael Ulmen, A Married Man | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 34 | N2SE4 | 355576 | McKenzie | ND |
| Michele Cook, A Single Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 1, 12, 13, 14, E2SW4, W2SE4 | 364917 | McKenzie | ND |
| Michelle R Fox Aif Samuel C Denton | Empire Oil Company | 3/4/2011 | 151 | 98 | 32 | 151N-098W-32-SE4 | 411718 | McKenzie | ND |
| Michelle R Fox Aif Samuel C Denton | Empire Oil Company | 3/4/2011 | 151 | 98 | 33 | 151N-098W-33-S2 | 411718 | McKenzie | ND |
| Michelle R Fox Aif Samuel C Denton | Empire Oil Company | 3/4/2011 | 151 | 98 | 33 | 151N-098W-33-N2NW, SW4NW4 | 411718 | McKenzie | ND |
| Mike Kulhanek | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 365665 | McKenzie | ND |
| Mike Kulhanek | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381437 | McKenzie | ND |
| Mike Kulhanek, A Single Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381437 | McKenzie | ND |
| Mildred A. Rogstad, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358457 | McKenzie | ND |
| Mildred A. Rogstad, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 24 | N2NW4 | 358457 | McKenzie | ND |
| Mildred G. Dahl, A/K/A Mildred Dahl, A Widow | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 30 | Lot 1 | 358840 | McKenzie | ND |
| Mildred S Robinson Et Vir | Unknown Lessee | 4/8/2005 | 27 | 59 | 7 | S/2SE/4 | 367168 | Roosevelt | MT |
| Mildred S Robinson Et Vir | Unknown Lessee | 4/8/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367168 | Roosevelt | MT |
| Mildred Shelley, A Widow | Diamond Resources, Inc. | 2/17/2009 | 151 | 98 | 5 | Lots 1, 2 | 380170 | McKenzie | ND |
| Mildred Shelley, A Widow | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 33 | W2E2, S2SW4 | 380170 | McKenzie | ND |
| Mildred Shelley, A Widow | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 31 | SE4NE4, NE4SE4 | 380170 | McKenzie | ND |
| Mildred Shelley, A Widow | Diamond Resources , Inc | 2/17/2009 | 152 | 98 | 32 | S2NW, S2 | 380170 | McKenzie | ND |
| Milton T. Wold, A Widower | Diamond Resources, Inc. | 3/27/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 363131 | McKenzie | ND |
| Milton Wold, A Married Man | Diamond Resources, Inc. | 5/9/2005 | 152 | 98 | 1 | Lots 3, 4 | 357174 | McKenzie | ND |
| Milton Wold, A Single Man | Diamond Resources, Inc. | 2/15/2005 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 356311 | McKenzie | ND |
| Mimi Back Loeb, A Widow | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | S2NE | 573489 | Williams | ND |
| Mimi Back Loeb, A Widow | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | E2SW | 573489 | Williams | ND |
| Mimi Back Loeb, A Widow | Diamond Resources Inc | 4/29/1997 | 155 | 101 | 12 | SE/4 | 573489 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 392766 | McKenzie | ND |
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SE4 | 392766 | McKenzie | ND |
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 152 | 98 | 33 | E2NE | 392766 | McKenzie | ND |
| Moen Phillip R Et Ux | St. Mary Land & Exploration Company | 9/15/2009 | 152 | 98 | 33 | E2SE | 392766 | McKenzie | ND |
| Mrs Dennis Sower Aka Muriel Sower | Panther Entergy Company, LLC | 6/27/2008 | 151 | 99 | 14 | E2 | 385483 | McKenzie | ND |
| Mrs Dennis Sower Aka Muriel Sower | Panther Entergy Company, LLC | 6/27/2008 | 151 | 99 | 14 | SW | 385483 | McKenzie | ND |
| Mrs Richard (Linda) Salley | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | SW | 385486 | McKenzie | ND |
| Muriel Mjelstad And Robert Mjelstad, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W2NE4, E2NW4 | 355586 | McKenzie | ND |
| Muriel Mjelstad And Robert Mjelstad, Her Husband | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 22 | W/2SE, E/2SW, NWSW | 355586 | McKenzie | ND |
| Muriel Sower, A/K/A Mrs. Dennis (Muriel) Sower, A Married Woman | Diamond Resources, Inc. | 5/23/2008 | 151 | 98 | 19 | Lot 3 | 379078 | McKenzie | ND |
| Murray Oil Trust Two, Nancy A. Murray, Trustee | Diamond Resources, Inc. | 11/30/2005 | 152 | 98 | 11 | SWSW, E2SW | 360378 | McKenzie | ND |
| Muscular Dystrophy Association | Continental Resources, Inc. | 11/30/2011 | 152 | 97 | 19 | E/2SE/4 | 427299 | McKenzie | ND |
| Muscular Dystrophy Association | Continental Resources, Inc. | 11/30/2011 | 152 | 97 | 19 | E/2SE/4 | 427299 | McKenzie | ND |
| Myers Nancy | Sm Energy Company | 12/1/2011 | 153 | 97 | 28 | NW4 | 446752 | McKenzie | ND |
| Myrna K. Dahl,  A Single Woman | Great Northern Energy, Inc. | 3/2/2010 | 152 | 99 | 25 | SWSW | 400055 | McKenzie | ND |
| Myron Cook, A Married Man | Diamond Resources, Inc. | 3/20/2008 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E1/2SW1/4, W1/2SE1/4 | 377197 | McKenzie | ND |
| Myron Forland, A Married Man | Diamond Resources, Inc. | 6/5/2008 | 151 | 98 | 33 | NENE | 379576 | McKenzie | ND |
| Myron Forland, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 1/13/2010 | 151 | 98 | 28 | N2, SE, N2SW, SESW | 397570 | McKenzie | ND |
| Myron Wold And Darlene Wold, Husband And Wife | Diamond Resources, Inc. | 6/6/2006 | 152 | 97 | 6 | Lot 1 | 364264 | McKenzie | ND |
| Myron Wold And Darlene Wold, Husband And Wife | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 34 | NW4NE4, S2NE4, S2 | 364264 | McKenzie | ND |
| Myron Wold And Darlene Wold, Husband And Wife | Diamond Resources, Inc. | 6/6/2006 | 153 | 97 | 27 | SW4NE4, E2W2, N2SE4, SW4SE4 | 364264 | McKenzie | ND |
| Nadine Tetrault | Panther Entergy Company, LLC | 7/15/2008 | 151 | 99 | 14 | SW | 385469 | McKenzie | ND |
| Nadine Tetrault | Brigham Oil & Gas, Lp | 7/15/2010 | 151 | 99 | 35 | E2E2 | 409475 | McKenzie | ND |
| Nadine Tetrault | Brigham Oil & Gas, Lp | 7/15/2010 | 151 | 99 | 26 | SESW,S2SE,NESE | 409475 | McKenzie | ND |
| Nan Blake Leavell | Oasis Petroleum North America LLC | 1/26/2014 | 155 | 101 | 12 | W/2SW/4 | 787687 | Williams | ND |
| Nancy A. Murray, Trustee Of The Murray Oil Trust Two | Diamond Resources, Inc . | 11/30/2005 | 152 | 98 | 14 | N2NW4 | 360378 | McKenzie | ND |
| Nancy Coleman | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 14 | NE4 | 357789 | McKenzie | ND |
| Nancy J Coleman; Single | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE | 378497 | McKenzie | ND |
| Nancy J. Coleman, A Single Woman | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | 378496 | McKenzie | ND |
| Nancy J. Coleman, A Single Woman | Diamond Resources, Inc. | 9/1/2010 | 152 | 98 | 32 | S2NE4 | 378496 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Nancy J. Coleman, A Single Woman | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | | 378496 | McKenzie | ND |
| Nancy L Beaudet | St Mary Land & Exploration Company | 11/11/2009 | 151 | 99 | 14 | SW | | 395877 | McKenzie | ND |
| Nelson Terry | Sundance Oil And Gas, Inc. | 5/10/2006 | 27 | 59 | 6 | LOT 1-4, SW4, SWNW, SESE | | 370936 | Roosevelt | MT |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SW4 | | 393631 | McKenzie | ND |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | | 393631 | McKenzie | ND |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | | 393631 | McKenzie | ND |
| Norby Lynette J | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | | 393631 | McKenzie | ND |
| Noreen Wollan | Zenergy, Inc. | 5/1/2012 | 152 | 98 | 23 | W2 | | 433795 | McKenzie | ND |
| Noreen Wollan | Continental Resources Inc. | 4/26/2008 | 152 | 98 | 34 | NE4 | | 368054 | McKenzie | ND |
| Noreen Wollan | Continental Resources Inc. | 4/26/2008 | 152 | 98 | 34 | NE4 | | 368054 | McKenzie | ND |
| Norma Breeding | 7 0'S Oil Corporation | 4/13/2005 | 27 | 59 | 7 | S/2SE/4 | | 367172 | Roosevelt | MT |
| Norma Breeding | 7 0'S Oil Corporation | 4/13/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | | 367172 | Roosevelt | MT |
| Norma J. Casper, A/K/A Norma Casper, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 358450 | McKenzie | ND |
| Norma J. Casper, A/K/A Norma Casper, A Widow | Diamond Resources, Inc. | 7/27/2005 | 152 | 98 | 24 | N2NW4 | | 358450 | McKenzie | ND |
| Norma Sue Lundstrom | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 2 | SW4 | | 349755 | McKenzie | ND |
| Norma Sue Lundstrom | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, N2SE4 | | 349755 | McKenzie | ND |
| Norma Sue Lundstrom | Missouri Basin Well Service | 5/2/2004 | 153 | 97 | 28 | NE4 | | 349755 | McKenzie | ND |
| Norma Sue Lundstrom Trust | Missouri Basin Well Service | 5/2/2004 | 152 | 98 | 3 | Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, N2S2 | | 349754 | McKenzie | ND |
| North Dakota Elks | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | | 358270 | McKenzie | ND |
| North Dakota Elks | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | | 358270 | McKenzie | ND |
| North Dakota Lung Association | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | | 348476 | McKenzie | ND |
| North Dakota Lung Association | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | | 348476 | McKenzie | ND |
| NWFCS Flca 10-0076 | Oasis Petroleum North America LLC | 5/12/2010 | 27 | 59 | 8 | E/2E/2 | | 385395 | Roosevelt | MT |
| NWFCS, Flca | Diamond Resources Inc. | 3/16/2005 | 28 | 58 | 25 | NE4SE4 | | 609-30 | Roosevelt | MT |
| Olga Reese, A Widow | Cody Oil & Gas Corporation | 5/6/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351141 | McKenzie | ND |
| Oliver Dyste, A Widower | Diamond Resources, Inc. | 6/7/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | | 357535 | McKenzie | ND |
| Oliver Dyste, A Widower | Diamond Resources, Inc. | 6/8/2005 | 152 | 98 | 23 | NE4NE4 | | 357535 | McKenzie | ND |
| Oliver Nelson Dyste, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | | 401494 | McKenzie | ND |
| Oliver Nelson Dyste, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | | 401494 | McKenzie | ND |
| Orin A Hermundstad | Arkota Energy, Inc. | 6/1/2011 | 151 | 98 | 33 | NW/4NE/4,S/2NE/4,SE/4NW/4 | | 418637 | McKenzie | ND |
| Orvin T. Boss And Luella Boss, Husband And Wife | Diamond Resources, Inc. | 5/5/2005 | 152 | 98 | 30 | Lot 1 | | 356865 | McKenzie | ND |
| Orvin T. Boss And Luella Boss, Husband And Wife | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 30 | Lot 4, SE4SW4 | | 356865 | McKenzie | ND |
| Oscar Quarne | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | E/2SW/4 | | 791474 | Williams | ND |
| Oscar Quarne | Oasis Petroleum North America LLC | 11/1/2011 | 155 | 101 | 12 | SE/4 | | 791474 | Williams | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Pamela Jackson, A Single Woman | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378309 | McKenzie | ND |
| Patricia Ann Leiseth And Kenneth Leiseth, Her Husband | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 27 | W2NE4, E2NW4 | 355191 | McKenzie | ND |
| Patricia Ann Leiseth And Kenneth Leiseth, Her Husband | Diamond Resources, Inc. | 2/28/2005 | 152 | 98 | 22 | W/2SE, E/2SW, NWSW | 355191 | McKenzie | ND |
| Patricia J. Pechtel,A Single Woman, Individually, And Elizabeth A. Myers And Patricia J. Pechtl, Trustees Of The Myers Pechtl 2006 Revocable Trust, Under The Trust Agreement Dtd September 13, 2006 | Great Northern Energy, Inc. | 12/4/2009 | 152 | 99 | 25 | SWSW | 395734 | McKenzie | ND |
| Patricia J. Pechtl | Diamond Resources, Inc. | 2/9/2006 | 152 | 98 | 30 | Lot 1 | 361835 | McKenzie | ND |
| Patricia Madej | Continental Resources, Inc. | 7/30/2008 | 153 | 97 | 27 | SE4SE4 | 382242 | McKenzie | ND |
| Patricia Poole, F/K/A Patricia Erickstadt, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358466 | McKenzie | ND |
| Patricia Poole, F/K/A Patricia Erickstadt, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358466 | McKenzie | ND |
| Patricia Wanaka | Oasis Petroleum North America LLC | 1/6/2012 | 151 | 98 | 28 | N/2SW/4,SE/4SW/4,SW/4SE/4 | 491450 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355181 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355181 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355181 | McKenzie | ND |
| Patti Nordeng Sweeney, A Married Woman | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355181 | McKenzie | ND |
| Paul & Betty Phillips Tst | Sundance Oil & Gas Inc | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370861 | Roosevelt | MT |
| Paul Dyste And Mena C. Dyste, Husband And Wife | Diamond Resources, Inc. | 5/12/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 357542 | McKenzie | ND |
| Paul Dyste And Mena C. Dyste, Husband And Wife | Diamond Resources, Inc. | 5/13/2005 | 152 | 98 | 23 | NE4NE4 | 357542 | McKenzie | ND |
| Paul H Bergem | Kodiak Oil And Gas (Usa) Inc | 2/25/2011 | 151 | 99 | 35 | 151N-099W-35-E2W2, W2E2 | 415549 | McKenzie | ND |
| Paul Linseth & Vivian L. Linseth, Husband And Wife As Joint Tenants; With Full Participation Rights And Right To Grant Lease Up To Five Years Without Consent | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 2 | Lots 5, 6, 7, 8, 9, 10, 11, 12 | 355736 | McKenzie | ND |
| Paul Linseth & Vivian L. Linseth, Husband And Wife As Joint Tenants; With Full Participation Rights And Right To Grant Lease Up To Five Years Without Consent | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 11 | W2NW, NWSW | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | 355736 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | 355736 | McKenzie | ND |
| Paul Linseth And Vivian L. Linseth, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | 355736 | McKenzie | ND |
| Paul R. Dyste Trust U/A Dated 3-2-1995, Paul R. Dyste, Trustee | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401488 | McKenzie | ND |
| Paul R. Dyste Trust U/A Dated 3-2-1995, Paul R. Dyste, Trustee | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401488 | McKenzie | ND |
| Pearl Marian Njus, F/K/A Marian Wold And Irving Njus, Her Husband | Diamond Resources, Inc. | 2/23/2005 | 152 | 97 | 6 | Lots 2, 3, 4, 5, 6, 7, 8, 10 less 38.00 acre tract in lot 6 mfd in book 11, page 221 | 355706 | McKenzie | ND |
| Pearl Marian Njus, F/K/A Marian Wold And Irving Njus, Her Husband | Diamond Resources, Inc. | 2/23/2005 | 152 | 98 | 1 | Lots 1, 2, 5, 6, 7, 8, 9, 10, 11 ,12, SE1/4 | 355706 | McKenzie | ND |
| Per STeinar Havn | Zenergy, Inc. | 6/1/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 423495 | McKenzie | ND |
| Peterson Trust Dated 7/15/88 | St. Mary Land & Exploration Company | 3/20/2010 | 151 | 99 | 24 | SE4SW4 | 396247 | McKenzie | ND |
| Peterson Trust Dated 7/15/88 | St. Mary Land & Exploration Company | 3/9/2010 | 151 | 99 | 25 | E2NW4, NW4NE4 | 396246 | McKenzie | ND |
| Philip Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355577 | McKenzie | ND |
| Philip Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355577 | McKenzie | ND |
| Philip Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355577 | McKenzie | ND |
| Phillip Nordeng | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355577 | McKenzie | ND |
| Phillips Family Trust | Sundance Oil & Gas Inc | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 374174 | Roosevelt | MT |
| Phillips-Murray Rev Trust | Unknown Lessee | 4/12/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370875 | Roosevelt | MT |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | N2NW4 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 7 | SE4 | 378790 | McKenzie | ND |
| Phyllis M. Bergeron, A Widow | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | 378790 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355173 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355173 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355173 | McKenzie | ND |
| Phyllis Nordeng | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355173 | McKenzie | ND |
| Phyllis Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382074 | Roosevelt | MT |
| Phyllis Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382074 | Roosevelt | MT |
| R. H.Gifford, A Married Man | Diamond Resources, Inc. | 10/28/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 360377 | McKenzie | ND |
| R. H.Gifford, A Married Man | Diamond Resources, Inc. | 6/30/2006 | 152 | 99 | 25 | NWNE, N2NW | 365291 | McKenzie | ND |
| R.H. Gifford, A Married Man | Diamond Resources, Inc. | 10/28/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360377 | McKenzie | ND |
| Rachel Cox | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | 151N-098W-29-SE/4 | 401354 | McKenzie | ND |
| Rachel Cox | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | NE/4 | 401354 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Rachel Cox | Continental Resources, Inc. | 4/15/2010 | 151 | 98 | 29 | N/2NW/4 | 401354 | McKenzie | ND |
| Rachel Cox | Continental Resources, Inc. | 7/9/2010 | 151 | 98 | 32 | NE/4 | 405470 | McKenzie | ND |
| Rachel E. Cox, A Married Woman | Diamond Resources, Inc. | 6/7/2008 | 151 | 98 | 20 | SW4 | 379769 | McKenzie | ND |
| Ragene Sovak, A Married Woman | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351156 | McKenzie | ND |
| Ragene Sovak, A Single Woman | Diamond Resources, Inc, | 5/2/2008 | 151 | 98 | 20 | SW4 | 378314 | McKenzie | ND |
| Raida C Pfeifer Aka Rida C Pfeifer, | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | E2SW4 | 571490 | Williams | ND |
| Raida C Pfeifer Aka Rida C Pfeifer, | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | S2NE | 571490 | Williams | ND |
| Raida C Pfeifer Aka Rida C Pfeifer, | Diamond Resources Inc | 4/8/1997 | 155 | 101 | 12 | SE/4 | 571490 | Williams | ND |
| Ralph Skoglund And Debra A. Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 29 | E2, N2NW | 364622 | McKenzie | ND |
| Ralph Skoglund And Debra A. Skoglund, Husband And Wife | Diamond Resources, Inc. | 4/22/2009 | 151 | 98 | 32 | NE | 364622 | McKenzie | ND |
| Ramona Curry, Individually And As Trustees, U/D/T Dated 5/24/1989 F/B/Of G. Leslie Curry And Ramona Curry | Diamond Resources Inc. | 1/14/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367592 | Roosevelt | MT |
| Randall Bruins Aka Randall H Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 26 | SESW,S2SE,NESE | 386140 | McKenzie | ND |
| Randall Bruins Aka Randall H Bruins | Panther Energy Company, LLC | 6/12/2008 | 151 | 99 | 35 | E2E2 | 386829 | McKenzie | ND |
| Randall H Bruins | Panther Entergy Company, LLC | 6/2/2008 | 151 | 99 | 14 | SW | 386831 | McKenzie | ND |
| Randy Gumm, A Married Man | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381441 | McKenzie | ND |
| Randy Gumm, A Married Man | Diamond Resources, Inc. | 7/22/2006 | 152 | 99 | 25 | NWNE, N2NW | 366075 | McKenzie | ND |
| Randy Gumm, A Married Man | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381441 | McKenzie | ND |
| Randy Teed, A Single Man | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 353919 | McKenzie | ND |
| Ray A Berquist And Linda Berquist; | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 353045 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 151 | 98 | 17 | S2NE4, SE4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 151 | 98 | 17 | S1/2NE1/4, SE1/4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 33 | E2E2 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 378517 | McKenzie | ND |
| Rayleen Kleppen, A Married Woman | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 378517 | McKenzie | ND |
| Raymond And Donrose M. Sharkey | Missouri Basin Well Service | 8/10/2004 | 152 | 98 | 11 | E2NW4 | 350139 | McKenzie | ND |
| Raymond And Donrose M. Sharkey | Missouri Basin Well Service | 12/8/2004 | 152 | 98 | 11 | NE4 | 350139 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 8 | W2 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 17 | N2NW4 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 17 | N1/2NW1/4 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 3/15/2005 | 151 | 98 | 7 | SE4 | 378795 | McKenzie | ND |
| Raymond Jack Bergeron, A Widower | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 7 | SE4 | 378795 | McKenzie | ND |
| Raymond Misemer, A Single Man | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 397582 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Raymond Misemer, A/K/A Ray Misemer, A Single Man | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364018 | McKenzie | ND |
| Raymond Sharkey And Donrose M Shark | Missouri Basin Well Service, Inc. | 12/8/2004 | 152 | 98 | 11 | NE | 354488 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW1/4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 1 | SW4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 28 | NE4SW4, S2SW4, SE4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 29 | SE4SE4 | 356869 | McKenzie | ND |
| Raymond Sharkey And Donrose M. Sharkey, Husband And Wife | Diamond Resources, Inc. | 5/11/2005 | 152 | 98 | 32 | N2NE4 | 356869 | McKenzie | ND |
| Red Wing Oil LLC | Sundance Oil & Gas Inc | 2/20/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370368 | Roosevelt | MT |
| Reeves A. Thielen, A Single Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360059 | McKenzie | ND |
| Reeves A. Thielen, A Single Man | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 360059 | McKenzie | ND |
| Renee Y Pearson Heir Of Martin Pete | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | 416086 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 13 | S2SW4, SW4SE4 | 393630 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 151 | 99 | 24 | NW4, N2NE4,SW4NE4,W2SE4, NE4SW4 | 393630 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2SE | 393630 | McKenzie | ND |
| Renville Cheryl I | St. Mary Land & Exploration Company | 9/18/2009 | 152 | 98 | 33 | E2NE | 393630 | McKenzie | ND |
| Reuben I Wolfson Properties | Oasis Petroleum North America LLC | 2/7/2012 | 155 | 101 | 12 | E/2SW/4 | 730408 | Williams | ND |
| Reuben I Wolfson Properties | Oasis Petroleum North America LLC | 2/7/2012 | 155 | 101 | 12 | S/2NE/4 | 730408 | Williams | ND |
| Reuben I Wolfson Properties | Oasis Petroleum North America LLC | 2/7/2012 | 155 | 101 | 12 | SE/4 | 730408 | Williams | ND |
| Revelle Christina Phillips | Unknown Lessee | 2/20/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 371240 | Roosevelt | MT |
| Richard Bruins; Single | St Mary Land & Exploration Company | 11/4/2009 | 151 | 99 | 23 | NE | 395072 | McKenzie | ND |
| Richard Enderud And Cheryl Enderud, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 27 | W2NE4, E2NW4 | 355185 | McKenzie | ND |
| Richard Enderud And Cheryl Enderud, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 22 | W/2SE, E/2SW, NWSW | 355185 | McKenzie | ND |
| Richard G. Cernosek And Amalie Cernosek, Husband And Wife | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381439 | McKenzie | ND |
| Richard G. Cernosek And Amalie Cernosek, Husband And Wife | Diamond Resources, Inc. | 7/31/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 381439 | McKenzie | ND |
| Richard Gifford Aka R H Gifford; Md | Great Northern Energy, Inc. | 7/1/2010 | 152 | 99 | 25 | N2NW | 404761 | McKenzie | ND |
| Richard Gifford Aka R H Gifford; Md | Great Northern Energy, Inc. | 7/1/2010 | 152 | 99 | 25 | NWNE | 404761 | McKenzie | ND |
| Richard K. Horst | Great Northern Energy, Inc. | 3/31/2010 | 152 | 99 | 25 | SWSW | 401493 | McKenzie | ND |
| Richard K. Horst, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 360811 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Richard M. Olson And Ida Olson, Husband And Wife | Diamond Resources, Inc. | 7/28/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 358444 | McKenzie | ND |
| Richard M. Olson And Ida Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 7/28/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 400919 | McKenzie | ND |
| Richard M. Olson And Ida Olson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 400919 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378518 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | 378518 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources, Inc. | 4/30/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378518 | McKenzie | ND |
| Richard Mead Fetveit | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378519 | McKenzie | ND |
| Richard N. Dyste, A Single Man | Great Northern Energy, Inc. | 4/3/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 401504 | McKenzie | ND |
| Richard N. Dyste, A Single Man | Great Northern Energy, Inc. | 4/4/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 401504 | McKenzie | ND |
| Richard P. Kilwein, A Single Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360979 | McKenzie | ND |
| Richard Thomas Lattin Jr | Oasis Petroleum North America LLC | 8/1/2011 | 151 | 99 | 26 | NW/4SW/4 | 496422 | McKenzie | ND |
| Richard W. Jones, A Widower, Individually And As Heir To The Estate Of Bernadine M. Jones, Deceased | Great Northern Energy, Inc. | 12/31/2009 | 152 | 98 | 30 | Lot 1(33.53) | 400925 | McKenzie | ND |
| Richard W. Jones, A Widower, Individually, And As Heir To The Estate Of Nernadine M. Jones, Deceased | Great Northern Energy, Inc. | 12/31/2009 | 152 | 99 | 25 | SWSW | 400925 | McKenzie | ND |
| Richardson Living Trust 4/19/99 And | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 397200 | McKenzie | ND |
| Richardson Living Trust Dtd 4.19.99 | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410664 | McKenzie | ND |
| Richardson Living Trust Dtd 4.19.99 | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410666 | McKenzie | ND |
| Richardson Living Trust Dtd 4.19.99 | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19  IN NE4NW4 | 410666 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 397199 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SW4 | 397199 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 397199 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette A. Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 397199 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 397198 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NE4SW4, SE4NW4 | 397198 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | 397198 | McKenzie | ND |
| Richardson Living Trust, Dated April 19, 1999 And Any Amendments Thereto, Jack K. Richardson And Jeanette Ann Richardson, Trustees | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | 397198 | McKenzie | ND |
| Rickey L. Thomley, A/K/A Rickey Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358468 | McKenzie | ND |
| Rickey L. Thomley, A/K/A Rickey Thomley | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358468 | McKenzie | ND |
| Robert A Dyste And Vivian E Dyste; | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 14 | E2SE,SWSE | 402080 | McKenzie | ND |
| Robert A Dyste And Vivian E Dyste; | Great Northern Energy, Inc. | 8/11/2010 | 152 | 98 | 23 | NENE | 402080 | McKenzie | ND |
| Robert A. Dyste | Diamond Resources, Inc. | 8/11/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | 358469 | McKenzie | ND |
| Robert A. Dyste | Diamond Resources, Inc. | 8/12/2005 | 152 | 98 | 23 | NE4NE4 | 358469 | McKenzie | ND |
| Robert A. Kilwein, A Married Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360988 | McKenzie | ND |
| Robert Buschbom, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364419 | McKenzie | ND |
| Robert Buschbom, A Married Man | Great Northern Energy, Inc. | 11/20/2009 | 152 | 99 | 25 | SWSW | 399026 | McKenzie | ND |
| Robert Buschbom, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 11/20/2009 | 152 | 98 | 30 | Lot 1(33.53) | 399026 | McKenzie | ND |
| Robert C Johnston And Marlai Johnst | Great Northern Energy, Inc. | 8/12/2008 | 152 | 98 | 30 | LOT 1 | 381619 | McKenzie | ND |
| Robert C Johnston And Marlai Johnst | Great Northern Energy, Inc. | 8/12/2008 | 152 | 98 | 30 | LOT 4 | 381619 | McKenzie | ND |
| Robert C Johnston Et Ux | Continental Resources, Inc. | 3/26/2010 | 152 | 98 | 30 | SE/4SW/4 | 400483 | McKenzie | ND |
| Robert C. Johnson And Marlai Johnson, Husband And Wife | Cody Oil & Gas Corporation | 7/31/2004 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 351167 | McKenzie | ND |
| Robert D. And Ardis M. Pederson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 11 | SE4 | 349782 | McKenzie | ND |
| Robert D. And Ardis M. Pederson | Missouri Basin Well Service | 4/30/2004 | 152 | 98 | 14 | SW4, NW4, SE4, S2NW4 | 349782 | McKenzie | ND |
| Robert D. Gisvold | Diamond Resources, Inc. | 11/3/2008 | 152 | 98 | 30 | Lot 1 | 385406 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Robert D. Gisvold, A Married Man | Diamond Resources, Inc. | 11/3/2008 | 152 | 99 | 25 | SWSW | 385406 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | N1/2, SW1/4 | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SE/4 less 4.50 acre tract | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | N/2 | 351134 | McKenzie | ND |
| Robert D. Pederson And Ardis M. Pederson, Husband And Wife | Cody Oil & Gas Corporation | 4/30/2004 | 152 | 98 | 10 | SW/4 | 351134 | McKenzie | ND |
| Robert Dee Theriault | Unknown Lessee | 5/22/2006 | 27 | 59 | 10 | NE/4SW/4 | 371251 | Roosevelt | MT |
| Robert Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378297 | McKenzie | ND |
| Robert Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | 378297 | McKenzie | ND |
| Robert Fetveit, A Married Man | Diamond Resources, Inc. | 2/14/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378297 | McKenzie | ND |
| Robert Fetveit; Married | Diamond Resources, Inc. | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378298 | McKenzie | ND |
| Robert Horst, A Married Man | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361885 | McKenzie | ND |
| Robert Horst, A Married Man | Great Northern Energy, Inc. | 3/31/2010 | 152 | 99 | 25 | SWSW | 402726 | McKenzie | ND |
| Robert J Neyer Restated Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687485 | Williams | ND |
| Robert J Neyer Restated Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687485 | Williams | ND |
| Robert J Neyer Restated Trust | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687485 | Williams | ND |
| Robert L Peters Heir Of Martin Pete | Zenergy, Inc. | 3/1/2011 | 151 | 99 | 26 | NWSW | 416088 | McKenzie | ND |
| Robert Patrick Wilson | Zenergy, Inc. | 3/6/2010 | 27 | 59 | 10 | W/2E/2, W/2 | 384070 | Roosevelt | MT |
| Robert Patrick Wilson | Zenergy, Inc. | 3/6/2010 | 27 | 59 | 10 | NE/4SW/4 | 384070 | Roosevelt | MT |
| Robert Post Johnson | Missouri Basin Well Service | 4/22/2008 | 152 | 98 | 29 | W2NE4, N2SE4, NE4SW4 | 377704 | McKenzie | ND |
| Robert Post Johnson, A Married Man | Diamond Resources, Inc. | 12/8/2005 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 360542 | McKenzie | ND |
| Roberta G, Ketterling, A Married Woman | Great Northern Energy, Inc. | 12/16/2009 | 152 | 99 | 25 | SWSW | 396699 | McKenzie | ND |
| Roberta G. Ketterling, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 12/16/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396681 | McKenzie | ND |
| Roda Drilling, Lp And Zeneco, Inc. | Zenergy, Inc. | 5/31/2012 | 151 | 98 | 1 | SENE,NESE | 435778 | McKenzie | ND |
| Rodney Johnsrud | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 5 |  S2NE4, SE4NW4, NE4SE4 | 357798 | McKenzie | ND |
| Roger Flatland Et Ux | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 377172 | McKenzie | ND |
| Roger Flatland Et Ux | Continental Resources, Inc. | 6/1/2008 | 153 | 97 | 27 | NW/2SW/4, W/2NW/4 | 377172 | McKenzie | ND |
| Ronald Curtis Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | 399011 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ronald Curtis Wold, A Married Man Dealing In His Sole And Separate Property, Individually, And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 399011 | McKenzie | ND |
| Ronald Curtis Wold; Mdssp | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 399016 | McKenzie | ND |
| Ronald Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378305 | McKenzie | ND |
| Ronald Fetveit, A Married Man | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378305 | McKenzie | ND |
| Ronald Fetveit, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 29 | E2NE4 | 378305 | McKenzie | ND |
| Ronald Fetveit; Married | Diamond Resources Inc | 2/17/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378304 | McKenzie | ND |
| Ronald Gunderson, A Single Man | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | 378508 | McKenzie | ND |
| Ronald Teed, A Married Man | Cody Oil & Gas Corporation | 6/18/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book 7, page 15 | 351151 | McKenzie | ND |
| Ronald Teed, A Married Man | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 15 | NW/4 | 356450 | McKenzie | ND |
| Ronald Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358448 | McKenzie | ND |
| Ronald Thomley, A Married Man | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358448 | McKenzie | ND |
| Rose Marie Mcfarlane | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | E/2SW/4 | 687487 | Williams | ND |
| Rose Marie Mcfarlane | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | SE/4 | 687487 | Williams | ND |
| Rose Marie Mcfarlane | Golden Eye Resources LLC | 4/13/2010 | 155 | 101 | 12 | S/2NE/4 | 687487 | Williams | ND |
| Roxy G Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 3 | SW/4 | 387170 | Roosevelt | MT |
| Roxy G Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 4 | S/2 | 387170 | Roosevelt | MT |
| Roxy G Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 9 | N/2 | 387170 | Roosevelt | MT |
| Roxy G. Houck | Diamond Resources, Inc. | 6/24/2005 | 27 | 59 | 5 | Lot 1 (40.07), 2 (40.07), 3 (40.05), 4 (40.05), S2NE, SENW, E2SW, SWSW, SE | 369582 | Roosevelt | MT |
| Roxy G. Houck, A Married Woman | Diamond Resources Inc. | 6/24/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 369582 | Roosevelt | MT |
| Roy A Berquist And Marlyn Berquist; | Copperhead Corporation | 12/8/2004 | 152 | 98 | 35 | SESE | 353044 | McKenzie | ND |
| Royce J Harmon | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 380610 | McKenzie | ND |
| Royce Rolfson | Cody Oil & Gas Corporation | 6/15/2004 | 151 | 98 | 20 | SW/4 | 351161 | McKenzie | ND |
| Royce Rolfson, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 151 | 98 | 20 | SW4 | 378307 | McKenzie | ND |
| Ruby R Rogers | Unknown Lessee | 4/5/2005 | 27 | 59 | 7 | S/2SE/4 | 367176 | Roosevelt | MT |
| Ruby R Rogers | Unknown Lessee | 4/5/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367176 | Roosevelt | MT |
| Russell B Johnson Et Ux | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | 410676 | McKenzie | ND |
| Russell B Johnson Et Ux | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | 410679 | McKenzie | ND |
| Russell B Johnson Et Ux | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | 410679 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE, N2SE4, NE4SW4, SE4NW4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 400156 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SW4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | SE4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 400156 | McKenzie | ND |
| Russell B. Johnson And Sandy Johnson, Individually And As Husband And Wife | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 | 400156 | McKenzie | ND |
| Russell E Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 3 | SW/4 | 379549 | Roosevelt | MT |
| Russell E Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 4 | S/2 | 379549 | Roosevelt | MT |
| Russell E Houck | Oasis Petroleum North America LLC | 9/29/2010 | 27 | 59 | 9 | N/2 | 379549 | Roosevelt | MT |
| Russell E. Houck | Diamond Resources, Inc. | 6/24/2005 | 27 | 59 | 5 | Lot 1 (40.07), 2 (40.07), 3 (40.05), 4 (40.05), S2NE, SENW, E2SW, SWSW, SE | 367763 | Roosevelt | MT |
| Russell E. Houck | Diamond Resources Inc. | 6/24/2005 | 27 | 59 | 6 | Lots 1, 2, 3, 4, SWNW, SW, SESE | 367763 | Roosevelt | MT |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 18 | Lots 1-4, S2NE4, N2SE4, NE4SW4, SE4NW4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson, Husband And Wife | Diamond Resources, Inc . | 3/2/2005 | 152 | 98 | 13 | E2SE4 | 356145 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 7 | LOTS 3,4 | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NW,N2SW | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 17 | S2NE,N2SE | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 97 | 18 | LOTS 1,2,3,4,S2NE,N2SE,NESW,SENW | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 12 | SE | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Diamond Resources Inc | 3/2/2005 | 152 | 98 | 13 | E2SE | 376187 | McKenzie | ND |
| Russell Johnson And Sandy Johnson; | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | 400153 | McKenzie | ND |
| Ruth Rolfson, A Widow | Cody Oil & Gas Corporation | 6/29/2004 | 151 | 98 | 20 | SW/4 | 351158 | McKenzie | ND |
| Sacred Heart Church | Diamond Resources, Inc. | 12/7/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 381637 | McKenzie | ND |
| Sacred Heart Church | Diamond Resources, Inc. | 8/1/2008 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 387633 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 5 | Lots 3, 4 | 363133 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 8 | W2 | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 17 | N2NW4 | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 6 | Lots 1, 2, 3, 4, 5, 7, S2NE4, SE4NW4, SE4SW4, SE4 | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 151 | 98 | 7 | Lots 1, 2, 3, 4, SE4NW4, E2SW4, SE4 | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 9/6/2005 | 152 | 98 | 32 | N2NW4 | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Diamond Resources, Inc. | 5/10/2005 | 152 | 98 | 31 | Lots 1, 2, E2NW4, SW4NE4, E2SW4, W2SE4, SE4SE4 | 363133 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 3 | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 4, SE4, SE4SW, N2NE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 19 | LOT 1,NENW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 19 | LOT 2,SENW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 19 | W2NE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 1 | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 18 | LOT 2,E2NW,NESW,SWNE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 17 | N2NW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | SE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 7 | LOT 1,2,3,4,SENW,E2SW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 7 | SE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 8 | NW,N2SW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 8 | S2SW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | LOT 3,4,5,SENW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | LOTS 1,2,S2NE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | SESW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 6 | LOT 7 | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 98 | 5 | LOTS 3,4 | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 151 | 99 | 13 | NE4, N2SE4 | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 32 | N2NW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 31 | S2SE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 29 | W2NE,N2SE,NESW | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 31 | LOTS 1,2,E2NW,SWNE,E2SW,NWSE | 408301 | McKenzie | ND |
| Samedan Royalty Corporation | Zenergy, Inc. | 6/24/2010 | 152 | 98 | 30 | NESW,N2SE,SWSE | 408301 | McKenzie | ND |
| Samuel A Derby And Bobbie S Derby; | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | S2NE | 569938 | Williams | ND |
| Samuel A Derby And Bobbie S Derby; | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | E2SW | 569938 | Williams | ND |
| Samuel A Derby And Bobbie S Derby; | Empire Oil Company | 4/10/1997 | 155 | 101 | 12 | SE/4 | 569938 | Williams | ND |
| Samuel C. Denton | Diamond Resources, Inc. | 3/9/2006 | 151 | 98 | 28 | SWSW | 364276 | McKenzie | ND |
| Sandi Wisness | Empire Oil Company | 8/10/2010 | 151 | 98 | 29 | S/2NW/4, SW/4 | 411703 | McKenzie | ND |
| Sandi Wisness | Empire Oil Company | 1/23/2008 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 411705 | McKenzie | ND |
| Sandra Edwards, A Married Woman | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364019 | McKenzie | ND |
| Sandra Edwards, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/8/2009 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 396678 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sandra Fullerton | Diamond Resources, Inc. | 4/20/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378788 | McKenzie | ND |
| Sandra Nelson, F/K/A Sandra Deguire, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358453 | McKenzie | ND |
| Sandra Nelson, F/K/A Sandra Deguire, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358453 | McKenzie | ND |
| Sara Alexander Gieb, A Single Woman | Diamond Resources, Inc. | 7/18/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 382030 | McKenzie | ND |
| Sara Hubler, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358454 | McKenzie | ND |
| Sara Hubler, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358454 | McKenzie | ND |
| Sara L Udland; Widow | Great Northern Energy, Inc. | 5/12/2010 | 152 | 99 | 25 | SWSW | 400057 | McKenzie | Widow |
| Sara L. Udland, A Widow | Diamond Resources, Inc. | 7/13/2005 | 152 | 98 | 30 | Lot 1 | 358056 | McKenzie | ND |
| Sarah Surly | Diamond Resources, Inc. | 2/24/2006 | 152 | 98 | 30 | Lot 1 | 362275 | McKenzie | ND |
| Sarah Surry, A Married Woman Dealing In Her Sole And Separate Property, Individually And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | Sec 30: Lot 1(33.53) | 396685 | McKenzie | ND |
| Sarah Surry; Mdssp | Great Northern Energy, Inc. | 5/1/2010 | 152 | 99 | 25 | SWSW | 396698 | McKenzie | ND |
| Sarah Surry; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | NWNE | 396691 | McKenzie | ND |
| Sarah Surry; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | N2NW | 396691 | McKenzie | ND |
| Scott A. Brown, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 8 | W2 | 355728 | McKenzie | ND |
| Scott A. Brown, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | N2NW4 | 355728 | McKenzie | ND |
| Scott A. Brown, A Single Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 7 | SE4 | 355728 | McKenzie | ND |
| Scott D. White | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 33 | E2SE4 | 356447 | McKenzie | ND |
| Scott D. White | Diamond Resources, Inc. | 4/20/2005 | 152 | 98 | 34 | E2W2, W2SW4 | 356447 | McKenzie | ND |
| Scott D. White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 8 | E2E2, W2E2 less a tract of land located in the NE4NE4 and the SE4NE4 more fully described in document 243639, and less a tract of land located in the NE4NE4 more fully described in document 243640 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 151 | 98 | 6 | Lots 1, 2, S2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 5 | Sec 5: Lots 3(39.93), 4(39.87) | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 8 | Sec 8: E2E2, less a 7.70 acre tract known as IT 1198 MFD in Doc. 243639; and less a 7.70 acre tract known as IT 1199, MFD in Doc. 243640, and W2E2, less an 8.70 acre tract known as IT 1200, MFD in Doc. 243641 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 17 | Sec 17: N2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 151 | 98 | 6 | Lots 1(39.86), 2(39.90), S2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Diamond Resources, Inc. | 2/4/2005 | 152 | 98 | 31 | SE4SW4, S2SE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 33 | E2NE4 | 401484 | McKenzie | ND |
| Scott D. White, A Single Man | Great Northern Energy, Inc. | 2/3/2010 | 152 | 98 | 31 | S2SE4 | 401484 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Scott Vance, Trustee Of The Rose Lawlar Minerals Trust | Diamond Resources, Inc. | 4/28/2005 | 151 | 98 | 19 | Lot 4, E2SW, W2SE | 356874 | McKenzie | ND |
| Sharon Blake Bromberg | Oasis Petroleum North America LLC | 1/26/2014 | 155 | 101 | 12 | W/2SW/4 | 787690 | Williams | ND |
| Sharon Eastwood | Empire Oil Company | 8/28/2007 | 151 | 98 | 32 | 151N-098W-32-N2SW4, NW4 | 372767 | McKenzie | ND |
| Sharon Eastwood, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 3/2/2010 | 151 | 98 | 29 | S2NW, SW | 400921 | McKenzie | ND |
| Sharon Eastwood, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 4/6/2010 | 151 | 98 | 30 | LOT 4, SENE, SESW, SE/4 | 400921 | McKenzie | ND |
| Sherry Cole, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358720 | McKenzie | ND |
| Sherry Cole, A Married Woman | Diamond Resources, Inc. | 8/3/2005 | 152 | 98 | 24 | N2NW4 | 358720 | McKenzie | ND |
| Shirley M. Lindeman And Donald L. Lindeman, Her Husband | Diamond Resources, Inc. | 6/9/2005 | 151 | 98 | 6 | Lot 6, NE4SW4 | 357534 | McKenzie | ND |
| Shirley M. Lindeman, A Widow | Great Northern Energy, Inc. | 6/9/2010 | 151 | 99 | 1 | Lot 3(40.05), SE4NW4, E2SW4, N2SE4 | 401486 | McKenzie | ND |
| Shirley M. Lindeman, A Widow | Great Northern Energy, Inc. | 3/23/2010 | 151 | 98 | 6 | Lot 6(34.30), NE4SW4 | 401486 | McKenzie | ND |
| Sigrid M. Russell Revocable Inter Vivos Trust, Blaine Russell, Trustee | Great Northern Energy, Inc. | 1/29/2010 | 151 | 98 | 28 | SWSW | 400417 | McKenzie | ND |
| Six T. LLC | Diamond Resources Inc. | 6/22/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-122 | Roosevelt | MT |
| Slemaker Royalty Company | Sundance Oil & Gas Inc | 4/14/2006 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 370844 | Roosevelt | MT |
| Smith Arla Et Al | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | N2 | 380017 | McKenzie | ND |
| Smith Arla Et Al | St. Mary Land & Exploration Company | 5/15/2008 | 153 | 97 | 33 | S2 | 380017 | McKenzie | ND |
| Smokey Oil LLC | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 6 | Lots 3(39.94), 4(39.20), 5(34.26), 7(34.34), SENW, SESW, SE | 402403 | McKenzie | ND |
| Smokey Oil LLC | Slawson Exploration Company, Inc. | 2/25/2010 | 151 | 98 | 7 | Lots 1(34.38), 2(34.44), 3(34.48), 4(34.54), SENW, E2SW | 402403 | McKenzie | ND |
| ST ND OG-09-00865 | Empire Oil | 8/4/2009 | 151 | 98 | 8 | E2NE4 | 391809 | McKenzie | ND |
| ST ND OG-09-00866 | Empire Oil | 8/4/2009 | 151 | 98 | 8 | E2SE4 | 391810 | McKenzie | ND |
| ST ND OG-09-00877 | St. Mary Land & Exploration Company | 8/4/2009 | 151 | 98 | 19 | W2NE4 | 391725 | McKenzie | ND |
| ST ND OG-09-00878 | St. Mary Land & Exploration Company | 8/4/2009 | 151 | 98 | 19 | LOT 2, SE4NW4 | 391726 | McKenzie | ND |
| ST Of ND OG-09-00905 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 2 | SE/4 | 391529 | McKenzie | ND |
| ST Of ND OG-09-00906 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 3 | LOTS 11-12 | 391530 | McKenzie | ND |
| ST Of ND OG-09-00916 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 23 | SE/4 | 391536 | McKenzie | ND |
| ST Of ND OG-09-00917 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 27 | W/2NW/4 | 391537 | McKenzie | ND |
| ST Of ND OG-09-00918 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 28 | NE4 | 397538 | McKenzie | ND |
| ST Of ND OG-09-00919 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 28 | E2NW4, NW4NW4 | 391539 | McKenzie | ND |
| ST Of ND OG-09-00922 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 34 | N/2SE/4 | 391540 | McKenzie | ND |
| Stallings Properties, Ltd | Diamond Resources, Inc. | 7/18/2008 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 382032 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 151 | 98 | 5 | LOT 1,2 | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 31 | SENE | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 31 | NESE | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 32 | SW | 382036 | McKenzie | ND |
| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 33 | W2SE,W2NE,S2SW | 382036 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| STan R Shelley | Diamond Resources Inc | 5/7/2008 | 152 | 98 | 32 | S2NW,SE | 382036 | McKenzie | ND |
|---|---|---|---|---|---|---|---|---|---|
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Keith G.Shelley, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, John F. Laughter, Leon H. Shelley, Nancy J. Goddard And Kl & Hazel Shelley Trust | Diamond Resources, Inc. | 2/17/2005 | 152 | 98 | 31 | SE4NE4, NE4SE4 | 380171 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 5/7/2008 | 151 | 98 | 5 | Lots 1, 2 | 380171 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 33 | W2E2, S2SW4 | 380171 | McKenzie | ND |
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 32 | S2NW4, S2 | 380171 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Stan R. Shelley, A/K/A Stanley R. Shelley, Attorney-In-Fact For Revonda Floyd, Sharon Millicent Roberts, Gary Lee Shelley, Steven Mark Shelley, Gloria Louise Davis, Susan Kuyers, Harley F. Shelley, Warren L. Shelley, Bryan K. Shelley, Stan R. Shelley, Leon H. Shelley, Nancy J. Goddard, Kl & Hazel Shelley Trust, John R. Shelley, Lauren Elizabeth Hairgrove | Diamond Resources, Inc. | 2/17/2009 | 152 | 98 | 31 | SE4NE4, NE4SE4 | 380171 | McKenzie | ND |
| State Of ND # OG-0900907 | Continental Resources Inc. | 8/4/2009 | 152 | 98 | 3 | N2SW4 | 391531 | McKenzie | ND |
| State Of North Dakota | Johnsrud And Sons | 8/3/2004 | 151 | 98 | 8 | E2NE4 | 351668 | McKenzie | ND |
| State Of North Dakota | Johnsrud And Sons | 8/3/2004 | 151 | 98 | 8 | E2SE4 | 351668 | McKenzie | ND |
| State Of North Dakota | Cody Oil & Gas Corporation | 8/6/2002 | 152 | 98 | 30 | Lot 2, E/2NW/4 | 351668 | McKenzie | ND |
| State Of North Dakota | Cody Oil & Gas Corporation | 8/6/2002 | 152 | 98 | 30 | Lot 3 | 351668 | McKenzie | ND |
| State Of North Dakota | Cody Oil & Gas Corporation | 8/6/2002 | 152 | 98 | 30 | Lot 4, SE/4SW/4 | 351668 | McKenzie | ND |
| State Of North Dakota | Lasalle Leasing, LLC C/O St Mary La | 2/2/2010 | 151 | 99 | 14 | SW | 429619 | McKenzie | ND |
| State Of North Dakota | Powers Energy Corporation | 8/3/2004 | 152 | 98 | 35 | SW | 353249 | McKenzie | ND |
| State Of North Dakota | Powers Energy Corporation | 8/3/2004 | 152 | 98 | 35 | S2NW | 353248 | McKenzie | ND |
| Stephany Beaver, A Married Woman Dealing In Her Sole And Separate Property, Ind And As Heir To The Estate Of Susan Schantz, Dec. | Great Northern Energy, Inc. | 7/9/2010 | 152 | 98 | 30 | Lot 1 (33.53) | 405835 | McKenzie | ND |
| Stephany Beaver, A Married Woman, Individually, And As Heir To The Estate Of Susan Schantz, Deceased | Great Northern Energy, Inc. | 7/9/2010 | 152 | 99 | 25 | SWSW | 405835 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 6 | Lot 9, E2SE4, and a tract in lots 7, 8, 10 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 7 | NE4, E2W2, SE4 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 18 | N2NE4, NE4NW4, S2SE4 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 97 | 19 | Lots 1, 2, N2NE4, E2NW4 | 364029 | McKenzie | ND |
| Stephen C. Grantier And Denise F. Grantier, Husband And Wife | Diamond Resources, Inc. | 3/23/2006 | 152 | 98 | 24 | E2NE4 | 364029 | McKenzie | ND |
| STeve A Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 11 | E2SW,SWSW | 431198 | McKenzie | ND |
| STeve A Wade | Zenergy, Inc. | 2/1/2012 | 152 | 98 | 14 | N2NW | 431198 | McKenzie | ND |
| STeve Shafer Trust | Great Northern Energy, Inc. | 4/29/2010 | 151 | 98 | 13 | E2NE | 402713 | McKenzie | ND |
| Steven A. Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2005 | 151 | 98 | 17 | S2NE4, SE4 | 355719 | McKenzie | ND |
| Steven A. Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2005 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, E2SW4, W2SE4 | 355719 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Steven A. Johnson, A/K/A Steven Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 33 | E2E2 | 377947 | McKenzie | ND |
| Steven A. Johnson, A/K/A Steven Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 34 | E2W2, W2SW4 | 377947 | McKenzie | ND |
| Steven A. Johnson, A/K/A Steven Johnson, A Married Man | Diamond Resources, Inc. | 1/31/2009 | 152 | 98 | 31 | Lots 1, 2, SW4NE4, E2NW4, NW4SE4, E2SW4 | 377947 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 151 | 98 | 5 | LOT 1,2 | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 31 | SENE | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 33 | W2SE,W2NE,S2SW | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 32 | SW | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 32 | S2NW,SE | 378312 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources Inc | 4/14/2009 | 152 | 98 | 33 | NW,N2SW | 378300 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources Inc | 4/14/2009 | 152 | 98 | 32 | SE4NE4 | 378300 | McKenzie | ND |
| STeven D Shelley; Married | Diamond Resources Inc | 4/14/2009 | 152 | 98 | 32 | SW4NE4 | 378300 | McKenzie | ND |
| Steven D. Shelley | Diamond Resources, Inc. | 4/14/2005 | 152 | 98 | 33 | W2NE4, NW4, N2SW4 | 356315 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 151 | 98 | 5 | Lots 1, 2 | 356312 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2005 | 152 | 98 | 33 | W2SE4, W2NE4, S2SW4 | 356312 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 4/14/2009 | 152 | 98 | 33 | NW4, N2SW4 | 356312 | McKenzie | ND |
| Steven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 33 | W2E2, S2SW4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 32 | S1/2NW1/4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/19/2009 | 152 | 98 | 32 | SE1/4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/20/2009 | 152 | 98 | 32 | SW1/4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 4/14/2009 | 152 | 98 | 32 | S2NE4 | 356312 | McKenzie | ND |
| STeven D. Shelley, A Married Man | Diamond Resources, Inc. | 2/18/2009 | 152 | 98 | 31 | SE1/4NE1/4 | 356312 | McKenzie | ND |
| STeven Martin Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378523 | McKenzie | ND |
| STeven Martin Fetveit, A Married Man | Diamond Resources, Inc. | 5/2/2008 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378523 | McKenzie | ND |
| STeven Martin Fetveit, A Married Man | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 29 | E2NE4 | 378523 | McKenzie | ND |
| STeven Martin Fetveit; Married | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378521 | McKenzie | ND |
| STeven Ryder | Unknown Lessee | 10/19/2005 | 27 | 59 | 7 | S/2SE/4 | 368726 | Roosevelt | MT |
| STeven Ryder | Unknown Lessee | 10/19/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 368726 | Roosevelt | MT |
| STewart J Fetveit And Carla R Fetve | Diamond Resources Inc | 2/14/2009 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | 378500 | McKenzie | ND |
| STewart J. Fetveit And Carla R. Fetveit, Husband And Wife | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 28 | NW4SW4, SW4NW4 | 378502 | McKenzie | ND |
| STewart J. Fetveit And Carla R. Fetveit, Husband And Wife | Diamond Resources, Inc. | 2/14/2009 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | 378502 | McKenzie | ND |
| STewart J. Fetveit And Carla R. Fetveit, Husband And Wife | Diamond Resources, Inc. | 2/1/2009 | 152 | 98 | 29 | E2NE4 | 378502 | McKenzie | ND |
| Susan D. Zimmerman Et Vir | Sundance Oil And Gas | 6/16/2008 | 27 | 59 | 10 | W/2E/2, W/2 | 377618 | Roosevelt | MT |
| Susan D. Zimmerman Et Vir | Sundance Oil And Gas | 6/16/2008 | 27 | 59 | 10 | NE/4SW/4 | 377618 | Roosevelt | MT |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Susan Elizabeth Murphy, A Single Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 378787 | McKenzie | ND |
| Susan Eyre, F/K/A Susan Looft, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358724 | McKenzie | ND |
| Susan Eyre, F/K/A Susan Looft, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 24 | N2NW4 | 358724 | McKenzie | ND |
| Susan Lemley | Diamond Resources, Inc. | 6/23/2005 | 152 | 98 | 14 | NE4 | 357790 | McKenzie | ND |
| Susan M Lemley; Married | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE | 378784 | McKenzie | ND |
| Susan M. Lemley, A Married Woman | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 33 | NW4, N2SW4 | 378493 | McKenzie | ND |
| Susan M. Lemley, A Married Woman | Diamond Resources, Inc. | 5/5/2009 | 152 | 98 | 32 | S2NE4 | 378493 | McKenzie | ND |
| Susan M. Lemley, A Married Woman | Diamond Resources, Inc. | 6/23/2009 | 152 | 98 | 14 | NE4 | 378493 | McKenzie | ND |
| Susan Nilson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360258 | McKenzie | ND |
| Susan Nilson, A Married Woman | Diamond Resources, Inc. | 11/14/2005 | 152 | 98 | 32 | S2NE4 | 360258 | McKenzie | ND |
| Susan Olson, A Married Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358445 | McKenzie | ND |
| Susan Olson, A Married Woman | Diamond Resources, Inc. | 8/1/2005 | 152 | 98 | 24 | N2NW4 | 358445 | McKenzie | ND |
| Susan R. Harris Et Vir | Unknown Lessee | 6/4/2008 | 27 | 59 | 7 | S/2SE/4 | 377716 | Roosevelt | MT |
| Susan R. Harris Et Vir | Unknown Lessee | 6/4/2008 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 377716 | Roosevelt | MT |
| Susan Schantz | Diamond Resources, Inc. | 12/27/2005 | 152 | 98 | 30 | Lot 1 | 361882 | McKenzie | ND |
| Suzanne Miles, F/K/A Suzanna Miles Robken, A Single Woman | Diamond Resources, Inc. | 4/3/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 379828 | McKenzie | ND |
| Sylvia K Heiney | Sundance Oil & Gas Inc | 11/25/2008 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | 379550 | Roosevelt | MT |
| T Rex & Fart LLC | Oasis Petroleum North America | 2/1/2014 | 152 | 98 | 30 | NE4 | 466579 | McKenzie | ND |
| T Rex & Fart LLC | Oasis Petroleum North America | 2/1/2014 | 152 | 98 | 30 | SE4SE4 | 466579 | McKenzie | ND |
| Ted Sheraris, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364026 | McKenzie | ND |
| Ted Sherarts | Continental Resources, Inc. | 9/8/2010 | 152 | 98 | 30 | LOT 1 | 407846 | McKenzie | ND |
| Ted Sherarts, A Married Man | Diamond Resources, Inc. | 5/23/2006 | 152 | 98 | 30 | Lot 1 | 364026 | McKenzie | ND |
| Teresa Anne Miles Pacheco, A/K/A Teresa Miles Pacheco, A Married Woman | Diamond Resources, Inc. | 3/30/2009 | 151 | 98 | 28 | N2, N2SE, SESE | 379081 | McKenzie | ND |
| Teresa STockford, A Single Woman | Diamond Resources Inc. | 6/27/2005 | 28 | 58 | 25 | NE4SW4, NW4SE4 | 609-192 | Roosevelt | MT |
| Terry Nelson | Sundance Oil And Gas | 5/10/2006 | 27 | 59 | 3 | SW/4 | 370936 | Roosevelt | MT |
| Terry Nelson | Sundance Oil And Gas | 5/10/2006 | 27 | 59 | 6 | LOTS 1, 2,3,4, SW/4NW/4, SW/4, SE/4SE/4 | 370936 | Roosevelt | MT |
| Terry Nelson | Oasis Petroleum N America LLC | 7/13/2011 | 27 | 59 | 4 | S/2 | 390636 | Roosevelt | MT |
| Terry Nelson | Oasis Petroleum N America LLC | 7/13/2011 | 27 | 59 | 9 | N/2 | 390636 | Roosevelt | MT |
| Terry Nelson | Oasis Petroleum N America LLC | 7/13/2011 | 27 | 59 | 5 | LOT1, LOT2, LOT3, LOT4, S/2NE/4, SW/4NW/4, E/2SW/4, SW/4SW/4, SE/4 | 390636 | Roosevelt | MT |
| Terry Nordeng, A Single Man | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 35 | NE4, N2NW4 | 355176 | McKenzie | ND |
| Terry Nordeng, A Single Man | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 26 | S2, S2NE4 | 355176 | McKenzie | ND |
| Terry Nordeng, A Single Man | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 36 | NW4 | 355176 | McKenzie | ND |
| Terry Nordeng, A Single Man | Diamond Resources, Inc | 3/1/2005 | 152 | 97 | 30 | Lot 2, SE1/4NW1/4 | 355176 | McKenzie | ND |
| The Good Shepherd Home | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | 358275 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| The Good Shepherd Home | Continental Resources, Inc. | 6/13/2005 | 152 | 97 | 19 | E/2SE/4 | 358275 | McKenzie | ND |
| The Myers And Pechtl 2006 Revocable Trust, Under Trust Agreement Dated September 13, 2006, Elizabeth A. Meyers And Patricia J. Pechtl, Trustees | Great Northern Energy, Inc. | 12/4/2009 | 152 | 98 | 30 | Lot 1(33.53) | 395729 | McKenzie | ND |
| The Rosen Mineral Trust, Louis Rose | Empire Oil Company | 9/20/1996 | 155 | 101 | 12 | E2SW | 569936 | Williams | ND |
| The Rosen Mineral Trust, Louis Rose | Empire Oil Company | 9/20/1996 | 155 | 101 | 12 | SE/4 | 569936 | Williams | ND |
| The Rosen Mineral Trust, Louis Rose | Empire Oil Company | 9/20/1996 | 155 | 101 | 12 | S/2NE/4 | 569936 | Williams | ND |
| Thelma I Draughon | 7 O'S Oil Corporation | 4/14/2005 | 27 | 59 | 7 | S/2SE/4 | 367169 | Roosevelt | MT |
| Thelma I Draughon | 7 O'S Oil Corporation | 4/14/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367169 | Roosevelt | MT |
| Thelma Mcintire | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | SW | 385463 | McKenzie | ND |
| Thelma Mcintire | Panther Entergy Company, LLC | 7/1/2008 | 151 | 99 | 14 | E2 | 385463 | McKenzie | ND |
| Thelma Mcintire, A Widow | Diamond Resources, Inc. | 5/20/2008 | 151 | 98 | 19 | Lot 3 | 378800 | McKenzie | ND |
| Theresa Andre, F/K/A/ Theresa Thomley, A Married Woman | Diamond Resources, Inc. | 8/4/2005 | 152 | 98 | 13 | N2SW4, SW4SW4 | 358432 | McKenzie | ND |
| Theresa Andre, F/K/A/ Theresa Thomley, A Married Woman | Diamond Resources, Inc. | 8/5/2005 | 152 | 98 | 24 | N2NW4 | 358432 | McKenzie | ND |
| Thomas A. Kilwein, A Married Man | Diamond Resources, Inc. | 12/30/2005 | 152 | 98 | 30 | Lot 1 | 360987 | McKenzie | ND |
| Thomas D Theriault Ut Ex | Sundance Oil & Gas Inc | 5/23/2006 | 27 | 59 | 10 | NE/4SW/4 | 371082 | Roosevelt | MT |
| Thomas J. Van Osdel, A Married Man | Great Northern Energy, Inc. | 12/3/2009 | 152 | 99 | 25 | SWSW | 396695 | McKenzie | ND |
| Thomas J. Van Osdel, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 12/3/2009 | 152 | 98 | 30 | Lot 1(33.53) | 396695 | McKenzie | ND |
| Thomas P Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | 382201 | Roosevelt | MT |
| Thomas P Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | 382201 | Roosevelt | MT |
| Thomas S Kjos, Sole Heir Of Evelyn | Zenergy, Inc. | 7/1/2012 | 152 | 98 | 14 | E2SE,SWSE | 436910 | McKenzie | ND |
| Thomas S Kjos, Sole Heir Of Evelyn | Zenergy, Inc. | 7/1/2012 | 152 | 98 | 23 | NENE | 436910 | McKenzie | ND |
| Thomas U Kellogg Et Ux | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | 348213 | McKenzie | ND |
| Thomas U Kellogg Et Ux | Bill.L. Seerup | 4/15/2004 | 152 | 97 | 19 | E/2SE/4 | 348213 | McKenzie | ND |
| Timothy Geck, A Married Man, Individually, And As Heir To The Estate Of Clemens Geck, Deceased | Great Northern Energy, Inc. | 12/17/2009 | 152 | 99 | 25 | SWSW | 399009 | McKenzie | ND |
| Timothy James Bergee; Single | Great Northern Energy Inc | 4/16/2010 | 151 | 98 | 24 | S2NE,SENW,E2SW,SE | 402082 | McKenzie | ND |
| Timothy R Geck; Mdssp | Great Northern Energy, Inc. | 12/17/2009 | 152 | 98 | 30 | LOT 1 | 399010 | McKenzie | ND |
| Todd D. Ehresmann, A/K/Atodd Ehresmann, A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 99 | 25 | SWSW | 400045 | McKenzie | ND |
| Todd D. Ehresmann, A/K/A Todd Ehresmann, A Single Man | Great Northern Energy, Inc. | 2/10/2010 | 152 | 98 | 30 | Lot 1(33.53) | 400045 | McKenzie | ND |
| Tracy R Barbee | Continental Resources, Inc. | 7/21/2008 | 153 | 97 | 27 | 153N-097W-27-E/2NE/4, NW/4NE/4 | 381653 | McKenzie | ND |
| USA NDM97028 Segregated NDM108450 | Whiting Oil And Gas Corporation | 9/1/2007 | 152 | 97 | 18 | SE4SW4 | | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | 155N-101W-01-LOTS 1 & 2 | | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | SE/4 | | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | S/2NE/4 | | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | SE/4NW/4 | | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | 155N-101W-01-SW/4 | | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | 155N-101W-01-LOTS 3 & 4 | | 693086 | Williams | ND |
| Valerie Ann Smischny Etvir  G | Oasis Petroleum North America LLC | 3/10/2011 | 155 | 101 | 1 | SW/4NW/4 | | 693086 | Williams | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 32 | N2NW4 | | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 30 | NE4SW4, N2SE4, SW4SE4 | | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 31 | N2NE4 | | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S2S2 | | 355734 | McKenzie | ND |
| Vernon R. Renbarger And Elise V. Renbarger, Husband And Wife | Diamond Resources, Inc. | 3/1/2005 | 152 | 98 | 3 | S1/2S1/2 | | 355734 | McKenzie | ND |
| Vicki Schelde And Jack Schelde, Her Husband | Diamond Resources, Inc. | 6/9/2009 | 152 | 98 | 29 | W2NE4, NE4SW4, N2SE4 | | 379074 | McKenzie | ND |
| Victoria Ruderman, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 98 | 13 | N2SW4, SW4SW4 | | 401490 | McKenzie | ND |
| Victoria Ruderman, A Married Woman Dealing In Her Sole And Separate Property | Great Northern Energy, Inc. | 1/25/2010 | 152 | 98 | 24 | N2NW4 | | 401490 | McKenzie | ND |
| Virginia Lee Lewis | Zenergy, Inc. | 6/1/2010 | 27 | 59 | 3 | LOT1, LOT2, LOT3, LOT4, S/2N/2 | | 385548 | Roosevelt | MT |
| Virginia Pearson, A Married Woman | Diamond Resources, Inc. | 6/6/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | | 358058 | McKenzie | ND |
| Virginia Pearson, A Married Woman | Diamond Resources, Inc. | 6/7/2005 | 152 | 98 | 23 | NE4NE4 | | 358058 | McKenzie | ND |
| Vvv Holdings, LLC, A North Dakota Corporation | Great Northern Energy, Inc. | 11/13/2009 | 152 | 97 | 19 | Sec 19: S2NE4, NW4SE4 | | 394858 | McKenzie | ND |
| W & A Wold Minerals Trust Dated 4-21-04, Gary Wold, Trustee | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | | 400923 | McKenzie | ND |
| Wallace F. Dyste, A Married Woman | Diamond Resources, Inc. | 8/11/2005 | 152 | 98 | 14 | E2SE4, SW4SE4 | | 358470 | McKenzie | ND |
| Wallace F. Dyste, A Married Woman | Diamond Resources, Inc. | 8/12/2005 | 152 | 98 | 23 | NE4NE4 | | 358470 | McKenzie | ND |
| Walter Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | W/2SE/4, W/2NE/4, E/2NW/4 | | 382204 | Roosevelt | MT |
| Walter Romo | Oasis Petroleum North America LLC | 6/25/2010 | 27 | 59 | 8 | E/2E/2 | | 382204 | Roosevelt | MT |
| Warren Reese, A Married Man | Cody Oil & Gas Corporation | 5/12/2004 | 152 | 98 | 10 | SE1/4 less a tract of land containing 4.50 acres mfd in book  7, page 15 | | 351142 | McKenzie | ND |
| Wayne R Johnson | Continental Resources, Inc. | 5/1/2011 | 152 | 97 | 19 | NE/4SW/4 | | 410672 | McKenzie | ND |
| Wayne R Johnson | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 12 | SW/4 | | 410674 | McKenzie | ND |
| Wayne R Johnson | Continental Resources Inc. | 10/29/2010 | 152 | 98 | 13 | IT 19 | | 410674 | McKenzie | ND |
| Wayne R Johnson; Single | Great Northern Energy, Inc. | 7/18/2010 | 152 | 98 | 13 | NE | | 400163 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/2/2005 | 152 | 97 | 7 | Lots 3, 4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 11/1/2009 | 152 | 97 | 19 | NE4SW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 12 | SE4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/11/2009 | 152 | 98 | 12 | SW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc. | 3/2/2005 | 152 | 98 | 24 | E1/2NE1/4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 7 | Lots 3(35.47), 4(35.53) | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 18 | Sec 18: Lots 1(35.61), 2(35.73), 3(35.83), 4(35.95), S2NE4, N2SE4, NESW4, SENW4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 97 | 19 | Sec 19: NE4SW4 Note: Wayne R. Johnson overpaid by 1.34 acres, Zenergy, Inc. refunded $100.00 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Diamond Resources, Inc | 3/2/2005 | 152 | 97 | 18 | Lots 1, 2, 3, 4, S2NE, N2SE, NESW, SENW | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SW4 Note: Wayne R. Johnson overpaid by 2.67 acres, Zenergy, Inc. refunded $200.25 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 12 | Sec 12: SE4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | NE4 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | IT 19 in the NE4NW4, more fully described in Book 7, Page 256 | 355575 | McKenzie | ND |
| Wayne R. Johnson, A Single Man | Great Northern Energy, Inc. | 1/15/2010 | 152 | 98 | 13 | E2SE4 Note: Wayne R. Johnson overpaid by 15.55 acres, Zenergy, Inc. refunded $1166.00 | 355575 | McKenzie | ND |
| Weldon B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 7 | S/2SE/4 | 367177 | Roosevelt | MT |
| Weldon B Rogers | Unknown Lessee | 4/6/2005 | 27 | 59 | 8 | SW/4NW/4, SW/4 | 367177 | Roosevelt | MT |
| Wendell Tasker And Carol Tasker, Husband And Wife | Diamond Resources, Inc. | 11/3/2005 | 152 | 99 | 25 | E2NE, SWNE, SE, S2NW, N2SW | 360373 | McKenzie | ND |
| Wendell Tasker And Carol Tasker, Husband And Wife | Diamond Resources, Inc. | 8/14/2006 | 152 | 99 | 25 | NWNE, N2NW | 365466 | McKenzie | ND |
| Wendell Tasker, A Married Man | Diamond Resources, Inc. | 11/3/2005 | 152 | 98 | 30 | Lots 1, 4, SE4SW4 | 360373 | McKenzie | ND |
| Wendy A Frisk | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | S/2NE/4 | 388760 | Roosevelt | MT |
| Wendy A Frisk | Oasis Petroleum North America LLC | 2/20/2011 | 27 | 59 | 4 | LOTS 1(40.08),2(40.08) | 388760 | Roosevelt | MT |
| Wendy A. Frisk | Unknown Lessee | 11/26/2008 | 27 | 59 | 4 | LOT 3(40.08), LOT 4(40.08) | 379372 | Roosevelt | MT |
| Wendy A. Frisk | Unknown Lessee | 11/26/2008 | 27 | 59 | 4 | S/2NW/4 | 379372 | Roosevelt | MT |
| Wesley Misemer, A Single Man | Great Northern Energy, Inc. | 1/8/2010 | 152 | 97 | 6 | Lots 11(40.00), 12(35.05), 13(35.15), 14(35.27), E2SW4, W2SE4 | 397571 | McKenzie | ND |
| Wesley Misemer, A/K/A Wes Misemer, A Single Man | Diamond Resources, Inc. | 5/18/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 364267 | McKenzie | ND |
| Wesley Wold & Arlene Wold, As Trustees Of The W. & A. Wold Minerals Trust Dated 4/21/04 | Diamond Resources, Inc. | 5/9/2005 | 152 | 98 | 1 | Lots 3, 4 | 357176 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Wesley Wold And Arlene J. Wold, As Trustees Of The W&A Wold Minerals Trust | Diamond Resources, Inc. | 4/11/2006 | 152 | 97 | 6 | Lots 11, 12, 13, 14, E2SW4, W2SE4 | 363132 | McKenzie | ND |
| Westhoma Oil Company | Zenergy, Inc. | 1/1/2010 | 152 | 98 | 34 | W2SW | 397331 | McKenzie | ND |
| Westhoma Oil Company | Zenergy, Inc. | 1/1/2010 | 152 | 98 | 33 | E2SE | 397331 | McKenzie | ND |
| White Rock Trust | Brigham Oil & Gas, Lp | 7/13/2010 | 151 | 99 | 35 | E2E2 | 409476 | McKenzie | ND |
| White Rock Trust | Brigham Oil & Gas, Lp | 7/13/2010 | 151 | 99 | 26 | SESW,S2SE,NESE | 409476 | McKenzie | ND |
| William A. Dyste And Marlys K. Dyste | Great Northern Energy, Inc. | 4/19/2010 | 152 | 98 | 23 | Sec 23: NE4NE4 | 402083 | McKenzie | ND |
| William A. Dyste And Marlys K. Dyste | Great Northern Energy, Inc. | 4/20/2010 | 152 | 98 | 14 | Sec 14: E2SE4, SW4SE4 | 402083 | McKenzie | ND |
| William D Utke | Panther Energy Company, LLC | 7/2/2008 | 151 | 99 | 14 | S2NW | 386835 | McKenzie | ND |
| William E. Bucshbom, A Merried Man | Great Northern Energy, Inc. | 11/20/2009 | 152 | 99 | 25 | SWSW | 394862 | McKenzie | ND |
| William E. Buschbom, A Married Man Dealing In His Sole And Separate Property | Great Northern Energy, Inc. | 11/20/2009 | 152 | 98 | 30 | Lot 1(33.53) | 394862 | McKenzie | ND |
| William H Sutton | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | E/2SW/4 | 700147 | Williams | ND |
| William H Sutton | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | SE/4 | 700147 | Williams | ND |
| William H Sutton | Brigham Oil & Gas Lp | 9/14/2010 | 155 | 101 | 12 | S/2NE/4 | 700147 | Williams | ND |
| William L Halldorson And Marilyn Ha | Zenergy, Inc. | 10/1/2010 | 152 | 98 | 33 | NW,N2SW | 410000 | McKenzie | ND |
| William L Halldorson And Marilyn Ha | Zenergy, Inc. | 10/1/2010 | 152 | 98 | 32 | SE4NE4 | 410000 | McKenzie | ND |
| William L Halldorson And Marilyn Ha | Zenergy, Inc. | 10/1/2010 | 152 | 98 | 32 | SW4NE4 | 410000 | McKenzie | ND |
| William L Mills | Panther Energy Company, LLC | 3/11/2010 | 152 | 98 | 11 | E2NW | 403345 | McKenzie | ND |
| William L Mills | Panther Energy Company, LLC | 3/11/2010 | 152 | 98 | 11 | NE | 403345 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 1 | SW/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | S/2SW/4, SE/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 28 | NE/4SW/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 29 | SE/4SE/4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NE4NE4 | 401346 | McKenzie | ND |
| William L Mills | Continental Resources Inc. | 2/1/2010 | 152 | 98 | 32 | NW4NE4 | 401346 | McKenzie | ND |
| William L. Mills | Missouri Basin Well Service | 3/10/2005 | 152 | 98 | 11 | NE4, E2NW4 | 356255 | McKenzie | ND |
| William R Andersen | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT 1 | 398686 | McKenzie | ND |
| William R Andersen | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | LOT4 | 398686 | McKenzie | ND |
| William R Andersen | Continental Resources, Inc. | 2/1/2010 | 152 | 98 | 30 | SE/4SW/4 | 398686 | McKenzie | ND |
| Wilma Ebensteiner, F/K/A Wilma Paul, A Married Woman | Diamond Resources, Inc. | 9/28/2009 | 152 | 98 | 33 | NW4, N2SW4 | 381440 | McKenzie | ND |
| Wilma Ebensteiner, F/K/A Wilma Paul, A Married Woman | Diamond Resources, Inc. | 9/28/2009 | 152 | 98 | 32 | S2NE4 | 381440 | McKenzie | ND |
| Winnie M. Shull, A Single Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 33 | NW4, N2SW4 | 360057 | McKenzie | ND |
| Winnie M. Shull, A Single Woman | Diamond Resources, Inc. | 10/19/2005 | 152 | 98 | 32 | S2NE4 | 360057 | McKenzie | ND |

Annex A-1 - Oil and Gas Leases Subject to this Agreement
Attached to and made part of that certain Exhibit "A"

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Winton Dale Wold, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 1 | Lots 3(29.89), 4(29.83) | | 399037 | McKenzie | ND |
| Winton Dale Wold, A Married Man Dealing In His Sole And Separate Property, Individually And As Heir To The Estate Of Milton T. Wold, Deceased | Great Northern Energy, Inc. | 2/1/2010 | 152 | 98 | 29 | NW4, W2SW4, SE4SW4, SW4SE4 | | 399037 | McKenzie | ND |
| Winton Dale Wold; Mdssp | Great Northern Energy, Inc. | 2/15/2010 | 152 | 98 | 29 | NW,W2SW,SESW,SWSE | | 399003 | McKenzie | ND |
| Wold Alvin Keith | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 379505 | McKenzie | ND |
| Wold Alvin Keith | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 379505 | McKenzie | ND |
| Wold Duane Leon | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 379506 | McKenzie | ND |
| Wold Duane Leon | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 379506 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | NE4 | | 349761 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | SWNE | | 349761 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | SWNE | | 349761 | McKenzie | ND |
| Wold Lynn M Et Ux | Missouri Basin Well Service, Inc. | 5/2/2004 | 153 | 97 | 28 | SWNE | | 349761 | McKenzie | ND |
| Wold Ronald Curtis | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 380014 | McKenzie | ND |
| Wold Ronald Curtis | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 380014 | McKenzie | ND |
| Wold W & A Minerals Trust | St. Mary Land & Exploration Company | 5/12/2008 | 153 | 97 | 33 | N2 | | 381104 | McKenzie | ND |
| Wold W & A Minerals Trust | St. Mary Land & Exploration Company | 5/12/2008 | 153 | 97 | 33 | S2 | | 381104 | McKenzie | ND |
| Wold Winton Dale | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | N2 | | 380880 | McKenzie | ND |
| Wold Winton Dale | St. Mary Land & Exploration Company | 5/16/2008 | 153 | 97 | 33 | S2 | | 380880 | McKenzie | ND |
| Wood River Investment Co., LLC | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 14 | N2NW4 | | 360266 | McKenzie | ND |
| Wood River Investment Company, LLC | Diamond Resources, Inc. | 7/19/2005 | 152 | 98 | 11 | SWSW, E2SW | | 360266 | McKenzie | ND |
| Woodbine Financial Corporation | Diamond Resources, Inc. | 6/13/2008 | 151 | 98 | 28 | N2SW, SESW, SWSE | | 379578 | McKenzie | ND |
| Woodbine Financial Corporation | Zenergy, Inc. | 7/15/2011 | 151 | 98 | 28 | N2SW,SESW,SWSE | | 420434 | McKenzie | ND |
| Yellowstone Boys & Girls | Unknown Lessee | 3/9/2005 | 27 | 59 | 3 | SE/4 | | 367815 | Roosevelt | MT |
| Yellowstone Boys & Girls | Unknown Lessee | 3/9/2005 | 27 | 59 | 10 | E/2E/2 | | 367815 | Roosevelt | MT |

# EXHIBIT "I"

**Attached to and made a part of that certain Joint Operating Agreement dated September 28, 2020 by and between Oasis Petroleum North America LLC, as Operator, and Mirada Wild Basin Holding Company, LLC, et al, as Non-Operators, covering certain lands in North Dakota and Montana.**

## CHART OF AFFILIATE RATES AND CHARGES

| Commodity | Fee/Cost/Expense/Category | Current Rate [1] | Units | Escalation |
|---|---|---|---|---|
| **JIB** | | | | |
| Produced Water | PW Gathering (all types) | $ 1.79 | $/BBL | 2.5% escalation |
| Produced Water | PW Injection (production) | $ 0.65 | $/BBL | 2.5% escalation |
| Produced Water | PW Injection (flowback and other) | $ 1.58 | $/BBL | 2.5% escalation |
| Freshwater | Freshwater | $ 2.54 | $/BBL | 2.5% escalation |
| Gas | Gas Lift [2] | $ 1.26 | $/MCF | 2.5% escalation |

(1) Excludes FL&U and PLA
(2) Rate reduction to $0.50/MCF per DSU 5 years after DSU initial flow of gas lift gas, excludes the Forland DSU

**EXHIBIT "J"**

**OIL BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**JOINT OPERATING AGREEMENT DATED** _____ **September 28, 2020** _____

**BY AND BETWEEN** ___ **OASIS PETROLEUM NORTH AMERICA LLC** _____ , _____ **AS OPERATOR** _____

**AND** _____ **MIRADA WILD BASIN HOLDING COMPANY, LLC, ET AL,** **AS NON-OPERATORS** _____ **("OPERATING AGREEMENT")**

**RELATING TO THE** _____ **AREA,**

___ **See Exhibit "A" to the Operating Agreement** _____ **county, state of** ___ **See Exhibit "A" to the Operating Agreement** _____

**1.    DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Affiliate" shall have the meaning set forth in the Operating Agreement.

1.02 "Arm's Length Agreement" shall mean any oil sales agreement with an unaffiliated purchaser or any oil sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time (for a long term contract, at the time such contract was entered into) for oil of comparable quality and quantity.

1.03 "Balancing Area" shall mean **(select one):**

☑ each well subject to the Operating Agreement that produces Oil or is allocated a share of Oil production. If a single well is completed in two or more producing intervals, each producing interval from which the Oil production is not commingled in the wellbore shall be considered a separate well.

☐ all of the acreage and depths subject to the Operating Agreement.

☐ _____

_____

_____

_____

_____

1.04 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Oil actually produced from the Balancing Area during each month.

1.05 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.06 "Oil" shall mean all hydrocarbons produced or producible from the Balancing Area including oil, condensate and other liquids, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding Gas recovered by field equipment operated for the joint account. "Oil" does not include oil used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to sale or delivery from the Balancing Area.

"Makeup Oil" shall mean any Oil taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.07 "Barrel" means 42 U.S gallons of 231cubic inches per gallon corrected to 60 degrees Farenheit.

1.09 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.10 "Overproduced Party" shall mean any Party having taken a greater quantity of Oil from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Oil produced from the Balancing Area.

1.11 "Overproduction" shall mean the cumulative quantity of Oil taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Oil produced from the Balancing Area.

1.12 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.13 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Oil produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.14 "Royalty" shall mean payments on production of Oil from the Balancing Area to all owners of royalties, overriding Royalties, production payments or similar interests.

"Reference Price" shall mean, if there is a published index for the Balancing Area, such reference price applicable at the time of the sale, and if there is no published index, the average price for which Oil is sold in the geographic area by Operator or its Affiliate where the Balancing Area is located, provided that if the terms of an Oil sales agreement with an Affiliate of the Overproduced Party are reasonable then such terms shall be the Reference Price; provided, further, that any contracts that have been executed on or prior to the execution date of the Operating Agreement, pursuant to which contracts Oil is being sold by Operator to its Affiliates, are deemed Arm's Length Agreements.

1.15 "Underproduced Party" shall mean any Party having taken a lesser quantity of Oil from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Oil produced from the Balancing Area.

1.16 "Underproduction" shall mean the deficiency between the cumulative quantity of Oil taken by a Party and its Percentage Interest in the cumulative quantity of all Oil produced from the Balancing Area.

1.17 ☑ (Optional)

**2.    BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Oil taken from the Balancing Area measured in Barrels.

**3.    RIGHT OF PARTIES TO TAKE OIL**

3.1 Each Party desiring to take Oil will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline or trucking entity and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other

1

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline or trucking entity in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Oil which such Party fails to take. To the extent practicable, such Oil shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Oil. If all such Oil is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Oil taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Oil taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Oil in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production; provided, further, that this limitation shall not apply to the extent there is Oil in excess of such 300% that is not taken by any Party. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Oil can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event **the Operator reasonably determines** that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator / **shall, to the extent practicable, make available to the Underproduced Party(ies) any part of such Party's Full Share of Current Production that such Party fails to take, or** may sell any part of such Party's Full Share of Current Production that such Party fails **pursuant to the provisions of Article VI.G of the Operating Agreement.** to take for the account of such Party / ~~and render to such Party, on a current basis, the full proceeds of the sale, less any~~ ~~reasonable marketing, stabilization, compression, /~~ **fuel, processing** ~~blending, storage, treating, gathering or transportation /~~ **or other** ~~costs deductions, charges and fees (including percentage of production~~ ~~payments), and each case whether paid to third-parties or Affiliates of a Party incurred directly in connection with the sale of~~ ~~such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain~~ ~~such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its~~ ~~markets.~~ The Underproduced Party shall not be charged for any capacity reservation charges, minimum volume commitment charges, or similar charges incurred by the Overproduced Party only when the Underproduced Party is separately disposing of its share of Oil. ~~Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent~~ ~~with the minimum needs of the industry under the particular circumstances, but in no event shall commit such Oil for a period in excess of one~~ ~~year.~~ Notwithstanding the provisions of Article 3.4 hereof, Oil sold by Operator for a Party under the provisions hereof shall be deemed to be Oil taken for the account of such Party. **See Article 14(a). Non-Operator has the right to review the records to the extent that the records relate to Oil sold under such sale.**

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following at least **thirty** (**30**) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Oil taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying **twenty-five** percent (**25**%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Oil. In no event will an Overproduced Party be required to provide more than **twenty-five** percent (**25**%) of its Full Share of Current Production for Makeup Oil. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Oil.

4.2 ☐ **(Optional - Seasonal Limitation on Makeup - Option 1)** ~~Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the _____ (_____) months immediately preceding the Winter Period.~~

4.2 ☑ **(Optional - Seasonal Limitation on Makeup - Option 2)** Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than **zero** percent (**0**%) of its Full Share of Current Production for Makeup Oil during the Winter Period.

4.3 ☐ **(Optional)** ~~Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to _____ percent (_____ %) of such Overproduced Party's Full Share of Current Production.~~

**5. STATEMENT OF OIL BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Oil that each Party is entitled to receive and the volumes of Oil actually taken or sold for each Party's account. Within ~~forty-five / (45) /~~ **sixty (60)** days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Oil actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, and (4) the Overproduction or Underproduction of each Party~~, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter~~. Each Party taking Oil will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder, and each Party shall require that its gatherer, transporter, or purchaser timely furnish such data and information to Operator. To the extent not already allowed as a Direct Charge to the Joint Account, under the applicable Accounting Procedure, or if there is no Accounting Procedure, the Operator may charge the Parties taking in kind, the actual costs of Labor (as defined in the form Accounting Procedure (COPAS form Accounting Procedure) relating to Operator's or its Affiliates employees or consultants for preparation of statements or otherwise administering the take in kind process

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Oil sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Oil shall pay or cause to be paid all ^/ production and severance taxes due on all volumes of Oil actually taken by such Party.

**Royalties and**

6.2 ☑ **(Alternative 1 - Entitlements)** Each Party shall pay or cause to be paid all Royalty due with respect to Royalty

3

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

~~owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.~~

~~6.2.1 ☐ (Optional - For use only with Section 6.2 - Alternative I - Entitlement) Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

6.4 ☑ (Alternative 2 - Sales) Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.5 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7.   CASH SETTLEMENTS**

7.1 Upon the earlier of /(i) the plugging and abandonment of the last producing interval in the Balancing Area, /(ii) the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, ~~or at~~ /(iii) **or (iv) all leases in the Balancing Area have expired,** any time no Oil is taken from the Balancing Area for a period of twelve (12) consecutive months, / any Party may give written notice calling for cash settlement of the Oil production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Oil Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 ☑ (Alternative I - Direct Party-to-Party Settlement) Within sixty (60) days after receipt of the Final Oil Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Oil imbalance settled by the Overproduced Party's payment.

~~7.4 ☐ (Alternative 2 - Settlement Through Operator) Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ (Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator) Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ☑ (Alternative 1 - Historical Sales Basis) The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Oil taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Oil taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

~~7.6 ☐ (Alternative 2 - Most Recent Sales Basis) The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Oil by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any ~~reasonable~~ marketing, ~~compression~~ pumpover, fuel, processing, treating, gathering or transportation costs deductions, charges and fees (including percentage of production payments), and each case whether paid to third-parties or Affiliates of a Party incurred directly in connection with the sale of the Overproduction.

~~7.5.1 ☐ (Optional - For Valuation Under Percentage of Proceeds Contracts) For Overproduction sold under a oil purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.~~

**Notwithstanding anything to the contrary in Section 2.1 f**

~~7.5.2 ☐ (Optional - Valuation for Processed Gas - Option 1) /~~ For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been **(adjusted on a MMBtu basis)** ~~extracted from the Overproduction/~~.

~~7.5.2 ☐ (Optional - Valuation for Processed Gas - Option 2) For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.~~

7.10 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any oil sold from the

4

A.A.P.L. FORM 610 E - GAS BALANCING AGREEMENT - 1992

Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be **"Reference Price", less any marketing, stabilization, compression, fuel, processing, blending, storage, treating, gathering or transportation or other costs, charges and fees (including percentage of production payments) incurred directly in connection with the sale of the Overproduction.** based on the / ~~spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.~~

**"Prime Rate" published in the Wall Street Journal plus one**

7.11  Interest compounded at the ~~rate of /~~_____percent ( __1__ %) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.12  In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.13  ☑ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.

~~7.10 ☐ **(Optional - Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.~~ **(See Article 14 (c))**

**8.  TESTING**

Notwithstanding any provision of this Agreement to the contrary, subject to the prior approval of the Operator, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Oil stream to meet the reasonable deliverability test(s) required by such Party's Oil purchaser, and the right to take any Makeup Oil shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after **thirty** (     **30**) days' prior written notice to the Operator and shall last no longer than **seventy-two** ( **72**     ) hours./ **Consent of Parties then taking all or any part of their share of gas shall be required to conduct testing during Winter Period.**

**9.  OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10.  LIQUIDS**

~~The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.~~

**11.  AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity~~, including but not limited to information regarding Btu-content~~. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Oil from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Oil sold each month and the volumes of Oil used in its own operations, along with the Royalty paid on any such Oil used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12.  MISCELLANEOUS**

12.1  As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any oil sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2  Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3  Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4  This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Oil accounts between the Parties are settled in full, and shall inure to

- 5 -

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992
the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992
the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 ~~If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.~~

12.9 ~~In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service **(select one)** ☐ as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or ☐ based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations.~~

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Oil, all rights to receive or obligations to provide or take Makeup Oil and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Oil or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ☐ ~~**(Optional - Cash Settlement Upon Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least_____(_____) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within **thirty**_____(_____**30**_____) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in~~ **the first day following the closing of** ~~Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning **/** sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.~~

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**14. OTHER PROVISIONS**

    (a)   **"Notwithstanding anything contained herein to the contrary, no agency relationship or other relationship of trust and confidence shall be created by such sale and Operator's sale of production under the terms hereof shall be subject to the terms of Section 12.3 hereof."**

    (b)   **"Notwithstanding anything contained herein to the contrary, it is understood and agreed that any Party may call for a cash settlement as provided in Section 7: (i) at such time as the Balancing Area is included in a unit which causes the change in the Percentage Interest of some or all of the Parties; and (ii) in the event that this Agreement covers a Federal Exploratory Unit, upon the expansion or revision of the participating area which constitutes the Balancing Area. The right to call for a cash settlement hereunder shall be in addition to the rights provided for in Section 7.1."**

A.A.P.L. FORM 610 E - GAS BALANCING AGREEMENT - 1992

**15. COUNTERPARTS**

This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a _____ percent (_____ %) therein fail(s) to execute this Agreement on or before_____, this Agreement shall not be binding upon any Party and shall be of no further force and effect.

IN WITNESS WHEREOF, this Agreement shall be effective as of the ___28th___ day of_ September, 2020.

**ATTEST OR WITNESS:**                                    **OPERATOR**

_Oasis Petroleum North America LLC_____

_____          BY: _____

_____          _Taylor L. Reid_____

                                                   Type or print name

                                                   Title _President and Chief Operating Officer_____

                                                   Date _September_____, 2020_____

                                                   Tax ID or S.S. No. _____


                                                   NON-OPERATORS


                                                   MIRADA WILD BASIN HOLDING COMPANY, LLC,
_____          SIGNING ON BEHALF OF ITSELF, AND AS AGENT FOR, MIRADA
                                                   ENERGY, LLC, MIRADA ENERGY FUND I, LLC, MIRADA F&C LLC,
_____          ORRION ENERGY, LLC, MCP ORION, LLC, MCP HOLDING
                                                   COMPANY, LLC, MIRADA MANAGER, LLC, MIRADA HOLDING
                                                   COMPANY, LLC, BRISBANE PROPERTIES LLC, AND GREAT
                                                   BARRIER ENERGY, LLC._____

                                                   _Adam Boniel_____

                                                   Type or print name

                                                   Title _President_____

                                                   Date _September_____, 2020_____

                                                   Tax ID or S.S. No. _____

_____

_____          _____

_____          BY: _____

                                                   _____

                                                   Type or print name

                                                   Title _____

                                                   Date _____

                                                   Tax ID or S.S. No. _____

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

State of_____)

                         ) ss.

County of_____)

This instrument was acknowledged before me on _____

_____by_____as

_____of **MIRADA WILD BASIN HOLDING COMPANY, LLC**_____,
Mirada Wild Basin Holding Company, LLC, signing on behalf of itself, and as agent for, Mirada Energy, LLC, Mirada Energy Fund I, LLC, Mirada F&C LLC, Orrion Energy, LLC, McP Orion, LLC, MCP Holding Company, LLC, Mirada Manager, LLC, Mirada Holding Company, LLC, Brisbane Properties LLC, and Great Barrier Energy, LLC.

(Seal, if any)                                    _____

                                                 Title (and Rank) _____

                                                 My commission expires: _____

State of_____)

                         ) ss.

County of_____)

A.A.P.L. FORM 610-E - GAS BALANCING AGREEMENT - 1992

This instrument was acknowledged before me on ⎽
_____

_____by
_____as

_____of
_____.

Seal, if any) 24

_____

Title (and Rank) ⎽

_____

My commission expires: ⎽

_____

## EXHIBIT C

## ACKNOWLEDGEMENT OF TERMINATION AND RELEASE OF RELASED CONTRACTS

(See Attached.)

*Exhibit C to Settlement and Mutual Release Agreement*

### ACKNOWLEDGEMENT OF TERMINATION AND RELEASE OF RELEASED CONTRACTS AGREEMENT

This Acknowledgement of Termination and Release of Released Contracts Agreement (this "***Agreement***") is entered into as of September 28, 2020 (the "***Execution Date***"), by and among the following parties (each, individually, a "***Party***" and, collectively, the "***Parties***"):

A. Mirada Energy, LLC, a Colorado limited liability company ("***Mirada Energy***"), Mirada Wild Basin Holding Company, LLC, a Delaware limited liability company ("***Mirada Wild Basin***"), and Mirada Energy Fund I, LLC, a Delaware limited liability company ("***Mirada Energy Fund***" and collectively with Mirada Energy and Mirada Wild Basin, the "***Mirada Group***");

B. Mirada F&C LLC, a Colorado limited liability company ("***Mirada FC***"), Orrion Energy, LLC, a Colorado limited liability company ("***Orrion***"), McP Orion, LLC, a Colorado limited liability company ("***McP***"), MCP Holding Company, LLC, a Colorado limited liability company ("***McP Holding***"), Mirada Manager, LLC, a Colorado limited liability company ("***Mirada Manager***"), Mirada Holding Company, LLC, a Colorado limited liability company ("***Mirada Holding Company***"), Brisbane Properties LLC, a Colorado limited liability company ("***Brisbane***"), and Great Barrier Energy, LLC, a Colorado limited liability company ("***Great Barrier***", and collectively with Mirada FC, Orrion, McP, McP Holding, Mirada Manager, Mirada Holding Company, and Brisbane, the "***Other Mirada Parties***", and collectively with the Mirada Group, the "***Mirada Parties***", and each of the Mirada Parties individually a "***Mirada Party***");

C. Oasis Petroleum Inc., a Delaware corporation ("***OPI***"), Oasis Petroleum North America LLC, a Delaware limited liability company ("***OPNA***"), Oasis Midstream Services LLC, a Delaware limited liability company ("***OMS***"), Oasis Midstream Partners LP, a Delaware limited partnership ("***OMP***"), Bighorn DevCo LLC, a Delaware limited liability company ("***Bighorn DevCo***"), Bobcat DevCo LLC, a Delaware limited liability company ("***Bobcat DevCo***"), and Beartooth DevCo LLC, a Delaware limited liability company ("***Beartooth DevCo***" and collectively with OPI, OPNA, OMS, OMP, Bighorn Devco and Bobcat DevCo, the "***Oasis Parties***" and each an "***Oasis Party***").

### RECITALS

**WHEREAS**, certain of the Parties may have owned or may own oil and gas interests that have been asserted by other Parties to be subject to the Released Contracts (hereinafter defined);

**WHEREAS**, the Oasis Parties and the Mirada Parties desire to acknowledge that the Released Contracts are no longer in force and effect and are terminated as among themselves; and

**WHEREAS,** the Parties desire to enter into this Agreement for (i) the Mirada Parties to acknowledge that they no longer have any rights, title or interests in or pursuant to the Released Contracts as against the Oasis Parties and their Affiliates and (ii) all Parties to agree to the termination of the Released Contracts, and agree that as among themselves the Released Contracts are no longer in force and effect.

1

**NOW, THEREFORE**, for and in consideration of the execution of this Agreement, the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.      Definitions.  In addition to terms defined elsewhere in this Agreement, which shall have the meanings as elsewhere defined herein, as used in this Agreement, the following terms shall have the meanings set forth below:

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" and its derivatives means, when used with respect to any Person, (A) the direct or indirect ownership of at least 50% of the Equity Interests in such Person or (B) the possession, directly or indirectly, of the power to direct, or cause or influence the direction of, the management of such Person, whether through ownership of voting securities, by Contract, or otherwise.  References herein to "Affiliates" includes any Person that is an Affiliate existing as of the Execution Date or in the future.  Affiliate with respect to a natural Person also includes the spouse, parents and children of such Person.

"*Applicable Law*" means all foreign, federal, state, local, county or municipal laws, statutes, codes, acts, treaties, ordinances, Orders, rules, regulations, charges, permits and requirements of all Governmental Authorities having jurisdiction over any Party or any asset of the Parties, as applicable.

"*Contract*" means any legally-binding contract, agreement, license, sublicense, assignment, undertaking or instrument of any kind, obligation or other arrangement, in each case, whether oral or written, including any amendments and other modifications thereto.

"*Equity Interest*" means (a) any shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust, other equity ownership interests in a Person, and any other interest that confers on a Person the right to receive a share of any profit or loss of, or distribution of any asset of, a Person or the right to appoint or vote to appoint any Person on the governing body of a Person, (b) any warrants, options or other rights entitling the holder thereof to purchase or acquire any interest described in Clause (a), and (c) any securities convertible into, or exercisable or exchangeable for, any interest described in Clause (a).

"*Governmental Authority*" means any (a) federal, state, county, municipal or local government (whether domestic or foreign) or any political subdivision thereof, (b) any court or administrative tribunal, (c) any other governmental, quasi-governmental, judicial, regulatory, public or statutory instrumentality, authority, body, agency, bureau, tribal government or authority, taxing authority or entity of competent jurisdiction, or (d) any arbitrator with authority to bind a party at law.

"*Order*" means any legally binding award, injunction, judgment, decree, order, writ, prohibition, ruling, subpoena, verdict or other decision issued, promulgated or entered by or with any Governmental Authority (including an arbitrator of competent jurisdiction), applicable directly to any Party.

2

"*Person*" means any individual, corporation, partnership, joint venture, trust, limited liability company, limited liability limited partnership, unincorporated organization or other entity or any Governmental Authority.

"*Released Contracts*" means:

(a)      the Participation Agreement (Chesapeake Purchase), dated March 16, 1999, by and among Zavanna, LLC, Palace Exploration Company and Zinke & Trumbo, Inc., as amended by that certain Amendment to Participation Agreement (Chesapeake Purchase), dated April 15, 2005 (but effective as of March 16, 2003), by and among Zavanna, LLC, Palace Exploration Company and RZ, Inc. (the "*Chesapeake PA*");

(b)      the Operating Agreement(s) referenced in or arising from Section 6 of the Chesapeake PA, including the Operating Agreement, dated March 16, 1999, by and between Bistate Oil Management Corporation, Zavanna, LLC and Zinke & Trumbo, Inc.;

(c)      the Participation Agreement (Wild Basin), dated January 21, 2005, by and among Split Creek Enterprises, LLC, Wild Basin Oil and Gas, LLC, Cody Oil and Gas Corp., Palace Exploration Company, Zinke & Trumbo, Inc., RZ, Inc. and Zavanna, LLC (the "*WBI PA*");

(d)      the Operating Agreement(s) referenced in or arising from Section 6 of the WBI PA, including the Operating Agreement, dated January 21, 2005, by and among Zinke & Trumbo, Inc., Palace Exploration Company, Zavanna, LLC, RZ, Inc., Split Creek Enterprises, LLC, Wild Basin Oil and Gas, LLC and Cody Oil and Gas Corp.;

(e)      the Participation Agreement (Wild Basin II), dated May 17, 2005, by and among Zavanna, LLC, Mirada Energy, LLC, Split Creek Enterprises, LLC, Wild Basin Oil and Gas, LLC and Cody Oil and Gas Corp. (the "*WBII PA*");

(f)      the Operating Agreement(s) referenced in or arising from Section 5 of the WBII PA;

in each case, (x) including any other Contract that is, or is in a form, attached thereto, and (y) without limiting the generality of Section 5(b), each reference to a Contract in this definition includes any amendment or modification thereto.

2.      Termination of Released Contracts.  The Parties on behalf of themselves, and their respective Affiliates, do hereby agree that the Released Contracts are terminated and agree that as among themselves the Released Contracts are no longer in force and effect.

3.      Agreement is Legally Binding.  The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each Party and their Affiliates and the respective successors, permitted assigns, executors, administrators, heirs, and estates of such Party or its Affiliates.

4.      Entire Agreement; Amendments; Waivers.  Other than the Settlement and Mutual Release Agreement between the Parties dated as of September 28, 2020, this Agreement

3

constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof and thereof.  No amendment or modification of, or waiver of any rights under, this Agreement shall be binding unless in writing and signed by each Party.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  No failure to exercise, and no delay in exercising, by any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

5.      <u>Interpretation</u>.  The headings within this Agreement are purely for convenience and are not to be used as an aid in interpretation.  The terms and provisions of this Agreement were arrived at by mutual negotiation.  Any rule of construction to the effect that ambiguities are resolved against the drafting Party does not apply to the interpretation or construction of this Agreement.  Except where otherwise expressly provided, or unless the context otherwise necessarily requires, in this Agreement: (a) any reference to any Section or Clause shall be to sections or clauses of this Agreement; (b) any reference to any Contract (including this Agreement) or other document shall be construed as a reference to such Contract or document as the same may have been, or may from time to time be, amended, supplemented, substituted, novated, assigned or otherwise transferred; (c) any reference to "herein," "herewith," "hereof" or "hereunder" shall be deemed to be a reference to this Agreement as a whole and not limited to the particular Section or Clause in which the relevant reference appears; (d) the use of "or", "either" or "any" shall not be exclusive; (e) references to any Person shall include any successors and permitted assigns of such Person; (f) references to the term "include", "includes" or "including" mean "include, without limitation", "includes, without limitation" or "including, without limitation"; (g) words importing the singular include the plural and vice versa and the masculine, feminine and neuter genders include all genders; and (h) references to any Applicable Law (including any law referenced in this Agreement) are to be construed as references to the same as it may have been, or may from time to time be, amended, modified or reenacted.

6.      <u>Counterparts</u>.  This Agreement may be executed by each Party in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute but one and the same instrument.  The delivery of signed counterparts by facsimile or electronic transmission that includes a copy of a Party's signature(s) is as effective as such Party signing and delivering an original of such counterpart.

7.      <u>Assistance and Cooperation</u>.  Each Party shall execute and deliver to any other Party all instruments, and do such further acts, as such other Party may reasonably request of such Party as necessary to effect this Agreement.

8.      <u>Severability</u>.  If a court of competent jurisdiction determines that any provision of this Agreement is void, illegal, or unenforceable, the other provisions of this Agreement shall remain in full force and effect and, if possible, such provision which is determined to be void, illegal, or unenforceable shall be limited so that it shall remain in effect to the maximum extent permissible by Applicable Law.

4

5

9.     <u>Miscellaneous</u>.  No Party shall assign any right or obligation under this Agreement without the prior written consent of the other Parties which consent may be withheld for any reason, and any such assignment or delegation made without such consent shall be void.

**[Signature and Acknowledgment Pages Follow.]**

**IN WITNESS WHEREOF**, and intending to be legally bound, each of the Parties has caused this Agreement to be executed as of the Execution Date.

**Oasis Petroleum Inc.**

By: _____

Name: _____

Title: _____

STATE OF TEXAS                              §

COUNTY OF HARRIS                       §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Oasis Petroleum Inc., a Delaware corporation, on behalf of said corporation.

_____

Notary Public in and for the State of  Texas

**Oasis Petroleum North America LLC**

By: _____

Name: _____

Title: _____

STATE OF TEXAS                              §

COUNTY OF HARRIS                       §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Oasis Petroleum North America LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of  Texas

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Oasis Midstream Services LLC**

By: _____
Name: _____
Title: _____

STATE OF TEXAS                         §

COUNTY OF HARRIS                       §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Oasis Midstream Services LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public in and for the State of Texas

**Oasis Midstream Partners LP**

By: OMP GP LLC, its General Partner

By: _____
Name: _____
Title: _____

STATE OF TEXAS                         §

COUNTY OF HARRIS                       §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for OMP GP LLC, the general partner of Oasis Midstream Partners LP, a Delaware limited partnership, on behalf of said limited partnership.

_____
Notary Public in and for the State of Texas

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Bighorn Devco LLC**

By: _____

Name: _____

Title: _____

STATE OF TEXAS                    §

COUNTY OF HARRIS                  §

        This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Bighorn Devco LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public in and for the State of  Texas

**Bobcat Devco LLC**

By: _____

Name: _____

Title: _____

STATE OF TEXAS                    §

COUNTY OF HARRIS                  §

        This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Bobcat Devco LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public in and for the State of  Texas

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Beartooth Devco LLC**

By: _____
Name: _____
Title: _____

STATE OF TEXAS                                    §

COUNTY OF HARRIS                                 §

     This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Beartooth Devco LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public in and for the State of  Texas

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Mirada Energy, LLC**

By: _____
Name: _____
Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____,
2020 by _____, as _____
for Mirada Energy LLC, a Colorado limited liability company, on behalf of said limited liability
company.

_____
Notary Public in and for the State of

_____

**Mirada Wild Basin Holding Company, LLC**

By: _____
Name: _____
Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____,
2020 by _____, as _____
for Mirada Wild Basin Holding Company, LLC, a Delaware limited liability company, on behalf
of said limited liability company.

_____
Notary Public in and for the State of

_____

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Mirada Energy Fund I, LLC**

By: _____

Name: _____

Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Mirada Energy Fund I, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of

_____

**Orrion Energy, LLC**

By: _____

Name: _____

Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Orrion Energy, LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of

_____

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Mirada F&C LLC**

By: _____
Name: _____
Title: _____

STATE OF _____ §

COUNTY OF _____ §

    This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Mirada F&C LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____
Notary Public in and for the State of
_____

**McP Orion, LLC**

By: _____
Name: _____
Title: _____

STATE OF _____ §

COUNTY OF _____ §

    This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for McP Orion, LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____
Notary Public in and for the State of
_____

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Great Barrier Energy, LLC**

By: _____

Name: _____

Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Great Barrier Energy, LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of

_____

**MCP Holding Company, LLC**

By: _____

Name: _____

Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for MCP Holding Company, LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of

_____

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Mirada Manager, LLC**

By: _____

Name: _____

Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Mirada Manager, LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of

_____

**Mirada Holding Company, LLC**

By: _____

Name: _____

Title: _____

STATE OF _____ §

COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Mirada Holding Company, LLC, a Colorado limited liability company, on behalf of said limited liability company.

_____

Notary Public in and for the State of

_____

*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*

**Brisbane Properties LLC**


By: _____
Name: _____
Title: _____


STATE OF _____ §


COUNTY OF _____ §


    This instrument was acknowledged before me on this _____ day of _____, 2020 by _____, as _____ for Brisbane Properties LLC, a Colorado limited liability company, on behalf of said limited liability company.


_____
Notary Public in and for the State of

_____


*Signature and Acknowledgement Page to Acknowledgement of Termination and Release of Released Contracts*